*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GASTAR EXPLORATION INC., *et al.*,[1] | § | Case No. 18-_____ (__) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

## DISCLOSURE STATEMENT
## RELATING TO THE DEBTORS' JOINT PREPACKAGED PLAN OF
## REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Ross M. Kwasteniet, P.C. (*pro hac vice* admission pending)
John R. Luze (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

-and-

Anna G. Rotman, P.C. (TX 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:  (713) 836-3600
Facsimile:  (713) 836-3601
Email:  anna.rotman@kirkland.com

Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221
Email:   ptomasco@jw.com
            mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  October 26, 2018

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Gastar Exploration Inc. (1640), and Northwest Property Ventures LLC (8685).  The location of the Debtors' service address is:  1331 Lamar Street, Suite 650, Houston, Texas 77010.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF GASTAR EXPLORATION INC. AND ITS DEBTOR AFFILIATE PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, CERTAIN HOLDERS OF CLAIMS AND INTERESTS THAT EXECUTED THE RSA, AND CERTAIN HOLDERS OF CLAIMS THAT EXECUTED THE HEDGE PARTY RSA INCLUDING HOLDERS OF 100% OF THE TERM LOAN CLAIMS, HOLDERS OF 100% OF THE SECOND LIEN NOTES CLAIMS, HOLDERS OF 25.9% OF THE EXISTING COMMON INTERESTS, AND HOLDERS OF 100% OF THE HEDGE CLAIMS.  THE DEBTORS URGE HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A

RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- TECHNOLOGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- ENVIRONMENTAL LIABILITIES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;

- DEVELOPMENTS IN OIL-PRODUCING AND NATURAL GAS-PRODUCING COUNTRIES;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**

- **RISKS IN CONNECTION WITH ACQUISITIONS;**

- **THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND**

- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS AND ENVIRONMENTAL COSTS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................................1

II.  PRELIMINARY STATEMENT .........................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
PLAN .......................................................................................................................................4

    A.  What is chapter 11? ....................................................................................................4
    B.  Why are the Debtors sending me this Disclosure Statement? ....................................4
    C.  Am I entitled to vote on the Plan? ..............................................................................4
    D.  What will I receive from the Debtors if the Plan is consummated? ...........................5
    E.  What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
        Claim, or a Priority Tax Claim? .................................................................................9
    F.  Are any regulatory approvals required to consummate the Plan? .............................10
    G.  What happens to my recovery if the Plan is not confirmed or does not go effective? ..................10
    H.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
        Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
        "Consummation?" .....................................................................................................10
    I.  What are the sources of Cash and other consideration required to fund the Plan? .......................10
    J.  Are there risks to owning the New Common Equity upon emergence from chapter 11? ...............10
    K.  Is there potential litigation related to the Plan? .......................................................11
    L.  What is the Management Incentive Plan and how will it affect the distribution I receive
        under the Plan? .........................................................................................................11
    M.  Will the final amount of Allowed General Unsecured Claims affect the recovery of
        holders of Allowed General Unsecured Claims under the Plan? ..............................11
    N.  How will the preservation of the Causes of Action impact my recovery under the Plan? ............11
    O.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ............12
    P.  What is the deadline to vote on the Plan? ................................................................15
    Q.  How do I vote for or against the Plan? .....................................................................15
    R.  Why is the Bankruptcy Court holding a Confirmation Hearing? .............................16
    S.  What is the purpose of the Confirmation Hearing? ..................................................16
    T.  What is the effect of the Plan on the Debtors' ongoing businesses? ........................16
    U.  Will any party have significant influence over the corporate governance and operations of
        the Reorganized Debtors? .........................................................................................16
    V.  Who do I contact if I have additional questions with respect to this Disclosure Statement
        or the Plan? ...............................................................................................................17
    W.  Do the Debtors recommend voting in favor of the Plan? .........................................17

IV.  THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ................17

    A.  Restructuring Support Agreements ...........................................................................17
    (i)  RSA ..........................................................................................................................17
    (ii)  Hedge Party RSA .....................................................................................................18
    B.  The Plan ....................................................................................................................18

V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ...........22

    A.  Gastar's Corporate History, Key Assets, and Operations ........................................22
    B.  The Debtor's Prepetition Capital Structure ..............................................................24

VI.  EVENTS LEADING TO THE CHAPTER 11 FILINGS ...................................................27

    A.  Post-2017 Refinancing Operational Challenges and Marketing Efforts ..................27
    B.  Financial Responses and the 2017 Refinancing .......................................................28

|       | C.   | The Restructuring Negotiations, Temporary Waiver, and Forbearance Agreement | 30 |
|       | D.   | Exploration of Strategic Alternatives | 31 |
| **VII.** | **RISK FACTORS** | | **32** |
|       | A.   | Bankruptcy Law Considerations | 32 |
|       | B.   | Risks Related to Recoveries under the Plan | 35 |
|       | C.   | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 36 |
| **VIII.** | **CERTAIN SECURITIES LAW MATTERS** | | **40** |
|       | A.   | New Common Equity and New Warrants | 40 |
|       | B.   | Issuance and Resale of New Common Equity and Warrants | 41 |
|       | C.   | Resales of New Common Equity and Warrants; Definition of Underwriter | 41 |
|       | D.   | New Common Equity & Management Incentive Plan | 43 |
|       | E.   | Restrictions Related to the New Warrants | 43 |
| **IX.** | **SOLICITATION AND VOTING PROCEDURES** | | **45** |
|       | A.   | Holders of Claims Entitled to Vote on the Plan | 45 |
|       | B.   | Voting Record Date | 45 |
|       | C.   | Voting on the Plan | 45 |
|       | D.   | Ballots Not Counted | 46 |
| **X.** | **CONFIRMATION OF THE PLAN** | | **46** |
|       | A.   | Requirements for Confirmation of the Plan | 46 |
|       | B.   | Best Interests of Creditors/Liquidation Analysis | 46 |
|       | C.   | Feasibility | 47 |
|       | D.   | Acceptance by Impaired Classes | 47 |
|       | E.   | Confirmation without Acceptance by All Impaired Classes | 48 |
|       | F.   | Valuation of the Debtors | 49 |
| **XI.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | **49** |
|       | A.   | Introduction | 49 |
|       | B.   | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors | 50 |
|       | C.   | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims | 54 |
|       | D.   | Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims | 59 |
|       | E.   | Information Reporting and Back-Up Withholding | 62 |
| **XII.** | **RECOMMENDATION** | | **63** |

**EXHIBITS[2]**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    RSA

EXHIBIT C    Hedge Party RSA

EXHIBIT D    Liquidation Analysis

EXHIBIT E    Financial Projections

---

[2]    Each Exhibit is incorporated herein by reference.

## I.      INTRODUCTION

Gastar Exploration Inc. and its debtor affiliate, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), dated October 26, 2018.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS, CERTAIN HOLDERS OF CLAIMS AND INTERESTS WHO EXECUTED THE RSA, AND CERTAIN HOLDERS OF CLAIMS WHO EXECUTED THE HEDGE PARTY RSA SUPPORT THE PLAN, INCLUDING HOLDERS OF 100% OF THE TERM LOAN CLAIMS, HOLDERS OF 100% OF THE SECOND LIEN NOTES CLAIMS, HOLDERS OF 25.9% OF THE EXISTING COMMON INTERESTS, AND HOLDERS OF 100% OF THE HEDGE CLAIMS.  THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

The Debtors are a pure-play, independent E&P company engaged in the exploration, development, and production of oil and condensate, natural gas, and natural gas liquids ("NGLs").  The Debtors' principal business activities include the identification, acquisition, and subsequent exploration and development of oil and natural gas properties with an emphasis on unconventional reserves, such as shale resource plays.  The Debtors' principal operations are conducted in the Sooner Trend of the Anadarko Basin in Canadian and Kingfisher Counties, Oklahoma, commonly referred to as the "STACK" shale play.  Headquartered in Houston, Texas, the Debtors employ approximately 40 individuals.  As of the Petition Date, the Debtors had not less than $446.4 million in aggregate funded-debt obligations, including approximately $283.9 million in outstanding principal amount of secured first lien term loans and $162.5 million in outstanding principal amount of secured convertible second lien notes.  Gastar also has two series of preferred stock outstanding, with an aggregate stated liquidation preference of approximately $154.6 million.

The oil and gas industry began a steep decline in late 2014 in response to rapidly declining oil prices, resulting in a sustained, historic downturn.  Over the past three years, the Debtors have taken a number of steps to forestall the need for a chapter 11 filing, even while many of their peers have pursued in-court restructurings.  Specifically, the Debtors have consummated a series of liquidity-enhancing transactions, including a number of equity raises and non-core asset sales, as well as a comprehensive balance sheet refinancing in the spring of 2017 (the "2017 Refinancing") that refinanced near term maturing indebtedness, resulted in a modest de-leveraging, and included a substantial equity investment.

The Debtors hoped that the 2017 Refinancing would allow them to weather the industry storm, while also de-risking their STACK asset base, utilizing funding from their DrillCo Venture (discussed

---

[1]     Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

below) and other liquidity sources. For the reasons described below, including the unplanned early termination of the DrillCo Venture, coupled with drilling and completion cost overruns, lower than expected production performance, higher than anticipated operated working interest, additional land costs, and non-operated drilling activity, the Debtors expended nearly $100 million more in capital than originally projected in the time since the 2017 Refinancing. Additionally, in an attempt to streamline operations and preserve liquidity, the Debtors made several cost-saving changes in their drilling operations that did not have the intended effect—ultimately leading to substantially worse well performance than projected. In an attempt to bolster liquidity to maintain its capital spending program, the Debtors executed several asset divestitures, ultimately resulting in their becoming a pure-play STACK operator. Beginning in July 2017, the Debtors launched a process seeking proposals for a merger or sale of the Debtors' entire business, ultimately to no avail. All of these measures were aimed at avoiding what has now become inevitable—an in-court restructuring.

Gastar no longer has the liquidity to fund its day-to-day operations, much less a robust drilling program, and its extensive marketing process has shown that the Debtors are unable to refinance their debt or attract new capital to continue their operations on an out-of-court basis. Against this challenging backdrop, the Debtors have secured committed new money financing up to $100 million under the DIP Facility (which will ultimately convert to the First Lien Exit Facility)[2]—the only financing available to the Debtors at this time—negotiated as a pre-packaged restructuring embodied in the Plan that will deleverage the balance sheet, leave operational obligations unimpaired, and facilitate a plan that benefits the majority of stakeholders from these chapter 11 cases.

The terms of the Debtors' restructuring are embodied in the RSA, a copy of which is attached hereto as **Exhibit B**. The RSA is supported by the Debtors' largest (and only) funded-debt creditors and largest common shareholders, certain funds affiliated with Ares Management LLC (collectively, "Ares"). The RSA contemplates a series of transactions that will eliminate more than $300 million of the Debtors' funded-debt obligations and preferred equity interests, provide $100 million in new-money committed financing to fund the Debtors' businesses in and upon emergence from chapter 11, and minimize the time and administrative costs associated with the Debtors' chapter 11 cases. These terms are reflected in the Plan. Upon consummation of this restructuring, the Debtors will be positioned to capitalize on their attractive asset base as the industry looks to recover from the oil price downturn.

The process that ultimately resulted in the RSA and Plan began in earnest in May 2018. At that time, facing an increasingly tight liquidity outlook, and dearth of comprehensive sale, merger, or refinancing options, Gastar's board of directors (the "Board"), as well as a special transaction committee (the "Special Committee"), began to consider other strategic alternatives. With limited liquidity to fund a long-term drilling program and the inability to further decrease capital expenditures or divest non-core assets to extend Gastar's liquidity runway, it became clear to the Board that it was necessary to pursue a transformative transaction, including potentially through a chapter 11 filing.

Prior to commencing chapter 11 cases, however, the Board determined to go to the market once more to solicit comprehensive out-of-court merger, sale, financing, and refinancing proposals pursuant to a process, described in greater detail below, beginning in June 2018 and running through October 1, 2018 (the "Bid Deadline"). The Debtors received three bids on the Bid Deadline, none of which contemplated a cash bid that cleared the Debtors' existing funded debt and each of which contemplated a stock-based "business combination" that was contingent on a restructuring or elimination of the Ares debt prior to or contemporaneously with the business combination. Ares indicated that it would not support any of the bids. Ultimately, the Board determined that none of these proposals presented an actionable alternative.

---

[2]    The DIP Facility also contemplates a "roll-up" of $283.9 million of prepetition first lien term loan obligations.

In parallel with the prepetition marketing process, the Debtors engaged with Ares regarding a comprehensive restructuring transaction. After extensive, arm's-length negotiations that played out over several months and concluded following the Bid Deadline, Ares and the Debtors arrived at the transactions embodied in the RSA. The Debtors have now reached the end of their liquidity runway and failure to take action would likely result in damage to the Debtors' core business, to the detriment of all stakeholders. Ultimately, the RSA and the Plan represent the best (and only) alternative available to the Debtors after extensively canvassing the market in the time since the 2017 Refinancing—an effort spanning more than 15 months.

The RSA contemplates and the Plan reflects the following stakeholder recoveries:

- holders of Administrative Claims and Priority Claims, as well as General Unsecured Claims, will receive payment in full in cash;

- all drawn amounts under the DIP Facility will roll over into the First Lien Exit Facility, with all undrawn commitments remaining available to fund the Debtors' post-emergence cash needs, including drilling operations;

- holders of all Allowed Hedge Claims will receive payment in cash over monthly installments concluding by December 2019 pursuant the Hedge Party Secured Notes;[3]

- holders of all Allowed Statutory Lien Claims will receive payments in two installments, one on the Effective Date and one on the date that is six months after the Effective Date;

- Ares will receive $200 million in new take-back term loans and 100 percent of the common equity of reorganized Gastar on account of approximately $283.9 million in DIP Claims that will have refinanced an equivalent amount of Term Loan Claims and approximately $162.5 million in Second Lien Notes Claims; and

- holders of Existing Preferred Interests and Existing Common Interests will receive new warrants exercisable for up to 5% in the aggregate of the common equity of reorganized Gastar in exchange for their not seeking official committee status or the appointment of a trustee or examiner, and their agreement not to object to or oppose the Debtors' restructuring efforts.

The RSA contains certain milestones (the "Milestones"), including securing an order confirming the Plan within 60 days following the Petition Date, and emergence from chapter 11 within 20 days following confirmation of the Plan. The Debtors believe they can confirm a plan of reorganization and emerge from chapter 11 within these time periods, thereby preserving the value inherent in the RSA, without prejudicing the ability of any parties to assert their rights in these chapter 11 cases.

The Debtors' actions over the past several years, taken together, have given existing equity holders a prolonged option period during a time when many of the Debtors' peers implemented restructuring transactions that resulted in little or no recovery to existing equity. After years of efforts on the part of the Debtors to avoid chapter 11, the Debtors now need to restructure. An extensive, multi-phase marketing process clearly indicates that the transactions contemplated by the RSA and Plan are fair and appropriate.

The RSA is a significant achievement for the Debtors in the wake of a historically challenging operating environment. The Debtors strongly believe that the Plan is in the best interests of the Debtors'

---

3    The Debtors and their hedge counterparties executed the separate Hedge Party RSA, attached hereto as **Exhibit C**.

estates, and represents the best available alternative at this time.  Given the Debtors' core strengths, including their experienced management team and the strategic location of their assets, the Debtors are confident that they can implement the RSA's balance sheet restructuring to ensure the Debtors' long-term viability. For these reasons, the Debtors strongly recommend that holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Hedge Party Claims | Impaired | Entitled to Vote |
| Class 4 | Statutory Lien Claims | Impaired | Entitled to Vote |

4

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 5 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 6 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 9 | Interests in Debtors other than Gastar | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 10 | Existing Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Existing Common Interests and Subordinated Securities Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.     What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

Provided that a DIP Toggle Event has not occurred, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent that a holder of an Allowed Claim or Allowed Interest agrees to a less favorable treatment.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

| SUMMARY OF EXPECTED RECOVERIES | | | |
|-------|----------------|------------------------------|--------------------------|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims |
| Class 1 | Other Secured Claims | Each holder of an Allowed Class 1 Claim shall receive, at the option of the applicable Debtor, with the consent (such consent not to be unreasonably withheld) of the Consenting Parties: (i) payment in full in Cash of its Allowed Class 1 Claim; (ii) the collateral securing its Allowed Class 1 Claim; (iii) Reinstatement of its Allowed Class 1 Claim; or (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code | $0 |

---

[4]     The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims |
| Class 2 | Other Priority Claims | Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim on the later of (a) the Effective Date or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract, or other agreement giving rise to such Allowed Class 2 Claim. | $0 |
| Class 3 | Hedge Party Claims | Each holder of an Allowed Class 3 Claim shall receive Cash in an amount equal to 100% of the Allowed amount of such holder's Claims, payable in the following installment: (a) on the Effective Date, an amount equal to the product of (i) the number of monthly settlement payments that would have occurred after the Hedge Termination Date and on or prior to the Effective Date had the Hedge Claims not been liquidated divided by 14 and (ii) the applicable Hedge Party Claims Payment Amount with respect to such holder; and (b) the remaining amount of the Hedge Party Claims Payment Amount with respect to such holder in equal monthly installments beginning on the first day of the first month following the Effective Date and ending on December 1, 2019, pursuant to the Hedge Party Secured Notes. | $13.3 million |
| Class 4 | Statutory Lien Claims | Each holder of an Allowed Class 4 Claim shall receive: (a) on the Effective Date, cash in an amount equal to 50% of the Allowed amount of such holder's Allowed Class 4 Claim; and (b) on the date that is six months following the Effective Date, cash in an amount equal to the remaining 50% of the Allowed amount of such holder's Allowed Class 4 Claim. | $8.9 million |
| Class 5 | Term Loan Claims | Each holder of an Allowed Class 5 Claim shall receive: (a) only to the extent there is remaining availability under the Second Lien Exit Facility after the refinancing and satisfaction of all Allowed DIP Claims in accordance Article II.B of the Plan, its Pro Rata share of participation in such remaining availability under the Second Lien Exit Facility in an equal face amount not to exceed $200 million; and (b) to the extent there are remaining Allowed Class 5 Claims not refinanced or otherwise satisfied pursuant to the Second Lien Exit Facility (which remaining amounts shall constitute Equitized Senior Obligations), its Pro Rata share (measured by reference to the aggregate amount of Equitized Senior Obligations, Second Lien Notes Claims, and, as applicable upon the occurrence of a DIP Toggle Event, General Unsecured Claims) of 100% of the New Common Equity, subject to dilution on account of, as applicable, the Management Incentive Plan and the New Warrants. | $283.9 million[5] |

---

[5]   The DIP Facility contemplates a "roll-up" of the $283.9 million in Term Loan Claims.

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims |
| Class 6 | Second Lien Notes Claims | Each holder of an Allowed Class 6 Claim shall receive its Pro Rata share (measured by reference to the aggregate amount of Equitized Senior Obligations, Second Lien Notes Claims, and, as applicable upon the occurrence of a DIP Toggle Event, General Unsecured Claims) of 100% of the New Common Equity, subject to dilution on account of, as applicable, the Management Incentive Plan and the New Warrants. | $162.5 million |
| Class 7 | General Unsecured Claims | Each holder of an Allowed Class 7 Claim shall receive Cash in an amount equal to such Allowed General Unsecured Claim on the later of: (i) the Effective Date; or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claim. | $0.5 million – $2.5 million |
| Class 8 | Intercompany Claims | Class 8 Claims shall be, at the option of the Debtor, with the consent (such consent not to be unreasonably withheld) of the Consenting Parties, either Reinstated or cancelled and released without any distribution. | N/A |
| Class 9 | Interests in Debtors other than Gastar | Class 9 Interests shall be, at the option of the Debtor, with the consent (such consent not to be unreasonably withheld) of the Consenting Parties, either Reinstated or cancelled and released without any distribution. | N/A |
| Class 10 | Existing Preferred Interests | Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests.  To the extent no holders of Class 10 Interests or Class 11 Interests seek appointment of an official committee of equity security holders, seek the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transactions, Confirmation of the Plan, or entry of the DIP Orders, holders of Class 10 Interests shall receive their Pro Rata share of the New Preferred Warrants.  If any holder of Class 10 Interest or Class 11 Interests seeks appointment of an official committee of equity security holders, seek the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transactions, Confirmation of the Plan, or entry of the DIP Orders, holders of Class 10 Interests shall not receive the New Preferred Warrants. | N/A |
| Class 11 | Existing Common Interests and Subordinated Securities Claims | Class 11 Claims and Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 11 Claims and Interests will not receive any distribution on account of such Class 11 Claims and Interests.  To the extent no holders of Class 11 Claims and Interests or holders of Class 10 Interests seek appointment of an official committee of equity security holders, seek the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transactions, | N/A |

| | | SUMMARY OF EXPECTED RECOVERIES | |
| --- | --- | --- | --- |
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims |
| | | Confirmation of the Plan, or entry of the DIP Orders, holders of Class 11 Claims and Interests shall receive their Pro Rata share of the New Common Warrants.  If any holder of Class 11 Claims and Interests or holders of Class 10 Interests seeks appointment of an official committee of equity security holders, seek the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transactions, Confirmation of the Plan, or entry of the DIP Orders, holders of Class 11 Claims and Interests shall not receive the New Common Warrants. | |

Notwithstanding anything to the foregoing or contrary in this Plan, in the event that a DIP Toggle Event has occurred, each holder of an Allowed Claim or Allowed Interest, as applicable, in Class 7, Class 10, and Class 11 shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent that a holder of an Allowed Claim or Allowed Interest agrees to a less favorable treatment.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.  For the avoidance of doubt, all holders of Allowed Claims or Allowed Interests, as applicable, in Classes other than Class 7, Class 10, or Class 11 shall receive the treatment applicable to such Allowed Claims or Allowed Interests, as applicable, prescribed under Article III.B of the Plan.

| | | SUMMARY OF EXPECTED RECOVERIES | |
| --- | --- | --- | --- |
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims |
| Class 7 | General Unsecured Claims | Each holder of an Allowed Class 7 Claim shall receive its Pro Rata share (measured by reference to the aggregate amount of Equitized Senior Obligations, Second Lien Notes Claims, and General Unsecured Claims) of 100% of the New Common Equity, subject to dilution on account of, as applicable, the Management Incentive Plan. | $0.5 million – $2.5 million |
| Class 10 | Existing Preferred Interests | Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests. | NA |
| Class 11 | Existing Common Interests and Subordinated Securities Claims | Class 11 Claims and Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 11 Claims and Interests will not receive any distribution on account of such Class 11 Claims and Interests. | NA |

Upon the occurrence of a DIP Toggle Event and prior to the Confirmation Hearing, the Debtors, after consultation and with the consent of the Consenting Parties, shall implement such other technical modifications to the Plan as are necessary to implement the Restructuring Transactions consistent with the foregoing.

**E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### 2.    DIP Claims

Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, (a) each holder of an Allowed DIP Claim arising on account of the New Money DIP Loans shall receive its Pro Rata share of participation in the First Lien Exit Facility in an amount equal to such Allowed DIP Claims outstanding on the Effective Date, (b) each holder of an Allowed DIP Claim, other than Allowed DIP Claims arising on account of the New Money DIP Loans, shall receive its Pro Rata share of participation in the Second Lien Exit Facility in an equal face amount up to an aggregate amount of $200 million, and (c) each holder of any remaining Allowed DIP Claims not refinanced or otherwise satisfied pursuant to the First Lien Exit Facility or Second Lien Exit Facility (which shall constitute Equitized Senior Obligations) shall receive such holder's Pro Rata share (measured by reference to the aggregate amount of Equitized Senior Obligations, Second Lien Notes Claims, and, as applicable upon the occurrence of a DIP Toggle Event, General Unsecured Claims) of 100% of the New Common Equity, subject to dilution on account of, as applicable, the New Warrants and the Management Incentive Plan (such treatment, the "DIP Facility Payoff").  Notwithstanding the foregoing, the Consenting Parties shall have the right to reduce the principal amount of the Second Lien Exit Facility in such amount as they may determine on or prior to the Effective Date.

Unless and until the DIP Facility Payoff has occurred, notwithstanding entry of the Confirmation Order and anything to the contrary in this Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens securing the DIP Claims shall be deemed to have been waived, released, satisfied or discharged, in whole or in part, and (iii) none of the DIP Loan Documents

9

shall be deemed terminated, discharged, satisfied or released or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

### 3.   Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.E of the Plan, as summarized herein. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### F.   Are any regulatory approvals required to consummate the Plan?

There are no known regulatory approvals that are required to consummate the Plan.  However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### G.   What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit D**.

### H.   If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.

### I.   What are the sources of Cash and other consideration required to fund the Plan?

The Plan will be funded by the following sources of consideration:  (1) Cash on hand, including Cash from operations; (2) the New Common Equity; (3) the New Warrants, (4) the First Lien Exit Facility, (5) the Second Lien Exit Facility; and (6) the Hedge Party Secured Notes.

### J.   Are there risks to owning the New Common Equity upon emergence from chapter 11?

Yes.  *See* Article VIII of this Disclosure Statement, entitled "Risk Factors."

**K.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VIII.C.10 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**L.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

The Management Incentive Plan shall provide for 10 percent of the New Common Equity, on a fully diluted basis, to be reserved for issuance to management of the Reorganized Debtors after the Effective Date at the discretion of the New Board and on terms to be determined by the New Board (including with respect to allocation, timing and structure of such issuance and the Management Incentive Plan). The New Common Equity being provided in connection with the Management Incentive Plan will dilute all of the New Common Equity equally.

**M.      Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan?**

No. Pursuant to Article III.B(6)(b) of the Plan, Allowed General Unsecured Claims shall receive cash in an amount equal to such Allowed General Unsecured claim either on (i) the Effective Date or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claim.

**N.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the**

11

**Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a  Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**O.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Parties in obtaining their support for the Plan pursuant to the terms of the RSA.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

1.  **Release of Liens.**

Except with respect to the First Lien Exit Facility Documents, the Hedge Party Secured Note Documents, the Second Lien Exit Facility Documents, the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

2.  **Releases by the Debtors.**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocable and forever, released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between the Debtors, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Definitive Documentation, the RSA or Hedge Party RSA or the related prepetition transactions, the Disclosure Statement, the DIP Facility, the First Lien Exit Facility, the Hedge Party Secured Notes, the Second Lien Exit Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Credit Agreement, or the Plan, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any Causes of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or fraud grounded in deliberate

recklessness.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any post-Effective Date obligations of any party or entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the First Lien Exit Facility Documents and the Second Lien Exit Facility Documents or (ii) any Causes of Action identified in the Schedule of Retained Causes of Action.

### 3.   Releases by Holders of Claims and Interests.

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party hereby releases and discharges, and is deemed to have released and discharged, conclusively, absolutely, unconditionally, irrevocably and forever, each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise (including any derivative claims, asserted on behalf of the Debtors) that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between the Debtors, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Definitive Documentation, RSA or Hedge Party RSA or the related prepetition transactions, the Disclosure Statement, the DIP Facility, the First Lien Exit Facility, the Hedge Party Secured Notes, the Second Lien Exit Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim pursuant to chapter 5 of the Bankruptcy Code or other applicable law,  the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any Causes of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or fraud grounded in deliberate recklessness.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any Post-Effective Date obligations of any party or entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the First Lien Exit Facility Documents, the Second Lien Exit Facility Documents or any Claim or obligation arising under the Plan or (ii) any Causes of Action identified in the Schedule of Retained Causes of Action.

### 4.   Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the Plan Supplement, the Definitive Documentation, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property

under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not release any Causes of Action identified in the Schedule of Retained Causes of Action.

### 5. Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### P.    What is the deadline to vote on the Plan?

The Voting Deadline is October 30, 2018, at 12:00 p.m. (prevailing Central Time).

### Q.    How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims or Interests that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is **actually received** by the Debtors' Claims and Balloting Agent, BMC Group, Inc.

(the "<u>Claims and Balloting Agent</u>") **on or before the Voting Deadline, _i.e._ October 30, 2018 at 12:00 p.m. prevailing Central Time**.  _See_ Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**R.**     **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court shortly after the commencement of the Chapter 11 Cases.  All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

**S.**     **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**T.**     **What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect, (2) all conditions to Consummation have been satisfied or waived (_see_ Article IX of the Plan), and (3) the Debtors declare the Plan effective.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**U.**     **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and all of the directors for the initial term of the New Board shall be appointed by the Consenting Parties.  The New Board shall initially consist of five members.  In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors.  The members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

**V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Balloting Agent, BMC Group, Inc., via one of the following methods:

> *By regular mail at:*
> BMC Group, Inc.
> Attn: Gastar Claims Processing
> PO Box 90100
> Los Angeles, CA 90009
>
> *By hand delivery or overnight mail at:*
> BMC Group, Inc.
> Attn: Gastar Claims Processing
> 3732 West 120th Street
> Hawthorne, CA 90250
>
> *By electronic mail at:*
> gastar@bmcgroup.com
>
> *By telephone (toll free) at:*
> (888) 909-0100

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Balloting Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Balloting Agent at www.bmcgroup.com/gastar (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

**W.    Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**IV.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN**

**A.    Restructuring Support Agreements**

**(i)    RSA**

On October 26, 2018, the Debtors and certain holders of Claims and Interests, including the Term Lender, the Second Lien Noteholders, and certain holders of Existing Common Interests, entered into the RSA.  Since executing the RSA, the Debtors have documented the terms of the prepackaged restructuring contemplated thereby, including the Plan.

The RSA provides for the reorganization of the Debtors as a going concern with a deleveraged capital structure and sufficient liquidity to fund the Debtors' post-emergence business plan. The RSA contemplates, and the Plan reflects, the following stakeholder recoveries:

- holders of Administrative Claims and Priority Claims, as well as General Unsecured Claims, will receive payment in full in cash;

- all drawn amounts under the DIP Facility will roll over into the First Lien Exit Facility, with all undrawn commitments remaining available to fund the Debtors' post-emergence cash needs;

- holders of all Allowed Hedge Claims will receive payment in cash over monthly installments concluding by December 2019 pursuant the Hedge Party Secured Notes;

- holders of all Allowed Statutory Lien Claims will receive payments in two installments, one on the Effective Date and one on the date that is six months after the Effective Date;

- Ares will receive $200 million in new take-back term loans and 100 percent of the common equity of reorganized Gastar on account of approximately $283.9 million in DIP Claims that will have refinanced an equivalent amount of Term Loan Claims and approximately $162.5 million in Second Lien Notes Claims; and

- holders of Existing Preferred Interests and Existing Common Interests will receive new warrants exercisable for up to 5% of the common equity of reorganized Gastar in exchange for their not seeking official committee status or the appointment of a trustee or examiner, and their agreement not to object to or oppose the Debtors' restructuring efforts.

The Plan represents a significant step in the Debtors' months-long restructuring process. The RSA and the Plan will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence. The Plan will deleverage the Debtors' balance sheet and provide the capital needed for the Debtors to conduct competitive operations going forward.

### (ii)    Hedge Party RSA

On October 26, 2018, the Debtors and Hedge Parties entered into the Hedge Party RSA. The Hedge Party RSA provides the Debtors and the Hedge Parties certainty regarding the treatment of the Hedge Parties and the Hedge Party Claims during the pendency of the Chapter 11 Cases and under the Plan.

### B.    The Plan

As discussed in Article III herein, the Plan contemplates, among other things, a substantial deleveraging through the conversion of the Term Loan Claims and Second Lien Notes Claims into New Common Equity. The Plan contemplates the following key terms, among others described herein and therein:

### 1.    Issuance of New Common Equity

All existing Interests in the Debtors will be cancelled as of the Effective Date and Reorganized Gastar will issue the New Common Equity to holders of Allowed DIP Claims, Allowed Term Loan Claims, and Allowed Second Lien Notes Claims.

The issuance of the New Common Equity, including options, or other equity awards, if any, reserved for the Management Incentive Plan, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity required to be issued under the Plan and pursuant to its New Organizational Documents.  On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 2.   Issuance of New Warrants

On the Effective Date, the Debtors will issue the New Warrants only to the extent required to provide for distributions to holders of Class 10 and Class 11 Interest and Claims as contemplated by the Plan.  Further requirements and restrictions related to the New Warrants are set forth in Article VIII of this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 40.

### 3.   Management Incentive Plan

On the Effective Date, the Debtors shall reserve shares of New Common Equity to be available for grant from time to time to employees of the reorganized business of the Debtors pursuant to the Management Incentive Plan in an aggregate amount equal to 10 percent of the New Common Equity, on a fully diluted, fully distributed basis.  All terms, conditions, allocations and grants of individual awards under the Management Incentive Plan shall be subject to the approval of the New Board.  Notwithstanding the foregoing, (a) no awards under the Management Incentive Plan shall vest on confirmation of the Plan and (b) the amount of awards permitted to be granted under the Management Incentive Plan each year will be subject to limitations to be determined by the New Board so that the award of grants will be staggered over a period of time.

The Confirmation Order shall authorize the New Board to adopt and enter into the Management Incentive Plan, on the terms set forth in Article IV.O of the Plan.  The issuance of New Common Equity under the Management Incentive Plan would dilute all of the New Common Equity equally.

### 4.   First Lien Exit Facility

On the Effective Date, the Reorganized Debtors shall enter into the First Lien Exit Facility, the terms of which will be set forth in the First Lien Exit Facility Documents.  The First Lien Exit Facility will take the form of a first lien senior secured, delayed draw term loan facility in the aggregate amount of $100 million.  On the Effective Date, the First Lien Exit Facility will have an amount outstanding equal to the drawn amount of the New Money DIP Loans on the Effective Date.  All committed, but undrawn New Money DIP Loans as of the Effective Date will convert to commitments for future term loans under the First Lien Exit Facility.  The First Lien Exit Facility shall otherwise contain terms and provisions as set forth in the Exit Facility Term Sheet.

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the First Lien Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to

be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Court, (i) execute and deliver those documents necessary or appropriate to obtain the First Lien Exit Facility, including the First Lien Exit Facility Documents, (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as (A) the Debtors, with the consent of the Consenting Parties or (B) Reorganized Debtors (the foregoing (A) or (B) as applicable), may deem to be necessary to consummate the First Lien Exit Facility, (iii) grant the Liens on and security interests in all assets of each Reorganized Debtor securing such Reorganized Debtors' indebtedness liabilities and obligations under the First Lien Exit Facility Documents, and (iv) and pay of all fees, indemnities, and expenses provided for in the First Lien Exit Facility Documents.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the First Lien Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the First Lien Exit Facility Documents, (c) shall be deemed perfected on the Effective Date automatically, without the necessity of filing or recording any financing statement, assignment, pledge, notice of lien or any similar document or instrument or taking any action (including taking possession of any such collateral), but the First Lien Exit Facility Agent, in its discretion, shall be authorized to make any such recording or filing or to take any such action, and in such event the Reorganized Debtors shall cooperate with and assist the First Lien Exit Facility Agent, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

## 5. Second Lien Exit Facility

On the Effective Date, the Reorganized Debtors shall enter into the Second Lien Exit Facility, the terms of which will be set forth in the Second Lien Exit Facility Documents and which shall be deemed to be fully drawn on the Effective Date. The Second Lien Exit Facility shall take the form of a second lien secured term loan facility in the aggregate amount of $200 million. The Second Lien Exit Facility shall otherwise contain terms and provisions as set forth in the Exit Facility Term Sheet and may be documented as one multi-tranche credit facility together with the First Lien Exit Facility.

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Second Lien Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Court, (i) execute and deliver those documents necessary or appropriate to obtain the Second Lien Exit Facility, including the Second Lien Exit Facility Documents, (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as (A) the Debtors, with the consent of the Consenting Parties or (B) Reorganized Debtors (the foregoing (A) or (B) as applicable), may deem to be necessary to consummate the Second Lien Exit Facility, (iii) grant the Liens on and security interests in all assets of each Reorganized Debtor securing such Reorganized Debtors' indebtedness liabilities and obligations under the Second Lien Exit Facility Documents, and (iv) pay all fees, indemnities, and expenses provided for in the Second Lien Exit Facility Documents.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Second Lien Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the

terms of the Second Lien Exit Facility Documents, (c) shall be deemed perfected on the Effective Date automatically, without the necessity of filing or recording any financing statement, assignment, pledge, notice of lien or any similar document or instrument or taking any action (including taking possession of any such collateral), but the Second Lien Exit Facility Agent, in its discretion, shall be authorized to make any such recording or filing or to take any such action, and in such event the Reorganized Debtors shall cooperate with and assist the Second Lien Exit Facility Agent, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

### 6.   Use of Proceeds

Proceeds from the First Lien Exit Facility and Second Lien Exit Facility, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations, and administration of the Chapter 11 Cases, as well as for general corporate purposes.

### 7.   Governance

In accordance with Article IV.K of the Plan, the New Board shall initially consist of five members. In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors.  The members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

### 8.   Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist as of and after the Effective Date as a separate entity in the same form as in effect prior to the Effective Date, except to the extent any of such Debtors' organizational or formation documents are amended under the Plan or otherwise, in each case, consistent with the RSA.

### 9.   General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Term Loan Claims or the Second Lien Notes Claims and (2) any claim to avoid, subordinate, or disallow any Term Loan Claim or the Second Lien Notes Claim, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### 10. Releases

The Plan contains certain releases (as described more fully in Article III.O of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"), including mutual releases among (a) the Consenting Parties; (b) the Term Lenders; (c) the Second Lien Noteholders; (d) the Ares Equity Holders; (e) the Term Agent; (f) the Second Lien Trustee; (g) the DIP Lenders; (h) the DIP Agent; (i) the First Lien Exit Facility Lenders; (j) the First Lien Exit Facility Agent; (k) the Second Lien Exit Facility Lenders; (l) the Second Lien Exit Facility Agent; (m) the Hedge Parties; and certain entities affiliated with the foregoing parties.

### 11. Exemption from Certain Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, financing statement, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant or maintenance of collateral as security for any or all of the First Lien Exit Facility or Second Lien Exit Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12. Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

## V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.  Gastar's Corporate History, Key Assets, and Operations

Gastar Exploration Inc. is a Delaware corporation that traces its roots back to a corporation originally incorporated in Canada in 1987 and later re-domiciled in the United States in 2013. The Debtors' common and preferred stock has historically traded on the NYSE American. Today, the Debtors' corporate structure consists of two entities—Gastar Exploration Inc. and its wholly-owned subsidiary Northwest Property Ventures LLC. The Debtors corporate structure is shown below:



The Debtors' principal activities include the identification, acquisition, exploration, and development of oil and natural gas properties on unconventional reserves, such as shale resource plays. Following the divestiture of certain non-core assets, the Debtors' assets consist solely of oil and natural gas wells and leases in Oklahoma, including a concentrated acreage position in the normally pressured oil window of the STACK play, an area of central Oklahoma that includes oil and natural gas-rich formations such as the Meramec, Osage, and Woodford shale, ranging in depth from 6,000 to 9,000 feet, and in the shallow Oswego formation, as well as the proven Hunton limestone horizontal oil play. The graphic below shows where Gastar has a concentrated acreage position and operated wells in the STACK play.



The Debtors focus their business on the STACK play.  The STACK play is a horizontal drilling play in an area of previously drilled vertical wells with multiple productive reservoirs that are predominantly oil producing and encompasses all or parts of Blaine, Canadian, Garfield, Kingfisher, and Major counties in Oklahoma.  Gastar began building an acreage position in the Mid-Continent area in 2012 and ultimately established a position in Kingfisher, Garfield, Major, and Blaine Counties.

In October 2016, Gastar executed an agreement (the "Development Agreement") with STACK Exploration LLC (the "DrillCo Partner") to jointly develop up to 60 wells operated by Gastar in the STACK Play in Kingfisher County, Oklahoma (the "DrillCo Venture").  The DrillCo Venture targeted the Meramec and Osage formations within the Mississippi Lime.  The Debtors were to serve as the operator of the DrillCo Venture wells.  The DrillCo Venture wells were proposed to be developed in three tranches of twenty wells each.  In simple terms, under the Development Agreement, the DrillCo Partner funded 90 percent of the Debtors' working interest portion of drilling and completion costs to initially earn 80 percent of the Debtors' working interest in each DrillCo Venture well.  As a result, the Debtors paid only ten percent of their working interest portion of such costs for twenty percent of their original working interest.  By July 2017, Gastar and the DrillCo Partner completed all twenty of the first tranche wells.  Participation in the second tranche of twenty DrillCo Venture wells was to be at the election of the DrillCo Partner and the third tranche of twenty wells would require mutual consent.  As described in greater detail below, in July 2017, due to capital cost overruns and lower than projected production performance from the first twenty wells, the DrillCo Partner pulled out of the DrillCo Venture prior to development of the second or third tranches.  As a result of the DrillCo Partner canceling the DrillCo Venture, the Debtors found themselves in the position of having to fund 100% of the Debtors' share of previously budgeted tranche two future drilling and completion costs versus the anticipated 10% within the DrillCo Venture.  The ramifications of this change are described below.

By the end of 2017, the Debtors held leases covering approximately 136,700 gross (93,400 net) acres in Garfield, Kingfisher, Logan, Blaine, and Oklahoma Counties within the STACK Play, of which 24,480 gross (24,060 net) acres were attributable to the West Edmund Hunton Lime Unit ("WEHLU").  The Debtors sold their interests in the WEHLU on February 28, 2018 (effective October 1, 2017) for net cash proceeds of $98.8 million at closing.  Accounting for the closing of the WEHLU sale and other leasing activities, the Debtors held leases covering approximately 96,100 gross (67,800 net) acres in the STACK play.  The Debtors view their current holdings as their core acreage position and have no current plans for further piecemeal asset divestitures.

The Debtors currently hold interests in approximately 248 gross (114 net) producing wells, a substantial majority of which are Debtor-operated, had approximately 106,600 gross (71,200 net) total acres under lease, and had estimated proved reserves of approximately 11,200 MBOE of oil and condensate, natural gas, and NGLs based on Securities & Exchange Commission parameters, of which all reserves were proved developed.[6]  In 2017, the Debtors' activities yielded total production of approximately 2,277 MBOE and adjusted EBITDA of approximately $46.2 million.  One hundred one gross (11.5 net) wells in which the Debtors have an interest are operated by other companies, representing 41% of their total gross wells (10% of the Debtors' total net wells).

## B.    The Debtor's Prepetition Capital Structure

The Debtors' prepetition capital structure is largely the product of the 2017 Refinancing, although the Debtors' outstanding preferred equity predates (and was not affected by) the 2017 Refinancing.  The Debtors have approximately $446.4 million in total prepetition outstanding funded debt obligations, as well

---

[6]    The Debtors have not included any proved undeveloped reserves in such figures due to their financial condition.

as outstanding preferred equity with a stated aggregate liquidation preference of approximately $154.6 million.  The following table depicts the Debtors' prepetition capital structure:

| Obligation | Maturity | Principal Amount |
|---|---|---|
| First Lien Term Loan | March 2022 | $283.9 million |
| Second Lien Convertible Notes | March 2022 | $162.5 million |
| **Aggregate Secured Debt:** | | $446.4 million |

| Preferred Equity | Shares | Liquidation Preference |
|---|---|---|
| Series A Preferred Shares | 4,045,000 | $101.1 million |
| Series B Preferred Shares | 2,140,000 | $53.5 million |
| **Aggregate Liquidation Preference:** | | $154.6 million |

### 1.  The Term Loan

The Debtors have approximately 283.9 million outstanding under the Term Loan Credit Agreement.  The loans made pursuant to the Term Loan Credit Agreement earned cash interest at a per annum rate equal to 8.5 percent, payable on a quarterly basis.[7]  The Term Loan Credit Agreement contemplates a scheduled maturity of March 3, 2022 and the Term Loan Claims are guaranteed by Debtor Northwest Property Ventures LLC.  The Term Loan Claims are secured by a first-priority lien on substantially all of the assets of the Debtors, excluding certain assets as customary exceptions.

In addition, the Term Loan Credit Agreement provides for an interest "make-whole" or repayment premium, such that any repayment or prepayment of the loans thereunder prior to the stated maturity date shall be subject to the payment of a repayment premium, and depending on the date of such repayment or prepayment, the applicable interest "make-whole" amount, with the amount of such repayment premium decreasing over the life of the Term Loan.  The Debtors estimate the Term Loan make-whole amount to be approximately $50.5 million as of the date of this disclosure statement. Upon the entry of the Final DIP Order, the Debtors anticipate that the outstanding principal amount and accrued but unpaid interest on the Term Loan will be refinanced with the proceeds of the DIP Loans.

### 2.  The Second Lien Notes Indenture

The Debtors have approximately $162.5 million in principal outstanding in Second Lien Notes. Pursuant to the Second Lien Indenture, the Second Lien Notes were issued for cash at par, bear interest initially at 6.0% per annum, and will mature on March 1, 2022 (unless earlier repurchased, redeemed, or converted in accordance with the terms of the Second Lien Notes Indenture).  Interest is payable on the Second Lien Notes on each March 1, June 1, September 1, and December 1 of each year, beginning on June 1, 2017.  The Second Lien Notes are secured by a second-priority lien on substantially all of the assets of the Debtors.  The Debtors are current on cash interest payments on the Second Lien Notes.

The Second Lien Notes are convertible at the option of the holder into shares of common stock of Gastar ("Common Stock") based on an initial conversion rate of 452.4355 shares of Common Stock per $1,000 in principal amount of the Second Lien Notes,[8] subject to certain adjustments and the issuance of

---

[7]  The interest rate increased to 10.25% in Amendment No. 2 to the Term Credit Agreement dated as of August 2017, but effective as of July 1, 2017 which the Debtors elected to pay-in-kind.

[8]  The conversion rate is equivalent to an initial conversion price of approximately $2.21 per share, or 30% above the volume weighted average price per share of Common Stock for the 30 trading days prior to execution of the Securities Purchase

additional "make-whole" shares under circumstances specified in the Second Lien Indenture. Subject to certain limitations, Gastar has the right to settle its conversion obligations on the Notes in cash, shares of Common Stock, or a combination of cash and shares of Common Stock. Gastar has the right to redeem the Second Lien Notes (a) on or after March 3, 2019 if the Common Stock trades above 150% of the conversion price for periods specified in the Indenture; and (b) on or after March 1, 2021 without regard to such condition, in each case at par plus accrued interest, if any. The Second Lien Notes are not redeemable prior to March 3, 2019.

### 3. Preferred Equity

Gastar's certificate of incorporation authorizes 40 million shares of preferred stock with a par value of $0.01 per share. Gastar has designated 10 million of such shares to constitute its 8.625% Series A Cumulative Preferred Stock (the "Series A Preferred Stock") and another 10 million of such shares to constitute its 10.75% Series B Cumulative Preferred Stock (the "Series B Preferred Stock" and, together with the Series A Preferred Stock, the "Preferred Stock"). The Series A Preferred Stock and the Series B Preferred Stock each have a liquidation preference of $25.00 per share.

There are approximately 4,045,000 shares of Series A Preferred Stock issued and outstanding and approximately 2,140,000 shares of Series B Preferred Stock issued and outstanding, with an aggregate liquidation preference of approximately $154.6 million. The Series A Preferred Stock trades at approximately $2.25 per share, and the Series B Preferred Stock trades at approximately $2.96 per share.

Dividends on the Preferred Stock accumulate regardless of whether any such dividends are declared. In 2017, Preferred Stock cash dividends paid totaled $19.3 million, including $10.9 million of dividends for the period from April 2016 to December 2016 paid in January 2017. These dividend payments were primarily funded based on at-the-market ("ATM") common stock issuance proceeds. On August 1, 2017, primarily in response to the decline in oil prices and to preserve liquidity, the Debtors elected to suspend Preferred Stock dividends. On April 30, 2018, the Debtors paid $10.8 million, reflecting total accumulated unpaid dividends on the Preferred Stock from August 1, 2017 through April 30, 2018. The Company continued to declare and pay dividends of $1.2 million per month on the Preferred Stock through June 30, 2018. On June 11, 2018, the Company elected to suspend the declaration and payment of monthly cash dividends on the Preferred Stock commencing July 2018. Accumulated and unpaid dividends on the outstanding Preferred Stock aggregated to approximately $4.8 million, or $0.78 per share.

### 4. Common Stock

There are approximately 219 million shares of Common Stock issued and outstanding. The Common Stock trades at approximately $0.04 per share, which, along with the trading prices of Preferred Stock, implies an aggregate equity market capitalization of less than $25 million.

The Debtors have never declared or paid any cash dividends on Common Stock. In addition, the Term Loan and the Second Lien Notes Indenture prohibit the Debtors from paying cash dividends on Common Stock as long as any debt remains outstanding.

### 5. Hedging Obligations

Prior to the Petition Date, the Debtors maintained a hedging program with certain counterparties to hedge against the risk of commodity price fluctuations. Pursuant to an Intercreditor Agreement, dated as of March 3, 2017, by and among the Debtors, the Term Loan Agent, and the Hedge Parties, and related

---

Agreement (the "Purchase Agreement"), dated February 16, 2017, between the Debtors and the Refinancing Purchasers (as defined below).

mortgages, deeds of trust and security documents, all liabilities and obligations of the Debtors under their hedging arrangements was secured by an uncapped, first priority lien on and security interest in the collateral securing the Term Loan Credit Agreement that ranked *pari passu* with the liens granted to the senior most creditors under the Term Loan Credit Agreement.  The Debtors and the Hedge Parties agreed to terminate and liquidate all transactions entered into between the Debtors, on the one hand, and any Hedge Party, on the other hand, on or as soon as is practicable after the Petition Date (as defined in the Hedge Party Term Sheet) and treat the approximately $13.3 million in aggregate resulting claims as set forth in the Plan.

## VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.   Post-2017 Refinancing Operational Challenges and Marketing Efforts

The market difficulties faced by the Debtors are consistent with those faced industry-wide.  Oil and gas companies and others have been challenged by low natural gas prices for years.  Since January 2014, natural gas prices fell from a peak of $5.39 per MMBtu in January 2014 to $1.73 per MMBtu by March 2016, and remain at approximately $3.17 per MMBtu.  The price of crude oil has similarly plummeted from a high of $107.26 per barrel in June 2014 to a low of $29.64 per barrel in January 2016.  Crude oil prices remain at approximately $67 per barrel.  Additionally, NYMEX futures curves for both natural gas and crude oil are backward dated, indicating an expectation among real-money traders in the derivatives market that these commodity prices are expected to decline over the next several years

| **WTI Crude Oil Closing Prices** | **Natural Gas Henry Hub Closing Prices** |
|---|---|
|  |  |

*Decline of oil and natural gas prices over time*

These market conditions have affected oil and gas companies at every level of the industry around the world.  All companies in the oil and gas industry (not just E&P companies) have felt these effects.  However, independent oil and gas companies have been especially hard-hit, as their revenues are generated from the sale of unrefined oil and gas.  Over 160 oil and gas companies have filed for chapter 11 since the beginning of 2015.  Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.

The Debtors were not immune to these macro-economic forces.  The following chart, showing the indexed performance of commodities prices against the trading prices of Gastar's equity securities,

demonstrates just how closely the Debtors' success is tied to commodities prices and various key liquidity enhancing activities from 2014 forward:



Beginning as early as 2015, the Debtors began evaluating and subsequently implementing a liability management strategy that focused on, among other things, surviving the industry downturn. Specifically, the Debtors focused on holding their core STACK play acreage position, drilling and completing single wells at a time in accordance with a delineated plan, remaining positioned to grow when prices recover, and maintaining financial liquidity. To this end, the Debtors executed additional drilling and exploration projects to identify and develop further reserves in STACK play areas at a low cost, including, most significantly, the DrillCo Venture described above.

Additionally, in June 2017, the Debtors began to more closely scrutinize their operating techniques and made extensive changes to improve drilling costs and production results. In August 2018, the Debtors ultimately decided to suspend their drilling and development program to preserve remaining liquidity while examining strategic alternatives. Finally, over the past three years, the Debtors have divested a range of non-core acreage holdings, including assets in the Appalachian Basin region of Pennsylvania and West Virginia, two non-core asset sales in the south STACK play, and the WEHLU assets.

### B.   Financial Responses and the 2017 Refinancing

The Debtors' distress came to an initial head in early 2016, when the Debtors were experiencing a liquidity crunch and facing a May 15 interest payment on their $325 million of legacy second lien note obligations. The Debtors engaged financial advisors to assist them in their review of strategic alternatives at this time, including a potential chapter 11 filing. The Debtors were ultimately able to avoid an early 2016 chapter 11 filing by raising equity financing sufficient to make the May 15, 2016 interest payment. The Debtors raised additional "at the market" equity capital to finance operations through the end of 2016 and early 2017.

The Debtors were cognizant, though, that these measures offered only a temporary solution as they faced the maturity of the entirety of their $325 million in legacy second lien obligations in May 2018. Accordingly, beginning in October 2016, the Debtors, with the assistance of their financial advisor Seaport Global ("Seaport"), commenced a process seeking proposals to address their existing capital structure, including comprehensive refinancings, controlling equity investments, and merger transactions. In connection with this process, Seaport reached out to over 40 potential third party investors and held management meetings with 13 of those potential investors. The Debtors ultimately received seven refinancing proposals and engaged in advanced discussions regarding three of those proposals (including Ares's proposal).

Through a highly competitive process, the Debtors ultimately selected the Ares proposal, based on a range of factors. Most significantly, the Ares proposal contemplated the highest degree of deleveraging, included a $50 million common equity investment (*i.e.*, investing behind the existing preferred equity), and provided for effectively no financial covenants on the new debt, which would give the Debtors substantial flexibility to ride out the industry storm. The other two proposals lacked some or all of these characteristics. Seaport issued a fairness opinion in support of the Ares proposal.

On March 3, 2017, the Debtors consummated the 2017 Refinancing. As part of the 2017 Refinancing, Ares initially lent $250 million in first lien term loans, purchased $125 million in second lien convertible notes, and made a $50 million equity investment. Ares purchased an additional $75 million in incremental Notes on March 21, 2017. A portion of the Notes were subsequently converted to equity on May 5, 2017 (shortly after the closing of the 2017 Refinancing), bringing Ares' total equity investment to $87.5 million. The Term Loan, by amended dated August 2, 2017, but effective July 1, 2017, began accruing "payment-in-kind" interest, resulting in the approximately $283.9 million Term Loan and $162.5 million Notes balances outstanding today. The proceeds from the Term Loan, Notes, and Ares equity investment were used to fully repay the $69.2 million outstanding on the Debtors' legacy revolving facility and satisfy and discharge the Debtors' legacy second lien notes. After paying approximately $10.5 million in transaction costs, the Debtors were left with $78.1 million more cash on their balance sheet than before the 2017 Refinancing, of which gross $51.4 million ($42.1 million net) was used for STACK leasehold acquisition.

| Obligation | Status Quo Amount Outstanding | Leverage | Adjustment | Pro Forma Amount Outstanding | Leverage | Rate | Maturity Date |
|---|---|---|---|---|---|---|---|
| Revolver | $69 | | ($69) | $- | | L + 200-300 | Nov-17 |
| First Lien Term Loan | | | 250 | 250 | | 8.500% | Mar-22 |
| Second Lien Convertible Notes | | | 163[9] | 163 | | 6.000% | Mar-22 |
| 8.625% Senior Secured Notes | 325 | | (325) | - | | 8.625% | May-18 |
| Total Debt | $394 | 8.5x | $18 | $413 | 8.9x | | |
| Cash | 14[10] | | 78 | 92 | | | |
| Net Debt | $380 | 8.2x | ($60) | $321 | 6.9x | | |
| Series A Preferred | 101 | | | 101 | | 8.625% | |
| Series B Preferred | 54 | | | 54 | | 10.750% | |
| Net Debt & Preferred | $535 | 11.6x | ($60) | $475 | 10.3x | | |

| | |
|---|---|
| 2017 EBITDA | $46 |

---

[9]   The balance of the second lien convertible notes is pro forma to reflect subsequent $37.5 million equitization.

[10]   The status quo cash value is implied based on closing cash balance less net incremental cash added in the 2017 Refinancing.

As a result of the 2017 Refinancing transactions, Ares became the Debtor's sole lender and largest common shareholder, today holding approximately 25.9% of the Debtors' outstanding common shares. Consistent with their level of common equity ownership, Ares has the authority to nominate two of the eight Board members (so long as Ares owns at least 15% of the total outstanding voting power of the Common Stock).

### C.    The Restructuring Negotiations, Temporary Waiver, and Forbearance Agreement

The Debtors intended for the 2017 Refinancing to allow them to weather the industry storm further develop and prove out their acreage, and bridge to capital market access at a later and more opportune date. Due to certain post-2017 Refinancing operational challenges, however, the Debtors were not able to survive the downturn, as they had hoped.

As described above, the Debtors entered into the DrillCo Venture in October 2016, which continued through the first half of 2017 (at the same time the 2017 Refinancing closed).  Early well production performance results on the first wells in the initial 20 DrillCo Venture tranche were encouraging.  In late 2016 the primary oilfield services completions provider for the Debtors and DrillCo Venture elected to cease operating in the area.  As a result, completion costs increased due to fewer completion service providers in the area.  The Debtors switched completions provider and in an attempt to contain completion costs transitioned to a fracking method that eliminated a number of special additives and reduced the number of fracking stages per well.

These operational changes resulted in a marked decrease in well production performance, which the Debtors only realized after it had completed a number of DrillCo Venture wells using the new completions provider and technique.  Due to the decrease in production performance coupled with higher drilling and completion costs, the DrillCo Partner elected to withdraw from the DrillCo Venture in July 2017, after the initial 20 wells were drilled.  Without the participation of the DrillCo Partner (who bore 90% of the Debtors' costs), the Debtors now had to proceed with its drilling program to de-risk and hold-by-production its acreage without a built-in partner paying a promoted share of drilling and completion costs for the next 20 well tranche.  The failure of the DrillCo Venture significantly stunted the Debtors' planned drilling activity and increased the capital required to continue drilling operations.  Whereas the DrillCo Partner had covered 90% of the Debtors' cost of drilling new tranche wells, the termination of the DrillCo Venture meant that the Company would bear 100% of their cost for any new wells.

In mid-2017, the Debtors, made changes to certain senior management positions, corrected their drilling and completion technique deficiencies, and resumed limited operated drilling activities.  While the Debtors were ultimately able to achieve the production levels consistent with what they had modeled at the time of the 2017 Refinancing, they were only able to do so through substantially higher-than-projected capital expenditures due to increased drilling and completion costs, higher than anticipated working interest, additional land costs and non-operated drilling activity resulting in nearly $100 million of greater than originally projected capital costs.

By early 2018, the Debtors were beginning to experience significant financial strain.  On August 8, 2018, the Debtors suspended their operated drilling program to preserve liquidity and have since completed all previously drilled and operated wells.  Sitting still indefinitely, however, is not an option for the Debtors. E&P companies require constant capital investment in new drilling projects just to maintain production levels.  Additionally, companies like the Debtors must invest capital to preserve their value by extending expiring leases, drilling wells, participating in non-operated well drilling with the goal of holding their acreage by production and growing production, among other things.  At this point, the Debtors cannot further reduce capital and operating expenditures without creating the risk for deterioration of the Company's core acreage and business.  Absent access to the DIP/Exit Facility, the Debtors have essentially no ability to continue to run their businesses.

### D.      Exploration of Strategic Alternatives

In August 2017, with operational drilling and completion challenges and declining liquidity, the Debtors retained Tudor, Pickering, Holt & Co. ("TPH") to assist the Board in its review of strategic alternatives.  In September 2017, TPH commenced parallel processes seeking to sell the Debtors' non-core assets outside of the STACK region (*i.e.*, the WEHLU assets), as well as seeking comprehensive out-of-court merger or sale proposals for the Debtors' entire business.  In connection with the WEHLU process, TPH reached out to 150 potential purchasers.  In connection with the broader merger and sale process, TPH contacted 42 potential counterparties.  Gastar received 8 proposals in connection with the WEHLU process and ultimately closed a sale of the WEHLU assets in February 2018 for a purchase price of $107.5 million, before purchase adjustments.  The Debtors did not receive any actionable proposals for the merger of sale of their entire business.

Following the series of operational challenges and the suspension of their drilling program, as described above, and with an apparent lack of comprehensive merger or sale transactions to address their balance sheet, the Debtors found themselves in an untenable position.  The Debtors lacked the liquidity to fund their ongoing operations even through the end of the year, much less a robust drilling program.  Accordingly, the Board and the Special Committee pursued comprehensive alternatives, including a potential chapter 11 filing, with the assistance of experienced legal advisors, Kirkland & Ellis LLP, and financial advisors, Perella Weinberg Partners LP ("PWP") and TPH.[11]  In June 2018, PWP and TPH began contacting potential financial investors, many of whom had been contacted during the 2017 process.  On August 1, 2018, Gastar issued a press release informing the market that it was "considering potential strategic transactions, including financing, refinancing, sale, or merger transactions, and is encouraging proposals from existing stakeholders and interested third-parties."

On August 21, 2018 the Debtors launched a targeted, formal marketing process by distributing a process letter soliciting proposals for restructuring transactions to 95 potential financial and strategic investors.  The Debtors distributed the process letter to an additional 17 potential financial and strategic investors over the following two weeks.  The process letter, which the Debtors publicly filed and posted to their website, established the Bid Deadline of October 1, 2018.  Of the 112 parties contacted, 30 executed nondisclosure agreements and 12 participated in management presentations.  No known shareholders participated in this process, and the Debtors have not received any restructuring proposals from existing equity holders.  The Debtors received three proposals from strategic investors by the Bid Deadline, none of which was actionable.  These proposals were each contingent on a fundamental restructuring of the Debtors' balance sheet, including the restructuring or elimination of the Ares debt and cancellation of the Debtors' preferred equity prior to or contemporaneously with a business combination.

In parallel with their marketing efforts, the Debtors engaged with Ares regarding a restructuring transaction.  Through extensive, arm's-length negotiations, the Debtors and Ares agreed to the terms of the restructuring set forth in the RSA.  Accordingly, the Debtors determined to proceed with their best and only alternative—the restructuring contemplated by the RSA.

The Debtors believe all potentially interested parties have had ample opportunity to propose higher and better transactions—and indeed they may still do so.  The Debtors will treat any proposed alternative transactions in accordance with the terms and conditions of the RSA.

---

[11]   PWP and TPH are part of the same global financial services firm.

On October 25, 2018, the Board approved the Debtors' entry into the RSA and Hedge Party RSA and the Debtors launched solicitation of the Plan shortly thereafter pursuant to this Disclosure Statement.

## VII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are waived or not met, the Effective Date will not take place.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan

will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas, and increasing expenses. See Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses". Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material

adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will

34

ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to forgo full payment in Cash of their claims against the Debtors' estates, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

### B. Risks Related to Recoveries under the Plan

#### 1. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Equity may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### 2. The Debtors May Be Controlled by Significant Holders

If the Plan is confirmed and consummated, holders of Term Loan Claims and Second Lien Notes Claims will receive the New Common Equity. The holders of Term Loan Claims and Second Lien Notes Claims will own approximately 100% of the New Common Equity (subject to dilution on account of the Management Incentive Plan and the New Warrants). As Ares currently holds 100% of the Term Loan Claims and Second Lien Notes Claims, the Ares entities holding the New Common Equity will act as a group, and will be in a position to control the outcome of actions requiring shareholder approval.

#### 3. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of certain Claims.

### 4.   The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C.      Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1.   The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facility upon emergence.

#### 2.   The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately

predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  The chapter 11 proceedings also require the Debtors to seek debtor-in-possession financing to fund operations.  If the Debtors are unable to obtain final approval of such financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

The Financial Projections attached hereto as **Exhibit E** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Equity and New Warrants and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent

consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation

### 5. The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors operate in a capital-intensive industry. If the Debtors' cash flow from operations remains depressed or decreases as a result of low commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 6. Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices. In short, the Debtors face a high level of exposure to oil and natural gas price swings.  Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends.  Oil and natural gas prices historically have been volatile and are likely to continue to be

volatile in the future, especially given current economic and geopolitical conditions.  The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- the price and quantity of imports of foreign oil and natural gas;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil and natural gas inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries ("OPEC");

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

Continued volatility or weakness in oil and natural gas prices (or the perception that oil and natural gas prices will remain depressed) generally leads to decreased upstream spending, which in turn negatively affects demand to the Debtors' services.  A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures.  As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 7. The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive federal, state and local laws and regulations, including complex environmental laws and occupational health and safety laws.  The Debtors may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties.  Additionally, in recent years, the practice of hydraulic fracturing has come under increased scrutiny by the environmental community.  The Debtors' operations create the risk of environmental liabilities to the government or third parties for any unlawful discharge of oil, gas or other pollutants into the air, soil or water.  In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file claims for alternative water supplies, property damage or bodily injury.  Laws and regulations protecting the environment have

become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

### 8. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 9. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 10. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## VIII.   CERTAIN SECURITIES LAW MATTERS

### A.   New Common Equity and New Warrants

As discussed herein, the Plan provides for the Reorganized Debtors to distribute the New Common Equity and the New Warrants to holders of Term Loan Claims, Second Lien Notes Claims, Existing Common Interests, and Existing Preferred Interests in accordance with Article III of the Plan. New Common Equity may also be distributed under the Management Incentive Plan after the Effective Date. The Debtors believe that the class of New Common Equity and the New Warrants will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue Sky Law.

The Debtors further believe that the issuance of the New Common Equity and/or the New Warrants pursuant to the Plan is, and subsequent transfers of the New Common Equity and/or New Warrants by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under the Bankruptcy Code and any applicable state Blue Sky Law as described in more detail below, except in certain limited circumstances.

### B.      Issuance and Resale of New Common Equity and Warrants

Other than with respect to the Ares Equity Holders and the Consenting Parties, the New Warrants issued to (a) holders of Existing Preferred Interests Claims, and (b) holders of Existing Common Interests and Subordinated Securities Claims, in each case, on account of their Claims and Interests, and all shares of New Common Equity (including any other securities issuable upon exercise of the New Warrants) issued upon the exercise of such New Warrants, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code. The shares of New Common Equity and the New Warrants issued to the Ares Equity Holders and the Consenting Parties, and all shares of New Common Equity (including any other securities issuable upon exercise of the New Warrants) issued upon the exercise of such New Warrants, will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act.

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property. The Debtors believe that the issuance of the 1145 Securities, and all shares of New Common Equity (including any other securities issuable upon exercise of the New Warrants) issued upon exercise of the New Warrants that constitute 1145 Securities, in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code. Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. The Private Placement Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act. The Private Placement Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws. Recipients of the New Common Equity and the New Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### C.      Resales of New Common Equity and Warrants; Definition of Underwriter

#### 1.      1145 Securities

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest;

(b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization could be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Equity and/or the Warrants constituting 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Equity and/or New Warrants constituting 1145 Securities who are deemed to be "underwriters" may be entitled to resell their New Common Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Equity and New Warrants would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Equity and/or New Warrants and, in turn, whether any Person may freely such New Common Equity and/or New Warrants. However, the Debtors do not intend to make publicly available the requisite information regarding the Company, and, as a result, after the holding period, Rule 144 will not be available for resales of such New Common Equity or New Warrants by Persons deemed to be underwriters or otherwise.

### 2.  Private Placement Securities

Unlike the 1145 Securities, the Private Placement Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

Recipients of Private Placement Securities will not be permitted to offer, sell, or otherwise transfer their Private Placement Securities except pursuant to a registration statement or an available exemption from registration, and subject to any additional restrictions contained in the New Organizational Documents and the Warrant Agreement, as applicable.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer." The availability of Rule 144 for resale is discussed in the immediately preceding section.

All Private Placement Securities will bear a restrictive legend in substantially the following form:

"THE SECURITIES REPRESENTED HEREBY WERE ORIGINALLY ISSUED ON ISSUANCE DATE, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

Any Person who receives 4(a)(2) Securities will be required to acknowledge and agree not to resell such securities except pursuant to an effective registration statements or in accordance with an available exemption from registration under the Securities Act, when available, and that such securities will be subject to the other restrictions described above.

**Accordingly, the Debtors recommend that potential recipients of the New Common Equity and the New Warrants consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law. In addition, these securities will not be registered under the Exchange Act or listed on any national securities exchange. The Debtors make no representation concerning the ability of a person to dispose of the New Common Equity or the New Warrants**

### D.     New Common Equity & Management Incentive Plan

The Management Incentive Plan shall provide for 10 percent of the New Common Equity, on a fully diluted basis, to be reserved for issuance to management of the Reorganized Debtors after the Effective Date at the discretion of the New Board and on terms to be determined by the New Board (including with respect to allocation, timing and structure of such issuance and the Management Incentive Plan). Grants of New Common Equity pursuant to the Management Incentive Plan will dilute all of the New Common Equity outstanding at the time of such issuance.

### E.     Restrictions Related to the New Warrants

The issuance of the New Warrants shall be conditioned upon each of the following: (i) the holders of the New Warrants holding passive positions (i.e., no minority governance, registration, or similar rights) following such issuance, and any exercise, of the New Warrants; (ii) such issuance of the New Warrants being exempt from the registration requirements under the Securities Act and any other applicable federal, state or other securities laws; (iii) such issuance of New Warrants not requiring the issuance of any fractional New Warrants; (iv) such issuance of New Warrants not resulting in a Reporting Triggering Event; and (v) such issuance of New Warrants not requiring the issuance of New Warrants to any competitors of the Debtors.

Notwithstanding the foregoing, in the event that the issuance of the New Warrants would result in the issuance of fractional New Warrants, the occurrence of a Reporting Triggering Event or the issuance of New Warrants to a competitor of the Debtors, then the Consenting Parties (prior to the Effective Date) or the Reorganized Debtors (on or after the Effective Date), as applicable, each in their sole discretion, shall be entitled to elect:

(a)     in the case of the failure of the condition set forth in such clause (iii) and/or the condition set forth in such clause (iv), to direct that any holder or holders of Existing Preferred Interests and any holders or holders of Existing Common Interests designated by the Consenting Parties (the designation of such holders to be made in the sole discretion of the Consenting Parties and taking into account the purpose of preventing the issuance of fractional New Warrants and/or the occurrence of a Reporting Triggering Event, as the case may be) shall receive instead of New Warrants a distribution of cash in an amount equal to the New Warrant Value of the New Warrants such holders would have otherwise received but for the failure of the applicable conditions(s); and/or

(b)     in the case of the failure of the condition set forth in such clause (v), direct that such holders of Existing Preferred Interests and holders of Existing Common Interests that are competitors of the Debtors shall be entitled to a distribution of cash in an amount equal to the New Warrant Value of the New Warrants such holders would have otherwise received but for the failure of the applicable condition.

In the event the Consenting Parties (prior to the Effective Date) or the Reorganized Debtors (on or after the Effective Date), as applicable, make any Cash-Out Election(s), then the amount of New Warrants granted pursuant to this Plan shall be reduced accordingly.

The New Warrants shall not be registered under the Securities Act or any other applicable federal, state or other securities laws, and will be issued pursuant to the applicable exemptions therefrom.  The New Warrants shall be transferable subject to restrictions pursuant to applicable federal, state and other securities laws.  In addition, such New Warrants shall only be transferable to "qualified institutional buyers" within the meaning of Rule 144A promulgated under the Securities Act and "accredited investors" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D promulgated under the Securities Act who are not disqualified persons under Rule 506(d) of Regulation D promulgated under the Securities Act.

The New Warrants shall also be subject to restrictions:

(a)     designed to prevent the occurrence of circumstances that are reasonably expected by the Consenting Parties to require registration or qualification of the New Warrants pursuant to federal, state or other securities laws, or require the Consenting Parties to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise;

(b)     on transfers that would subject the Consenting Parties or the Reorganized Debtors to regulation under the Investment Company Act of 1940, the Investment Advisers Act of 1940 or the U.S. Employee Retirement Income Security Act of 1974, each as amended;

(c)     as specified in the Warrant Agreement; and

(d)     on transfers to competitors.

All holders of New Common Equity issued or issuable upon the exercise of the New Warrants shall be required to become parties to a stockholders or similar agreement with respect to the post-emergence equity in the entities holding the reorganized business of the Debtors, which shall be in form and substance acceptable to the Consenting Parties.

In the event that a sale is consummated prior to the 3-year anniversary of the Effective Date, any New Warrants then remaining outstanding and unexercised shall expire worthless and will automatically be cancelled for no further consideration.  For the avoidance of doubt, no holder of New Warrants shall be

44

entitled to the fair market value of the New Warrants (using the Black Scholes model or otherwise) in connection with a sale, but shall have the right to exercise the New Warrants at any time prior to such sale. The Debtors shall provide the holders of the New Warrants with five (5) business days' prior written notice of a sale.  As used in this paragraph, the term "sale" applies to any transaction with respect to the Debtors (or any successor to the Debtors) and/or its subsidiaries taken as a whole and means (i) any consolidation, (ii) any merger, (iii) any disposition, transfer, conveyance or sale of all or a majority of the assets or equity interests, (iv) any transaction in which the holders of equity interests (other than the New Warrants) are entitled to receive (either directly or upon subsequent liquidation) cash, securities or other property with respect to, or in exchange for, such equity interests, and/or (v) any transaction similar to the foregoing.

For the avoidance of doubt, notwithstanding anything to the contrary in this Plan, neither the Debtors nor any of the entities holding the reorganized business of the Debtors following the Effective Date shall be required to take any action that would result in the Debtors or such entity, as the case may be, being required to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims or Interests in Classes 3, 4, 5, and 6 (collectively, the "Voting Classes").  The holders of Claims or Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.  The Debtors are *not* soliciting votes from holders of Claims or Interests in Classes 1, 2, 7, 8, 9, 10, and 11.

### B.    Voting Record Date

**The Voting Record Date is October 25, 2018**.  The Voting Record Date is the date on which it will be determined which holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim or Interest.

### C.    Voting on the Plan

**The Voting Deadline is October 30, 2018, at 12:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Claims and Balloting Agent on or before the Voting Deadline.

**To vote, complete, sign, and date your ballot and return it (with an original signature)** *promptly* **via electronic mail to gastar@bmcgroup.com with "Gastar Vote" in the subject line.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT TOLL FREE AT (888) 909-0100 OR VIA ELECTRONIC MAIL TO GASTAR@BMCGROUP.COM.**

### D.    Ballots Not Counted

<u>**No ballot will be counted toward Confirmation if, among other things**</u>:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date; (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Balloting Agent), or the Debtors' financial or legal advisors instead of the Claims and Balloting Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.** [12]

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted

---

[12]    For any ballot cast via electronic mail, a format of the attachment must be found in the common workplace and industry standard format (*i.e.*, industry-standard PDF file) and a received date and time in the Claims and Balloting Agent's inbox will be used as a timestamp for a receipt.

the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Equity to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is

not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[13]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests is eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.      Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 3.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether

---

[13]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 4. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors

The Debtors believe the best method of valuing their business was to conduct a comprehensive marketing process and let the market speak as to the value of the Debtors' businesses.  Accordingly, the Debtors, with the assistance of their advisors, conducted a lengthy and exhaustive marketing process to search for counterparties for a potential transaction.  As shown from the offers received from its extensive marketing process, the Debtors' going concern value does not exceed the aggregate amount of its funded-debt obligations.  The Debtors did not receive any proposals that contemplated payment in full of all funded-debt obligations and/or a distribution to holders of Interests in Gastar.  This further supports the Debtors conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are

49

related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Common Equity as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Further, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (2) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

    **B.**    **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

        **1.**    **Characterization of Restructuring Transactions**

The tax consequences of the implementation of the Plan to the Debtors will depend on whether Reorganized Gastar is a corporation or an entity taxed as a partnership for U.S. federal income tax purposes. If a corporation, the tax consequences will also depend on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor (a "<u>Taxable Transaction</u>") or as a

recapitalization or tax-free reorganization of the Debtors (a "<u>Recapitalization Transaction</u>"). The Debtors and the Consenting Parties have not yet determined how the Restructuring Transactions will be structured, either in whole or in part. Such decision will depend on, among other things, factors relating to the Consenting Parties, whether assets being sold pursuant to any Taxable Transaction have an aggregate fair market value in excess of their aggregate tax basis (i.e., a "built-in gain") or an aggregate fair market value less than their aggregate tax basis (i.e., a "built-in loss"), the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("<u>CODI</u>") and whether sufficient tax attributes are available to offset any such built-in gain, future tax benefits associated with a step-up in the tax basis of the Debtors' assets as a result of a Taxable Transaction, and the amount and character of any losses with respect to the stock of the Debtors, in each case for U.S. federal, state, and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured in whole or in part as a Taxable Transaction, the Debtors would realize gain or loss upon the transfer in an amount equal to the difference between the aggregate fair market value of the assets transferred or deemed transferred by the Debtors and the Debtors' aggregate tax basis in such assets. Gain, if any, would be reduced by the amount of available net operating losses ("<u>NOLs</u>"). Any gain not reduced by NOLs would be recognized by the Debtors and result in a cash tax obligation. If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock.

As of December 31, 2017, the Debtors had approximately $550 million of federal NOLs, some of which are subject to existing limitations on use. Additional losses may be generated in 2018, which will ultimately increase the Debtors' NOLs and other tax attributes. Depending on the how the Restructuring Transactions are implemented, some NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. NOLs arising before 2018 may offset up to 100% of future taxable income and NOLs arising in taxable years starting with 2018 may be used to offset up to 80% of taxable income in a given year. As discussed below, however, the Debtors' NOLs may be reduced and possibly eliminated upon implementation of the Plan.

If the Debtors structure the Restructuring Transactions entirely as a Recapitalization Transaction, the transaction would not give rise to any gain or loss to the Debtors (other than as a result of CODI, as described below). In a Recapitalization Transaction, the Debtors' tax attributes would, subject to the rules discussed below regarding CODI and Section 382 of the Tax Code, survive the restructuring process and potentially be usable by the Reorganized Debtors going forward.

## 2.  Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize CODI, for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence. Such reduction in tax attributes occurs only after the tax for the

year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the Debtors with respect to the sale of all or a portion of their assets in a Taxable Transaction). In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.[14] Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.[15] Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding CODI is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded CODI exceeds its tax attributes, the excess CODI is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

As a result of the Restructuring Transactions, the Debtors expect to realize CODI. The exact amount of any CODI that will be realized by the Debtors will not be determinable until the consummation of the Plan. Because the Plan provides that certain Claim Holders will receive non-Cash consideration, the amount of CODI, and accordingly the amount of tax attributes required to be reduced, will depend, in part, on the fair market value (or, in the case of debt instruments, the adjusted issue price) of the non-Cash consideration received, which cannot be known with certainty at this time. The amount of the tax attributes required to be reduced pursuant to section 108 of the Tax Code will also depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction or Recapitalization Transaction.

### 3. Limitation of NOL Carryforwards and Other Tax Attributes

As of December 31, 2017, the Debtors had approximately $550 million of available NOLs. Additional losses may be generated in 2018. Following the Effective Date, the Debtors anticipate that, to the extent the Reorganized Debtors succeed to the Debtors' tax attributes (i.e., if the Restructuring Transactions are not structured as a Taxable Transaction pursuant to which the Debtors' assets, and not stock of corporate entities, are being transferred to the Reorganized Debtors for U.S. federal income tax purposes), any NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors that are not reduced according to the CODI rules described above and that are allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject

---

[14]   Under the 2017 tax reform legislation commonly referred to as the tax cuts and jobs act (the "Tax Cut and Jobs Act"), interest deductions in excess of statutorily-defined limits are deferred under section 163(j) of the Tax Code unless and until a debt issuer has sufficient adjusted taxable income to be entitled to claim such deductions. It is unclear whether interest deductions that are deferred under section 163(j) of the Tax Code are subject to reduction under section 108 of the Tax Code.

[15]   This extent to which this election can apply to the Debtors' assets that are subject to depletion, as opposed to depreciation, is subject to uncertainty.

to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Common Equity pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

### (a) General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently 2.27 percent for October 2018). The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if post-ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

### (b) Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual

53

limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors currently believe that a Recapitalization Transaction may qualify for the 382(l)(5) Exception, although analysis is ongoing. If a Recapitalization Transaction is eligible for the 382(l)(5) Exception, the Debtors and the Consenting Parties have not yet decided whether the Debtors would elect out of its application. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date

### C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

#### 1.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 3 and Class 4 Claims

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Class 3 or Class 4 Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Class 3 or Class 4 Claim, each such U.S. Holder will receive Cash in an amount equal to 100% of the Allowed amount of such Holder's Claims, payable according to the schedule in Article III.D (entitled "What will I receive from the Debtors if the Plan is consummated?").

A U.S. Holder of an Allowed Class 3 or Class 4 Claim who receives Cash will be treated as exchanging such Claim for Cash in a taxable exchange under section 1001 of the Tax Code. Accordingly, subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between (a) Cash received and (b) such Holder's adjusted basis, if any, in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. A U.S. Holder of an Allowed Class 3 or Class 4 Claim that receives payments in more than one tax year may be subject to special rules regarding the timing for inclusion of any gain or loss with respect to such holder's Claim and should consult their own tax advisor regarding such treatment.

### 2. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 5 and Class 6 Claims.

The U.S. federal income tax consequences to a U.S. Holder of a Class 5 or Class 6 Claim will depend, in part, on the form of the Restructuring Transactions and, if the Restructuring Transactions are treated as a Recapitalization Transaction, whether the Claims surrendered constitute "securities" of Gastar for U.S. federal income tax purposes. For a U.S. Holder of a Class 5 Claim, the U.S. federal income tax consequences will also depend on whether the Second Lien Exit Facility Debt constitutes a "security" for United States federal income tax purposes.

Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. **Due to the inherently factual nature of the determination, if relevant based on the form of the Restructuring Transactions, U.S. Holders are urged to consult their own tax advisors regarding the status of their Claims and of the Second Lien Exit Facility Debt as "securities" for U.S. federal income tax purposes.**

### (a)    Holders of Class 5 Claims

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Class 5 Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Class 5 Claim, each such U.S. Holder will receive its Pro Rata share of (i) Second Lien Exit Facility Debt, and (ii) New Common Equity.

If the Restructuring Transactions are structured (i) as a Taxable Transaction or (ii) (a) as a Recapitalization Transaction and (b) an Allowed Class 5 Claim does not qualify as a security of Gastar, then the Holder of such Claim will be treated as exchanging such Claim for such Holder's Pro Rata share of Second Lien Exit Facility Debt and New Common Equity in a taxable exchange under section 1001 of the Tax Code. Subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between (i) the sum of the issue price of the Second Lien Exit Facility Debt and New Common Equity received and (ii) such Holder's adjusted basis in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in any Second Lien Exit Facility Debt and New Common Equity received should equal the issue price of such Second Lien Exit Facility Debt and the fair market value of the New Common Equity as of the date such New Common Equity is distributed to the Holder. A Holder's holding period for the Second Lien Exit Facility Debt and New Common Equity received should begin on the day following the date it receives the Second Lien Exit Facility Debt and New Common Equity.

If the Restructuring Transactions are structured as a Recapitalization Transaction, an Allowed Class 5 Claim qualifies as a "security" of Gastar, and the Second Lien Exit Facility Debt qualifies as a "security" of Reorganized Gastar, then the Holder of the Allowed Class 5 Claim should be treated as receiving its Second Lien Exit Facility Debt and New Common Equity in a recapitalization. Subject to the rules regarding "accrued but untaxed interest" (as discussed in Section XI.C.4 of this Disclosure Statement, entitled "Accrued Interest"), a Holder of such Claim should not recognize any gain or loss. The Holder should obtain a tax basis in the Second Lien Exit Facility Debt and New Common Equity received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the tax basis of the Claim surrendered, with such basis allocated between the Second Lien Exit Facility Debt and New Common Equity based on their relative fair market values. The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest. Subject to amounts treated as received in satisfaction of accrued but untaxed interest, the holding period for the Second Lien Exit Facility Debt and New Common Equity received should include the holding period for the exchanged Claim. The holding period for any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest should begin on the day following the receipt of such property.

If the Restructuring Transactions are structured as a Recapitalization Transaction, an Allowed Class 5 Claim qualifies as a "security" of Gastar, but the Second Lien Exit Facility Debt does not qualify as a "security" of Reorganized Gastar, then the Holder should be treated as receiving its Second Lien Exit Facility Debt and New Common Equity in a recapitalization. Subject to the rules regarding "accrued but untaxed interest," a Holder of such Claim should recognize gain (but not loss), with the amount of gain equal to the lesser of (1) the excess, if any, of (i) the fair market value of the Second Lien Exit Facility Debt received plus the fair market value of the New Common Equity received, over (ii) the Holder's adjusted basis in its Claim; and (2) the fair market value of the Second Lien Exit Facility Debt received. The Holder should obtain a tax basis in the New Common Equity received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to (i) the tax basis of the Claim surrendered, plus (ii) gain recognized (if any), minus (iii) the fair market value of the Second Lien Exit Facility Debt. The Holder should obtain a tax basis in the Second Lien Exit Facility Debt received equal to its fair market value. The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest. Subject to amounts treated as received in satisfaction of accrued but untaxed interest, the holding period for the New Common Equity received should include the holding period for the exchanged Claim. The holding period for the Second Lien Exit Facility Debt and any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest should begin on the day following the receipt of such property.

### (b)    Holders of Class 6 Claims

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Class 6 Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Class 6 Claim, each such U.S. Holder will receive its Pro Rata share of the New Common Equity.

If the Restructuring Transactions are structured as a Recapitalization Transaction and an Allowed Class 6 Claim qualifies as a security of Gastar, then the Holder of such Claim should be treated as receiving New Common Equity in a recapitalization. Subject to the rules regarding accrued but untaxed interest, a Holder of such Claim should not recognize gain or loss with respect to the exchange. Such Holder's tax basis in its New Common Equity, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in the Allowed Class 6 Claim surrendered therefor. The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the New Common Equity should include the holding period

for the exchanged Claim. The holding period for any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest should begin on the day following the receipt of such property.

If the Restructuring Transactions are structured as a Taxable Transaction or if an Allowed Class 6 Claim does not qualify as a security of Gastar, then the Holder will be treated as exchanging such Claim for New Common Equity in a taxable exchange under section 1001 of the Tax Code. Subject to the rules regarding accrued but untaxed interest, the Holder should recognize gain or loss equal to the difference between (i) the fair market value of New Common Equity received and (ii) such Holder's adjusted basis, if any, in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in any New Common Equity received should equal the fair market value of such New Common Equity as of the date it is distributed to the Holder. The holding period for the New Common Equity received should begin on the day following the date on which the Holder receives the New Common Equity.

### 3. Issue Price

The determination of "issue price" for purposes of the analysis herein will depend, in part, on whether the debt instruments and other property issued to a Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending thirty (30) days after the Effective Date. In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). While a determination cannot be made until after the Effective Date, it is not expected that the Second Lien Exit Facility Debt will be considered traded on an "established securities market" for these purposes.

### 4. Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid

interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

### 5.  Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount, with respect to the exchanged debt instrument.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.

### 6.  Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 7. Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

### D. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such non-U.S. Holder and the ownership and disposition of the New Common Equity, as applicable.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### 1. Gain Recognition

Any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States, including as a result of such Holder's Claim being considered a "United States real property interest" within the meaning of Section 897(c) of the Tax Code (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax (and possibly withholding tax) with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. Interest Payments; Accrued Interest

Payments to a non-U.S. Holder that are attributable to (x) interest on (or OID accruals with respect to) debt received under the Plan or (y) accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

(a) the non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of Gastar (in the case of consideration received in respect of accrued but untaxed interest) or Reorganized Debtor obligor (in the case of interest payments with respect to debt received under the Plan);

(b) the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Debtors (each, within the meaning of the Tax Code);

(c) the non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

(d) such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to (a) interest on debt received under the Plan and (b) accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Equity

#### (a) Reorganized Gastar Treated as a Corporation - Sale, Redemption, or Repurchase of Non-Cash Consideration

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on a subsequent sale or other taxable disposition (including a Cash redemption) of consideration received under the Plan unless:

(i) such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii) such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

(iii) in the case of the sale of New Common Equity, the Reorganized Debtors are or have been, during a specified testing period, a "United States real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Equity under FIRPTA and be required to file U.S. federal income tax returns. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Equity will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.  In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period and (b) such interest is regularly traded on an established securities market.

The Debtors expect that, to the extent Reorganized Gastar is a corporation, Reorganized Gastar will constitute a USRPHC as of the Effective Date, and thus that the New Common Equity will constitute a United States real property interest, for the period required under the Tax Code.  Non-U.S. Holders who may receive or acquire New Common Equity in connection with the Restructuring Transactions are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding, and disposition of such New Common Equity.

> (b)   **Reorganized Gastar Treated as a Partnership - Sale, Redemption, or Repurchase of Non-Cash Consideration**

If Reorganized Gastar is a partnership for U.S. federal income tax purposes, a non-U.S. Holder of New Common Equity will be treated as engaged in the conduct of a U.S. trade or business and will be required to file U.S. federal income tax returns and pay tax on income that is treated as effectively connected with such U.S. trade or business. In that case, a non-U.S. Holder of New Common Equity will be required to pay U.S. federal income tax on its allocable share of Reorganized Gastar taxable income regardless of whether distributions are made by Reorganized Gastar.  In addition, a non-U.S. Holder will be subject to U.S. federal income tax on any gain recognized in connection with a sale of such Holder's New Common Equity.  Further, the buyer of the New Common Equity will be required to withhold tax currently equal to 10 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the non-U.S. Holder's federal income tax liability and may entitle the non-U.S. Holder to a refund, provided that the non-U.S. Holder properly and timely files a tax return with the IRS.

### 4. FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Equity), and also include gross proceeds from the

sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Equity and Second Lien Exit Facility Debt). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

### E.      Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

*[Remainder of page intentionally left blank]*

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: October 26, 2018                    GASTAR EXPLORATION INC.
                                           on behalf of itself and all other Debtors

                                           Michael A. Gerlich
                                           Chief Financial Officer
                                           Gastar Exploration Inc.

**Exhibit A**

**Plan of Reorganization**

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| GASTAR EXPLORATION INC., *et al.*,[1] | § | Case No. 18-_____ (__) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

## DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

Ross M. Kwasteniet, P.C. (*pro hac vice* admission pending)
John R. Luze (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

-and-

Anna G. Rotman, P.C. (TX 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:  (713) 836-3600
Facsimile:  (713) 836-3601

Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  October 26, 2018

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Gastar Exploration Inc. (1640), and Northwest Property Ventures LLC (8685).  The location of the Debtors' service address is:  1331 Lamar Street, Suite 650, Houston, Texas 77010.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
        GOVERNING LAW ...................................................................................................... 1
    A.     Defined Terms. ........................................................................................................ 1
    B.     Rules of Interpretation. ......................................................................................... 12
    C.     Computation of Time. ........................................................................................... 12
    D.     Governing Law. .................................................................................................... 12
    E.     Reference to Monetary Figures. ........................................................................... 13
    F.     Reference to the Debtors or the Reorganized Debtors. ........................................ 13
    G.    Controlling Document. ......................................................................................... 13

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS ............................ 13
    A.     Administrative Claims. ......................................................................................... 13
    B.     DIP Claims. ........................................................................................................... 13
    C.     Professional Fee Claims. ...................................................................................... 14
    D.     Priority Tax Claims. .............................................................................................. 15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................... 15
    A.     Classification of Claims and Interests. ................................................................ 15
    B.     Treatment of Claims and Interests. ...................................................................... 15
    C.     Certain Provisions Effective Upon the Occurrence of a DIP Toggle Event. ....... 20
    D.     Release of Statutory Liens. ................................................................................... 21
    E.     Special Provision Governing Unimpaired Claims. .............................................. 21
    F.     Elimination of Vacant Classes ............................................................................. 21
    G.    Voting Classes, Presumed Acceptance by Non-Voting Classes .......................... 21
    H.    Intercompany Interests ......................................................................................... 21
    I.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................. 21
    J.     Controversy Concerning Impairment. .................................................................. 22
    K.     Subordinated Claims. ............................................................................................ 22

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ................................................................ 22
    A.     General Settlement of Claims and Interests. ........................................................ 22
    B.     Restructuring Transactions. .................................................................................. 22
    C.     Definitive Documentation. ................................................................................... 23
    D.     Reorganized Debtors. ........................................................................................... 23
    E.     Sources of Consideration for Plan Distributions. ................................................ 23
    F.     Holders of Working and Similar Interests. ......................................................... 26
    G.    Corporate Existence. ............................................................................................ 27
    H.    Vesting of Assets in the Reorganized Debtors. ................................................... 27
    I.     Cancellation of Existing Securities and Agreements. .......................................... 27
    J.     Corporate Action. ................................................................................................. 28
    K.     New Organizational Documents. .......................................................................... 28
    L.     Directors and Officers of the Reorganized Debtors. ........................................... 28
    M.    Effectuating Documents; Further Transactions. .................................................. 29
    N.     Certain Securities Law Matters. ........................................................................... 29
    O.     Section 1146 Exemption. ..................................................................................... 29
    P.     Management Incentive Program. .......................................................................... 30
    Q.    Employee and Retiree Benefits. ........................................................................... 30
    R.     Corporate Structuring Transactions. .................................................................... 30
    S.     Preservation of Causes of Action. ........................................................................ 30

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................. 31
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ....... 31
    B.     Indemnification Obligations. ................................................................................ 32

C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases Assumed. .................32
D.      Claims Based on Rejection of Executory Contracts and Unexpired Leases ...................................33
E.      Insurance Policies. ...........................................................................................................................33
F.      Reservation of Rights. ......................................................................................................................33
G.      Nonoccurrence of Effective Date. ....................................................................................................34
H.      Contracts and Leases Entered Into After the Petition Date. ............................................................34

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........................................................................34
A.      Timing and Calculation of Amounts to Be Distributed.....................................................................34
B.      Disbursing Agent. .............................................................................................................................34
C.      Rights and Powers of Disbursing Agent. .........................................................................................34
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........................................35
E.      Compliance with Tax Requirements. ................................................................................................36
F.      Allocations. .......................................................................................................................................36
G.      No Postpetition Interest on Claims ..................................................................................................36
H.      Foreign Currency Exchange Rate. ...................................................................................................36
I.      Setoffs and Recoupment. .................................................................................................................36
J.      Claims Paid or Payable by Third Parties..........................................................................................37

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
              DISPUTED CLAIMS ...................................................................................................................37
A.      Disputed Claims Process...................................................................................................................37
B.      Allowance of Claims. ........................................................................................................................38
C.      Claims Administration Responsibilities.............................................................................................38
D.      Adjustment to Claims or Interests without Objection. ......................................................................38
E.      Disallowance of Claims or Interests. ................................................................................................38
F.      No Distributions Pending Allowance .................................................................................................38
G.      Distributions After Allowance ...........................................................................................................39
H.      No Interest. .......................................................................................................................................39

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........................39
A.      Discharge of Claims and Termination of Interests. ..........................................................................39
**B.      Release of Liens.** ...............................................................................................................................39
**C.      Releases by the Debtors.** .................................................................................................................40
**D.      Releases by Holders of Claims and Interests.** ................................................................................40
**E.      Exculpation.** .....................................................................................................................................41
**F.      Injunction.** ........................................................................................................................................41
G.      Protections Against Discriminatory Treatment. ...............................................................................42
H.      Document Retention. ........................................................................................................................42
I.      Reimbursement or Contribution. ......................................................................................................42

ARTICLE IX. CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN .......................................42
A.      Conditions Precedent to the Effective Date. ....................................................................................42
B.      Waiver of Conditions. .......................................................................................................................43
C.      Effect of Failure of Conditions. ........................................................................................................43

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .....................................43
A.      Modification and Amendments...........................................................................................................43
B.      Effect of Confirmation on Modifications. ..........................................................................................43
C.      Revocation or Withdrawal of Plan. ...................................................................................................44

ARTICLE XI. RETENTION OF JURISDICTION ..............................................................................................44

ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................................................................46
A.      Immediate Binding Effect. ................................................................................................................46
B.      Additional Documents. ......................................................................................................................46

| | | |
|---|---|---|
| C. | Payment of Statutory Fees. | 46 |
| D. | Statutory Committee and Cessation of Fee and Expense Payment. | 46 |
| E. | Reservation of Rights. | 46 |
| F. | Successors and Assigns. | 46 |
| G. | Notices. | 47 |
| H. | Term of Injunctions or Stays. | 47 |
| I. | Entire Agreement. | 48 |
| J. | Exhibits. | 48 |
| K. | Nonseverability of Plan Provisions. | 48 |
| L. | Votes Solicited in Good Faith. | 48 |
| M. | Closing of Chapter 11 Cases. | 48 |
| N. | Waiver or Estoppel. | 48 |
| O. | Conflicts. | 49 |

**INTRODUCTION**

The Debtors propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used herein and not otherwise defined have the meanings given to such terms in Article I.A of this Plan.  Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and accomplishments during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.     "*1145 Securities*" has the meaning given to such term in Article IV.N of this Plan.

2.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if such Entity were a Debtor.

4.     "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors, in consultation with the Consenting Parties, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

5.     "*Applicable Premium*" has the meaning set forth in Section 2.09 of the Term Loan Credit Agreement.

6.     "*Ares Equity Holders*" means, collectively, AF V ENERGY I AIV A1, L.P., AF V ENERGY I AIV A2, L.P., AF V ENERGY I AIV A3, L.P., AF V ENERGY I AIV A4, L.P., AF V ENERGY I AIV A5, L.P., AF V ENERGY I AIV A6, L.P., AF V ENERGY I AIV A7, L.P., AF V ENERGY I AIV A8, L.P., AF V ENERGY I AIV A9, L.P., AF V ENERGY I AIV A10, L.P., AF V ENERGY I AIV A11, L.P., AF V ENERGY I AIV A12, L.P., AF V ENERGY I AIV A13, L.P., AF V ENERGY I AIV B1, L.P. in their capacities as holders of Existing Common Interests.

7.     "Assumed Executory Contract and Unexpired Lease List" means the list of Executory Contracts and Unexpired Leases that will be assumed, subject to the consent of the Consenting Parties, by the Reorganized Debtors pursuant to the Plan, which list shall be included in the Plan Supplement.

1

8.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

9.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

10.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

11.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

12.     "*Cargill*" means Cargill, Inc.

13.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

14.     "*Cash-Out Election*" has the meaning given to such term in Article IV.E.2 of the Plan.

15.     "*Catch-Up Payment Amount*" has the meaning given to such term in Article III.B.3 of the Plan.

16.     "*Causes of Action*" means any claims, interests, damages, liabilities, judgments, remedies, causes of action, controversies, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, interests, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, choate or inchoate, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, or equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law preferential or fraudulent transfer or similar claim.

17.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

19.     "*Claims and Balloting Agent*" means BMC Group, Inc., the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

20.     "*Claims Register*" means the official register of Claims and Interests maintained by the Claims and Balloting Agent.

21.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

22.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

23.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

24. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

25. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

26. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A of the Plan having been (a) satisfied or (b) waived pursuant to Article IX.B of the Plan.

27. "*Consenting Parties*" means the Consenting Term Lender, the Consenting Second Lien Noteholders and the Ares Equity Holders.

28. "*Consenting Second Lien Noteholders*" means, collectively, AF V ENERGY I AIV A1, L.P., AF V ENERGY I AIV A2, L.P., AF V ENERGY I AIV A3, L.P., AF V ENERGY I AIV A4, L.P., AF V ENERGY I AIV A5, L.P., AF V ENERGY I AIV A6, L.P., AF V ENERGY I AIV A7, L.P., AF V ENERGY I AIV A8, L.P., AF V ENERGY I AIV A9, L.P., AF V ENERGY I AIV A10, L.P., AF V ENERGY I AIV A11, L.P., AF V ENERGY I AIV A12, L.P., AF V ENERGY I AIV A13, L.P., and AF V ENERGY I AIV B1, L.P. in their capacities as Second Lien Noteholders.

29. "*Consenting Term Lender*" means AF V Energy I Holdings, L.P., in its capacity as Term Lender.

30. "*Consummation*" means the occurrence of the Effective Date.

31. "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

32. "*Debtors*" means, collectively, Gastar Exploration Inc. and Northwest Property Ventures LLC.

33. "*Definitive Documentation*" means the definitive documents and agreements governing the Restructuring Transactions (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in the Plan (as amended, modified, or supplemented from time to time), including the following: (a) the Plan (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto); (b) the RSA (including the "Definitive Documentation" as defined therein); (c) any document or agreement comprising the Plan Supplement; (d) the Disclosure Statement; (e) the DIP Credit Agreement and the DIP Loan Documents; (f) the DIP Orders; (g) the First Lien Exit Facility Documents; (h) the Second Lien Exit Facility Documents; (i) the Warrant Agreement and any other document or agreement relating to the New Warrants; (j) the New Organizational Documents; (k) the Confirmation Order; (l) the Hedge Party RSA and Hedge Party Term Sheet; (m) the Hedge Party Secured Note Documents; (n) the Stockholders Agreement, as applicable; and (o) such other agreements and documentation desired or necessary to consummate and document the transactions contemplated by this Plan and the RSA.

34. "*DIP Agent*" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

35. "*DIP Claim*" means any Claims of the DIP Lenders or the DIP Agent arising under or relating to the DIP Loan Documents or the DIP Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Credit Agreement.

36.     "*DIP Credit Agreement*" means that certain credit agreement for an approximately $383.9 million superpriority debtor-in-possession financing facility entered into in accordance with the DIP Orders by and between the Debtors, the DIP Agent, and the DIP Lenders.

37.     "*DIP Facility Payoff*" has the meaning given to such term in Article II.B of this Plan.

38.     "*DIP Lenders*" means the lenders under the DIP Credit Agreement.

39.     "*DIP Loan Documents*" means any supplements, notes, certificates, agreements, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Credit Agreement.

40.     "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

41.     "*DIP Toggle Event*" shall have occurred upon (a) the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and (b) the delivery to the Company and filing on the docket of the Chapter 11 Cases, in each case by the Majority DIP Lenders (as defined in the DIP Credit Agreement) or DIP Agent at the direction of the Majority DIP Lenders, of a notice stating that the DIP Toggle Event has occurred.

42.      "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

43.     "*Disclosure Statement*" means the *Disclosure Statement Relating to Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated October 26, 2018, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

44.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

45.     "*Distribution Record Date*" means other than with respect to publicly held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing or such other date agreed to by the Debtors and the Consenting Parties.

46.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A. of the Plan have been satisfied or waived in accordance with Article IX.B. of the Plan, and (c) the Debtors declare (subject to the consent of the Consenting Parties) that the Plan is effective.

47.     "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with Article IV.Q of the Plan.

48.     "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

49.     "*Equitized Senior Obligations*" means any amount of the DIP Claims and the Term Loan Claims not refinanced or otherwise paid or satisfied pursuant to the First Lien Exit Facility or the Second Lien Exit Facility, which shall be exchanged for New Common Equity, as set forth in this Plan.

50.     "*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

51.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

52.     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a, *et seq.*

53.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (i) the Debtors; (ii) any official committees appointed in the Chapter 11 Cases and each of their respective members; and (iii) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

54.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

55.     "*Existing Common Interests*" means all outstanding common shares of Gastar, together with any and all outstanding and unexercised or unvested warrants, options or other rights of any kind to acquire Gastar's common shares.

56.     "*Existing Preferred Interests*" means all outstanding Series A and Series B preferred shares of Gastar, together with any and all outstanding and unexercised or unvested warrants, options or other rights of any kind to acquire Gastar's currently outstanding preferred shares of any series.

57.     "*Exit Facility Term Sheet*" means the Exit Facility Term Sheet attached as <u>Exhibit E</u> to the RSA.

58.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

59.     "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

60.     "*Final DIP Order*" means *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* to be filed and approved by the Bankruptcy Court in the Chapter 11 Cases.

61.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

62.     "*First Lien Exit Facility Agent*" means the administrative agent under the First Lien Exit Facility Loan Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the First Lien Exit Facility Loan Agreement.

63.     "*First Lien Exit Facility Documents*" means the agreements memorializing the First Lien Exit Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages or deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the First Lien Exit Facility.

64.     "*First Lien Exit Facility Lenders*" means those lenders party to the First Lien Exit Facility Loan Agreement.

65.     "*First Lien Exit Facility Loan Agreement*" means that certain loan agreement memorializing the First Lien Exit Facility, which shall be entered into among one or more of the Debtors or the Reorganized Debtors (as applicable), the First Lien Exit Facility Agent, and the First Lien Exit Facility Lenders.

66.     "*First Lien Exit Facility*" means, that certain $100 million first lien delayed draw term loan credit facility, the form of which shall be consistent with the RSA and the Exit Facility Term Sheet entered into, as applicable, by and among the Debtors, Reorganized Debtors, the First Lien Exit Facility Lenders, and the administrative agent thereunder, the documentation for which shall be set forth in the Plan Supplement.

67.     "*Gastar*" means Gastar Exploration Inc.

68.     "*General Unsecured Claim*" means any Claim that is not (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court or (b) an Administrative Claim, a Professional Fee Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Term Loan Claim, a Second Lien Notes Claim, a Hedge Party Claim, a Statutory Lien Claim, a DIP Claim or a Subordinated Securities Claim.

69.     "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

70.     "*Hedge Parties*" means Cargill and NextEra, each in its capacity as holders of Hedge Party Claims.

71.     "*Hedge Party Claims Payment Amount*" means an amount equal to 100% of the Hedge Party Claims.

72.     "*Hedge Party Claims*" means, with respect to each Hedge Party, individually, or all Hedge Parties, collectively, as context requires, all Claims arising under or related to the Debtors' prepetition hedging and/or swaps transactions entered into between any Debtor and such Hedge Party, including all liabilities and obligations outstanding as of the Petition Date and all claims arising out of any termination of such transactions, and reasonable, actual, and documented fees, costs, and expenses incurred in connection with such transactions.

73.     "*Hedge Party RSA*" means that certain Hedge Party Restructuring Support Agreement, dated as of October 26, 2018, by and among the Debtors and the Hedge Parties, as may be amended, modified, or supplemented from time to time, in accordance with its terms

74.     "*Hedge Party Secured Note Documents*" means the agreements and instruments memorializing the Hedge Party Secured Notes, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages or deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the First Lien Exit Facility.

75.     "*Hedge Party Secured Notes*" means two new secured notes, each in an amount equal to the difference between (i) the full amount of the applicable Hedge Party Claims Payment Amount and (ii) the applicable Catch-Up Payment Amount, in each case of each of the Hedge Parties as of the Effective Date, by and among the Reorganized Debtors, on the one hand, and each of the Hedge Parties, on the other hand, which notes shall be secured by an uncapped first priority security interest and lien on the collateral securing the respective Hedge Party Claims as of the Petition Date (that ranks *pari passu* with the liens granted to the holders of the senior-most creditors (with respect to debt for borrowed money) of the Debtors (which, for the avoidance of doubt, may be the creditors under the First Lien Exit Facility) and otherwise in form and substance consistent with the Hedge Party Term Sheet.

76.     "*Hedge Party Term Sheet*" means the Hedge Party Term Sheet attached as <u>Exhibit A</u> to the Hedge Party RSA.

77.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

78. "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

79. "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor, other than any claims against any Debtor held by the Term Lenders and Second Lien Noteholders.

80. "*Intercompany Interest*" means (a) an Interest in one Debtor held by another Debtor or (b) an Interest in a Debtor held by an Affiliate of a Debtor, but excluding any Interest in a Debtor held by the Ares Equity Holders.

81. "*Interest*" means any Equity Security in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

82. "*Interim DIP Order*" means *Interim Order Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-In-Possession Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Primed Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* to be filed and approved by the Bankruptcy Court in the Chapter 11 Cases.

83. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

84. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

85. "*Management Incentive Plan*" means that certain post-Effective Date management incentive plan that shall provide for ten percent (10%) of the New Common Equity, on a fully diluted basis, to be reserved for issuance to management of the Reorganized Debtors after the Effective Date at the discretion of the New Board and on terms to be determined by the New Board (including with respect to allocation, timing and structure of such issuance and the Management Incentive Plan).

86. "*Milestones*" means the milestones set forth in the Restructuring Term Sheet.

87. "*New Board*" means the board of directors of Reorganized Gastar.

88. "*New Common Equity*" means new common equity interests in Reorganized Gastar issued on the Effective Date, which equity may take the form of equity interests in a limited liability company or in a limited liability partnership or stock in a corporation.

89. "*New Common Warrants*" means the 3-year warrants exercisable for cash into up to 2.5% of the number of shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of the New Common Equity outstanding on the Effective Date with a strike price equal to, as of any applicable date of determination, (a) (i) the amount of the Second Lien Notes Claims outstanding as of immediately prior to the Effective Date *plus* (ii) the amount of interest that would have accrued (assuming such interest is compounded on each March 1, June 1, September 1 and December 1) on the Second Lien Notes Claims through such date if the Second Lien Notes Claims had remained outstanding after the Effective Date and through such date *plus* (iii) the amount of the Equitized Senior Obligations *plus* (iv) the amount of interest that would have accrued on the Equitized Senior Obligations through such date if the Equitized Senior Obligations had remained outstanding in accordance with their terms after the Effective Date and through such date (assuming such interest is compounded on each March 31, June 30, September 30 and December 31) *plus* (v) the aggregate liquidation preference of the Existing Preferred Interests as of immediately prior to the effectiveness of the Effective Date *plus* (vi) the amount of dividends that would have accrued on such Existing Preferred Interests through such date if the Existing Preferred Interests had remained outstanding after the Effective Date and through such date, *divided by* (ii) the number of shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity issued under the Plan on the Effective Date.

90.    "*New Money DIP Loans*" means up to $100 million in new money financing provided by the DIP Lenders pursuant to the DIP Loan Documents.  For the avoidance of doubt, such loans shall not include any obligations arising under the Term Loan Credit Agreement that were refinanced on or after the Petition Dare pursuant to the DIP Loan Documents.

91.    "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, limited liability company agreements, partnership agreements, or other organizational documents, investor rights agreements, or shareholders' agreements, as applicable, which shall be consistent with the Restructuring Term Sheet and section 1123(a)(6) of the Bankruptcy Code (as applicable).

92.    "*New Preferred Warrants*" means the 3-year warrants exercisable for cash into up to 2.5% of the number of shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of the New Common Equity outstanding on the Effective Date with a strike price equal to, as of any applicable date of determination, (a) (i) the amount of the Second Lien Notes Claims outstanding as of immediately prior to the Effective Date *plus* (ii) the amount of interest that would have accrued (assuming such interest is compounded on each March 1, June 1, September 1 and December 1) on the Second Lien Notes Claims through such date if the Second Lien Notes had been outstanding after the Effective Date and through such date *plus* (iii) the amount of the Equitized Senior Obligations *plus* (iii) the amount of interest that would have accrued on the Equitized Senior Obligations through such date if the Equitized Senior Obligations had remained outstanding in accordance with their terms after the Effective Date and through such date (assuming such interest is compounded on each March 31, June 30, September 30 and December 31) *divided by* (b) the number of shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity issued under the Plan on the Effective Date.

93.    "*New Warrant Value*" means the value of the applicable New Preferred Warrants or New Common Warrants, as the case may be, as reasonably determined by the Debtors and the Consenting Parties using the Black Scholes model or such other valuation methodology as is customary for valuations of this type.

94.    "*New Warrants*" means, collectively, the New Common Warrants and the New Preferred Warrants.

95.    "*NextEra*" means NextEra Energy Marketing, LLC.

96.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

97.    "*Other Secured Claim*" any claim against the Debtors (other than the Term Loan Claims, the Second Lien Notes Claims, the Hedge Party Claims, and the Statutory Lien Claims) that is: (a) secured by a lien on property in which the Debtors have an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

98.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

99.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

100.    "*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

101.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors, to the extent reasonably practicable, no later than seven (7) days before the Confirmation Hearing

or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) New Organizational Documents; (b) First Lien Exit Facility Documents; (c) the Second Lien Exit Facility Documents; (d) the Hedge Party Secured Notes; (e) Schedule of Retained Causes of Action; (f) the Warrant Agreement; (g) the Stockholders Agreement, if applicable; (h) the Assumed Executory Contract and Unexpired Lease List; (i) the Rejected Executory Contract and Unexpired Lease List; and (j) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

102.     "*Plan*" means this *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, modified, supplemented or restated from time to time in accordance with the terms herein and the RSA), including the Plan Supplement, which is incorporated herein by reference.

103.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

104.     "*Private Placement Securities*" has the meaning given to such term in Article IV.N of this Plan.

105.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

106.     "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

107.     "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

108.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

109.     "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

110.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

111.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

112.     "*Rejected Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases, if any, determined to be rejected by the Debtors pursuant to the Plan with the consent of the Consenting Parties or Reorganized Debtors, as applicable, which list shall be included in the Plan Supplement.

113.     "*Released Party*" means each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Parties; (d) the Term Lenders; (e) the Second Lien Noteholders; (f) the Ares Equity Holders; (g) the Term Agent; (h) the Second Lien Trustee; (i) the DIP Lenders; (j) DIP Agent; (k) the First Lien Exit Facility Lenders; (l) the First Lien Exit Facility Agent; (m) the Second Lien Exit Facility Lenders; (n) the Second Lien Exit Facility Agent; (o) the Hedge Parties; and (p) with respect to each of the foregoing entities in clauses (a) through (p), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, participants, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board

members, financial advisors, partners, limited partners, general partners, attorneys, advisors, accountants, investment bankers, consultants, representatives, and other professionals.

114.     "*Releasing Parties*" means each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Parties; (d) the Term Lenders; (e) the Second Lien Noteholders; (f) the Ares Equity Holders; (g) the Term Agent; (h) the Second Lien Trustee; (i) the DIP Lenders; (j) the DIP Agent; (k) the First Lien Exit Facility Lenders; (l) the First Lien Exit Facility Agent; (m) the Second Lien Exit Facility Lenders (n) the Second Lien Exit Facility Agent; (o) the Hedge Parties; (p) all holders of Claims; (q) all holders of Interests; and (r) with respect to each of the foregoing entities in clauses (a) through (r), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, participants, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

115.     "*Reorganized Debtors*" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

116.     "*Reporting Triggering Event*" has the meaning given to such term in Article IV.E.2 of the Plan.

117.     "*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as <u>Exhibit A</u> to the RSA.

118.     "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan and contemplated in the RSA.

119.     "*RSA*" means that certain Restructuring Support Agreement, dated as of October 26, 2018, by and among the Debtors and the Consenting Parties, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

120.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time with the consent (such consent not to be unreasonably withheld) of the Consenting Parties and the Debtors.

121.     "*Second Lien Additional Amount*" means $23,369,951.46.

122.     "*Second Lien Exit Facility Agent*" means the administrative agent under the Second Lien Exit Facility Loan Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Second Lien Exit Facility Loan Agreement.

123.     "*Second Lien Exit Facility Documents*" means the agreements memorializing the Second Lien Exit Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Second Lien Exit Facility.

124.     "*Second Lien Exit Facility Lenders*" means those lenders party to the Second Lien Exit Facility Loan Agreement.

125.     "*Second Lien Exit Facility Loan Agreement*" means that certain loan agreement memorializing the Second Lien Exit Facility, which shall be entered into among one or more of the Debtors or the Reorganized Debtors (as applicable), the Second Lien Exit Facility Agent, and the Second Lien Exit Facility Lenders.

126.     "*Second Lien Exit Facility*" means, that certain $200 million second lien term loan credit facility, the form of which shall be consistent with the RSA and Exit Facility Term Sheet entered into, as applicable, by and among the Debtors, Reorganized Debtors, the Second Lien Exit Facility Lenders, and the administrative agent thereunder, the documentation for which shall be set forth in the Plan Supplement.  Notwithstanding the foregoing, the Consenting Parties shall have the right to reduce the principal amount of the Second Lien Exit Facility in such amount as they may determine on or prior to the Effective Date.

127.     "*Second Lien Indenture*" means that certain Indenture dated March 3, 2017 (as amended, restated, modified or supplemented from time to time), by and among Gastar, as issuer, the guarantors specified therein or in related transaction documentation, and the Second Lien Trustee.

128.     "*Second Lien Noteholders*" means the holders of Second Lien Notes.

129.     "*Second Lien Notes Claims*" means all Claims rising under or in respect of the Second Lien Indenture, which, if the DIP Toggle Event has occurred, shall include the Second Lien Additional Amount.

130.     "*Second Lien Notes*" means the notes issued pursuant to the Second Lien Indenture.

131.     "*Second Lien Trustee*" means Wilmington Trust, National Association, in its capacity as trustee under the Second Lien Indenture.

132.     "*Secured Claim*" means a Claim:  (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

133.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

134.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

135.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

136.     "*Senior Additional Amount*" means $50,541,158.61.

137.     "*Statutory Lien Claims*" means any Claims secured by statutory mechanic's or construction liens as of the Petition Date in accordance with applicable non-bankruptcy law.

138.     "*Subordinated Securities Claim*" means a Claim of the type described in and subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

139.     "*Term Agent*" means Wilmington Trust, National Association.

140.     "*Term Lenders*" means the lenders to the Term Loan Credit Agreement.

141.     "*Term Loan Claims*" means any and all Claims arising under or in respect of the Term Loan Credit Agreement, which, if the DIP Toggle Event has occurred, shall include the Senior Additional Amount (regardless of whether the Term Loan Refinancing (as defined in the DIP Term Sheet) has occurred).

142.     "*Term Loan Credit Agreement*" means the Third Amended and Restated Credit Agreement, dated March 3, 2017 (as amended, restated, modified or supplemented from time to time) by and among Gastar, as borrower, the guarantors specified therein or in related transaction documentation, the Term Lenders from time to time party thereto, the Term Agent.

143.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

144.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

145.    "*Warrant Agreement*" means that certain agreement providing for, among other things, the issuance and terms of the New Warrants.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, restated or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and the RSA all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (15) any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.  Notwithstanding the foregoing, no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not

incorporated in New York shall be governed by the laws of the state of incorporation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such Plan document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Claims.*

Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, (a) each holder of an Allowed DIP Claim arising on account of the New Money DIP Loans shall receive its Pro Rata share of participation in the First Lien Exit Facility in an amount equal to such Allowed DIP Claims outstanding on the Effective Date, (b) each holder of an Allowed DIP Claim, other than Allowed DIP Claims arising on account of the New Money DIP Loans, shall receive its Pro Rata share of participation in the Second Lien Exit Facility in an equal

13

face amount up to an aggregate amount of $200 million, and (c) each holder of any remaining Allowed DIP Claims not refinanced or otherwise satisfied pursuant to the First Lien Exit Facility or Second Lien Exit Facility (which shall constitute Equitized Senior Obligations) shall receive such holder's Pro Rata share (measured by reference to the aggregate amount of Equitized Senior Obligations, Second Lien Notes Claims, and, as applicable upon the occurrence of a DIP Toggle Event, General Unsecured Claims) of 100% of the New Common Equity, subject to dilution on account of, as applicable, the New Warrants and the Management Incentive Plan (such treatment, the "DIP Facility Payoff"). Notwithstanding the foregoing, the Consenting Parties shall have the right to reduce the principal amount of the Second Lien Exit Facility in such amount as they may determine on or prior to the Effective Date.

Unless and until the DIP Facility Payoff has occurred, notwithstanding entry of the Confirmation Order and anything to the contrary in this Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens securing the DIP Claims shall be deemed to have been waived, released, satisfied or discharged, in whole or in part, and (iii) none of the DIP Loan Documents shall be deemed terminated, discharged, satisfied or released or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

C.     *Professional Fee Claims.*

1.     Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2.     Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining funds in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.     Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.     Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Effective Date, any requirement that Professionals

14

comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Code.

D.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Hedge Party Claims | Impaired | Entitled to Vote |
| Class 4 | Statutory Lien Claims | Impaired | Entitled to Vote |
| Class 5 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 6 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 9 | Interests in Debtors other than Gastar | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 10 | Existing Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Existing Common Interests and Subordinated Securities Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests.*

Provided that a DIP Toggle Event has not occurred, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent

15

that a holder of an Allowed Claim or Allowed Interest agrees to a less favorable treatment.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1. Class 1 - Other Secured Claims

    (a)   *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

    (b)   *Treatment*:  Each holder of an Allowed Class 1 Claim shall receive, at the option of the applicable Debtor, with the consent (such consent not to be unreasonably withheld) of the Consenting Parties:

        (i)   payment in full in Cash of its Allowed Class 1 Claim;

        (ii)   the collateral securing its Allowed Class 1 Claim;

        (iii)   Reinstatement of its Allowed Class 1 Claim; or

        (iv)   such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)   *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2. Class 2 - Other Priority Claims

    (a)   *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

    (b)   *Treatment*:  Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim on the later of (i) the Effective Date or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract, or other agreement giving rise to such Allowed Class 2 Claim.

    (c)   *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3. Class 3 - Hedge Party Claims

    (a)   *Classification*:  Class 3 consists of Hedge Party Claims against any Debtor.

    (b)   *Allowance*:  Class 3 Claims shall be Allowed on the Effective Date in full.

    (c)   *Treatment*:  Each holder of an Allowed Class 3 Claim shall receive Cash in an amount equal to 100% of the Allowed amount of such holder's Claims, payable in the following installments:

        (i)   on the Effective Date, an amount (the "Catch-Up Payment Amount") equal to the *product* of (A) the number of monthly settlement payments that would have occurred after the Hedge Termination Date and on or prior to the Effective Date had the Hedge Party Claims not been liquidated *divided* by 14 and (B) the

16

applicable Hedge Party Claims Payment Amount with respect to such holder; and

(ii)     the remaining amount of the Hedge Party Claims Payment Amount with respect to such holder in equal monthly installments beginning on the first day of the first month following the Effective Date and ending on December 1, 2019, pursuant to the Hedge Party Secured Notes.

(d)     *Voting:*  Class 3 is Impaired under the Plan.  Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.   <u>Class 4 - Statutory Lien Claims</u>

(a)     *Classification*:  Class 4 consists of Statutory Lien Claims against any Debtor.

(b)     *Treatment*:  Each holder of an Allowed Class 4 Claim shall receive:

(i)     on the Effective Date, cash in an amount equal to 50% of the Allowed amount of such holder's Allowed Class 4 Claim; and

(ii)     on the date that is six months following the Effective Date, cash in an amount equal to the remaining 50% of the Allowed amount of such holder's Allowed Class 4 Claim.

(c)     *Voting:*  Class 4 is Impaired under the Plan.  Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.   <u>Class 5 – Term Loan Claims</u>

(a)     *Classification*:  Class 5 consists of all Term Loan Claims.

(b)     *Allowance*:  Class 5 Claims shall be Allowed on the Effective Date in full.

(c)     *Treatment*:  Each holder of an Allowed Class 5 Claim shall receive:

(i)     only to the extent there is remaining availability under the Second Lien Exit Facility after the refinancing and satisfaction of all Allowed DIP Claims in accordance with Article II.B of this Plan, its Pro Rata share of participation in such remaining availability under the Second Lien Exit Facility in an equal face amount not to exceed $200 million; and

(ii)     to the extent there are remaining Allowed Class 5 Claims not refinanced or otherwise satisfied pursuant to the Second Lien Exit Facility (which remaining amounts shall constitute Equitized Senior Obligations), its Pro Rata share (measured by reference to the aggregate amount of Equitized Senior Obligations, Second Lien Notes Claims, and, as applicable upon the occurrence of a DIP Toggle Event, General Unsecured Claims) of 100% of the New Common Equity,

subject to dilution on account of, as applicable, the Management Incentive Plan and the New Warrants.

(d)    *Voting*: Class 5 is Impaired under the Plan.  Holders of Allowed Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Second Lien Notes Claims</u>

(a)    *Classification*:  Class 6 consists of all Second Lien Notes Claims.

(b)    *Allowance*:  Class 6 Claims shall be Allowed on the Effective Date in full.

(c)    *Treatment*:  Each holder of an Allowed Class 6 Claim shall receive its Pro Rata share (measured by reference to the aggregate amount of Equitized Senior Obligations, Second Lien Notes Claims, and, as applicable upon the occurrence of a DIP Toggle Event, General Unsecured Claims) of 100% of the New Common Equity, subject to dilution on account of, as applicable, the Management Incentive Plan and the New Warrants.

(d)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of Allowed Claims in Class 6 are entitled to vote to accept or reject the Plan.

7.    <u>Class 7 - General Unsecured Claims</u>

(a)    *Classification:*  Class 7 consists of all General Unsecured Claims against any Debtor.

(b)    *Treatment:*  Each holder of an Allowed Class 7 Claim shall receive Cash in an amount equal to such Allowed General Unsecured Claim on the later of:

(i)    the Effective Date; or

(ii)    the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract, or other agreement giving rise to such Allowed General Unsecured Claim.

(c)    *Voting:*  Class 7 is Unimpaired under the Plan.  Holders of Allowed Class 7 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8.    <u>Class 8 - Intercompany Claims</u>

(a)    *Classification:*  Class 8 consists of all Intercompany Claims

(b)    *Treatment:*  Class 8 Claims shall be, at the option of the Debtor, with the consent (such consent not to be unreasonably withheld) of the Consenting Parties, either Reinstated or cancelled and released without any distribution.

(c)    *Voting:*  Class 8 is Unimpaired if the Class 8 Claims are Reinstated or Impaired if the Class 8 Claims are cancelled.  Holders of Class 8 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 8 Claims are not entitled to vote to accept or reject the Plan.

9.  Class 9 - Interests in the Debtors other than Gastar

    (a)    *Classification*:  Class 9 consists of all Interests in the Debtors other than Gastar.

    (b)    *Treatment*:  Class 9 Interests shall be, at the option of the Debtor, with the consent (such consent not to be unreasonably withheld) of the Consenting Parties, either Reinstated or cancelled and released without any distribution.

    (c)    *Voting*:  Class 9 is Unimpaired if the Class 9 Interests are Reinstated or Impaired if the Class 9 Interests are cancelled.  Holders of Class 9 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 9 Interests are not entitled to vote to accept or reject the Plan.

10.  Class 10 - Existing Preferred Interests

    (a)    *Classification*:  Class 10 consists of all Existing Preferred Interests in Gastar.

    (b)    *Treatment*:  Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests.  Notwithstanding the foregoing, to the extent no holders of Class 10 Interests or Class 11 Interests seek appointment of an official committee of equity security holders, seek the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transactions, Confirmation of the Plan, or entry of the DIP Orders, holders of Class 10 Interests shall receive their Pro Rata share of the New Preferred Warrants.  If any holder of Class 10 Interests or Class 11 Interests seeks appointment of an official committee of equity security holders, seek the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transactions, Confirmation of the Plan, or entry of the DIP Orders, holders of Class 10 Interests shall not receive the New Preferred Warrants.

    (c)    *Voting*:  Class 10 Existing Preferred Interests are Impaired under the Plan.  Holders of Interests in Class 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 10 Interests are not entitled to vote to accept or reject the Plan.

11.  Class 11 - Existing Common Interests and Subordinated Securities Claims

    (a)    *Classification*:  Class 11 consists of all Existing Common Interests in and all Subordinated Securities Claims against Gastar.

    (b)    *Treatment*:  Class 11 Claims and Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 11 Claims and Interests will not receive any distribution on account of such Class 11 Claims and Interests.  Notwithstanding the foregoing, to the extent no holders of Class 11 Claims and Interests or holders of Class 10 Interests seek appointment of an official committee of equity security holders, seek the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transactions, Confirmation of the Plan, or entry of the DIP Orders, holders of Class 11 Claims and Interests shall receive their Pro Rata share of the New Common Warrants.  If any holder of Class 11 Claims and Interests or holders of Class 10 Interests seeks appointment of an official committee of equity security holders, seek the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transactions, Confirmation of

the Plan, or entry of the DIP Orders, holders of Class 11 Claims and Interests shall not receive the New Common Warrants.

    (c)    *Voting*:  Class 11 Existing Common Interests and Subordinated Securities Claims are Impaired under the Plan.  Holders of Interests and Claims in Class 11 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 11 Interests and Claims are not entitled to vote to accept or reject the Plan.

C.    *Certain Provisions Effective Upon the Occurrence of a DIP Toggle Event.*

Notwithstanding anything to the contrary in this Plan, in the event that a DIP Toggle Event has occurred, each holder of an Allowed Claim or Allowed Interest, as applicable, in Class 7, Class 10, and Class 11 shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent that a holder of an Allowed Claim or Allowed Interest agrees to a less favorable treatment.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.  For the avoidance of doubt, all holders of Allowed Claims or Allowed Interests, as applicable, in Classes other than Class 7, Class 10, or Class 11 shall receive the treatment applicable to such Allowed Claims or Allowed Interests, as applicable, prescribed under Article III.B of this Plan.

    7.    <u>Class 7 - General Unsecured Claims (Treatment upon the Occurrence of a DIP Toggle Event)</u>

    (a)    *Classification:*  Class 7 consists of all General Unsecured Claims against any Debtor.

    (b)    *Treatment:*  Each holder of an Allowed Class 7 Claim shall receive its Pro Rata share (measured by reference to the aggregate amount of Equitized Senior Obligations, Second Lien Notes Claims, and General Unsecured Claims) of 100% of the New Common Equity, subject to dilution on account of, as applicable, the Management Incentive Plan.

    (c)    *Voting:*  Class 7 General Unsecured Claims are Impaired under the Plan.  Holders of Claims in Class 7 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

    10.    <u>Class 10 - Existing Preferred Interests (Treatment upon the Occurrence of a DIP Toggle Event)</u>

    (a)    *Classification*:  Class 10 consists of all Existing Preferred Interests in Gastar.

    (b)    *Treatment*:  Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests.

    (c)    *Voting*:  Class 10 Existing Preferred Interests are Impaired under the Plan.  Holders of Interests in Class 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 10 Interests are not entitled to vote to accept or reject the Plan.

    11.    <u>Class 11 - Existing Common Interests and Subordinated Securities Claims (Treatment upon the Occurrence of a DIP Toggle Event)</u>

    (a)    *Classification*:  Class 11 consists of all Existing Common Interests in and all Subordinated Securities Claims against Gastar.

    (b)    *Treatment*:  Class 11 Claims and Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 11

Claims and Interests will not receive any distribution on account of such Class 11 Claims and Interests.

(c)     *Voting*:   Class 11 Existing Common Interests and Subordinated Securities Claims are Impaired under the Plan.   Holders of Interests and Claims in Class 11 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 11 Interests and Claims are not entitled to vote to accept or reject the Plan.

Upon the occurrence of a DIP Toggle Event and prior to the Confirmation Hearing, the Debtors, after consultation and with the consent of the Consenting Parties, shall implement such other technical modifications to the Plan as are necessary to implement the Restructuring Transactions consistent with the foregoing.

D.     *Release of Statutory Liens.*

The prepetition statutory liens securing any Statutory Lien Claims shall be automatically released and discharged on the Effective Date without the requirement of any further notice, demand or order of the Bankruptcy Court or any other court or any action by any party.  Immediately upon payment on the Effective Date of 50% of an Statutory Lien Claims, as contemplated by this Plan, each holder of Statutory Lien Claims shall take all commercially reasonable actions to effectuate and document the release of such prepetition liens securing such Statutory Lien Claims in accordance with applicable non-bankruptcy law.

E.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

F.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

G.     *Voting Classes, Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

H.     *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of New Common Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

I.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.   The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code

21

requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules

*J.*        *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*K.*        *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors, with the consent of the Consenting Parties, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.*        *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Term Loan Claims or the Second Lien Notes Claims and (2) any claim to avoid, subordinate, or disallow any Term Loan Claim or the Second Lien Notes Claim, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

*B.*        *Restructuring Transactions.*

On the Effective Date, the applicable Debtors or the Reorganized Debtors, with the consent of the Consenting Parties, shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan or otherwise contemplated by the RSA, including the issuance of all securities, notes, instruments, certificates , and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, other corporate transactions, or any other transaction described in, approved by, contemplated by or necessary to effectuate the Plan, in each case subject to the DIP Orders and any limitations or agreement set forth in the RSA or the DIP Loan Documents (collectively, the "Restructuring Transactions").  The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer,

assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other organizational documents pursuant to applicable state or provincial law; (4) as applicable, all transactions necessary to provide for the purchase of substantially all of the asserts or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Gastar, which may be structured as a taxable transaction for United States federal income tax purposes; and (5) all other actions that the Debtors or the Reorganized Debtors, with the consent of the Consenting Parties, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

C.      *Definitive Documentation.*

Except as set forth in the immediately succeeding sentence, all Definitive Documents shall be in form and substance reasonably acceptable to the Debtors and the Consenting Parties.  Notwithstanding the foregoing, (1) the Plan, the Plan Supplement (but excluding the New Organizational Documents), the Disclosure Statement, the DIP Orders, the DIP Loan Documents, the First Lien Exit Facility Documents, and the Second Lien Exit Facility Documents shall each be in form and substance satisfactory to the Consenting Parties and the Debtors, each in their sole discretion, and (2) each of the New Organizational Documents shall be in form and substance satisfactory solely to the Consenting Parties in their sole discretion.

D.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

E.      *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan with:  (1) Cash on hand, including Cash from operations; (2) the New Common Equity; (3) the New Warrants, (4) the First Lien Exit Facility, (5) the Second Lien Exit Facility; and (6) the Hedge Party Secured Notes.

1.      Issuance of New Common Equity.

The issuance of the New Common Equity, including options, or other equity awards, if any, reserved for the Management Incentive Plan, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests.  The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity required to be issued under the Plan and pursuant to its New Organizational Documents.  On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

2. <u>Issuance of New Warrants</u>.

On the Effective Date, the Debtors will issue the New Warrants only to the extent required to provide for distributions to holders of Class 10 and Class 11 Interest as contemplated by this Plan.

The issuance of the New Warrants shall be conditioned upon each of the following: (i) the holders of the New Warrants holding passive positions (*i.e.*, no minority governance, registration, or similar rights) following such issuance, and any exercise, of the New Warrants; (ii) such issuance of the New Warrants being exempt from the registration requirements under the Securities Act and any other applicable federal, state or other securities laws; (iii) in no event shall any fractional New Warrants be required to be issued; (iv) such issuance of New Warrants not resulting in any of the entities holding the reorganized business of the Debtors following the consummation of the Restructuring Transaction being required to be a publicly held company or otherwise being required to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise (a "<u>Reporting Triggering Event</u>"); and (v) in no event shall any New Warrants be required to be issued to any competitors of the Debtors.

Notwithstanding the foregoing, in the event that the issuance of the New Warrants would result in the issuance of fractional New Warrants, the occurrence of a Reporting Triggering Event or the issuance of New Warrants to a competitor of the Debtors, the Consenting Parties (prior to the Effective Date) or the Reorganized Debtors (on or after the Effective Date), as applicable, each in their sole discretion, be entitled to elect (a "<u>Cash-Out Election</u>"):

(a)  in the case of the failure of the condition set forth in such clause (iii) and/or the condition set forth in such clause (iv), to direct that any holder or holders of Existing Preferred Interests and any holders or holders of Existing Common Interests designated by the Consenting Parties (the designation of such holders to be made in the sole discretion of the Consenting Parties and taking into account the purpose of preventing the issuance of fractional New Warrants and/or the occurrence of a Reporting Triggering Event, as the case may be) shall receive instead of New Warrants a distribution of cash in an amount equal to the New Warrant Value of the New Warrants such holders would have otherwise received but for the failure of the applicable conditions(s); and/or

(b)  in the case of the failure of the condition set forth in such clause (v), to direct that such holders of Existing Preferred Interests and holders of Existing Common Interests that are competitors of the Debtors shall be entitled to a distribution of cash in an amount equal to the New Warrant Value of the New Warrants such holders would have otherwise received but for the failure of the applicable condition.

In the event the Consenting Parties (prior to the Effective Date) or the Reorganized Debtors (on or after the Effective Date), as applicable, make any Cash-Out Election(s), then the amount of New Warrants granted pursuant to this Plan shall be reduced accordingly.

The New Warrants shall not be registered under the Securities Act or any other applicable federal, state or other securities laws, and will be issued pursuant to applicable exemptions therefrom.  The New Warrants shall be transferable subject to restrictions pursuant to applicable federal, state and other securities laws.  In addition, such New Warrants shall only be transferable to "qualified institutional buyers" within the meaning of Rule 144A promulgated under the Securities Act and "accredited investors" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D promulgated under the Securities Act who are not disqualified persons under Rule 506(d) of Regulation D promulgated under the Securities Act.

The New Warrants shall also be subject to restrictions:

(a)  designed to prevent the occurrence of circumstances that are reasonably expected by the Consenting Parties to require registration or qualification of the New Warrants pursuant to federal, state or other securities laws, or require the Consenting Parties to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise;

(b)  on transfers that would subject the Consenting Parties or the Reorganized Debtors to regulation under

the Investment Company Act of 1940, the Investment Advisers Act of 1940 or the U.S. Employee Retirement Income Security Act of 1974, each as amended;

(c)     as specified in the Warrant Agreement; and

(d)     on transfers to competitors.

All holders of New Common Equity issued or issuable upon the exercise of the New Warrants shall be required to become parties to a stockholders or similar agreement with respect to the post-emergence equity in the entities holding the reorganized business of the Debtors.

In the event that a sale is consummated prior to the 3-year anniversary of the Effective Date, any New Warrants then remaining outstanding and unexercised shall expire worthless and will automatically be cancelled for no further consideration.   For the avoidance of doubt, no holder of New Warrants shall be entitled to the fair market value of the New Warrants (using the Black Scholes model or otherwise) in connection with a sale, but shall have the right to exercise the New Warrants at any time prior to such sale.   The Debtors shall provide the holders of the New Warrants with five (5) business days' prior written notice of a sale.   As used in this paragraph, the term "sale" applies to any transaction with respect to the Debtors (or any successor to the Debtors) and/or its subsidiaries taken as a whole and means (i) any consolidation, (ii) any merger, (iii) any disposition, transfer, conveyance or sale of all or a majority of the assets or equity interests, (iv) any transaction in which the holders of equity interests (other than the New Warrants) are entitled to receive (either directly or upon subsequent liquidation) cash, securities or other property with respect to, or in exchange for, such equity interests, and/or (v) any transaction similar to the foregoing.

For the avoidance of doubt, notwithstanding anything to the contrary in this Plan, neither the Debtors nor any of the entities holding the reorganized business of the Debtors following the Effective Date shall be required to take any action that would result in the Debtors or such entity, as the case may be, being required to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise.

3.     <u>First Lien Exit Facility</u>

On the Effective Date, the Reorganized Debtors shall enter into the First Lien Exit Facility, the terms of which will be set forth in the First Lien Exit Facility Documents.   The First Lien Exit Facility shall take the form of a first lien delayed draw term loan facility in the aggregate amount of $100 million.   On the Effective Date, the First Lien Exit Facility shall have an amount outstanding equal to the drawn amount of the New Money DIP Loans on the Effective Date.   All committed, but undrawn New Money DIP Loans as of the Effective Date shall convert to commitments for future term loans under the First Lien Exit Facility.   The First Lien Exit Facility shall otherwise contain terms and provisions as set forth in the Exit Facility Term Sheet.

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the First Lien Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Court, (i) execute and deliver those documents necessary or appropriate to obtain the First Lien Exit Facility, including the First Lien Exit Facility Documents, (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as (A) the Debtors, with the consent of the Consenting Parties or (B) Reorganized Debtors (the foregoing (A) or (B) as applicable), may deem to be necessary to consummate the First Lien Exit Facility, (iii) grant the Liens on and security interests in all assets of each Reorganized Debtor securing such Reorganized Debtors' indebtedness liabilities and obligations under the First Lien Exit Facility Documents, and (iv) and pay of all fees, indemnities, and expenses provided for in the First Lien Exit Facility Documents.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the First Lien Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the First Lien Exit Facility Documents, (c) shall be deemed perfected on the Effective Date automatically, without the necessity of filing or recording any financing statement, assignment, pledge, notice of lien or any similar document or instrument or taking any action (including taking possession of any such collateral), but the First Lien Exit Facility Agent, in its discretion,

25

shall be authorized to make any such recording or filing or to take any such action, and in such event the Reorganized Debtors shall cooperate with and assist the First Lien Exit Facility Agent, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

4.    Second Lien Exit Facility

On the Effective Date, the Reorganized Debtors shall enter into the Second Lien Exit Facility, the terms of which will be set forth in the Second Lien Exit Facility Documents and which shall be deemed to be fully drawn on the Effective Date.  The Second Lien Exit Facility shall take the form of a second lien term loan facility in the aggregate amount of $200 million.  The Second Lien Exit Facility shall otherwise contain terms and provisions as set forth in the Exit Facility Term Sheet, and may be documented as one multi-tranche credit facility together with the First Lien Exit Facility.

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Second Lien Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Court, (i) execute and deliver those documents necessary or appropriate to obtain the Second Lien Exit Facility, including the Second Lien Exit Facility Documents, (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as (A) the Debtors, with the consent of the Consenting Parties or (B) Reorganized Debtors (the foregoing (A) or (B) as applicable), may deem to be necessary to consummate the Second Lien Exit Facility, (iii) grant the Liens on and security interests in all assets of each Reorganized Debtor securing such Reorganized Debtors' indebtedness liabilities and obligations under the Second Lien Exit Facility Documents, and (iv) pay all fees, indemnities, and expenses provided for in the Second Lien Exit Facility Documents.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Second Lien Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Second Lien Exit Facility Documents, (c) shall be deemed perfected on the Effective Date automatically, without the necessity of filing or recording any financing statement, assignment, pledge, notice of lien or any similar document or instrument or taking any action (including taking possession of any such collateral), but the Second Lien Exit Facility Agent, in its discretion, shall be authorized to make any such recording or filing or to take any such action, and in such event the Reorganized Debtors shall cooperate with and assist the Second Lien Exit Facility Agent, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

5.    Hedge Party Secured Notes

On the Effective Date, the Reorganized Debtors shall enter into the Hedge Party Secured Notes, which shall contain terms and provisions consistent with the Hedge Party Term Sheet.  To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Hedge Party Secured Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Court, to (i) execute and deliver those documents necessary or appropriate to obtain the Hedge Party Secured Notes and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors (or Reorganized Debtors, as applicable), the Hedge Parties and the Consenting Parties, may deem to be necessary to consummate the Hedge Party Secured Notes.

F.    *Holders of Working and Similar Interests*

The legal and equitable rights, interests, defenses, and obligations of lessors under the Debtors' oil and gas leases, holders of certain other mineral interests related to the Debtors' oil and gas properties, owners of non-operating working interests in the Debtors' oil and gas properties, counterparties to the Debtors' joint operating agreements, and holders of claims related to joint-interest billings and other similar working interests (but excluding, for the avoidance

of doubt, midstream contracts, gathering contracts or any similar contracts or agreements) shall not be impaired in any manner by the provisions of this Plan. Nor shall anything in this Plan impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors or the Reorganized Debtors. To the extent applicable, such Claims or Interests shall be Reinstated pursuant to this Plan.

Notwithstanding the foregoing, nothing in this Article IV.F of this Plan shall limit the Debtors' rights to reject any executory contract or unexpired lease in accordance with the Bankruptcy Code or pursuant to Article V of this Plan.

G. *Corporate Existence.*

Except as otherwise provided in the Plan, each Debtor shall continue to exist as of and after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the RSA, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

H. *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions) or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I. *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan (including, without limitation, with respect to the First Lien Exit Facility Documents, the Second Lien Exit Facility Documents, the Hedge Secured Note, and any obligations thereunder, which shall not be cancelled or discharged under the Plan), the Confirmation Order, or any agreement or instrument or other document entered into in connection with or pursuant to the Plan, all notes, equity interests (including options or warrants exercisable for, or rights to acquire, such equity interests, whether or not vested), instruments, certificates, and other documents evidencing Claims against or Interests in the Debtors, shall be cancelled and the obligations of the Debtors and any non-Debtor affiliate thereunder or in any way related thereto shall be discharged. Notwithstanding such cancellation and discharge, anything to the contrary in the Plan or the Conformation Order or the occurrence of the Effective Date, but subject to any applicable provisions of Article VI, the DIP Loan Documents, the Term Loan Documents and the Second Lien Documents shall continue in effect solely to the extent necessary to: (1) permit holders of Claims under either the DIP Loan Documents, the Term Loan Documents or the Second Lien Documents to receive Plan Distributions; (2) permit the Reorganized Debtors, the DIP Agent, the Term Agent and the Second Lien Trustee to make Plan Distributions on account of the Allowed Claims under the DIP Loan Documents, the Term Loan Documents, the Second Lien Documents, as applicable; and (3) preserve any rights of the Term Agent or Second Lien Trustee and any respective predecessor thereof as against any money or property distributable to holders of Term Loan Claims or Second Lien Notes Claims, respectively, including any priority in respect of payment of fees, expenses, or indemnification and the right to exercise any charging lien. Except as provided in this Plan (including Article VI of this Plan), on the Effective Date, the DIP Agent, the Term Agent, the Second Lien Trustee, and their respective agents, successors and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Loan Documents, the Term Loan Documents, and the Second Lien Documents, as applicable. The commitments and obligations (if any) of the Term Lenders and/or the DIP Lenders to extend any further or future credit or financial accommodations to any of the

Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the DIP Credit Agreement or the Term Loan Credit Agreement, as applicable, shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision of the DIP Credit Agreement or DIP Orders are of a type that survives repayment of the subject indebtedness, such provisions shall remain in effect notwithstanding satisfaction of the DIP Claims.

J.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan and consistent with the RSA shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors and officers for the Reorganized Debtors; (3) the distribution of the New Common Equity; (4) implementation of the Restructuring Transactions; (5) issuance of the New Warrants; (6) entry into the Warrant Agreement, the Second Lien Exit Facility Documents, and the First Lien Exit Facility Documents, as applicable; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for or contemplated in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect except as set forth in the RSA, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New Organizational Documents, the New Warrants and the Warrant Agreement (as applicable), the First Lien Exit Facility Documents (as applicable), the Second Lien Exit Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be amended, amended and restated, or replaced as may be necessary to effectuate the transactions contemplated or permitted by the Plan. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of incorporation if and to the extent required in accordance with the corporate laws of the respective state or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be consistent with the Restructuring Term Sheet and shall be included as exhibits to the Plan Supplement. After the Effective Date, the Reorganized Debtors may amend and restate New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

L.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and all of the directors for the initial term of the New Board shall be appointed by the Consenting Parties. The New Board shall initially consist of five members. In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors. The members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

M.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

N.      *Certain Securities Law Matters*

The issuance, and distribution of the New Common Equity and the New Warrants (including shares of New Common Stock upon the exercise thereof), as contemplated by Article III of this Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code, except for any such New Common Stock and New Warrants (including shares of New Common Stock upon the exercise thereof) to be issued to the Ares Equity Holders and to the Consenting Parties (the "Private Placement Securities", and the other shares of New Common Stock and the New Warrants noted above that do not constitute Private Placement Securities, the "1145 Securities")), which securities shall be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or any other available exemption from registration under the Securities Act, as applicable.  Such New Common Equity and New Warrants that are 1145 Securities will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents and the Warrant Agreement, as applicable.  In addition to the foregoing restrictions on transfers, as applicable, the Private Placement Securities will be "restricted securities" subject to resale restrictions under applicable securities laws, and may not be resold, exchanged, assigned or otherwise transferred except pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law.  Any Persons receiving "restricted securities" under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

O.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, financing statement, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant or maintenance of collateral as security for any or all of the First Lien Exit Facility or Second Lien Exit Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.        *Management Incentive Program.*

On the Effective Date, the Debtors shall reserve shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity to be available for grant from time to time to employees of the reorganized business of the Debtors pursuant to the Management Incentive Plan in an aggregate amount equal to ten percent (10%) of the New Common Equity, on a fully diluted, fully distributed basis.  All terms, conditions, allocations, securities types, exercise prices and grants of individual awards under the Management Incentive Plan shall be subject to the approval of the New Board.  Notwithstanding the foregoing, (a) no awards under the Management Incentive Plan shall vest on confirmation of the Plan and (b) the amount of awards permitted to be granted under the Management Incentive Plan each year will be subject to limitations to be determined by the New Board so that the award of grants will be staggered over a period of time.

Q.        *Employee and Retiree Benefits.*

Unless otherwise provided herein, and subject to Article V of the Plan, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

R.        *Corporate Structuring Transactions*

Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Consenting Parties) or the Reorganized Debtors, as applicable, may structure the Restructuring Transactions (a) in a tax-efficient manner designed to preserve the Debtors' favorable tax attributes for the benefit of the Reorganized Debtors and the holders of the New Common Equity following the consummation of the Restructuring Transaction and (b) to enable the Company or its successor to emerge on the Effective Date in the organizational form, and with the tax structure and tax elections, requested or consented to by the Consenting Parties.  Without limiting the foregoing, and subject to the prior consent of or at the express direction of the Consenting Parties, such tax related structuring may be effectuated through one or more of the following means (or such other means requested or consented to by the Consenting Parties): (a) on or prior to the Effective Date, the Debtors or the Reorganized Debtors may effectuate internal corporate reorganizations (i) to preserve and/or house in a holding entity the Debtors' favorable tax attributes, including, without limitation, the Debtors' net operating losses, (ii) to contribute certain of the Debtors' assets to one or more subsidiaries; (iii) to convert into, transfer its assets to or cause the equity interests in it to be transferred to, in each case, a limited liability company or a limited partnership, and/or (iv) as a result of which the Consenting Parties hold a portion of their equity interests in the reorganized Company through a corporation (the "Corporation") and another portion of such equity interests through a limited liability company or a limited partnership and (y) the New Warrants (as defined in the Term Sheet) are issued by the Corporation (b) on or prior to the Agreement Effective Date, the Consenting Second Lien Noteholders may sell or assign their Second Lien Claims (or the rights to receive the New Common Equity that such holders would receive under the Plan on account of such Second Lien Claims) to third-party investors, subject to the terms of the RSA; and (c) the Debtors or Reorganized Debtors may issue new preferred equity or common equity to third-party investors.

S.        *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.     Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease (including those set forth in the Assumed Executory Contract and Unexpired Lease List) shall, subject to the consent of the Consenting Parties, be assumed and assigned to the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are determined to be rejected by the Debtors, with the consent of the Consenting Parties or the Reorganized Debtors, as applicable, including: (1) those that are identified on the Rejected Executory Contract and Unexpired Lease List; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject an Executory Contract or Unexpired Lease Filed by the Debtors and pending on the Confirmation Date; (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; or (6) those that previously expired or terminated pursuant to its own terms.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions and assumptions and assignments of the Executory Contracts and Unexpired Leases as set forth in the Plan and the Assumed Executory Contract and Unexpired Lease List and the rejections of the Executory Contracts and Unexpired Leases as set forth in the Rejected Executory Contract and Unexpired Lease List, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List or Assumed Executory Contract and Unexpired Lease List identified in this Article V.A and in the Plan Supplement at any time through and including forty-five (45) days after the Effective Date.

To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the Executory Contract or Unexpired Lease counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.   Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

## B.     Indemnification Obligations.

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

## C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases Assumed.

No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide notices of proposed Cure amounts to counterparties to Executory Contracts and Unexpired Leases, which shall include a description of the procedures for objecting to assumption thereof based on the proposed Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in such notice.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors, with the consent of the Consenting Parties, and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.**Error! Reference source not found.** shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition (including based on the issuance of the New Common Equity pursuant to the Plan) or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to or on the effective date of assumption.  The Consummation of the Plan and the Restructuring Transactions shall not allow any counterparty to any of the Debtors' contracts or leases (including, without limitation, any Executory Contract or Unexpired Lease) to exercise any rights or remedies based on any "change-in-control" provision or similar limitation or restriction in such contracts or leases.  Any attempt by such counterparties to exercise any rights or remedies based on a "change-in-control" provision or similar limitation or restriction in such contracts or leases based on the Consummation of the Plan or the Restructuring Transactions shall be void and of no force and effect.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.**Error! Reference source not found.**, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List or the Assumed Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or

rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

G.      *Nonoccurrence of Effective Date.*

        In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

        Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

        Unless otherwise provided in the Plan or the Confirmation Order, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class; provided, however, that distributions in respect of publicly held securities shall be made on, or as soon as practicable after, the Effective Date. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

        All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all reasonable costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent.*

        1.      Powers of the Disbursing Agent.

        The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual and documented attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1. <u>Record Date for Distribution</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, the Distribution Record Date with respect to publicly held securities shall be deemed to refer to the date such distribution are made by the Disbursing Agent.

2. <u>Delivery of Distributions in General</u>.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further*, *however*, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder.  For the avoidance of doubt, distributions in respect of publicly held securities shall, where applicable, be effected via customary methods to make distributions through The Depository Trust Company, including via a mandatory exchange upon surrender thereof.

No fractional shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity or New Warrants shall be distributed, and, subject to Article IV.D.2 hereof, no cash shall be distributed in respect to such fractional amounts.   Subject to Article IV.D.2 hereof, when any distribution of pursuant to the Plan would otherwise result in the issuance of a number of shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity or New Warrants that is not a whole number, the actual distribution of shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Equity or New Warrants, as applicable, shall be rounded as follows: (a) fractions of greater than one-half (½) shall be rounded to the next higher whole number, and (b) fractions of one-half (½) or less shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares, units or equity interests (as the case may be based on how the New Common Equity is denominated) of New Common Units or New Warrants, as applicable, to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.  The Depository Trust Company is considered a single holder for rounding and distribution purposes and no additional cash or securities will be distributed to The Depository Trust Company on account of rounding at the participant or beneficial holder level therein.

The Reorganized Debtors shall reimburse the Term Agent and the Second Lien Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan.

3. <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b)

of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the claim of any holder of Claims and Interests to such property or interest in property shall be discharged and forever barred.

E.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

F.      *Allocations.*

Except as provided in the DIP Loan Documents with respect to the DIP Claims, the Term Loan Documents with respect to the Term Loan Claims, and the Second Lien Documents with respect to the Second Lien Notes Claims, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim (other than DIP Claims, Term Loan Claims or Second Lien Notes Claims), any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided, however,* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. In no event shall any holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan

36

on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

J.    *Claims Paid or Payable by Third Parties.*

    1.    <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

    2.    <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.    <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Disputed Claims Process*

Except as otherwise provided herein, if a party files a Proof of Claim and the Debtors (with the consent of the Consenting Parties) or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this <u>Article **Error! Reference source not found.**</u> of the Plan.  For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan.  **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors (with the consent of the Consenting Parties) may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors (with the consent of the Consenting Parties) and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law.  If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors (with the consent of the Consenting Parties) or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

F.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; provided that if only the Allowed amount of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

G.    *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

H.    *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.    **Release of Liens.**

**Except with respect to the First Lien Exit Facility Documents, the Hedge Party Secured Note Documents, the Second Lien Exit Facility Documents, the Plan, or any contract, instrument, release, or other agreement or document created or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such**

39

Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**C.**      *Releases by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocable and forever, released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Definitive Documentation, the RSA or Hedge Party RSA or the related prepetition transactions, the Disclosure Statement, the DIP Facility, the First Lien Exit Facility, the Hedge Party Secured Notes, the Second Lien Exit Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Credit Agreement, or the Plan, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any Causes of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or fraud grounded in deliberate recklessness.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any post-Effective Date obligations of any party or entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the First Lien Exit Facility Documents and the Second Lien Exit Facility Documents or (ii) any Causes of Action identified in the Schedule of Retained Causes of Action.

**D.**      *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party hereby releases and discharges, and is deemed to have released and discharged, conclusively, absolutely, unconditionally, irrevocably and forever, each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise (including any derivative claims, asserted on behalf of the Debtors) that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between the Debtors, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Definitive Documentation, RSA or Hedge Party RSA or the related prepetition transactions, the Disclosure Statement, the DIP Facility, the First Lien Exit Facility, the Hedge Party Secured Notes, the Second Lien Exit Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim pursuant to chapter 5 of the Bankruptcy Code or other applicable law,  the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and

implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any Causes of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or fraud grounded in deliberate recklessness. Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any Post-Effective Date obligations of any party or entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the First Lien Exit Facility Documents, the Second Lien Exit Facility Documents or any Claim or obligation arising under the Plan or (ii) any Causes of Action identified in the Schedule of Retained Causes of Action.

E.      *Exculpation.*

        Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the Plan Supplement, the Definitive Documentation, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not release any Causes of Action identified in the Schedule of Retained Causes of Action.

F.      *Injunction.*

        Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such

**document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan.**

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date  that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the RSA shall not have been terminated and shall be in full force and effect;

2.      all Definitive Documentation shall be in compliance with Article IV.C of this Plan;

3.      the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall not have been stayed, modified, vacated or reversed;

4.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

5.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the RSA, the Restructuring Term Sheet, and the Plan;

6.      all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

7.    all professional fees and expenses of the advisors to the Consenting Parties (including Milbank, Tweed, Hadley & McCloy LLP and local counsel),the DIP Lenders, the DIP Agent, and any and all other advisors entitled to payment pursuant to the terms and conditions of the RSA shall have been paid in full;

8.    all reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) of the Second Lien Trustee and the Term Agent pursuant to the terms and conditions of the Second Lien Documents and the Term Loan Documents, respectively, shall have been paid in full;

9.    entry into the First Lien Exit Facility Documents and the Second Lien Exit Facility Documents;

10.    the effectiveness of any other applicable Definitive Documentation; and

11.    the Debtors shall have implemented the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the RSA, the Restructuring Term Sheet, and the Plan.

B.    *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX may be waived only with the prior written consent of the Consenting Parties, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Subject to the limitations set forth in the RSA and the Plan, the Debtors, with the consent of the Consenting Parties, reserve the right to amend or modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the RSA and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code,  each of the Debtors expressly reserves its respective rights to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of, and in a manner consistent with, the Plan and the RSA.

B.    *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan that are consistent with Section X.A since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.*        *Revocation or Withdrawal of Plan.*

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall  (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of such Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XI.
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.        allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.        decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the Assumed Executory Contracts List or the Rejected Executory Contract List; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.        ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.        adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.        adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions or the enforcement of the RSA;

8.        enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

44

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J hereof;

14.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     enter an order concluding or closing the Chapter 11 Cases;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and released granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

23.     enforce all orders previously entered by the Bankruptcy Court; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents, the First Lien Exit Facility and any documents related thereto, and the Second Lien Exit Facility and any documents related thereto, shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.       *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

    1.    if to the Debtors, to:

        Gastar Exploration Inc.
        1331 Lamar Street, Suite 650
        Houston, Texas 77010
        Attention: Michael A. Gerlich, Chief Financial Officer
        Email address:  mgerlich@gastar.com

        with copies to:

        Kirkland & Ellis LLP
        300 North LaSalle
        Chicago, Illinois 60654
        Facsimile:  (312) 862-2200
        Attention:  Ross M. Kwasteniet, P.C. and John R. Luze
        E-mail addresses:  ross.kwasteniet@kirkland.com and john.luze@kirkland.com

    2.    if to a Consenting Party:

        Ares Management LLC
        2000 Avenue of the Stars, 12th Floor
        Los Angeles, California 90067
        Attention:  Eric Waxman
        Email address:  ewaxman@aresmgmt.com

        with copies to:

        Milbank, Tweed, Hadley & McCloy LLP
        2029 Century Park East, 33rd Floor
        Los Angeles, California 90067
        Attention: Paul S. Aronzon, Thomas R. Kreller, and Haig M. Maghakian
        E-mail addresses: paronzon@milbank.com, tkreller@milbank.com, and
        hmaghakian@milbank.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.       *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, on the Effective Date, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at www.bmcgroup.com/gastar (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee). To the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan, unless otherwise ordered by the Bankruptcy Court, such part of the Plan that does not constitute the Plan Supplement shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court at the request of the Debtors, with the consent of the Consenting Parties, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding the foregoing, any such alteration or interpretation shall be acceptable in form and substance to the Debtors and the Reorganized Debtors and the Consenting Parties. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and Consenting Parties' consent; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if

such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  To the extent that any provision in the Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

*[Remainder of page intentionally left blank.]*

Dated:  October 26, 2018                      GASTAR EXPLORATION INC.

on behalf of itself and all other Debtors

By:  _____

Michael A. Gerlich
Chief Financial Officer

<u>**Exhibit B**</u>

**Restructuring Support Agreement**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS RESTRUCTURING SUPPORT AGREEMENT.**

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this agreement, including all exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**")[1] is made and entered into as of October 26, 2018, by and among the following parties (each of the parties described in Sub-Clauses (i), (ii), and (iii), a "**Party**" and, collectively, the "**Parties**"):

    i.    Gastar Exploration Inc. ("**Gastar**"); its undersigned subsidiary Northwest Property Ventures LLC; and any other future subsidiary of Gastar (each a "**Company Party**" and collectively, the "**Company**" or the "**Company Parties**");

    ii.    AF V Energy I Holdings, L.P., as a lender (the "**Consenting Term Lender**") party to the Third Amended and Restated Credit Agreement, dated March 3, 2017 (as amended, restated, modified, or supplemented from time to time, the "**Term Credit Agreement**"), by and among Gastar, as borrower, the guarantors specified in the Term Credit Agreement or in related transaction documentation, the lenders from time to time party thereto and Wilmington Trust, National Association, as administrative agent and collateral agent (solely in such capacities, the "**Term Agent**");

    iii.    the undersigned holders of notes (the "**Second Lien Notes**") issued pursuant to the Indenture dated March 3, 2017 (as amended, restated, modified or supplemented from time to time, the "**Second Lien Indenture**"), by and among Gastar, as issuer, the guarantors specified in the Second Lien Indenture or in related transaction documentation, and Wilmington Trust, National Association, as trustee and collateral agent (solely in such capacities, the "**Second Lien Trustee**") and any other holder of Second Lien Notes that may become party to this Agreement pursuant to Section 6 below (collectively, the "**Consenting Second Lien Noteholders**" and, together with the Consenting Term Lender, the "**Consenting Creditors**"); and

    iv.    the entities identified on Annex 1 to the Restructuring Term Sheet, in their capacities as holders of Gastar's outstanding common shares (such common shares, together with any and all outstanding and unexercised or unvested warrants, options or rights to acquire Gastar's currently outstanding equity, the "**Existing Common Equity**") (in

---

[1]   Capitalized terms used but not otherwise defined in this document have the meanings ascribed to such terms in the term sheet attached to this Agreement as **Exhibit A** (the "**Restructuring Term Sheet**"), subject to Section 2 hereof.

such capacities, the "**Ares Equity Holders**"; together with the Consenting Creditors, the "**Consenting Parties**").

### *RECITALS*

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding the restructuring and recapitalization of the Company, including with respect to the Company's respective obligations under the Term Credit Agreement and the Second Lien Indenture;

**WHEREAS**, the Parties desire to effectuate a restructuring of the Company as set forth in the Restructuring Term Sheet.  Such restructuring shall be implemented pursuant to a "prepackaged" chapter 11 plan of reorganization (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Plan**") reflecting the Economic Terms set forth in Restructuring Term Sheet and the various transactions set forth in or contemplated by the Restructuring Term Sheet, the DIP Term Sheet (defined below) and the Exit Term Sheet (defined below) (collectively, the "**Restructuring Transaction**");

**WHEREAS**, the Company will commence solicitation of the Plan prior to the commencement of the Chapter 11 Cases.  In connection with such solicitation, the Company shall prepare and deliver to all classes of claims entitled to vote on the Plan a disclosure statement relating to the Plan (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Disclosure Statement**");

**WHEREAS**, the Company will commence voluntary cases under chapter 11 of the Bankruptcy Code[2] (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

**WHEREAS**, upon commencement of such Chapter 11 Cases, the Company will file the Plan and the Disclosure Statement, seek approval of the Disclosure Statement, and seek confirmation of the Plan, in each case, in accordance with the milestones and other terms set forth in the Restructuring Term Sheet;

**WHEREAS**, subject to the conditions set forth in this Agreement, certain Consenting Parties and/or their affiliates have agreed to provide, on a committed basis, the Company with superpriority debtor-in-possession financing (the "**DIP Facility**") on terms set forth in the term sheet attached to this Agreement as Exhibit D (the "**DIP Term Sheet**");

**WHEREAS**, among other things, the DIP Facility will fund the operations of the Company through the consummation of the Restructuring Transaction on the terms and subject to the conditions set forth in the DIP Term Sheet;

**WHEREAS**, subject to the conditions set forth in this Agreement, certain Consenting Parties and/or their affiliates have agreed to provide on a committed basis the Company with an exit financing term loan facility (the "**Exit Facility**") on the terms set forth in the term sheet

---

[2] "**Bankruptcy Code**" means title 11 of the United States Code, as amended.

attached to this Agreement as <u>Exhibit E</u> (the "**Exit Facility Term Sheet**" and, together with the DIP Term Sheet, the "**Term Sheets**"); and

       **WHEREAS**, the following sets forth the agreement among the Parties concerning their respective rights and obligations in respect of the Restructuring Transaction.

       **NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

*AGREEMENT*

**Section 1.**    *Agreement Effective Date*.  This Agreement shall become effective and binding upon each of the Parties on the date:  (a) each of the Company Parties has executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Parties; (b) holders of 100% of the aggregate principal amount of all claims outstanding under the Term Credit Agreement (any such claims, the "**Term Loan Claims**") have executed and delivered to the Company counterpart signature pages of this Agreement; (c) holders of 100% of the aggregate principal amount of all claims outstanding under the Second Lien Indenture (any such claims, the "**Second Lien Claims**") have executed and delivered to the Company counterpart signature pages of this Agreement; and (d) the Ares Equity Holders have executed and delivered to the Company counterpart signature pages of this Agreement (such date, the "**Agreement Effective Date**").

**Section 2.**    *Exhibits and Schedules Incorporated by Reference*.  Each of the exhibits to this Agreement (including, but not limited to, the Restructuring Term Sheet, the DIP Term Sheet, and the Exit Facility Term Sheet) and any schedules or annexes to such exhibits (collectively, the "**Exhibits and Schedules**") is expressly incorporated into, and made a part of, this Agreement. As used in this Agreement, all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

**Section 3.**    *Definitive Documentation*.

    (a)    The definitive documents and agreements governing the Restructuring Transaction (collectively, the "**Definitive Documents**") shall consist of this Agreement and each of the following documents:

        (i)    the Plan (and all exhibits to the Plan);

        (ii)    the Disclosure Statement and the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**");

        (iii)    the order of the Bankruptcy Court (x) confirming the Plan, (y) approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and (z) approving the prepetition and/or postpetition solicitation of the Plan (the "**Confirmation Order**");

3

(iv)     all other documents that are contained in any supplements filed in connection with the Plan (collectively, the "**Plan Supplement**");

(v)     (1) the interim order or orders authorizing the use of cash collateral and the DIP Facility (each, an "**Interim DIP Order**") and (2) the final order or orders authorizing the use of cash collateral and the DIP Facility (each, a "**Final DIP Order**" and together with each Interim DIP Order, collectively, the "**DIP Orders**");

(vi)     the post-petition debtor-in-possession credit agreement (the "**DIP Credit Agreement**") for the DIP Facility to be entered into in accordance with the DIP Orders by the Company Parties, Wilmington Trust, National Association, as administrative agent, and the lenders party thereto, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**");

(vii)     the agreements memorializing any exit financing facilities, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with any exit financing (collectively, the "**Exit Financing Documents**");

(viii)     any documents relating to the formation, organization or governance of any Company Party or the rights of holders or interests, directly or indirectly, in any Company Party (collectively, the "**Governance Documents**"); and

(ix)     the Hedge Party Restructuring Support Agreement dated as of October 26, 2018 (including all exhibits and schedules attached thereto, as each may be amended, restated, supplemented, or otherwise modified from time to time, the "**Hedge RSA**") by and between the Company Parties and the Hedge Parties (as defined in the Hedge RSA), in their capacities as holders of claims arising under or related to the Debtors' prepetition hedging and/or swaps program (the "**Hedge Obligations**"), including any market-to-market liability outstanding as of the Petition Date or any net claims arising out of any termination thereof on or prior to the Petition Date).

(b)     Certain of the Definitive Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement.  Except as provided in the immediately succeeding sentence, all such Definitive Documents shall be in form and substance reasonably acceptable to the Company Parties and the Consenting Parties.  Notwithstanding the foregoing, (i) the Plan, the Plan Supplement (but excluding any Governance Documents in such Plan Supplement), the Disclosure Statement, the DIP Orders, the DIP Loan Documents, and the Exit Financing Documents shall each be in form and substance satisfactory to the Consenting Parties and the Company Parties, each in their sole discretion, and (ii) each of the Governance Documents shall be in form and substance satisfactory solely to the Consenting Parties in their sole discretion.

**Section 4.**     *Milestones*.   As provided in and subject to Section 5.02, the Company shall implement the Restructuring Transaction in accordance with, and within the time contemplated for the satisfaction of, the milestones set forth in the Restructuring Term Sheet (the "**Milestones**"). Each Milestone shall be subject to extension or waiver only in the sole discretion of the Consenting Parties.

**Section 5.**     ***Commitments Regarding the Restructuring Transaction***.

     5.01.   Commitment of the Consenting Parties.

     (a)     From the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 12.05) applicable to the Consenting Parties, each of the Consenting Parties agrees (on a several but not joint basis) to:

          (i)     to the extent permitted to vote to accept or reject the Plan (and subject to the actual receipt by such Consenting Party of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code), vote each of its claims against the Company (including each of its Term Loan Claims, Second Lien Claims, and any other claims against the Company (such claims the "**Debtor Claims**")) and any interests in the Company (such interests, the "**Debtor Interests**" and collectively with the Debtor Claims, the "**Debtor Claims/Interests**") to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis;

          (ii)     negotiate in good faith the Definitive Documents and use reasonable best efforts to take any and all necessary and appropriate actions in furtherance of the Restructuring Transaction, the Plan and this Agreement;

          (iii)     use reasonable best efforts to support and take all actions necessary or appropriate to facilitate the solicitation, confirmation and consummation of the Restructuring Transaction and the Plan;

          (iv)     consent to and use reasonable best efforts to support the release, discharge, exculpation, and injunction provisions contained in the Definitive Documents and, if applicable, not "opt out" of such provisions in the Plan;

          (v)     not (A) object to or join in any objection to, and use reasonable best efforts to support approval of the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, and the Confirmation Order, or (B) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is not materially consistent with this Agreement or the Plan;

          (vi)     not change or withdraw (or cause to be changed or withdrawn) any vote(s) to accept the Plan.   However, if a Termination Date occurs before consummation of the Restructuring Transaction, to the greatest extent permitted by law, all votes tendered by such Consenting Parties to accept the Plan shall be immediately revoked and deemed void *ab initio* in accordance with Section 12;

(vii)    not (A) object to, delay, impede, or knowingly take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transaction, (B) propose, file, support, or vote for any actual or proposed transaction involving any or all of (1) another financial and/or corporate restructuring of the Company, (2) the issuance, sale, or other disposition of any equity or debt interests, or any material assets, of the Company, or (3) a merger, acquisition, disposition, consolidation, business combination, joint venture, liquidation, dissolution, winding up, assignment for the benefit of creditors, recapitalization, refinancing, or similar transaction involving the Company, other than the Restructuring Transaction (each, an "**Alternative Transaction**"), or (C) support, encourage or direct any other person or entity to take any action prohibited by either (A) or (B) of this Section 5.01(a)(vii).

(b)    Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Consenting Party nor the acceptance of the Plan by any Consenting Party shall: (i) be construed to prohibit any Consenting Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the other Definitive Documents, complying with applicable law, or exercising any rights (including any consent and approval rights contemplated under this Agreement or the other Definitive Documents) or remedies specifically reserved in this Agreement or the other Definitive Documents; (ii) be construed to prohibit or limit any Consenting Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the period from the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 12.05) applicable to any Party (the "**Effective Period**"), such appearance and the positions advocated are not inconsistent with this Agreement; or (iii) impair or waive the rights of any Consenting Party to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.  For the avoidance of doubt, any delay or other effect on consummation of the Restructuring Transaction contemplated by the Plan caused by a Consenting Party's opposition to: (x) any relief that is inconsistent (other than to a de minimis extent, but, in no event, if adverse to the Company Parties) with such Restructuring Transaction; (y) a motion by the Company to enter into, amend, modify, assume or reject an executory contract, lease, or other arrangement outside of the ordinary course of its business without obtaining the prior written consent of the Consenting Parties; or (z) any relief that is adverse to the interests of the Consenting Parties sought by the Company (or any other party) in violation of this Agreement, shall, in each case, not constitute a violation of this Agreement.

5.02.   Commitment of the Company.

(a)    From the Agreement Effective Date until the occurrence of a Termination Date applicable to the Company, the Company Parties agree, and agree to cause any of their direct and indirect subsidiaries to:

(i)    negotiate in good faith all Definitive Documents and take any and all necessary and appropriate actions in furtherance of the Restructuring Transaction, the Plan, and this Agreement, including, but not limited to, the timely filing of the Plan, the Disclosure Statement, and any other pleadings or documents necessary to obtain confirmation of the Plan and approval of the Disclosure Statement with the Bankruptcy Court, the submission of verified declarations and other customary evidence in support of confirmation of the Plan and approval of

the Disclosure Statement, and making available any expert witnesses and key management of the Company for any and all proceedings involving the Plan and Disclosure Statement;

(ii)     seek orders of the Bankruptcy Court in respect of the Restructuring Transaction, including approval of the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, and the Confirmation Order;

(iii)    support and seek to consummate the Restructuring Transaction in accordance with this Agreement within the time-frames contemplated under this Agreement and in compliance with each Milestone.

(iv)    negotiate, execute and deliver any other agreements necessary to effectuate and consummate the Restructuring Transaction;

(v)     use reasonable best efforts to obtain any and all regulatory and/or third-party approvals necessary or appropriate in connection with the Restructuring Transaction.  For the avoidance of doubt, for purposes of the foregoing sentence and Section 12.02(c), "reasonable best efforts" with respect to an undertaking means the obligation to take all actions that a reasonable person desirous of achieving the result in question would use in similar circumstances to achieve such result as expeditiously as practicable, and shall include, without limitation, the obligation to incur costs, expend resources, engage advisors of recognized standing, and instruct such advisors to take all reasonable actions necessary or advisable to attain the applicable result that is the object of the undertaking in question;

(vi)    pay the reasonable and documented fees and expenses of the Consenting Parties as set forth in Section 13 of this Agreement;

(vii)   timely file an objection with the Bankruptcy Court to any motion filed with the Bankruptcy Court by a party seeking the entry of an order: (1) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code); (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (3) dismissing any of the Chapter 11 Cases; or (4) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(viii)  support and use commercially reasonable efforts to consummate the DIP Facility pursuant to the DIP Orders and the DIP Loan Documents (including the refinancing of the Term Loans with the DIP Loans);

(ix)    timely file a formal objection, in form and substance acceptable to the Consenting Parties, to any motion, application, or adversary proceeding: (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims or Second Lien Claims; or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(x)     to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any

such impediment that are consistent with this Agreement or otherwise acceptable to the Consenting Parties;

(xi) if the Company knows of a breach by any Company Party in respect of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement, furnish prompt written notice (and in any event within two (2) calendar days of such knowledge) to the Consenting Parties and promptly take all reasonably available remedial action necessary to cure such breach by any such Company Party;

(xii) in consultation with the Consenting Parties, timely file a formal response to any motion or other pleading filed with the Bankruptcy Court by any party objecting to approval of the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, the Confirmation Order, or any other Definitive Documents contemplated under this Agreement;

(xiii) operate their business in the ordinary course, taking into account the Restructuring Transaction;

(xiv) not enter into an executory contract, lease, or other arrangement outside of the ordinary course of its business without obtaining the prior written consent of the Consenting Parties;

(xv) not assume or reject any executory contract or unexpired lease without obtaining the prior written consent of the Consenting Parties.

(xvi) (A) not modify, amend, supplement, waive any portion of, or terminate the Plan or any other Definitive Documents, in whole or in part, in a manner inconsistent (other than to a de minimis extent, but, in no event, in a manner adverse to the Company Parties) with this Agreement, subject to Section 14 of this Agreement, and (B) take any and all reasonably necessary and appropriate actions in furtherance and support of the effectuation of the transactions contemplated by, and the performance of the terms set forth in, the Hedge RSA (including, without limitation, by complying with the obligations of the Company Parties under the Hedge RSA and seeking to cause the other parties to the Hedge RSA to satisfy their respective obligations under such agreement); and

(xvii) not directly or indirectly: (A) delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transaction, or otherwise take any action which would, or which would reasonably be expected to, breach or be inconsistent with this Agreement; or (B) support, encourage or direct any other person or entity to take any action referred to in this Section 5.02(a)(xvii).

(b) Notwithstanding the foregoing Section 5.02(a) or any other provision of this Agreement, without limiting the rights and obligations of the Parties under Section 12 (including, without limitation, the Company's termination rights under Section 12.02):

(i) Whether or not expressly so provided in this Agreement, the Company shall:

(A)     promptly keep the Consenting Parties fully informed of, and reasonably consult with the Consenting Parties with respect to: (1) the status and satisfaction of (or failure to satisfy) each Milestone; (2) any proposal, offer or expression of interest the Company receives for an Alternative Transaction; (3) any negotiations or discussions described in clauses (A), (B), or (C) of the final proviso of Section 5.02(b)(ii); and (4) any proposed budget, business plan, forecast, projection or valuation of, or relating to, the Company;

(B)     promptly (and, in any event, within one (1) business day) notify counsel to the Consenting Parties of the Company's receipt of any proposal, offer or expression of interest regarding any Alternative Transaction or any proposal, offer, or expression of interest from any Qualifying Prospective Bidder (as defined below).  Any such notice shall include the material terms of such proposal, offer or expression of interest, including the identity of the person or group of persons involved, any written documentation evidencing such proposal, offer or expression of interest and any other information received relating to such proposal, offer or expression of interest; and

(C)     promptly (and, in any event, within one (1) business day) inform counsel to the Consenting Parties of (x) any determination by the Company's board of directors (the "**Board**") (I) pursuant to Section 12.02(b) that its continued support of the Restructuring Transaction would be a breach of its fiduciary duties under applicable law; or (II) pursuant to Section 5.02(c) that it is entitled to take any material action inconsistent with this Agreement or that it is entitled to refrain from taking any material action required by this Agreement with respect to the Restructuring Transaction as a result of applicable law or applicable fiduciary obligations under applicable law or (y) any material changes to any of the matters contemplated in clauses (A) and (B) of this Section 5.02(b)(i) (the foregoing matters contemplated in this Section 5.02(b)(i) collectively, the "**Information Sharing and Consultation Rights**");

For purposes of Section 5.02(b)(i)(A), "promptly" shall mean at least three (3) business days in advance of the Company failing to attain any Milestone, the occurrence of any relevant development, acting or omitting to act with respect to any applicable matter or making any applicable decision or determination.

(ii)     Immediately upon the Petition Date and thereafter, the Company: shall not (x) propose, file, seek, solicit, or support any Alternative Transaction, (y) induce or initiate any proposal, offer or expression of interest from any person or entity, or (z) enter into any agreement with, provide or otherwise make available any due diligence information (including, without limitation, through the provision of data site access) concerning the Company to, or engage in or

9

continue any discussions or negotiations with, any person or entity concerning any Alternative Transaction, except as set forth in this Agreement.  Notwithstanding the foregoing:

(A)     The Company shall be entitled to at any time to engage in any discussions or negotiations with any creditor or shareholder of the Company regarding any matter.  However, any such creditor or shareholder must have entered into a non-disclosure agreement or otherwise be subject to a confidentiality obligation to the Company no less restrictive than the obligation imposed by the non-disclosure agreement in effect with the Consenting Parties.  Any such discussions or negotiations shall be subject to the Information Sharing and Consultation Rights.  In addition, notwithstanding the foregoing, in the event that any such discussions or negotiations relate to an Alternative Transaction, such discussions or negotiations shall in all respects be subject to the introductory paragraph of this Section 5.02(b)(ii), sub-clause (B) of this Section 5.02(b)(ii) and clauses (iii) and (iv) of this Section 5.02(b).

(B)     Immediately upon the Petition Date and thereafter, the Company shall be entitled to engage in any discussions or negotiations with, including providing data site access and due diligence information concerning the Company to, any party from which the Company receives a proposal, offer or expression of interest with respect to an Alternative Transaction after the Petition Date, only if the Company reasonably believes it is reasonably likely that (A) such party will make an unconditional proposal (other than any required regulatory and/or court approvals) that is of higher value from the perspective of the Company's stakeholders than the Restructuring Transaction (a "**Potentially Superior Proposal**") and (B) failure to further engage with such party in respect of such proposal, offer, or expression of interest would be inconsistent with the fiduciary duties of the directors then serving on the Board or applicable law (the foregoing parties, the "**Qualifying Prospective Bidders**").

(iii)     If the Company receives a Potentially Superior Proposal that did not result from a breach of Section 5.02(b) of this Agreement, then the Company may terminate this Agreement pursuant to Section 12.02(b) of this Agreement and enter into a definitive agreement with respect to such Potentially Superior Proposal.  However, prior to any such termination: (A) the Company must provide the Consenting Parties with reasonable advance written notice (and, in any event, such notice shall be provided to the Consenting Parties not less than four (4) business days in advance) of the Company's intent to so terminate this Agreement; (B) the Company shall negotiate in good faith with the Consenting Parties, to the extent the Consenting Parties wish to negotiate, with respect to any revisions to the terms of the Restructuring Transaction contemplated by this Agreement proposed by the Consenting Parties; and (C) in determining whether it may still under the terms of this Section 5.02 terminate this Agreement, the Board shall take into account any changes to the terms of the Restructuring Transaction proposed by the Consenting Parties and any other information provided by the Consenting Parties in response to

such notice during such five business day period. Any amendment to the financial terms or conditions or other material terms of any such Potentially Superior Proposal will be deemed to be a new Potentially Superior Proposal for purposes of this Section 5.02(b), including with respect to the notice period referred to in this Section 5.02(b), except that the four (4) business day period shall be three (3) business days for such purposes.

(iv)    The Company shall not enter into any confidentiality or other agreement with, or subject itself to any confidentiality or other obligation in favor of, a party interested in an Alternative Transaction unless such party consents to the Company identifying and providing to counsel to the Consenting Parties (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 5.02(b).

(c)    Nothing in this Agreement shall require the Company, the Board or any other person or entity, after consulting with external counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transaction to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law. Provided the Board is acting consistent with its fiduciary obligations, any such action or inaction pursuant to this Section 5.02(c) shall not be deemed to constitute a breach of this Agreement.

5.03.    Corporate Structuring Transactions. Notwithstanding anything to the contrary in this Agreement, the Company shall reasonably cooperate with the Consenting Parties to structure the Restructuring Transaction (x) in a tax-efficient manner designed to preserve the Company's favorable tax attributes for the benefit of the Company, as reorganized, and the new equity holders of the Company following the consummation of the Restructuring Transaction and (y) to enable the Company or its successor to emerge on the effective date of the Plan (the "Effective Date") in the organizational form, and with the tax structure and tax elections, requested or consented to by the Consenting Parties. Without limiting the foregoing, and subject to the prior consent of or at the express direction of the Consenting Parties, such tax related structuring may be effectuated through one or more of the following means (or such other means requested or consented to by the Consenting Parties): (a) on or prior to the Effective Date, the Company may effectuate internal corporate reorganizations (i) to preserve and/or house in a holding entity the Company's favorable tax attributes, including, without limitation, the Company's net operating losses, (ii) to contribute certain of the Company's assets, or the assets of any other Company Party, to one or more subsidiaries, (iii) to convert into, transfer its assets to or cause the equity interests in it to be transferred to, in each case, a limited liability company or a limited partnership, and/or (iv) as a result of which the Consenting Parties hold a portion of their equity interests in the reorganized Company through a corporation (the "Corporation") and another portion of such equity interests through a limited liability company or a limited partnership and (y) the New Warrants (as defined in the Term Sheet) are issued by the Corporation; (b) on or prior to the Agreement Effective Date, the Consenting Second Lien Noteholders may sell or assign their Second Lien Claims (or the rights to receive the new common stock that such holders would receive under the Plan on account of such Second Lien Claims) to third-party investors, subject to the terms of this Agreement; and (c) on or after the Agreement Effective Date, the Company may issue new preferred equity or common equity to third-party investors.

**Section 6.**     *Transfer of Debtor Claims/Interests.*

(a)     During the Effective Period, no Consenting Party shall sell, assign, transfer, permit the participation in, or otherwise dispose of (each, a "**Transfer**") any ownership (including any beneficial ownership[3]) in the Debtor Claims/Interests to any party (other than to an Investment Affiliate[4] of such Consenting Party or to an entity that is controlled by or is under common control with such Consenting Party), unless the intended transferee executes and delivers to counsel to the Company and counsel to the Consenting Parties on the terms set forth below an executed form of the transfer agreement in the form attached to this Agreement as **Exhibit B** (a "**Transfer Agreement**") (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

(b)     Notwithstanding Section 6(a): (i) the foregoing provisions shall not preclude a Consenting Party from settling or delivering securities or bank debt that would otherwise be subject to the terms of this Agreement to settle any confirmed transaction pending as of the date of such Party's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such securities or bank debt so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement; and (ii) a Qualified Marketmaker[5] that acquires any Debtor Claims/Interests subject to this Agreement shall not be required to execute and deliver to counsel a Transfer Agreement in respect of such Debtor Claims/Interests if (A) such Qualified Marketmaker transfers such Debtor Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within five (5) business days of its acquisition to a transferee that is an entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (B) the transferee otherwise is a Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement); and (C) the transfer otherwise is a Permitted Transfer.

(c)     This Agreement shall in no way be construed to preclude any Consenting Party from acquiring additional Debtor Claims/Interests or effecting a Transfer of all or a portion of its Debtor Claims/Interests to an Investment Affiliate of such Consenting Party or an entity controlled by or under common control with such Consenting Party. However: (i) any such Consenting Party or entity that acquires Debtor Claims/Interests, as applicable, after the Agreement Effective Date shall promptly notify counsel to the Company of such acquisition including the amount of such acquisition, who shall then promptly notify counsel to the Consenting Parties; and (ii) such Debtor

---

[3]     As used in this Agreement, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims/Interests or the right to acquire such claims or interests.

[4]     As used in this Agreement, "**Investment Affiliate**" means and refers to any entity that (x) is organized by a holder of Debtor Claims/Interests or an affiliate thereof for the purpose of making equity or debt investments in one or more companies and/or is managed by, controlled by, or under common control with, a holder of Debtor Claims/Interests or an affiliate thereof, (y) is an "accredited investor" within the meaning of Rule 501(a)(1), (3) or (7) of Regulation D promulgated under the Securities Act and (z) is not a disqualified person under Rule 506(d) of Regulation D promulgated under the Securities Act.

[5]     As used in this Agreement, the term "**Qualified Marketmaker**" means an entity that holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in claims against the Company.

Claims/Interests shall automatically and immediately upon acquisition by such Consenting Party or entity, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Company or counsel to the Consenting Parties) and subsequent Transfers shall be subject to this <u>Section 6</u>.

(d)     Upon the completion of any Transfer of Debtor Claims in accordance with this <u>Section 6</u>, the transferee shall be deemed a Consenting Party under this Agreement with respect to such transferred rights, obligations and claims and the transferor of such Debtor Claims shall be deemed to relinquish its rights and claims (and be released from its obligations under this Agreement) with respect to such transferred Debtor Claims.

(e)     Any Transfer of any Debtor Claims/Interests made in violation of this <u>Section 6</u> shall be void *ab initio* and of no force and effect and shall not create any obligation or liability of any Consenting Party or the Company to the purported transferee.

**Section 7.     *Representations and Warranties of Consenting Parties.*** Each Consenting Party, severally, and not jointly, represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date of this Agreement:

(a)     it is the beneficial owner of the face amount of the Debtor Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Debtor Claims/Interests, as reflected on such Consenting Party's signature page to this Agreement (such Debtor Claims/Interests, the "**<u>Owned Debtor Claims/Interests</u>**");

(b)     such Debtor Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect such Consenting Parties' ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(c)     it has the full power and authority to act on behalf of, vote, and consent to matters concerning the Owned Debtor Claims/Interests;

(d)     it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "**<u>Securities Act</u>**"), (iii) a Regulation S non-U.S. person, or (iv) the foreign equivalent of (i) or (ii) above.

**Section 8.     *Representations and Warranties of the Company.*** Each Company Party, severally, and not jointly, represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date of this Agreement and as of the Effective Date:

(a)     none of the Company Parties or any of their subsidiaries is in violation or default of: (i) any provision of its respective organizational documents; (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note agreement, loan agreement or other agreement, obligation, condition, covenant or instrument to which it is a party or bound or to which

its property is subject; or (iii) any statute, law, rule, regulation, judgment, order or decree applicable to the Company or any of its subsidiaries or any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or such subsidiary or any of its properties, as applicable, in any material respect;

(b)      the Company is subject to and in full compliance with the reporting requirements of Section 13 or Section 15(d) of the Securities Exchange Act of 1934, as amended;

(c)      the Gastar Exploration, Ltd. Employee Change of Control Severance Plan (the "CIC Severance Plan") has been duly terminated and the Company has no continuing obligations under the CIC Severance Plan;

(d)      all employment and other agreements providing any party with a right to payment under the CIC Severance Plan have been duly terminated; and

(e)      except as disclosed in the Company's periodic reports filed with the Securities and Exchange Commission or as set forth on **Schedule 1** to this Agreement, no Company Party has any material contingent liabilities, non-compete agreements, MFN agreements, continuing indemnification obligations or other material obligations (aside from the Hedge Obligations or those obligations under the Second Lien Notes or the Term Credit Agreement) that would be accelerated, or rights that would be lost, upon the occurrence of a change of control or the commencement of the Chapter 11 Cases.

**Section 9.**      *Mutual Representations and Warranties*.  Each (i) Consenting Party, severally, and not jointly, and (ii) Company Party, on a joint and several basis,  represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date of this Agreement:

9.01.   Enforceability.  It is validly existing and in good standing under the laws of the state of its organization.  This Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

9.02.   No Consent or Approval.  Except as expressly provided in this Agreement, the Plan, the Restructuring Term Sheet, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transaction contemplated by, and perform the respective obligations under, this Agreement.

9.03.   Power and Authority.  Except as expressly provided in this Agreement and subject to applicable law, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transaction contemplated by, and perform its respective obligations under, this Agreement.  Each of the Definitive Documents will be duly authorized and, assuming due authorization, execution and delivery of such Definitive Document by the other parties to such Definitive Document, when executed and delivered by each Party, will constitute a legal, valid, binding instrument enforceable against the Parties in accordance with its terms (subject, as to enforcement of remedies, to applicable bankruptcy,

14

reorganization, insolvency, moratorium or other laws affecting creditors' rights generally from time to time in effect and to general principles of equity).

9.04.   <u>Governmental Consents</u>.  Except as expressly set forth in this Agreement and with respect to the Company's execution and performance of this Agreement (and subject to any necessary Bankruptcy Court approval, if applicable, and/or regulatory approvals associated with the Restructuring Transaction), the execution, delivery, and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

9.05.   <u>No Conflicts</u>.  The execution, delivery, and performance of this Agreement does not and shall not: (a) conflict with any provision of law, rules, or regulations applicable to it or any of its subsidiaries in any material respect; (b) conflict with, breach, or result in a default under its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (c) conflict with, breach, or result in a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Restructuring Transaction.

9.06.   <u>Fiduciary Duties</u>.  It has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

9.07.   <u>Other Representations</u>.  It has sufficient knowledge and experience to evaluate properly the terms and conditions of the Restructuring Term Sheet, the Plan, and this Agreement. It has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

**Section 10.**   *Acknowledgement*.  Notwithstanding any other provision in this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.  The Company will not solicit acceptances of any Plan from Consenting Parties in any manner inconsistent with the Bankruptcy Code or applicable bankruptcy law.

**Section 11.**   *Cooperation and Support.*

(a)   The Company shall provide the Consenting Parties with reasonable advance notice of and an opportunity to review and comment on all Definitive Documents and any related notices and instruments.  Such Definitive Documents shall be subject to the consent and approval rights of the Company and the Consenting Parties set forth in <u>Section 3</u> of this Agreement.

(b)   At least five (5) days before the date on which the Company commences the Chapter 11 Cases in accordance with the terms of the Restructuring Term Sheet and this Agreement, the Consenting Parties shall be furnished with and have a reasonable opportunity to review and comment on the Company's drafts of the first-day pleadings (the "**First Day**

15

**Pleadings**").   The Company shall use commercially reasonable efforts to incorporate any comments of the Consenting Parties to the First Day Pleadings.

(c)     Additionally, during the Effective Period, the Company will use commercially reasonable efforts to provide draft copies of any additional process letters as well as all material motions, pleadings, and documents other than the First Day Pleadings that the Company intends to file with the Bankruptcy Court, in each case, to counsel to the Consenting Parties at least two (2) days before the date on which Company intends to distribute or file such materials.  To the extent such documents do not constitute Definitive Documents (which shall be subject to the consent and approval rights of the Company and the Consenting Parties as set forth in Section 3 of this Agreement), the Company shall consult in good faith with, and reasonably consider for incorporation any comments of, counsel to the Consenting Parties regarding the form and substance of such documents.

(d)     The Company shall: (i) promptly (and, in any event, within five (5) business days) provide to the Consenting Parties' advisors timely, accurate and complete responses to all reasonable due diligence requests, including those relating to the Consenting Parties' evaluation of the Company's assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs; and (ii) promptly (and, in any event, within three (3) business days) notify counsel to the Consenting Parties of any governmental or third party litigations, investigations, regulatory actions or hearings against or involving any of the Company Parties.

**Section 12.     *Termination Events*.**

12.01.  Consenting Party Termination Events.  So long as the Consenting Parties have not failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure is the result of any act, omission or delay on the part of any Company Party in violation of its obligations under this Agreement), this Agreement may be terminated by the Consenting Parties pursuant to this Section 12.01 upon prior written notice delivered in accordance with Section 16.09 of this Agreement, upon the occurrence and continuation of any of the following events (each, a "**Consenting Party Termination Event**"):

(a)     the failure to meet any of the Milestones unless: (i) such failure is the result of any act, omission, or delay on the part of the Consenting Parties in material violation of their obligations under this Agreement; or (ii) such Milestone previously has been waived by the Consenting Parties in accordance with Section 4;

(b)     the occurrence of any act, event or omission that provides the Consenting Parties with a termination right specified in the Restructuring Term Sheet;

(c)     the occurrence of a breach (other than a de minimis breach, but, in no event, a breach that is adverse to the Company Parties) of this Agreement by any Party other than the Consenting Parties.  However, if such breach is capable of being cured, the breaching Party shall have ten (10) calendar days following written notice from the Consenting Parties of the occurrence thereof to cure such breach;

(d)     the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree,

charge, ruling, or order that, in each case, would have the effect of preventing consummation of all or a material portion of the Restructuring Transaction.  However, the Company shall have thirty (30) calendar days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring Transaction in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement;

(e)     the (i) conversion of one or more of the Chapter 11 Cases of the Company Parties to a case under chapter 7 of the Bankruptcy Code, (ii) dismissal of one or more of the Chapter 11 Cases of the Company Parties, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Consenting Parties, or (iii) appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)     without the prior consent of the Consenting Parties, any Company Party: (i) amends, supplements, waives any portion of, terminates or modifies, or files a pleading seeking authority to amend, supplement, waive any portion of, terminate or modify, the Definitive Documents; (ii) suspends or revokes the Restructuring Transaction; or (iii) publicly announces its intention to take any such action specified in Sub-Clauses (i) and (ii) of this subsection. Notwithstanding the foregoing, all Definitive Documents shall remain subject to the consent and approval standards set forth in Section 3 of this Agreement, and, to the extent applicable, the additional obligations with respect to the Definitive Documents set forth in Section 5.02(a);

(g)     any of the Definitive Documents do not comply with Section 3 of this Agreement or any other document or agreement necessary to consummate the Restructuring Transaction is not reasonably satisfactory to the Consenting Parties;

(h)     any Company Party makes any filing in support of or seeking authority to, enters into an agreement with respect to or consummates, or announces its support for (i) any Alternative Transaction or that it will file any plan of reorganization other than the Plan, or (ii) the sale of any material assets (other than as provided for in the Plan), in each case, without the prior written consent of the Consenting Parties;

(i)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not consistent (other than to a de minimis extent, but, in no event, in a manner adverse to the Company Parties) with this Agreement or otherwise consented to by the Consenting Parties;

(j)     the Company's failure to consummate the DIP Facility;

(k)     the occurrence of any Event of Default under the DIP Loan Documents, or the DIP Orders, as applicable, that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof;

(l)     a breach by any Company Party of any representation or warranty of such Company Party set forth in Section 9 of this Agreement that has had, or would reasonably be expected to have, a material adverse effect on the consummation of the Restructuring Transaction that (to the extent curable) remains uncured for a period of ten (10) business days after the receipt by the Company of written notice and description of such breach from any other Party;

17

(m)      any Company Party files a motion, application, or adversary proceeding (or any Company Party or other Party supports any such motion, application, or adversary proceeding filed or commence by any third party) (i) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the Term Loan Claims or the Second Lien Claims, or (ii) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(n)      any Company Party determines or announces that: (i) pursuant to Section 12.02(b) that its continued support of the Restructuring Transaction would be a breach of its fiduciary duties under applicable law; or (ii) pursuant to Section 5.02(c) that it is entitled to take any material action or that it is entitled to refrain from taking any material action with respect to the Restructuring Transaction as a result of applicable law or applicable fiduciary obligations under applicable law;

(o)      any Company Party terminates its obligations under and in accordance with Section 12.02 of this Agreement;

(p)      the Bankruptcy Court enters an order terminating any of the Company Parties' exclusive right to file a plan or plans of reorganization or to solicit acceptances of such plan or plans pursuant to section 1121 of the Bankruptcy Code;

(q)      the DIP Orders or any of the orders confirming the Plan or approving the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified (other than to a de minimis extent, but, in no event, in a manner adverse to the Company Parties), or amended (other than to a de minimis extent, but, in no event, in a manner adverse to the Company Parties) without the consent of the Consenting Parties or a motion for reconsideration, reargument, or rehearing with respect to such orders has been filed and the Company has failed to timely object to such motion;

(r)      the Bankruptcy Court enters an order denying confirmation of the Plan.  However, the Consenting Parties may not exercise the termination right set forth in this Section 12.01(r) until five (5) business days after the entry of such order;

(s)      the occurrence of a Maturity Date (as defined in the DIP Credit Agreement); or

(t)      the date on which the Consenting Parties deliver a notice to the Company Parties (which notice may be in the form of an e-mail to counsel to the Company Parties) stating that the Consenting Parties are terminating the Agreement based on their due diligence investigation of the Company Parties and the Consenting Parties' conclusion that such investigation reveals information that, individually or in the aggregate, (a) has had or would reasonably be expected to have a material adverse effect on the financial condition, business, assets, properties, liabilities, operating results and/or operations of the Company Parties or (b) would, or would reasonably be expected to, prevent or materially impair the consummation of the Restructuring Transaction (any such termination, a "Diligence Termination").  For purposes of sub-clause (a) in the preceding sentence, the Parties acknowledge and agree that "material adverse effect" shall mean an adverse effect, individually or in the aggregate with one or more other adverse effects, that causes the Company Parties to expend or incur costs, expenses or other obligations, or suffer or incur a loss or diminution in value, equal to or greater than $1,000,000.  Notwithstanding the foregoing, so

18

long as the Company has promptly and timely provided due diligence materials in response to reasonable requests for the same made by the Consenting Parties, the Consenting Parties may exercise the Diligence Termination only until the date that is fifteen (15) days following the Agreement Effective Date.

The Interim DIP Order will provide that the Consenting Parties are authorized to take any steps necessary (including, without limitation, sending any notice contemplated under this Agreement) to effectuate the termination of this Agreement notwithstanding section 362 of the Bankruptcy Code or any other applicable law.  In the event of such termination, no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of the Consenting Parties.  Following the commencement of the Chapter 11 Cases and until such time as the Interim DIP Order (which includes the foregoing provision) is entered, the occurrence of any Consenting Party Termination Event in this <u>Section 12.01</u> shall result in the automatic termination of this Agreement five (5) days following such occurrence unless waived in writing by the Consenting Parties.

12.02.  <u>Company's Termination Events</u>.  So long as no Company Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure is the result of any act, omission, or delay on the part of the Consenting Parties in violation of their obligations under this Agreement), the Company may terminate this Agreement as to all Parties upon prior written notice, delivered in accordance with <u>Section 16.09</u> of this Agreement, upon the occurrence of any of the following events:

(a)     A material breach by any of the Consenting Parties of any provision set forth in this Agreement that has had, or would reasonably be expected to have, a material adverse impact on the consummation of the Restructuring Transaction that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Consenting Parties of notice of such material breach;

(b)     after consultation with external counsel, the Board determines that proceeding with the Restructuring Transaction would be inconsistent with applicable law or its fiduciary duties under applicable law and that failure to terminate this Agreement would be inconsistent with the exercise of its fiduciary obligations or applicable law.  However, the Company acknowledges that <u>Section 5.02(b)</u> of this Agreement applies to any deliberation regarding or decision to exercise its termination right set forth in this Section 12.02(b);

(c)     the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any ruling or order enjoining the consummation of all or a material portion of the Restructuring Transaction, so long as the Company has made reasonable best efforts to cure, vacate, reverse, or have overruled such ruling or order prior to terminating this Agreement; or

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan.  However, the Company may not exercise the termination right set forth in this <u>Section 12.02(d)</u> until five (5) business days after the entry of such order.

12.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among each of the Company and the Consenting Parties.

12.04.  <u>Termination upon Completion of the Restructuring Transaction</u>.  This Agreement shall terminate automatically without any further required action or notice on the Effective Date.

12.05.  <u>Effect of Termination</u>.  The earliest date on which termination of this Agreement as to a Party is effective in accordance with <u>Sections 12.01</u>, <u>12.02</u>, <u>12.03</u>, and/or <u>12.04</u> shall be referred to as a "**Termination Date**."  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force or effect with respect to such Party.  Each Party subject to such termination shall: (a) be released from its commitments, undertakings, and agreements under or related to this Agreement; (b) have the rights and remedies that it would have had, had it not entered into this Agreement; and (c) be entitled to take all actions, whether with respect to the Restructuring Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement.  The termination of this Agreement with respect to any Party shall not relieve or absolve any Party of any liability for any breaches of this Agreement that preceded the termination of the Agreement.  Upon the occurrence of a Termination Date with respect to the Consenting Parties, any and all consents or ballots tendered by such Consenting Parties shall be deemed, for all purposes, to be null and void *ab initio to the fullest extent permitted by law* and shall not be used in any manner in connection with the Restructuring Transaction or otherwise.  Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit a Company Party or any of the Consenting Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Party, or the ability of any Consenting Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Party.  Nothing in this <u>Section 12.05</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 12.02(b)</u>.

**Section 13.**    *Fees and Expenses*.  Upon receipt of a request for payment, the Company shall promptly pay and reimburse all reasonable and documented fees and out-of-pocket fees and expenses of the Consenting Parties, including the fees and expenses of all attorneys, accountants, advisors, consultants, and other professionals of the Consenting Parties (regardless of whether such fees and expenses are incurred before or after the Petition Date).

**Section 14.**    *Amendments; Consents and Waivers*.  This Agreement (including the Exhibits and Schedules), may not be modified, amended, or supplemented in any manner except in writing signed by the Company and each of the Consenting Parties.  Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void ab initio.  For the purposes of this Agreement and the Restructuring Term Sheet, notwithstanding anything to the contrary in this Agreement or the Restructuring Term Sheet any consent, waiver or exercise of discretion by the Consenting Parties required under the Agreement or the Restructuring Term Sheet will be effective only upon the consent, waiver or exercise of such discretion by the (i) the Required Lenders, (ii) the Required Noteholders, and (iii) the Ares Equity Holders.

**Section 15.** *Fiduciary Duties*.  Nothing in this Agreement shall create any fiduciary duty, or agent relationship, of any of the Consenting Parties to each other, the Company or any of the Company's creditors or other stakeholders.

**Section 16.** *Miscellaneous*.

16.01.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters in this Agreement specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transaction, as applicable.

16.02.  Complete Agreement.  This Agreement (including the Exhibits and Schedules) constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior negotiations, agreements, and understandings, whether oral or written, among the Parties with respect thereto.

16.03.  Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision of this Agreement.

16.04.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in either the United States District Court for the Southern District of New York or any New York state court (the "**Chosen Courts**").  Solely in connection with claims arising under this Agreement, each Party:  (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party to this Agreement or constitutional authority to finally adjudicate the matter.  Notwithstanding the foregoing, if the Company Parties commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

16.05.  Trial by Jury Waiver.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.06.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery. Each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing

this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.07.  <u>Interpretation and Rules of Construction</u>.  This Agreement is the product of good faith negotiations among the Company and the Consenting Parties.  Consequently, this Agreement shall be enforced and interpreted in a neutral manner.  Any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Company and the Consenting Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.  In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.  For the purposes of this Agreement, the term "including" shall mean "including, without limitation," whether or not so specified.

16.08.  <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.09.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Gastar Exploration Inc.
1331 Lamar Street, Suite 650
Houston, TX 7710
Attention:  Michael A. Gerlich
              mgerlich@gastar.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Ross M. Kwasteniet, P.C.
              ross.kwasteniet@kirkland.com
              Douglas E. Bacon, P.C.
              douglas.bacon@kirkland.com
              John R. Luze
              john.luze@kirkland.com

(b)      if to the Consenting Parties, to:

22

The address set forth on each such Consenting Party's signature page (or as directed by any transferee of such Consenting Party), as the case may be.

With a copy to counsel to the Consenting Parties (which shall not constitute notice):

Milbank, Tweed, Hadley & McCloy LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Attention:  Paul S. Aronzon
           paronzon@milbank.com
           Thomas R. Kreller
           tkreller@milbank.com
           Adam Moses
           amoses@milbank.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.  For purposes of this Agreement, any consents or approvals of the Consenting Parties may be provided by counsel to the Consenting Parties.

16.10.  <u>Waiver</u>.  If the Restructuring Transaction is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transaction, or the payment of damages to which a Party may be entitled under this Agreement.

16.11.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party. Consequently, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.12.  <u>Relationship Among Parties</u>.  Notwithstanding anything in this Agreement to the contrary, the agreements, representations, warranties, and obligations of the Consenting Parties under this Agreement are, in all respects, several and not joint, and are made in favor of the Company only and not in favor of or for the benefit of any other Consenting Party.   The agreements, representations and obligations of the Company Parties under this Agreement are, in all respects, joint and several.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other Entity.  Unless expressly stated in this Agreement, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.  Any breach of this Agreement by a Consenting Party shall not result in liability for any other Consenting Party.  No prior history, pattern, or practice of sharing

confidences among or between the Parties shall in any way affect or negate this Agreement. The Parties to this Agreement acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company and the Consenting Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. No action taken by any Consenting Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Consenting Parties are in any way acting in concert or as such a "group."

16.13. <u>Reservation of Rights</u>.

(a) Except as expressly provided in this Agreement or the Restructuring Term Sheet, including <u>Section 5.01</u> and <u>Section 5.02</u> of this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect, preserve, and assert its rights, remedies, defenses, claims and interests against or with respect to any of the other Parties.

(b) Without limiting <u>Section 12.05</u> and Sub-Clause (a) of this <u>Section 16.13</u> in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement, or if this Agreement is terminated for any reason, nothing shall be construed in this Agreement as a waiver by any Party of any or all of such Party's rights, remedies, defenses, claims and interests. Each of the Parties expressly reserves and preserves any and all of its respective rights, remedies, defenses, claims, and interests, subject to <u>Section 16.10</u> of this Agreement. This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession of any kind or nature by any Party, including, but not limited to, with respect to: (i) the valuation of any Company Party or any business of any Company Party; or (ii) the nature, priority, extent, validity and/or perfection of the Consenting Parties' respective liens on, claims against or interests in any Company Party's property or assets.

(c) Except as expressly set forth in this Agreement, nothing in this Agreement shall be deemed to be, or construed as, a waiver or release of: (i) any secured claim or any unsecured deficiency claim held by any Consenting Term Lender or any Consenting Second Lien Noteholder; (ii) any claim in respect of the Applicable Premium (as defined in the Term Credit Agreement) (a "**First Lien Make-Whole Claim**"); (iii) any claim in respect of damages from the breach of the "no-call" protections set forth in the Second Lien Indenture (including in section 4.04 of the Second Lien Indenture), including but not limited to amounts in respect of yield protection (a "**Second Lien Yield Protection Claim**"); (iv) the right of any Consenting Term Lender or any Consenting Second Lien Noteholder to assert any such secured claim, unsecured deficiency claim, First Lien Make-Whole Claim or Second Lien Yield Protection Claim, including but not limited to the right to credit bid all or a portion of any such claims in accordance with section 363(k) of the Bankruptcy Code; or (v) the right of any Consenting Term Lender or any Consenting Second Lien Noteholder to assert that its claims are fully secured or that it is entitled to payment in full from the collateral securing its claims. Subject to the express terms of this Agreement, any and all secured claims, unsecured deficiency claims, First Lien Make-Whole Claims or Second Lien Yield Protection Claims of any Consenting Term Lender or any Consenting Second Lien Noteholder and the rights to assert such secured claims, unsecured deficiency claims, First Lien Make-Whole Claims and Second Lien Yield Protection Claims are expressly reserved and preserved.

16.14.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.15.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect of this Agreement at law or in equity shall be cumulative and not alternative.  The exercise of any right, power, or remedy by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.16.  <u>Additional Parties</u>.  Without in any way limiting the requirements of <u>Section 6</u> of this Agreement, additional holders of Debtor Claims/Interests may elect to become Parties to this Agreement upon execution and delivery to the other Parties of a Joinder Agreement in the form attached to this Agreement as **<u>Exhibit C</u>**.  Each such additional Party shall (a) become a Consenting Party under this Agreement in accordance with the terms of this Agreement, (b) be bound by the terms and conditions of this Agreement, and (c) be deemed to make all representations and warranties contained in this Agreement as of the date of the execution and delivery of such Joinder Agreement.

16.17.  <u>Other Support Agreements.</u>  Until a Termination Date with respect to the Company, the Company shall not enter into any other restructuring support agreement related to a partial or total restructuring of the Company's balance sheet or assets unless such support agreement is consistent in all respects with the Restructuring Term Sheet and is acceptable to the Consenting Parties in their sole discretion.

16.18.  <u>Confidentiality</u>.  The terms of any existing confidentiality agreements executed by and among any of the Parties as of the date of this Agreement shall remain in full force and effect in accordance with their terms.  Except as required by applicable law, rule, or regulation or as ordered by the Bankruptcy Court or other court of competent jurisdiction, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party) the holdings information of any Consenting Party without such Consenting Party's prior written consent.  However, the Company may publicly disclose the aggregate holdings of all Consenting Parties.

16.19.  <u>Consent Rights Preserved</u>.  Notwithstanding any provision in any order approving any First Day Pleading or any other order that grants the Company discretion to take any action that is subject to consent or approval rights of the Consenting Parties hereunder, the entry of such order shall not be deemed a waiver of such consent or approval rights hereunder.

16.20.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

GASTAR EXPLORATION INC.

By: _____

NORTHWEST PROPERTY VENTURES LLC

By: _____

*Debtor Signature Page to Restructuring Support Agreement*

**AF V ENERGY I AIV A1, L.P.**
**AF V ENERGY I AIV A2, L.P.**
**AF V ENERGY I AIV A3, L.P.**
**AF V ENERGY I AIV A4, L.P.**
**AF V ENERGY I AIV A5, L.P.**
**AF V ENERGY I AIV A6, L.P.**
**AF V ENERGY I AIV A7, L.P.**
**AF V ENERGY I AIV A8, L.P.**
**AF V ENERGY I AIV A9, L.P.**
**AF V ENERGY I AIV A10, L.P.**
**AF V ENERGY I AIV A11, L.P.**
**AF V ENERGY I AIV A12, L.P.**
**AF V ENERGY I AIV A13, L.P.**
**AF V ENERGY I AIV B1, L.P.,**
as Ares Equity Holders

By: AF V ENERGY I AIV GP, L.P.
    as general partner

By: _____

Name: Gary Levin
Title: Authorized Signer

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Term Loan Claims (if any) | $ 0.00 |
| Second Lien Claims (if any) | $ 0.00 |
| Existing Common Equity (if any) | 56,712,088 shares |

**AF V ENERGY I AIV A1, L.P.**
**AF V ENERGY I AIV A2, L.P.**
**AF V ENERGY I AIV A3, L.P.**
**AF V ENERGY I AIV A4, L.P.**
**AF V ENERGY I AIV A5, L.P.**
**AF V ENERGY I AIV A6, L.P.**
**AF V ENERGY I AIV A7, L.P.**
**AF V ENERGY I AIV A8, L.P.**
**AF V ENERGY I AIV A9, L.P.**
**AF V ENERGY I AIV A10, L.P.**
**AF V ENERGY I AIV A11, L.P.**
**AF V ENERGY I AIV A12, L.P.**
**AF V ENERGY I AIV A13, L.P.**
**AF V ENERGY I AIV B1, L.P.,**
as Consenting Second Lien Noteholders

By: AF V ENERGY I AIV GP, L.P.
    as general partner

By: _____

Name: Gary Levin
Title: Authorized Signer

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Term Loan Claims (if any) | $ 0.00 |
| Second Lien Claims (if any) *in principal amount* | $ 162,500,000.00 |
| Existing Common Equity (if any) | 0      shares |

*Consenting Party Signature Page to Restructuring Support Agreement*

**AF V ENERGY I HOLDINGS, L.P.,**
as Consenting Term Lender

By: AF V Energy I AIV GP, L.P.,
    as general partner

By: _____

Name: GARY LEVIN
Title: AUTHORIZED Signer

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Term Loan Claims (if any)   : in principal amount @ | $ 283,851,332.61 |
| Second Lien Claims (if any)  10/1/2018 | $ 0.00 |
| Existing Common Equity (if any) | 0                shares |

*Consenting Party Signature Page to Restructuring Support Agreement*

**<u>SCHEDULE 1</u> to
the Restructuring Support Agreement**

**<u>EXHIBIT A</u> to**
**the Restructuring Support Agreement**

**Restructuring Term Sheet**

*Execution Version*

GASTAR EXPLORATION INC.

## RESTRUCTURING TERM SHEET

### October 26, 2018

This term sheet (the "Restructuring Term Sheet") summarizes the material terms and conditions of certain transactions in connection with a potential restructuring (the "Restructuring Transaction") of the capital structure and financial obligations of Gastar Exploration Inc., a Delaware corporation ("Gastar"), and its subsidiary. The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring Transaction have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring Transaction. This Restructuring Term Sheet is attached to and made a part of the Restructuring Support Agreement (as amended, modified or supplemented from time to time, the "RSA"), dated as of October 26, 2018, by and among the Company and the Consenting Parties (as each such term is defined below).

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER OR PROPOSAL WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN. THE PARTIES TO THIS TERM SHEET ACKNOWLEDGE AND AGREE THAT ANY SUCH OFFER, PROPOSAL OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW. THIS RESTRUCTURING TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING. THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT AND THE TRANSACTIONS CONTEMPLATED IN THIS RESTRUCTURING TERM SHEET ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS RESTRUCTURING TERM SHEET AND OTHERWISE ACCEPTABLE TO THE COMPANY AND THE CONSENTING PARTIES AS WELL AS THE SATISFACTORY COMPLETION OF DUE DILIGENCE BY THE CONSENTING PARTIES IN THEIR SOLE DISCRETION. THIS RESTRUCTURING TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY. ACCORDINGLY, THIS TERM SHEET IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS. THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED IN THIS RESTRUCTURING TERM SHEET ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE CONSENTING PARTIES OR THEIR COUNSEL.

| OVERVIEW | |
|---|---|
| **Parties to the Restructuring** | **Company**: Gastar; Northwest Property Ventures LLC; and any other future subsidiaries of Gastar (collectively, the "Company"). |

| | |
|---|---|
| | **Term Lender**:  AF V Energy I Holdings, L.P., as a lender (the "Consenting Term Lender") under the Third Amended and Restated Credit Agreement, dated March 3, 2017 (as amended, restated, modified or supplemented from time to time, the "Term Credit Agreement"), by among Gastar, as Borrower, the Guarantors specified in the Term Credit Agreement or in related transaction documentation, the Lenders from time to time party to the Term Credit Agreement and Wilmington Trust, National Association, as administrative agent (the "Term Agent"). |
| | **Second Lien Noteholders**:  The entities identified on Annex 1 attached to this Restructuring Term Sheet, in their capacities as holders of the notes (the "Second Lien Notes") (in such capacities, the "Consenting Second Lien Noteholders") issued pursuant to the Indenture dated March 3, 2017 (as amended, restated, modified or supplemented from time to time, the "Second Lien Indenture"), by and among Gastar, as issuer, the Guarantors specified in the Second Lien Indenture or in related transaction documentation, and Wilmington Trust, National Association, as trustee and collateral agent (the "Second Lien Trustee"). |
| | **Ares Equity Holders**:  The entities identified on Annex 1 attached to this Restructuring Term Sheet, in their capacities as holders of Gastar's outstanding common shares (such common shares, together with any and all outstanding and unexercised or unvested warrants, options or rights to acquire Gastar's currently outstanding equity, the "Existing Common Equity") (in such capacities, the "Ares Equity Holders"; together with the Consenting Term Lender and the Consenting Second Lien Noteholders, the "Consenting Parties"). |
| | The Company and each of the Consenting Parties is referred to in this Restructuring Term Sheet as a "Party", and they are collectively referred to in this Restructuring Term Sheet as the "Parties". |
| **Restructuring Transaction Overview** | The Restructuring Transaction shall be implemented pursuant to a "prepackaged" chapter 11 plan of reorganization (as may be amended or supplemented from time to time, the "Plan"), which shall provide for a balance sheet restructuring consistent with the Economic Terms (as defined below) and other terms set forth in this Restructuring Term Sheet.  The Company shall commence cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and file the Plan.  The Plan will be subject to certain milestones (the "Milestones") set forth in this Restructuring Term Sheet. |
| | The Company will commence solicitation of the Plan prior to the commencement of the Chapter 11 Cases and, in any event, by no later than October 26, 2018.  In connection with such solicitation, the Company shall prepare and deliver to all classes of claims |

| | |
|---|---|
| | entitled to vote on the Plan a disclosure statement relating to the Plan (as may be amended or supplemented from time to time, the "Disclosure Statement").<br><br>The Restructuring Transaction will be financed by: (i) consensual use of cash collateral; and (ii) an approximately $383.9 million superpriority debtor-in-possession financing to be provided by one or more of the Consenting Parties and/or affiliates thereof substantially on terms and subject to conditions set forth in the term sheet attached to the RSA as Exhibit D (the "DIP Term Sheet").<br><br>In accordance with the terms and conditions described in Section 5.02(b) of the RSA, the Economic Terms are subject to a Potentially Superior Proposal (as defined in the RSA).<br><br>Each of the Milestones shall be subject to extension or waiver in the sole discretion of the Consenting Parties. |
| **Economic Terms** | The Plan shall provide for the following classification and principal economic treatment (the "Economic Terms") of claims against and interests in the Company, provided that a DIP Toggle Event[1] has not occurred:<br><br>   i.  DIP Claims:  On the effective date of the Chapter 11 Cases (the "Effective Date"), all obligations under the DIP Facility (including, but not limited to, any outstanding obligations relating to the Term Loan Refinancing) (collectively, the "DIP Claims") shall be treated as follows:<br><br>     a. *first*, the DIP Claims shall be refinanced in accordance with the treatment set forth below under the caption "Exit Facility; Refinancing of DIP Facility and Term Facility;"<br><br>     b. *second*, any amount of the DIP Claims that is not refinanced pursuant to clause (a) immediately above (such amount the "Remaining DIP Claims") shall be exchanged for its *pro rata* share of 100% of the new common equity of the reorganized Company (or a newly formed or other entity to be mutually agreed) (which equity may take the form of equity interest in a limited liability company or in a limited liability partnership or stock in a corporation, the "New Common Equity"), subject to dilution on account of, as applicable, the New Warrants (as defined below) and the Management Incentive Plan (as defined below). |

---

[1] A "DIP Toggle Event" shall have occurred upon (a) the occurrence of an Event of Default (as defined in the DIP Term Sheet) and (b) the delivery to the Company and filing on the docket of the Chapter 11 Cases, in each case by the Majority DIP Lenders (as defined in the DIP Term Sheet) or DIP Agent at the direction of the Majority DIP Lenders, of a notice stating that the DIP Toggle Event has occurred.  The notice referred to in the preceding sentence is referred to herein as a "DIP Toggle Notice."

For purposes of the treatment of the DIP Claims, "*pro rata*" shall mean the proportion of (i) the Remaining DIP Claims to (ii) the sum of (a) the Equitized Senior Obligations (as defined below), which amount, if a DIP Toggle Event has occurred, shall include the Senior Additional Amount (as defined below) for the purposes of this calculation, *plus* (b) the Second Lien Claims (as defined below), which amount, if a DIP Toggle Event has occurred, shall include the Second Lien Additional Amount (as defined below) for the purposes of this calculation, *plus*, solely upon the occurrence of a DIP Toggle Event, (c) the General Unsecured Claims (as defined below).

ii.   <u>Term Credit Agreement</u>:   On the Effective Date, all obligations under or in respect of the Term Credit Agreement (the "<u>Term Loan Claims</u>") shall be treated as follows:

a. *first,* the Term Loan Claims shall be refinanced as set forth below under the caption "Exit Facility; Refinancing of DIP Facility and Term Facility;"

b. *second*, any amount of the Term Loan Claims that is not refinanced pursuant to clause (a) immediately above (such amount, the "<u>Remaining Term Loan Claims,</u>" together with the Remaining DIP Claims, the "<u>Equitized Senior Obligations</u>") shall be exchanged for its *pro rata* share of 100% of the New Common Equity, subject to dilution on account of, as applicable, the New Warrants and the Management Incentive Plan.

For purposes of the treatment of the Term Loan Claims, "*pro rata*" shall mean the proportion of (i) the Remaining Term Loan Claims, which amount, if a DIP Toggle Event has occurred, shall include the Senior Additional Amount for the purposes of this calculation, to (ii) the sum of (a) the Equitized Senior Obligations, which amount, if a DIP Toggle Event has occurred, shall include the Senior Additional Amount for the purposes of this calculation, *plus* (b) the Second Lien Claims, which amount, if a DIP Toggle Event has occurred, shall include the Second Lien Additional Amount for the purposes of this calculation, *plus*, solely upon the occurrence of a DIP Toggle Event, (c) the General Unsecured Claims.

iii.   <u>Second Lien Indenture</u>:   On the Effective Date, all obligations under or in respect of the Second Lien Indenture (the "<u>Second Lien Claims</u>") shall be exchanged for a *pro rata* share of 100% of the New Common Equity, subject to dilution on account of, as applicable, the New Warrants and the Management Incentive Plan.

4

For purposes of the treatment of the Second Lien Claims, "*pro rata*" shall mean the proportion of (i) the Second Lien Claims, which amount, if a DIP Toggle Event has occurred, shall include the Second Lien Additional Amount for the purposes of this calculation, to (ii) the sum of (a) the Equitized Senior Obligations (as defined below), which amount, if a DIP Toggle Event has occurred, shall include the Senior Additional Amount for the purposes of this calculation, *plus* (b) the Second Lien Claims, which amount, if a DIP Toggle Event has occurred, shall include the Second Lien Additional Amount for the purposes of this calculation, *plus*, solely upon the occurrence of a DIP Toggle Event, (c) the General Unsecured Claims.

iv.  <u>Administrative Claims</u>:  On the Effective Date, any claims incurred for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code ("<u>Administrative Claims</u>") shall receive payment in full in cash.  For the avoidance of doubt, all claims arising from the provision of goods or services provided within the 20 days prior to the Petition Date (the "<u>Reclamation Claims</u>") shall be paid in the ordinary course of business during the pendency of the Chapter 11 Cases as permitted by section 503(b)(9) of the Bankruptcy Code.  Notwithstanding the foregoing, the payments on account of such Reclamation Claims shall be subject to an aggregate cap of $2 million, after which any further payments on account of Reclamation Claims will be subject to the consent of the Consenting Parties in their sole discretion.  If such consent is denied, any such Reclamation Claims will be treated as Administrative Claims to be paid as set forth above.

v.  <u>Hedging Bank Claims</u>:  Each holder of any net claims arising out of any termination of the Company's prepetition hedging or swap arrangements with Cargill, Inc. and NextEra Energy Marketing, LLC (the "<u>Hedge Claims</u>") shall receive cash in an amount equal to 100% of such holder's Hedge Claims (the "<u>Hedge Claims Payment Amount</u>"), payable in the following installments:

(a) on the Effective Date, an amount equal to the product of (i) the number of monthly settlement payments that would have occurred after the Hedge Termination Date and on or prior to the Effective Date had the Hedge Claims not been liquidated *divided* by 14 and (ii) the Hedge Claims Payment Amount; and

(b) the remaining amount of the Hedge Claims Payment Amount in equal monthly installments, with such

remaining amount to be paid in full by December 31, 2019, pursuant to a new secured note that will be secured by a security interest in the collateral securing the Hedge Claims as of the Petition Date (that is senior up to the Effective Date and *pari passu* with the First Lien Exit Facility (as defined below)) and otherwise on terms acceptable to the Company and the Consenting Parties.

vi. <u>Statutory Lien Claims</u>:  Each holder of any net claims secured by statutory mechanics' or construction liens (the foregoing collectively, the "<u>Statutory Lien Claims</u>") shall receive:  (a) on the Effective Date, cash in an amount equal to 50% of the allowed amount of such holder's net claims (the "<u>Initial Distribution</u>"); and (b) on the date that is six months following the Effective Date, cash in an amount equal to 50% of the allowed amount of such holder's net claims.  The prepetition liens securing any such Statutory Lien Claims shall be automatically released and discharged on the Effective Date without the requirement of any further notice, demand or order of the Bankruptcy Court or any other court or any action by any party.  Immediately upon payment of the Initial Distribution, each holder of Statutory Lien Claims shall take all commercially reasonable actions to effectuate and document the release of such prepetition liens securing such Statutory Lien Claims in accordance with applicable non-bankruptcy law.

vii. <u>Other Secured Claims</u>:  On the Effective Date, Other Secured Claims (as defined below) shall receive, in full and final satisfaction of such claims, either (a) payment in full in cash, (b) delivery of the collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code, (c) reinstatement of such claim under section 1124 of the Bankruptcy Code, (d) other treatment rendering such claim unimpaired or (e) the indubitable equivalent of such claim.[2]

viii. <u>Priority Tax Claims</u>:  On the Effective Date, any claim of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code ("<u>Priority Tax Claims</u>") shall receive payment in full in cash or otherwise receive

---

[2] "<u>Other Secured Claims</u>" means any claim against the Company (other than the Term Loan Claims, the Second Lien Claims, the Hedge Claims and the Statutory Lien Claims) that is:  (a) secured by a lien on property in which the Company has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Company's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

ix.   Other Priority Claims:  On the Effective Date, any claims, other than Administrative Claims or Priority Tax Claims, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code (the "Other Priority Claims") shall be paid in full in cash.

x.    General Unsecured Claims:  Each holder of a general unsecured claim (the "General Unsecured Claims") (if and to the extent any such General Unsecured Claim has not been paid, including in connection with any "critical vendor" or "first day" orders of the Bankruptcy Court) shall receive cash in an amount equal to such General Unsecured Claim on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract or other arrangement giving rise to such General Unsecured Claim.

xi.   Existing Preferred Equity:  Holders of Gastar's current outstanding preferred equity shares (the "Existing Preferred Equity") shall receive their *pro rata* share of 100% of the New Preferred Warrants (as defined below), which New Preferred Warrants shall be convertible into up to 2.5% of the number of shares, units or equity interests (as the case may be based how the New Common Equity is denominated) of the New Common Equity outstanding on the Effective Date.  Notwithstanding the foregoing, holders of Existing Preferred Equity will not receive any New Warrants if any holder or holders of Existing Common Equity or Existing Preferred Equity seek official committee status or the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transaction, the confirmation of the Plan by the Bankruptcy Court or the approval of the DIP Facility by the Bankruptcy Court.

xii.  Existing Common Equity:  Holders of Existing Common Equity shall receive their *pro rata* share of 100% of the New Common Warrants (as defined below), which New Common Warrants shall be convertible into up to 2.5% of the number of shares, units or equity interests (as the case may be based how the New Common Equity is denominated) of the New Common Equity outstanding on the Effective Date.  Notwithstanding the foregoing, holders of Existing Common Equity will not receive any New Warrants if any holder or holders of Existing Common Equity or Existing Preferred Equity seek official committee

7

status or the appointment of a trustee or examiner, or object to or otherwise oppose the consummation of the Restructuring Transaction, the confirmation of the Plan by the Bankruptcy Court or the approval of the DIP Facility by the Bankruptcy Court.

xiii. <u>Intercompany Claims and Interests</u>:   Any intercompany claims or interests shall be, at the option of the Company and with the consent of the Consenting Parties (such consent not to be unreasonably withheld, conditioned or delayed), either reinstated or canceled and released without any distribution.

Notwithstanding the foregoing, in the event that a DIP Toggle Event has occurred, each holder of General Unsecured Claims, Existing Preferred Equity, or Existing Common Equity shall receive under the Plan the treatment described below, which shall constitute the Economic Terms as to such holders:

i. <u>General Unsecured Claims</u>: Each holder of a General Unsecured Claim (if and to the extent any such General Unsecured Claim has not been paid, including in connection with any "critical vendor" or "first day" orders of the Bankruptcy Court) shall receive its *pro rata* share of 100% of the New Common Equity, subject to dilution on account of the Management Incentive Plan.

For purposes of the treatment of the General Unsecured Claims in the event a DIP Toggle Event has occurred, "*pro rata*" shall mean the proportion of (i) the General Unsecured Claims to (ii) the sum of (a) the Equitized Senior Obligations, which amount shall include the Senior Additional Amount for the purposes of this calculation, *plus* (b) the Second Lien Claims, which amount shall include the Second Lien Additional Amount for the purposes of this calculation, *plus* (c) the General Unsecured Claims.

ii. <u>Existing Preferred Equity</u>:   The Existing Preferred Equity shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Existing Preferred Equity will not receive any distribution on account of such Existing Preferred Equity.

iii. <u>Existing Common Equity</u>:   The Existing Common Equity shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Existing Common Equity will not receive any distribution on account of such Existing Common Equity.

For the avoidance of doubt, treatment of all other claims or interests described above other than General Unsecured Claims, Existing Preferred Equity, or Existing Common Equity shall not receive

| | |
|---|---|
| | different treatment in the event that a DIP Toggle Event has occurred. |
| | Each holder of an allowed claim or interest, as applicable, shall receive under the Plan the treatment described above (or less favorable treatment that may be agreed by the Company and the holder of such allowed claim or interest) in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed claim or interest.  Any action to be taken by the Company on the Effective Date may be taken on the Effective Date or as soon as is reasonably practicable thereafter. |
| | Notwithstanding the foregoing, in any Chapter 11 Cases, in no event shall any claim or interest that is not an allowed claim or interest pursuant to the Bankruptcy Code be entitled to any consideration whatsoever on account of such claim.  Additionally, if the holder of any claim or interest has agreed with the Company to less favorable treatment on account of such claim than is set forth above, the holder of such claim or interest will receive such less favorable treatment. |
| **Plan Voting** | Only the holders of Term Loan Claims, the Second Lien Claims, the Hedge Claims and the Statutory Lien Claims shall be entitled to vote on the Plan.  For the avoidance of doubt, holders of Existing Preferred Equity and/or Existing Common Equity shall be deemed to reject the Plan. |
| **Exit Facility; Refinancing of DIP Facility and Term Facility** | On the Effective Date, the Consenting Parties shall provide to the reorganized Company (or a newly formed or other entity to be mutually agreed) (the "Borrower") either through new money loans or a debt-for debt exchange (at the election of the Consenting Parties): |
| |     (i)  a $100 million first lien secured delayed draw term loan facility comprised of (a) term loans equal to the portion of the New Money Loans (as defined in the DIP Term Sheet) outstanding under the DIP Facility and (b) term loan commitments consisting of DIP Claims in an amount equal to any undrawn New Money Loan commitments under the DIP Facility (the "First Lien Exit Facility"); and |
| |     (ii) a $200 million second lien secured term loan facility (the "Second Lien Exit Facility"; and together with the First Lien Exit Facility, collectively, the "Exit Facility"). |
| | Pursuant to the Exit Facility, and subject to, the terms and conditions set forth in the term sheet attached to the RSA as Exhibit E (the "Exit Facility Term Sheet") and the definitive documents memorializing such facility: |
| |     (a) a portion of the First Lien Exit Facility in an amount equal to the undrawn portion of the DIP Facility |

9

immediately prior to the consummation of the Restructuring Transaction shall be available to the Borrower for working capital, subject to and in accordance with the Exit Facility Term Sheet and the terms of the definitive documentation governing the First Lien Exit Facility;

(b) the balance of the First Lien Exit Facility shall be treated as satisfying on a dollar-for-dollar basis *first,* the outstanding DIP Claims and *second*, solely to the extent that all DIP Claims have been fully repaid, the Term Loan Claims; and

(c) the Second Lien Exit Facility shall be treated as satisfying on a dollar-for-dollar basis *first,* any outstanding DIP Claims remaining after application of the First Lien Exit Facility and *second*, solely to the extent that all DIP Claims have been fully repaid, the Term Loan Claims.

Any portion of the DIP Claims or the Term Loan Claims that is not refinanced pursuant to the Exit Facility shall receive the treatment for Remaining DIP Claims and Remaining Term Loan Claims, respectively, set forth above under the caption "Economic Terms". The First Lien Exit Facility and the Second Lien Exit Facility shall be secured by (subject to permitted liens to be mutually agreed), respectively, first priority and second priority liens on the Credit Parties' (as defined in the Exit Term Sheet) assets.

Notwithstanding the foregoing, the Consenting Parties shall have the right, exercisable in their sole discretion, to (i) replace the First Lien Exit Facility with a $100 million reserve based lending facility from a third party financing source on or prior to the Effective Date; and (ii) to reduce the principal amount of the Second Lien Exit Facility in such amount as they may determine on or prior to the Effective Date.

| | |
|---|---|
| **Management Incentive Plan** | On the Effective Date, the Company shall reserve shares, units or equity interests (as the case may be based how the New Common Equity is denominated) of New Common Equity to be available for grant from time to time to employees of the reorganized business of the Company pursuant to a management incentive plan (the "Management Incentive Plan") in an aggregate amount equal to 10% of the New Common Equity, on a fully diluted, fully distributed basis.  All terms, conditions, allocations, securities types, exercise prices and grants of individual awards under the Management Incentive Plan shall be subject to the approval of the new Board of Directors (the "New Board") of the parent entity holding the reorganized business of the Company following the consummation of the Restructuring Transaction.  Notwithstanding the foregoing, (i) no awards under the Management Incentive Plan |

| | |
|---|---|
| | shall vest on confirmation of the Plan and (ii) the amount of awards permitted to be granted under the Management Incentive Plan each year will be subject to limitations to be determined by the New Board so that the award of grants will be staggered over a period of time. |
| **Restructuring Support Agreement** | The Company and the Consenting Parties shall execute the RSA. The RSA shall contain customary terms and conditions for an agreement of its type, including, without limitation, terms evidencing the obligation of the parties to such agreement to support the consummation of the Restructuring Transaction. |
| **Information Sharing and Consultation Rights** | Notwithstanding anything to the contrary in this Restructuring Term Sheet, whether or not expressly so provided in this Restructuring Term Sheet, each of the following matters shall be subject to the Information Sharing and Consultation Rights:  (i) the status and satisfaction of (or failure to satisfy) each Milestone; (ii) any proposal, offer or expression of interest the Company receives for an Alternative Transaction (as defined in the RSA); and (iii) any proposed budget, business plan, forecast, projection or valuation of, or relating to, the Company. <br><br> As used in this Restructuring Term Sheet, the "Information Sharing and Consultation Rights" shall have the meaning set forth in the RSA. |
| **Milestones** | The Consenting Parties' support for the Restructuring Transaction shall be subject to the timely satisfaction of the following Milestones:[3] <br><br> • The Company shall have commenced the solicitation of the Plan by no later than October 26, 2018. <br><br> • The Company shall have concluded the solicitation of the Plan by no later than October 31, 2018. <br><br> • The Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court by no later than October 31, 2018. <br><br> • On the date of the commencement of the Chapter 11 Cases (the "Petition Date"), the Company shall have filed (i) the Plan, (ii) the Disclosure Statement, and (iii) a motion for approval of the Disclosure Statement and solicitation procedures and to set a hearing to consider confirmation of the Plan. |

---

[3] To the extent a Milestone falls within a Holiday Period then such milestone shall be extended by three (3) business days after the end of the Holiday Period. "Holiday Period" shall mean the period from November 19, 2018 through and including November 23, 2018 and the period from December 24, 2018 through and including January 4, 2018.

|  | |
|---|---|
|  | • Within five (5) days following the Petition Date, the Bankruptcy Court shall have entered the interim order approving the DIP Facility (the "Interim Order"). <br><br> • Within thirty (30) days following the Petition Date, the Bankruptcy Court shall have entered the final order approving the DIP Facility. <br><br> • Within sixty (60) days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and confirming the Plan (the "Confirmation Order"). <br><br> • Within twenty (20) days following the entry of the Confirmation Order, the Plan shall have been consummated. <br><br> The Company shall use its best efforts to cause each of the Milestones to be timely attained.  However, in the event that any Milestone is not timely attained, the use by the Company of such best efforts shall in no event relieve it of its obligation hereunder to have caused such Milestone to be timely attained.  The failure to attain any Milestone shall give the Consenting Parties the right to terminate the RSA in accordance with the terms of the RSA. |
| **Credit Bidding** | Upon the direction of the DIP Lenders (as defined in the DIP Term Sheet), the Term Lender and the Second Lien Noteholders, as applicable, in their sole discretion, the administrative agent under the DIP Facility (the "DIP Agent"), the Term Agent and the Second Lien Trustee or their respective designees shall have the right to credit bid all or a portion of the of DIP Claims, the Term Loan Claims or the Second Lien Claims, respectively, in accordance with section 363(k) of the Bankruptcy Code. |
| **Debtor-in-Possession Financing** | Subject to the terms and conditions set forth in the DIP Term Sheet, certain of the Consenting Parties and/or their affiliates will be lenders under a new superpriority debtor-in-possession financing (the "DIP Facility") in an aggregate amount of approximately $383.9 million, which shall include up to $100 million in new money financing, to the extent necessary to fund the Company through to the consummation of the Restructuring Transaction. Subject to the terms and conditions set forth in the DIP Term Sheet, the new money proceeds of the DIP Facility shall be used by the Company, among other things, for general working capital purposes and to fund the administration of the Chapter 11 Cases, in each case, in accordance with a budget agreed to by the DIP Lenders (the "DIP Budget").  In addition, at the election of the Consenting Parties, approximately $283.9 million of Term Loan Claims (consisting of the outstanding principal amount and accrued but unpaid interest under the Term Credit Agreement as of the Petition Date) shall either (i) be refinanced on a dollar-for-dollar basis in cash with |

| | |
|---|---|
| | proceeds of the DIP Facility or (ii) be exchanged on a dollar-for-dollar basis for an equal interest in the DIP Facility (the "Term Loan Refinancing"). The DIP Facility shall contain other customary terms and conditions consistent with the DIP Term Sheet and otherwise be, in form and substance, acceptable to the Company and the Consenting Parties. |
| **New Preferred Warrants** | On the Effective Date, subject to the conditions set forth above in the Economic Terms relating to the treatment of the Existing Preferred Equity, the Company will issue 3-year warrants exercisable for cash (and in no event exercisable on a cashless basis) into up to 2.5% of the number of shares, units or equity interests (as the case may be based how the New Common Equity is denominated) of the New Common Equity outstanding on the Effective Date with a strike price equal to, as of any applicable date of determination, (i) (A) the amount of the Second Lien Claims outstanding as of immediately prior to the effectiveness of the Restructuring Transaction plus (B) the amount of interest that would have accrued (assuming such interest is compounded on each March 1, June 1, September 1 and December 1) on the sum of such Second Lien Claims and $23,369,951.46 (the "Second Lien Additional Amount") through such date if the Second Lien Notes (plus the Second Lien Additional Amount) had been outstanding after the Effective Date and through such date plus (C) the amount of the Equitized Senior Obligations plus (D) the amount of interest that would have accrued on the sum of such Equitized Senior Obligations and $50,541,158.61 (the "Senior Additional Amount") through such date if the Equitized Senior Obligations (plus the Senior Additional Amount) had remained outstanding in accordance with their terms after the Effective Date and through such date (assuming such interest is compounded on each March 31, June 30, September 30 and December 31), plus (E) $73,911,110.07, divided by (ii) the number of shares, units or equity interests (as the case may be based how the New Common Equity is denominated) of New Common Equity issued under the Plan on the Effective Date (the "New Preferred Warrants"). <br><br> The foregoing is subject in its entirety to the terms and conditions set forth below in "Parameters Relating to the Issuance of the New Warrants." |
| **New Common Warrants** | On the Effective Date, subject to the conditions set forth above in the Economic Terms relating to the treatment of the Existing Common Equity, the Company will issue 3-year warrants exercisable for cash (and in no event exercisable on a cashless basis) into up to 2.5% of the number of shares, units or equity interests (as the case may be based how the New Common Equity is denominated) of the New Common Equity outstanding on the Effective Date with a strike price equal to, as of any applicable date |

13

| | |
|---|---|
| | of determination, (i) (A) the amount of the Second Lien Claims outstanding as of immediately prior to the effectiveness of the Restructuring Transaction plus (B) the amount of interest that would have accrued (assuming such interest is compounded on each March 1, June 1, September 1 and December 1) on the sum of such Second Lien Claims and the Second Lien Additional Amount through such date if the Second Lien Notes (plus the Second Lien Additional Amount) had remained outstanding after the Effective Date and through such date plus (C) the amount of the Equitized Senior Obligations plus (D) the amount of interest that would have accrued on the sum of such Equitized Senior Obligations and the Senior Additional Amount through such date if the Equitized Senior Obligations (plus the Second Lien Additional Amount) had remained outstanding in accordance with their terms after the Effective Date and through such date (assuming such interest is compounded on each March 31, June 30, September 30 and December 31) plus (E) the aggregate liquidation preference of the Existing Preferred Equity as of immediately prior to the effectiveness of the Restructuring Transaction plus (F) the amount of dividends that would have accrued on such Existing Preferred Equity through such date if the Existing Preferred Equity had remained outstanding after the Effective Date and through such date, plus (G) $73,911,110.07, divided by (ii) the number of shares, units or equity interests (as the case may be based how the New Common Equity is denominated) of New Common Equity issued under the Plan on the Effective Date (the "<u>New Common Warrants</u>", and together with the New Preferred Warrants, the "<u>New Warrants</u>"). The foregoing is subject in its entirety to the terms and conditions set forth below in "Parameters Relating to the Issuance of the New Warrants." |
| **Parameters Relating to the Issuance of the New Warrants** | The issuance of the New Warrants shall be conditioned upon each of the following: (i) the holders of the New Warrants holding passive positions (i.e., no minority governance, registration, or similar rights) following such issuance, and any exercise, of the New Warrants; (ii) such issuance of the New Warrants being exempt from the registration requirements under the Securities Act of 1933 (the "<u>Securities Act</u>") and any other applicable federal, state or other securities laws; (iii) in no event shall any fractional New Warrants be required to be issued; (iv) such issuance of New Warrants not resulting in any of the entities holding the reorganized business of the Company following the consummation of the Restructuring Transaction being required to be a publicly held company or otherwise being required to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise (a "<u>Reporting Triggering Event</u>"); and (v) in no |

event shall any New Warrants be required to be issued to any competitors of the Company.

Notwithstanding the foregoing, in the event that the issuance of the New Warrants in accordance with the terms set forth in "New Preferred Warrants" and "New Common Warrants" above would result in the issuance of fractional New Warrants, the occurrence of a Reporting Triggering Event or the issuance of New Warrants to a competitor of the Company, then, although such issuances would not be required to be effected pursuant to this Term Sheet as a result of the failure of, as applicable, the condition set forth in clause (iii), clause (iv) and/or clause (v) of the immediately preceding paragraph, the Consenting Parties shall nevertheless, in their sole discretion, be entitled to elect (a "Cash-Out Election"):

(a) in the case of the failure of the condition set forth in such clause (iii) and/or the condition set forth in such clause (iv), to direct that any holder or holders of Existing Preferred Equity and any holders or holders of Existing Common Equity designated by the Consenting Parties (the designation of such holders to be made in the sole discretion of the Consenting Parties, taking into account the purpose of preventing the issuance of fractional New Warrants and/or the occurrence of a Reporting Triggering Event, as the case may be) shall receive instead of New Warrants a distribution of cash in an amount equal to the Value (as defined below) of the New Warrants such holders would have otherwise received but for the failure of the applicable conditions(s) (the "Category I Unavailable Warrants"); and/or

(b) in the case of the failure of the condition set forth in such clause (v), direct that such holders of Existing Preferred Equity and holders of Existing Common Equity that are competitors of the Company shall be entitled to a distribution of cash in an amount equal to the Value of the New Warrants such holders would have otherwise received but for the failure of the applicable condition (the "Category II Unavailable Warrants," and together with the Category I Unavailable Warrants, the "Unavailable Warrants").

In the event that the Consenting Parties make any Cash-Out Election(s), then the amount of New Warrants granted pursuant to "New Preferred Warrants" and "New Common Warrants," as applicable, shall be reduced by the amount of Unavailable Warrants.

For purposes of the foregoing, "Value" means the value of the applicable New Preferred Warrants or New Common Warrants, as the case may be, as reasonably determined by the Company and the Consenting Parties using the Black Scholes model or such other valuation methodology as is customary for valuations of this type.

The New Warrants will not be registered under the Securities Act or any other applicable federal, state or other securities laws.

The New Warrants will be transferable subject to restrictions pursuant to applicable federal, state and other securities laws. Such New Warrants shall only be transferable to:

(a)      "qualified institutional buyers" within the meaning of Rule 144A promulgated under the Securities Act; and

(b)      "accredited investors" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D promulgated under the Securities Act who are not disqualified persons under Rule 506(d) of Regulation D promulgated under the Securities Act.

The New Warrants will also be subject to restrictions:

(i)      designed to prevent the occurrence of circumstances that are reasonably expected by the Consenting Parties to require registration or qualification of the New Warrants pursuant to federal, state or other securities laws, or require the Consenting Parties to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise; and

(ii)      on transfers that would subject the Consenting Parties to regulation under the Investment Company Act of 1940, the Investment Advisers Act of 1940 or the U.S. Employee Retirement Income Security Act of 1974, each as amended;

(iii)      as specified in the definitive warrant agreement (the "Warrant Agreement") pursuant to which the New Warrants will be issued; and

(iv)      on transfers to competitors.

All holders of New Common Equity issued or issuable upon the exercise of the New Warrants shall be required to become parties to a stockholders or similar agreement with respect to the post-emergence equity in the entities holding the reorganized business of the Company (the "Stockholders Agreement"). The Warrant Agreement and the Stockholders Agreement shall each be in form and substance acceptable to the Consenting Parties.

In the event that a Sale (as defined below) is consummated prior to the 3-year anniversary of the Effective Date, any Warrants then remaining outstanding and unexercised shall expire worthless and will automatically be cancelled for no further consideration. For the avoidance of doubt, no holder of Warrants shall be entitled to the fair market value of the New Warrants (using the Black Scholes model or otherwise) in connection with a Sale, but shall have the right to exercise the New Warrants at any time prior to such Sale. The Company shall provide the holders of the New Warrants with five (5) business days' prior written notice of a Sale. The term "Sale" applies to any transaction with respect to the Company (or

| | |
|---|---|
| | any successor to the Company) and/or its subsidiaries taken as a whole and means (i) any consolidation, (ii) any merger, (iii) any disposition, transfer, conveyance or sale of all or a majority of the assets or equity interests, (iv) any transaction in which the holders of equity interests are entitled to receive (either directly or upon subsequent liquidation) cash, securities or other property with respect to, or in exchange for, such equity interests and/or (v) any transaction similar to the foregoing.<br><br>Notwithstanding anything to the contrary in this Term Sheet, neither the Company nor any of the entities holding the reorganized business of the Company following the consummation of the Restructuring Transaction shall be required to take any action that would result in the Company or such entity, as the case may be, being required to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise. |
| **Release** | Except as expressly set forth in this Restructuring Term Sheet or the definitive documentation for the Restructuring Transaction (the "Definitive Documentation"), the Definitive Documentation shall include full customary debtor and "third party" releases from liability in favor of the Company, each of the DIP Lenders, the DIP Agent, the Consenting Parties, the Term Agent, the Second Lien Trustee, and each of their respective directors, officers, funds, affiliates, members, employees, partners, managers, investment advisors, agents, representatives, principals, consultants, attorneys, professional advisors, heirs, executors, successors and assigns (each in their capacity as such).  The releases will cover any claims and causes of action related to or in connection with the Company, the Company's out-of-court restructuring efforts, the RSA, the Plan, the Restructuring Transaction or the obligations under the DIP Facility, the Term Credit Agreement, the Second Lien Indenture, the Existing Preferred Equity or the Existing Common Equity.  The releases described in this section shall contain a carve-out for actual fraud or fraud grounded in deliberate recklessness.  For the avoidance of doubt, any claims in respect of avoidance actions against the Consenting Parties shall be released.  Nothing in the foregoing shall result in any current or former members of the board of directors of the Company (the "Existing Board") or any current or former officers of the Company waiving any indemnification claims against the Company or any of its insurance carriers or any rights as beneficiaries of any insurance policies. |
| **Board of Directors** | The New Board shall consist of five (5) members.  All of the directors for the initial term following the consummation of the Restructuring Transaction shall be selected by the Consenting Parties.  In subsequent terms, the directors shall be selected in accordance with the organizational documents of the parent entity holding the reorganized business of the Company. |

| Senior Officers | Upon the consummation of the Restructuring Transaction, the Company's existing senior officers shall continue to serve in their current capacities at the pleasure of the New Board. |
|---|---|
| Employment Agreements | TBD. |
| Executory Contracts | The Company shall not enter into an executory contract, lease, or other arrangement outside of the ordinary course of its business without obtaining the prior written consent of the Consenting Parties. |
| | The Company shall not assume or reject any executory contract or unexpired lease without obtaining the prior written consent of the Consenting Parties. |
| Amended Articles & Bylaws | Any existing organizational and corporate governance documents of the entities holding the reorganized business of the Company after giving effect to the Restructuring Transaction shall be subject to amendments and modifications customary in connection with transactions similar to the Restructuring Transaction. |
| Public / Private Status of Company | The entities holding the reorganized business of the Company shall be privately held and shall not be subject to any United States Securities and Exchange Commission reporting obligations. |
| Registration Rights | The reorganized Company shall remain a privately held company and will not be required to register any of its post-emergence equity (including, without limitation, the New Common Equity or the New Warrants) for resale under the Securities Act or any other applicable federal, state or other securities laws or to offer to exchange any of such post-emergence equity for securities registered under the Securities Act or any other applicable federal, state or other securities laws. |
| Fees & Expenses / Expense Reimbursement | The Company shall promptly upon receipt of a request for payment thereof, pay all reasonable and documented out-of-pocket fees and expenses of the Consenting Parties as they are incurred, including but not limited to, the fees and expenses of their legal, financial and other advisors. |
| Tax, Securities, and Corporate Matters / Related Structure Considerations | The transactions discussed in this Restructuring Term Sheet are subject to ongoing tax diligence, securities compliance, and other corporate review. |
| | The Company shall reasonably cooperate with the Consenting Parties to structure the Restructuring Transaction to enable the Company or its successor to emerge on the Effective Date in the organizational form, and with the tax structure and tax elections, requested or consented to by the Consenting Parties.  Without limiting the foregoing, if requested by the Consenting Parties, the Company shall effectuate an internal corporate reorganization (i) to |

| | convert into, transfer all or a portion of its assets to or cause all or a portion of the equity interests in it to be transferred to, in each case, a limited liability company or a limited partnership, or (ii) as a result of which (x) the Consenting Parties hold a portion of their equity interests in the reorganized Company through a corporation (the "Corporation") and another portion of such equity interests through a limited liability company or a limited partnership and (y) the New Warrants are issued by the Corporation. |
|---|---|
| **Definitive Documentation** | The Definitive Documentation and other material agreements relating to the Restructuring Transaction, any Plan or accompanying Disclosure Statement, any of the documents or materials identified in the "Milestones" section of this Restructuring Term Sheet, and any forms of orders submitted to the Bankruptcy Court shall: (i) be consistent with this Restructuring Term Sheet, (ii) be subject to the consent and approval standards set forth in the Restructuring Term Sheet, and (iii) contain such other terms and conditions as are customary for transactions of this type. |
| **Required Lenders / Required Noteholders** | For the purposes of this Restructuring Term Sheet, any consent, waiver or exercise of discretion of the Consenting Parties will be effective only upon the consent of the Required Lenders, the Required Noteholders and the Ares Equity Holders. "Required Lenders" means, as of any date of determination, Term Lenders holding a majority of the outstanding principal amount of the Term Loan Claims held by the Term Lenders in the aggregate. "Required Noteholders" means, as of any date of determination, Second Lien Noteholders holding a majority of the outstanding principal amount of the Second Lien Claims held by the Second Lien Noteholders in the aggregate. |

*Execution Version*

## Annex 1

### Consenting Second Lien Noteholders
### and Ares Equity Holders

### Consenting Second Lien Noteholders

AF V ENERGY I AIV A1, L.P.
AF V ENERGY I AIV A2, L.P.
AF V ENERGY I AIV A3, L.P.
AF V ENERGY I AIV A4, L.P.
AF V ENERGY I AIV A5, L.P.
AF V ENERGY I AIV A6, L.P.
AF V ENERGY I AIV A7, L.P.
AF V ENERGY I AIV A8, L.P.
AF V ENERGY I AIV A9, L.P.
AF V ENERGY I AIV A10, L.P.
AF V ENERGY I AIV A11, L.P.
AF V ENERGY I AIV A12, L.P.
AF V ENERGY I AIV A13, L.P.
AF V ENERGY I AIV B1, L.P.

### Ares Equity Holders

AF V ENERGY I AIV A1, L.P.
AF V ENERGY I AIV A2, L.P.
AF V ENERGY I AIV A3, L.P.
AF V ENERGY I AIV A4, L.P.
AF V ENERGY I AIV A5, L.P.
AF V ENERGY I AIV A6, L.P.
AF V ENERGY I AIV A7, L.P.
AF V ENERGY I AIV A8, L.P.
AF V ENERGY I AIV A9, L.P.
AF V ENERGY I AIV A10, L.P.
AF V ENERGY I AIV A11, L.P.
AF V ENERGY I AIV A12, L.P.
AF V ENERGY I AIV A13, L.P.
AF V ENERGY I AIV B1, L.P.

**<u>EXHIBIT B</u> to**
**the Restructuring Support Agreement**

**Form of Transfer Agreement and Joinder**

**Transfer Agreement and Joinder**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[6] by and among Gastar, its direct and indirect subsidiaries bound thereto and Northwest Property Ventures LLC, and certain other parties, including the transferor to the Transferee of any [Debtor Claims/Interests] (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting Party**" and a "**Party**" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this Transfer Agreement and Joinder.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| Term Loan Claims (if any) | $[__] |
| Second Lien Claims (if any) | $[__] |
| [Preferred Stock Claims] (if any) | [__] shares |
| [Existing Common Equity] (if any)] | [__] shares |

---

[6]     Capitalized terms not used but not otherwise defined in this Transfer Agreement and Joinder shall have the meanings ascribed to such terms in the Agreement.

**<u>EXHIBIT C</u> to**
**the Restructuring Support Agreement**

**Form of Joinder Agreement**

## Joinder Agreement

The undersigned ("**Joining Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[7] by and among Gastar, its direct and indirect subsidiaries bound thereto and Northwest Property Ventures LLC, the Consenting Parties, and certain other parties, and agrees to be bound by the terms and conditions of the Agreement, and shall be deemed a "**Consenting Party**" and a "**Party**" under the terms of the Agreement.

The Joining Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Revolver Claims (if any) | $[__] |
| ABL Term Loan Claims (if any) | $[__] |
| Term Loan Claims (if any) | $[__] |
| Unsecured Note Claims (if any) | $[__] |
| Existing Common Stock (if any) | [__] shares |

---

[7] Capitalized terms not used but not otherwise defined in this Joinder Agreement shall have the meanings ascribed to such terms in the Agreement.

**EXHIBIT D** to
**the Restructuring Support Agreement**

**DIP Term Sheet**

*EXECUTION VERSION*

# DIP TERM SHEET

## GASTAR EXPLORATION INC.[1]

This term sheet (this "***DIP Term Sheet***") is a summary of indicative terms and conditions for a proposed DIP term loan financing (the "***DIP Facility***") that is materially consistent with the terms and conditions as set forth in this DIP Term Sheet and otherwise acceptable in form and substance to the Debtors and the DIP Lenders (each as defined below).

This DIP Term Sheet is non-binding and is being presented for discussion and settlement purposes only. Consequently, this DIP Term Sheet is entitled to protection from any use or disclosure to any person or entity pursuant to Federal Rule of Evidence 408 and any other rules or laws of similar import. This DIP Term Sheet does not purport to summarize all of the terms, conditions, covenants and other provisions that may be contained in the fully negotiated and executed definitive documentation in connection with the DIP Facility. Among other things, the transactions described in this DIP Term Sheet are subject in all respects to: (i) internal authorization and approval by the appropriate credit committee of the DIP Lenders; (ii) the execution and delivery of definitive documentation satisfactory in form and substance to the Debtors and the DIP Lenders; (iii) satisfaction or waiver of the conditions precedent set forth in this DIP Term Sheet; (iv) approval by the Bankruptcy Court (as defined below); and (iv) the satisfactory completion of diligence by the DIP Lenders in their sole discretion. This DIP Term Sheet does not constitute a commitment to lend or to provide or arrange any other financing; such an obligation would arise only under a fully negotiated commitment letter if executed by all parties thereto in accordance with its terms.

This DIP Term Sheet and the information contained in this DIP Term Sheet shall remain strictly confidential and may not be shared with any person or entity (other than the Debtors, the DIP Lenders and their respective professionals), unless otherwise consented to by the Debtors or the DIP Lenders, as applicable.

| Parties | **Debtors**: Gastar Exploration Inc. ("***Gastar***"), Northwest Property Ventures LLC, and any other current or future subsidiaries of Gastar, as debtors-in-possession (collectively, the "***Debtors***") in the cases to be filed under Chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"). The date of commencement of the Chapter 11 Cases is referred to in this DIP Term Sheet as the "***Petition Date***". |
|---|---|
| | **Borrower**: Gastar. |
| | **Guarantors**: Each of the Debtors (other than Gastar) and each other subsidiary of Gastar that guaranteed the Term Facility (as defined below) or the Second Lien Notes (as defined below) (collectively, the "***Guarantors***"). All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors, and each Guarantor that is a Debtor shall be deemed to have guaranteed the DIP Obligations (as defined below) pursuant to the Interim Order (as defined below). |

---

[1] This DIP Term Sheet, the terms and provisions set forth in this DIP Term Sheet, and the transactions contemplated by this DIP Term Sheet are in all respects subject to, and may be further revised, modified or changed following, the completion of due diligence by the DIP Lenders (as defined below) and their professionals.

| | |
|---|---|
| | **DIP Lenders**: Funds managed or controlled by Ares Management, L.P. (together with their successors and permitted assigns, collectively, the "***DIP Lenders***"). |
| | **DIP Agent**: Wilmington Trust, National Association (the "***DIP Agent***"), shall act as administrative agent for the DIP Lenders under the DIP Facility. |
| **Existing Debt Arrangements** | **Term Loan Facility**: The Third Amended and Restated Credit Agreement, dated March 3, 2017 (the "***Term Credit Agreement***"), by and between Gastar, as Borrower, the Guarantors party thereto, the Lenders (the "***Term Lenders***") from time to time party thereto and Wilmington Trust, National Association, as administrative agent (the "***Term Agent***") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and guarantee, security and other ancillary documentation in respect thereof, the "***Term Facility***"; all payment Obligations (as defined in the Term Credit Agreement), under or related to the Term Facility, collectively, the "***Term Obligations***"). |
| | **Second Lien Notes**: Those certain notes issued pursuant to the Indenture dated March 3, 2017 (the "***Second Lien Indenture***"), by and between Gastar, as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as trustee and collateral agent (the "***Second Lien Trustee***") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and guarantee, security and other ancillary documentation in respect thereof, the "***Second Lien Notes***"; all payment Obligations (as defined in the Second Lien Indenture), under or related to the Second Lien Notes, collectively, the "***Second Lien Obligations***"). |
| **DIP Facility** | As described in greater detail below, the proceeds of the DIP Facility will be used by the Debtors: (i) subject to the Budget (as defined below) for working capital purposes and funding the administration of the Chapter 11 Cases; and (ii) to effectuate the Term Facility Refinancing (as defined below). |
| | The DIP Facility shall be comprised of term loans in an aggregate amount of approximately $383.9 million (the "***DIP Loans***") and shall consist of the following: (a) $100 million of new money loans (the "***New Money Loans***"); and (b) approximately $283.9 million of refinanced Term Obligations consisting of outstanding principal and accrued and unpaid interest under the Term Facility as of the Petition Date (the "***Roll-up Loans***") pursuant to the Term Facility Refinancing. |
| | The DIP Facility and all instruments and documents executed at any time in connection therewith, together with the DIP Orders (as defined below), shall be referred to collectively as the "***DIP Loan Documents***." Amounts repaid or prepaid in respect of DIP Loans may not be reborrowed. |

Upon entry of and subject to a Bankruptcy Court order granting interim approval of the DIP Facility (such order to be in form and substance satisfactory to the Debtors in their reasonable discretion and the DIP Lenders in their sole discretion, the "*Interim Order*") and subject to satisfaction (or waiver) of the additional Conditions Precedent (defined below) and the draw limitations set forth in the last sentence of this paragraph and so long as consistent with the Budget, up to $15 million of the New Money Loans (the "*Interim DIP Tranche*") may be drawn by the Borrower upon three business days' notice in one or more draws in an amount that is not less than $2,500,000 for the initial draw and not less than $500,000 for each subsequent draw (or, if less, in the amount of the entire unused balance of the Interim DIP Tranche). Notwithstanding the foregoing or anything to the contrary in this DIP Term Sheet, (i) draws under the Interim DIP Tranche shall be limited to no more than one draw per week and (ii) no draw under the Interim DIP Tranche shall in any event exceed the amount actually needed by the Borrower at the applicable time of determination (taking into account the Borrower's cash on hand at such time) to fund the Chapter 11 Cases and/or the Borrower's working capital needs (after giving effect to a $5 million cash minimum liquidity floor, which the Debtors shall be permitted to maintain at all times during the pendency of the Chapter 11 Cases), in each case, over the immediately succeeding 14-day period (any such applicable period, a "*Forward Period*") in the amounts expressly provided for in the Budget for such Forward Period, net of (and without duplicating) any amounts previously drawn under the DIP Facility in respect of amounts provided for in the Budget for such Forward Period.

Upon entry of and subject to a Bankruptcy Court order granting final approval of the DIP Facility (such order to be in form and substance satisfactory to the Debtors in their reasonable discretion and the DIP Lenders in their sole discretion, the "*Final Order*" and together with the Interim Order, collectively, the "*DIP Orders*") and subject to the terms and conditions of the DIP Loan Documents and the draw limitations set forth in the last sentence of this paragraph and so long as consistent with the Budget, up to an amount equal to $100 million of New Money Loans, minus the amount of New Money Loans previously drawn by the Debtors prior to such date (the resulting amount, the "*Final DIP Tranche*") may be drawn by the Borrower upon three business days' notice in one or more draws in an amount not less than $500,000 for each draw (or, if less, in the amount of the entire unused balance of the Final DIP Tranche). Notwithstanding the foregoing or anything to the contrary in this DIP Term Sheet, (a) draws under the Final DIP Tranche shall be limited to no more than one draw per week and (b) no draw under the Final DIP Tranche shall in any event exceed the amount actually needed by the Borrower at the applicable time of determination (taking into account the Borrower's

cash on hand at such time) to fund the Chapter 11 Cases and/or the Borrower's working capital needs, in each case, over the immediately succeeding Forward Period in the amounts expressly provided for in the Budget for such Forward Period, net of (and without duplicating) any amounts previously drawn under the DIP Facility in respect of amounts provided for in the Budget for such Forward Period.

Upon entry of and subject to the Final Order and subject to the terms and conditions of the DIP Loan Documents and the Debtors having demonstrated to the reasonable satisfaction of the DIP Lenders acting in good faith, the bona fide need of the Debtors for such additional liquidity to preserve lease operating rights in response to actions taken or proposed to be taken by third parties (the "***Operating Rights Preservation Activities***") and subject to the draw limitations set forth in the last sentence of this paragraph, up to an amount equal to $100 million of New Money Loans, *minus* any amounts of New Money Loans previously drawn by the Debtors prior to such date (the "***Reserve DIP Tranche***") may be drawn by the Borrower upon three business days' notice in one or more draws in an amount not less than $500,000 for each draw (or, if less, in the entire amount of the unused balance of the Reserve DIP Tranche). Notwithstanding the foregoing or anything to the contrary in this DIP Term Sheet, (i) draws under the Reserve DIP Tranche shall be limited to no more than one draw per week and (ii) no draw under the Reserve DIP Tranche shall in any event exceed the amount actually needed by the Borrower at the applicable time of determination (taking into account the Borrower's cash on hand at such time) to fund Operating Rights Preservation Activities over the immediately succeeding Forward Period in the amounts expressly approved by the DIP Lenders for such Forward Period, net of (and without duplicating) any amounts previously drawn under the DIP Facility in respect of amounts so approved by the DIP Lenders for such Forward Period.

The date of entry of the Interim Order and satisfaction of the other Conditions Precedent is referred to hereunder as the "***Closing Date.***"

| | |
|---|---|
| **DIP Liens and Superpriority Status** | Subject to a "carve-out" as set forth on Exhibit A to this DIP Term Sheet (the "***Carve-Out***") and liens securing obligations owed to the Debtors' hedge counterparties (the "***Hedge Carve-Out***"), the DIP Facility and all obligations of the Debtors to the DIP Lenders and the DIP Agent under the DIP Loan Documents (collectively, the "***DIP Obligations***") shall at all times be secured: (a) pursuant to Bankruptcy Code section 364(d) of the Bankruptcy Code, by first priority priming liens on all encumbered assets of the Debtors (whether existing as of the Petition Date or after-acquired, tangible or intangible, and comprising real or personal property), which liens shall prime all other liens and claims, including the liens securing the Term Obligations and the Second Lien Obligations but excluding the items addressed in clause (c) below; (b) pursuant to Bankruptcy Code section 364(c)(2), |

<table>
<tr><td></td><td>first priority liens on all unencumbered assets of the Debtors (whether existing as of the Petition Date or after-acquired, tangible or intangible, and comprising real or personal property) including, upon entry of the Final Order, any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law and the proceeds thereof ("**_Avoidance Actions_**") and (c) pursuant to the Bankruptcy Code 364(c)(3), junior-priority liens on all assets of the Debtors to the extent that such assets are subject to valid, perfected and unavoidable Permitted Liens (as such term shall be defined under the DIP Loan Documents) in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable Permitted Liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the existing liens and claims in respect of the Term Obligations and the Second Lien Obligations, which existing liens and claims will be primed by the liens described in clause (a) above) (such liens and security interests, collectively, the "**_DIP Liens_**").

Subject to the Carve-Out, the DIP Obligations shall be allowed superpriority claims, pursuant to Bankruptcy Code section 364(c)(1), with priority over all other claims (including claims otherwise having priority under section 507 of the Bankruptcy Code or otherwise).</td></tr>
<tr><td>**Use of Proceeds; Carve-Out**</td><td>Subject to the terms and conditions in this DIP Term Sheet, the proceeds of the DIP Facility shall be used only (x) to effect the Term Facility Refinancing and (y) otherwise in accordance with the terms of the Budget (other than with respect to the Reserve DIP Tranche, which may not be reflected in the Budget) and the DIP Loan Documents.  Permitted uses for such funds shall include:

(i)      to pay (x) all fees due to DIP Lenders and the DIP Agent under the DIP Loan Documents and (y) all reasonable pre- and post-petition professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Lenders and the DIP Agent, including, without limitation, those incurred in connection with the preparation, negotiation, documentation and court approval of the documentation and transactions contemplated by this DIP Term Sheet;

(ii)     to provide working capital to the Debtors and to fund the Debtors' general corporate purposes (but not, for the avoidance of doubt, any equityholder or other affiliate of the Debtors except as expressly set forth in this DIP Term Sheet or the DIP Loan Documents);</td></tr>
</table>

<table>
<tr>
<td></td>
<td>

(iii)      fund the fees, costs and expenses of administration of the Chapter 11 Cases (including the Carve-Out); and

(iv)      to pay amounts in respect of the adequate protection provided to the Term Facility Secured Parties (as defined below) and the Second Lien Secured Parties (as defined below).

Notwithstanding the foregoing, during the period between entry of the Interim Order and entry of the Final Order, the proceeds of the DIP Facility shall not be used in connection with the payment of any fees or expenses incurred by any professional retained (or to be retained) in these Chapter 11 Cases.

The liens securing the DIP Obligations, the DIP Obligations status as "super-priority" claims, the "super-priority" claims and liens constituting the Term Facility Adequate Protection Claims (as defined below), and the liens securing the Term Obligations shall be subject to the Carve-Out and the Hedge Carve-Out.

</td>
</tr>
<tr>
<td>

**Use of Cash Collateral**

</td>
<td>

The Debtors shall be entitled to use cash collateral of the DIP Agent, the Term Agent and the Second Lien Trustee (the "***Cash Collateral***") in accordance with the Budget and DIP Loan Documents.

</td>
</tr>
<tr>
<td>

**Limitations on Use of DIP Proceeds and Cash Collateral**

</td>
<td>

The DIP Loan Documents shall provide customary and regular restrictions on the Debtors' use of Cash Collateral, the proceeds of the DIP Facility, and the collateral therefor.  Those restrictions shall, without limitation, include:

(i)      financing any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Agent or the DIP Lenders, the Term Facility Secured Parties, the Second Lien Secured Parties, or any of their respective Related Persons,[2] or their respective rights and remedies under or in respect of the DIP Facility, the Term Facility, the Second Lien Notes, or any interim or final order with respect to the DIP Facility and the adequate protection granted to the Term Facility Secured Parties and the Second Lien Secured Parties;

(ii)      financing any action with respect to (a) the Term Facility or the Term Facility Secured Parties, (b) the Second Lien Notes or the Second Lien Secured Parties, (c) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations, or (d) the Debtors' Stipulations (as defined below);

</td>
</tr>
</table>

---

[2] "***Related Persons***" means any person's or entity's respective directors, officers, funds, affiliates, members, employees, partners, managers, investment advisors, agents, representatives, principals, attorneys, consultants, professional advisors, heirs, executors, successors and assigns (each in their capacity as such).

| | |
|---|---|
| | (iii)    any purpose that is (a) prohibited under the Bankruptcy Code, the Interim Order, the Final Order or the DIP Loan Documents or (b) not expressly provided for in the Budget; and |
| | (iv)    making any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, which payment is not provided for in the Budget, without the prior written consent of the DIP Lenders holding at least 50.1% of the total DIP Loans and DIP Commitments (the "***Majority DIP Lenders***"). |
| | Notwithstanding the foregoing, advisors to the official unsecured creditors' committee, if one is appointed with regard to the Chapter 11 Cases, may investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Term Facility or the Second Lien Notes at an aggregate expense for such investigation not to exceed $25,000.  Further, no portion of such amount may be used to prosecute or support any claims. |
| **Term Facility Refinancing** | Subject to entry of the Final Order, approximately $283.9 million in outstanding Term Obligations consisting of principal and accrued and unpaid interest under the Term Facility as of the Petition Date will be repaid from the proceeds of the DIP Loans (the "***Term Facility Refinancing***"). |
| **Adequate Protection** | **Adequate Protection for Term Facility**: The Term Agent and the Term Lenders (collectively, the "***Term Facility Secured Parties***") shall be entitled to adequate protection of their interests in the Collateral (as defined in the Term Credit Agreement, the "***Term Facility Collateral***").  Such adequate protection shall be in an amount equal to the aggregate diminution in the value of their interests in the Term Facility Collateral (the "***Term Facility Adequate Protection Claims***") in the form of: |
| | (i)    a senior perfected replacement lien on all Term Facility Collateral, including any such assets of the Debtors' estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof, to secure the Term Facility Adequate Protection Claims, senior to all other liens on such Term Facility Collateral (other than the DIP Liens), subject to the Carve-Out and the Hedge Carve-Out; |
| | (ii)    additional perfected liens on all assets of the Debtors that do not constitute Term Facility Collateral but constitute collateral for the DIP Facility (including, for the avoidance of doubt, any Avoidance Actions and the proceeds thereof upon the entry of the Final Order), senior to all other liens on such collateral (other than the DIP Liens), subject to the Carve-Out and the Hedge Carve-Out (together with the adequate protection liens granted to the Term Facility Secured Parties in clause (i) |

7

immediately above, the "***Term Facility Adequate Protection Liens***");

(iii)     superpriority claims as provided in section 507(b) in the amount of any Term Facility Adequate Protection Claims, with priority over all other superpriority and administrative expense claims except the Carve-Out, the Hedge Carve-Out and the DIP Obligations;

(iv)     within three (3) business days following the initial funding of the DIP Loans, payment in cash of all accrued and unpaid reasonable pre-petition fees and expenses of the Term Facility Secured Parties (including, but not limited to, fees and expenses of their advisors); and

(v)     after entry of the Interim Order, monthly payment in cash of the reasonable and documented costs, fees and expenses of the Term Facility Secured Parties (including, but not limited, to fees and expenses of their advisors) in accordance with the Term Credit Agreement.

All interest on the Term Facility, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall not be paid currently, but shall continue to accrue at the non-default rate. To the extent permitted under the Bankruptcy Code and by the Bankruptcy Court, all such interest shall be deemed part of the Term Facility Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

**Adequate Protection for Second Lien Notes**: The Second Lien Trustee and the holders of the Second Lien Notes (the "***Second Lien Secured Parties***") shall be entitled to adequate protection of their interests in the Collateral (as defined in the Second Lien Indenture, the "***Second Lien Collateral***"). Such adequate protection shall be in an amount equal to the aggregate diminution in the value of their interests in the Second Lien Collateral (the "***Second Lien Adequate Protection Claims***") in the form of:

(i)     a senior perfected replacement lien on all the Second Lien Collateral, including any such assets of the Debtors' estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof, to secure the Second Lien Adequate Protection Claims, senior to all other liens on such Second Lien Collateral (other than the liens thereon securing the DIP Facility, the Term Obligations, or the Term Facility Adequate Protection Claims), subject to the Carve-Out and the Hedge Carve-Out;

(ii)     additional perfected liens on all assets of the Debtors that do not constitute Second Lien Collateral (including, for the avoidance of doubt, any Avoidance Actions and the proceeds

<table>
<tr>
<td></td>
<td>

thereof upon the entry of the Final Order), senior to all other liens on such collateral (other than the DIP Liens, the liens securing the Term Obligations, the Term Facility Adequate Protection Liens, and the Term Facility Adequate Protection Claims), subject to the Carve-Out and the Hedge Carve-Out;

(iii)    superpriority claims as provided in section 507(b) in the amount of any Second Lien Adequate Protection Claims, with priority over all other superpriority and administrative expense claims except the Carve-Out, the Hedge Carve-Out, the DIP Obligations, the Term Obligations, the Term Facility Adequate Protection Claims, and the Term Facility Adequate Protection Liens;

(iv)    within three (3) business days following the initial funding of the DIP Loans, payment in cash of all accrued and unpaid reasonable pre-petition fees and expenses of the Second Lien Secured Parties (including, but not limited to, fees and expenses of their advisors); and

(v)    after entry of the Interim Order, monthly payment in cash of the reasonable and documented costs, fees and expenses of the Second Lien Secured Parties (including, but not limited, fees and expenses of their advisors) in accordance with the Second Lien Indenture.

All interest on the Second Lien Notes, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall not be paid currently, but shall continue to accrue at the non-default rate. To the extent permitted under the Bankruptcy Code and by the Bankruptcy Court, all such interest shall be deemed part of the Second Lien Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

</td>
</tr>
<tr>
<td>**Scheduled Maturity Date**</td>
<td>

The earliest of (i) thirty (30) days following the Petition Date if the Final Order shall not have been entered by such date, (ii) the effective date of an Acceptable Plan,[3] (iii) February 15, 2019 and (iv) the date that all DIP Loans shall become due and payable in full in accordance with the terms of the DIP Facility, including due to acceleration (whether voluntary or involuntary). For the avoidance of doubt, upon the maturity of the DIP Obligations, certain of the DIP Obligations shall, under the circumstances provided for in the restructuring term sheet (the "***Restructuring Term Sheet***") attached to the Restructuring Support Agreement dated as of October 26, 2018 (the "***RSA***"), be rolled-over into an exit facility as more thoroughly described in the Restructuring Term Sheet.

</td>
</tr>
</table>

---

[3] "***Acceptable Plan***" means a plan of reorganization that contains the terms and conditions set forth in the RSA Term Sheet and which is otherwise acceptable to the DIP Lenders in their sole discretion.

| | |
|---|---|
| **Interest Rate** | The DIP Loans will bear interest at a rate of adjusted LIBOR (subject to a 2.0% floor) plus 7.5% per annum and such interest rate shall increase to adjusted LIBOR (subject to a 2.0% floor) plus 10.0% for DIP Loans outstanding in excess of 90 days. Interest on the New Money Loans shall be paid in cash monthly and upon any repayment or prepayment.  Interest on the Roll-up Loans shall be paid in kind and any reference to "principal amount" of the Roll-up Loans shall include any interest so capitalized and added to the principal amount thereof. Notwithstanding the foregoing, upon the occurrence of any Event of Default under the DIP Facility, and upon written notice from the Majority DIP Lenders, such interest rate margin in respect of the DIP Loans shall automatically increase as of the date of the occurrence of the Event of Default by an additional 3.0% per annum (the "***Default Rate***").  A customary alternate base rate option will be available (or required) as an alternative to adjusted LIBOR. <br><br> Interest shall be due and payable on (a) the last day of each interest period for DIP Loans bearing interest at LIBOR and (b) the last business day of each month for DIP Loans bearing interest at an alternate base rate. |
| **Upfront/Arrangement Fee** | An upfront and arrangement fee in an aggregate amount equal to 1.75% of the aggregate principal amount of the New Money Loans shall be due and payable to the DIP Lenders in cash on the initial funding date of the New Money Loans. |
| **Commitment Yield Enhancement** | A commitment yield enhancement in an amount equal to 1.75% of the aggregate principal amount of the New Money Loans shall be due and payable to the DIP Lenders in cash on the initial funding date of the New Money Loans. |
| **Budget; Permitted Variances** | Prior to the commencement of the Chapter 11 Cases, the DIP Lenders shall receive an initial 13-week budget commencing with the week during which the Petition Date shall occur.  The budget shall contain line items of sufficient detail to reflect the Debtors' consolidated projected receipts and disbursements for such 13-week period, as set forth on a week-by-week basis.  The 13-week budget shall be in form and substance satisfactory to the Majority DIP Lenders in their sole discretion (the "***Initial Budget***"). The Budget (as defined below) shall also contain line items of sufficient detail to reflect the Debtors' consolidated projected professional fees (the "***Professional Fees Estimate***") and royalty obligations (the "***Royalty Estimate***").   The Debtors shall provide a new budget to the DIP Lenders on the Thursday of each week, beginning with the Thursday of the second full week after the Petition Date.  Once delivered and approved by the Majority DIP Lenders in their sole discretion, each subsequent budget shall become the new budget (together with the Initial Budget, each such subsequent budget, the "***Budget***").  To the extent such subsequent budget is not approved by the Majority DIP Lenders, the existing |

budget shall remain as the Budget.

Commencing on the Thursday of the second full week after the Petition Date, the Debtors shall deliver to the DIP Lenders on the Thursday of each calendar week (a) a variance report comparing actual cash disbursements for the preceding Testing Period (as defined below) to the projected cash disbursements for such Testing Period as set forth in the Budget and (b) a variance report comparing actual cash receipts for the preceding Testing Period to the projected cash receipts for such Testing Period as set forth in the Budget, in each case such variance reports to be certified by the chief financial officer of the Debtors (the variance test described in the foregoing clauses (a) and (b), the "**Budget Test**").  The Budget Test shall not include a test on the Professional Fees Estimate.

"**Testing Period**" means (a) with respect to the initial Budget Test, the Petition Date through and including the last day of the first full week after the Petition Date and (b) with respect to each subsequent Budget Test, the first day after the end of the immediately preceding week through and including the last day of the same calendar week.

"**Permitted Variance**" means for any Testing Period, a variance of not more than (a) 20% less than the amount in the Budget for the operating receipts for such Testing Period measured on a line-by-line basis after giving effect to any Operating Receipt Carryforward (as defined below) and (b) 10% more than the amount in the Budget for the operating disbursements measured on a line-by-line basis after giving effect to any Operating Disbursement Carryforward (as defined below).  Additional variances, if any, from the Budget shall be subject to the written consent of the Majority DIP Lenders in their sole discretion.

An "**Operating Receipt Carryforward**" is the amount by which the amount of actual cash receipts received in a Testing Period exceeds the amount of any projected cash receipts set forth in the Budget for such Testing Period, which amounts shall carry forward into the next seceding Testing Period.

An "**Operating Disbursement Carryforward**" is the amount of any projected cash disbursements set forth in the Budget for a Testing Period not expended in such Testing Period, which amounts shall carry forward into the next seceding Testing Period.

Substantially concurrently with the delivery of the applicable variance report, the Debtors shall deliver to the DIP Lenders a "flash" cash report detailing all cash and cash equivalents of each of the Debtors (broken out by entity) as of the close of business of the last business day of the prior week.

| | |
|---|---|
| **Conditions Precedent to Funding** | The obligation of each DIP Lender to fund the DIP Loans on the Closing Date or thereafter is subject to the Debtors' satisfaction, or waiver by the Majority DIP Lenders, of all conditions set forth below (the "***Conditions Precedent***"):<br><br>1.    The Interim Order shall have been entered by the Bankruptcy Court in the Chapter 11 Cases and shall have been in form and substance consistent with this DIP Term Sheet and otherwise satisfactory to the Debtors in their reasonable discretion and the Majority DIP Lenders in their sole discretion. The Interim Order shall be in full force and effect and shall not have been vacated, stayed, revised, modified or amended in any manner without the prior written consent of the Majority DIP Lenders in their sole discretion.<br><br>2.    All orders entered by the Bankruptcy Court, including orders pertaining to cash management and adequate protection and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance reasonably satisfactory to the Majority DIP Lenders. With respect to any provisions that affect the rights or duties of the DIP Agent, the orders shall be in form and substance reasonably satisfactory to the DIP Agent.<br><br>3.    With respect to any borrowings to occur later than thirty (30) days following the Petition Date, the Final Order shall have been entered by the Bankruptcy Court no later than thirty (30) days following the Petition Date and the DIP Agent shall have received a true and complete copy of such order. Such order shall be consistent with the DIP Term Sheet and otherwise in form and substance satisfactory to the Debtors in their reasonable discretion and the Majority DIP Lenders (and with respect to any provisions that affect the rights or duties of the DIP Agent, the DIP Agent) in their sole discretion. The Final Order shall be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Majority DIP Lenders (and with respect to any provisions that affect the rights or duties of the DIP Agent, the DIP Agent) in their sole discretion.<br><br>4.    Except as disclosed to the DIP Lenders in writing, since the Petition Date, no event, circumstance or change shall have occurred that has caused, or would reasonably be expected to cause, or evidences, either in any case or in the aggregate, a material adverse effect (to be defined as mutually agreed in the DIP Loan Documents, a "***Material Adverse Effect***"). |

5.      Other than the Chapter 11 Cases (and, except as otherwise provided herein, any objections, claims, actions, suits, investigations, litigation, or proceedings that may be commenced or pursued therein), there shall exist no claim, action, suit, investigation, litigation or proceeding, pending in any court or before any arbitrator or governmental instrumentality (a) which relates to the DIP Facility or the transactions contemplated thereby or (b) except for claims, actions, suits, investigations, litigation or proceedings (i) disclosed in a schedule to the DIP Loan Documents or (ii) otherwise stayed by 11 U.S.C. § 362.

6.      The DIP Lenders shall have received executed originals of each guaranty and pledge agreement required under the DIP Loan Documents. Subject to the entry of the Interim Order or Final Order, as applicable, each such agreement shall be in full force and effect.

7.      No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets.

8.      The DIP Lenders shall have received the Budget, which shall be in form and substance acceptable to the DIP Lenders in their sole discretion, and such other information (financial or otherwise) as the DIP Lenders may reasonably request. The Debtors shall be in compliance with the Budget.

9.      No default or event of default under the DIP Loan Documents shall have occurred and be continuing.

10.     The Debtors shall have delivered a funding notice in the form required by the DIP Loan Documents.

11.     The Debtors shall be in compliance with the Interim Order or, if applicable, the Final Order in all respects and each other Bankruptcy Court order in all material respects.

12.     All reasonable and documented fees and expenses of the DIP Agent and the DIP Lenders (including, but not limited to, the fees and expenses of their advisors) shall have been satisfied.

13.     The representations and warranties contained in the DIP Loan Documents shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such date, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such

| | |
|---|---|
| | representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date). |
| **Covenants** | The DIP Facility shall contain the financial, negative and affirmative covenants set forth below (subject to exceptions and qualifiers) that are ordinary and customary in debtor-in-possession financings of this type acceptable to the Debtors in their reasonable discretion and the Majority DIP Lenders in their sole discretion:<br><br>(i)    delivery of the Budget and variance reports as set forth in the "Budget; Permitted Variances" section and compliance with the Budget Test subject to the Permitted Variance, in accordance with the terms of this DIP Term Sheet and the DIP Loan Documents;<br><br>(ii)    delivery of information (financial or otherwise) reasonably requested by the DIP Lenders and commercially reasonable access to management subject to customary prior notice;<br><br>(iii)    delivery to the DIP Lenders and their counsel with reasonable prior notice and an opportunity to comment, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of the Debtors to any official committee appointed in the Chapter 11 Cases;<br><br>(iv)    support and seek to consummate the Restructuring Transaction (as defined in the RSA) in accordance with the RSA within the time-frames contemplated under the RSA and in compliance with each Milestone (as defined in the RSA);<br><br>(v)    restrictions on the granting of liens, the issuing of guarantees and the incurrence of other obligations (including the refinancing of any obligations);<br><br>(vi)    without the Majority DIP Lenders' consent (in their sole discretion), a prohibition on the Debtors, proposing, filing, consenting to, cooperating with, soliciting votes with respect to, acquiescing to, or supporting any chapter 11 plan or debtor in possession financing unless: (i) such plan or financing would, on the date of its effectiveness, pay in full in cash all DIP Obligations, all Term Obligations and |

|  |  | all Second Lien Obligations; or (ii) such plan is an Acceptable Plan; |
|--|--|--|
|  | (vii) | make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to any DIP Order, without the written consent of the Majority DIP Lenders in their sole discretion (which consent may be granted through email); |
|  | (viii) | except as otherwise permitted pursuant to the DIP Orders, (A) assume or reject any executory contract or unexpired lease without the consent of the Majority DIP Lenders or (B) consent to termination or reduction of any exclusivity period or fail to object to any motion seeking to terminate or reduce any exclusivity period other than a motion filed by or with the written consent of the Majority DIP Lenders (which consent may be granted through email); |
|  | (ix) | assert any right of subrogation or contribution against any other obligor under the DIP Facility until all borrowings under the DIP Facility are paid in full and the commitments are terminated; and |
|  | (x) | the existing covenants in the Term Credit Agreement, which shall be modified as appropriate for the purposes of the DIP Facility in a manner satisfactory to the Debtors in their reasonable discretion and the DIP Lenders in their sole discretion. |
|  | The Debtors shall not amend, modify, or assign, without the prior written consent of the Majority DIP Lenders any of their respective material agreements (each as in effect on the date hereof). | |
| **Representations and Warranties** | The DIP Loan Documents shall only contain representations and warranties customary for transactions and debtors of this type, which shall be limited to priority, collateral, the DIP Orders, the DIP Loan Documents, the Budget, prepetition indebtedness, use of proceeds and the representations and warranties set forth in the Term Credit Agreement, as appropriate and as modified to reflect the debtor-in-possession nature of the financing, as such representations and warranties may be modified or waived form time to time at the discretion of the Majority DIP Lenders in their sole discretion. | |
| **Prepayments** | **Voluntary Prepayment**:  At any time prior to maturity, the Debtors may voluntarily prepay the DIP Loans in full or in part.  Any such prepayment shall be made with all accrued interest, fees, the Make-Whole Amount (as defined and calculated in the Term Credit Agreement), if any, and other amounts outstanding in respect to such prepaid DIP Loans. | |

| | |
|---|---|
| | **Mandatory Prepayment**: Customary for transactions of this type, including without limitation: 100% of the net cash proceeds of (i) any non-ordinary course asset sales above $25,000 individually or in the aggregate, (ii) insurance/condemnation events above $25,000 individually or in the aggregate (the prepayments set forth in the foregoing clause (i) or (ii), collectively, the "***Excluded Make-Whole Prepayments***") and (iii) any incurrence of indebtedness not otherwise permitted under the DIP Loan Documents.  The Debtors shall make such mandatory prepayments within three (3) business days following the Debtors' receipt of any such net cash proceeds.<br><br>**Make-Whole Amount**: Whether voluntary or mandatory, and with respect to each repayment or prepayment of the DIP Loans, any acceleration of the DIP Loans or any other satisfaction or discharge of the DIP Loans prior to February 15, 2019, the Borrower shall pay to the DIP Agent, for the ratable benefit of the DIP Lenders, with respect to the amount of the DIP Loans repaid, prepaid, accelerated, satisfied or discharged, in each case, concurrently with such repayment, prepayment, acceleration, satisfaction or discharge, an amount equal to the Make Whole Amount.  Notwithstanding the foregoing, no Make-Whole Amount shall be payable (a) with respect to any Excluded Make-Whole Prepayments, which shall not include, for the avoidance of doubt, and prepayment in connection with a sale pursuant to section 363 of the Bankruptcy Code, or (b) if the DIP Loans are repaid and otherwise satisfied pursuant to the Acceptable Plan. |
| **Events of Default** | The following will constitute events of default ("***Events of Default***" and each an "***Event of Default***") under the DIP Loan Documents (in each case, subject to cure periods and materiality qualifiers customary for transactions and debtors of this type as agreed to by the Debtors, DIP Lenders and the DIP Agent):<br><br>    (i)     "Events of Default" as defined in and consistent with the Term Facility shall be included in the DIP Loan Documentation, *mutatis mutandis* for the DIP Loan Obligations (and only to the extent applicable to the DIP Loan Obligations), other than any such "Events of Default" in respect of insolvency or the filing of the Chapter 11 Cases contemplated hereunder;<br><br>    (ii)    appointment of a chief restructuring officer  or any equivalent officer that is not reasonably satisfactory to the Majority DIP Lenders;<br><br>    (iii)   appointment of a trustee or examiner in the Chapter 11 Cases or appointment of a receiver;<br><br>    (iv)   the Bankruptcy Court shall have entered an order with respect to any of the Chapter 11 Cases converting such |

Chapter 11 Cases to a case or cases under Chapter 7 of the Bankruptcy Code;

(v)     an order shall be entered by the Bankruptcy Court without the written consent of the Majority DIP Lenders (which may be withheld in their sole discretion) permitting (A) the incurrence of any debt (including any guaranty or refinancing) or lien by any Debtor (excepting any Permitted Debt and/or Permitted Liens as such terms shall be defined under the DIP Loan Documents) or (B) any administrative expense or any claim to have administrative priority as to the Debtors equal or superior to the priority of the Chapter 11 Cases (other than the Carve-Out and the Hedge Carve-Out);

(vi)    without the Majority DIP Lenders' consent, the Debtors shall have proposed, filed, solicited, consented to, cooperated with, acquiesced to, or supported any chapter 11 plan or debtor in possession financing unless: (i) such plan or financing would, on the date of its effectiveness, pay in full in cash all DIP Obligations, all Term Obligations and all Second Lien Obligations; or (ii) such plan is an Acceptable Plan;

(vii)   the Debtors shall have breached any of the Debtors' Stipulations;

(viii)  the Debtors shall file a motion seeking, or the Bankruptcy Court shall enter, an order granting any third party relief from the stay applicable to any third party to the extent the claim of such third party is in excess of $500,000;

(ix)    the Debtors shall file a motion seeking, or the Bankruptcy Court shall enter, an order approving payment of any prepetition claim other than (A) as provided for in the "first-day orders" or "second-day orders," (B) as contemplated by the Budget (subject to the Permitted Variance) or (C) otherwise consented to by the Majority DIP Lenders (which consent may be withheld in their sole discretion);

(x)     an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for payment in full of the DIP Obligations, the Term Obligations and the Second Lien Obligations;

(xi)    the termination of the Debtors' exclusive period to file or solicit acceptance of a plan;

(xii)   any Debtor shall fail to execute and deliver to the DIP Agent any agreement, financing statement, trademark

17

| | |
|---|---|
| | filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Agent or the DIP Lenders may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the liens created in favor of the DIP Agent, and such failure shall continue unremedied for a period of ten days; |
| | (xiii)  (A) any Debtor shall attempt to invalidate, reduce or otherwise impair the DIP Liens or security interests of the DIP Agent or the DIP Lenders, claims or rights against such person or to subject any collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, (B) the DIP Liens or security interest created by the collateral documents or the DIP Orders shall for any reason cease to be valid or (C) any action is commenced by the Debtors which contests the validity, perfection or enforceability of any of the DIP Liens or security interests of the DIP Agent; |
| | (xiv)  the Acceptable Plan (including any exit financing) or confirmation order approving the same is not in form or substance satisfactory to the Majority DIP Lenders in their sole discretion; |
| | (xv)  the Acceptable Plan is withdrawn, terminated, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Majority DIP Lenders in their sole discretion; |
| | (xvi)  any Debtor shall seek to, or shall support any other person's motion to, disallow the DIP Lenders' claim in respect of the DIP Obligations or contest any provision of any DIP Loan Document or any material provision of any DIP Loan Document shall cease to be effective; |
| | (xvii)  the initiation by the Debtors, any statutory committee appointed in the Chapter 11 Cases, any trustee, any examiner or any other party in interest of any contested matter or adversary proceeding in respect of any of the DIP Facility, the DIP    Obligations, the DIP Agent, the DIP Lenders, the Term Facility, the Term Obligations, the Term Facility Secured Parties, the Second Lien Notes, the Second Lien Obligations, the Second Lien Secured Parties, including, but not limited to, any actions pursuant to chapter 5 of the Bankruptcy Code, in each case, except as may otherwise be permitted under the Interim Order or Final Order; |
| | (xviii)  the violation of any term, provision or condition in the Interim Order or the Final Order; the Interim Order or the Final Order is amended, supplemented, reversed, vacated |

18

or otherwise modified without the prior written consent of the Majority DIP Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the DIP Agent, the DIP Agent);

(xix)    an application for any of the orders described in clause (v) or (xviii) shall be made by a person other than the Debtors and such application is not contested by the Debtors in good faith or the relief requested is not withdrawn, dismissed or denied within 30 day after filing or any person obtains a final order under section 506(c) of the Bankruptcy Code against the DIP Agent or obtain a final order adverse to the DIP Agent or the DIP Lenders or any of their respective rights and remedies under the DIP Loan Documents or in the collateral; and

(xx)    the occurrence of a default under or termination of the RSA.

Upon the occurrence and during the continuation of an Event of Default, the Majority DIP Lenders or the DIP Agent at the direction of the Majority DIP Lenders may immediately (a) deliver a notice of an Event of Default to Debtors and (b) terminate any commitments of each DIP Lender.

In addition, upon the occurrence and during the continuation of an Event of Default, upon three (3) business days prior written notice to the Debtors from the Majority DIP Lenders or the DIP Agent at the direction of the Majority DIP Lenders, (a) the DIP Obligations shall accelerate and (b) the automatic stay of Section 362 of the Bankruptcy Code shall be terminated without order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the purpose of permitting the DIP Lenders to exercise any or all of their rights and remedies set forth in the DIP Orders or the DIP Loan Documents, including without limitation: (i) directing the DIP Agent to foreclose on the Collateral and (ii) moving the Bankruptcy Court (on shortened notice) to appoint a chief restructuring officer for the Debtors, which the Debtors shall agree not to oppose such motion.  In addition, upon an Event of Default, the DIP Lenders (or the DIP Agent at the direction of the Majority DIP Lenders) may file a motion to seek to terminate or modify the Debtors' plan exclusivity periods under Bankruptcy Code section 1121(d) and have such motion heard on shortened notice.

Upon the occurrence of an Event of Default, the DIP Lenders also shall have the right to deliver to the Debtors a DIP Toggle Notice (as defined in the Restructuring Term Sheet).  Upon the delivery of a DIP Toggle Notice, the Debtors shall continue to pursue the Acceptable Plan in accordance with the RSA and the milestones set forth therein.  The delivery of the DIP Toggle Notice shall not be, and shall not be

| | |
|---|---|
| | deemed, a waiver of any Event of Default (including, but not limited to, any Event of Default on which the DIP Toggle Notice is based) or any rights or remedies of the DIP Agent or the DIP Lenders in respect of any Event of Default (including the right to terminate the DIP Facility and accelerate the DIP Loans). All such rights and remedies shall be reserved and preserved and the DIP Agent or the DIP Lenders, as applicable, may exercise such rights and remedies (including the right to terminate the DIP Facility and accelerate the DIP Loans) following the delivery of a DIP Toggle Notice. |
| **DIP Orders** | The DIP Orders shall be consistent with this Term Sheet and shall otherwise be in form and substance satisfactory to the Debtors in their reasonable discretion and the Majority DIP Lenders in their sole discretion. Among other things, the DIP Orders shall provide and/or contain:<br><br>(i)   stipulations from the Debtors as to the validity, perfection, amount and priority of the Term Obligations, the Second Lien Obligations and the respective liens and security interests securing such obligations;<br><br>(ii)   indemnifications for the DIP Agent, the DIP Lenders and each of their respective Related Persons as set forth below;<br><br>(iii)   subject to the entry of the Final Order, full waivers of (A) the ability to surcharge the collateral securing the Term Facility and the Second Lien Notes under section 506(c) of the Bankruptcy Code or otherwise, (B) the ability to apply the "equities of the case exception" under section 552(b) of the Bankruptcy Code; and (C) the application of the doctrine of marshalling;<br><br>(iv)   payment of all reasonable and documented out-of-pocket expenses (pre- or post-petition) of the DIP Agent, the DIP Lenders, the Term Facility Secured Parties and the Notes Secured Parties, including the reasonable and documented fees and expenses of their advisors (as set forth in this DIP Term Sheet), including all Term Facility Adequate Protection Claims and all Second Lien Adequate Protection Claims;<br><br>(v)   that the net proceeds from any non-ordinary course sale of collateral securing the DIP Obligations, the Term Obligations or the Second Lien Obligations shall above the threshold set forth above be used by the Debtors to repay such obligations;<br><br>(vi)   other than Permitted Debt or Permitted Liens (as such terms are to be defined in the DIP Loan Documents), that the Majority DIP Lenders' consent in their sole discretion is required for any debt (including any guaranty or |

refinancing) to be incurred or lien to be granted by any Debtor;

(vii)    that, without the Majority DIP Lenders' consent (which may be withheld in their sole discretion), the Debtors shall not propose, file, consent to, cooperate with, solicit votes with respect to, acquiesce to, or support any chapter 11 plan or debtor in possession financing unless (A) such plan or financing would, on the date of its effectiveness, pay in full in cash all DIP Obligations, all Term Obligations and all Second Lien Obligations or (B) such plan is an Acceptable Plan;

(viii)    that the Debtors shall not directly or indirectly take any action that is inconsistent with, or that would unreasonably delay or impede approval of, any of this DIP Term Sheet, the DIP Facility or the DIP Loan Documents, which actions include, without limitation, directly or indirectly soliciting, encouraging, initiating, joining, and/or supporting any offer or proposal from, entering into any agreement with, and/or engaging in any discussions or negotiations with, any person concerning any actual or proposed transaction involving any or all of (A) a financial and/or corporate restructuring of any Debtor not supported by the DIP Lenders, (B) another debtor-in-possession financing facility (other than a financing that pays the DIP Obligations, the Term Obligations and the Second Lien Obligations in full in cash), (C) the issuance, sale, or other disposition of any equity or debt interests, or any material assets, of any Debtor, or (D) a merger, consolidation, business combination, liquidation, recapitalization, refinancing, sale of substantially all assets, or similar transaction involving any Debtor;

(ix)    that the DIP Orders are binding on the Debtors, their estates, all parties in interest, any statutory committee appointed in the Chapter 11 Cases, any successor in interest in the Chapter 11 Cases or to the Debtors, including, but not limited to, any trustee appointed in the Chapter 11 Cases or any subsequent cases under chapter 7 of the Bankruptcy Code, and any examiner; and

(x)    that upon the direction of the DIP Lenders, the Term Lenders and the holders of the Second Lien Notes, as applicable, each in their sole discretion, the DIP Agent, the Term Agent and the Second Lien Trustee or any of their respective designees shall have the right to credit bid all or a portion of the DIP Obligations, the Term Obligations or the Second Lien Obligations, respectively, in accordance with section 363(k) of the Bankruptcy Code.

21

| | |
|---|---|
| | The stipulations, acknowledgements, and agreements of the Debtors set forth in this section are referred to collectively as the "***Debtors' Stipulations***".  For the avoidance of doubt, nothing in this DIP Term Sheet or the DIP Orders shall be deemed a waiver of any of the Debtors', the Term Facility Secured Parties' or the Second Lien Secured Parties' respective rights, remedies, claims or defenses, including, but not limited to, any rights, remedies, claims or defenses under the Term Loan Documents, the Second Lien Documents, or under applicable law (including, but not limited to, any claims under Bankruptcy Code section 506(b)).  The DIP Orders shall provide that all such rights, remedies, claims and defenses of the Term Facility Secured Parties and the Second Lien Secured Parties, as applicable, are expressly reserved and preserved and may be asserted by the Term Facility Secured Parties and the Second Lien Secured Parties, as applicable, at any time during the Chapter 11 Cases.<br><br>The Debtors' Stipulations concerning the extent, validity, priority, perfection, enforceability and non-avoidance of the Term Obligations, the Second Lien Obligations and the liens and security interests securing such obligations, respectively, shall: (i) be binding on the Debtors, their estates, all parties in interest, any statutory committee appointed in the Chapter 11 Cases, any successor in interest in the Chapter 11 Cases or to the Debtors, including, but not limited to, any trustee appointed in the Chapter 11 Cases or any subsequent cases under chapter 7 of the Bankruptcy Code, and any examiner; and (ii) subject to a "Challenge Period" to be determined. |
| **Amendments, Waivers and Modifications** | The consent of the Majority DIP Lenders shall be required to amend, waive or modify the DIP Facility or any of the DIP Loan Documents. Notwithstanding the foregoing, certain matters shall be subject to an "affected lender" consent. |
| **Assignments and Participations** | The DIP Loan Documents shall include customary rights of assignment and participation rights, including the Debtors' right to consent to assignments unless an event of default has occurred and is continuing. |
| **Indemnity** | The Debtors shall, jointly and severally, indemnify and hold harmless the DIP Agent (and any sub-agent thereof), each of the DIP Lenders, and each of their respective Related Persons (each, an "***Indemnified Person***") from and against all any and all claims arising in respect of the DIP Facility.  Such indemnified claims shall include, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), losses, liabilities, actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims of whatsoever nature and kind.  The Indemnified Persons shall be indemnified from such claims, whether known or unknown, whether now existing or hereafter |

22

| | |
|---|---|
| | arising, whether arising at law or in equity, or whether foreseen or unforeseen,[4] in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility except to the extent arising from any dispute solely among Indemnified Persons which does not arise out of any act or omission of the Debtors (other than any proceeding against any Indemnified Person solely in its capacity or in fulfilling its role as DIP Agent or similar role).  Notwithstanding the foregoing, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from the fraud, gross negligence or willful misconduct of such Indemnified Person or a material breach by such Indemnified Person of any of its obligations in respect of the DIP Facility. |
| **Governing Law** | New York, except to the extent preempted by federal bankruptcy laws.<br><br>The DIP Loan Documents will provide that the Debtors will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State of New York; and shall waive any right to trial by jury. |

---

[4] This includes, without limitation, as to the DIP Agent and the DIP Lenders, in each case, the reasonable and documented out-of-pocket fees and disbursements of one primary counsel and one local counsel in each relevant jurisdiction and, if necessary, a single special counsel for each relevant specialty and, in the case of a conflict of interest, one additional counsel in each jurisdiction to such affected parties similarly situated and, in the case of other Indemnified Persons, the reasonable and documented out-of-pocket fees and disbursements of one primary counsel and one local counsel in each relevant jurisdiction and, in the case of a conflict of interest, one additional counsel in each jurisdiction to such affected parties similarly situated.

**<u>EXHIBIT A</u> to**
**the DIP Term Sheet**

**Carve-Out Language**

1.      <u>Carve Out</u>.

(a)      <u>Carve Out</u>.  As used in this [Final/Interim] Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent or the Majority DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $350,000 incurred after the first business day following delivery by the DIP Agent or the Majority DIP Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Majority DIP Lenders (or by counsel to either of the foregoing) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence and during

the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

          (b)    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (if any) (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for New Money Loans under the Final DIP Tranche (each, as defined in the DIP Loan Documents) (on a pro rata basis based on the then outstanding DIP Loans), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at or in the name of the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for New Money Loans under the Final DIP Tranche (on a pro rata basis based on the then outstanding DIP Loans), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at or in the name of the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice</u>

Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves")

prior to any and all other claims.  On the first business day after the DIP Agent gives such notice

to such DIP Lenders (as defined in the DIP Loan Documents), notwithstanding anything in the

DIP Loan Documents to the contrary, including with respect to the existence of a Default (as

defined in the DIP Loan Documents) or Event of Default, the failure of the Debtors to satisfy any

or all of the conditions precedent for borrowing of New Money Loans under the Final DIP Tranche

under the DIP Facility, any termination of the DIP Facility following an Event of Default, or the

occurrence of the Maturity Date, each DIP Lender (on a pro rata basis based on the then

outstanding DIP Loans) shall make available to the DIP Agent such DIP Lender's pro rata share

with respect to such borrowing in accordance with the DIP Loan Documents.  All funds in the Pre-

Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses

(i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but

not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then,

to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the

DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly

paid in full, in cash, and all DIP Loans have been terminated, in which case any such excess shall

be paid to the holders of Term Obligations and Second Lien Obligations in accordance with their

rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice

Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve

Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out

Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the

DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP

Loans have been terminated, in which case any such excess shall be paid to the holders of Term

Obligations and Second Lien Obligations in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, or this [Final/Interim] Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [●], then, any excess funds in either of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [●], prior to making any payments to the DIP Agent or the holders of Term Obligations and Second Lien Obligations, as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this [Final/Interim] Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, the Term Agent, and the Second Lien Trustee shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this [Final/Interim] Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans (as defined in the DIP Loan Documents) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this [Final/Interim] Order, the DIP Facility, or in the Term Facility or Second Lien Notes, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Term Facility Adequate

Protection Claims, and the Second Lien Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, the Term Obligations, or the Second Lien Obligations.

(c)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     No Direct Obligation To Pay Allowed Professional Fees. None of the DIP Agent, DIP Lenders, Term Lenders, the holders of Second Lien Notes, the Term Agent, or the Second Lien Trustee shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this [Interim/Final] Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, the Term Lenders, the holders of Second Lien Notes, the Term Agent, or the Second Lien Trustee in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Facility collateral and shall be otherwise entitled to the protections granted under this [Final/Interim] Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

**<u>EXHIBIT E</u> to**
**the Restructuring Support Agreement**

**Exit Facility Term Sheet**

*Execution Version*

### EXIT FACILITY TERM SHEET

### <u>GASTAR EXPLORATION INC.</u>[1]

This exit facility term sheet (this "***Exit Facility Term Sheet***") is a summary of indicative terms and conditions for a proposed exit facility term loan financing that is materially consistent with the terms and conditions as set forth in this Exit Facility Term Sheet and otherwise acceptable in form and substance to the Credit Parties and the Exit Lenders (each as defined below).

This Exit Facility Term Sheet is non-binding and is being presented for discussion and settlement purposes only. Consequently, this Exit Facility Term Sheet is entitled to protection from any use or disclosure to any person or entity pursuant to Federal Rule of Evidence 408 and any other rules or laws of similar import. This Exit Facility Term Sheet does not purport to summarize all of the terms, conditions, covenants and other provisions that may be contained in the fully negotiated and executed definitive documentation in connection with the Exit Facility (the "***Exit Facility Documentation***"). The transactions described in this Exit Facility Term Sheet are subject in all respects to, among other things, internal authorization and approval by the appropriate credit committees of the Exit Lenders, the execution and delivery of Exit Facility Documentation satisfactory in form and substance to the Credit Parties and the Exit Lenders, satisfaction or waiver of the conditions precedent set forth in such Exit Facility Documentation, approval by the Bankruptcy Court (as defined below), and the satisfactory completion of diligence by the Exit Lenders in their sole discretion. This Exit Facility Term Sheet does not constitute a commitment to lend or to provide or arrange any other financing; such an obligation would arise only under a fully negotiated commitment letter if executed by all parties thereto in accordance with its terms.

This Exit Facility Term Sheet and the information contained in this Exit Facility Term Sheet shall remain strictly confidential and may not be shared with any person or entity (other than the Credit Parties, the Exit Lenders and their respective professionals), unless otherwise consented to by the Credit Parties or the Exit Lenders, as applicable.

| | |
|---|---|
| **Borrower** | An entity to be mutually agreed (the "***Borrower***"). |
| **Holdings** | To the extent a structure is mutually agreed whereby the equity of the Borrower is wholly-owned by a holding company, such holding company ("***Holdings***"). |
| **Guarantors** | Holdings, if any, Northwest Property Ventures LLC, Gastar Exploration Inc. (to the extent it is not the Borrower and as mutually agreed), and each other subsidiary of Holdings (other than the Borrower) (collectively, the "***Guarantors***" and together with the Borrower, the "***Credit Parties***"). |
| **Exit Lenders** | Funds managed or controlled by Ares Management, L.P. (collectively, the "***Exit Lenders***"). |
| **Exit Facility** | (a) A $100 million secured delayed draw term loan facility (the "***First Lien Exit Facility***") comprised of (i) term loans consisting of DIP Claims (as defined in the RSA) that constitute New Money Loans (as defined in the DIP Term Sheet (as defined in the RSA)) funded under the DIP Facility (as defined in the RSA) and deemed funded under the First Lien Exit Facility on the Closing Date and (ii) term loan commitments consisting of |

---

[1] This Exit Facility Term Sheet, the terms and provisions set forth in this Exit Facility Term Sheet, and the transactions contemplated by this Exit Facility Term Sheet are in all respects subject to, and may be further revised, modified or changed following, the completion of due diligence by the Exit Lenders and their professionals.

DIP Claims in an amount equal to any undrawn commitment under the DIP Facility and (b) a secured term loan facility (the "**Second Lien Exit Facility**" and together with the First Lien Exit Facility, collectively, the "**Exit Facility**") comprised of up to $200 million (as such amount may be reduced by the Exit Lenders in their sole discretion on or prior to the effective date of the Plan (the "**Effective Date**")) in aggregate principal amount of term loans deemed funded on the Closing Date consisting of DIP Claims and Term Loan Claims (as defined in the RSA) (the loans under the First Lien Exit Facility and the Second Lien Exit Facility, collectively, the "**Exit Loans**"). The Exit Loans may not be reborrowed once repaid.

The "**Plan**" means the Plan (as defined in the RSA), which is a Chapter 11 Plan of Reorganization and a related disclosure statement of the Credit Parties to be filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The reorganization contemplated by the Plan is referred to herein as the "**Reorganization**."

| | |
|---|---|
| **Administrative and Collateral Agent** | Wilmington Trust, National Association (the "**Administrative Agent**"). |
| **Use of Proceeds** | The proceeds of the Exit Facility will be used to refinance on the Closing Date a portion of the outstanding obligations under the DIP Facility as of the Effective Date and refinance indebtedness under and replace the commitments under the Credit Parties' Term Facility. The First Lien Exit Facility shall provide for commitments for future term loans to fund general working capital and for other general corporate purposes after emergence from Chapter 11 on terms to be mutually agreed and in an amount equal to the undrawn commitments under the DIP Facility as of the Effective Date. |
| **Closing Date** | The date on which the Exit Loans are issued under the Exit Facility and the Reorganization is consummated in all material respects pursuant to the Plan (the "**Closing Date**"). |
| **Maturity** | The date that is mutually agreed but in any event no less than 5 years or greater than 7 years after the Closing Date (the "**Maturity Date**"). |
| **Collateral** | The First Lien Exit Facility will be secured by a perfected first-priority (subject to the pari passu liens securing obligations owed to the Credit Parties' hedge counterparties and other permitted liens to be mutually agreed) security interest in and lien on substantially all of the Credit Parties' tangible and intangible assets (collectively, the "**Collateral**"), with materiality thresholds and exceptions consistent with those in the Pledge and Security Agreement (as defined in the Term Credit Agreement (as defined in the RSA)), including, without limitation, (i) 100% of the stock, membership or partnership interests of the Borrower (so long as Holdings wholly-owns the equity of the Borrower), each Guarantor (other than Holdings) and each subsidiary of the foregoing, (ii) all of the Credit Parties' deposit, securities and commodities accounts, in each case, subject to certain exceptions consistent with those in the Pledge and Security Agreement and subject to control agreements, and (iii) oil and gas properties of the Credit Parties comprising not less than each of (a) 90% of the PV10 of the proved reserves attributable to such properties of the |

Credit Parties and (b) 90% of the net acres of such properties of the Credit Parties with no associated proved reserves; in each case, subject to mutually agreed exceptions for "excluded property" consistent with those in the existing Security Documents (as defined in the Term Credit Agreement). The Second Lien Exit Facility will be secured by a perfected second-priority security interest in and lien on the Collateral.  All such security interests in personal property and all liens on oil and gas properties and other real property will be created in accordance with the Exit Facility Documentation.

**Conditions to Closing**    Usual and customary for facilities of this type, including, without limitation, the following:

A.   The negotiation, execution and delivery of the Exit Facility Documentation substantially consistent with the terms set forth in this Exit Facility Term Sheet and otherwise satisfactory to the Exit Lenders in their sole discretion.

B.   The satisfaction of the Exit Lenders in their sole discretion with:

- the Plan; and

- the terms, entry and effectiveness of a confirmation order with respect to the Plan.

C.   The Reorganization shall have been consummated in accordance with the Plan in all material respects (all conditions set forth therein having been satisfied or waived (with any such waiver having been approved by the Exit Lenders in their sole discretion)), substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan in accordance with its terms in all material respects shall have occurred substantially contemporaneously with the closing of the Exit Facility and such closing shall have occurred not later than February 15, 2019.

D.   The Exit Lenders shall be satisfied in their sole discretion that, on the Closing Date, immediately after giving effect to the consummation of the Plan, the issuance of the Exit Loans to occur on the Closing Date and any other transactions to occur on the Closing Date, the Credit Parties and their subsidiaries shall have outstanding no indebtedness for borrowed money other than indebtedness outstanding under the Exit Facility and any additional indebtedness (including but not limited to capital leases and obligations owed to the Credit Parties' hedge counterparties) on terms and conditions (including as to structure and amount) satisfactory to the Exit Lenders in their sole discretion.

E.   Delivery of evidence that all required insurance has been maintained and that the Administrative Agent (as defined below) has been named as loss payee and additional insured.  To the extent the Borrower is not able to deliver endorsements pursuant to this clause (E) by the Closing Date after having used commercially reasonable efforts to do so, such endorsements shall be delivered within 30 days after the

Closing Date (or such longer time as the majority of the Exit Lenders may agree).

F.   Accuracy of representations and warranties contained in the Exit Facility Documentation in all material respects (or, in the case of representations and warranties that are qualified by materiality, in all respects) on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (or, in the case of representations and warranties that are qualified by materiality, in all respects)) and absence of default and Event of Default under the Exit Facility Documentation.

G.   Compliance with customary documentation conditions, including the delivery of customary legal opinions and closing certificates (including a customary solvency certificate), good standing certificates and certified organizational documents, in each case, in form and substance reasonably satisfactory to the Exit Lenders and the Administrative Agent.

H.   The Administrative Agent shall have a perfected first-priority (subject to permitted liens to be mutually agreed) lien on substantially all of the assets of the Credit Parties, subject to any agreed post-closing perfection requirements.

I.   Receipt by the Administrative Agent of reasonably satisfactory results of customary lien searches.

J.   Receipt and satisfactory review by the Administrative Agent of (i) the Borrower's audited financial statements for the most recent fiscal year ending at least 90 days prior to the Closing Date, (ii) the Borrower's unaudited financial statements for the most recent fiscal quarter ending at least 60 days prior to the Closing Date and (iii) pro forma financial statements of the Borrower (after giving effect to the transactions contemplated in the Plan and this Exit Facility Term Sheet).

K.   Receipt and satisfactory review of the reserve reports (i) dated as of the most recent date required by the Term Credit Agreement and prepared by Wright & Company, Inc. or other engineering firm acceptable to the Exit Lenders and (ii) dated as of the most recent date required by the Term Credit Agreement and prepared internally by the Borrower, together with certification by the Borrower as to accuracy, title and, except as otherwise disclosed, absence of gas imbalances or take-or-pay or other prepayments.

L.   Satisfactory title information as required by the Exit Lenders on at least 90% of the PV10 of the oil and gas properties of the Credit Parties.

M.   Receipt of mortgages and security agreements providing perfected first-priority (subject to permitted liens to be mutually agreed) or second-priority, as applicable, security interests in and liens on all assets of the Credit Parties, including, as applicable, not less than each

– 4 –

of (i) 90% of the PV10 of the proved reserves attributable to the oil and gas properties of the Credit Parties and (ii) 90% of the net acres of oil and gas properties of the Credit Parties with no associated proved reserves.

N.  All requisite governmental and third party approvals shall have been obtained, and there shall be no material litigation, governmental, administrative or judicial action against the Credit Parties, except as otherwise disclosed pursuant to the Credit Parties' public disclosures or to the Exit Lenders in writing prior to the Closing Date.

O.  Delivery of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer", anti-money laundering rules and regulations, and the Patriot Act, to the extent requested at least 5 business days prior to the Closing Date.

P.  To the extent invoiced at least one business day prior to the Closing Date, payment by the Borrower on or before the Closing Date of (i) the reasonable and documented out-of-pocket fees and expenses of the Administrative Agent (including the fees and expenses of one outside counsel to the Administrative Agent), and (ii) the fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, in connection with the transaction hereunder due on such date.

Q.  No default or event of default under the DIP Facility.

R.  No material adverse change from the date of the RSA until closing (excluding the pendency of the Chapter 11 Cases).

| | |
|---|---|
| **Interest Rate** | At the election of the Borrower, either (a) Adjusted LIBOR Rate plus 6.00% *per annum* (subject to a 2.00% LIBOR floor) if paid in cash or (b) Adjusted LIBOR Rate plus 8.00% *per annum* (subject to a 2.00% LIBOR floor) if paid in kind, in each case, payable quarterly.

During the continuance of an event of default, past due amounts under the Exit Facility will bear interest at an additional 3.00% *per annum* above the interest rate otherwise applicable. |
| **Upfront/Arrangement Fee** | None. |
| **Scheduled Amortization** | None.  The unpaid principal amount of the Exit Loans shall be repaid in full on the Maturity Date. |
| **Call Protection** | None. |
| **Mandatory Prepayments** | The Exit Loans shall be prepaid with:

(i)   100% of the net cash proceeds of non-ordinary course asset sales or casualty or condemnation events (subject to reinvestment rights and baskets and exclusions to be agreed); and

(ii)  100% of the proceeds of debt incurrences (other than debt permitted under the Exit Facility Documentation). |
| **Financial Covenants** | None. |

| | |
|---|---|
| **Exit Facility Documentation** | The Exit Facility Documentation shall contain representations and warranties, affirmative covenants, negative covenants and events of default usual and customary for transactions of this type and with materiality, thresholds and exceptions, in each case, consistent with the existing Loan Documents as mutually agreed.  Terms not expressly set forth in this Exit Facility Term Sheet will (i) be negotiated in good faith within a reasonable time period to be determined based on the expected Closing Date and (ii) contain such other terms as the Credit Parties and the Exit Lenders shall agree (given due regard to the operations, size, industry (and risks and trends associated therewith), geographic locations and businesses of the Credit Parties). The definitive documentation for the Term Credit Agreement will be used as a starting point for the Exit Facility Documentation. |
| **Expenses and Indemnification** | Usual and customary for facilities of this type and consistent with the existing Loan Documents. |
| **Governing Law** | State of New York. |

**<u>Exhibit C</u>**

**Hedge Party RSA**

*Execution Version*

**THIS HEDGE PARTY RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS HEDGE PARTY RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS HEDGE PARTY RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS HEDGE PARTY RESTRUCTURING SUPPORT AGREEMENT.**

## *HEDGE PARTY RESTRUCTURING SUPPORT AGREEMENT*

This Hedge Party Restructuring Support Agreement (this agreement, including all exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**")[1] is made and entered into as of October 26, 2018, by and among the following parties (each of the parties described in Sub-Clauses (i) and (ii), a "**Party**" and, collectively, the "**Parties**"):

 i. Gastar Exploration Inc. ("**Gastar**"); its undersigned subsidiary Northwest Property Ventures LLC; and any other future subsidiary of Gastar (each a "**Company Party**" and collectively, the "**Company**" or the "**Company Parties**"); and

 ii. the entities Cargill, Inc. and NextEra Energy Marketing, LLC (each a "**Hedge Party**," and collectively, the "**Hedge Parties**") in their capacities as holders of claims arising under or related to the prepetition transactions entered into by such Hedge Party with Gastar under the applicable Initial Swap Party ISDA (as defined in the Hedge Party Term Sheet), including all liabilities and obligations of the Company outstanding as of the date of commencement of the Chapter 11 Cases (the "**Petition Date**") and any claims of such Hedge Party arising out of any termination thereof (such claims, with respect to each Hedge Party individually or with respect to the Hedge Parties collectively, as the context requires, the "**Hedge Claims**").

## *RECITALS*

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding the treatment of the Hedge Claims in connection with the restructuring and recapitalization of the Company;

**WHEREAS**, to implement the Restructuring Transaction (as defined in the Hedge Party Term Sheet), the Company intends to commence voluntary cases under chapter 11 of the

---

[1] Capitalized terms used but not otherwise defined in this document have the meanings ascribed to such terms in the term sheet attached to this Agreement as **Exhibit A** (the "**Hedge Party Term Sheet**"), subject to Section 2 hereof.

Bankruptcy Code[2] (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

 **WHEREAS**, the Company intends to pursue the Restructuring Transaction in accordance with a prepackaged chapter 11 plan of reorganization (the "**Plan**") and a related disclosure statement (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Disclosure Statement**");

 **WHEREAS**, the following sets forth the agreement among the Parties concerning their respective rights and obligations in respect of the Transaction.

 **NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

*AGREEMENT*

**Section 1.** *Agreement Effective Date*.  This Agreement shall become effective and binding upon each of the Parties on the date: (a) each of the Company Parties has executed and delivered counterpart signature pages of this Agreement to the Hedge Parties; and (b) each of the Hedge Parties has executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties (such date, the "**Agreement Effective Date**").

**Section 2.** *Exhibits and Schedules Incorporated by Reference*.  Each of the exhibits to this Agreement (including, but not limited to, the Hedge Party Term Sheet) and any schedules or annexes to such exhibits (collectively, the "**Exhibits and Schedules**")) is expressly incorporated into, and made a part of, this Agreement.  As used in this Agreement, all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

**Section 3.** *Definitive Documentation*.

 (a) The definitive documents and agreements governing the Restructuring Transaction (collectively, the "**Definitive Documents**") shall consist of this Agreement and each of the following documents:

  (i) the Plan (and all exhibits to the Plan);

  (ii) the order confirming the Plan (the "**Confirmation Order**");

  (iii) the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**");

---

2 "**Bankruptcy Code**" means title 11 of the United States Code, as amended.

2

(iv)     the interim and final orders approving use of cash collateral and debtor-in-possession financing (the "**DIP Orders**");

(v)      the Hedge Party Secured Note (as defined in the Hedge Party Term Sheet), which shall be contained in the supplement to the Plan to be filed in the Chapter 11 Cases; and

(vi)     the Intercreditor Agreement (as defined in the Hedge Party Term Sheet).

(b) Certain of the Definitive Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement.  The provisions regarding treatment of the Hedge Claims under the Plan or any other provisions of the Definitive Documents that will have a material adverse affect on the rights of the Hedge Parties shall be in form and substance acceptable to the Company Parties and the Hedge Parties.

**Section 4.**      *Commitments Regarding the Restructuring Transaction*.

4.01.   <u>Commitment of the Hedge Parties</u>.

(a)      From the Agreement Effective Date until the termination of this Agreement in accordance with the terms hereof, each of the Hedge Parties agrees to:

(i)      vote each of its claims, including the Hedge Claims, against the Company to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis;

(ii)     negotiate in good faith the Definitive Documents and use commercially reasonable efforts to take any and all necessary and appropriate actions in furtherance of the Restructuring Transaction and the Plan (if applicable) and this Agreement;

(iii)    use commercially reasonable efforts to support and take all actions necessary or appropriate to facilitate the solicitation, confirmation and consummation of the Restructuring Transaction and the Plan (if applicable);

(iv)     consent to and use commercially reasonable efforts to support the release, discharge, exculpation, and injunction provisions contained in the Definitive Documents and, if applicable, not "opt out" of such provisions in the Plan;

(v)      not (A) object to or join in any objection to the Confirmation Order, or (B) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is not materially consistent with this Agreement or the Plan;

(vi)     not change or withdraw (or cause to be changed or withdrawn) any vote(s) to accept the Plan;

(vii)    not transfer any of their Hedge Claims prior to the effective date of the Plan to any party that is not a Hedge Party; and

(viii)    not (A) object to, delay, impede, or knowingly take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transaction, (B) propose, file, support, or vote for any actual or proposed transaction involving any or all of (1) another financial and/or corporate restructuring of the Company, (2) the issuance, sale, or other disposition of any equity or debt interests, or any material assets, of the Company, or (3) a merger, consolidation, business combination, joint venture, liquidation, dissolution, winding up, assignment for the benefit of creditors, recapitalization, refinancing, or similar transaction involving the Company, other than the Restructuring Transaction, or (C) exercise any right or remedy for the enforcement, collection, or recovery of any Debtor Claims/Interests, or (D) support, encourage or direct any other person or entity to take any such action.

(b)    Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Hedge Party nor the acceptance of the Plan by any Hedge Party shall: (i) be construed to prohibit any Hedge Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the other Definitive Documents, complying with applicable law or exercising any rights (including any consent and approval rights contemplated under this Agreement or the other Definitive Documents) or remedies specifically reserved in this Agreement or the other Definitive Documents; (ii) be construed to prohibit or limit any Hedge Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Effective Period, such appearance and the positions advocated  are not inconsistent with this Agreement; or (iii) impair or waive the rights of any Hedge Party to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

4.02.    <u>Commitment of the Company</u>.

(a)    From the Agreement Effective Date until the termination of this Agreement in accordance with the terms hereof, each of the Company Parties agrees to:

(i)    negotiate in good faith all Definitive Documents and take any and all reasonably necessary and appropriate actions in furtherance of the Restructuring Transaction, the Plan (if applicable), and this Agreement;

(ii)    use reasonable best efforts to obtain orders of the Bankruptcy Court in respect of the Restructuring Transaction, including the Confirmation Order;

(iii)    support and use reasonable best efforts to consummate the Restructuring Transaction in accordance with this Agreement within the time-frames contemplated under this Agreement.

(iv)    use reasonable best efforts to negotiate, execute and deliver any other agreements necessary to effectuate and consummate the Restructuring Transaction;

(v)     use commercially reasonable efforts to obtain any and all regulatory and/or third-party approvals necessary or appropriate in connection with the Restructuring Transaction;

(vi)     pay the reasonable and documented fees and expenses of the Hedge Parties as set forth in Section 9 of this Agreement;

(vii)     not object to or join in any objection to, on any grounds, including but not limited to, avoidance, disallowance, expungement, recharacterization, subordination, or otherwise, the Hedge Claims;

(viii)     timely file an objection or response with the Bankruptcy Court to any motion, or other pleading, filed with the Bankruptcy Court by a party seeking the entry of an order: (1) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code); (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (3) dismissing any of the Chapter 11 Cases; (4) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; or (5) objecting to the Hedge Claims; and

(ix)     not directly or indirectly: (A) delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transaction, or otherwise take any action which would, or which would reasonably be expected to, breach or be inconsistent with this Agreement; or (B) support, encourage or direct any other person or entity to take any action referred to in this Section 4.02(a)(ix).

(b) Nothing in this Agreement shall require the Company, the Board or any other person or entity, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transaction to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.

**Section 5.     *Representations and Warranties of Hedge Parties.*** Each Hedge Party, severally, and not jointly, represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date of this Agreement and the Hedge Termination Date (as defined in the Hedge Party Term Sheet):

(a)     it is the owner of the Hedge Claims;

(b)     such Hedge Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect such Hedge Party's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(c)     it has the full power and authority to act on behalf of, vote, and consent to matters concerning such Hedge Claims.

**Section 6.**     ***Mutual Representations and Warranties.***  Each (i) Hedge Party, severally, and not jointly, and (ii) Company Party, on a joint and several basis, represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date of this Agreement:

6.01.   <u>Enforceability</u>.  It is validly existing and in good standing under the laws of the state of its organization.  This Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

6.02.   <u>No Consent or Approval</u>.  Except as expressly provided in this Agreement, the Plan (if applicable), the Hedge Party Term Sheet, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transaction contemplated by, and perform the respective obligations under, this Agreement.

6.03.   <u>Power and Authority</u>.  Except as expressly provided in this Agreement and subject to applicable law, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transaction contemplated by, and perform its respective obligations under, this Agreement.  Each of the Definitive Documents will be duly authorized and, assuming due authorization, execution and delivery of such Definitive Document by the other parties to such Definitive Document, when executed and delivered by each Party, will constitute a legal, valid, binding instrument enforceable against the Parties in accordance with its terms (subject, as to enforcement of remedies, to applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally from time to time in effect and to general principles of equity).

6.04.   <u>Other Representations</u>.  Each Party represents and warrants that it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Restructuring Term Sheet, the Plan (if applicable), and this Agreement.  Each Party further represents and warrants that it has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

**Section 7.**     ***Cooperation and Support.***  The Company shall provide the Hedge Parties with reasonable advance notice of and an opportunity to review and comment on each Definitive Document.  The form and substance of such Definitive Document shall be subject to the consent and approval rights of the Company and the Hedge Parties set forth in <u>Section 3</u> of the Restructuring Support Agreement.

**Section 8.**     ***Termination Events.***

8.01.   <u>Hedge Party Termination Events</u>.  With respect to any Hedge Party, so long as such Hedge Party has not failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure is the result of any act, omission or delay on

the part of any Company Party in violation of its obligations under this Agreement), this Agreement may be terminated by such Hedge Party as to such Hedge Party pursuant to this Section 8.01 upon prior written notice delivered in accordance with this Agreement, upon the occurrence and continuation of any of the following events:

(a)     the occurrence of a material breach of this Agreement by any Party other than the terminating Hedge Party.  However, if such breach is capable of being cured, the breaching Party shall have five (5) business days following written notice from such Hedge Party of the occurrence thereof to cure such breach;

(b)     the (i) conversion of one or more of the Chapter 11 Cases of the Company Parties to a case under chapter 7 of the Bankruptcy Code, (ii) dismissal of one or more of the Chapter 11 Cases of the Company Parties, unless such conversion or dismissal, as applicable, is made with the prior written consent of such Hedge Party, or (iii) appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(c)     any of the Definitive Documents do not comply with Section 3 of this Agreement;

(d)     a material breach by any Company Party of any representation or warranty of such Company Party set forth in Section 6 of this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transaction that (to the extent curable) remains uncured for a period of ten (10) business days after the receipt by the Company of written notice and description of such breach from any other Party;

(e)     any Company Party terminates its obligations under and in accordance with Section 8.02 of this Agreement;

(f)     the failure to meet any of the Milestones unless: (i) such failure is the result of any act, omission, or delay on the part of such Hedge Party in material violation of its obligations under this Agreement; or (ii) such Milestone previously has been waived by such Hedge Party; or

(g)     any other Hedge Party terminates its obligations under and in accordance with this Section 8.01.

8.02.   Company's Termination Events.  So long as no Company Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure is the result of any act, omission, or delay on the part of the Hedge Parties in violation of their obligations under this Agreement), the Company may terminate this Agreement as to all Parties upon prior written notice, delivered in accordance with Section 11.09 of this Agreement, upon the occurrence of any of the following events:

(a)     A material breach by any of the Hedge Parties of any provision set forth in this Agreement that has an adverse effect on the Company and that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Hedge Parties of notice of such material breach;

7

(b)       the Board determines, after consulting with counsel, that proceeding with the Restructuring Transaction would be inconsistent with its fiduciary duties or applicable law and that failure to terminate this Agreement would be inconsistent with the exercise of its fiduciary obligations or applicable law; or

(c)       the Bankruptcy Court enters an order denying confirmation of the Plan.

8.03.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among each of the Company and the Hedge Parties.

8.04.   <u>Termination upon Completion of the Restructuring Transaction</u>.  This Agreement shall terminate automatically without any further required action or notice on the effective date of the Plan.

8.05.   <u>Effect of Termination</u>.  Upon the termination of this Agreement as to a Party, this Agreement shall be of no further force or effect with respect to such Party.  Each Party subject to such termination shall: (a) be released from its commitments, undertakings, and agreements under or related to this Agreement; (b) have the rights and remedies that it would have had, had it not entered into this Agreement; and (c) be entitled to take all actions, whether with respect to the Restructuring Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement.   The termination of this Agreement with respect to any Party shall not relieve or absolve any Party of any liability for any breaches of this Agreement that preceded the termination of the Agreement.

**Section 9.**     ***Fees and Expenses***.   Upon receipt of a request for payment, the Company shall promptly pay and reimburse all reasonable and documented fees and out-of-pocket fees and expenses of the Hedge Parties, including the fees and expenses of all attorneys, accountants, advisors, consultants, and other professionals of the Hedge Parties (regardless of whether such fees and expenses are incurred before or after the Petition Date).

**Section 10.**     ***Amendments; Consents and Waivers***.   This Agreement (including the Exhibits and Schedules), may not be modified, amended, or supplemented in any manner except in writing signed by the Company and each of the Hedge Parties.   Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.

**Section 11.**     ***Miscellaneous***.

11.01.   <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters in this Agreement specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transaction, as applicable.

11.02.   <u>Complete Agreement</u>.  This Agreement (including the Exhibits and Schedules) constitutes the entire agreement among the Parties with respect to the subject matter of this

Agreement and supersedes all prior negotiations, agreements, and understandings, whether oral or written, among the Parties with respect thereto.

11.03.  <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision of this Agreement.

11.04.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in either the United States District Court for the Southern District of New York or any New York state court (the "**Chosen Courts**").  Solely in connection with claims arising under this Agreement, each Party: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party to this Agreement or constitutional authority to finally adjudicate the matter. Notwithstanding the foregoing, if the Company Parties commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

11.05.  <u>Trial by Jury Waiver</u>.    EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.06.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery.  Each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

11.07.  <u>Interpretation and Rules of Construction</u>.  This Agreement is the product of good faith negotiations among the Company and the Hedge Parties.  Consequently, this Agreement shall be enforced and interpreted in a neutral manner.  Any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Company and the Hedge Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.  In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.  For the purposes of

this Agreement, the term "including" shall mean "including, without limitation," whether or not so specified.

11.08.  <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

11.09.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Gastar Exploration Inc.
1331 Lamar Street, Suite 650
Houston, TX 7710
Attention:  Michael A. Gerlich
                     mgerlich@gastar.com
                     Heather Rhodes
                     hrhodes@gastar.com
with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Ross M. Kwasteniet, P.C.
                     ross.kwasteniet@kirkland.com
                     Douglas E. Bacon, P.C.
                     douglas.bacon@kirkland.com
                     John R. Luze
                     john.luze@kirkland.com

(b)      if to NextEra Energy Marketing, LLC, to:

NextEra Energy Marketing, LLC
700 Universe Blvd.
Juno Beach, Florida 33408
Attn: Credit Department
Fax: 561-694-7642

With a copy to counsel to the Hedge Parties (which shall not constitute notice):

Attn: Legal Department – Contracts Group
Fax: 561-694-7504

(c)      if to Cargill, Inc., to:

Cargill, Incorporated
Cargill Risk Management
840 West Sam Houston Parkway North, Suite 300
Houston, TX 77024
Attention: Tyler R Smith
Fax: 952-367-0849
Email: Tyler_Smith_1@Cargill.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received. For purposes of this Agreement, any consents or approvals of the Hedge Parties may be provided by counsel to the Hedge Parties.

11.10. <u>Waiver</u>.   If the Restructuring Transaction is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transaction, or the payment of damages to which a Party may be entitled under this Agreement.

11.11. <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party. Consequently, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

11.12. <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

11.13. <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect of this Agreement at law or in equity shall be cumulative and not alternative. The exercise of any right, power, or remedy by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

11.14.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Company Parties:

GASTAR EXPLORATION INC.

By: _____

Name: **Michael A. Gerlich**
Title: **Gastar Exploration Inc.**
**Sr Vice President and CFO**

NORTHWEST PROPERTY VENTURES LLC

By: _____

Name: **Michael A. Gerlich**
Title: **Gastar Exploration Inc.**
**Sr Vice President and CFO**

**Hedge Parties:**

**NEXTERA ENERGY MARKETING, LLC**

By: _____

Name: 
Title:

Lawrence Silverstein
Senior Vice President and
Managing Director
Nextera Energy
Marketing, LLC

Legal
Review
Completed
DM

CREDIT
CN

**CARGILL, INCORPORATED**

By: _____

Name:
Title:

**Hedge Parties:**

**NEXTERA ENERGY MARKETING, LLC**

By:_____

Name:
Title:

**CARGILL, INCORPORATED**

By:_____

Name: Tyler R Smith
Title: Authorized Signer

**<u>EXHIBIT A</u> to**
**the Hedge Party Restructuring Support Agreement**
**Hedge Party Term Sheet**

*Execution Version*

GASTAR EXPLORATION INC.

## HEDGE PARTY TERM SHEET

### October 26, 2018

This term sheet (the "Hedge Party Term Sheet") summarizes the material terms and conditions of certain transactions in connection with an in-court restructuring (the "Restructuring Transaction") of the capital structure and financial obligations of Gastar Exploration Inc., a Delaware corporation ("Gastar"), and its subsidiary related to the obligations of Gastar under the applicable Initial Swap Party ISDAs (as defined in the hereinafter defined Existing Intercreditor Agreement, the "Initial Swap Party ISDAs")) entered into between Gastar and each of the Hedge Parties (as defined below). This Hedge Party Term Sheet is attached to and made a part of the Hedge Party Restructuring Support Agreement (as amended, modified or supplemented from time to time, the "Hedge Party RSA"),[1] dated as of October 26, 2018, by and among the Company and the Hedge Parties (as each such term is defined below).

THIS HEDGE PARTY TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER OR PROPOSAL WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN. THE PARTIES TO THIS TERM SHEET ACKNOWLEDGE AND AGREE THAT ANY SUCH OFFER, PROPOSAL OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW. THIS HEDGE PARTY TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY RESTRUCTURING TRANSACTION.

| OVERVIEW | |
|---|---|
| **Parties to the Restructuring** | **Company**: Gastar; Northwest Property Ventures, LLC; and any other future subsidiaries of Gastar (collectively, the "Company"). |
| | **Hedge Parties**: Each of Cargill, Inc. ("Cargill") and NextEra Energy Marketing, LLC ("NextEra", and together with Cargill, the "Hedge Parties"), in its capacity as holder of claims arising under or related to the Company's prepetition transactions entered into by such Hedge Party with any Company Party under the applicable Initial Swap Party ISDA, including all liabilities and other obligations of the Company outstanding as of the date of commencement of the Chapter 11 Cases (the "Petition Date") and all claims of the applicable Hedge Party arising out of the termination thereof (such claims, with respect to any Hedge Party individually or with respect to the Hedge Parties collectively, as the context requires, the "Hedge Claims"). |
| | The Company and the each of the Hedge Parties is referred to in |

---

[1] Capitalized terms used but not defined herein have the meaning given to them in the Hedge Party RSA.

| | |
|---|---|
| | this Hedge Party Term Sheet as a "<u>Party</u>", and they are collectively referred to in this Restructuring Term Sheet as the "<u>Parties</u>". |
| **Treatment of Hedge Claims** | The Restructuring Transaction will be implemented pursuant to the Chapter 11 Cases on the terms set forth in the Plan. |
| | The Plan shall provide that, on the effective date of the Plan (the "<u>Effective Date</u>"), each holder of Hedge Claims shall receive cash in an amount equal to 100% of such holder's Hedge Claims (the "<u>Hedge Claims Payment Amount</u>"), payable in the following installments: |
| | (i) on the Effective Date, an amount (the "<u>Catch-Up Payment Amount</u>") equal to the product of: |
| | (a) the number of monthly settlement payments that would have occurred after the Hedge Termination Date and on or prior to the Effective Date had the Hedge Claims not been liquidated *divided by* 14; and |
| | (b) the Hedge Claims Payment Amount; and |
| | (ii) the remaining amount of the Hedge Claims Payment Amount owed to each Hedge Party in equal monthly installments with such remaining amount to be paid in full by December 31, 2019 pursuant to new secured notes issued to each Hedge Party (such notes, the "<u>Hedge Party Secured Notes</u>") that will be secured by an uncapped first priority security interest in and lien on the Collateral (as defined below), which security interest and lien shall rank *pari passu* with the liens granted to the holders of the senior-most creditors (with respect to debt for borrowed money) of the Company (which, for the avoidance of doubt, may be the creditors under the first lien exit facility after the Effective Date (the "<u>Exit Facility</u>") to be provided on the Effective Date by funds affiliated with Ares Management, L.P. ("<u>Ares</u>") under the Plan). Funds in the Exit Facility will be available to make payments under the Hedge Party Secured Notes. |
| | Each holder of Hedge Claims shall receive under the Plan the treatment described above in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Hedge Claims. Any action to be taken by the Company on the Effective Date may be taken on the Effective Date or as soon as is reasonably practicable thereafter. |
| | Prior to the Effective Date but after effectiveness of the DIP Orders (as defined in the Hedge Party RSA), the Hedge Claims shall be secured by a first priority lien on the same collateral securing the hedge and swap transactions between the Company Parties and the Hedge Parties as of the date of the Hedge Party |

2

|  | RSA in accordance with the Existing Intercreditor Agreement and Security Instruments (as defined in the hereinafter defined Existing Intercreditor Agreement). The Hedge Parties' existing senior secured liens and security interests shall be acknowledged and preserved in the DIP Order, and shall not be primed.<br><br>Prior to the effectiveness of the DIP Orders, the Hedge Claims shall be secured by the liens on and security interests in the Collateral (as defined in the Existing Intercreditor Agreement), in accordance with the terms of the Existing Intercreditor Agreement and Security Instruments. |
| --- | --- |
| **Liquidation of Hedge Claims** | On or as soon as practicable following the Petition Date (the "Hedge Termination Date"), each Hedge Party shall exercise its rights under the Initial Swap Party ISDA to which it is a party to terminate all of the transactions in effect under such Initial Swap Party ISDA in accordance with the terms of such Initial Swap Party ISDA and such transactions. Upon the designation of an early termination date under the Initial Swap Party ISDAs, the Hedge Parties shall take all steps necessary to liquidate the Hedge Claims. The Hedge Claims will be allowed in full in the Chapter 11 Cases and such amounts will be fully secured and treated as a secured claim as set forth in the Plan in accordance with this Hedge Party Term Sheet. |
| **Milestones** | The Hedge Parties' support for the transactions described in this Hedge Party Term Sheet is contingent on the Company commencing the Chapter 11 Cases by no later than November 20, 2018 and securing confirmation of the Plan and the Plan having gone effective by no later than 180 days after the Petition Date (collectively, the "Milestones"). |
| **Release** | The Definitive Documentation, including the Plan, shall include full customary debtor and "third party" releases from liability in favor of the Company, each of the Hedge Parties, and each of their respective directors, officers, funds, affiliates, members, employees, partners, managers, investment advisors, agents, representatives, principals, consultants, attorneys, professional advisors, heirs, executors, successors and assigns (each in their capacity as such). |
| **Collateral** | On and after the Effective Date, the Hedge Party Secured Notes will be secured by an uncapped, first priority lien on and security interest in the collateral that secures the Exit Facility that ranks *pari passu* with the liens granted to the holders of the senior-most creditors (with respect to debt for borrowed money) of the Company Parties (which, for the avoidance of doubt, may be the creditors under the Exit Facility after the Effective Date). |

| | |
|---|---|
| | For the avoidance of doubt, subject to certain thresholds and exceptions to be agreed among the Company and Ares, the Exit Facility and Hedge Claims will be secured by a perfected first-priority security interest in and lien on substantially all of the Company's tangible and intangible assets (collectively, the "<u>Collateral</u>"), including, without limitation, (i) all of the Company's deposit, securities and commodities accounts, in each case, subject to certain customary exceptions and subject to control agreements, and (ii) oil and gas properties of the Company comprising not less than each of (a) 90% of the PV10 of the proved reserves attributable to such properties of the Company and (b) 90% of the net acres of such properties with no associated proved reserves of the Company, in each case, subject to exceptions for "excluded property" to be agreed among the Company and Ares. |
| **Repayment Terms** | The initial principal amount of each Hedge Party Secured Note shall be equal to the difference between (i) the full amount of the applicable Hedge Claims Payment Amount and (ii) the applicable Catch-Up Payment Amount.  Pursuant to the Hedge Party Secured Notes, the Company shall pay to each Hedge Party an amount equal to the Catch-Up Payment Amount applicable to such Hedge Party on the Effective Date and then on the first business day of each month thereafter in equal monthly installments until the initial principal amount of the Hedge Party Secured Note is paid in full, which shall occur by no later than December 31, 2019.  Except as provided below, no Hedge Party Secured Note will accrue interest.  Any payments made in respect of any Hedge Party Secured Note shall be made to the Hedge Parties pro rata in accordance with each Hedge Party's proportionate share of the total amount of Hedge Claims. |
| **Default Interest** | In the event that the Company fails to satisfy any of its payment obligations under any Hedge Party Secured Note, and such failure remains unremedied for a period of five business days, the Hedge Party Secured Note will accrue interest at a rate of 5% per annum until such time as such payment default has been remedied (including payment of all such accrued interest).  The balance of the Hedge Parties' rights and remedies upon the occurrence of a payment default will be governed by the Intercreditor Agreement (as defined below).  If the Company fails to cure any payment default within 30 calendar days of the original payment date, it shall be an event of default under the Hedge Party Secured Note. |
| **Intercreditor Agreement** | The Hedge Party Secured Notes will be subject to an intercreditor agreement (the "<u>Intercreditor Agreement</u>") by and among the Hedge Parties, the Company, and the administrative and collateral |

4

| | |
|---|---|
| | agent under the Exit Facility (the "Exit Facility Agent"). The terms of the Intercreditor Agreement shall be in form and substance substantially similar to the terms contained in that certain Intercreditor Agreement (the "Existing Intercreditor Agreement"), dated as of March 3, 2017, by and between, among others, the Hedge Parties, the Company, and Wilmington Trust, National Association, in its capacity as administrative and collateral agent under the Company's existing first lien term loan credit agreement and otherwise in form and substance acceptable to the Company, the Hedge Parties, and the Exit Facility Agent. Upon the occurrence of a payment default or other event of default under any Hedge Party Secured Note, the applicable Hedge Party shall have rights substantially similar to the rights and remedies arising under the Existing Intercreditor Agreement, including the rights and remedies of a Hedge Party arising upon the occurrence of a "Triggering Event".<br><br>None of the Hedge Party Secured Notes, the Intercreditor Agreement, or the Plan shall contain any restriction on any refinancing of the Exit Facility so long as (a) the indebtedness evidenced by the Hedge Party Secured Notes is permitted by such refinancing debt, (b) the Hedge Party Secured Notes continue to be secured by an uncapped, first priority lien on and security interest in the collateral that secures the Exit Facility that ranks *pari passu* with the liens granted to the holders of the senior-most creditors (with respect to debt for borrowed money) of the Company Parties (which, for the avoidance of doubt, may be the creditors under the Exit Facility after the Effective Date) and on a senior basis during any bankruptcy filing period, and (c) in connection with such refinancing facility, the new lenders either execute a joinder to the Intercreditor Agreement or enter into a new intercreditor agreement that is either (i) substantially similar to the Intercreditor Agreement, or (ii) not materially less advantageous to the Hedge Parties than the Intercreditor Agreement and does not have the effect of disproportionately disadvantaging or otherwise discriminating against any Hedge Party, or the Hedge Parties as a whole, as compared to the Intercreditor Agreement. The Intercreditor Agreement shall contain (a) an agreement to such effect by the Hedge Parties and (b) a consent to any such refinancing by the Hedge Parties. |
| **Definitive Documentation** | Each Hedge Party Secured Note shall: (a) contain standard representations and warranties for senior secured credit agreements; (b) contain standard affirmative and negative covenants related to payment and otherwise standard for senior secured credit agreements; (c) contain standard events of default for senior secured credit agreements, (d) be consistent with this |

| | Hedge Party Term Sheet; and (e) otherwise be in form and substance acceptable to the Hedge Parties and the Company; provided that such representations, warranties, covenants and events of default shall be no more burdensome (from the Company's perspective) than the representations, warranties, covenants and events of default in the documents memorializing the Exit Facility. |
|---|---|

**<u>Exhibit D</u>**

**Liquidation Analysis**

# INTRODUCTION

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the proposed Plan satisfies the "best interests" of creditors test, Opportune LLP ("Opportune") with the assistance of the Debtors, has prepared the following hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis. [1]

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of The Bankruptcy Code* (the "Disclosure Statement") to which this Liquidation Analysis is attached.

## Statement of Limitations:

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would likely not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in a chapter 7 liquidation, including but not limited to the uncertainty of the currently volatile oil and gas pricing environment. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REFLECTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' ASSETS ON A GOING CONCERN BASIS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL CHAPTER 7 LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) COULD BE LESS, FEWER CLAIMS COULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS COULD BE ASSUMED BY THE BUYER(S).

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors financial statements to account for estimated liabilities as necessary. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 Cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and

---

[1]      Terms used but not defined herein have the meaning set forth in the Disclosure Statement.

chapter 7 Administrative Claims such as wind down costs and trustee fees and tax liabilities.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION BY THE DEBTORS.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Chapter 7 Conversion Date and Appointment of Chapter 7 Trustee:**

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 11 cases are converted to chapter 7 cases on or about December 31, 2018 (the "Chapter 7 Conversion Date"), which the Debtors estimate to be a reasonable proxy for the Effective Date.  Except for Cash and Cash Equivalents and Oil and Gas Properties, which were subject to additional procedures to determine their estimated balance as of the Chapter 7 Conversion Date, the Liquidation Analysis is based upon the unaudited consolidated balance sheets of the Debtors as of September 30, 2018, and those values, are assumed to be representative of the Debtors' approximate assets and liabilities as of the Chapter 7 Conversion Date.  It is assumed that, on the Chapter 7 Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") who would sell all of the Debtors' major assets and distribute the cash proceeds, net of liquidation-related costs, to creditors in accordance with applicable bankruptcy law.  There can be no assurance that the recoveries realized from the sale of the assets would, in fact, approximate the amounts reflected in this Liquidation Analysis.  Under section 704 of the Bankruptcy Code, the Trustee must, among other duties, collect and convert the property of the estate as expeditiously as possible (generally at distressed prices), taking into account the best interests of stakeholders.

**Global Notes & Assumptions:**

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

1. The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered and substantively consolidated proceeding.

2. *Dependence on unaudited financial statements* – The Liquidation Analysis contains numerous estimates.  Proceeds available for recovery are based upon the unaudited financial statements and balance sheets of the Debtors as of September 30, 2018, unless otherwise noted.

3. *Chapter 7 Liquidation Costs & Length of Liquidation Process* – For the purposes of the Liquidation Analysis, the Debtors have assumed that the Trustee would take approximately four to six months to pursue orderly sales of substantially all the remaining oil and gas assets, monetize and collect receivables as well as other assets on the balance sheet, and otherwise administer and close the estates.  While a four to six month liquidation process may be reasonable given the nature of the Debtors' assets, in an actual liquidation, the wind down process and time period(s) could vary significantly, thereby impacting recoveries.  For example, the uncertain duration and potential outcomes of the process to liquidate and allow Claims, including priority, contingent, litigation, rejection, and other Claims could substantially impact both the timing and the amounts of the distributions of asset proceeds to creditors.  Accordingly, there can be no assurance that the values

reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such liquidation.

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses associated with selling the Debtors' assets, would be entitled to payment in full prior to any distributions to chapter 11 Administrative Claims and Priority Tax Claims. The estimates used in the Liquidation Analysis for these expenses include estimates for operational expenses and certain legal, accounting and other professionals, as well applicable fees for the Trustee per the fee guidelines in section 326(a) of the Bankruptcy Code. It is assumed the chapter 7 Administrative Claims and Priority Claims, post-chapter 7 conversion expenses and professional fees, and the Trustee fees are entitled to payment in full prior to distribution to Holders of any other Claims.

4. *Additional Claims* – The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of Claims include various potential employee Claims, tax liabilities, Claims related to further rejection of unexpired leases and executory contracts, bonding or letters of credit for plugging and abandoning ("P&A") liabilities, litigation claims, and other potential Allowed Claims. While some of these Claims could be significant and, in certain instances, may be entitled to priority in payment over General Unsecured Claims, no adjustment has been made for these potential Claims.

5. *Preference or fraudulent transfers* – No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions due to, among other issues, the costs of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.

6. *Distribution of Net Proceeds* – Chapter 11 Administrative Claim amounts and Priority Tax Claim amounts, trustee fees and other such Claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of those proceeds can be made available to pay General Unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

**<u>Conclusion:</u>**

The Debtors have determined, based on the following analysis, that upon the Effective Date, the Plan will provide all creditors and equity holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

### NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Notes | Estimated NBV | Low Potential Recovery % | Low Potential Recovery $ | High Potential Recovery % | High Potential Recovery $ |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and Cash Equivalents | A | $ 4,071 | 100% | $ 4,071 | 100% | $ 4,071 |
| Accounts Receivable | B | 20,906 | 80% | 16,658 | 92% | 19,226 |
| Other Current Assets | C | 2,302 | 67% | 1,554 | 77% | 1,783 |
| Oil & Gas Properties | D | n/a | n/a | 300,000 | n/a | 375,000 |
| Other Non-Current Assets | E | 940 | 23% | 215 | 33% | 309 |
| **Gross Liquidation Proceeds** | | | | $ 322,498 | | $ 400,389 |
| **Liquidation Adjustments:** | | | | | | |
| Net Wind-Down Expenses | F | | | (8,982) | | (6,011) |
| Trustee Fees | G | | | (9,576) | | (11,913) |
| Trustee Legal & Financial Advisors | H | | | (9,553) | | (11,890) |
| **Subtotal** | | | | $ (28,111) | | $ (29,813) |
| **Net Liquidation Proceeds Available for Distribution:** | | | | $ 294,388 | | $ 370,576 |

*Gastar Exploration Inc.*

### SUMMARY OF ESTIMATED CLAIMS RECOVERY

| | Notes | Claims Estimate | Low Recovery Estimate % | Low Recovery Estimate $ | High Recovery Estimate % | High Recovery Estimate $ |
|---|---|---|---|---|---|---|
| Administrative Claims | A | $ 46,634 | 100% | $ 46,634 | 100% | $ 46,634 |
| Priority Tax Claims | B | 374 | 100% | 374 | 100% | 374 |
| DIP Claims | C | 310,012 | 74% | 228,730 | 97% | 301,784 |
| Class 1 - Other Secured Claims | D | - | n/a | - | n/a | - |
| Class 2 - Other Priority Claims | E | - | n/a | - | n/a | - |
| Class 3 - Hedge Party Claims | F | 13,300 | 74% | 9,813 | 97% | 12,947 |
| Class 4 - Statutory Lien Claims | G | 8,837 | 100% | 8,837 | 100% | 8,837 |
| Class 5 - Term Loan Claims | H | 50,541 | 0% | - | 0% | - |
| Class 6 - Second Lien Notes Claims | I | 187,495 | 0% | - | 0% | - |
| Class 7 - General Unsecured Claims | J | 6,536 | 0% | - | 0% | - |
| Class 8 - Intercompany Claims | K | - | n/a | - | n/a | - |
| Class 9 - Interests in Debtors Other than Gastar | L | - | n/a | - | n/a | - |
| Class 9 - Existing Preferred Interests | M | - | n/a | - | n/a | - |
| Class 10 - Existing Common Interests | N | - | n/a | - | n/a | - |
| **Total Estimated Claims and Recoveries** | | $ 623,729 | | $ 294,388 | | $ 370,576 |

*Gastar Exploration Inc. — Liquidation*

**Specific Notes to the Liquidation Analysis:**

*Gross Liquidation Proceeds -*

Except as noted herein, the Liquidation Analysis was developed using the unaudited balance sheets for the Debtors as of September 30, 2018. Historical balance sheet amounts, unless otherwise noted herein, are intended to be proxies for actual balances on the date of a hypothetical liquidation.

**A. Cash & Cash Equivalents**

Cash and Cash Equivalents consist of all bank accounts held by the Debtors, including deposit accounts and investment accounts. The pro forma balance is based on the Debtors' forecasted cash balance as of the Liquidation Date, December 31, 2018, which is expected to be fully recoverable.

**B. Accounts Receivable**

Accounts Receivable includes, among other things, $12.2 million in receivables related to the sales of oil and gas, $5.6 million due from joint interest billing ("JIB") partners, and $3.2 million in other accounts receivable. The Company has an allowance for bad debts that is included in the amounts due from JIB parties. Recovery of the oil and gas sales receivables was estimated at 85% to 95%, the JIB receivables at 85% to 95% and other accounts receivable at 50% to 75%. The blended recovery rate for the Debtors' Accounts Receivable was 80% to 92%.

**C. Other Current Assets**

Other Current Assets include, among other things, numerous prepayments and customer deposits. The Company has $0.3 million of prepaid insurance, $0.4 million of prepaid vendor payments, and $1.5 million of other prepaids comprised primarily of retainers for the various bankruptcy professionals. For purposes of the Liquidation Analysis, recovery of the prepaid insurance amount is estimated at 0% to 10%, prepaid vendor payments at 45% to 55%, and other prepaids at 90% to 100% as professional fee amounts are shown as Administrative Expenses. The total blended recovery rate for Debtors' Other Current Assets was 67% to 77%.

**D. Oil and Gas Properties**

Given the daily production and depletion of the oil and gas assets, it is expected that the Trustee will pursue a prudent, prompt, and broad marketing of the assets over a four to six-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures. It is also assumed that the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling or completion of the oil and gas assets other than to the extent necessary to maintain material portions of value.

The adjusted net book value of the Debtors' oil and gas properties as of September 30, 2018 was $293.5 million. The liquidation of the Debtors' oil and natural gas properties would include both proved and unproved reserves and would produce a sale value in the range of $300 million to $375 million based on the application of the income approach (the discounted cash flow method) for both proved and unproved reserves and the market approach (the precedent transaction method) for unproved reserves.

The income approach considered reserve reports with an effective date of January 1, 2019 using the five-year NYMEX strip as of October 1, 2018 for the commodity price forecast. Depending on reserve category, adjustments were made to the reserve report for risking, inflation, workover expenses (not included in reserve report), corporate general and administrative expense and federal

and state income taxes.  The projected cash flows were discounted to present value at 10% based on a weighted average cost of capital estimated using guideline companies.

It is important to note that value range above assumes the sale of all oil and gas assets in an orderly liquidation and does not consider a reduction in value that would exist because of execution risk and the reasonable possibility that not all assets may be sold in a four to six-month period.  It is not possible to quantify the impact of such items with a high degree of certainty.

**E.  Other Non-Current Assets**

Other Non-Current Assets include, among other things, furniture, fixtures, and equipment with a net book value of $0.9 million and prepaid drilling costs of $0.1 million. For purposes of the Liquidation Analysis, recovery of the furniture, fixtures, and equipment at 25% to 35% and recovery of the prepaid drilling costs at 0% to 10%.  The blended recovery rate for the Debtors' Other Non-Current Assets is 23% to 33%.

*Liquidation Adjustments –*

**F.  Net Wind-Down Expenses**

The Liquidation Analysis assumes the chapter 7 liquidation process will take four to six months to complete and that certain limited functions would be required during the liquidation process to effectuate a sale of the assets and the orderly wind-down of the business.  Examples of such costs incurred during a chapter 7 liquidation would include, but are not limited to, expenses associated with salary and hourly compensation, retention or bonus programs to maintain key personnel, and costs associated with the usage of the corporate and field offices.  This Liquidation Analysis includes the cost of an employee retention program equal to 50% of total employee compensation. As discussed above, the liquidation valuation of the oil and gas reserves includes corporate payroll and general & administrative costs that a market participant may consider when valuing these assets. The Liquidation Adjustments include an incremental amount of corporate payroll and general & administrative costs that reflect the Debtors' expected cost structure during the liquidation period.  The Liquidation Analysis does not incorporate any severance costs from the termination of employees.

**G.  Trustee Fees**

Compensation for the chapter 7 Trustee would be limited to fee guidelines in section 326(a) of the Bankruptcy Code.  The Debtors have estimated trustee fees based on the fee guidelines as provided by the US Trustee.

**H.  Trustee Legal & Financial Advisors**

Compensation for the chapter 7 trustee's professionals (counsel and other legal, financial, and professional services) during the chapter 7 case is estimated to be 3% of total liquidation proceeds, excluding cash.

*Claims –*

**A.  Administrative Claims**

Administrative Claims include, among other things, approximately $24.2 million of unpaid post-petition vendor payables, $11.9 million of revenue distributions payable, $9.9 million of unpaid

chapter 11 professional fees and other costs and expenses of administration of the Debtors' estates after the Petition Date, and $0.7 million of other Administrative Claims. The Liquidation Analysis projects a recovery rate of 100%.

**B. Priority Tax Claims**

Priority Tax Claims consist of $0.4 million of property, franchise, and other taxes. The Liquidation Analysis projects a recovery rate of 100%.

**C. DIP Claims**

For purposes of this analysis, DIP Claims consist of $19.0 million of the New Money DIP Loans issued as of the Liquidation Date and $291.0 million of claims related to the refinanced Term Loan consisting of principal and interest accrued at various rates until the Final DIP Order is entered. Interest accrues on the Term Loan at 10.25% up to the date at which the Interim DIP Order is entered and at 9.70% from the date at which the Final DIP Order is entered until the Liquidation Date. The Liquidation Analysis projects an estimated recovery rate of 74% to 97% for holders of DIP Claims.

**D. Class 1 – Other Secured Claims**

There are currently no Other Secured Claims. To the extent such claims exist, the projected recovery is 100%.

**E. Class 2 – Other Priority Claims**

There are currently no Other Priority Claims. To the extent such claims exist, the projected recovery is 100%.

**F. Class 3 – Hedge Party Claims**

Hedge Party Claims consist of $13.3 million of claims arising under or related to the Debtors prepetition hedging and/or swaps program with Cargill, Inc. and NextEra Energy Marketing, LLC. The Liquidation Analysis projects a recovery of 74% to 97% for holders of Hedge Party Claims.

**G. Class 4 – Statutory Lien Claims**

Statutory Lien Claims consist of $8.8 million of claims secured by statutory mechanic's or construction liens. The Liquidation Analysis projects a recovery rate of 100% for holders of Statutory Lien Claims.

**H. Class 5 – Term Loan Claims**

Term Loan Claims consist of all claims arising under the Term Loan Credit Agreement that are not rolled-up into the DIP Credit Agreement. For purposes of this analysis, the book value of the Term Loan including accrued interest is rolled-up into the DIP Credit Agreement on the presumed date the Final DIP Order is entered. For purposes of this analysis Term Loan Claims include the Senior Additional Amount of $50.5 million arising under the Term Loan Credit Agreement that is not rolled-up into the DIP Credit Agreement. Term Loan Claims are expected to receive zero recovery.

**I. Class 6 – Second Lien Notes Claims**

Second Lien Notes Claims consist of all amounts owed under the Second Lien Indenture including principal of $162.5 million, accrued and unpaid interest of $1.6 million, and the Second Lien Additional Amount of $23.4 million. Second Lien Notes Claims are expected to receive zero recovery.

**J.  Class 7 – General Unsecured Claims**

General Unsecured Claims include, among other things, $2.4 million employee obligations, $2.6 million of plugging and abandonment obligations, and $1.6 million of other general unsecured claims.  General Unsecured are expected to receive zero recovery.

**K.  Class 8 – Intercompany Claims**

Intercompany Claims include any claims held by a Debtor or an Affiliate against a Debtor, other than any claims against any Debtor held by the Term Lenders and Second Lien Noteholders. Intercompany Claims are expected to receive zero recovery.

**L.  Class 9 – Interests in Other Debtors than Gastar**

Class 9 consists of all interests in the Debtors other than Gastar. Interests in the Debtors other than Gastar are expected to receive zero recovery.

**M.  Class 10 – Existing Preferred Interests Claims**

Existing Preferred Interests Claims consist of approximately 4,045,000 shares of Series A Preferred Stock and 2,140,000 shares of Series B Preferred Stock issued and outstanding. Existing Preferred Interests Claims are expected to receive zero recovery.

**N.  Class 10 – Existing Common Interests and Subordinated Securities Claims**

Existing Common Interest and Subordinated Securities Claims consist of approximately 219 million shares of Common Stock issued and outstanding. Existing Common Interests and Subordinated Claims are expected to receive zero recovery.

**Exhibit E**

**Financial Projections**

## Financial Projections

The Debtors believe that the Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code, because confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. In connection with the preparation and development of a plan of reorganization and for purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared financial projections ("Projections") for fiscal years 2019 through 2021 ("Projection Period"). The Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS DO NOT REFLECT THE IMPACT OF FRESH START ACCOUNTING, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTORS AND THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE FINANCIAL PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

1) **General Assumptions**

   a. **Overview**

The Debtors are an independent E&P company engaged in the exploration, development, and production of oil and condensate, natural gas, and natural gas liquids with principal operations in Oklahoma.

   b. **Accounting Policies**

The Projections are presented on a consolidated basis and have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements and projections. The Debtors did not prepare the Projections with a view toward compliance with published guidelines of the Securities and Exchange Commission or guidelines established by the Financial Accounting Standards Board, particularly for reorganization accounting. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to ASC 852-10, as issued by the American Institute of Public Accountants.

   c. **Methodology**

Management developed a business plan for the Projection Period based on forecasted production estimates of the Reorganized Debtors' oil and gas reserves, estimated commodity pricing, and estimated future incurred operating, capital expenditure, and overhead costs. The production estimates are based on, among other things, Management's best efforts to forecast the decline curves for existing proved developed producing wells, as well as new wells brought online during the Projection Period. The actual production from new and existing wells could vary considerably from the assumptions used to prepare the production forecast contained herein.

   d. **Plan Consummation**

The operating assumptions assume that the Plan will be confirmed and consummated by December 31, 2018.

2) **Assumptions With Respect to the Projected Income Statement**

   a. **Production**

Oil and gas production volumes are estimates based on decline curves for existing producing wells and wells scheduled to be drilled and completed during the Projection Period. The actual production from new and existing wells could vary considerably from the assumptions used to prepare the production forecast contained herein.

   b. **Commodity Pricing**

Based on October 23, 2018 New York Mercantile Exchange ("NYMEX") strip pricing for crude oil and natural gas. Assumptions regarding realized pricing (i.e., "differentials") from NYMEX are based on both input from Management and existing contracts.

### c.  Operating Expenses

The forecasts for lease operating expenses ("LOE"), workover expenses, transportation expenses, and production taxes are based on historical expenses and future production estimates.

### d.  Income Taxes

Taxes are projected to remain at an effective rate near zero throughout the Projection Period due to the impact of deductions for depletion, depreciation, intangible drilling costs, and NOLs.

### e.  General and Administrative ("G&A")

G&A is primarily composed of personnel costs, rent, and corporate overhead necessary to manage the business and comply with regulatory requirements. Projected G&A is based on current development plans.

### f.  Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA")

EBITDA is projected to improve over the Projection Period primarily due to increasing production levels from newly drilled wells per the Company's go-forward drilling program.

## 3)  Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows

The projected Consolidated Balance Sheets were developed using September 30, 2018 unaudited financial results as a starting point and are adjusted on a go-forward basis, incorporating projected results from operations and cash flows over the Projection Period.

### a.  Pro Forma Adjustments Related to Emergence

The Reorganized Debtors' Pro Forma Balance Sheet as of the Effective Date shows (a) the adjusted balance sheet for the Debtors as of the assumed Effective Date of December 31, 2018, prior to giving effect to the Plan and (b) a balance sheet reflecting certain pro forma adjustments that would result from consummation of the Plan. These adjustments primarily relate to the treatment given to DIP Claims, Term Loan Claims and Second Lien Notes Claims as more fully described in the Plan and the Disclosure Statement.  The Debtors' adjusted December 31, 2018 balance sheet was developed based on the September 30, 2018 unaudited balance sheet and projected results of operations and cash flows over the projected period to the assumed Effective Date of December 31, 2018.  On the Effective Date, actual balances may vary from balances reflected on the adjusted December 31, 2018 balance sheet due to the variance between actual results and forecasts through the Effective Date.  Additionally, the projected cash balance includes estimates for professional fees, payments to lien claimants, and other transaction expenses.  The cash balance at emergence

could vary based on the actual transaction related expenses and other contingencies.  While the 2019 through 2021 Projections roll-forward the effect of pro forma adjustments, fresh-start accounting pursuant to ASC 852-10 principles have not been applied and could materially impact the balances on the projected Pro Forma Balance Sheet.

**b.  Capital Expenditures**

Projections for capital expenditures were prepared with consideration of the Debtors' forecasted drilling program and future estimates of non-operated capital expenditures.  Capital expenditures in 2019, 2020 and 2021 are assumed to be approximately $128.5 million, $257.5 million and $284.3 million, respectively.

**c.  Capital Structure**

Pro forma capital structure reflects the restructuring effectuated via the Plan.

[EXHIBITS BELOW]

# Gastar Exploration Inc.

## Consolidated Projected Income Statements (Unaudited)

(in thousands)

| | Year Ending December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| **TOTAL NET REVENUE (a)** | $ 98,215 | $ 195,238 | $ 279,430 |
| **COST OF OPERATIONS** | | | |
| Operating Expenses | 30,157 | 47,378 | 67,905 |
| Depreciation, Depletion and Amortization | 30,184 | 57,509 | 86,006 |
| Accretion of Asset Retirement Obligation | 276 | 276 | 276 |
| General & Administrative | 16,058 | 18,950 | 25,647 |
| Restructuring Related Expenses | 4,806 | - | - |
| **Total Expenses** | **81,481** | **124,113** | **179,834** |
| **INCOME / (LOSS) FROM OPERATIONS** | **16,734** | **71,124** | **99,596** |
| Interest Expense | 32,682 | 38,963 | 49,780 |
| **NET (LOSS) INCOME** | **$ (15,948)** | **$ 32,161** | **$ 49,816** |
| | | | |
| **ADJUSTED EBITDA** | | | |
| Net (Loss) Income | (15,948) | 32,161 | 49,816 |
| + Interest Expense | 32,682 | 38,963 | 49,780 |
| + Depreciation, Depletion and Amortization | 30,184 | 57,509 | 86,006 |
| + Accretion Expense | 276 | 276 | 276 |
| + General & Administrative - Non-Cash | 2,146 | 876 | 200 |
| + Restructuring Related Expenses | 4,806 | - | - |
| **ADJUSTED EBITDA** | **$ 54,146** | **$ 129,786** | **$ 186,079** |

*Notes:*
(a) Priced using 10/23/2018 Strip

# Gastar Exploration LLC

## Consolidated Projected Balance Sheet (Unaudited)

### (in thousands)

| | Pre-Reorg | Debt Impact | Reclass | Year Ending December 31, | | | |
|---|---|---|---|---|---|---|---|
| | 12/31/2018 | (a) | (b) | 2018 | 2019 | 2020 | 2021 |
| **CURRENT ASSETS** | | | | | | | |
| Cash | $ 3,439 | $ 68,000 | | $ 71,439 | $ 40,777 | $ 20,000 | $ 20,000 |
| Revenue Receivable | 10,050 | | | 10,050 | 15,539 | 23,038 | 28,128 |
| Accounts Receivable, net | 6,274 | | | 6,274 | 13,324 | 17,781 | 20,872 |
| Prepaid Expenses | 2,456 | | | 2,456 | 2,456 | 2,456 | 2,456 |
| **TOTAL CURRENT ASSETS** | 22,221 | 68,000 | - | 90,221 | 72,096 | 63,275 | 71,457 |
| **PP&E** | | | | | | | |
| Total Natural Gas and Oil Properties | 1,507,404 | | | 1,507,404 | 1,635,895 | 1,893,402 | 2,177,720 |
| Furniture and Equipment | 3,615 | | | 3,615 | 3,615 | 3,615 | 3,615 |
| Accumulated DD&A | (1,204,072) | | | (1,204,072) | (1,234,255) | (1,291,764) | (1,377,771) |
| **Total PP&E, net** | 306,947 | - | - | 306,947 | 405,255 | 605,253 | 803,565 |
| **OTHER ASSETS** | | | | | | | |
| Restricted Cash | 25 | | | 25 | 25 | 25 | 25 |
| Advances to Operators | 79 | | | 79 | 79 | 79 | 79 |
| **TOTAL OTHER ASSETS** | 104 | - | - | 104 | 104 | 104 | 104 |
| **TOTAL ASSETS** | $ 329,272 | $ 68,000 | $ - | $ 397,272 | $ 477,455 | $ 668,632 | $ 875,125 |
| **CURRENT LIABILITIES** | | | | | | | |
| Accounts Payable | $ 5,075 | | $ 10,299 | $ 15,373 | $ 44,079 | $ 79,512 | $ 94,074 |
| Revenue Payable | 8,224 | | | 8,224 | 3,565 | 1,099 | 1,579 |
| Accrued Drilling and Operating Costs | 7,555 | | | 7,555 | 7,555 | 7,555 | 7,555 |
| Advances from non-Operators | 623 | | | 623 | 623 | 623 | 623 |
| Other Accrued Liabilities | 2,644 | | | 2,644 | 2,925 | 2,925 | 2,925 |
| Liabilities Subject to Compromise | 187,545 | (163,946) | (23,599) | - | - | - | - |
| **TOTAL CURRENT LIABILITIES** | 211,666 | (163,946) | (13,300) | 34,420 | 58,747 | 91,713 | 106,756 |
| **LONG TERM DEBT** | | | | | | | |
| DIP Financing | 318,279 | (318,279) | | - | - | - | - |
| Exit Financing | - | 300,000 | | 300,000 | 332,682 | 369,754 | 411,067 |
| RBL Financing | - | | | - | - | 87,824 | 187,669 |
| Hedge Claim Note Payable | - | | 13,300 | 13,300 | | | |
| **TOTAL NON CURRENT LIABILITIES** | 318,279 | (18,279) | 13,300 | 313,300 | 332,682 | 457,579 | 598,737 |
| **OTHER LONG TERM LIABILITIES** | | | | | | | |
| Asset Retirement Obligation | 2,646 | | | 2,646 | 2,922 | 3,198 | 3,474 |
| **TOTAL OTHER LONG TERM LIABILITIES** | 2,646 | - | - | 2,646 | 2,922 | 3,198 | 3,474 |
| **TOTAL LIABILITIES** | 532,590 | (182,225) | - | 350,365 | 394,350 | 552,489 | 708,966 |
| **SHAREHOLDERS' EQUITY** | | | | | | | |
| Equity | 572,341 | 250,225 | - | 822,565 | 874,712 | 875,588 | 875,788 |
| Accumulated Deficits | (775,659) | | | (775,659) | (791,607) | (759,445) | (709,630) |
| **TOTAL SHAREHOLDERS' EQUITY** | (203,318) | 250,225 | | 46,907 | 83,105 | 116,143 | 166,159 |
| **TOTAL LIABILITIES AND EQUITY** | $ 329,272 | $ 68,000 | $ - | $ 397,272 | $ 477,455 | $ 668,632 | $ 875,125 |

**Notes:**

(a) Reflects the proceeds of exit financing and extinguishment of debt pursuant to the Plan.

(b) Reflects the reclass of estimated Statutory Lien Claims and Hedge Party Claims pursuant to the Plan.

# Gastar Exploration Inc.

## Consolidated Projected Statement of Cash Flows (Unaudited)

### (in thousands)

| | Year Ending December 31, | | |
|---|---|---|---|
| | **2019** | **2020** | **2021** |
| **CASH FLOW FROM OPERATING ACTIVITIES** | | | |
| Net Income / (Loss) | $ (15,948) | $ 32,161 | $ 49,816 |
| **Adjustments to Reconcile Net Income to Net** | | | |
| **Cash Provided by Operating Activities:** | | | |
| Depreciation, depletion and amortization | 30,184 | 57,509 | 86,006 |
| General & Administrative - non-cash | 2,146 | 876 | 200 |
| Paid-in-kind interest | 32,682 | 37,072 | 41,313 |
| Accretion of asset retirement obligation | 276 | 276 | 276 |
| Accounts receivable | (12,538) | (11,956) | (8,181) |
| Accounts payable and accrued liabilities | 24,327 | 32,967 | 15,043 |
| **NET CASH PROVIDED BY OPERATING ACTIVITIES** | **61,129** | **148,906** | **184,473** |
| **CASH FLOW FROM INVESTING ACTIVITIES** | | | |
| Development and purchase of oil and gas properties | (128,491) | (257,507) | (284,318) |
| **NET CASH PROVIDED BY INVESTING ACTIVITIES** | **(128,491)** | **(257,507)** | **(284,318)** |
| **CASH FLOW FROM FINANCING ACTIVITIES** | | | |
| Proceeds (Repayment) of long term debt | - | 87,824 | 99,845 |
| Proceeds (Repayment) of hedge claim notes | (13,300) | - | - |
| Proceeds from issuance of equity | 50,000 | - | - |
| **NET CASH PROVIDED BY FINANCING ACTIVITIES** | **36,700** | **87,824** | **99,845** |
| **TOTAL CASH FLOW** | | | |
| Cash and cash equivalents at beginning of period | 71,439 | 40,777 | 20,000 |
| Change in cash from net activities | (30,662) | (20,777) | - |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | **$ 40,777** | **$ 20,000** | **$ 20,000** |