# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| GASTAR EXPLORATION INC., *et al.*,[1] | § | Case No. 18-36057 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § | (Emergency Hearing Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION
## FOR ENTRY OF INTERIM AND FINAL
## ORDERS (I) AUTHORIZING THE DEBTORS TO
## OBTAIN POSTPETITION SECURED FINANCING,
## (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING
## THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE
## PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI)
## SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

> THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.
>
> EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR NOVEMBER 1, 2018, AT 2:30 P.M. (CT) BEFORE THE HONORABLE MARVIN ISGUR, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.
>
> REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Gastar Exploration Inc. (1640) and Northwest Property Ventures LLC (8685). The location of the Debtors' service address is: 1331 Lamar Street, Suite 650, Houston, Texas 77010.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state the following in support of this motion:

## Relief Requested

1.     The Debtors seek entry of interim substantially in the form attached hereto as **Exhibit A** (the "Interim Order")[3] and a Final Order (the "Final Order,"[4] and together the "DIP Orders") approving the Debtors' entry into the DIP Facility and granting related relief.  In support of this motion, the Debtors respectfully submit the *Declaration of Kevin M. Cofsky In Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, [Docket No. 16] (the "Cofsky Declaration") and the First Day Declaration.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days days of the Petition Date, to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

---

[2]     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Michael A. Gerlich, Chief Financial Officer and Senior Vice President of Gastar Exploration Inc., in Support of Chapter 11 Petitions and First Day Motions*, (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on October 31, 2018 (the "Petition Date").

[3]     Capitalized terms not otherwise defined herein will have the meaning ascribed to them in the Interim Order.  The description of the capital structure (including the priority, perfection, and collateral (if any)) of the Debtors contained herein is solely for illustrative purposes.  To the extent that there is any discrepancy between the Interim Order and this motion, the terms of the Interim Order, as entered by the Court, shall control.

[4]     The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

*Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Complex Case Procedures").

## Preliminary Statement

5.      This motion requests that the Court approve the new superpriority debtor-in-possession financing facility in an aggregate amount of approximately $383.9 million[5] (the "DIP Facility") by and between the Debtors, certain funds affiliated with Ares Management LLC (collectively, the "DIP Lenders"), and Wilmington Trust, National Association, as administrative agent (in such capacity, the "DIP Agent," and together with the DIP Agent, the "DIP Secured Parties").  The DIP Facility will provide the Debtors with sufficient liquidity for, among other things, general working capital purposes and funding the administration of these chapter 11 cases, in each case in accordance with a budget agreed to by the DIP Lenders (the "Budget").

---

[5]     This amount does not account for accrued, but unpaid interest.

6.      As described in the First Day Declaration, absent entry into the DIP Facility, the Debtors will have insufficient liquidity to continue operating in the ordinary course.  The liquidity provided by the DIP Facility—which is the only financing available to the Debtors after an extensive marketing process—will ensure the Debtors can continue to operate uninterrupted in the ordinary course of business and will provide the Debtors with sufficient time to consummate a restructuring of their business.

7.      The DIP Facility was the product of extensive, arm's-length negotiations with the DIP Lenders and was preceded by a 15-month prepetition marketing process (which included requests for financing proposals).  As described in the First Day Declaration and the Cofsky Declaration, in late 2016, the Debtors commenced a marketing process that ultimately resulted in a comprehensive refinancing of their balance sheet that closed on March 3, 2017.  The Debtors intended for this refinancing to allow them to weather the industry storm, further develop and prove out their acreage, and bridge to capital market access at a later and more opportune date. Due to certain operational challenges, as detailed in the First Day Declaration, the Debtors were not able to survive the downturn without additional liquidity-enhancing transactions, as they had hoped.  The Debtors ultimately determined to pursue further strategic alternatives.

8.      In August 2017, the Debtors retained Tudor, Pickering, Holt & Co. LLC ("TPH") (and later Perella Weinberg Partners LP ("PWP")) to assist in their review of strategic alternatives. In September 2017, TPH commenced a process seeking to sell the Debtors' non-core assets outside of the STACK region.  While the Debtors were successful in selling certain non-core assets, they did not receive any actionable comprehensive financing, merger, or sale proposals.  In May 2018, facing increasingly tight liquidity, and a dearth of comprehensive sale, merger, or refinancing

options, it became clear to Gastar's board of directors (the "Board") that it was necessary to pursue a transformative transaction, including potentially through a chapter 11 filing.

9.       Prior to commencing these chapter 11 cases, however, the Board determined to go to the market once more to solicit comprehensive out-of-court merger, sale, financing, and refinancing proposals.  After an extensive marketing process, however, the Debtors were unable to secure an actionable comprehensive proposal.  In parallel with their marketing efforts, the Debtors engaged with funds affiliated with Ares Management LLC ("Ares")—the Debtors' largest and only funded-debt creditors and largest shareholder—regarding a restructuring transaction. Through extensive, arm's-length negotiations, the Debtors and Ares agreed to the terms of the restructuring set forth in the restructuring support agreement (the "Restructuring Support Agreement"), dated October 26, 2018.  Accordingly, the Debtors determined to proceed with their best and only alternative—the restructuring contemplated by the Restructuring Support Agreement.  As part of the Restructuring Support Agreement, Ares has agreed to fund the DIP Facility which will ultimately convert to a first lien exit facility.

10.      In addition to the Debtors' broader restructuring negotiations and marketing efforts, PWP and TPH conducted a marketing process to determine the availability of other debtor-in-possession financing sources.  Based on the results of this marketing process, alternative debtor-in-possession financing on terms superior to those contained in the DIP Facility is presently unavailable to the Debtors.  PWP and TPH contacted 21 potential investors and interested parties that PWP and TPH determined could have the interest and financial wherewithal to fund a debtor-in-possession financing facility the size of the DIP Facility.  Each of these potential investors rejected the opportunity to provide alternative debtor-in-possession financing.  In light of the Debtors' approximately $446.4 million in prepetition secured debt and the fact that Ares has

expressed both its interest in providing debtor-in-possession financing and its objection to any "priming" debtor-in-possession financing third-party, no parties that PWP and TPH contacted were interested in providing junior debtor-in-possession financing or investing the time and cost necessary to provide debtor-in-possession financing on a nonconsensual, priming basis.

11.      The DIP Facility will provide the Debtors with immediate access to liquidity that is necessary to fund the Debtors' operations, stabilize the Debtors' businesses during the pendency of these chapter 11 cases, and ensure that the value-maximizing transaction contemplated by the Restructuring Support Agreement is consummated.  The DIP Facility also provides committed financing to fund the Debtors' emergence from chapter 11.

12.      No party that PWP or TPH contacted as part of the above-described process was interested in providing, or willing to provide, postpetition financing to the Debtors on more favorable terms.  Thus, providing the DIP Lenders with the protections described in this motion is reasonable and appropriate here, as it will allow the Debtors to obtain the critical financing they need to fund their operations, preserve their assets, and provide assurances to vendors and customers that the Debtors have sufficient liquidity to continue their operations in the ordinary course, without disruption.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases**

13.      The Debtors seek entry of the DIP Orders:

a.      ***DIP Facility:***  authorizing the Debtors to enter into a new superpriority debtor-in-possession financing facility in the aggregate principal amount of approximately $383.9 million, which shall include (a) up to $100 million in new money financing (the "New Money Loans") and (b) approximately $283.9 million of refinanced Term Obligations consisting of outstanding principal and accrued and unpaid interest under the Term Facility as of the Petition Date (the "Refinanced Loans");

b.      ***DIP Loan Documents:***  authorizing the Debtors to enter into the Superpriority Debtor-in-Possession Credit Agreement dated as of

October 31, 2018, among the Debtors, the DIP Lenders, and the DIP Agent, substantially in the form attached hereto as **Exhibit B** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement") and certain ancillary documentation (together with the DIP Credit Agreement, the "DIP Loan Documents");

c.   ***Adequate Protection:***  authorizing the Debtors to grant adequate protection in connection with the prepetition indebtedness and all related security agreements and all of the Debtors' secured obligations arising thereunder;

d.   ***Cash Collateral:***  authorizing the Debtors to continue to use Cash Collateral of the DIP Agent, the Term Agent (on behalf of the Term Lenders and the Hedge Counterparties), and the Second Lien Trustee subject to the restrictions set forth in the DIP Loan Documents and the Interim Order and the granting of adequate protection to the Term Facility Secured Parties, The Hedge Counterparties and the Second Lien Secured Parties (each as defined herein) with respect thereto;

e.   ***Superpriority Claims and DIP Liens:***  granting first priority priming liens on all encumbered and unencumbered assets of the Debtors (whether existing as of the Petition Date or after-acquired, tangible or intangible, and comprising real or personal property), which liens shall prime all other liens and claims, including the liens securing the Term Obligations and the Second Lien Obligations but junior priority liens on all assets of the Debtors to the extent that such assets are subject to valid, perfected and unavoidable Permitted Liens (as defined in the DIP Loan Documents) in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable Permitted Liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (other than the existing liens and claims in respect of the Term Obligations and the Second Lien Obligations, which existing liens and claims will be primed by the liens described herein (such liens and security interests, collectively, the "DIP Liens");

f.   ***Automatic Stay:***  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders; and

g.   ***Final Hearing:***  scheduling a final hearing (the "Final Hearing") on the motion.

14.   The following chart contains a summary of the material terms of the proposed DIP

Facility, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[6]

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Gastar Exploration Inc. ("Gastar"), as debtor-in-possession in these chapter 11 cases.<br>*See* DIP Credit Agreement Preamble; Interim Order Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Gastar and Northwest Property Ventures LLC ("Northwest").<br>*See* DIP Credit Agreement, Art. I. |
| **DIP Financing Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The parties set forth on schedule 2.01 to the DIP Credit Agreement.<br>*See* DIP Credit Agreement, Schedule 2.01. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The earliest of:<br>(a) February 15, 2019;<br>(b) 30 days after the Petition Date if the Final Order Entry Date shall not have occurred by such date;<br>(c) the earlier of the effective date and the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code), in each case, of the Acceptable Plan that has been confirmed by a Final Order; and<br>(d) the date of termination of the Lenders' commitments and the acceleration of any outstanding extensions of credit, in each case, under the DIP Credit Agreement.<br>*See* DIP Credit Agreement, Art. I. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | (a) New Money Interim Loan:<br>   a. Not less than $2,500,000 for the initial Borrowing and not less than $500,000 for each subsequent Borrowing (or, if less, the amount of the remaining New Money Interim Commitment), and, in any event, in an amount not to exceed the New Money Interim Commitment or the Borrowing Cap.<br>(b) New Money Final Loan:<br>   a. Not less than $500,000 for each Borrowing (or, if less, the amount of the remaining New Money Final Commitment), and, in any event, not to exceed the New Money Final Commitment or the Borrowing Cap.<br>(c) New Money Reserve Loan:<br>   a. Not less than $500,000 for each Borrowing (or, if less, the amount of the remaining New Money Reserve Commitment), and, in any event, |

---

6 The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
| --- | --- |
| | not to exceed the New Money Reserve Commitment or the Borrowing Cap. |
| | *See* DIP Credit Agreement, Art. I, Art. II, § 2.02. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | <u>Conditions to New Money Interim Loans</u>:<br><br>(a) *Loan Documents*.  The DIP Documents shall be fully executed.<br><br>(b) *Organizational Documents*.  The DIP Agent shall have received all corporate documentation required pursuant to the DIP Documents.<br><br>(c) *Collateral*.  The DIP Agent, for the benefit of the Secured Parties, shall have been granted a perfected lien on the Collateral by the DIP Orders on the terms and conditions set forth therein and in the other Loan Documents.<br><br>(d) *Initial Budget*.  The Majority Lenders shall have received the Initial Budget.<br><br>(e) *Fees and Expenses*.  The DIP Agent and the Lenders shall have received all fees and expenses due and payable to the Secured Parties on or prior to the Closing Date.<br><br>(f) *Required Documentation*.  At least three (3) Business Days prior to the Effective Date, the DIP Agent and the Lenders shall have received all requested documentation pursuant to the terms of the DIP Credit Agreement.<br><br>(g) *Bankruptcy Related Conditions*.<br><br>    a. The  Chapter 11 Cases shall have been commenced and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases and be in form and substance reasonably acceptable to the Majority Lenders;<br><br>    b. The Interim Order shall have been entered by the Bankruptcy Court within five (5) days after the Petition Date; and<br><br>    c. All Non-DIP Orders shall be in form and substance reasonably satisfactory to the Majority Lenders.<br><br><u>Conditions to All Loans</u>:<br><br>(a) *Representations and Warranties*.  The representations and warranties shall be true and correct in all material respects.<br><br>(b) *No Default*. At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.<br><br>(c) *Borrowing Request*.  The DIP Agent shall have received a Borrowing Request in accordance with Section 2.03.<br><br>(d) *No Material Adverse Effect*. There shall have been no Material Adverse Effect.<br><br>(e) *DIP Orders*.  The Final Order shall have been entered no later than 30 days after the Petition Date and each DIP Order, as the case may be, shall be in full force and effect.<br><br>(f) *Compliance with Orders*.  The Credit Parties shall be in compliance with the DIP Orders in all respects and the Non-DIP Orders in all material respects. |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (g) *Budget.* The DIP Agent and the Lenders shall have received all periodic updates required under the Approved Budget and the Credit Parties shall be in compliance with the Approved Budget.<br><br>(h) *No Trustee, Examiner or Receiver.* No trustee, examiner or receiver shall have been appointed or designated.<br><br>(i) *Approvals.* Each Credit Party shall have obtained all approvals required from any Governmental Authority and all consents of other Persons.<br><br>(j) *No Other Proceedings.* Other than the Chapter 11 Cases there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality which relates to the DIP Facility or the transactions contemplated hereby except for claims, actions, suits, investigations, litigation or proceedings otherwise stayed by 11 U.S.C. 362.<br><br>(k) Each of the conditions in Section 4.01 shall have been satisfied (or waived by the Majority Lenders).<br><br>*See* DIP Credit Agreement, Art. IV, § 4.01. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will bear interest at a rate of adjusted LIBOR (subject to a 2.0% floor) plus 7.5% per annum and such interest rate shall increase to adjusted LIBOR (subject to a 2.0% floor) plus 10.0% for DIP Loans outstanding for more than 90 days.  Interest on the New Money Loans shall be paid in cash monthly and upon any repayment or prepayment.  Interest on the Refinanced Loans shall be paid in kind and any reference to "principal amount" of the Refinanced Loans shall include any interest so capitalized and added to the principal amount thereof.<br><br>*See* DIP Credit Agreement, Art. II, § 2.10. |
| **DIP Make-Whole**<br>Bankruptcy Rule 4001(c)(1)(B) | Whether voluntary or mandatory, and with respect to each repayment or prepayment of the DIP Loans, any acceleration of the DIP Loans or any other satisfaction or discharge of the DIP Loans prior to February 15, 2019, the Borrower shall pay to the DIP Agent, for the ratable benefit of the DIP Lenders, with respect to the amount of the DIP Loans repaid, prepaid, accelerated, satisfied or discharged, in each case, concurrently with such repayment, prepayment, acceleration, satisfaction or discharge, an amount equal to the Make Whole Amount (as defined and calculated in the Term Credit Agreement).<br><br>Notwithstanding the foregoing, no Make-Whole Amount shall be payable (a) with respect to any Excluded Make-Whole Prepayments (as defined below), which shall not include, for the avoidance of doubt, and prepayment in connection with a sale pursuant to section 363 of the Bankruptcy Code, or (b) if the DIP Loans are repaid and otherwise satisfied pursuant to the Acceptable Plan.<br><br>"Excluded Make-Whole Prepayments" shall mean any prepayment in connection with an Asset Sale or Casualty Event (as such terms are defined in the DIP Credit Agreement). |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii) | The proceeds of the New Money Loans will be used in a manner consistent with the uses set forth in section 3.24.  No part of the proceeds of the New Money Loans will be used, whether directly or indirectly, to purchase or carry any margin stock (as defined in Regulation U issued by the Board).  The Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of the New Money Loans (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.  The Borrower will not fund all or part of any repayment of the Obligations out of proceeds derived from transactions which would be prohibited by Sanctions or would otherwise cause any Person to be in breach of Sanctions.<br><br>No proceeds of the DIP Loans, the DIP Collateral, the Prepetition Collateral, or any portion of the Carve Out may be used for the payment of (i) the fees and expenses of any person incurred in (A) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any DIP Secured Party, Term Facility Secured Party, Hedge Counterparty or Second Lien Party for the purpose of challenging the amount, validity, extent, perfection, priority, characterization, or enforceability of or asserting any defense, counterclaim or offset to the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Term Obligations, the Term Liens, the Hedge Obligations, the Hedge Liens, the Term Administrative Expense Claim, the Second Lien Obligations, the Second Lien Notes Liens, the Second Lien Administrative Expense Claim, and the Adequate Protection Liens; or (B) asserting any other claims, causes of action, adversary proceeding, or other litigation or actions (including, without limitation, any Avoidance Actions (as defined below)) against any DIP Secured Party, Term Facility Secured Party, Hedge Counterparty or Second Lien Party that would hinder or delay the assertion, enforcement, or realization on the DIP Collateral or the Cash Collateral in accordance with the DIP Loan Documents, the Term Loan Documents, the Hedge Documents, the Second Lien Documents, or this Interim Order; or (ii) any other purposes not expressly permitted under the DIP Loan Documents.<br><br>Subject to entry of the Final Order, up to $25,000 in the aggregate proceeds of the DIP Loans, the DIP Collateral, the Prepetition Collateral, and/or the Carve Out may be used to pay fees and expenses of the professionals retained by any Committee that are incurred in connection with investigating the matters covered by the stipulations contained in Paragraph J of this Interim Order; provided, however that no portion of such amount may be used by a Committee or any other party to prosecute or support any claims or challenges.<br><br>So long as the Final Order is entered by the Bankruptcy Court within 30 days after the Petition Date, no proceeds of the DIP Loans or the DIP Collateral may be used for the payment of the fees and expenses of any professional retained (or to be retained) in these Chapter 11 Cases, other than the fees and expenses of the DIP Agent and DIP Lenders, during the period between entry of this Interim Order and entry of the Final Order. Nothing in this paragraph 4(c) shall alter or otherwise impair the Carve Out as set forth in paragraph 11.<br><br>*See* DIP Credit Agreement, Art. VI, § 5.09; Interim Order ¶ 4. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral:<br><br>    (a)   Term Facility Secured Parties;<br><br>    (b)   Hedge Counterparties; and<br><br>    (c)   Second Lien Secured Parties.<br><br>*See* Interim Order ¶¶ 13–14. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) |     (a)   *Upfront Fee.*  Non-refundable upfront fee in cash in an amount equal to 1.75% of the aggregate New Money Commitment on the Effective Date. |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (b) *Commitment Yield Enhancement.*  Non-refundable yield enhancement in cash in an amount equal to 1.75% of the aggregate New Money Commitment. |
| | (c) *Administrative Agent Fees.*  The Borrower shall pay to the DIP Agent, for its own account, the administrative agent fees and expenses in the amounts and at the times set forth in the Fee Letter. |
| | *See* DIP Credit Agreement, Art. II, § 2.12; Interim Order ¶ 5. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The Approved Budget was prepared in good faith based on assumptions believed by the Credit Parties to be reasonable at the time made. *See* DIP Credit Agreement § 5.01. *See* Interim Order <u>Exhibit 1</u>. |
| **Reporting Information** Bankruptcy Rule 4001(c)(l)(B) | As soon as available and in any event on the fourth Business Day of each week covered in the Approved Budget, commencing with Thursday of the second full week after the Petition Date, a proposed 13-Week Budget, and, upon approval thereof by the Majority Lenders, such 13-Week Budget shall become the Approved Budget; <u>provided</u> that if such proposed 13-Week Budget is not satisfactory to the Majority Lenders in their sole discretion and not approved by the Majority Lenders, the Approved Budget that is then in effect shall remain in place. *See* DIP Credit Agreement, Art. VI, § 5.01. |
| **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) | On each Budget Testing Date (prior to 5:00 p.m. pacific time), (i) a variance report by email and certified by the chief financial officer of the Borrower, in form and substance acceptable to the Majority Lenders in their sole discretion, setting forth (x) each of the actual cash receipts and disbursements for the immediately preceding calendar week on a cumulative basis and the aggregate liquidity as of the end of such calendar week and (y) the variance in dollar amounts of the actual cash receipts and disbursements (including debt service but excluding fees and expenses of the Lenders and any professional fees) for each weekly period from those reflected for the corresponding period in the Approved Budget and including explanations for all material variances (including whether such variance is permanent in nature or timing related), (ii) an analysis, certified by the chief financial officer of the Borrower, demonstrating that, subject to and after giving effect to the application of any Carry Forward Amount, a Budget Event shall not have occurred for such week (if applicable) and (iii) a "flash" cash report detailing all cash and Cash Equivalents of each of the Credit Parties (broken out by entity) as of the close of business on the last Business Day of the prior week. *See* DIP Credit Agreement, Art. VII, § 5.01. |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | The Consenting Parties' support for the Restructuring Transaction shall be subject to the timely satisfaction of the following Milestones: |
| | (a) The Company shall have commenced the solicitation of the Plan by no later than October 26, 2018. |
| | (b) The Company shall have concluded the solicitation of the Plan by no later than October 31, 2018. |
| | (c) The Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court by no later than October 31, 2018. |
| | (d) On the Petition Date, the Company shall have filed (i) the Plan, (ii) the Disclosure Statement, and (iii) a motion for approval of the Disclosure |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | Statement and solicitation procedures and to set a hearing to consider confirmation of the Plan. |
| | (e) Within five (5) days following the Petition Date, the Bankruptcy Court shall have entered the Interim Order. |
| | (f) Within thirty (30) days following the Petition Date, the Bankruptcy Court shall have entered the Final Order. |
| | (g) Within sixty (60) days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and confirming the Plan (the "Confirmation Order"). |
| | Within twenty (20) days following the entry of the Confirmation Order, the Plan shall have been consummated. |
| | *See* DIP Credit Agreement, Art. I. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | The liens contemplated by the DIP Credit Agreement will follow the following priority: |
| | The DIP Liens will be junior to the Hedge Liens and the Permitted Liens, but senior to the Term Liens and Second Lien Notes Liens. |
| | *See* Interim Order ¶¶ 14–17. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) | The "Carve Out" shall have the meaning set forth in the DIP Orders. |
| | *See* DIP Credit Agreement, Art. I. |
| | *See* Interim Order ¶ 11. |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) | The stipulations and admissions contained in this Interim Order, including, without limitation, in Paragraph [J] of this Interim Order, shall be binding on the Debtors' estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) and all parties in interest, including, without limitation, any statutory committee appointed in the Chapter 11 Cases, unless a party has timely commenced a contested matter or adversary proceeding (a "Challenge") after obtaining requisite standing and authority (a) challenging the amount, validity, or enforceability of the Term Obligations or the Second Lien Obligations, (b) challenging the perfection or priority of the Primed Liens, (c) challenging the existence of any DIP Collateral, or (d) otherwise asserting any objections, claims, or causes of action (including, without limitation, any actions for preferences, fraudulent conveyances, or other avoidance power claims) against the Primed Parties relating to the Primed Liens, the Term Obligations, the Second Lien Obligations, the Term Loan Documents, or the Second Lien Documents no later than the earlier of (i) 40 days after the Petition Date or (ii) thirty (30) days after the appointment of a Committee.  If no such Challenge is timely commenced as of such dates then, without further order of the Bankruptcy Court, to the extent not theretofore indefeasibly repaid, satisfied, or discharged, as applicable, the claims, liens, and security interests of the Primed Parties shall, without further order of the Bankruptcy Court, be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount or otherwise. Notwithstanding anything to the contrary therein (other than as set forth in Paragraph [J]), if no Challenge is timely commenced and sustained, the stipulations contained in Paragraph [J] of this Interim Order shall be binding on the Debtors' estates, any statutory committee appointed in the Chapter 11 Cases, and all parties in interest.  If any such Challenge is timely commenced and/or sustained, the stipulations contained in Paragraph [J] shall nonetheless remain binding on the Debtors' estates, any statutory committee |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | appointed in the Chapter 11 Cases, and all parties in interest (other than as set forth in Paragraph [J]), except to the extent that such stipulations were expressly challenged in such Challenge.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory committee appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges.  For the avoidance of doubt, as to the Debtors, all Challenges and any rights to assert any Challenges are hereby irrevocably waived and relinquished as of the Petition Date.<br><br>*See* Interim Order ¶ 27. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The Term Facility Secured Parties and the Second Lien Secured Parties shall be entitled to adequate protection of their interests in the Primed Collateral (including the Cash Collateral), and the Hedge Counterparties shall be entitled to adequate protection of their interests in the Hedge Collateral (including the Cash Collateral), as set forth in Paragraphs 13, 14, and 15 below, respectively, in an amount equal to the aggregate diminution in value (if any) of the Primed Collateral or the Hedge Collateral, as applicable, resulting from the sale, lease, or use by the Debtors of the Primed Collateral or Hedge Collateral, as applicable, (including the Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution, the "Adequate Protection Obligations").<br><br>The terms of the Adequate Protection (as defined below) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and are sufficient to allow the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to permit the DIP Liens and the DIP Superpriority Claims to prime the Primed Liens on the Primed Collateral, but not, for avoidance of doubt, the Hedge Liens on the Hedge Collateral.<br><br>*See* Interim Order ¶¶ 13 and 14. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The following events shall constitute "Events of Default"<br><br>(a)  *Non-Payment*. Any Credit Party shall fail to pay any principal, or premium on any Loan or (ii) any Credit Party shall fail to pay any fee or any other amount;<br><br>(b)  *Representations and Warranties*.  Any representation or warranty shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing;<br><br>(c)  *Covenants*.  The Borrower or any Subsidiary shall fail to observe or perform (i) any term, covenant, condition or agreement contained in Section 5.01(j), Section 5.01(k), Section 5.01(l), Section 5.02, Section 5.03 (with respect to the Borrower's or any Subsidiary's existence), Section 5.07(b), Section 5.09, Section 5.18, Section 5.19 or in Article VI or (ii) any other term, covenant, condition or agreement contained in the DIP Credit Agreement;<br><br>(d)  *DrillCo Agreement*.  The Borrower or any Subsidiary shall fail to make any payment required under the DrillCo Agreement;<br><br>(e)  *Cross-Default*.  The Borrower or any Subsidiary shall fail to make any payment in respect of any Material Indebtedness;<br><br>(f)  *Restructuring Support Agreement*.  (i) Any Credit Party or any of its Subsidiaries files or supports a motion that has been filed to reject the Restructuring Support |

14

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | Agreement, (ii) the Restructuring Support Agreement is terminated for any reason other than as a result of a default thereunder by the holders of the Prepetition Obligations or (ii) the occurrence of a default by any Credit Party or any of its Subsidiaries under the Restructuring Support Agreement; |
| | (g) *Judgments*.  One or more judgments for the payment of money in an aggregate amount in excess of $500,000 shall be rendered against the Borrower or any Subsidiary; |
| | (h) *ERISA*.  An ERISA Event shall have occurred that, in the opinion of the Majority Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; |
| | (i) *Guarantee*.  The delivery by any Guarantor to the DIP Agent of written notice that a Guarantee under Article VII has been revoked; |
| | (j) *Invalidity of Loan Documents*.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be valid and enforceable; |
| | (k) *Drillco*.  Any Lien granted to a Credit Party by the DrillCo Investor under or related to the DrillCo Operating Agreement fails to be senior to all other Liens granted by the DrillCo Investor in the Property encumbered thereby; |
| | (l) *Budget Event*. Subject to and after giving effect to the application of any Carry Forward Amount, there occurs any Budget Event; |
| | (m) *Liens; Additional Security Documents*.  (i) Any Credit Party or its Subsidiaries shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the DIP Agent and/or the Lenders; |
| | (n) *Conversion to Chapter 7*.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting any Chapter 11 Case to a Chapter 7 case; |
| | (o) *Alternate Financing*. Any Credit Party shall propose, consent to, cooperate with, solicit votes with respect to, acquiesce to, support or file a motion in any of the Chapter 11 Cases without the express written consent of the Majority Lenders (x) to obtain additional financing from a party other than the Lenders under section 364(d) of the Bankruptcy Code or (y) to use Cash Collateral of a Lender under section 363(c) of the Bankruptcy Code, unless, in either case of (x) or (y), such plan provides for the Discharge of Obligations and payment of all Prepetition Obligations in full in cash upon the incurrence of such additional financing or such plan is an Acceptable Plan; |
| | (p) *Prepetition Claims*.  Any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in the "first day orders" and included in the Approved Budget (subject to and after giving effect to the application of any Carry Forward Amount and any permitted variance), or (y) otherwise consented to in writing by the Majority Lenders in their sole discretion, (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | any holder of any security interest to permit foreclosure on any assets having a book value in excess of $500,000 in the aggregate, or (iii) except with respect to the Prepetition Indebtedness, approving any settlement or other stipulation not approved by the Majority Lenders or not authorized by the Bankruptcy Court and not included in the Approved Budget (subject to and after giving effect to the application of any Carry Forward Amount and any permitted variance) with any secured creditor of any Credit Party providing for Adequate Protection Payments or other payment to such secured creditor; |

(q)   *Other Proceedings.*  Other than the Chapter 11 Cases or any ancillary non-U.S. proceeding, scheme or process requested by the Lenders, the commencement or pendency of any involuntary or voluntary insolvency proceeding, scheme or like processes pending in any jurisdiction with respect any Credit Party;

(r)   *Appointment of Trustee or Examiner.*  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Credit Party, or any Subsidiary of a Credit Party shall file an application for an order with respect to any of the Chapter 11 Cases or otherwise seeking the appointment of, (i) a trustee under section 1104, (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code or (iii) a receiver;

(s)   *Dismissal of Chapter 11 Cases.*  An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision upon entry thereof for each of (i) Discharge of Obligations and (ii) payment in full of the Prepetition Obligations;

(t)   *Order With Respect to Chapter 11 Cases*.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Majority Lenders;

(u)   *Application for Order By Third Party*.  An application for any of the orders described in clause (n) above shall be made by a Person other than the Credit Parties and such application is not contested by the Credit Parties in good faith or the relief requested is not withdrawn, dismissed or denied within 30 days after filing or any Person obtains a Final Order under §506(c) of the Bankruptcy Code against the DIP Agent or obtains a Final Order adverse to the DIP Agent or the Lenders or any of their respective rights and remedies under the Loan Documents or in the Collateral, unless such plan provides for the Discharge of Obligations and payment of all Prepetition Obligations in full in cash upon the incurrence of such additional financing or such plan is an Acceptable Plan;

(v)   *DIP Orders.*  (i) A violation by any Credit Party of any term, provision or condition in any DIP Order, (ii) Any DIP Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Majority Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the DIP Agent, the DIP Agent) or (iii) any DIP Order shall cease to be in full force and effect;

(w)   *Right to File Chapter 11 Plan.*  The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party to file a Chapter

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
| --- | --- |
| | 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Majority Lenders; |
| | (x) *Invalidation of Claims.* Any Credit Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Credit Party) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of (i) the Obligations or contest any Loan Document, or any material provision of any Loan Document shall cease to be effective (other than in accordance with its terms) or (ii) the Prepetition Obligations or to challenge the validity and enforceability of the liens in favor of the holders thereof; |
| | (y) *Liquidation.* The determination of any Credit Party or any of its Subsidiaries, whether by vote of such Person's board of directors or otherwise, to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or to conduct any sales of all or substantially all of such Person's assets, or the filing of a motion or other application in the Cases except as permitted by the DIP Credit Agreement; |
| | (z) *Public Announcements.* Any Credit Party files or publicly announces its intention to file a Chapter 11 plan that contains terms and conditions that are inconsistent in any material respect with the Acceptable Plan or any exhibit or supplement attached thereto and any permitted amendment or modification thereof, without the prior written consent of the Majority Lenders, unless such plan provides for the Discharge of Obligations and payment of all Prepetition Obligations in full in cash upon the incurrence of additional financing; |
| | (aa) *Payments.* Any Credit Party or any of its Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a material payment to any Person that would be inconsistent with the treatment of any such Person under the Acceptable Plan, other than in accordance with any of the "first day orders", the final cash collateral order, the DIP Orders, the Approved Budget (subject to and after giving effect to the application of any Carry Forward Amount and any permitted variance), or as otherwise agreed to by the Majority Lenders; |
| | (bb) *Impairment.* (i) The Credit Parties or any of their Affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding which results in a material impairment of the rights or interests of the Lenders; |
| | (cc) *Acceptable Plan.* The Acceptable Plan or the confirmation order approving the same is amended, supplemented or otherwise modified or withdrawn or terminated without the prior written consent of the Majority Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the DIP Agent, the DIP Agent); |
| | (dd) *Alternate Reorganization Plan.* (i) The Credit Parties' pursuit of, proposal to, consent to, cooperation with, solicitation of votes with respect to, acquiescence to, support of or the filing of a motion in any of the Chapter 11 Cases with respect to, without the express written consent of the Majority Lenders, any plan of |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | reorganization (including any exit financing) other than the Acceptable Plan or (ii) the entry of an order approving any disclosure statement in support of a plan of reorganization (including any exit financing) other than the Acceptable Plan, without the express written consent of the Majority Lenders; <br><br> (ee) *Chief Restructuring Officer.*  The appointment of a chief restructuring officer or any equivalent officer that is not reasonably satisfactory to the Majority Lenders; <br><br> (ff) *Stipulations.*  The Credit Parties shall breach any of their respective stipulations set forth in the DIP Orders; <br><br> (gg) *Adversary Proceedings.*   The initiation by the Credit Parties, any statutory Committee appointed in the Chapter 11 Cases, any trustee, any examiner or any other party in interest of any contested matter or adversary proceeding in respect of any of the DIP Credit Agreement, the Obligations, the DIP Agent, the Lenders, the Prepetition Obligations, the Prepetition Secured Parties, including, but not limited to, any actions pursuant to chapter 5 of the Bankruptcy Code, in each case, except as may otherwise be permitted under the DIP Orders; or <br><br> (hh) *Change of Control.*  There occurs any Change of Control. <br><br> *See* DIP Credit Agreement, Art. VIII. |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | Without requiring further order from the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Majority DIP Lenders or the DIP Agent at the direction of the Majority DIP Lenders to, immediately upon the occurrence and during the continuance of any Event of Default (as defined in the DIP Credit Agreement), (a) send written notice of the occurrence of an Event of Default (such notice, the "Event of Default Notice") and/or (b) without limitation and without prior notice, terminate commitments under the DIP Facility, pursuant to and subject to the terms and conditions set forth in the DIP Loan Documents and in this Interim Order.  Upon the occurrence and during the continuation of an Event of Default, after three (3) business days' prior written notice to the Debtors from the Majority DIP Lenders or the DIP Agent at the direction of the Majority DIP Lenders (the "Notice Period"), (a) the DIP Obligations shall accelerate and (b) the automatic stay of Section 362 of the Bankruptcy Code shall be terminated without order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the purpose of permitting the DIP Lenders to exercise any or all of their rights and remedies set forth in the DIP Orders or the DIP Loan Documents, including without limitation: (i) directing the DIP Agent to foreclose on the DIP Collateral and (ii) moving the Bankruptcy Court (on shortened notice) to appoint a chief restructuring officer for the Debtors, which motion the Debtors shall not to oppose. After the Majority DIP Lenders or the DIP Agent at the direction of the Majority DIP Lenders have sent the Event of Default Notice, any obligation otherwise imposed on the DIP Secured Parties to provide any loans or advances under the DIP Facility shall be immediately suspended, unless otherwise ordered by the Court *provided*, that during the Notice Period the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of Event of Default) or Cash Collateral to (i) fund operations in accordance with the DIP Credit Agreement and the Budget and (ii) to fund the Carve-Out Reserves; *provided further* that during the Notice Period the Debtors, the DIP Lenders and the DIP Agent consent to a hearing on an expedited basis to consider whether an Event of Default has occurred; *provided further*, that if a hearing to consider the foregoing |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five (5) business days after delivery of the Event of Default Notice; *provided further* that any fees and expenses incurred by the Debtors or the Committee during the Notice Period shall permanently reduce the Post-Carve-Out Trigger Notice Cap..  Notwithstanding the occurrence of an Event of Default, the Maturity Date, and/or termination of the commitments under the DIP Credit Agreement, all of the rights, remedies, benefits, and protections provided to the DIP Secured Parties under the DIP Loan Documents and this Interim Order shall survive.<br><br>*See* Interim Order ¶ 15. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | <u>Indemnification by the Borrower</u>.  The Credit Parties shall jointly and severally indemnify each Recipient, within 10 Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the DIP Agent), or by the DIP Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.<br><br>*See* Interim Order ¶ 24. |

## **Statement Regarding Significant Provisions**

15. The Interim Order contains certain of the provisions (the "Significant Provisions")[7] identified on Exhibit B to the Complex Case Procedures as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached hereto as **Exhibit C**.

16. The Interim Order:  (a) grants superpriority administrative expense claims to the DIP Secured Parties (the "DIP Superpriority Claim"); (b) grants superpriority administrative expense claims to the Hedge Counterparties, subject only to the Carve-Out and the DIP

---

[7]   Significant Provisions refer to those provisions that:  (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under section 506(c) of the bankruptcy code; (e) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

Obligations; (c) grants superpriority administrative expense claims to the Term Facility Secured Parties, subject only to the Carve-Out, the Hedge Obligations, and the DIP Obligations; (d) grants superpriority administrative expense claims to the Second Lien Secured Parties, subject only to the Carve Out, the Hedge Obligations, the DIP Obligations, the Term Obligations, the Term Facility Adequate Protection Claims, and the Term Facility Adequate Protection Liens; (e) grants replacement liens on all Hedge Collateral to the Hedge Counterparties, subject only to the Carve-Out and the DIP Liens; (f) grants additional perfected liens on all DIP Collateral to the Hedge Counterparties, subject only to the Carve-Out and the DIP Liens; (g) grants replacement liens on all Term Facility Collateral to the Term Facility Secured Parties, subject only to the Carve-Out, the Hedge Liens, and the DIP Liens; (h) grants additional perfected liens on all DIP Collateral to the Term Facility Secured Parties, subject only to the Carve-Out, the Hedge Liens, and the DIP Liens; (i) grants additional perfected liens on all DIP Collateral to the Term Facility Secured Parties, subject only to the Carve-Out, the Hedge Liens, and the DIP Liens; (j) grants senior perfected replacement liens on all Second Lien Collateral to the Second Lien Secured Parties, subject only to the Carve-Out, the Hedge Liens, the DIP Liens, the Term Obligations, and the Term Facility Adequate Protection Claims; (k) grants additional perfected liens on all DIP Collateral to Second Lien Secured Parties, subject only to the Carve-Out, the Hedge Liens, the DIP Liens, the Term Obligations, and the Term Facility Adequate Protection Claims; and (l) after entry of the Interim Order, monthly payment in cash of the reasonable and documented costs, fees and expenses of the Term Facility Secured Parties and the Second Lien Secured Parties (including, but not limited, to fees and expenses of their advisors) in accordance with the Term Credit Agreement and the Second Lien Indenture, respectively.

17.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases.  Accordingly, the Significant Provisions in the Interim Order should be approved.

## I.      The Debtors' Prepetition Capital Structure.

18.     As of the Petition Date, the Debtors have approximately $446.4 million in total funded debt obligations, as well as outstanding preferred equity with a stated aggregate liquidation preference of approximately $154.6 million.  The following tables depict the Debtors' prepetition capital structure:

| Obligation | Maturity | Approximate Principal Amount |
|---|---|---|
| First Lien Term Loan | March 2022 | $283.9 million |
| Second Lien Convertible Notes | March 2022 | $162.5 million |
| Aggregate Funded Secured Debt: | | $446.4 million |

| Preferred Equity | Shares | Liquidation Preference |
|---|---|---|
| Series A Preferred Shares | 4,045,000 | $101.1 million |
| Series B Preferred Shares | 2,140,000 | $53.5 million |
| Aggregate Liquidation Preference: | | $154.6 million |

### A.      Term Loan.

19.     As of the Petition Date, the Debtors have approximately $283.9 million in principal outstanding under the senior secured first-lien term loan (the "Term Loan") incurred under that certain Third Amended and Restated Credit Agreement, dated as of March 3, 2017 (as amended, restated or otherwise modified from time to time, the "Term Credit Agreement"), by and among Gastar, as borrower, Northwest Property Ventures LLC, as guarantor party thereto, Wilmington Trust, N.A. ("Wilmington Trust"), as administrative agent, and the lender parties thereto (the "Term Lenders," and together with the Term Agent, the "Term Facility Secured Parties").

20.     The loans made pursuant to the Term Loan accrued cash interest at a per annum rate equal to 8.5%, payable on a quarterly basis.[8]  The Term Loan has a scheduled maturity of March 3, 2022 and is guaranteed by Debtor Northwest Property Ventures LLC.  The Term Loan is secured by a first-priority lien on substantially all of the assets of the Debtors, excluding certain assets as customary exceptions.

21.     In addition, the Term Loan provides for an interest "make-whole," or repayment premium, such that any repayment or prepayment of the loans thereunder prior to the stated maturity date shall be subject to the payment of a repayment premium, and depending on the date of such repayment or prepayment, the applicable interest "make-whole" amount, with the amount of such repayment premium decreasing over the life of the Term Loan.  As of the Petition Date, the Debtors estimate the Term Loan make-whole amount to be approximately $50.5 million.  Upon the entry of the Final DIP Order, the Debtors anticipate that the outstanding principal amount and accrued but unpaid interest on the Term Loan will be refinanced with the proceeds of the DIP Facility.

**B.     Second Lien Notes Indenture.**

22.     The Debtors have approximately $162.5 million in principal outstanding in convertible second lien secured notes (the "Second Lien Notes") issued under an indenture, dated March 3, 2017 (the "Second Lien Notes Indenture"), by and among Gastar, as borrower, Northwest Property Ventures LLC, as guarantor party thereto, Wilmington Trust, as administrative agent and collateral trustee (the "Second Lien Trustee," and together with the holders of the Second Lien Notes, the "Second Lien Secured Parties").  The principal terms of the Second Lien Notes are

---

[8]     The interest rate increased to 10.25% in Amendment No. 2 to the Term Credit Agreement dated as of August 2017 but effective as of July 1, 2017, which the Debtors elected to pay-in-kind.

governed by the Second Lien Notes Indenture.  Pursuant to the Second Lien Notes Indenture, the Second Lien Notes were issued for cash at par, bear interest initially at 6.0 percent per annum, and will mature on March 1, 2022 (unless earlier repurchased, redeemed, or converted in accordance with the terms of the Second Lien Notes Indenture).  Interest is payable on the Second Lien Notes on each March 1, June 1, September 1, and December 1 of each year, beginning on June 1, 2017.  The Second Lien Notes are secured by a second-priority lien on substantially all of the assets of the Debtors.  The Debtors are current on cash interest payments on the Second Lien Notes.

23.     The Second Lien Notes are convertible at the option of the holder into shares of common stock of Gastar ("Common Stock") based on an initial conversion rate of 452.4355 shares of Common Stock per $1,000 in principal amount of the Second Lien Notes,[9] subject to certain adjustments and the issuance of additional "make-whole" shares under circumstances specified in the Indenture.  Subject to certain limitations, Gastar has the right to settle its conversion obligations on the Second Lien Notes in cash, shares of Common Stock, or a combination of cash and shares of Common Stock.  Gastar has the right to redeem the Second Lien Notes (a) on or after March 3, 2019 if the Common Stock trades above 150% of the conversion price for periods specified in the Indenture; and (b) on or after March 1, 2021 without regard to such condition, in each case at par plus accrued interest, if any.  The Second Lien Notes are not redeemable prior to March 3, 2019.

**C.     Preferred Equity.**

24.     Gastar Exploration Inc.'s certificate of incorporation authorizes 40 million shares of preferred stock with a par value of $0.01 per share.  Gastar has designated 10 million of such shares to constitute its 8.625% Series A Cumulative Preferred Stock (the "Series A Preferred

---

[9]     The conversion rate is equivalent to an initial conversion price of approximately $2.21 per share, or 30 percent above the volume weighted average price per share of Common Stock for the 30 trading days prior to execution of the Securities Purchase Agreement (the "Purchase Agreement"), dated February 16, 2017, between the Debtors and the Refinancing Purchasers (as defined below).

Stock") and another 10 million of such shares to constitute their 10.75% Series B Cumulative Preferred Stock (the "Series B Preferred Stock" and, together with the Series A Preferred Stock, the "Preferred Stock").  The Series A Preferred Stock and the Series B Preferred Stock each have a liquidation preference of $25.00 per share.

25.     As of the Petition Date, there were approximately 4,045,000 shares of Series A Preferred Stock issued and outstanding and approximately 2,140,000 shares of Series B Preferred Stock issued and outstanding, with an aggregate liquidation preference of approximately $154.6 million.  As of the Petition Date, the Series A Preferred Stock traded at approximately $2.18 per share, Series B Preferred Stock traded at approximately $2.80 per share.

26.     Dividends on the Preferred Stock accumulate regardless of whether any such dividends are declared.  In 2017, Preferred Stock cash dividends paid totaled $19.3 million, including $10.9 million of dividends for the period from April 2016 to December 2016 paid in January 2017.  On August 1, 2017, primarily in response to the decline in oil prices and to preserve liquidity, the Debtors elected to temporarily suspend Preferred Stock dividends.  On April 30, 2018, however, the Debtors paid $10.8 million, reflecting total accumulated unpaid dividends on the Preferred Stock from August 1, 2017 through April 30, 2018.  The Company continued to declare and pay dividends of $1.2 million per month on the Preferred Stock through June 30, 2018.  On June 11, 2018, the Company elected to permanently suspend the declaration and payment of monthly cash dividends on the Preferred Stock commencing July 2018.  As of the Petition Date, accumulated and unpaid dividends on the outstanding Preferred Stock aggregated to approximately $[4.8] million, or $[0.78] per share.

D.     **Common Equity.**

27.     As of the Petition Date, there were approximately 219 million shares of Common Stock issued and outstanding.  As of the Petition Date, the Common Stock traded at $0.055 per

share, which, along with the trading prices of Preferred Stock, implies an aggregate equity market capitalization of less than $26.9 million.

28.     The Debtors have never declared or paid any cash dividends on Common Stock.  In addition, the Term Loan and the Second Lien Notes Indenture prohibit the Debtors from paying cash dividends on Common Stock as long as any debt remains outstanding.

### E.     Hedging Obligations.

29.     Prior to the Petition Date, the Debtors maintained a hedging program with certain counterparties (the "Hedge Counterparties" and together with the Term Facility Secured Parties and the Second Lien Secured Parties, the "Primed Parties") to hedge against the risk of commodity price fluctuations.  Pursuant to an Intercreditor Agreement, dated as of March 3, 2017, by and among the Debtors, the Term Loan Agent, and the Hedge Counterparties, and related mortgages, deeds of trust and security documents, all liabilities and obligations of the Debtors under their hedging arrangements were secured by an uncapped, first priority lien on and security interest in the collateral securing the Term Loan Credit Agreement that ranked *pari passu* with the liens granted to the senior most creditors under the Term Loan Credit Agreement.  The Debtors and the Hedge Counterparties agreed to terminate and liquidate all transactions entered into between the Debtors, on the one hand, and any Hedge Counterparty, on the other hand, on or as soon as is practicable after the Petition Date (as defined in the Hedge Party Term Sheet) and treat the approximately $13 million in aggregate resulting claims as set forth in the Plan.  Each of the Debtors' hedge counterparties voted to support the Plan.

### II.     The Debtors Have a Need for Debtor-in-Possession Financing and Use of Cash Collateral.

30.     The Debtors require immediate access to the DIP Facility in addition to continued use of the DIP Agent, the Term Agent, and the Second Lien Trustee's cash collateral (the "Cash

Collateral"). As of the Petition Date, the Debtors' current cash balance is insufficient to operate their enterprise and continue paying their debts as they come due. The Debtors' business is capital intensive, with significant daily costs required to satisfy obligations to vendors and employees. As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to operate their business, preserve value, and avoid irreparable harm pending the Final Hearing.

31.     Further, a significant portion of the Prepetition Collateral includes oil and gas properties and related assets (including real property and personal property related thereto) on which the Term Facility Secured Parties and the Second Lien Secured Parties have liens, including the oil and gas extracted by the Debtors from those properties and the proceeds generated from sales thereof. The Debtors' business model is predicated upon their ability to maximize the value of their oil and gas assets, bring them to market, and utilize the proceeds in their business operations. Thus, the orderly continuation of the Debtors' operations and the preservation of their going concern value is largely dependent upon their ability to regularly convert the prepetition collateral into Cash Collateral and use it in their operations.

32.     The Debtors also rely on the encumbered cash generated from their operations to fund working capital, capital expenditures, research and development efforts, and for other general corporate purposes. During the start of these chapter 11 cases, the Debtors will need this operating revenue to satisfy payroll, pay suppliers, meet overhead, pay expenses pursuant to joint operating agreements for properties operated by the Debtors, satisfy joint interest billings for properties where the Debtors are a non-operating working interest holder, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.

The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.

33.     Absent funds available from the DIP Facility, access to Cash Collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on whom the Debtors' business depends—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors.

**III.     Alternative Sources of Financing Are Not Available on Better Terms.**

34.     The Debtors do not believe it would be prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. As mentioned above, PWP and TPH conducted a marketing process to determine the availability of postpetition financing sources, and ultimately each of the 21 potential investors and interested parties contacted rejected the opportunity to provide alternative debtor-in-possession financing. Based on the results of this marketing process, alternative debtor-in-possession financing on terms superior to those contained in the DIP/Exit Financing is not presently unavailable to the Debtors.

35.     The Restructuring Support Agreement is the product of extensive good-faith, arm's-length negotiations, and the DIP Facility is an essential component of the broader restructuring transaction contemplated thereby.  As a result, and in light of the foregoing, the DIP Facility represents the only viable financing available that has garnered the support of Ares.  The DIP Facility will provide the Debtors with immediate access to the liquidity that is necessary to fund the Debtors' operations, stabilize the Debtors' business during the pendency of these chapter 11 cases, ensure that the value-maximizing transaction contemplated by the Restructuring Support Agreement is consummated, and provide committed financing to fund the Debtors' emergence

from chapter 11.  The economic terms of the proposed DIP Facility are competitive and reflective of the market for other similar postpetition financing in recent years.  Therefore, the DIP Facility is in the best interests of the Debtors' estates and the Debtors respectfully request that the Court approve the DIP Facility on the terms and conditions described herein.

## Basis for Relief

**I.    The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Loan Documents.**

### A.    Entering into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.

36.    The Court should authorize the Debtors, in an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

37.    Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del.

2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

38.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

39.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their sound business judgment following a thorough process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of their chapter 11 cases and their ongoing operations.  The Debtors negotiated the DIP Loan Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.  As discussed, the Debtors through negotiations, ultimately determined that the DIP Facility was the best available alternative after a competitive process and, successfully avoided the time and expense of a priming fight.  Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

40.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including previously unencumbered property and "priming" liens on all of the Prepetition Collateral.

41.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

42.     11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of the estate; and
>
> c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

43.     No party that PWP and TPH contacted as part of the above-described process was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.  Indeed, no constituency was willing to provide postpetition financing on anything other than a superpriority or priming basis with respect to all of the Debtors' assets.  Put simply, the DIP Lenders were not willing to provide the DIP Facility on any other terms, and no other existing stakeholder or third-party presented a proposal without such priming liens.  Further, the Debtors have not discovered sufficient unencumbered assets to secure sufficient debtor-in-possession financing to fund a non-consensual chapter 11 case.  Accordingly, the DIP Facility structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

44.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Primed Parties have consented, or (b) the Primed Parties' interests in collateral are adequately protected.  Here, the requisite Primed Parties have consented to the priming liens securing the DIP Facility.  Further, the Primed Parties will receive adequate protection of the Prepetition Collateral under the DIP Orders.  Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

**C.      No Comparable Alternative to the DIP Facility Is Reasonably Available.**

45.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

46.      Here the Debtors conducted a competitive and comprehensive debtor-in-possession marketing process, and following arm's-length negotiations with all potential lenders, the Debtors determined that the DIP Facility is the best available alternative under the circumstances to fund these chapter 11 cases.  The DIP Facility is supported by the holders of the Debtors' secured debt, will avoid expensive litigation at the outset of these cases, and provide the Debtors with flexibility to pursue a balance sheet restructuring.

**II.     The Use of Cash Collateral Is Warranted and Should Be Approved.**

47.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[10] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

48.     11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

49.     Generally, what constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its

---

[10]     Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

collateral during the reorganization process") (citation omitted); *see also In re Cont'l Airlines Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993).

50.     The Debtors intend to provide the Primed Parties with adequate protection. Specifically, the Debtors will provide:  (a) adequate protection in the form of replacement and additional liens on the prepetition and DIP Collateral, respectively, to the Primed Parties; (b) cash payments after entry of the Interim Order to the Term Facility Secured Lenders and the Second Lien Secured Lenders; (c) superpriority administrative claims to the Primed Parties subject to the Carve Out and the DIP Liens; and (d) payment of reasonable fees and expenses of the Term Facility Secured Lenders and the Second Lien Secured Lenders.

51.     Further, the Primed Parties will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors continue to negotiate with all of their key stakeholders.  Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

52.     The Debtors believe that the proposed adequate protection in the proposed Interim Order is necessary and sufficient for the Debtors to continue to use Cash Collateral.  Accordingly, the Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy

the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.  Moreover, courts in this district and others have approved similar adequate protection packages in other recent chapter 11 cases.  *See, e.g.*, *In re EXCO Resources, Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 18, 2018) (granting superpriority administrative claims, adequate protection replacement liens, adequate protection payments, and fees and expenses on an interim basis to the applicable prepetition secured creditors); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (same); *In re Energy XXI LTD.,* No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (same); *In re Goodrich Petrol. Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Apr. 18, 2016) (same); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016) (same).[11]

### III.   The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Loan Documents.

53.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

> a.     ***Upfront / Arrangement Fee.***  1.75% of the aggregate principal amount of the New Money Loans due and payable to the DIP Lenders in cash on the initial funding date of the New Money Loans.

> b.     ***DIP Agent and DIP Lender Fees:*** All reasonable and documented fees and expenses of the DIP Agent and the DIP Lenders (including, but not limited to, the fees and expenses of their advisors) shall have been satisfied.

54.     As set forth in the Cofsky Declaration, the Debtors believe that the fees and expenses to be paid under the DIP Facility are appropriate in light of the facts and circumstances

---

[11]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

of these chapter 11 cases.  Specifically, the Debtors have agreed to pay an arrangement fee to the DIP Agent and the DIP Lenders.  Further, the above-described fees and expenses are relatively minor in comparison to the Debtors' overall capital structure—*i.e.*, the approximately $446.4 million in funded debt.  Accordingly, the fees and expenses provided for under the DIP Facility are reasonable and within market practice for debtor-in-possession financings of this size and type. Accordingly, the Court should authorize the Debtors to pay the fees and expenses provided under the DIP Loan Documents in connection with the DIP Facility.

## IV.   The Repayment Feature of the DIP Facility Is Appropriate.

55.   Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  It is well settled in most circuits that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

56.   Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  The Debtors seek approval of the "roll-up" feature only upon entry of the Final Order.  However, courts in many jurisdictions have approved similar DIP features on the first day of the case.  *See, e.g.*, *In re Mission Coal Company, LLC*, No. 18-04177 (TOM) (Bankr. N.D. Ala. Oct. 16, 2018) (authorizing approximately $201,441,464 DIP and a roll-up of approximately $50 million on an interim basis); *In re Remington Outdoor Co.*,

*Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re Real Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included a full ABL roll-up of approximately $22 million prepetition debt pursuant to interim order); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP and a roll-up of approximately $250 million prepetition debt, including a full ABL roll-up of $215 million, pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included a full roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re BCBG Max Azria Global Holdings LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (authorizing a $157 million DIP and a roll-up of $117 million, including a full ABL roll-up of $82 million pursuant to final order following a creeping roll-up pursuant to the interim order); *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y. Feb. 2, 2018) (authorizing a $290 million DIP, including a full ABL roll-up of $190 million, pursuant to interim order); *In re Gymboree Corporation*, No. 17-32986 (Bankr. E.D. Va. June 12, 2017) (authorizing a $378 million DIP and $247 million roll-up, including a full ABL roll-up of $177 million); *In re Toys "R" US, Inc.*, No. 17-34665 (Bankr. E.D. Va. Sept. 20, 2017)

(authorizing a $2.3 billion DIP and a full roll-up of approximately $948 million in the prepetition ABL and FILO facilities).[12]

57.      As set forth above, the DIP Credit Agreement provides that approximately $283.9 million of the Term Obligations will "roll up" with the DIP Facility pursuant to the Term Facility Refinancing.  The roll-up of the Term Obligations is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing.  The DIP Facility is the only financing available at this time and the Debtors' need incremental liquidity to fund the operation of their business.  Absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  Given these circumstances, the roll-up of the Term Obligations is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**V.     The DIP Agent, the DIP Lenders, and the Primed Parties Should Be Afforded Good-Faith Protection under Section 364(e).[13]**

58.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

---

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

[13]    [Please conform parties receiving Good-Faith Protection to the Interim Order.]

59.     The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extensive arm's-length, good-faith negotiations between the Debtors, the DIP Lenders, the DIP Agent, and the Primed Parties.  The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent, the DIP Lenders, the Primed Parties in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Agent, the DIP Lenders, and the Primed Parties are entitled to all of the protections afforded thereby.

**VI.     The Automatic Stay Should Be Modified on a Limited Basis.**

60.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders.  The proposed Interim Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim Order.  Finally, the proposed Interim Order provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent necessary to permit the DIP Agent and DIP Lenders to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Loan Documents.

61.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re EXCO Resources, Inc.*, No.

18-30155 (MI) (Bankr. S.D. Tex. Jan. 18, 2018); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same); *see also In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (same).

**VII.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

62.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "on motion by the Debtors, a hearing will routinely be conducted within three business days to consider . . . cash collateral use[.]"  Complex Case Procedures, ¶ 4.A.

63.    The Debtors require immediate access to the DIP Facility.  As of the Petition Date, the Debtors' total unrestricted cash balance is insufficient to operate their enterprise and continue paying their debts as they come due.  The Debtors' business is cash intensive, with significant daily costs required to satisfy obligations to vendors and employees.  As such, and due to their

current limited liquidity, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their business, preserve value, and avoid irreparable harm pending the Final Hearing.

64.     The Debtors, with the assistance of their advisors and through negotiations with the DIP Lenders, developed the Budget. The Budget establishes that the Debtors will have adequate liquidity during this interim period if allowed to utilize the Cash Collateral and access the DIP Facility.  The DIP includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Budget.

65.     The Debtors are seeking limited relief to, among other things, satisfy payroll, pay suppliers, meet overhead, pay expenses pursuant to joint operating agreements for properties operated by the Debtors, satisfy joint interest billings for properties where the Debtors are a non-operating working interest holder, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.

66.     Failure to obtain access to the DIP Facility and Cash Collateral will result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates. Without the approval of the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course and preserve and maximize the value of their assets for the benefit of all parties in interest.

67.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this motion, and

enter the proposed Interim Order authorizing the Debtors to enter into the DIP Facility and use the Cash Collateral.

## Request for Final Hearing

68.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Emergency Consideration

69.     Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."   As set forth in this motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.   Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations as this critical juncture and imperil the Debtors' restructuring.   Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

70.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

71.    The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to Ares Management LLC and its affiliated funds; (d) the United States Attorney's Office for the Southern District of Texas; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  October 31, 2018

*/s/ Matthew D. Cavenaugh*

Patricia B. Tomasco (TX Bar No. 01797600)
Elizabeth C. Freeman (TX Bar No. 24009222)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:            ptomasco@jw.com
                       efreeman@jw.com
                       mcavenaugh@jw.com

-and-

Anna G. Rotman, P.C. (TX Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:      (713) 836-3601
Email:            anna.rotman@kirkland.com

-and-

Ross M. Kwasteniet, P.C. (*pro hac vice* admission pending)
John R. Luze (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            ross.kwasteniet@kirkland.com
                       john.luze@kirkland.com

## **Certificate of Service**

I certify that on October 31, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh