**Exhibit B**

**DIP Credit Agreement**

EXECUTION VERSION

SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

October 31, 2018

among

GASTAR EXPLORATION INC.,
as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as Borrower

The Guarantors from time to time Party Hereto,
as Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code

the Lenders Party Hereto,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent

TABLE OF CONTENTS

Page

Article I. Definitions ................................................................................................ 1
    Section 1.01    Defined Terms ......................................................................... 1
    Section 1.02    Terms Generally ..................................................................... 31
    Section 1.03    Classification of Loans and Borrowings ................................ 32

Article II. The Credits .............................................................................................. 32
    Section 2.01    Accounting Terms; GAAP ..................................................... 32
    Section 2.02    Loans and Commitments ........................................................ 32
    Section 2.03    Request for Borrowings; Funding of Borrowings .................. 34
    Section 2.04    [Reserved] .............................................................................. 36
    Section 2.05    Repayment of Loans; Evidence of Debt ................................ 36
    Section 2.06    Optional Prepayment of Loans .............................................. 36
    Section 2.07    Mandatory Prepayment of Loans ........................................... 37
    Section 2.08    [Reserved] .............................................................................. 37
    Section 2.09    Payment of Make-Whole Amount .......................................... 37
    Section 2.10    Interest on Loans .................................................................... 38
    Section 2.11    Alternate Rate of Interest ....................................................... 39
    Section 2.12    Fees ........................................................................................ 40
    Section 2.13    Conversion and Continuation of Borrowings ........................ 40
    Section 2.14    Increased Costs ...................................................................... 41
    Section 2.15    Change in Legality ................................................................. 43
    Section 2.16    Breakage ................................................................................ 43
    Section 2.17    Taxes ...................................................................................... 44
    Section 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ............ 48

Article III. Representations and Warranties ............................................................. 50
    Section 3.01    Organization; Powers ............................................................. 50
    Section 3.02    Authorization; Enforceability ................................................. 50
    Section 3.03    Governmental Approvals; No Conflicts ................................. 50
    Section 3.04    Financial Condition; No Material Adverse Change............... 50
    Section 3.05    Properties ............................................................................... 51
    Section 3.06    Litigation and Environmental Matters ................................... 52
    Section 3.07    Compliance with Laws and Agreements ................................ 53
    Section 3.08    Investment Company Status ................................................... 53
    Section 3.09    Taxes ...................................................................................... 53
    Section 3.10    ERISA .................................................................................... 53
    Section 3.11    Disclosure .............................................................................. 53
    Section 3.12    Labor Matters ........................................................................ 54
    Section 3.13    Capitalization ......................................................................... 54
    Section 3.14    Margin Stock ......................................................................... 54
    Section 3.15    Bank Accounts ....................................................................... 54
    Section 3.16    [Reserved] .............................................................................. 54
    Section 3.17    [Reserved] .............................................................................. 54

Section 3.18    Gas Imbalances ............................................................... 54
Section 3.19    Reserve Reports ............................................................... 54
Section 3.20    Sale of Production ............................................................ 55
Section 3.21    Anti-Corruption Laws and Sanctions.................................. 55
Section 3.22    No Foreign Operations ...................................................... 55
Section 3.23    Budget ............................................................................ 55
Section 3.24    Purpose of Loans.............................................................. 55
Section 3.25    Collateral Documents........................................................ 56
Section 3.26    Prepetition Obligations ..................................................... 56
Section 3.27    Priority ............................................................................ 56

Article IV. Conditions to borrowings ............................................................ 56

Section 4.01    Conditions to New Money Interim Loans ............................ 56
Section 4.02    Conditions to All Loans .................................................... 58

Article V. Affirmative Covenants.................................................................. 59

Section 5.01    Financial Statements; Other Information; Budget ................ 59
Section 5.02    Notices of Material Events................................................. 62
Section 5.03    Existence; Conduct of Business ......................................... 63
Section 5.04    Payment of Obligations..................................................... 63
Section 5.05    Maintenance of Properties; Insurance.................................. 63
Section 5.06    Books and Records; Inspection Rights ................................ 64
Section 5.07    Compliance with Laws and DIP Orders .............................. 64
Section 5.08    Environmental Matters....................................................... 64
Section 5.09    Use of Proceeds................................................................ 64
Section 5.10    [Reserved] ....................................................................... 65
Section 5.11    Title Data ........................................................................ 65
Section 5.12    [Reserved] ....................................................................... 65
Section 5.13    Operation of Oil and Gas Property ..................................... 65
Section 5.14    Subsidiaries...................................................................... 65
Section 5.15    Pledged Capital Stock ....................................................... 66
Section 5.16    [Reserved] ....................................................................... 66
Section 5.17    Further Assurances............................................................ 66
Section 5.18    Lender Calls ..................................................................... 67
Section 5.19    Collateral Proceeds ........................................................... 67
Section 5.20    [Reserved] ....................................................................... 67
Section 5.21    Plan of Reorganization ...................................................... 67
Section 5.22    Access to Information ........................................................ 67

Article VI. Negative Covenants..................................................................... 67

Section 6.01    [Reserved] ....................................................................... 67
Section 6.02    Indebtedness..................................................................... 67
Section 6.03    Liens................................................................................ 69
Section 6.04    Fundamental Changes........................................................ 69
Section 6.05    Disposition of Assets ........................................................ 70
Section 6.06    Nature of Business ............................................................ 71
Section 6.07    Investments ...................................................................... 71

Section 6.08    Swap Agreements ........................................................ 72
Section 6.09    Restricted Payments .................................................... 72
Section 6.10    Transactions with Affiliates ........................................ 72
Section 6.11    Restrictive Agreements ................................................ 73
Section 6.12    Disqualified Stock....................................................... 73
Section 6.13    Certain Amendments to Organizational Documents; Prepayments of Indebtedness ........................................... 74
Section 6.14    Sale and Leaseback Transactions and other Off-Balance Sheet Liabilities ................................................ 74
Section 6.15    DrillCo Restrictions .................................................... 74
Section 6.16    Lease Restrictions ....................................................... 74
Section 6.17    Changes to DIP Orders ................................................ 75
Section 6.18    Actions Requiring Majority Lender Consent........................ 75
Section 6.19    Right of Subrogation ................................................... 75
Section 6.20    Use of Proceeds.......................................................... 75

Article VII. guarantee of obligations ............................................... 76

Section 7.01    Guarantee of Payment ................................................. 76
Section 7.02    Guarantee Absolute ..................................................... 77
Section 7.03    Guarantee Irrevocable .................................................. 77
Section 7.04    Reinstatement.............................................................. 77
Section 7.05    Subrogation ................................................................ 77
Section 7.06    Subordination .............................................................. 78
Section 7.07    Payments Generally ..................................................... 78
Section 7.08    Setoff ........................................................................ 78
Section 7.09    Formalities ................................................................. 78
Section 7.10    Limitations on Guarantee.............................................. 78
Section 7.11    Stay of Acceleration .................................................... 79
Section 7.12    Survival ..................................................................... 79

Article VIII. Events of Default ......................................................... 79

Article IX. The Administrative Agent ................................................ 86

Section 9.01    Appointment and Authority ........................................... 86
Section 9.02    Rights as a Lender....................................................... 87
Section 9.03    Exculpatory Provisions ................................................. 87
Section 9.04    Reliance by Administrative Agent................................... 88
Section 9.05    Delegation of Duties .................................................... 89
Section 9.06    Collateral and Guaranty Matters..................................... 89
Section 9.07    Resignation and Removal of Administrative Agent .............. 90
Section 9.08    Non-Reliance on Administrative Agent and Other Lenders................. 91
Section 9.09    Administrative Agent May File Proofs of Claim.................... 91

Article X. SECURITY AGREEMENT ................................................ 93

Section 10.01   Grant of Security Interest.............................................. 93
Section 10.02   Perfection and Protection of Security Interests.................... 95
Section 10.03   Deposit Accounts ........................................................ 96

Section 10.04     Title to, Liens on and Use of Collateral .................................................. 96
Section 10.05     Right to Cure ......................................................................................... 97
Section 10.06     Power of Attorney .................................................................................. 97
Section 10.07     The Secured Parties' Rights, Duties and Liabilities .............................. 97
Section 10.08     Site Visits, Observations and Testing .................................................... 97
Section 10.09     Rights in Respect of Investment Property .............................................. 98
Section 10.10     No Filings Required ............................................................................... 99

Article XI. Miscellaneous ........................................................................................................... 99

Section 11.01     Notices ................................................................................................... 99
Section 11.02     Waivers; Amendments ........................................................................... 101
Section 11.03     Expenses; Indemnity; Damage Waiver .................................................. 102
Section 11.04     Successors and Assigns .......................................................................... 104
Section 11.05     Survival .................................................................................................. 108
Section 11.06     Counterparts; Integration; Effectiveness; Electronic Execution .......... 108
Section 11.07     Severability ............................................................................................ 109
Section 11.08     Right of Setoff ....................................................................................... 109
Section 11.09     GOVERNING LAW; JURISDICTION; CONSENT TO
                  SERVICE OF PROCESS ....................................................................... 110
Section 11.10     WAIVER OF JURY TRIAL .................................................................. 110
Section 11.11     Headings ................................................................................................ 111
Section 11.12     Confidentiality ....................................................................................... 111
Section 11.13     Material Non-Public Information .......................................................... 111
Section 11.14     Authorization to Distribute Certain Materials to Public-Siders ........... 112
Section 11.15     Interest Rate Limitation ......................................................................... 112
Section 11.16     USA PATRIOT Act ............................................................................... 113
Section 11.17     Release of Guarantees and Liens .......................................................... 113

<u>EXHIBITS</u>:

Exhibit A – Form of Assignment and Assumption
Exhibit B – Form of Borrowing Request
Exhibit C – Form of Counterpart Agreement
Exhibit D – Initial Budget
Exhibit E – Form of Interest Election Request
Exhibit F – Form of Interim Order
Exhibit G – Form of Note
Exhibits H-1 through H-4 – Form of Tax Certificates

<u>SCHEDULES</u>:

Schedule 1.01(c) - Subject Leases
Schedule 2.01 – Commitments
Schedule 3.04 – Material Liabilities
Schedule 3.06 – Disclosed Matters
Schedule 3.13 –Capitalization
Schedule 3.15 – Bank Accounts
Schedule 3.18 - Gas Imbalances
Schedule 3.19 – Changes to Reserves
Schedule 6.02 – Existing Indebtedness
Schedule 6.03 – Existing Liens
Schedule 6.07(c) - Investment Commitments
Schedule 6.07(g) – Existing Investments

**SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of October 31, 2018, is among GASTAR EXPLORATION INC., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, as Borrower, CERTAIN SUBSIDIARIES OF BORROWER, as Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code, as Guarantors, the LENDERS party hereto, and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent.

**RECITALS**

WHEREAS, on October 31, 2018, (the "Petition Date"), the Borrower and the Guarantors commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and the Borrower and the Guarantors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower and the Guarantors have requested and the Lenders have agreed to provide a secured superpriority debtor-in-possession term loan facility to the Borrower (the "DIP Facility"), comprised of loans in an aggregate principal amount not to exceed $386,242,682.88; and

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to Administrative Agent, for the benefit of the Secured Parties, a lien on substantially all of their respective assets, in accordance with the priorities provided in the DIP Orders.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, such parties hereby agree as follows:

**ARTICLE I.**

**DEFINITIONS**

**Section 1.01   Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"13-Week Budget" means a thirteen-week rolling operating budget and cash flow forecast, in form and substance acceptable to the Majority Lenders in their sole discretion, which shall reflect the Borrower's good faith projection of all weekly cash receipts and disbursements in connection with the operation of the Credit Parties' and their respective Subsidiaries' business during such thirteen-week period on a line item basis, including but not limited to, (a) operational expenses, (b) professional fees (provided that the projections for professional fees shall include projections through February 15, 2019), (c) interest accrued under this Agreement, (d) royalty obligations and (e) Adequate Protection Payments, as such budget and forecast may be updated from time to time as required under Section 5.01(j) and which has been certified by a

Financial Officer of the Borrower as having been prepared in good faith based upon assumptions believed by the Credit Parties to be reasonable at the time made.

"ABR Loan" or "ABR Borrowing" shall mean a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Plan" means a plan of reorganization or liquidation that contains the terms and conditions set forth in the Restructuring Support Agreement and which is otherwise acceptable to the Lenders (and with respect to any provision that affects the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion.

"Acceptable Security Interest" means, with respect to any Property, a Lien which (a) exists in favor of the Administrative Agent for the benefit of the Secured Parties, (b) is superior to all Liens or rights of any other Person in the Property encumbered thereby (other than Non-Primed Excepted Liens), (c) secures the Obligations, and (d) is perfected and enforceable. Any requirement that the Credit Parties provide an Acceptable Security Interest with respect to any DrillCo PDP Reserves shall be satisfied if the applicable Credit Party grants a Wellbore Lien with respect to such DrillCo PDP Reserves and the Oil and Gas Properties owned by any Credit Party attributable thereto, so long as the Wellbore Lien meets the foregoing criteria.

"Acquisition" means, the acquisition by the Borrower or any Subsidiary, whether by purchase, merger (and, in the case of a merger with any such Person, with such Person being the surviving corporation) or otherwise, of all or substantially all of the Capital Stock of, or all or substantially all of the business, property or fixed assets of or business line or unit or a division of, any other Person engaged solely in the business of producing oil or Natural Gas or the acquisition by the Borrower or any Subsidiary of Property consisting of Oil and Gas Property.

"Act" shall have the meaning assigned to such term in Section 11.16.

"Adequate Protection Liens" has the meaning ascribed to such term in the Interim Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"Adequate Protection Payments" means the adequate protection payments to the Prepetition Secured Parties pursuant to the terms of the DIP Orders.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) (x) an interest rate per annum (rounded upward, if necessary, to the next 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBO Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (y) 1 minus the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period and (b) 2.00% per annum.

"Administrative Agent" means Wilmington Trust, National Association, in its capacity as Administrative Agent under any of the Loan Documents, and any successor agent appointed pursuant to Article IX.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Advance Payment" has the meaning assigned to such term in the definition of Advance Payment Contract.

"Advance Payment Contract" means any contract whereby any Credit Party either (a) receives or becomes entitled to receive (either directly or indirectly) any payment (an "Advance Payment") to be applied toward payment of the purchase price of Hydrocarbons produced or to be produced from Oil and Gas Property owned by any Credit Party and which Advance Payment is, or is to be, paid in advance of actual delivery of such production to or for the account of the purchaser regardless of such production, or (b) grants an option or right of refusal to the purchaser to take delivery of such production in lieu of payment, and, in either of the foregoing instances, the Advance Payment is, or is to be, applied as payment in full for such production when sold and delivered or is, or is to be, applied as payment for a portion only of the purchase price thereof or of a percentage or share of such production; provided that inclusion of the standard "take or pay" provision in any gas sales or purchase contract or any other similar contract in the ordinary course of business shall not, in and of itself, constitute such contract as an Advance Payment Contract for the purposes hereof.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Affiliate Transaction" shall have the meaning assigned to such term in Section 6.10(a).

"Aggregate Commitment" means, collectively, the aggregate New Money Commitments and the aggregate Refinanced Commitments.

"Agreement" means this Superpriority Debtor-in-Possession Credit Agreement, dated as of October 31, 2018, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Alternate Base Rate" shall mean, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest $1/100^{th}$ of 1%) equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1.00% or (c) the Adjusted LIBO Rate for a one-month Interest Period beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1.00%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"Anti-Corruption Laws" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption, including without limitation the United States Foreign Corrupt Practices

Act of 1977, as amended, the UK Bribery Act 2010 and other similar legislation in any other jurisdictions.

"Applicable Margin" shall mean, for any day (a) with respect to any Eurodollar Loan, 7.50% per annum and (b) with respect to any ABR Loan, 6.50% per annum; provided that to the extent any Loan is outstanding for more than 90 days, the "Applicable Margin" for such Loan (including, in the case of a Refinanced Loan, PIK Interest added to the principal amount of such Refinanced Loan regardless of when such PIK Interest was added to such Refinanced Loan) shall be increased from and after the 91st day by 2.50% per annum.

"Applicable Percentage" means, with respect to any Lender at any time, a percentage equal to a fraction, the numerator of which is the sum of such Lender's Credit Exposure and unused Commitments at such time and the denominator of which is the aggregate Credit Exposure and aggregate unused Commitments at such time.

"Approved Budget" means each of (a) the Initial Budget and (b) any 13-Week Budget delivered by the Borrower pursuant to Section 5.01(j) and approved by the Majority Lenders in their sole discretion.

"Approved Fund" has the meaning assigned to such term in Section 11.04(b).

"Approved Petroleum Engineer" means Wright & Company, Inc. or any reputable firm of independent petroleum engineers selected by the Borrower and reasonably acceptable to the Majority Lenders.

"Ares" means (a) Ares Management LLC, its Affiliated investment managers and funds or accounts managed by any of them (but excluding any portfolio companies that are owned in whole or in part by any of the foregoing) and (b) any partner, member, manager, principal, director or officer of any of the foregoing.

"Asset Sale" means any Disposition by any Credit Party of any Property other than Dispositions permitted by clauses (a), (b), (c), (d), (e) or (f) of Section 6.05.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required under 11.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy," now and hereafter in effect, or any applicable successor statute.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals hereto.

"Base Rate" shall mean, for any day, the prime lending rate published in *The Wall Street Journal* for such day; provided that if *The Wall Street Journal* ceases to publish for any reason such rate of interest, "Base Rate" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime

Page 4

lending interest rates); each change in the Base Rate shall be effective on the date such change is effective.  The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Gastar Exploration Inc., a Delaware corporation, and its successors and permitted assigns.

"Borrower Materials" shall have the meaning assigned to such term in Section 11.01(d).

"Borrowing" shall mean Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Cap" means, for any week, (a) with respect to New Money Interim Loans and New Money Final Loans, the amount of Borrowings (if any) actually needed by the Borrower at the applicable time of determination (taking into account the Borrower's cash on hand at such time) to fund the Chapter 11 Cases and/or the Borrower's working capital needs (after giving effect to the Minimum Liquidity Floor) for the immediately succeeding 14-day period (any such applicable period, a "Borrowing Cap Period") in the amounts expressly provided for in the Approved Budget for such Borrowing Cap Period, net of (and without duplicating) any New Money Interim Loans or New Money Final Loans previously made in respect of amounts provided for in the Approved Budget for such Borrowing Cap Period, and (b) with respect to New Money Reserve Loans, the amount of Borrowings (if any) actually needed by the Borrower at the applicable time of determination (taking into account the Borrower's cash on hand at such time) to fund Operating Rights Preservation Activities (after giving effect to the Minimum Liquidity Floor) in the amounts expressly approved by the Lenders for the applicable Borrowing Cap Period, net of (and without duplicating) any New Money Reserve Loans previously made in respect of Operating Rights Preservation Activities in respect of amounts so approved by the Lenders for such Borrowing Cap Period.

"Borrowing Request" means a written request by the Borrower for a New Money Loan in accordance with Section 2.03, which shall be substantially in the form of Exhibit B.

"Breakage Event" shall have the meaning assigned to such term in Section 2.16.

"Budget Event" shall mean any of the following:

(a)     the actual amount of aggregate cumulative operating disbursements and expenses (excluding professional fees and expenses) during any Budget Testing Period shall exceed the projected cumulative operating disbursements (on a cumulative basis) in the Approved Budget for such Budget Testing Period by more than 10%; or

(b)     the aggregate amount of actual receipts during any Budget Testing Period shall be less than 80% of the aggregate cumulative receipts in the Approved Budget for such Budget Testing Period (the variances described in (a) and (b), the "**Permitted Variance**").

"Budget Testing Date" means Thursday of each calendar week, commencing on November 8, 2018.

"Budget Testing Period" means, with respect to the initial Budget Testing Date, the period beginning on the Petition Date and ending on a Saturday immediately preceding the initial Budget Testing Date and for each Budget Test Date thereafter, the one-week period ending on the Saturday immediately preceding such Budget Test Date.

"Business Day" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or lease obligations on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Carry Forward Amount" means, with respect to any given line item in the Approved Budget for any given week (a) with respect to disbursements and expenses (other than professional fees), the amount (if any) by which the budgeted operating disbursements and expenses as stated in the Approved Budget for the immediately preceding week exceeded the actual operating disbursements and expenses for such immediately preceding week and (b) with respect to receipts, the amount (if any) by which the actual cash receipts for the immediately preceding week exceed the budgeted cash receipts as stated in the Approved Budget for such immediately preceding week.

"Carve-Out" shall have the meaning assigned to such term in the Interim Order.

"Cash Collateral" means all cash and Cash Equivalents in the Cash Collateral Account.

"Cash Collateral Account" means, in respect of the Credit Parties, one or more deposit accounts (including, for avoidance of doubt, any lockboxes or similar accounts, any related securities accounts and any accounts holding Cash Equivalents), and with respect to which the Secured Parties shall have a perfected Lien as security for the payment and performance of the Obligations by virtue of, and having the priority set forth in, the DIP Orders.

"Cash Equivalents" means: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, or overnight bank

deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a "nationally recognized statistical rating organization" (within the meaning of proposed Rule 3b-10 promulgated by the SEC under the Exchange Act), if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision or taxing authority (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Credit Parties.

"Change in Law" means the occurrence after the date of this Agreement or, with respect to the Administrative Agent or any Lender, such later date on which the Administrative Agent or such Lender becomes a party to this Agreement of (a) the adoption of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the interpretation or application thereof by any Governmental Authority or (c) compliance by any Lender (or, for purposes of Section 2.14(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law" regardless of the date enacted, adopted or issued.

"Change of Control" means

(a)       any "person" or "group" (as such terms are used in sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than Ares or any Related Party thereof, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that such person or group shall be deemed to have "beneficial ownership" of all shares that such person or group has the right to acquire, whether such right is

exercisable immediately or only after the passage of time), directly or indirectly, of more than 35% of the total voting power of the outstanding Capital Stock normally entitled to vote in the election of directors ("Voting Stock") of the Borrower (or its successor by merger, consolidation or purchase of all or substantially all of its assets); or

(b)      a disposition by the Borrower or any Subsidiary pursuant to which the Borrower or any Subsidiary sells, leases, licenses, transfers, assigns or otherwise Disposes, in one or a series of related transactions, all or substantially all of the properties or assets of Borrower and its Subsidiaries as determined by reference to the Borrower's and its Subsidiaries' financial statements on the last day of the most recently ended fiscal quarter, determined on a consolidated basis in accordance with GAAP.

"Chapter 11 Cases" shall have the meaning assigned to such term in the recitals hereto.

"Charges" has the meaning assigned to such term in Section 11.15.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all right, title and interest held by any Credit Party in any Property, including the Property described in Section 10.01, but excluding any such Property specifically excluded under this Agreement or the applicable DIP Order.

"Committee" means an official creditors' committee of creditors holding unsecured claims appointed by the Bankruptcy Court in respect of the Cases pursuant to Section 1102(a) of the Bankruptcy Code.

"Commitment" means a New Money Commitment or a Refinanced Commitment.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Subsidiaries" means, for any Person, any Subsidiary or other entity the accounts of which would be consolidated with those of such Person in its consolidated financial statements in accordance with GAAP.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Counterpart Agreement" means a Counterpart Agreement substantially in the form of Exhibit C delivered by a Guarantor pursuant to Section 5.14.

"Credit Date" means the date of a Borrowing.

"Credit Exposure" means, with respect to any Lender at any time, the outstanding principal amount of such Lender's Loans at such time.

"Credit Parties" means, collectively, the Borrower and each Guarantor, and each individually, a "Credit Party".

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" shall mean, with respect to the Loans or other Obligations which accrue interest at the Default Rate hereunder, a rate per annum equal to the sum of three percent (3%) plus the interest rate otherwise applicable thereto.

"DIP Facility" has the mean set forth in the recitals hereto.

"DIP Orders" means the Interim Order and the Final DIP Order, as applicable.

"Discharge of Obligations" means (a) the indefeasible payment in full in cash of all Obligations (other than contingent indemnity obligations for which no claim for payment has been made (which indemnity obligations continue to survive as expressly provided in this Agreement or in any other Loan Document)), (b) termination or expiration of the Aggregate Commitments and (c) termination of this Agreement other than indemnity and reimbursement obligations which expressly survive the termination hereof.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disposition" or "Dispose" means the sale, transfer, license, lease, exchange or other disposition (including any Sale and Leaseback Transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Capital Stock (which would not constitute Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable for any consideration other than other Capital Stock (which would not constitute Disqualified Stock) at the sole option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after the Maturity Date.

"Dollars" or "$" refers to lawful money of the United States of America.

"DrillCo Agreement" means that certain Development Agreement dated as of October 14, 2016 by and between the Borrower and DrillCo Investor, as amended as permitted under this Agreement.

"DrillCo Contract Area" means the following locations in Kingfisher County, Oklahoma: Township 18 North – Range 6 West, Township 18 North – Range 7 West and Township 18 North – Range 8 West.

"DrillCo Investor" means STACK Exploration LLC, a Delaware limited liability company.

"DrillCo Joint Well" means a "Joint Well Program Interest," as that term is defined in the DrillCo Agreement, that is located in the DrillCo Contract Area.

"DrillCo Operating Agreement" means a "DrillCo Operating Agreement" as that term is defined in the DrillCo Agreement.

"DrillCo PDP Reserves" means the Proved Developed Producing Reserves of any Credit Party attributable to any well located in the DrillCo Contract Area.

"DrillCo Required Disposition" means an assignment to the DrillCo Investor of an interest in a DrillCo Joint Well in accordance with the DrillCo Agreement pursuant to a DrillCo Wellbore Assignment.

"DrillCo Wellbore Assignment" means a "Wellbore Assignment" as that term is defined in the DrillCo Agreement.

"Effective Date" means the date the conditions set forth in Section 4.01 are satisfied (or waived by the Majority Lenders) which date is November [2][1], 2018.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means any Person that qualifies as an assignee pursuant to Section 11.04(b)(i); provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrower or any of the Borrower's Affiliates or Subsidiaries.

"Environmental Laws" means all laws (including common law), rules, regulations, codes, ordinances, orders, determinations, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, pollution, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Credit Party directly or indirectly resulting from or based upon (a) violation of or liability under any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal (or arrangement for the disposal) of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

---

[1] NTD: To be updated as needed.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Credit Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure of any Plan to satisfy the minimum funding standard applicable to that Plan for a plan year under Section 412 of the Code or Section 302 of ERISA; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Credit Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Credit Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Credit Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by any Credit Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Credit Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar Loan" or "Eurodollar Borrowing" shall mean a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VIII.

"Excluded Make-Whole Prepayments" shall mean any prepayment in connection with an Asset Sale or Casualty Event pursuant to Section 2.07.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its lending

office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(f) and (g) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"Excluded Collateral" shall have the meaning assigned to such term in Section 10.01(a).

"Excluded Contracts" shall have the meaning assigned to such term in Section 10.01(a).

"Excluded Trademark Applications" shall have the meaning assigned to such term in Section 10.01(a).

"Fair Market Value" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith in accordance with generally accepted finance practices.

"FASB" means Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means that certain Fee Letter by and between the Borrower and the Administrative Agent dated as of the Effective Date, as may be amended, restated, supplemented or otherwise modified from time to time.

"Final DIP Order" means the Final Order entered by the Bankruptcy Court in form and substance satisfactory to the Credit Parties in their reasonable discretion and the Majority Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion authorizing the Credit Parties to (a) obtain post-petition secured financing pursuant to this Agreement, (b) use Cash Collateral during the pendency of the Chapter 11 Cases and (c) granting certain related relief, as the same may be amended, modified or supplemented from time to time with the prior written consent of the Majority Lenders in their sole discretion.

"Final DIP Order Entry Date" means the date on which the Final DIP Order shall have been entered on the docket of the Bankruptcy Court.

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"Financial Officer" means the chief financial officer of any Credit Party.  Any document delivered hereunder that is signed by a Financial Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party and such Financial Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"Foreign Lender" means a Lender that is not a U.S. Person.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 2.01.

"Gas Imbalance" means (a) a sale or utilization by the Borrower or any of its Subsidiaries of volumes of Natural Gas in excess of its gross working interest, (b) receipt of volumes of natural gas into a gathering system and redelivery by the Borrower or any of its Subsidiaries of a larger or smaller volume of Natural Gas under the terms of the applicable transportation agreement, or (c) delivery to a gathering system of a volume of Natural Gas produced by the Borrower or any of its Subsidiaries that is larger or smaller than the volume of Natural Gas such gathering system redelivers for the account of the Borrower or any of its Subsidiaries, as applicable.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity properly exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (in this definition, the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term

Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Liabilities" has the meaning assigned to such term in Section 7.01.

"Guarantor" means the Borrower (with respect to the Obligations of the other Credit Parties) and each Subsidiary that is a party hereto or hereafter executes and delivers to the Administrative Agent and the Lenders a Counterpart Agreement pursuant to Section 5.14 or otherwise.

"Hazardous Materials" means all explosive or radioactive materials, substances or wastes and all hazardous or toxic materials, substances or wastes or other chemicals or pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other materials, substances or wastes of any nature regulated pursuant to, or for which liability or standards of conduct may be imposed under, any Environmental Law.

"Hedge Carve-Out" shall have the meaning assigned to such term in the Interim Order.

"Hedge Modification" means the amendment, modification, cancellation, monetization, sale, transfer, assignment, early termination or other disposition of any Swap Agreement.

"Hydrocarbon Interests" all presently existing or after-acquired rights, titles and interests in and to oil and gas leases, oil, gas and mineral leases, other Hydrocarbon leases, mineral interests, mineral servitudes, overriding royalty interests, royalty interests, net profits interests, production payment interests and other similar interests. Unless otherwise qualified, all references to a Hydrocarbon Interest or Hydrocarbon Interests in this Agreement shall refer to a Hydrocarbon Interest or Hydrocarbon Interests of the Borrower or the Guarantors.

"Hydrocarbons" means, collectively, oil, gas, casinghead gas, drip gasoline, Natural Gas, condensate, distillate and all other liquid or gaseous hydrocarbons and related minerals and all products therefrom, in each case whether in a natural or a processed state.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding, other than for purposes of Section 6.02, those incurred in the ordinary course of business which are not greater than 60 days past the due date or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person, but limited to the lesser of (i) the amount of such Indebtedness and (ii) the fair market value of the property securing such Indebtedness, (f) all Guarantees by such Person of Indebtedness of others to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such Guarantee, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent

or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (j) attributable Indebtedness in respect of Sale and Leaseback Transactions and (k) all obligations of such Person relating to any Production Payment.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document and (b) to the extent not otherwise described in (a) hereof, Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 11.03.

"Ineligible Institution" has the meaning assigned to it in Section 11.04(b).

"Information" has the meaning assigned to such term in Section 11.12.

"Initial Budget" means the 13-Week Budget prepared by the Borrower and furnished to the Lenders on the Effective Date in the form of Exhibit D.

"Interest Election Request" shall mean a request by the Borrower in accordance with the terms of Section 2.13 and substantially in the form of Exhibit E or such other form as shall be approved by the Administrative Agent.

"Interest Payment Date" shall mean (a) with respect to any ABR Loan, the last Business Day of each calendar month and any date upon which a payment or prepayment thereof is made and (b) with respect to any Eurodollar Borrowing, the last day of the Interest Period applicable to such Borrowing, and any date upon which a payment or prepayment thereof is made.

"Interest Period" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day that is (x) one week thereafter or (y) one month thereafter, in any case at the Borrower's election pursuant to Section 2.03 or 2.13, as applicable; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c), end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Borrowing shall extend beyond the applicable Maturity Date.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of the Borrowing initially shall be the date on which the Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of the Borrowing.

"Interim Order" means the interim order in the form of Exhibit F entered by the Bankruptcy Court (a) authorizing, on an interim basis, the Credit Parties to (i) obtain post-petition secured financing pursuant to this Agreement and (ii) use Cash Collateral during the pendency of the Chapter 11 Cases, and (b) granting certain related relief, as the same may be amended, modified or supplemented from time to time with the prior written consent of the Majority Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion.

"Interim Order Entry Date" means the date on which the Interim Order shall have been entered on the docket of the Bankruptcy Court.

"Investment" means all direct or indirect investments by such Person in other Persons (including, without limitation, Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Capital Stock or other securities (excluding any interest in an oil or Natural Gas leasehold to the extent constituting a security under applicable law), together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRS" means the United States Internal Revenue Service.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period therefor, the rate per annum determined by the Administrative Agent by reference to the ICE Benchmark Administration London Interbank Offered Rate for deposits in Dollars with a term equivalent to such Interest Period (as set forth on the applicable Bloomberg screen page or by or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period; *provided* that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the LIBO Rate shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which the Administrative Agent is offered deposits in Dollars by major banks in the London interbank market in London, England at approximately 11:00 a.m., London, England time, two (2) Business Days prior to the first day of such Interest Period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, any promissory notes executed in connection herewith, the Security Documents, the Fee Letter and any other agreements executed by any Credit Party in connection with this Agreement and designated as a Loan Document therein.

"Loans" means, collectively, the New Money Loans and the Refinanced Loans.

"Majority Lenders" means, at any time, Lenders having more than 50% of the sum of the total outstanding Loans and unused Aggregate Commitments.

"Make-Whole Amount" shall be a cash amount equal to the excess of (a) the present value at such repayment, prepayment or acceleration date or the date the Obligations otherwise become due and payable in full of (i) the sum of (A) the principal amount repaid, prepaid or accelerated *plus* (B) a cash amount equal to the product of the principal amount of the Loans prepaid times 8.500% *plus* (ii) the interest accruing on such principal amount (assuming for such purpose that PIK Interest is paid in cash) from the date of such repayment, prepayment or acceleration through September 1, 2019 (excluding accrued but unpaid interest to the date of such repayment, prepayment or acceleration), such present value to be computed using a discount rate equal to the Treasury Rate plus 50 basis points discounted to the repayment, prepayment or acceleration date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months), *over* (b) the principal amount of the Loans repaid, prepaid or accelerated.

"Market Disruption Loans" shall mean Loans the rate of interest applicable to which is based upon the Market Disruption Rate, and the Applicable Margin with respect thereto shall be the same as the Applicable Margin applicable to Eurodollar Loans; provided that, other than with respect to the rate of interest and Applicable Margin applicable thereto, Market Disruption Loans shall for all purposes hereunder and under the other Loan Documents be treated as ABR Loans (and Borrowings bearing interest at the Market Disruption Rate shall for all purposes hereunder and under the other Loan Documents be treated as ABR Borrowings).

"Market Disruption Rate" shall mean, for any day, a fluctuating rate *per annum* (rounded upwards, if necessary, to the nearest $1/100^{th}$ of 1.00%) equal to, the Alternate Base Rate for such day (without giving effect to clause (c) of the definition of Alternative Base Rate).  Any change in the Market Disruption Rate shall be effective as of the opening of business on the effective day of any change in the relevant component of the Market Disruption Rate. Notwithstanding the foregoing, if the "*Market Disruption Rate*" as determined in accordance with the immediately preceding sentences is less than the percentage specified in clause (b) of the definition of "*Adjusted LIBO Rate,*" then for all purposes of this Agreement and the other Loan Documents, the "*Market Disruption Rate*" shall be deemed equal to such percentage for such Interest Period.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, financial condition or results of operations of the Borrower and its Subsidiaries taken as a whole, (b) the ability of any Credit Party to perform any of its obligations under this Agreement or the other Loan Documents or (c) the validity or enforceability of any Loan Document against any Credit Party which is a party thereto or the rights of or benefits available to the Lenders under this Agreement or the other Loan Documents; provided that, Material

Adverse Effect shall expressly exclude the effect of filing the Chapter 11 Cases and any action required to be taken under the Loan Documents, the Interim Order or the Final DIP Order.

"Material Indebtedness" means Indebtedness (other than the Loans) and obligations in respect of one or more Swap Agreements of the Borrower or any one or more of the Subsidiaries in an aggregate principal amount exceeding $5,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any Swap Agreement at any time shall be the Swap Termination Value.

"Maturity Date" means the earliest of (a) February 15, 2019, (b) 30 days after the Petition Date if the Final DIP Order Entry Date shall not have occurred by such date, (c) the earlier of the effective date and the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code), in each case, of the Acceptable Plan that has been confirmed by a Final Order and (d) the date of termination of the Lenders' commitments and the acceleration of any outstanding extensions of credit, in each case, under this Agreement.

"Maximum Liability" has the meaning assigned to such term in Section 7.10.

"Maximum Rate" has the meaning assigned to such term in Section 11.15.

"Milestones" has the meaning assigned to "In-Court Milestones" in the Restructuring Support Agreement.

"Minimum Liquidity Floor" means an unrestricted "book" cash liquidity of the Borrower and its Subsidiaries of $5,000,000, which the Credit Parties shall be permitted to maintain at all times during the pendency of the Chapter 11 Cases.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Credit Party or any ERISA Affiliate contributed or has any obligations (current or contingent).

"Natural Gas" means all natural gas, distillate or sulphur, natural gas liquids and all products recovered in the processing of natural gas (other than condensate) including, without limitation, natural gasoline, coalbed methane gas, casinghead gas, iso-butane, normal butane, propane and ethane (including such methane allowable in commercial ethane).

"Net Cash Proceeds" means, (a) with respect to any Disposition or series of related Dispositions of any assets (including any Oil and Gas Property and Capital Stock of any Subsidiary) by the Borrower or any Subsidiary, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Dispositions, but only as and when so received, over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by such asset or assets and that is required to be repaid in connection with such Disposition or Dispositions (other than the Loans) and (B) the reasonable and documented out-of-pocket expenses (including Taxes) incurred by the Borrower or such Subsidiary in connection with such Disposition or Dispositions and (b) with respect to any Hedge Modification by the Borrower or any Subsidiary, the excess, if any, of (i) the sum of cash and Cash

Equivalents received in connection with such Hedge Modification (after giving effect to any netting arrangements), over (ii) the out-of-pocket expenses (including Taxes) incurred by the Borrower or such Subsidiary in connection with such Hedge Modification.

"New Money Commitment" means, collectively, the New Money Interim Commitment, the New Money Final Commitment and the New Money Reserve Commitment.

"New Money Final Commitment" means as to each Lender, its obligation to make New Money Final Loans to Borrower hereunder, expressed as an amount representing the maximum principal amount of New Money Final Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption or reduced from time to time pursuant to the last sentence of Section 2.02(a).  The amount of each Lender's New Money Final Commitment is set forth on Schedule 2.01 under the caption "New Money Final Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Final Commitment, as the case may be.  The aggregate amount of the New Money Final Commitments at any time is an amount up to $100,000,000, *minus* the sum of the aggregate principal amount of New Money Loans previously drawn by the Borrower under this Agreement.

"New Money Final Loans" has the meaning assigned to such term in Section 2.02(a).

"New Money Interim Commitment" means as to each Lender, its obligation to make New Money Interim Loans to Borrower hereunder, expressed as an amount representing the maximum principal amount of New Money Interim Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption or reduced from time to time pursuant to the last sentence of Section 2.02(a).  The amount of each Lender's New Money Interim Commitment is set forth on Schedule 2.01 under the caption "New Money Interim Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Interim Commitment, as the case may be.  The aggregate amount of the New Money Interim Commitments as of the Effective Date is $15,000,000.

"New Money Interim Loans" has the meaning assigned to such term in Section 2.02(a).

"New Money Loans" means, collectively, the New Money Interim Loans, the New Money Final Loans and the New Money Reserve Loans.

"New Money Reserve Commitment" means as to each Lender, its obligation to make a New Money Reserve Loan to Borrower hereunder, expressed as an amount representing the maximum principal amount of New Money Reserve Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption or reduced from time to time pursuant to the last sentence of Section 2.02(a).  The amount of each Lender's New Money Reserve Commitment is set forth on Schedule 2.01 under the caption "New Money Reserve Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Reserve Commitment, as the case may be.  The aggregate

amount of the New Money Reserve Commitments at any time is an amount up to $100,000,000, *minus* the sum of the aggregate principal amount of New Money Loans previously drawn by the Borrower under this Agreement.

"New Money Reserve Loans" has the meaning assigned to such term in Section 2.02(a).

"Non-Core Assets" means the Oil and Gas Properties of the Borrower or any Subsidiary within (i) the WEHLU field in Oklahoma and (ii) the undeveloped acreage to the East of WEHLU located in 15N 4W and 14N 4W in Oklahoma County, Oklahoma.

"Non-DrillCo Assets" means any Property located in the DrillCo Contract Area and owned or acquired by the Borrower or any Subsidiary thereof but not necessary or desirable for the Borrower to produce, operate, maintain, and plug and abandon the DrillCo Joint Wells described in the Development Plans (as defined in the DrillCo Agreement).

"Non-Primed Excepted Liens" means (a) valid, perfected and unavoidable Permitted Encumbrances in favor of third parties in existence immediately prior to the Petition Date or (b) valid and unavoidable Permitted Encumbrances in favor of third parties in existence immediately prior to the Petition Date for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, but in each case under the foregoing clauses (a) and (b), only to the extent such valid, perfected and unavoidable liens are senior by operation of law in priority to the Prepetition Liens.

"NYMEX" means the New York Mercantile Exchange.

"Obligations" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, whether or not allowed) or otherwise) of each Credit Party from time to time owed to the Administrative Agent or any Lender under any Loan Document, including any make-whole amounts (including the Make-Whole Amount), any repayment or prepayment premiums and any accrued and unpaid interest, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.  For the avoidance of doubt, it is understood and agreed that any Make-Whole Amount shall be presumed to be the liquidated damages sustained by each Lender as a result of the early termination of the Loans and the Credit Parties agree that such amounts shall constitute Obligations under this Agreement.

"Off-Balance Sheet Liability" of a Person means (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability under any Sale and Leaseback Transaction which is not a Capital Lease Obligation, (iii) any liability under any so-called "synthetic lease" transaction entered into by such Person, or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person, but excluding from the foregoing clauses, operating leases and usual and customary oil, gas and mineral leases.

"Oil and Gas Properties" means Hydrocarbon Interests; the properties now or hereafter pooled or unitized with Hydrocarbon Interests; all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all

units created under orders, regulations and rules of any Governmental Authority having jurisdiction) which may affect all or any portion of the Hydrocarbon Interests; all operating agreements, contracts and other agreements which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, the lands covered thereby and all oil in tanks and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; all tenements, hereditaments, appurtenances and properties in anywise appertaining, belonging, affixed or incidental to the Hydrocarbon Interests, properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.  Unless otherwise qualified, all references to an Oil and Gas Property or to Oil and Gas Properties in this Agreement shall refer to an Oil and Gas Property or Oil and Gas Properties of Borrower or its Subsidiaries.

"Operating Rights Preservation Activities" means efforts to preserve lease operating rights in response to actions taken or proposed to be taken by third parties.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation, organization or formation, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership or formation, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its certificate of formation or articles of organization, as amended, and its limited liability company agreement or operating agreement, as amended.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant" has the meaning assigned to such term in Section 11.04(c).

"Participant Register" has the meaning assigned to such term in Section 11.04(c).

"Payment Currency" has the meaning assigned to such term in Section 7.07.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes, assessments or other governmental charges or levies which are not yet delinquent or which (i) are being contested in good faith by appropriate proceedings diligently conducted and (ii) the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, and contractual Liens granted to operators and non-operators under oil and gas operating agreements, in each case, arising in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Property and securing obligations that are not overdue by more than 60 days or which (i) are being contested in good faith by appropriate proceedings and (ii) the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP;

(c)     contractual Liens which arise in the ordinary course of business under oil and gas leases, division orders, contracts for the sale, transportation or exchange of oil and Natural Gas, unitization and pooling declarations and agreements, area of mutual interest agreements, marketing agreements, processing agreements, development agreements, gas balancing agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements and seismic or other geophysical permits or agreements, which Liens are limited to the Oil and Gas Property and related property that is the subject of such agreement, arising out of or pertaining to the operation or the production or sale of Hydrocarbons produced from the Oil and Gas Property, provided that any such Lien referred to in this clause does not materially impair the use of the property covered by such Lien for the purposes for which such property is held by the Borrower or any Subsidiary or materially impair the value of such property subject thereto;

(d)     subject to the DIP Orders, pledges and deposits in connection with workers' compensation, unemployment insurance and other social security laws or regulations;

(e)     Liens on cash and securities and deposits to secure the performance of bids, trade contracts, leases, statutory obligations (excluding Liens arising under ERISA), surety and appeal bonds, performance bonds and other obligations of a like nature, in each case, which are in the ordinary course of business and which are in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(f)       Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies, or under general depositary agreements, and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated Cash Collateral Account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower or any of its Subsidiaries to provide collateral to the depository institution;

(g)       easements, zoning restrictions, rights-of-way, servitudes, permits, surface leases, and similar encumbrances on real property in each case imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and that, in the aggregate, do not materially detract from the value of the affected property or materially impair the use of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

(h)       royalties, overriding royalties, reversionary interests and similar burdens granted by the Borrower or any Subsidiary with respect to the Oil and Gas Property owned by the Borrower or such Subsidiary, as the case may be, if the net cumulative effect of such burdens does not operate to deprive the Borrower or any Subsidiary of any material right in respect of its assets or properties (except for rights customarily granted with respect to such interests);

(i)       Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower or any Subsidiary in the ordinary course of business covering the property under the lease;

(j)       unperfected Liens reserved in leases (other than oil and gas leases) or arising by operation of law for rent or compliance with the lease in the case of leasehold estates; and

(k)       defects in or irregularities of title (other than defects or irregularities of title to Oil and Gas Property), if such defects or irregularities do not deprive the Borrower or any Subsidiary of any material right in respect of its assets or properties;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Variance" has the meaning set forth in the defined term "Budget Event."

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

"Petroleum Industry Standards" means Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"PIK Interest" has the meaning assigned to such term in Section 2.10(c).

"<u>Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Credit Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Platform</u>" shall have the meaning assigned to such term in Section 11.01(d).

"<u>Pledged Collateral</u>" shall have the meaning assigned to such term in Section 10.09.

"<u>Prepetition Intercreditor Agreement</u>" means that certain Intercreditor Agreement dated as of March 13, 2017, by and among the Prepetition Term Agent and the Prepetition Second Lien Trustee, as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof.

"<u>Prepetition Loan Documents</u>" means the Prepetition Term Loan Documents, the Prepetition Second Lien Documents and the Prepetition Intercreditor Agreement and any other agreement, instrument, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Prepetition Obligation.

"<u>Prepetition Obligations</u>" means all Prepetition Term Loan Obligations and all Prepetition Second Lien Obligations, in each case, incurred prior to the Petition Date.

"<u>Prepetition Second Lien Additional Securities Purchase Agreement</u>" means that certain Securities Purchase Agreement dated as of March 20, 2017, by and among the Borrower and each of the purchasers party thereto, pursuant to which the Borrower has issued and sold an additional $75,000,000 in aggregate principal amount of its Prepetition Second Lien Notes.

"<u>Prepetition Second Lien Documents</u>" means "Indenture Documents" as defined in the Prepetition Second Lien Indenture.

"<u>Prepetition Second Lien Holders</u>" means holders of the Prepetition Second Lien Notes.

"<u>Prepetition Second Lien Indenture</u>" means that certain indenture, effective as of March 3, 2017, governing the Prepetition Second Lien Notes, between the Prepetition Second Lien Trustee and the Borrower, as issuer, as amended, supplemented or otherwise modified prior to the date hereof.

"<u>Prepetition Second Lien Notes</u>" means, collectively, those certain senior second lien secured convertible notes due 2022, issued by the Borrower pursuant to the (a) Prepetition Second Lien Securities Purchase Agreement and (b) Prepetition Second Lien Additional Securities Purchase Agreement.

"<u>Prepetition Second Lien Obligations</u>" means the sum of (a) "Obligations" as defined in the Prepetition Second Lien Indenture and (b) the amount of damages resulting from the breach of the "no-call" protection set forth in the Prepetition Second Lien Indenture (including in section 4.04 thereof) in an amount equal to $23,369,951.46.

"Prepetition Second Lien Securities Purchase Agreement" means that certain Securities Purchase Agreement dated as of February 16, 2017, by and among the Borrower and each of the purchasers party thereto, pursuant to which the Borrower has issued and sold its Prepetition Convertible Notes.

"Prepetition Second Lien Trustee" means Wilmington Trust, National Association, as trustee under the Prepetition Second Lien Indenture.

"Prepetition Secured Parties" means, collectively, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the other Secured Parties (as defined in the Prepetition Term Loan Agreement), the Prepetition Second Lien Trustee and the Prepetition Second Lien Holders.

"Prepetition Term Loan Agent" means (a) Wilmington Trust, National Association, in its capacity as administrative agent and/or collateral agent under any of the Prepetition Term Loan Documents, or (b) any successor administrative agent thereunder.

"Prepetition Term Loan Agreement" means that certain Third Amended and Restated Credit Agreement, dated as of March 3, 2017, by and among the Borrower, the Guarantors party thereto, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof.

"Prepetition Term Loan Documents" means the "Loan Documents" as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loan Lenders" means the lenders party to the Prepetition Term Loan Agreement, from time to time, under and as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loan Obligations" means "Obligations," including, for the avoidance of doubt, the "Make-Whole Amount," each as defined in the Prepetition Term Loan Agreement.

"Production Payment" means the grant or transfer by the Borrower or any of its Subsidiaries to any Person of a royalty, overriding royalty, net profits interest, production payment, partnership or other interest in Oil and Gas Property, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties, in which the holder of such interests is entitled to receive a specified volume or value of production and in which the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the oil and gas business.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.  Unless otherwise qualified, all references to Property in this Agreement shall refer to a Property or Properties of the Borrower or its Subsidiaries.

"Proved Developed Producing Reserves" shall mean oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves."

"Proved Reserves" shall mean oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following:  (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves".

"Public Lender" shall have the meaning assigned to such term in Section 11.01(d).

"Public-Sider" means a Lender or any representative of such Lender that does not want to receive material non-public information within the meaning of the federal and state securities laws.

"PV10" means, in respect of the Proved Reserves of any Credit Parties' Oil and Gas Property set forth in the most recently delivered Reserve Report, the aggregate net present value (discounted at 10% per annum) of such Oil and Gas Properties calculated before income taxes, but after reduction for royalties, lease operating expenses, severance and ad valorem taxes, capital expenditures and abandonment costs and with no escalation of capital expenditures or abandonment costs (a) calculated in accordance with SEC guidelines but using Strip Price for crude oil and natural gas liquids (WTI Cushing) and natural gas (Henry Hub), (b) calculated by (i) in the case of a Reserve Report prepared as of December 31 of any year, an Approved Petroleum Engineer and (ii) in the case of each other Reserve Report or as otherwise required under this Agreement, at the Borrower's option, a petroleum engineer employed by the Borrower or an Approved Petroleum Engineer, in each case, in such person's reasonable judgment after having reviewed the information from the most recently delivered Reserve Report, (c) as set forth in the Reserve Report most recently delivered under Section 5.01(g), (d) as adjusted to give effect to Swap Agreements permitted by this Agreement as in effect on the date of such determination and (e) as adjusted to give *pro forma* effect to all Dispositions or Acquisitions completed since the date of the Reserve Report.

"Recipient" means (a) the Administrative Agent, (b) the Majority Lenders and (b) any other Lender, as applicable.

"Refinanced Commitment" means as to each Lender, its obligation to make a Refinanced Loan to Borrower hereunder, expressed as an amount representing the maximum principal amount of Refinanced Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption (but only to the extent that, together with any such Assignment and Assumption, the assignor and assignee execute and deliver to the Prepetition Term Loan Agent an Assignment and Assumption (as defined in Prepetition Term Loan Agreement) in the same amount in respect of Prepetition Loan Obligations).  The amount of each Lender's Refinanced Commitment is set forth on Schedule 2.01 under the caption "Refinanced Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its Refinanced Commitment, as the case may be.  The aggregate amount of the Refinanced Commitments as of the Effective Date is equal to $286,242,682.88,

which amount (a) shall refinance certain Prepetition Term Loan Obligations approved pursuant to the Final DIP Order and (b) shall be deemed funded by the Lenders on the Final DIP Order Entry Date.

"Refinanced Loans" are the Loans made pursuant to Section 2.02(b).

"Register" has the meaning assigned to such term in Section 11.04(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, managers, members, partners, employees, agents and advisors of such Person and such Person's Affiliates.

"Removal Effective Date" has the meaning assigned to such term in Section 9.07(b).

"Requirements of Law" means, as to any Person, any order, law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserve Report" means an unsuperseded engineering analysis of the Credit Parties' Oil and Gas Property, in form and substance reasonably acceptable to the Majority Lenders, which shall include (i) pricing assumptions based upon the Strip Price and (ii) projections of revenues attributable to all undrilled locations on the Credit Parties' Oil and Gas Property based on a development plan for a period no greater than 10 years from the date of such Reserve Report reasonably acceptable to the Majority Lenders; provided that, for the avoidance of doubt, such projections need not be based on historical capital expenditures in such locations nor take into account potential financings of projected capital expenditures.

"Reserve Report Certificate" means, with respect to any Reserve Report, a certificate from a Responsible Officer certifying that in all material respects:  (a) such Reserve Report is based on information reasonably available to the Borrower; (b) the Borrower or its Subsidiaries owns good and defensible title to the Oil and Gas Property evaluated in such Reserve Report (except any such Oil and Gas Property that has been Disposed of since the date of such Reserve Report as permitted by this Agreement) and such properties are free and clear of all Liens except for Liens permitted by Section 6.03; (c) except as set forth on an exhibit to the Reserve Report Certificate, on a net basis there are no gas imbalances, take-or-pay or other prepayments with respect to its Oil and Gas Property evaluated in such Reserve Report which would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from Oil and Gas Property at some future time without then or thereafter receiving full payment therefor other than those which do not result in any Credit Party or any Subsidiary having net aggregate liability in excess of $500,000; (d) except as set forth on an exhibit to the Reserve Report Certificate, none of the Borrower's or its Subsidiaries' Oil and Gas Property have been Disposed of since the last delivery of the corresponding Reserve Report, which exhibit shall describe in reasonable detail such Dispositions; (e) the Borrower is in compliance with Section 5.10(a); and (f) except as set forth on an exhibit to the Reserve Report Certificate, all such properties are owned by the Borrower or a Guarantor.

"Resignation Effective Date" has the meaning assigned to such term in Section 9.07(a).

"Responsible Officer" means the chief executive officer or chief financial officer of a Credit Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"Restricted Payment" means:

(a)      any dividend or other distribution or other payment (whether in cash, securities or other property) with respect to any Capital Stock in the Borrower or any Subsidiary, to any Person (in each case, solely in such Person's capacity as holder of such Capital Stock or, in the case of any payment, to the direct or indirect holders of the Borrower's or any of its Subsidiaries' Capital Stock), including any dividend or distribution payable or payment made in connection with any merger, amalgamation or consolidation;

(b)      any purchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of the Borrower (including in connection with any merger, amalgamation or consolidation); and

(c)      any principal payment on, or redemption, purchase, repurchase, defeasance or other acquisition or retirement for value, in each case, prior to any scheduled repayment, sinking fund payment or scheduled maturity, of any Indebtedness secured by Liens junior in priority to the Liens securing the Obligations hereunder or unsecured Indebtedness, of the Borrower or any Subsidiary (excluding any intercompany Indebtedness between or among Borrower and any Guarantor), except a payment of interest or principal at the stated maturity date thereof.

"Restructuring" means the restructuring of the Borrower and its Subsidiaries to be implemented through the Chapter 11 Cases and confirmation of the Acceptable Plan under chapter 11 of the Bankruptcy Code.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement dated as of October 26, 2018 (as amended, supplemented or otherwise modified from time to time), by and among the Credit Parties and the other parties party thereto.

"S&P" means Standard & Poor's.

"Sale and Leaseback Transaction" means any sale or other transfer of any property by any Person with the intent to lease such property as lessee.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions (at the time of this Agreement, Cuba, Crimea, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or (b) (i) an agency of the government of a Sanctioned Country, (ii) an organization controlled by a Sanctioned Country, (iii) any Person domiciled, operating, organized or resident in a Sanctioned Country or (iv) any Person controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including but not limited to those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the United Kingdom, the European Union and other relevant sanctions authority with jurisdiction over the Credit Parties, each as amended, supplemented or substituted from time to time.

"SEC" means the Securities and Exchange Commission of the United States of America.

"Secured Party" means each of the Administrative Agent and each Lender.

"Security Agreement" means the terms set forth in Article X.

"Security Documents" means, collectively, this Agreement, the DIP Orders, the Security Agreement and all deeds of trust, security agreements, pledge agreements, guaranty agreements (including Article VII of this Agreement but otherwise excluding this Agreement), collateral assignments and all other collateral documents, now or hereafter executed and delivered by any Credit Party or any other Person as security for the payment or performance of the Obligations, all such documents to be in form and substance satisfactory to the Administrative Agent and the Majority Lenders in their sole discretion.

"Statutory Reserves" shall mean, for any day during any Interest Period for any Eurodollar Borrowing, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained, during such Interest Period under regulations issued from time to time (including "*Regulation D,*" issued by the Board of Governors of the Federal Reserve Bank of the United States (the "Reserve Regulations") by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion Dollars against Eurocurrency funding liabilities (currently referred to as "*Eurocurrency liabilities*" (as such term is used in Regulation D)). Eurodollar Borrowings shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under the Reserve Regulations.

"Strip Price" shall mean, as of any date of determination, the forward month prices as of such date, for the most comparable hydrocarbon commodity applicable to such future production month for a five-year period (or such shorter period if forward month prices are not quoted for a reasonably comparable hydrocarbon commodity for the full five-year period), with such prices escalated at 2% each year thereafter based on the last quoted forward month price of such period, as such prices are (i) quoted on the NYMEX as of the determination date and (ii) adjusted by appropriate management adjustments for additions to reserves and depletion or sale of reserves since the date of such Reserve Report, adjusted for any basis differential as of the date of determination.

"Subject Lease" means the Oil and Gas Property set forth on Schedule 1.01(c) or at any time thereafter held or acquired by any Credit Party, in each case, that is subject to a right of a third party existing on the date hereof under an area of mutual interest agreement, joint venture agreement, participation agreement or other similar agreement customary in the oil and gas

industry to acquire an interest in such lease from such Credit Party; provided, in each case, that such right has not been exercised and the time for exercise has not expired.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Capital Stock representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent. Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of the Borrower.

"Swap Agreement" means any agreement or arrangement, or any combination thereof, (i) consisting of interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies or (ii) relating to oil and gas or other hydrocarbon prices or basis costs or differentials or other similar financial factors.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Texas Finance Code" shall have the meaning assigned to such term in Section 11.15.

"Transactions" means (a) the execution, delivery and performance by the Credit Parties of this Agreement and the other Loan Documents, (b) the Borrowing of Loans, and (c) the use of the proceeds thereof.

"Treasury Rate" means the yield to maturity at a time of computation of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) which has become publicly available at least two (2) Business Days prior to the prepayment date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the applicable prepayment date to September 1, 2019, provided that if the period from the applicable prepayment date to September 1, 2019 is not equal to the constant maturity of a

United States Treasury security for which a weekly average yield is given, the Treasury Rate shall be obtained by linear interpolation (calculated to the nearest 1/12th of a year) from the weekly average yields of United States Treasury securities for which such yields are given having maturities as close as possible to September 1, 2019, except that if the period from the applicable prepayment date to September 1, 2019 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year shall be used.

"Type" when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "*Rate*" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"U.S. Government Securities" means direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency or instrumentality thereof to the extent such obligations are entitled to the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.12(f)(ii)(B)(3).

"Wellbore Lien" means, with respect to any DrillCo PDP Reserves of a Credit Party attributable to a particular well, a Lien (including a real property mortgage on and a locally, and, if applicable, centrally, filed financing statement covering fixtures and as-extracted collateral) on (i) the interest of the relevant Credit Party in and to such well, the associated wellbore and the associated fixtures and as-extracted collateral, and (ii) the interest of such Credit Party in and to the Leases or other Oil and Gas Properties attributable to such DrillCo PDP Reserves, but only insofar as such Leases or other Oil and Gas Properties are necessary to produce, operate, maintain, and plug and abandon such well.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Credit Party and the Administrative Agent.

**Section 1.02   Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or

otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.03    **Classification of Loans and Borrowings**.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "*Eurodollar Loan*") or as either New Money Loans or Refinanced Loans.

## ARTICLE II.

## THE CREDITS

Section 2.01    **Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent in writing that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Majority Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein.

Section 2.02    **Loans and Commitments**.

(a)    Subject to the terms and conditions set forth herein and the DIP Orders, and relying upon the representations and warranties set forth herein, each Lender agrees, severally and not jointly, to make New Money Loans to the Borrower from time to time on any Business Day as follows:

(i)    *New Money Interim Loans*. Subject to satisfaction of the conditions set forth in Sections 4.01 and 4.02, each Lender with a New Money Interim Commitment agrees, severally and not jointly, to make loans to the Borrower in Dollars on any Business Day following the Interim Order Entry Date in an aggregate amount not to

exceed its New Money Interim Commitment at such time; provided that the aggregate amount of each such Borrowing shall not be less than $2,500,000 for the initial Borrowing and not less than $500,000 for each subsequent Borrowing (or, if less, the aggregate amount of the remaining New Money Interim Commitments), and, in any event, in an aggregate amount for each such Borrowing not to exceed (x) the aggregate New Money Interim Commitments at such time or (y) the Borrowing Cap at such time (each such loan, a "New Money Interim Loan"). The amount of each Lender's New Money Interim Loan as part of any such Borrowing shall equal its *pro rata* share of such Borrowing.

(ii) *New Money Final Loan.* Subject to satisfaction of the conditions set forth in Sections 4.01 and 4.02, each Lender with a New Money Final Commitment agrees, severally and not jointly, to make loans in Dollars to the Borrower on any Business Day following the Final DIP Order Entry Date in an aggregate amount not to exceed its New Money Final Commitment at such time; provided that the aggregate amount of each such Borrowing shall not be less than $500,000 (or, if less, the aggregate amount of the remaining New Money Final Commitments), and, in any event, not to exceed (x) the aggregate New Money Final Commitments at such time or (y) the Borrowing Cap at such time (each such Loan, a "New Money Final Loan"). The amount of each Lender's New Money Final Loan as part of any such Borrowing shall equal its *pro rata* share of such Borrowing.

(iii) *New Money Reserve Loan.* Subject to satisfaction of the conditions set forth in Sections 4.01 and 4.02 and the Borrower having demonstrated to the reasonable satisfaction of the Majority Lenders acting in good faith, the bona fide need of the Borrower for such additional liquidity to effectuate the Operating Rights Preservation Activities, each Lender with a New Money Reserve Commitment agrees, severally and not jointly, to make loans in Dollars to the Borrower on any Business Day following the Final DIP Order Entry Date in an aggregate amount not to exceed its New Money Reserve Commitment at such time; provided that the aggregate amount of each such Borrowing shall not be less than $500,000 (or, if less, the aggregate amount of the remaining New Money Reserve Commitments), and, in any event, not to exceed (x) the aggregate New Money Reserve Commitments at such time or (y) the Borrowing Cap at such time (each such loan, a "New Money Reserve Loan"). The amount of each Lender's New Money Reserve Loan as part of any such Borrowing shall equal its *pro rata* share of such Borrowing.

Proceeds of the New Money Loans shall be used and distributed by the Borrower solely as permitted herein. Once borrowed or repaid, the New Money Loans may not be reborrowed, and any New Money Commitment, once terminated or reduced, may not be reinstated. The Parties hereto acknowledge and agree that the Administrative Agent shall not (a) be obligated to ascertain, monitor or inquire as to whether any Borrowing is in compliance with the Borrowing Cap and, unless the Administrative Agent receives written notice from the Majority Lenders prior to the funding of any requested Borrowing indicating that the Borrowing Cap as set forth in the Borrowing Request for such Borrowing is inaccurate, the Administrative Agent may conclusively assume that the Borrowing Cap set forth in the Borrowing Request is accurate for such Borrowing or (b) have any liability with respect to or arising out of any Borrowing

requested exceeding the Borrowing Cap.  The aggregate amount of the New Money Commitments (which on the Effective Date is $100,000,000) shall be reduced by the amount of each Borrowing of New Money Loans made hereunder immediately upon the funding thereof (and in no event shall the aggregate amount of New Money Loans borrowed hereunder during the term of this Agreement exceed $100,000,000), and the amount of each Lender's applicable New Money Commitment shall be automatically and permanently reduced by the amount of the related New Money Loan funded by such Lender pursuant to Section 2.02(a) immediately upon the funding thereof.

(b)     Subject to the terms and conditions set forth herein and in the DIP Orders, and relying upon the representations and warranties set forth herein, each Lender with a Refinanced Commitment shall be deemed, on the Final DIP Order Entry Date, to have made a loan to the Borrower (each such loan, a "Refinanced Loan") in an aggregate amount equal to such Lender's Refinanced Commitment.  The Administrative Agent, the Lenders and the Credit Parties each acknowledges and agrees that the Refinanced Loans shall be deemed funded on the Final DIP Order Entry Date and the Refinanced Commitment of each Lender shall terminate immediately and automatically after the deemed making of the Refinanced Loan.  The Refinanced Loans shall initially be made as Eurodollar Loans with an Interest Period of one month.

**Section 2.03   Request for Borrowings; Funding of Borrowings**.

(a)     In order to request a Borrowing (other than a Borrowing of Refinanced Loans), the Borrower shall deliver in writing to the Administrative Agent and the Lenders (or shall provide telephonic notice promptly confirmed in writing by a duly completed Borrowing Request) not later than 12:00 p.m. New York city time, three (3) Business Days prior to the proposed Borrowing.  Such Borrowing Request shall be irrevocable and shall be delivered by telecopy or email to the Administrative Agent and shall be signed by the Borrower.  Each such written Borrowing Request shall specify the following information:

(i)     whether the Borrowing then being requested is to be a Eurodollar Borrowing or an ABR Borrowing;

(ii)     the aggregate amount of such Borrowing;

(iii)     the wiring information of the account of the Borrower to which funds are to be disbursed;

(iv)     the date of such Borrowing, which shall be a Business Day;

(v)     whether the Borrowing will be a Borrowing of New Money Interim Loans, New Money Final Loans or New Money Reserve Loans; and

(vi)     if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto.

Notwithstanding any other provision of this Agreement, the Borrower shall not request, and the Lenders shall not be required to fund, a Borrowing of New Money Loans more frequently than once per calendar week.

Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from a Responsible Officer of the Borrower.

(b)     If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's *pro rata* share of the requested Borrowing.

(c)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or elect to convert or continue, any Borrowing if the Interest Period requested or elected with respect thereto would end after the maturity date of such Borrowing.

(d)     The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(e)     Each submission by the Borrower to the Administrative Agent of a Borrowing Request shall be deemed to constitute a representation and warranty by the Borrower that the conditions set forth in Article IV have been satisfied or waived as of the date of the Borrowing.

(f)     Each Lender shall make its *pro rata* share of each Borrowing of New Money Loans by wire transfer of immediately available funds by 12:00 p.m., New York City time, to an account of the Administrative Agent designated for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly disbursing the amounts so received, in like funds, to a deposit account of the Borrower designated by the Borrower in the applicable Borrowing Request.

(g)     Unless the Administrative Agent shall have received written notice from a Lender prior to the proposed time its New Money Loan is required to be made by such Lender in accordance with paragraph (f) of this Section that such Lender will not make available to the Administrative Agent such Lender's New Money Loan, the Administrative Agent may assume that such Lender has made its New Money Loan available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its New Money Loan available to the Administrative Agent, then such Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to the New Money Loans.  If such

Page 35

Lender pays such amount to the Administrative Agent, then the principal portion of such payment shall constitute such Lender's New Money Loan.

(h)     Notwithstanding any other provision of this Agreement, there shall be no more than fifteen (15) Interest Periods outstanding at any time.

**Section 2.04   [Reserved]**.

**Section 2.05   Repayment of Loans; Evidence of Debt**.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of the Loans of such Lender, and all interest due thereon, and otherwise satisfy all other Obligations, in each case, on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from the Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's Applicable Percentage thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement; and provided further that to the extent there is any conflict between the accounts maintained pursuant to paragraph (b) or (c) of this Section and the Register maintained pursuant to Section 11.04(b), the Register shall control.

(e)     Any Lender may request that the Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender or its registered assigns in the form attached hereto as Exhibit G. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 11.04) be represented by a promissory note in such form.

**Section 2.06   Optional Prepayment of Loans**.

(a)     The Borrower shall have the right at any time and from time to time to prepay the Loans, in whole or in part, in an aggregate minimum amount equal to (i) if being paid in whole, the Obligations and (ii) if being paid in part, $1,000,000 and integral multiples of $500,000 in

excess of that amount.  With respect to each prepayment of Loans required by this <u>Section 2.06</u>, such prepayments shall be applied on a *pro rata* basis to the then outstanding Loans irrespective of whether such outstanding Loans are ABR Loans or Eurodollar Loans.

(b)      The Borrower shall notify the Administrative Agent and the Lenders in writing of any prepayment hereunder not later than 12:00 p.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans to be prepaid and the Make-Whole Amount due in respect of such prepayment.  All prepayments under this Section 2.06 shall be subject to Section 2.09 and Section 2.16 but otherwise without premium or penalty.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment shall be applied ratably to the Loans.

(c)      Each prepayment pursuant to this Section 2.06 shall be accompanied by a cash amount equal to the accrued but unpaid interest through the date of such prepayment.

**Section 2.07    <u>Mandatory Prepayment of Loans</u>**.

(a)      If any Credit Party shall consummate any Asset Sale above $25,000 individually or in the aggregate, incur any Indebtedness (other than Indebtedness permitted under Section 6.02) or realize proceeds from any Casualty Event above $25,000 individually or in the aggregate, then, in each case, not later than two (2) Business Days after receipt of the Net Cash Proceeds therefrom, the Borrower shall apply 100% of such Net Cash Proceeds to the repayment of Loans and the payment of accrued and unpaid interest thereon.  The provisions of this Section 2.07(a) do not constitute a consent to any Disposition or the incurrence of any Indebtedness by any Credit Party.

(b)      Each payment of Net Cash Proceeds pursuant to this Section 2.07 shall be applied on a *pro rata* basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are ABR Loans or Eurodollar Loans and shall, with respect to New Money Loans, be accompanied by all accrued but unpaid interest thereon.

(c)      The Borrower shall notify the Administrative Agent and the Lenders in writing of any prepayment hereunder not later than 12:00 p.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans to be prepaid and the Make-Whole Amount due in respect of such prepayment.  All prepayments under this Section 2.07 shall be subject to Section 2.09 and Section 2.16 but otherwise without premium or penalty.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.

**Section 2.08    [Reserved]**.

**Section 2.09    <u>Payment of Make-Whole Amount</u>**.

(a)      Whether voluntary or mandatory, and with respect to each repayment or prepayment of Loans under Section 2.06 or 2.07 or any acceleration of the Loans and other Obligations pursuant to Article VIII, the Borrower shall pay to the Administrative Agent, for the

ratable benefit of the Lenders, with respect to the amount of the Loans repaid, prepaid or accelerated, in each case, concurrently with such repayment or prepayment, the Make-Whole Amount (as calculated by the Majority Lenders in consultation with the Borrower). Notwithstanding the foregoing, no Make-Whole Amount shall be payable (i) with respect to any Excluded Make-Whole Prepayments, which shall not include, for the avoidance of doubt, any prepayments in connection with a sale pursuant to section 363 of the Bankruptcy Code or (ii) if the Loans are repaid and otherwise satisfied pursuant to an Acceptable Plan.

(b)     Any Make-Whole Amount payable pursuant to this Section 2.09 shall be presumed to be the liquidated damages sustained by each Lender as the result of the early prepayment and/or acceleration of its Loans and the Borrower agrees that it is reasonable under the circumstances in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof.

(c)     Notwithstanding any provision herein or in any Loan Document to the contrary, any payment of the Make-Whole Amount hereunder with respect to the Refinanced Loans shall be made without duplication of any make-whole amounts due and payable under the Prepetition Term Loan Documents or with respect to the Prepetition Term Loan Obligations.

### Section 2.10   Interest on Loans.

(a)     The Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days (or, in the case of ABR Loans and that bear interest by reference to the Base Rate, 365 or 366 days, as applicable) and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)     Interest on each Loan shall be payable in arrears on each Interest Payment Date applicable to such Loan and on the Maturity Date, and, in the event of any repayment or prepayment of any Loan, interest on the amount so repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.  Interest accruing on the New Money Loans shall be payable in cash on each Interest Payment Date and interest accruing on the Refinanced Loans shall be payable on each Interest Payment Date by capitalizing and adding such amount to the outstanding principal balance of the Loans on such Interest Payment Date in lieu of paying such amount in cash (such interest that is capitalized and added to the principal amount of a Refinanced Loan being referred to herein as "PIK Interest"). Upon being capitalized and added to the then aggregate outstanding principal balance of the Refinanced Loans, PIK Interest shall be treated as principal of the Refinanced Loans for all purposes of this Agreement and the other Loan Documents.

(d)     Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans and, to the extent permitted by applicable law, other Obligations outstanding shall thereafter bear interest, after as well as before judgment, at the Default Rate.

(e)     If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the rate applicable during such extension period.

### Section 2.11   **Alternate Rate of Interest**.

(a)     If prior to the commencement of any Interest Period for a Eurodollar Borrowing: (x) the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or (y) the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) or is advised in writing by the Majority Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period; then the Administrative Agent shall give written notice thereof to Borrower and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Eurodollar Borrowing requested to be made on the first day of such Interest Period shall be made as a Market Disruption Loan, (ii) any Borrowings that were to have been converted on the first day of such Interest Period to a Eurodollar Borrowing shall be continued as a Market Disruption Loan and (iii) any outstanding Eurodollar Borrowing shall be converted, on the last day of the then-current Interest Period, to a Market Disruption Loan.

(b)     If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(x) above have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(x) have not arisen but the administrator of the ICE Benchmark Administration London Interbank Offered Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the ICE Benchmark Administration London Interbank Offered Rate shall no longer be used for determining interest rates for loans, then the Borrower and the Administrative Agent (acting at the direction of the Majority Lenders) shall endeavor to establish an alternate rate of interest to the LIBO Rate that (x) gives due consideration to the then-prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time and (y) is a rate for which the Administrative Agent has indicated in writing to the Lenders (which includes email) that it is able to calculate and administer and the Borrower and the Administrative Agent, with the consent of Majority Lenders, may enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin) (and the Lenders hereby (A) authorize and direct the Administrative Agent to execute and deliver any such amendment in respect of which the Majority Lenders have indicated in writing to the Administrative Agent (which may be via email) that such amendment

(and the alternate interest rate specified therein) is satisfactory to the Majority Lenders and (B) acknowledge and agree that the Administrative Agent shall be entitled to all of the exculpations and indemnifications provided for in this Agreement in favor of the Administrative Agent in executing and delivering any such amendment).  Notwithstanding anything to the contrary in Section 11.02, such amendment shall become effective without any further action or consent of any other party to this Agreement.  Until an alternate rate of interest is determined in accordance with this clause (b) (but, in the case of the circumstances described in clause (ii) of the first sentence of this Section 2.11(b), only to the extent the ICE Benchmark Administration London Interbank Offered Rate for such Interest Period is not available or published at such time on a current basis), (x) any requested Eurodollar Loans shall be made as ABR Loans, (y) any ABR Loans that were to have been converted to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then current Interest Period applicable thereto, into ABR Loans, in each case determined without giving effect to clause (c) of the Alternative Base Rate.

**Section 2.12   Fees**.

(a)     *Upfront Fee*.  The Borrower shall pay to each Lender a non-refundable upfront fee in cash in an amount equal to 1.75% of its aggregate New Money Commitments on the Effective Date; *provided* that, such upfront fee may be structured as original issue discount as agreed between the Borrower and the applicable Lender(s).  Such fee shall be fully earned, due and payable on the Effective Date and shall not be refundable for any reason whatsoever.  To the extent the upfront fee is structured as original issue discount, each applicable Lender shall on the first date of Borrowing of New Money Loans fund the amount of its New Money Loan on such date (net of such original issue discount) requested by the Borrower in exchange for the Borrower's obligations to repay in full the face amount of the New Money Loans plus interest accrued thereon in accordance with the terms hereof.

(b)     *Commitment Yield Enhancement*.  The Borrower shall pay to each Lender a non-refundable yield enhancement in cash in an amount equal to 1.75% of its aggregate New Money Commitment on the Effective Date.  Such fee shall be fully earned, due and payable on the Effective Date and shall not be refundable for any reason whatsoever.

(c)     *Administrative Agent Fees*.  The Borrower shall pay to the Administrative Agent, for its own account, the fees and expenses set forth in the Fee Letter in the amounts and at the times set forth therein.  Such fees shall be fully earned when due and shall not be refundable for any reason whatsoever.

**Section 2.13   Conversion and Continuation of Borrowings**.  The Borrower shall have the right at any time upon delivery of an Interest Election Request to the Administrative Agent (a) not later than 11:00 a.m., New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 11:00 a.m., New York City time, three (3) Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 11:00 a.m., New York City time, three (3) Business Days prior to conversion, to convert the Interest Period with respect to

any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

(i)    each conversion or continuation shall be made *pro rata* among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)    no less than all the outstanding principal amount of any Borrowing shall be converted or continued;

(iii)    accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv)    if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v)    any portion of the Borrowing maturing or required to be repaid in less than one week may not be converted into or continued as a Eurodollar Borrowing;

(vi)    any portion of a Eurodollar Borrowing that cannot be continued as a Eurodollar Borrowing by reason of the immediately preceding clause (v) shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing; and

(vii)    after the occurrence and during the continuance of a Default or Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each such Interest Election Request shall be irrevocable and shall specify (a) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (b) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (c) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (d) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the Lenders of any notice given pursuant to this Section 2.13. If the Borrower shall not have given notice in accordance with this Section 2.13 to continue any Borrowing into a subsequent Interest Period, such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted into an ABR Borrowing.

**Section 2.14    Increased Costs**.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with

or for the account of or credit extended by any Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate);

(ii)     subject any Recipient to any Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (iii) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender

and the result of any of the foregoing shall be to increase the cost to such Recipient of making, converting to, continuing or maintaining any Loan or maintaining its obligations to make any such Loan or to reduce the amount of any sum received or receivable by such Recipient hereunder (whether of principal, interest or any other amount), then the Borrower will pay to such Recipient such additional amount or amounts as will compensate such Recipient for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Recipient setting forth the amount or amounts necessary to compensate such Recipient or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive absent manifest error.  The Borrower shall pay such Recipient the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof.

(d)     Failure or delay on the part of any Recipient to demand compensation pursuant to this Section shall not constitute a waiver of such Recipient's right to demand such compensation; provided that the Borrower shall not be required to compensate a Recipient pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Recipient notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Recipient's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

**Section 2.15     Change in Legality**.

(a)     Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)     such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)     such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under paragraph (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)     For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, (i) if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan and (ii) in all other cases, on the date of receipt by the Borrower.

**Section 2.16     Breakage**.  The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving, or being deemed to receive, any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.13) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "Breakage Event") or (b) any default in the making of any payment or prepayment required to be made hereunder.  In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for

the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period.  A certificate of any Lender (with a copy to the Administrative Agent) setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

**Section 2.17   Taxes**.

(a)      Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Credit Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings of Indemnified Taxes applicable to additional sums payable under this Section 2.17) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      Payment of Other Taxes by the Borrower.  The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)      Evidence of Payments.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 2.17, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)      Indemnification by the Borrower.  The Credit Parties shall jointly and severally indemnify each Recipient, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)      Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) Business Days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has

not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding Tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time

Page 45

thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form) establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form) establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form); or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form), a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or Exhibit H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding

Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Recipient under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     <u>Status of Administrative Agent</u>.  On or before the date on which Wilmington Trust, National Association (and any successor or replacement Administrative Agent) becomes the Administrative Agent hereunder, it shall deliver to the Borrower two executed copies of either (i) IRS Form W-9, or (ii) IRS Form W-8ECI (with respect to any payments to be received on its own behalf) and IRS Form W-8IMY (for all other payments), establishing that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States, including Taxes imposed under FATCA.

(h)     <u>Treatment of Certain Refunds</u>.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the

indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     FATCA.  For purposes of determining withholding Taxes imposed under FATCA, from and after the effective date of this Agreement, the Borrower and the Administrative Agent shall treat (and the Lenders hereby authorize the Administrative Agent to treat) each Loan as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

(j)     Survival.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

### Section 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under Section 2.14, Section 2.16 or Section 2.17, or otherwise) prior to 2:00 p.m. New York City Time on the date when due, in Dollars and (other than in the case of PIK Interest) in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at such account as may be specified by the Administrative Agent, except that payments pursuant to Section 2.14, Section 2.16, Section 2.17 or Section 11.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied (i) first, towards payment of fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of fees then due to such parties, (ii) second, towards payment of interest and premiums then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and premiums then due to such parties and (iii) third, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.17(e) or Section 11.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to it under such Sections until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as Cash Collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES

Each Credit Party represents and warrants to the Administrative Agent and the Lenders that on the Effective Date and each Credit Date:

**Section 3.01   Organization; Powers**.  Each Credit Party (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) subject to the entry and terms of the DIP Orders and any other orders of the Bankruptcy Court, as applicable, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

**Section 3.02   Authorization; Enforceability**.  Subject to entry and the terms of the DIP Orders, the Transactions are within each Credit Party's corporate, limited liability company or partnership powers and have been duly authorized by all necessary corporate, limited liability company or partnership and, if required, actions by equity holders.  Subject to entry and the terms of the DIP Orders, this Agreement has been duly executed and delivered by each Credit Party and constitutes a legal, valid and binding obligation of each Credit Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03   Governmental Approvals; No Conflicts**.  Subject to the entry and terms of the DIP Orders, the Transactions (a) other than the DIP Orders, do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect or have been made or to be made in connection with the filing of any Security Documents, financing statements, or other registrations or filings to secure the Obligations, (b) will not violate any Requirement of Law applicable to any Credit Party or any Subsidiary, (c) will not violate or result in a default under any post-petition indenture, agreement or other instrument evidencing Indebtedness, or give rise to a right thereunder to require any payment to be made by any Credit Party or any Subsidiary, and (d) will not result in the creation or imposition of any Lien on any asset of any Credit Party or any Subsidiary not otherwise permitted under Section 6.03.

**Section 3.04   Financial Condition; No Material Adverse Change**.

(a)      The Borrower has heretofore furnished to the Administrative Agent and the Lenders (i) the audited consolidated balance sheet and related statements of income, stockholders equity and cash flows of the Borrower and its Consolidated Subsidiaries as of and for the fiscal year ended December 31, 2017, reported on by BDO USA, LLP, independent public accountants and (ii) the unaudited consolidated balance sheet and related statements of income, stockholders equity and cash flows of the Borrower and its Consolidated Subsidiaries as of and for the fiscal quarter ended June 30, 2018.  Such financial statements, together with any notes and management discussions related to such financials appearing in the Borrower's Form 10-K filed

with the SEC on March 15, 2018 and the Borrower's Form 10-Q filed with the SEC on August 9, 2018 present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its Consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP and, except as set forth on <u>Schedule 3.04</u>, show all Material Indebtedness and other liabilities, direct or contingent, of the Borrower and its Consolidated Subsidiaries as of the date thereof, including material commitments and Indebtedness.

(b)     Since the Petition Date, no event or circumstance, either individually or in the aggregate, which has had or could reasonably be expected to have a Material Adverse Effect has occurred.

**Section 3.05   Properties**.

(a)     Except as otherwise provided in Section 3.05(c) with respect to Oil and Gas Property, the Borrower and each Subsidiary has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for (i) minor defects in title that do not, in the aggregate, interfere with its ability to conduct its business as currently conducted and (ii) Liens permitted under Section 6.03.

(b)     The Borrower and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower and such Subsidiaries, as the case may be, does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c)     Each Credit Party has good and defensible title to all Proved Reserves included in the Oil and Gas Property described in the most recent Reserve Report provided to the Administrative Agent and the Lenders (other than such Proved Reserves that have been subsequently disposed of and disclosed on <u>Schedule 3.19</u>), free and clear of all Liens except Liens permitted under Section 6.03.  All such proved Oil and Gas Property are valid, subsisting, and in full force and effect in all material respects, and all rentals, royalties, and other amounts due and payable in respect thereof have been duly paid except for such rentals, royalties and other amounts that are amounts being contested in good faith by appropriate proceedings and for which the Borrower or the applicable Subsidiary has set aside on its books adequate reserves. Without regard to any consent or non-consent provisions of any joint operating agreement covering any Credit Party's proved Oil and Gas Property, such Credit Party's share of (a) the costs for the proved Oil and Gas Property described in the Reserve Report (other than for such proved Oil and Gas Property that have been subsequently disposed of and disclosed on <u>Schedule 3.19</u>) is not materially greater than the decimal fraction set forth in the Reserve Report, before and after payout, as the case may be, and described therein by the respective designations "working interests," "WI," "gross working interest," "GWI," or similar terms (except in such cases where there is a corresponding increase in the net revenue interest), and (b) production from, allocated to, or attributed to such proved Oil and Gas Property is not materially less than the decimal fraction set forth in the Reserve Report, before and after payout, as the case may be, and described therein by the designations "net revenue interest," "NRI," or similar terms.  The wells drilled in respect of proved producing Oil and Gas Property described in the Reserve Report (other than wells drilled in respect of such proved producing Oil and Gas Property that

Page 51

have been subsequently disposed of and disclosed on <u>Schedule 3.19</u>) (1) are capable of, and are presently, either producing Hydrocarbons in commercially profitable quantities or in the process of being worked over or enhanced, and the Credit Party that owns such proved producing Oil and Gas Property is currently receiving payments for its share of production, with no funds in respect of any thereof being presently held in suspense, other than any such funds being held in suspense pending delivery of appropriate division orders, (2) have been drilled, bottomed, completed, and operated in material compliance with all applicable laws, and (3) are not subject to any material penalty in production by reason of such well having produced in excess of its allowable production.

(d)      No Credit Party has knowledge that a default exists under any of the terms or provisions, express or implied, of any of the leases and term mineral interests in the Oil and Gas Properties evaluated in the most recently delivered Reserve Report (other than any thereof Disposed of in a Disposition permitted by this Agreement) or under any agreement to which the same are subject that would materially and adversely affect the rights of the Credit Parties with respect to the Oil and Gas Properties to which such lease, interest, or agreement relates.

(e)      Except as otherwise permitted hereunder, there are no obligations under any Oil and Gas Property or contract or agreement which require the drilling of additional wells or operations to earn or to continue to hold any of the Oil and Gas Properties in force and effect, except leases in the primary term and those under customary continuous operations provisions that may be found in one or more of the Borrower's or any Subsidiaries oil and gas and/or oil, gas and mineral leases.

(f)      To the extent required hereunder, all material necessary regulatory filings have been properly made in connection with the drilling, completion and operation of the wells on or attributable to the Oil and Gas Properties and all other operations related thereto.

(g)      To the extent required hereunder, all production and sales of Hydrocarbons produced or sold from the Oil and Gas Properties have been made materially in accordance with any applicable allowables (plus permitted tolerances) imposed by any Governmental Authorities.

(h)      No Credit Party has collected any proceeds from the sale of Hydrocarbons produced from the Oil and Gas Properties which are subject to any material refund obligation.

**Section 3.06   <u>Litigation and Environmental Matters</u>**.

(a)      Except for the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Credit Party, threatened against or affecting the Borrower or any Subsidiary, (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect after taking into account insurance proceeds or other recoveries from third parties actually received (other than the Disclosed Matters) or (ii) that involve this Agreement or the Transactions.

(b)      Except for the Disclosed Matters and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material

Adverse Effect after taking into account insurance proceeds or other recoveries from third parties actually received, neither the Borrower nor any Subsidiary, to the Borrower's knowledge, (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any claim with respect to any Environmental Liability.

Section 3.07   **Compliance with Laws and Agreements**.  (a) Unless stayed by the Chapter 11 Cases, the Borrower and each Subsidiary is in compliance with all Requirements of Law applicable to it or its property, (b) the Borrower and each Subsidiary is in compliance with its respective Organizational Documents and (c) the Borrower and each Subsidiary is in compliance with all post-petition indentures, agreements and other instruments binding upon it or its property, except, in the case of clauses (a) or (c), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

Section 3.08   **Investment Company Status**.  Neither the Borrower nor any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

Section 3.09   **Taxes**.  The Borrower and each Subsidiary has timely filed or caused to be filed all material Tax returns and material reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except Taxes (a) that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

Section 3.10   **ERISA**.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of FASB Statement 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount that could reasonably be expected to result in Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of FASB Statement 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that could reasonably be expected to result in Material Adverse Effect.

Section 3.11   **Disclosure**.  The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower

or any Subsidiary to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date made or deemed made; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based on assumptions believed to be reasonable at the time and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

Section 3.12   **Labor Matters**.  There are no strikes, lockouts or slowdowns against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened that could reasonably be expected to have a Material Adverse Effect.  The hours worked by and payments made to employees of the Borrower and of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other Law dealing with such matters in any material respect.

Section 3.13   **Capitalization**.  Schedule 3.13 lists as of the Effective Date, for the Borrower and each Subsidiary, its full legal name and its jurisdiction of organization.

Section 3.14   **Margin Stock**.  Neither the Borrower nor any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), and no part of the proceeds of the Loans will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

Section 3.15   **Bank Accounts**.  Schedule 3.15 lists all accounts maintained by or for the benefit of any Credit Party with any bank or financial institution.

Section 3.16   **[Reserved]**.

Section 3.17   **[Reserved]**.

Section 3.18   **Gas Imbalances**.  Except as set forth on Schedule 3.18, on a net basis there are no Gas Imbalances, take or pay or other prepayments with respect to any Oil and Gas Properties which would require any Credit Party to deliver Hydrocarbons produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor other than that which do not result in any Credit Party or any Subsidiary having net aggregate liability in excess of $500,000.

Section 3.19   **Reserve Reports**. To the best of the Borrower's knowledge, (i) the assumptions stated or used in the preparation of each Reserve Report are reasonable (it being understood by Administrative Agent and the Lenders that assumptions as to future results are subject to uncertainty and that no assurance can be given that any particular projections will be realized to the extent beyond any Credit Party's control), (ii) all information furnished by any Credit Party to the Petroleum Engineers for use in the preparation of each Reserve Report was accurate in all material respects at the time furnished or was subsequently corrected, (iii) except as set forth on Schedule 3.19, there has been no decrease in the amount of the estimated Proved

Reserves shown in any Reserve Report since the date thereof, except for changes which have occurred as a result of production in the ordinary course of business, and (iv) at the time furnished, no Reserve Report omitted any statement or information necessary to cause the same not to be misleading to Administrative Agent and the Lenders in any material respect.

Section 3.20    **Sale of Production**.  No Oil and Gas Property is subject to any Advance Payment Contract or any contract whereby payments are made to any Credit Party other than by checks, drafts, wire transfer advices or other similar writings, instruments or communications for the immediate payment of money.  Except for production sales contracts, processing agreements, transportation agreements and other agreements relating to the marketing of production in connection with the Oil and Gas Properties to which such contract or agreement relates:  (i) no Oil and Gas Property is subject to any contractual or other arrangement for the sale, processing or transportation of production (or otherwise related to the marketing of production) which cannot be canceled on one year's (or fewer) notice, other than as consented to by the Majority Lenders, and (ii) all contractual or other arrangements for the sale, processing or transportation of production (or otherwise related to the marketing of production) are bona fide arm's length transactions made on the best terms available with third parties not affiliated with any Credit Party.  Each Credit Party is presently receiving a price for all production from (or attributable to) each Oil and Gas Property covered by a production sales contract or marketing contract that is computed in accordance with the terms of such contract, and no Credit Party is having deliveries of production from such Oil and Gas Property curtailed substantially below such Property's delivery capacity.

Section 3.21    **Anti-Corruption Laws and Sanctions**.  The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees and, to the knowledge of the Borrower its directors and agents, insofar as the same are acting on behalf of the Borrower or its Subsidiaries, (i) are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and (ii) have not and will not do business, enter into transactions or store with, purchase or receive money from, transport from, to or with, sell goods or give money to, a Sanctioned Person.  None of (a) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  The making of the Loans, use of proceeds thereof or other transaction contemplated by the Credit Agreement will not violate Anti-Corruption Laws or applicable Sanctions.

Section 3.22    **No Foreign Operations**.  The Borrower and its Subsidiaries do not operate their business outside the geographical boundaries of the United States.

Section 3.23    **Budget**.  The Approved Budget was prepared in good faith based on assumptions believed by the Credit Parties to be reasonable at the time made.

Section 3.24    **Purpose of Loans**.  The proceeds of the New Money Loans will be used in accordance with the terms of the Approved Budget (including any Carry Forward Amount and any Permitted Variance), including, without limitation (i) to pay amounts due to Lenders and the

Administrative Agent hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, (ii) to provide working capital, and for other general corporate purposes of the Credit Parties, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court and (iii) to pay the Adequate Protection Payments.

Section 3.25   **Collateral Documents**.  The provisions of the DIP Orders, as applicable, and the Security Documents are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid and enforceable security interest on all right, title and interest of the respective Credit Parties in the Collateral (with such priority as provided for in the DIP Orders).  Except for filings contemplated hereby and by the DIP Orders, as applicable, no filing or other action will be necessary to perfect the Liens on any Collateral.

Section 3.26   **Prepetition Obligations**.  Except for the Prepetition Obligations and as disclosed on Schedule 6.02, the Credit Parties do not have any other Material Indebtedness for borrowed money outstanding on the date hereof.

Section 3.27   **Priority**.  Subject to the Carve-Out, the Hedge Carve-Out and the Non-Primed Excepted Liens (only to the extent set forth in the DIP Orders), the Obligations are secured by a first-priority perfected Lien on the all of the Collateral.

## ARTICLE IV.

## CONDITIONS TO BORROWINGS

Section 4.01   **Conditions to New Money Interim Loans**.  The obligation of each Lender to make the New Money Interim Loan shall be subject to the satisfaction (or waiver by the Majority Lenders) of the following conditions:

(a)   *Loan Documents*. The Administrative Agent and the Lenders shall have received executed counterparts of this Agreement and the other Loan Documents executed by each party hereto and thereto, each of which shall be in form and substance satisfactory to the Majority Lenders in their sole discretion.

(b)   *Organizational Documents.*  The Administrative Agent and the Lenders shall have received (i) customary certificates of resolutions or other action, incumbency certificates of Responsible Officers of each Credit Party evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Credit Party is a party and (ii) certificates (including Organization Documents and good standing certificates) relating to the organization, existence and good standing of each Credit Party in its jurisdiction of organization, in each case, as certified by the Secretary or an Assistant Secretary of such Credit Party.

(c)   *Collateral*. The Administrative Agent, for the benefit of the Secured Parties, shall have been granted a perfected lien on the Collateral by the DIP Orders on the terms and conditions set forth herein and in the other Loan Documents.

(d)     *Initial Budget*.  The Majority Lenders shall have received the Initial Budget in form and substance satisfactory to the Majority Lenders in their sole discretion and such other information (financial or otherwise) as the Majority Lenders may reasonably request.

(e)     *Fees and Expenses*.  The Administrative Agent and the Lenders shall have received all fees and expenses due and payable to the Secured Parties on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all reasonable and documented expenses (including reasonable and documented fees, charges and disbursements of counsel and other advisors) required to be reimbursed or paid by any Credit Party hereunder or under any other Loan Document.  The Administrative Agent shall have received a fully executed copy of the Fee Letter.

(f)     *Required Documentation*.   At least three (3) Business Days prior to the Effective Date, the Administrative Agent and the Lenders shall have received all documentation and other information with respect to the Credit Parties, requested in writing by the Administrative Agent or a Lender and required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act including, for the avoidance of doubt, a certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230.

(g)     *Bankruptcy Related Conditions*.

(i)     The  Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed by the Majority Lenders and be in form and substance reasonably acceptable to the Majority Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent);

(ii)     the Interim Order shall have been entered by the Bankruptcy Court within five (5) days after the Petition Date and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise subject to any challenge or a motion to amend, modify or vacate or for reconsideration absent the prior written consent of the Majority Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) (which consent may be withheld in their sole discretion); and

(iii)     All orders entered by the Bankruptcy Court, including orders pertaining to cash management and adequate protection (collectively, the "Non-DIP Orders") and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance reasonably satisfactory to the Majority Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent).

**Section 4.02   Conditions to All Loans**. The obligation of each Lender to make any Loans shall be subject to the satisfaction (or waiver by the Majority Lenders) of the following conditions:

(a)      *Representations and Warranties*.  The representations and warranties of each Credit Party contained in this Agreement and in each other Loan Document shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such date of Borrowing, as applicable, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date).

(b)      *No Default*. At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(c)      *Borrowing Request*.  The Administrative Agent shall have received a Borrowing Request in accordance with Section 2.03.

(d)      *No Material Adverse Effect*.   Except as disclosed to the Lenders in writing, since the Petition Date, there shall have been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(e)      *DIP Orders*.  With respect to New Money Final Loans and New Money Reserve Loans, the Final DIP Order shall have been entered by the Bankruptcy Court no later than 30 days after the Petition Date, and the Administrative Agent shall have received a true and correct copy of the Final DIP Order.  Each DIP Order, as the case may be, shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise subject to any challenge or a motion to amend, modify or vacate or for reconsideration absent the prior written consent of the Majority Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) (which consent may be withheld in their sole discretion).

(f)      *Compliance with Orders*.  The Credit Parties shall be in compliance with the DIP Orders in all respects and the Non-DIP Orders in all material respects.

(g)      *Budget*.  The Administrative Agent and the Lenders shall have received all periodic updates required under the Approved Budget and the Credit Parties shall be in compliance with the Approved Budget (including any Carry Forward Amount and any Permitted Variance).

(h)      *No Trustee, Examiner or Receiver*.   No trustee, examiner or receiver shall have been appointed or designated with respect to the Borrower or its Subsidiaries or their respective businesses, properties or assets, and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral.

(i)      *Approvals*.  Each Credit Party shall have obtained all approvals required from any Governmental Authority and all consents of other Persons, in each case that are necessary or, in the reasonable discretion of the Majority Lenders, advisable in connection with the Transactions and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Majority Lenders.  All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(j)      *No Other Proceedings*.  Other than the Chapter 11 Cases (and, except as otherwise provided herein, any objections, claims, actions, suits, investigations, litigation, or proceedings that may be commenced or pursued therein), there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality which relates to the DIP Facility or the transactions contemplated hereby (including, without limitation, any challenge by a creditor of the Credit Parties in any jurisdiction with respect to the validity or priority of the Liens securing the Collateral), except for claims, actions, suits, investigations, litigation or proceedings otherwise stayed by 11 U.S.C. 362.

(k)      Each of the conditions in Section 4.01 shall have been satisfied (or waived by the Majority Lenders).

The Majority Lenders shall notify the Administrative Agent of the Effective Date and such notice shall be conclusive and binding.  Without limiting the generality of the provisions of Article IX, for purposes of determining compliance with the conditions specified in this Article IV, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

## ARTICLE V.

## AFFIRMATIVE COVENANTS

Until the Discharge of Obligations, the Credit Parties covenant and agree with the Administrative Agent and the Lenders that:

**Section 5.01   Financial Statements; Other Information; Budget**.  The Borrower will furnish to the Administrative Agent for distribution to each Lender:

(a)      within 90 days after the end of each fiscal year of the Borrower, the audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows of the Borrower and its Consolidated Subsidiaries as of the end of and for such year,

Page 59

setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by BDO USA, LLP or other independent public accountants reasonably acceptable to the Majority Lenders, to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)     within 60 days after the end of each fiscal quarter of the Borrower, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows of the Borrower and its Consolidated Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     [reserved];

(d)     [reserved];

(e)     [reserved];

(f)     within 45 days following June 30th of each year and within 90 days following December 31st of each year, the Borrower shall furnish or make available to the Administrative Agent and each Lender (i) a Reserve Report in form and substance satisfactory to the Majority Lenders in their reasonable discretion and prepared as of the immediately preceding June 30th or December 31st, as applicable, which Reserve Report, in the case of each December 31 report shall be prepared or audited by an Approved Petroleum Engineer and in the case of each other Reserve Report shall be prepared by one or more petroleum engineers employed by the Borrower or, at the Borrower's election, by an Approved Petroleum Engineer; said Reserve Report to utilize economic and pricing parameters consistent with those set forth in the definition of Reserve Report, together with a Reserve Report Certificate;

(g)     together with each Reserve Report required to be delivered under Section 5.01(f), a report, in reasonable detail, setting forth (i) the Swap Agreements then in effect, the notional volumes of and prices for, on a monthly basis and in the aggregate, the Hydrocarbons for each such Swap Agreement and the term of each such Swap Agreement, (ii) the notional volumes of Hydrocarbons for each such Swap Agreement and (iii) a list of the customers comprising 80% of the Hydrocarbons (by value) being purchased from the Borrower or any Subsidiary in the six month period prior to the "as of" date of the most recently delivered Reserve Report or Reserve Report, as applicable;

(h)     together with each Reserve Report delivered under Section 5.01(f) for the period ending June 30th and December 31st of each year, (i) any updated production history of the Proved Reserves of the Credit Parties as of such date, (ii) the lease operating expenses attributable to the Oil and Gas Properties of the Credit Parties for the prior 12-month period

ending on the effective date of the applicable Reserve Report, and (iii) any other information as to the operations of Borrower and its Subsidiaries as reasonably requested by Administrative Agent;

(i)      from time to time such information or projections with respect to the business or Properties, or the condition or operations, financial or otherwise, of, or compliance with the terms of this Agreement by, the Credit Parties and their respective Subsidiaries as the Administrative Agent or the Majority Lenders may reasonably request, including, for the avoidance of doubt, any unsuperseded analysis of (i) the Borrower's and its Subsidiaries' Proved Reserves and (ii) the valuation of the Oil and Gas Properties, in each case, in either Credit Party's possession or control, such information to be provided in each case, as promptly as practicable, and in any event, within ten (10) Business Days following each such request;

(j)      as soon as available and in any event (i) on the fourth Business Day of each week covered in the Approved Budget, commencing with Thursday of the second full week after the Petition Date, a proposed 13-Week Budget, and, upon approval thereof by the Majority Lenders, such 13-Week Budget shall become the Approved Budget; provided that if such proposed 13-Week Budget is not satisfactory to the Majority Lenders in their sole discretion and not approved by the Majority Lenders, the Approved Budget that is then in effect shall remain in place;

(k)      on each Budget Testing Date (prior to 5:00 p.m. pacific time), (i) a variance report by email and certified by the chief financial officer of the Borrower, in form and substance acceptable to the Majority Lenders in their sole discretion, setting forth (x) each of the actual cash receipts and disbursements for the immediately preceding calendar week on a cumulative basis and the aggregate liquidity as of the end of such calendar week and (y) the variance in dollar amounts of the actual cash receipts and disbursements (including debt service but excluding fees and expenses of the Lenders and any professional fees) for each weekly period from those reflected for the corresponding period in the Approved Budget and including explanations for all material variances (including whether such variance is permanent in nature or timing related), (ii) an analysis, certified by the chief financial officer of the Borrower, demonstrating that, subject to and after giving effect to the application of any Carry Forward Amount, a Budget Event shall not have occurred for such week (if applicable) and (iii) a "flash" cash report detailing all cash and Cash Equivalents of each of the Credit Parties (broken out by entity) as of the close of business on the last Business Day of the prior week; and

(l)      with reasonable prior notice and an opportunity to comment by the Lenders and their counsel, copies of all pleadings, motions, applications, judicial information, financial information and any other documents to be filed by or on behalf of the Credit Parties with the Bankruptcy Court and any such information or documents given to the US Trustee or to any Committee relating to the operations, business, assets, properties or financial condition of the Credit Parties.

Documents required to be delivered pursuant to Section 5.01(a) or (b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (1) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's website on the Internet at www.gastar.com, or (2) on which such documents are posted on the

Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:  (i) upon request, the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent (by electronic mail) and, upon request, each Lender (by electronic mail) of the posting of any such documents and, upon request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Section 5.02   Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)      as soon as possible, but in any event within two (2) Business Days of obtaining knowledge thereof, (i) the occurrence of any Default, (ii) the occurrence of any "default" or "event of default" under any Material Indebtedness or (iii) the occurrence of any default under the DrillCo Operating Agreement;

(b)      as soon as possible, but in any event within two (2) Business Days after obtaining knowledge of the filing or commencement of any action, suit or proceeding (other than the Chapter 11 Cases) by or before any arbitrator or Governmental Authority against or affecting any Credit Party or any Affiliate thereof that, if adversely determined, could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect;

(c)      as soon as possible, but in any event within  two (2) Business Days after the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(d)      as soon as possible, but in any event within two (2) Business Days after obtaining knowledge of any release by any Credit Party, or any other Person of any Hazardous Material into the environment, which could reasonably be expected to have a Material Adverse Effect;

(e)      as soon as possible, but in any event within two (2) Business Days after any notice alleging any violation of any Environmental Law by any Credit Party or any other Environmental Liability, which could reasonably be expected to have a Material Adverse Effect;

(f)      as soon as possible, but in any event within two (2) Business Days after the occurrence of any breach or default under, or repudiation or termination of, any post-petition Material Sales Contract, which could reasonably be expected to have a Material Adverse Effect;

(g)      as soon as possible, but in any event within two (2) Business Days after becoming aware of any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect, including, without limitation, in connection with the Chapter 11 Cases (including, without limitation, progress of any proposed or confirmed plan of reorganization);

(h)     within three (3) days after the date on which any Credit Party provides written notice to the DrillCo Investor that an Initial Reversion Date (as defined in the DrillCo Agreement) or Final Reversion Date (as defined in the DrillCo Agreement) has occurred, the Borrower shall provide a copy of such notice to the Administrative Agent and the Lenders. Within three (3) Business Days of any Credit Party receiving a Wellbore Assignment from the DrillCo Investor covering an Initial Reversionary Share (as defined in the DrillCo Agreement) or a Final Reversionary Share (as defined in the DrillCo Agreement), the Borrower shall notify the Administrative Agent of the same;

(i)     any material amendments, restatements, supplements or other modifications to documents governing Material Indebtedness; and

(j)     the commencement of any insolvency or similar proceedings (other than the Chapter 11 Cases) relating to any Credit Party in any jurisdiction.

To the extent applicable, each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**Section 5.03   Existence; Conduct of Business**.  Each Credit Party will, and will cause each Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; underlined*provided* that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.04 or any Disposition permitted under Section 6.05 nor shall any Credit Party or any Subsidiary be required to preserve any right or franchise unrelated to the Oil and Gas Property if such Credit Party or such Subsidiary determines that the preservation thereof is no longer desirable in the conduct of its business and that the loss thereof is not adverse in any material respect to the Administrative Agent or any Lender.

**Section 5.04   Payment of Obligations**.  Each Credit Party will, and will cause each Subsidiary to, pay its obligations, including Tax liabilities, before the same shall become delinquent or in default in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, except (a) where the validity or amount thereof is being contested in good faith by appropriate proceedings and such Credit Party or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP or (b) where such payment would be inconsistent with the Approved Budget.

**Section 5.05   Maintenance of Properties; Insurance**.  Each Credit Party will, and will cause each Subsidiary and use commercially reasonable efforts to cause each operator of Oil and Gas Property to:

(a)     keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and

(b)     maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the

same or similar businesses operating in the same or similar locations.  Upon request of the Administrative Agent, the Borrower will furnish or cause to be furnished to the Administrative Agent from time to time a summary of the respective insurance coverage of the Borrower and its Subsidiaries in form and substance reasonably satisfactory to the Majority Lenders, and, if requested, will furnish the Administrative Agent copies of the applicable policies.  Upon demand by the Administrative Agent, the Borrower will cause any insurance policies covering any such property to be endorsed (a) to provide that such policies may not be cancelled, reduced or affected in any manner for any reason without 30 days' prior notice to the Administrative Agent, (b) to include the Administrative Agent as loss payee with respect to all property/casualty policies and additional insured with respect to all liability policies and (c) to provide for such other matters as the Lenders may reasonably require.

Section 5.06   **Books and Records; Inspection Rights**.  Each Credit Party will, and will cause each Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Subject to the proviso in Section 5.22, each Credit Party will, and will cause each Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its senior management, independent accountants and other advisors, all at such reasonable times and as often as reasonably requested.

Section 5.07   **Compliance with Laws and DIP Orders**.  Each Credit Party will, and will cause each Subsidiary to, comply with (a) all Requirements of Law (including Environmental Laws) applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect or such compliance is stayed by the Chapter 11 Cases and (b) the DIP Orders in all respects.

Section 5.08   **Environmental Matters**.  If an Event of Default is continuing or if the Administrative Agent at any time has a reasonable basis to believe that there exists a violation of any Environmental Law by either Credit Party or any Subsidiary or that there exists any other Environmental Liabilities that would in either case reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect, then the applicable Credit Party and each relevant Subsidiary shall, promptly upon the receipt of a request from the Administrative Agent, cause the performance of, or allow the Administrative Agent (or its designee) access to the real property for the purpose of conducting, an environmental assessment, including subsurface sampling of soil and groundwater, and cause the preparation of a report.  Such assessments and reports, to the extent not conducted by the Administrative Agent (or its designee), shall be conducted and prepared by a reputable environmental consulting firm acceptable to the Majority Lenders and shall be in form and substance acceptable to the Majority Lenders.  The Borrower shall be responsible for (and reimburse the Administrative Agent for) all costs associated with any such assessments and reports.

Section 5.09   **Use of Proceeds**.  The proceeds of the New Money Loans will be used in a manner consistent with the uses set forth in Section 3.24.  No part of the proceeds of the New Money Loans will be used, whether directly or indirectly, to purchase or carry any margin stock

(as defined in Regulation U issued by the Board).  The Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of the New Money Loans (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.  The Borrower will not fund all or part of any repayment of the Obligations out of proceeds derived from transactions which would be prohibited by Sanctions or would otherwise cause any Person to be in breach of Sanctions.

**Section 5.10**   [Reserved].

**Section 5.11**   **Title Data**.  Each Credit Party will, and will cause each Subsidiary to, from time to time at the request of the Majority Lenders, deliver to the Administrative Agent title information in form and substance reasonably acceptable to the Majority Lenders with respect to that portion of the Oil and Gas Property set forth in the most recent Reserve Report provided to the Administrative Agent and the Lenders as the Majority Lenders shall deem reasonably necessary or appropriate to verify the title of the Credit Parties to not less than (i) 90% of the PV10 of the Oil and Gas Property set forth in such Reserve Report and (ii) 90% of the net acres of Oil and Gas Properties.

**Section 5.12**   [Reserved].

**Section 5.13**   **Operation of Oil and Gas Property**.

(a)      Each Credit Party will, and will cause each Subsidiary to, maintain, develop and operate its Oil and Gas Property in a good and workmanlike manner, and observe and comply with all of the terms and provisions, express or implied, of all oil and gas leases relating to such Oil and Gas Property so long as such Oil and Gas Property are capable of producing Hydrocarbons and accompanying elements in paying quantities, except where such failure to comply could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      Each Credit Party will, and will cause each Subsidiary to, comply in all respects with all contracts and agreements applicable to or relating to its Oil and Gas Property or the production and sale of Hydrocarbons and accompanying elements therefrom, except to the extent a failure to so comply could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 5.14**   **Subsidiaries**.  At the time hereafter that any Subsidiary of the Borrower is created or acquired, each Credit Party will (a) promptly take all action necessary to comply with Section 5.15, (b) promptly take all such action and execute and deliver, or cause to be executed and delivered, to the Administrative Agent all such opinions, documents, instruments, agreements, and certificates that the Administrative Agent or the Majority Lenders may reasonably request, and (c) promptly cause such Subsidiary to (i) become a party to this Agreement and Guarantee the Obligations by executing and delivering to the Administrative

Agent a Counterpart Agreement in the form of Exhibit C, (ii) if requested by the Administrative Agent or the Majority Lenders, execute and deliver Security Documents creating first priority Liens in favor of the Administrative Agent, subject in priority only to the Carve-Out, the Hedge Carve-Out and the Non-Primed Excepted Liens (only to the extent set forth in the DIP Orders), in such Subsidiary's Oil and Gas Property and substantially all of such Subsidiary's personal property, and (iii) deliver all title opinions and other information reasonably requested by the Administrative Agent or the Majority Lenders.  Upon delivery of any such Counterpart Agreement to the Administrative Agent, notice of which is hereby waived by each Credit Party, such Subsidiary shall be a Guarantor and shall be as fully a party hereto as if such Subsidiary were an original signatory hereto.  Each Credit Party expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Credit Party hereunder.  This Agreement shall be fully effective as to any Credit Party that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Credit Party hereunder.  With respect to each such Subsidiary, the Borrower shall promptly send to the Administrative Agent written notice setting forth with respect to such Person the date on which such Person became a Subsidiary of the Borrower, and supplement the data required to be set forth in the Schedules to this Agreement as a result of the acquisition or creation of such Subsidiary; provided that such supplemental data must be reasonably acceptable to the Majority Lenders.

Section 5.15   **Pledged Capital Stock**.  At the request of the Administrative Agent or the Majority Lenders, on the Effective Date and at the time hereafter that any Subsidiary of the Borrower is created or acquired, each Credit Party and the Subsidiaries (as applicable) shall deliver to the Administrative Agent for the benefit of the Secured Parties all certificates (or other evidence acceptable to the Majority Lenders) evidencing the issued and outstanding Capital Stock of each such Subsidiary of every class owned by such Credit Party (as applicable) which, if certificated, shall be duly endorsed or accompanied by stock powers executed in blank to the Administrative Agent, as the Administrative Agent or the Majority Lenders shall deem necessary or appropriate to grant, evidence and perfect a first priority security interest in the issued and outstanding Capital Stock owned by Borrower or any Subsidiary in each Subsidiary.

Section 5.16   **[Reserved]**.

Section 5.17   **Further Assurances**.

(a)   From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as Administrative Agent or the Majority Lenders may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other Property hereafter acquired by any Credit Party, which may be deemed to be part of the Collateral) pursuant hereto or thereto.

(b)   Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority,

execute and deliver, or cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from any Credit Party or any of their respective Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

**Section 5.18**   **Lender Calls**.  Promptly following the delivery of each variance report pursuant to Section 5.01(k), the Borrower shall host a call with Ares Management, L.P. and its advisors to discuss the contents of such variance report.

**Section 5.19**   **Collateral Proceeds**.  Deposit all proceeds resulting from any Disposition of, or Casualty Event relating to, any property or assets constituting in accordance with the DIP Orders.

**Section 5.20**   **[Reserved]**.

**Section 5.21**   **Plan of Reorganization**.  In consultation with the Lenders, the Credit Parties shall support and seek to cause confirmation of the Acceptable Plan in accordance with the Restructuring Support Agreement (and within the time-frames contemplated in the Restructuring Support Agreement) and in compliance with each Milestone.

**Section 5.22**   **Access to Information**.  Promptly following reasonable request, deliver information requested by the Majority Lenders in connection with the Restructuring; provided that, notwithstanding anything to the contrary in this Section 5.22, none of the Credit Parties or any of their respective Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (x) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law or (y) is subject to attorney-client privilege or constitutes attorney work product.

## ARTICLE VI.

## <u>NEGATIVE COVENANTS</u>

Until the Discharge of Obligations, the Credit Parties covenant and agree with the Administrative Agent and the Lenders that:

**Section 6.01**   **[Reserved]**.

**Section 6.02**   **Indebtedness**.  The Borrower will not, nor will it permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)   Indebtedness of any Credit Party under (i) the Loan Documents, (ii) the Prepetition Indebtedness, (iii) the Carve-Out or (iv) the Hedge Carve-Out;

(b)   Indebtedness in respect of Swap Agreements permitted pursuant to Section 6.08;

(c)   Indebtedness existing on the Effective Date and set forth in Schedule 6.02;

(d)      Unsecured intercompany Indebtedness between the Borrower and any Subsidiary or between Subsidiaries to the extent expressly permitted by the Approved Budget and permitted by Section 6.07(b); provided that any such Indebtedness owed by either the Borrower or a Guarantor shall be subordinated to the Indebtedness on terms set forth in Article VII or on such terms as are reasonably acceptable to the Majority Lenders; provided, further, that upon the request of the Administrative Agent or the Majority Lenders at any time, such Indebtedness shall be evidenced by promissory notes having terms reasonably satisfactory to the Majority Lenders, and the sole originally executed counterparts of which shall be pledged and delivered to the Administrative Agent, for the benefit of the Secured Parties, as security for the Obligations;

(e)      [reserved];

(f)      Indebtedness (other than Indebtedness for borrowed money) incurred or deposits made by the Borrower or any Subsidiary (i) under worker's compensation laws, unemployment insurance laws or similar legislation, (ii) in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which the Borrower or any Subsidiary is a party, (iii) to secure public or statutory obligations of the Borrower or any Subsidiary, and (iv) of cash or U.S. Government Securities made to secure the performance of statutory obligations, surety, stay, customs and appeal bonds to which the Borrower or any Subsidiary is party in connection with the operation of the Oil and Gas Property, in each case in the ordinary course of business and consistent with past practice;

(g)      [reserved];

(h)      Guarantees in respect of Indebtedness otherwise permitted pursuant to this Section 6.02;

(i)      Indebtedness in connection with the endorsement of negotiable instruments and other obligations in respect of cash management services, netting services, overdraft protection and similar arrangements, in each case in the ordinary course of business and consistent with past practice;

(j)      Indebtedness in respect of insurance premium financing for insurance being acquired or maintained by the Borrower or any Subsidiary under customary terms and conditions;

(k)      [reserved];

(l)      Indebtedness consisting of sureties or bonds provided to any Governmental Authority or other Person and assuring payment of contingent liabilities of the Borrower in connection with the operation of the Oil and Gas Properties, including with respect to plugging, facility removal and abandonment of its Oil and Gas Properties; and

(m)      other unsecured Indebtedness not in respect of borrowed money in an aggregate amount outstanding to exceed $100,000 for the term of this Agreement.

**Section 6.03   Liens**.  The Borrower will not, nor will it permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien on any Property now owned or hereafter acquired by it, except:

(a)       (i) Liens created pursuant to any Loan Agreement, (ii) Adequate Protection Liens or any Liens existing on the date hereof securing Prepetition Indebtedness and subordinated to the extent required by the DIP Orders, (iii) the Carve-Out and (iv) the Hedge Carve-Out;

(b)       Permitted Encumbrances;

(c)       any Lien on any Property of the Borrower or any Subsidiary existing on the Petition Date and set forth in Schedule 6.03 and subordinated to the extent required by the DIP Orders;

(d)       any Lien securing obligations under Swap Agreements permitted pursuant to Section 6.08;

(e)       [reserved];

(f)       Liens securing insurance premium financing under customary terms and conditions, provided that no such Lien may extend to or cover any property other than the insurance being acquired with such financing, the proceeds thereof and any unearned or refunded insurance premiums related thereto;

(g)       [reserved];

(h)       [reserved]; and

(i)       Liens arising under the DrillCo Operating Agreements provided (1) such DrillCo Operating Agreements do not cover Property located outside of the DrillCo Contract Area, and (2) such DrillCo Operating Agreements are entered into pursuant to the DrillCo Agreement.

**Section 6.04   Fundamental Changes**.  The Borrower will not, nor will it permit any of its Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing and so long as no approval of the Bankruptcy Court is required (or such approval is required and shall have been received):

(a)       any Subsidiary may merge into a Credit Party in a transaction in which such Credit Party is the surviving entity so long as such transaction does not have an adverse effect on the perfection or priority of the Liens granted under the Collateral Documents;

(b)       any Subsidiary that is not a Credit Party may merge into any other Subsidiary that is not a Credit Party in a transaction in which the surviving entity is a Subsidiary;

(c)       any Subsidiary may Dispose of its assets to a Credit Party; and

(d)     Dispositions permitted by Section 6.05 may be made.

**Section 6.05   Disposition of Assets**.  The Borrower will not, and will not permit any Subsidiary to, Dispose of any property except:

(a)     the sale of Hydrocarbons in the ordinary course of business;

(b)     the Disposition of equipment and other property in the ordinary course of business, that is obsolete or no longer necessary in the business of the Borrower or any of its Subsidiaries or that is being replaced by equipment of comparable value and utility;

(c)     Liens permitted by Section 6.03, Investments permitted by Section 6.07 and Restricted Payments permitted by Section 6.09;

(d)     Dispositions of cash and Cash Equivalents in the ordinary course of business;

(e)     any Credit Party may Dispose of its property to another Credit Party;

(f)     sales or discounts of overdue accounts receivable in the ordinary course of business, in connection with the compromise or collection thereof, and not in connection with any financing transaction;

(g)     [reserved];

(h)     [reserved];

(i)     Dispositions of seismic, geologic or other data and license rights in the ordinary course of business;

(j)     Hedge Modifications; provided that the consideration received for such Hedge Modification is at least equal to Fair Market Value;

(k)     a DrillCo Required Disposition so long as the Administrative Agent (or any designee thereof) has received within 30 days of the date on which such DrillCo Required Disposition is effected, a duly executed mortgage in form and substance reasonably satisfactory to the Majority Lenders granting an Acceptable Security Interest, or has a perfected security interest pursuant to the DIP Orders, in the applicable Credit Party's interest in the DrillCo Joint Well that is the subject of such DrillCo Required Disposition;

(l)     Dispositions pursuant to a decision not to participate in an Oklahoma Corporation Commission Force Pooling Order or any relinquishment of any interests in any oil and gas leases pursuant to a non-consent provision of a standard form of joint operating agreement;

(m)     Dispositions of interests in any Subject Lease pursuant to the exercise by a third party of its rights to acquire an interest therein, to the extent and pursuant to the terms of such right to acquire an interest therein, to the extent and pursuant to the terms of such right as in effect on the date hereof, which Disposition is effected on or before the 90th day after such

Subject Lease is acquired by a Credit Party (or, in the case of Subject Leases held on the Effective Date, the 90th day after the Effective Date); and

(n)    Other dispositions and sales of Properties (including any midstream assets or gathering systems) not otherwise permitted pursuant to this Section 6.05 having a fair market value not to exceed $500,000 in the aggregate for all dispositions and sales of Properties pursuant to this Section 6.05(n) for the term of this Agreement.

**Section 6.06    Nature of Business**.  The Borrower will not, nor will it permit any of its Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the Petition Date and businesses reasonably related thereto.

**Section 6.07    Investments**.  The Borrower will not, nor will it permit any of its Subsidiaries to, make any Investment, except:

(a)    Investments in Cash Equivalents;

(b)    Investments made by any Credit Party in or to any other Credit Party;

(c)    Investments made by the Borrower or any Subsidiary pursuant to the commitments set forth on Schedule 6.07(c); provided, that the Borrower's or any Subsidiary's commitments set forth on Schedule 6.07(c) shall not be increased or otherwise altered in any manner adverse to the interests of the Borrower or any of its Subsidiaries, on the one hand, and the Lenders, on the other hand, unless otherwise consented to by the Majority Lenders in their sole discretion;

(d)    Guarantees constituting Indebtedness permitted by Section 6.02 (other than guarantees in respect of Capital Lease Obligations) and performance guarantees, in each case, incurred in the ordinary course of business;

(e)    Investments by the Borrower and its Subsidiaries that are customary in the oil and gas business and in the ordinary course of the Borrower's or such Subsidiary's business, and in the form of, or pursuant to, oil, gas and mineral leases, operating agreements, unitization agreements, joint bidding agreements, services contracts and other similar agreements that a reasonable and prudent oil and gas industry owner or operator would find reasonably acceptable;

(f)    Investments consisting of Swap Agreements to the extent permitted under Section 6.08;

(g)    Investments existing as of the Petition Date and set forth on Schedule 6.07(g);

(h)    Investments consisting of loans and advances to employees for moving, entertainment, travel and other similar expenses in the ordinary course of business, in each case, in accordance with the Approved Budget (including any Carry Forward Amount and any Permitted Variance) and in any event not to exceed $100,000 in the aggregate during the term of this Agreement;

(i)      demand deposits with financial institutions, prepaid expenses and extensions of trade credit in the ordinary course of business (and any Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss);

(j)      trade and customer accounts receivable which are for goods furnished or services rendered in the ordinary course of business and are payable in accordance with customary trade terms;

(k)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; provided that, the aggregate amount of such investment shall not exceed $500,000 (other than by appreciation);

(l)      [reserved];

(m)      any Investment by the Borrower or any Subsidiary of the Borrower in a Person, if as a result of such Investment (i) such Person becomes a Subsidiary of the Borrower or (ii) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its Properties or assets to, or is liquidated into, the Borrower or a Subsidiary of the Borrower; and

(n)      Investments expressly contemplated by the Approved Budget (including any Carry Forward Amount and any Permitted Variance).

**Section 6.08    Swap Agreements**.  The Borrower will not, nor will the Borrower permit any of its Subsidiaries to, enter into any Swap Agreement without the prior written consent of the Majority Lenders in their sole discretion.

**Section 6.09    Restricted Payments**.  The Borrower will not, nor will it permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment; provided that, so long as at the time of and immediately after giving effect to such Restricted Payment no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof, the Borrower or any Subsidiary may make the following Restricted Payments:

(a)      Restricted Payments expressly identified and provided for in the Approved Budget (including any Carry Forward Amount and any Permitted Variance); and

(b)      the declaration and payment of dividends or distributions by any Subsidiary to the Borrower or any Guarantor.

**Section 6.10    Transactions with Affiliates**.

(a)      The Borrower will not, and will not permit any of its Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any Property from, or enter into or make or amend any transaction, contract, agreement,

understanding, loan, advance or guarantee with (or for the benefit of), any Affiliate of the Borrower (each, an "<u>Affiliate Transaction</u>"), unless:

      (i)    the Affiliate Transaction is on terms that are no less favorable to the Credit Parties than those that would have been obtained in a comparable transaction by the Credit Parties with an unrelated Person; and

      (ii)    the Borrower delivers to the Administrative Agent (A) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $1,000,000, a resolution of the Board of Directors of the Borrower set forth in an officers' certificate certifying that such Affiliate Transaction or series of related Affiliate Transactions complies with this covenant and that such Affiliate Transaction or series of related Affiliate Transactions has been approved by a majority of the disinterested members of the Board of Directors of the Borrower; and (B) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $5,000,000, an opinion as to the fairness to the Borrower or such Subsidiary of such Affiliate Transaction or series of related Affiliate Transactions from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing.

(b)    Section 6.10(a) will not apply to:

      (i)    transactions between or among Credit Parties;

      (ii)    transactions expressly identified and provided for in the Approved Budget (including any Carry Forward Amount and any Permitted Variance); and

      (iii)    Restricted Payments permitted by Section 6.09.

**Section 6.11   <u>Restrictive Agreements</u>**.  The Borrower will not, nor will it permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its Property to secure the Obligations, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Capital Stock or to make or repay loans or advances to the Borrower or any Subsidiary or to Guarantee Indebtedness of the Borrower or any Subsidiary; <u>provided</u> that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement and (ii) clause (a) of the foregoing shall not apply to (A) [reserved], (B) customary provisions in leases and other contracts restricting the assignment thereof, (C) restrictions with respect to Oil and Gas Property that are not included in the most recent Reserve Report delivered to the Administrative Agent and (D) provisions of the DrillCo Agreement pursuant to which the Credit Parties agree not to grant Liens that can be perfected with recordings in the applicable county records securing the Obligations on any Properties in the DrillCo Contract Area (other than Wellbore Liens permitted hereunder and Liens on Non-DrillCo Assets).

**Section 6.12   <u>Disqualified Stock</u>**.  The Borrower will not, nor will it permit any of its Subsidiaries to, issue any Disqualified Stock.

**Section 6.13   Certain Amendments to Organizational Documents; Prepayments of Indebtedness**.  The Borrower will not, nor will it permit any of its Subsidiaries to:

(a)      enter into or permit any modification or amendment of, or waive any material right or obligation of any Person under its Organizational Documents if the effect thereof would be materially adverse to the Administrative Agent or any Lender or violate Section 6.11;

(b)      make any payment of principal or interest or otherwise on account of any Prepetition Indebtedness or payables under the Prepetition Documents, other than (i) payments made in compliance with the Approved Budget (including any Carry Forward Amount and any Permitted Variance), (ii) payments agreed to in writing by the Majority Lenders in their sole discretion and (iii) payments approved by the DIP Orders and, if necessary, authorized by the Bankruptcy Court;

(c)      without the prior written consent of the Majority Lenders, amend or modify the terms of the Prepetition Documents; or

(d)      without the prior written consent of the Majority Lenders, amend, modify or assign any of their respective material agreements (as in effect on the Petition Date).

**Section 6.14   Sale and Leaseback Transactions and other Off-Balance Sheet Liabilities**.  The Borrower will not, nor will it permit any Subsidiary to, enter into or suffer to exist any Sale and Leaseback Transaction or any other transaction pursuant to which it incurs or has incurred Off-Balance Sheet Liabilities.

**Section 6.15   DrillCo Restrictions**.  Without the prior written consent of the Majority Lenders, no Credit Party shall amend or otherwise modify the DrillCo Agreement in a manner materially adverse to the Lenders, including, without limitation, any amendment or modification which would (a) increases the number of Joint Wells (as defined in the Drillco Agreement) above sixty (60); (b) materially changes the area subject to the Joint Development Agreement; or (c) materially change any economic terms or provision of the Joint Development Agreement, including with respect to the costs to be borne by the Company.

**Section 6.16   Lease Restrictions**.  The Borrower and its Subsidiaries shall not, without the consent of the Majority Lenders, allow more than 5.0% of the net acreage consisting of Oil and Gas Properties of the Borrower and its Subsidiaries, measured as of the Petition Date, to lapse, expire or otherwise terminate in any manner without such Oil and Gas Properties being replaced by Oil and Gas Properties of similar quantity and value in Township 20 North – Range 8 West, Township 20 North – Range 7 West, Township 19 North – Range 9 West, Township 19 North – Range 8 West, Township 19 North – Range 7 West, Township 18 North – Range 8 West, Township 18 North – Range 7 West, and Township 18 North – Range 6 West; provided that, (a) for purposes of calculating such net acreage, all Non-Core Assets shall be excluded from the Oil and Gas Properties of the Borrower and its Subsidiaries and (b) such percentage shall be adjusted following the Effective Date to take into account any disposition or acquisition of Oil and Gas Properties as reasonably determined between the Borrower and the Majority Lenders (it being understood and agreed that such adjustment referred to in this proviso shall not in and of itself result in a Default or an Event of Default).

Section 6.17   **Changes to DIP Orders**.  Without the prior written consent of the Majority Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion, make, or permit to be made, any change, amendment or modification, or any application or motion for any change, amendment or modification, to the DIP Orders.

Section 6.18   **Actions Requiring Majority Lender Consent**.  Except as otherwise permitted pursuant to the DIP Orders, without the prior written consent of the Majority Lenders, (a) assume or reject any executory contract or unexpired lease or (b) consent to termination or reduction of any exclusivity period or fail to object to any motion seeking to terminate or reduce any exclusivity period other than a motion filed by the Majority Lenders.

Section 6.19   **Right of Subrogation**.  Assert any right of subrogation or contribution against any other Credit Party.

Section 6.20   **Use of Proceeds**.  No part of the Credit Parties' cash collateral (as defined pursuant to section 363 of the Bankruptcy Code), the Collateral, the proceeds of the Loans, the Carve-Out or the Hedge Carve-Out will be used, whether directly or indirectly:

(a)      in any manner that causes such Loan or the application of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Securities Exchange Act:

(b)      for any purpose that is (i) prohibited under the Bankruptcy Code, the DIP Orders or the Loan Documents or (ii) not expressly provided for in the Approved Budget (including any Carry Forward Amount and any Permitted Variance);

(c)      to investigate, commence, prosecute or finance in any way any action, suit, proceeding (including discovery proceedings), application, motion, objection or other litigation with respect to or related to: (i) the claims, liens or security interest of the Administrative Agent, the Lenders, the Prepetition Secured Parties or any of their respective Related Parties or their respective rights and remedies under this Agreement, the other Loan Documents, the DIP Orders or the Prepetition Loan Documents, as the case may be, including to commence or prosecute or join in any action against any or all of the Administrative Agent, the Lenders or the Prepetition Secured Parties seeking (x) to avoid, subordinate or recharacterize the Obligations or any of the Administrative Agent's or the Prepetition Secured Parties' Liens, (y) any monetary, injunctive or other affirmative relief against any or all of the Administrative Agent, the Lenders, the Prepetition Secured Parties or their Collateral or "Collateral" (as defined in the Prepetition Loan Documents) in connection with the Loan Documents or the Prepetition Loan Documents or (z) to prevent or restrict the exercise by any or all of the Administrative Agent, the Lenders or the Prepetition Secured Parties of any of their respective rights or remedies under the Loan Documents or the Prepetition Loan Documents, (ii) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of a release under the Acceptable Plan against the Administrative Agent, the Lenders and the Prepetition Secured Parties or (iii) certain stipulations to be made by the Credit Parties and approved by the Bankruptcy Court; provided that, the DIP Orders will include an agreed upon "challenge period" and investigation budget for a Committee of unsecured creditors in the

Chapter 11 Cases, if one is appointed, to investigate the Liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition Loan Documents at an aggregate expense for such investigation not to exceed $25,000; <u>provided</u> <u>further</u> that no portion of such amount may be used to prosecute or support any such claims or causes of action;

(d)     to finance in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the Administrative Agent, the Lenders, the Prepetition Secured Parties or any of their respective Related Parties or their respective rights and remedies under the Loan Documents, the DIP Orders or the Prepetition Loan Documents or (ii) any other action which with the giving of notice or passing of time would result in an Event of Default hereunder or under any of the other Loan Documents; <u>provided</u> that, the DIP Orders will include an agreed upon "challenge period" and investigation budget for a Committee of unsecured creditors in the Chapter 11 Cases, if one is appointed, to investigate the Liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition Loan Documents at an aggregate expense for such investigation not to exceed $25,000; <u>provided</u> <u>further</u> that no portion of such amount may be used to prosecute or support any such claims or causes of action;

(e)     for the payment of fees, expenses, interest or principal under the Prepetition Loan Documents;

(f)     to make any distribution under a plan of reorganization in the Chapter 11 Cases except the Acceptable Plan or as otherwise agreed to in writing by the Majority Lenders and the Borrower; and

(g)     to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other Governmental Authority, which payment is not provided for in the Approved Budget (including any Carry Forward Amount and any Permitted Variance), without the prior written consent of the Majority Lenders.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

During the period between the Interim Order Entry Date and the Final DIP Order Entry Date, no proceeds of the Loans shall be used in connection with the payment of any fees or expenses incurred by any professional retained (or to be retained) in the Chapter 11 Cases, other than the payment of fees and expenses of the Administrative Agent and the Lenders.

## ARTICLE VII.

## <u>GUARANTEE OF OBLIGATIONS</u>

**Section 7.01   <u>Guarantee of Payment</u>**. Each Guarantor unconditionally and irrevocably guarantees to the Administrative Agent for the benefit of the Secured Parties, the punctual

payment of all Obligations now or which may in the future be owing by any Credit Party, including any Obligations incurred or accrued during the pendency of the Chapter 11 Cases or any other proceeding under bankruptcy, insolvency or similar laws of any jurisdiction, whether or not allowed or allowable in such proceeding (including all such amounts that would become due but for the operation of the automatic stay under section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a), and the operation of sections 502(b) and 506(b) of the Bankruptcy Code, 11 U.S.C. §502(b) and §506(b)) (collectively, the "Guaranteed Liabilities"). This Guarantee is a guaranty of payment and not of collection only. The Administrative Agent shall not be required to exhaust any right or remedy or take any action against the Borrower or any other Person or any collateral. Each Guarantor agrees that, as between the Guarantor and the Administrative Agent, the Guaranteed Liabilities may be declared to be due and payable for the purposes of this Guarantee notwithstanding any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards the Borrower or any other Guarantor and that in the event of a declaration or attempted declaration, the Guaranteed Liabilities shall immediately become due and payable by each Guarantor for the purposes of this Guarantee.

Section 7.02   **Guarantee Absolute**. Each Guarantor guarantees that the Guaranteed Liabilities shall be paid strictly in accordance with the terms of this Agreement. The liability of each Guarantor hereunder is absolute and unconditional irrespective of: (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Loan Documents or the Guaranteed Liabilities, or any other amendment or waiver of or any consent to departure from any of the terms of any Loan Document or Guaranteed Liability, including any increase or decrease in the rate of interest thereon; (b) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or any exchange, release or non-perfection of any collateral, for all or any of the Loan Documents or Guaranteed Liabilities; (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Loan Document or Guaranteed Liability; (d) without being limited by the foregoing, any lack of validity or enforceability of any Loan Document or Guaranteed Liability; and (e) any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Loan Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrower or a Guarantor (other than the defense of payment or performance).

Section 7.03   **Guarantee Irrevocable**. This Guarantee is a continuing guaranty of the payment of all Guaranteed Liabilities now or hereafter existing under this Agreement, and shall remain in full force and effect until the Discharge of Obligations.

Section 7.04   **Reinstatement**. This Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Liabilities is rescinded or must otherwise be returned by the Administrative Agent or any Lender as a result of the insolvency, bankruptcy or reorganization of the Borrower, or any other Credit Party, or otherwise, all as though the payment had not been made.

Section 7.05   **Subrogation**. No Guarantor shall exercise any rights which it may acquire by way of subrogation, by any payment made under this Guarantee or otherwise. If any amount is paid to the Guarantor on account of subrogation rights under this Guarantee at any

time when all the Guaranteed Liabilities have not been paid in full, the amount shall be held in trust for the benefit of the Secured Parties and shall be promptly paid to the Administrative Agent to be credited and applied to the Guaranteed Liabilities, whether matured or unmatured or absolute or contingent, in accordance with the terms of this Agreement.  If any Guarantor makes payment to any Secured Party of all or any part of the Guaranteed Liabilities and all the Guaranteed Liabilities are paid in full and this Agreement, the Administrative Agent and the Secured Parties shall, at such Guarantor's request, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Liabilities resulting from the payment.

Section 7.06    **Subordination**.  Without limiting the rights of the Administrative Agent and the other Secured Parties under any other agreement, any liabilities owed by the Borrower to any Guarantor in connection with any extension of credit or financial accommodation by any Guarantor to or for the account of the Borrower, including but not limited to interest accruing at the agreed contract rate after the commencement of a bankruptcy or similar proceeding, are hereby subordinated to the Guaranteed Liabilities, and such liabilities of the Borrower to such Guarantor, if the Administrative Agent so requests after the occurrence and during the continuation of a Default, shall be collected, enforced and received by any Guarantor as trustee for the Administrative Agent and shall be paid over to the Administrative Agent on account of the Guaranteed Liabilities but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guarantee.

Section 7.07    **Payments Generally**.  All payments by the Guarantors shall be made in Dollars and in immediately available funds (except PIK Interest, which shall be payable on each Interest Payment Date by capitalizing and adding such amount to the outstanding principal balance of the Refinanced Loans on such Interest Payment Date in lieu of paying such amount in cash).

Section 7.08    **Setoff**.  Each Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim the Administrative Agent or any other Secured Party may otherwise have, the Administrative Agent or such Secured Party shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final) held by it for the account of any Guarantor at any office of the Administrative Agent or such Secured Party, in Dollars or in any other currency, against any amount payable by such Guarantor under this Guarantee which is not paid when due (regardless of whether such balances are then due to such Guarantor), in which case it shall promptly notify such Guarantor thereof; provided that the failure of the Administrative Agent or such Secured Party to give such notice shall not affect the validity thereof.

Section 7.09    **Formalities**.  Each Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guarantee or incurrence of any Guaranteed Liability and any other formality with respect to any of the Guaranteed Liabilities or this Guarantee.

Section 7.10    **Limitations on Guarantee**.  The provisions of the Guarantee under this Article VII are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the

rights of creditors generally, if the obligations of any Guarantor under this Guarantee would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guarantee, then, notwithstanding any other provision of this Guarantee to the contrary, the amount of such liability shall, without any further action by the Guarantors, the Administrative Agent or any other Secured Party, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability").  This Section 7.10 with respect to the Maximum Liability of the Guarantors is intended solely to preserve the rights of the Administrative Agent and the other Secured Parties hereunder to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other Person shall have any right or claim under this Section 7.10 with respect to the Maximum Liability, except to the extent necessary so that none of the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law.

Section 7.11   **Stay of Acceleration**.  If acceleration of the time for payment of any of the Guaranteed Liabilities is stayed upon the insolvency, bankruptcy or reorganization (including the Chapter 11 Cases) of the Credit Parties, all such amounts otherwise subject to acceleration under the terms of this Agreement or any other Loan Document shall nonetheless be payable by each of the Guarantors hereunder forthwith on demand by the Administrative Agent made at the written request of the Majority Lenders.

Section 7.12   **Survival**.  The agreements and other provisions in this Article VII shall survive, and remain in full force and effect regardless of, the resignation or removal of the Administrative Agent, the replacement of any Lender, the expiration or termination of this Agreement and the Aggregate Commitments or the Discharge of Obligations.

## ARTICLE VIII.

## EVENTS OF DEFAULT

If any of the following events ("Events of Default") shall occur:

(a)   *Non-Payment*. (i) Any Credit Party shall fail to pay any principal of, or premium on, any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise or (ii) any Credit Party shall fail to pay any fee or any other amount (including interest), other than an amount referred to in clause (i)) payable under this Agreement or the Fee Letter, when and as the same shall become due and payable, and such failure under this clause (ii) shall continue unremedied for a period of three (3) Business Days;

(b)   *Representations and Warranties*.  Any representation or warranty made or deemed made by or on behalf of the Borrower or any Subsidiary in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder or in any Loan Document furnished pursuant to or in connection with this Agreement or any amendment or

modification thereof or waiver hereunder, shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing;

(c)     *Covenants*.  The Borrower or any Subsidiary shall fail to observe or perform (i) any term, covenant, condition or agreement contained in Section 5.01(j), Section 5.01(k), Section 5.01(l), Section 5.02, Section 5.03 (with respect to the Borrower's or any Subsidiary's existence), Section 5.07(b), Section 5.09, Section 5.18, Section 5.19 or in Article VI or (ii) any other term, covenant, condition or agreement contained in this Agreement (other than those specified in the foregoing clause (i) of this section or clause (a) or (b) of this Article) or any Loan Document, and such failure shall continue unremedied for a period of 10 days after the earlier of (x) knowledge thereof by the Borrower or (y) receipt of written notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(d)     *DrillCo Agreement*.  The Borrower or any Subsidiary shall fail to make any payment required under the DrillCo Agreement (which is not stayed by the filing of the voluntary petition to commence the Chapter 11 Cases and is otherwise permitted to be paid under this Agreement and by the DIP Orders) within 30 days of the date such payment is due under the DrillCo Agreement, unless such payment is being disputed in good faith and the Company has established adequate reserves therefor;

(e)     *Cross-Default*.  The Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable and such failure shall continue beyond the applicable grace period, if any, or any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, in each case, which is not stayed by the filing of the voluntary petition to commence the Chapter 11 Cases and is otherwise permitted to be paid under this Agreement and by the DIP Orders;

(f)     *Restructuring Support Agreement*.  (i) Any Credit Party or any of its Subsidiaries files or supports a motion that has been filed to reject the Restructuring Support Agreement, (ii) the Restructuring Support Agreement is terminated for any reason other than as a result of a default thereunder by the holders of the Prepetition Obligations or (ii) the occurrence of a default by any Credit Party or any of its Subsidiaries under the Restructuring Support Agreement;

(g)     *Judgments*.  One or more judgments for the payment of money in an aggregate amount in excess of $500,000 shall be rendered against the Borrower or any Subsidiary or any combination thereof and either the same shall remain undischarged or unsatisfied for a period of 15 days after entry thereof during which execution shall not be effectively stayed (including pursuant to the Chapter 11 Cases), or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment;

(h)     *ERISA*.  An ERISA Event shall have occurred that, in the opinion of the Majority Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(i)     *Guarantee*.  The delivery by any Guarantor to the Administrative Agent of written notice that a Guarantee under Article VII has been revoked;

(j)     *Invalidity of Loan Documents*.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be valid and enforceable as against any Credit Party; or any Credit Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Credit Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document;

(k)     *Drillco*.  Any Lien granted to a Credit Party by the DrillCo Investor under or related to the DrillCo Operating Agreement fails to be senior to all other Liens granted by the DrillCo Investor in the Property encumbered thereby (other than (i) the Liens granted under the memorandum of DrillCo Operating Agreement to the other Persons party thereto and (ii) Liens of the type described in clause (a) of "Permitted Encumbrances" definition), and such failure shall remain unremedied for 30 days after the earlier to occur of a Credit Party becoming aware of the occurrence of such failure and notice from the Administrative Agent to the Borrower of such failure;

(l)     *Budget Event*. Subject to and after giving effect to the application of any Carry Forward Amount, there occurs any Budget Event;

(m)     *Liens; Additional Security Documents*.  (i) Any Credit Party or its Subsidiaries shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Administrative Agent and/or the Lenders, claims or rights against such Person or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, (ii) the Lien or security interest created by any Loan Document with respect to the Collateral shall, for any reason, cease to create a valid and perfected Lien with such priority required by this Agreement (other than in accordance with their terms) on the Collateral purported to be covered thereby, (iii) any action is commenced by the Credit Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Administrative Agent and/or the Lenders purported to be created by any Loan Document or (iv) any Credit Party shall fail to execute and deliver to the Administrative Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the Administrative Agent or the Lenders may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the liens created in favor of the Administrative Agent, and such failure under this clause (iv) shall continue unremedied for a period of ten days;

(n)     *Conversion to Chapter 7*.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting any Chapter 11 Case to a Chapter 7 case;

(o)    *Alternate Financing*.  Any Credit Party shall propose, consent to, cooperate with, acquiesce to, support or file a motion in any of the Chapter 11 Cases without the express written consent of the Majority Lenders (x) to obtain additional financing from a party other than the Lenders under section 364(d) of the Bankruptcy Code unless such additional financing provides for the Discharge of Obligations and payment in full in cash of all Prepetition Obligations upon the incurrence of such additional financing or (y) to use Cash Collateral of a Lender under section 363(c) of the Bankruptcy Code;

(p)    *Prepetition Claims*.  Any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in the "first day orders" and included in the Approved Budget (including any Carry Forward Amount and any Permitted Variance), or (y) otherwise consented to in writing by the Majority Lenders in their sole discretion, (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $500,000 in the aggregate or to permit other actions that would have a material adverse effect on the Credit Parties or their estates, or (iii) except with respect to the Prepetition Obligations, approving any settlement or other stipulation not approved by the Majority Lenders or not authorized by the Bankruptcy Court and not included in the Approved Budget (including any Carry Forward Amount and any Permitted Variance) with any secured creditor of any Credit Party providing for Adequate Protection Payments or other payment to such secured creditor;

(q)    *Other Proceedings*.  Other than the Chapter 11 Cases or any ancillary non-U.S. proceeding, scheme or process requested by the Lenders, the commencement or pendency of any involuntary or voluntary insolvency proceeding, scheme or like processes pending in any jurisdiction with respect any Credit Party;

(r)    *Appointment of Trustee or Examiner*.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Credit Party, or any Subsidiary of a Credit Party shall file an application for an order with respect to any of the Chapter 11 Cases or otherwise seeking the appointment of, (i) a trustee under section 1104, (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code or (iii) a receiver;

(s)    *Dismissal of Chapter 11 Cases.*  An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision upon entry thereof for each of (i) Discharge of Obligations and (ii) payment in full of the Prepetition Obligations;

(t)    *Order With Respect to Chapter 11 Cases*.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Majority Lenders (which may be withheld in their sole discretion) (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), (i) to revoke, reverse, stay, modify, supplement, vacate or amend any of the DIP Orders (or any Credit Party shall apply for authority to do so), (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature

whatsoever) to have administrative priority as to the Credit Parties equal or superior to the priority of the Chapter 11 Cases (other than the Carve-Out and the Hedge Carve-Out) or (iii) to permit the incurrence of any Indebtedness not permitted by Section 6.02 or to grant or permit the grant of a Lien on the Collateral not permitted by Section 6.03;

(u)     *Application for Order By Third Party.*  (i) An application for any of the orders described in clause (o), (p) or (t) of this section shall be made by a Person other than the Credit Parties and such application is not contested by the Credit Parties in good faith or the relief requested is not withdrawn, dismissed or denied within 30 days after filing or (ii) any Person obtains a Final Order under §506(c) of the Bankruptcy Code against the Administrative Agent or the Lenders or obtains a Final Order adverse to the Administrative Agent or the Lenders or any of their respective rights and remedies under the Loan Documents or in the Collateral;

(v)     *DIP Orders.*  (i) A violation by any Credit Party of any term, provision or condition in any DIP Order, (ii) Any DIP Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Majority Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent) or (iii) any DIP Order shall cease to be in full force and effect;

(w)     *Right to File Chapter 11 Plan*.  The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Majority Lenders;

(x)     *Invalidation of Claims.*  Any Credit Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Credit Party) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of (i) the Obligations or contest any Loan Document, or any material provision of any Loan Document shall cease to be effective (other than in accordance with its terms) or (ii) the Prepetition Obligations or to challenge the validity and enforceability of the liens in favor of the holders thereof;

(y)     *Liquidation.*  The determination of any Credit Party or any of its Subsidiaries, whether by vote of such Person's board of directors or otherwise, to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or to conduct any sales of all or substantially all of such Person's assets, or the filing of a motion or other application in the Cases except as permitted by this Agreement;

(z)     *Public Announcements.*  Any Credit Party files or publicly announces its intention to file a Chapter 11 plan that contains terms and conditions that are inconsistent in any material respect with the Acceptable Plan or any exhibit or supplement attached thereto and any permitted amendment or modification thereof, without the prior written consent of the Majority Lenders, unless such plan provides for the Discharge of Obligations and payment in full in cash of all Prepetition Obligations upon the effectiveness of such plan;

(aa)     *Payments.*  Any Credit Party or any of its Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any Person that would be inconsistent with the treatment of any such Person under the Acceptable Plan, other than in accordance with any of the "first day orders," the final cash collateral order, the DIP Orders, the Approved Budget (including any Carry Forward Amount and any Permitted Variance), or as otherwise agreed to in writing by the Majority Lenders;

(bb)     *Impairment.* (i) The Credit Parties or any of their Affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding which results in a material impairment of the rights or interests of the Lenders;

(cc)     *Acceptable Plan.*  The Acceptable Plan or the confirmation order approving the same is amended, supplemented or otherwise modified or withdrawn or terminated without the prior written consent of the Majority Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent);

(dd)     *Alternate Reorganization Plan.*  (i) The Credit Parties' pursuit of, proposal to, consent to, cooperation with, solicitation of votes with respect to, acquiescence to, support of or the filing of a motion in any of the Chapter 11 Cases with respect to, without the express written consent of the Majority Lenders, any plan of reorganization (including any exit financing) other than the Acceptable Plan or (ii) the entry of an order approving any disclosure statement in support of a plan of reorganization (including any exit financing) other than the Acceptable Plan, without the express written consent of the Majority Lenders;

(ee)     *Chief Restructuring Officer.*  The appointment of a chief restructuring officer or any equivalent officer that is not reasonably satisfactory to the Majority Lenders;

(ff)     *Stipulations.*  The Credit Parties shall breach any of their respective stipulations set forth in the DIP Orders;

(gg)     *Adversary Proceedings.*  The initiation by the Credit Parties, any statutory Committee appointed in the Chapter 11 Cases, any trustee, any examiner or any other party in interest of any contested matter or adversary proceeding in respect of any of this Agreement, the Obligations, the Administrative Agent, the Lenders, the Prepetition Obligations or the Prepetition Secured Parties, including, but not limited to, any actions pursuant to chapter 5 of the Bankruptcy Code, in each case, except as may otherwise be permitted under the DIP Orders; or

(hh)     *Change of Control.*  There occurs any Change of Control.

then, the Administrative Agent may, at the written request of the Majority Lenders, issue a DIP Toggle Notice (as defined in the DIP Orders), and in every such event, and at any time thereafter during the continuance of such event, subject to the terms of the DIP Orders, the Administrative Agent may, and at the written request of the Majority Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times:  (i) terminate the Aggregate Commitment, and thereupon the Aggregate Commitment shall terminate immediately,

(ii) upon three (3) Business Days' prior written notice to the Borrower, declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrower accrued or payable hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, at which point the automatic stay of Section 362 of the Bankruptcy Code shall be terminated without order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the purpose of permitting the Administrative Agent and the Lenders to exercise any or all of their rights and remedies set forth in the DIP Orders or the Loan Documents, including without limitation: (A) directing the Administrative Agent to foreclose on the Collateral and (B) moving the Bankruptcy Court (on shortened notice) to appoint a chief restructuring officer for the Credit Parties, which the Credit Parties hereby agree not to oppose such motion.  In addition, upon the occurrence of an Event of Default, the Lenders (or the Administrative Agent at the direction of the Majority Lenders) may file a motion to seek to terminate or modify the Credit Parties' plan exclusivity periods under section 1121(d) of the Bankruptcy Code and have such motion heard on shortened notice (but in no event on less than three (3) Business Days' notice).  Without limiting the foregoing, upon the occurrence and during the continuance of an Event of Default, upon three (3) Business Days' prior written notice to the Borrower, the Administrative Agent and each Lender may protect and enforce its rights under this Agreement and the other Loan Documents by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained in this Agreement or any other Loan Document, and the Administrative Agent and each Lender may enforce payment of any Obligations due and payable hereunder or enforce any other legal or equitable right and remedies which it may have under this Agreement, any other Loan Document, or under applicable law or in equity.

Without limiting the generality of the foregoing, it is understood and agreed that if the maturity of the Loans shall be accelerated or the Loans otherwise become due prior to the Maturity Date (under any provision of this Article VIII or otherwise) a premium equal to the Make-Whole Amount (in each case, determined as if the Loans were repaid at the time of such acceleration at the option of the Borrower pursuant to Section 2.08 and as calculated by the Majority Lenders which, absent manifest error, shall be deemed conclusive) shall also become immediately due and payable and shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof.  Any premium payable pursuant to this Article VIII shall be presumed to be the liquidated damages sustained by each Lender as a result of the early redemption and the Credit Parties agree that it is reasonable under the circumstances currently existing.  The premium shall also be payable in the event the Obligations are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means.  THE CREDIT PARTIES EXPRESSLY WAIVE (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION.  The Credit Parties expressly agree (to the fullest extent it may lawfully do so) that:  (A) the premium is reasonable and is the product of

an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Credit Parties giving specific consideration in this transaction for such agreement to pay the premium; and (D) the Credit Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Credit Parties expressly acknowledge that its agreement to pay the premium to Lenders as herein described is a material inducement to Lenders to enter into this Agreement.

Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, the Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Administrative Agent from or on behalf of Borrower or any Guarantor of all or any part of the Obligations, and, as between Borrower on the one hand and Administrative Agent and Lenders on the other, Administrative Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as Administrative Agent may deem advisable notwithstanding any previous application by Administrative Agent.

Following the occurrence and during the continuance of an Event of Default, Administrative Agent shall apply any and all payments received by Administrative Agent in respect of the Obligations, and any and all proceeds of Collateral received by Administrative Agent, in the following order: first, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to Administrative Agent with respect to this Agreement, the other Loan Documents or the Collateral, second, to all fees, costs, indemnities and expenses incurred by or owing to any Lender with respect to this Agreement, the other Loan Documents or the Collateral, including any Make-Whole Amount, third, to accrued and unpaid interest on the Obligations, fourth, to the principal amount of the Obligations outstanding, and fifth, to any other indebtedness or obligations of Borrower owing to Administrative Agent or any Lender under the Loan Documents. Any balance remaining after giving effect to the applications set forth above shall be delivered to the Borrower or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out any of the applications set forth herein, amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category.

## ARTICLE IX.

## THE ADMINISTRATIVE AGENT

### Section 9.01    Appointment and Authority.

(a)      Each of the Lenders hereby irrevocably appoints Wilmington Trust, National Association, to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

(b)     The Administrative Agent shall also act as the collateral agent under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.

**Section 9.02   <u>Rights as a Lender</u>**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity, if applicable, as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with any Credit Party or other Affiliate thereof as if it were not the Administrative Agent hereunder.

**Section 9.03   <u>Exculpatory Provisions</u>**.  The duties of Administrative Agent shall be mechanical and administrative in nature.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein or in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing:

(a)     the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing,

(b)     the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise as directed in writing by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02); *provided* that Administrative Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law, and

(c)     except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Credit Party or any of their Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02) or in the absence of its own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the

performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, or any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.  The Administrative Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term us used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.  Each party to this Agreement acknowledges and agrees that the Administrative Agent and the Majority Lenders or the Majority Lenders may use an outside service provider for the tracking of all UCC financing statements or similar statements under the laws of any other jurisdiction required to be filed pursuant to the Loan Documents and notification to the Administrative Agent, the Majority Lenders or the Majority Lenders, as the case may be, of, among other things, the upcoming lapse or expiration thereof.

**Section 9.04   Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.

The Administrative Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents the Administrative Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, the Administrative Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from Majority Lenders or all

or such other portion of Lenders as shall be prescribed by this Agreement.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of Administrative Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Majority Lenders (or all or such other portion of Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of the Majority Lenders (or such other applicable portion of Lenders), the Administrative Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable law or exposes the Administrative Agent to any liability for which it has not received indemnification reasonably satisfactory to it.

      **Section 9.05**   **Delegation of Duties**.  The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs, including those indemnification and expense reimbursement provisions in Section 10.03, shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  Administrative Agent shall not incur any liability for any action or inaction taken by a sub-agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

      **Section 9.06**   **Collateral and Guaranty Matters**.  Each Lender hereby authorizes the Administrative Agent to release any Collateral that it is permitted to be sold or released pursuant to the terms of the Loan Documents (it being understood and agreed that the Administrative Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the Loan Documents).  Each Lender hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any Disposition of Collateral to the extent such Disposition is permitted by the terms of this Agreement or is otherwise authorized by the terms of the Loan Documents.  Upon request by the Administrative Agent at any time, the Lenders will confirm the Administrative Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Article IX.

      The Administrative Agent shall have no obligation whatsoever to any Lender or any other person to investigate, confirm or assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or has been encumbered, or that any particular items of Collateral meet the eligibility criteria applicable in respect of the Loans hereunder, or that the liens and security interests granted to the Administrative Agent pursuant hereto or any of the Loan Documents or otherwise have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Administrative Agent in this Agreement or in any of the other Loan Documents, it being understood and agreed that in respect

of the Collateral, or any act, omission or event related thereto, subject to the other terms and conditions contained herein, the Administrative Agent shall have no duty or liability whatsoever to any other Lender.

The Administrative Agent and each Lender hereby appoint each other as agent for the purpose of perfecting the Administrative Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control. Should any Lender (other than the Administrative Agent) obtain possession or control of any such assets, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor, shall deliver such assets to the Administrative Agent or in accordance with the Administrative Agent's instructions or transfer control to the Administrative Agent in accordance with the Administrative Agent's instructions. Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Instrument or to realize upon any Collateral for the Loans unless instructed to do so by the Administrative Agent (or consented to by Administrative Agent), it being understood and agreed that such rights and remedies may be exercised only by Administrative Agent.

**Section 9.07   Resignation and Removal of Administrative Agent**.

(a)     The Administrative Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Majority Lenders shall have the right to appoint a successor. If no successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier date as shall be agreed by the Majority Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in Chicago, Illinois or New York, New York, or an Affiliate of any such bank that is a financial institution. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor which shall include execution by such successor Administrative Agent of a joinder agreement in form and substance reasonably satisfactory to the Majority Lenders, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent. If no successor administrative agent has accepted appointment as Administrative Agent by the date which is thirty (30) days following a retiring Administrative Agents notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective.

(b)     The Majority Lenders may remove the Administrative Agent upon twenty (20) days prior written notice to the Administrative Agent and appoint a successor. If no successor administrative agent shall have been appointed by the Majority Lenders and shall have accepted such appointment within twenty (20) days (or such earlier date as shall be agreed by the Majority Lenders (the "Removal Effective Date")) which acceptance shall include execution by such successor Administrative Agent of a joinder agreement in form and substance reasonably satisfactory to the Majority Lenders, then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)      With the effect of the Resignation Effective Date or the Removal Effective Date, the Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly and the Majority Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Majority Lenders appoint a successor as provided for above.  After the Administrative Agent's resignation or removal hereunder, the provisions of this Article and Section 11.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

**Section 9.08   Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges and agrees that the extensions of credit made hereunder are commercial loans and not investments in a business enterprise or securities.  Each Lender further represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder.  Each Lender shall, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder and in deciding whether or to the extent to which it will continue as a lender or assign or otherwise transfer its rights, interests and obligations hereunder.

**Section 9.09   Administrative Agent May File Proofs of Claim**.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any Subsidiary, the Administrative Agent shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 11.03 of this Agreement allowed in such judicial proceeding); and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making

of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and their agents and counsel, and any other amounts due the Administrative Agent under Section 11.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrower, Administrative Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by Administrative Agent, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), Administrative Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code,) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and Administrative Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from Majority Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Administrative Agent at such sale or other disposition. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Majority Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 thereof, or any similar laws in any other jurisdictions to which a Credit Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Capital Stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid

(i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Capital Stock thereof shall be governed, directly or indirectly, by the vote of the Majority Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Majority Lenders contained in <u>Section 11.02</u>), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Capital Stock and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

**ARTICLE X.**

**<u>SECURITY AGREEMENT</u>**

**Section 10.01  <u>Grant of Security Interest</u>**.

(a)     To secure the prompt payment and performance in full of all of the Obligations, upon authorization by the Bankruptcy Court under any of the DIP Orders, including as pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, each Credit Party hereby pledges, hypothecates, assigns, charges, mortgages, delivers, and transfers to the Administrative Agent, for the ratable benefit of each Secured Party, and hereby grants to the Administrative Agent, for the ratable benefit of each Secured Party, a continuing security interest in all of such Credit Party's right, title and interest in, to and under, all of the following, whether now owned or hereafter acquired by such Credit Party, and wherever located and whether now owned or hereafter existing or arising:

<blockquote>

(i)     all accounts;

(ii)    all contract rights;

(iii)   all chattel paper;

(iv)    all documents;

(v)     all instruments;

(vi)    all supporting obligations and letter-of-credit rights;

</blockquote>

(vii)    all general intangibles (including payment intangibles, intercompany accounts, intellectual property and software);

(viii)   all inventory and other goods;

(ix)     all motor vehicles, equipment and fixtures;

(x)      all investment property, financial assets and all securities accounts;

(xi)     all money, cash, Cash Equivalents, securities, and other property of any kind;

(xii)    all deposit accounts;

(xiii)   all notes, and all documents of title;

(xiv)    all books, records, and other property related to or referring to any of the foregoing, including books, records, account ledgers, data processing records, computer software and other property, and general intangibles at any time evidencing or relating to any of the foregoing;

(xv)     all commercial tort claims;

(xvi)    all real property owned or leased by such Credit Party;

(xvii)   all other personal property of such Credit Party;

(xviii)  all accessions to, substitutions for, and replacements, products, and proceeds of any of the foregoing, including, but not limited to, dividends or distributions on investment property, rents, profits, income and benefits, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing; and

(xix)    any and all proceeds of any of the foregoing.

For the avoidance of doubt, the Collateral (or any component term thereof) shall include or be deemed to include any claims and causes of action of the Credit Parties under sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, and any other avoidance actions under the Bankruptcy Code or other applicable law and the proceeds thereof.  Notwithstanding the foregoing, the Collateral shall not include or be deemed to include (a) any United States intent-to-use trademark application ("Excluded Trademark Applications") until such time, if any, as a statement of use or an amendment to allege use is filed with and accepted by the United States Patent and Trademark Office or (b) any general intangibles, contracts, contract documents, government approvals or other document (and any contract rights arising thereunder) to which any Credit Party is a party to the extent (and only to the extent) that a Credit Party is prohibited from granting a security interest in, pledge of, or charge, mortgage or lien upon any such property by reason of (i) an existing and enforceable negative pledge or anti-assignment provision the breach of which would give another party any rights of termination or (ii)

Page 94

applicable law or regulation to which such Credit Party is subject (the foregoing property in this clause (b) and the contract rights thereunder, collectively, "Excluded Contracts" and together with Excluded Trademark Applications, collectively, "Excluded Collateral"); provided that (x) the exclusion from the lien and security interest granted by such Credit Party hereunder shall not limit, restrict or impair the grant by such Credit Party of the lien and security interest in any right to receive proceeds from the sale or other disposition of Excluded Collateral or any proceeds, products, substitutes or replacements of any Excluded Collateral (unless otherwise constituting Excluded Collateral) and (y) any Excluded Collateral shall automatically cease to be an "Excluded Collateral" and excluded from the Collateral (and shall automatically be subject to the lien and security interest granted hereby and to the terms and provisions of this Agreement as "Collateral"), to the extent that (1) either of the prohibitions discussed in clause (i) or (ii) above is ineffective or subsequently rendered ineffective under any Requirements of Law or the Bankruptcy Code or is otherwise no longer in effect, or (2) with respect to Excluded Contracts, the applicable Credit Party has obtained the consent of the other parties to such Excluded Contract to the creation of a lien and security interest in, such Excluded Contract (which consent, upon the reasonable request of the Administrative Agent, such Credit Party will use its commercial reasonable efforts to obtain).

(b)     Subject to the Carve-Out and the Hedge Carve-Out, pursuant to Bankruptcy Code section 364(c)(1), the Administrative Agent on behalf of the Secured Parties has been granted a super-priority administrative claim over any and all administrative claims (including claims having priority under section 507 of the Bankruptcy Code or otherwise).

(c)     The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement, the DIP Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrower (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.

(d)     The Liens and security interests granted pursuant to this Section 10.01 and the administrative priority and lien priority granted pursuant this Agreement may be independently granted by the Loan Documents and by other Loan Documents entered into hereafter.  This Agreement, the DIP Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative; provided that, to the extent of conflict the DIP Orders control.

**Section 10.02** **Perfection and Protection of Security Interests**.

(a)     Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, each Credit Party shall, as applicable, at such Credit Party's expense, perform all steps reasonably requested by the Administrative Agent or the Majority Lenders at any time to perfect, maintain, protect, and enforce the Liens granted to the Administrative Agent, including:  upon request by the Administrative Agent or the Majority Lenders, delivering to the Administrative Agent (who shall

hold on behalf of the other Secured Parties) (i) the originals of all certificated investment property, instruments, documents, and chattel paper, and all other Collateral of which the Majority Lenders reasonably determine the Administrative Agent should have physical possession in order to perfect and protect the Administrative Agent's security interest therein, duly pledged, endorsed, or assigned to the Administrative Agent without restriction, (ii) certificates of title (excluding deeds for real estate) covering any portion of the Collateral for which certificates of title have been issued and (iii) all letters of credit on which such Credit Party is named beneficiary.

(b)     To the fullest extent permitted by applicable law, the Administrative Agent may file one or more financing statements disclosing the Liens on the Collateral granted to the Administrative Agent.

(c)     To the extent any Credit Party owns any investment property, such Credit Party agrees as follows with respect to such investment property:

(i)     all cash dividends, cash distributions, and other cash or Cash Equivalents in respect of such investment property at any time payable or deliverable to such Credit Party shall be deposited into an account specified by the Administrative Agent; and

(ii)     such Credit Party will not acknowledge any transfer or encumbrance in respect of such investment property to or in favor of any Person other than the Administrative Agent or a Person designated by the Administrative Agent in writing.

(d)     To the extent the Capital Stock of any Subsidiary of a Credit Party is in certificated form, upon the Administrative Agent's or Majority Lender's reasonable request, such Credit Party shall deliver all certificates or instruments at any time representing or evidencing such Capital Stock in such Subsidiary to the Administrative Agent, and shall be in suitable form for transfer by delivery, or shall be accompanied by instruments of transfer or assignment, duly executed in blank, all in form and substance satisfactory to the Majority Lenders.  The Administrative Agent shall have the right, at any time, after the occurrence and during the continuance of an Event of Default, upon three Business Days' prior written notice, to transfer to or to register in the name of the Administrative Agent or its nominee any Capital Stock in such Subsidiary.  In addition, the Administrative Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Capital Stock of such Subsidiaries for certificates or instruments of smaller or larger denominations.

**Section 10.03  <u>Deposit Accounts</u>**.  No Credit Party shall open any deposit or securities account without the prior written consent of the Majority Lenders.

**Section 10.04  <u>Title to, Liens on and Use of Collateral</u>**.  Each Credit Party represents and warrants to the Secured Parties and agrees with the Secured Parties that:  (a) all of the Collateral owned by such Credit Party is and will (subject to dispositions permitted hereunder) continue to be owned by such Credit Party free and clear of all Liens whatsoever, except for the Liens permitted under Section 6.03, (b) the Liens granted to the Administrative Agent in the Collateral will not be junior in priority to any Lien other than the Carve-Out, the Hedge Carve-Out and the Non-Primed Excepted Liens (only to the extent set forth in the DIP Orders), and (c)

such Credit Party will use, store, and maintain the Collateral owned by such Credit Party consistent with past practice.  The inclusion of proceeds in the Collateral shall not be deemed to constitute any Secured Party's consent to any sale or other disposition of the Collateral except as expressly permitted herein.

Section 10.05  **Right to Cure**.  Upon the occurrence and during the continuance of an Event of Default, upon three Business Days' prior written notice, the Administrative Agent shall have the right to (but shall not be obligated to), pay any amount or do any act required of any Credit Party hereunder or under any other Loan Document (other than in respect of principal, interest or fees on the Loans) in order to preserve, protect, maintain, or enforce the Obligations, the Collateral, or the Liens granted to the Administrative Agent, and which any Credit Party fails to pay or do, including payment of any judgment against any Credit Party, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord's or bailee's claim, and any other obligation secured by a Lien upon or with respect to the Collateral.  All payments that the Administrative Agent makes under this Section 10.05 and all out-of-pocket costs and expenses that the Administrative Agent pays or incurs in connection with any reasonable action taken by it hereunder shall be considered part of the Obligations and shall bear interest until repaid at the rate set forth in Section 2.10.  Any payment made or other action taken by the Administrative Agent under this Section 10.05 shall be without prejudice to any right to assert an Event of Default hereunder and to proceed thereafter as herein provided.

Section 10.06  **Power of Attorney**.  Upon the occurrence of and during the continuance of an Event of Default, upon three Business Days' prior written notice, each Credit Party hereby appoints the Administrative Agent and the Administrative Agent's designee(s) as such Credit Party's attorney to sign such Credit Party's name on any invoice, bill of lading, warehouse receipt, or other document of title relating to any Collateral, on drafts against customers, on assignments of accounts, on notices of assignment, financing statements, and other public records and to file any such financing statements permitted under this Agreement by electronic means with or without a signature as authorized or required by applicable law or filing procedure.  Each Credit Party ratifies and approves all acts of such attorney.  This power, being coupled with an interest, is irrevocable until the Discharge of Obligations.

Section 10.07  **The Secured Parties' Rights, Duties and Liabilities**.  The Credit Parties assume all responsibility and liability arising from or relating to the use, sale, or other disposition of the Collateral.  The Obligations shall not be affected by any failure of any Secured Party to take any steps to perfect the Liens granted to the Administrative Agent or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Credit Party from any of the Obligations.

Section 10.08  **Site Visits, Observations and Testing**.  The Secured Parties and their representatives will have the right at any commercially reasonable time, and upon reasonable advance notice to the applicable Credit Party, to enter and visit the properties of any Credit Party constituting or containing Collateral for the purposes of observing or inspecting such Collateral.  The Secured Parties may examine, audit and make copies of any and all of the Credit Parties' books and records and the Collateral and discuss the Credit Parties' affairs with executive officers or managers of any Credit Party.  No site visit, observation, or inspection by the Secured Parties will result in a waiver of any Default or Event of Default or impose any liability on the

Secured Parties other than for damages incurred as a result of the gross negligence or willful misconduct by the Secured Parties as determined by a final, non-appealable order of a court of competent jurisdiction.  The Secured Parties will make reasonable efforts to avoid interfering with any use of such properties or any other property in exercising any rights provided hereunder; provided that, notwithstanding anything to the contrary in this Section 10.08, none of the Credit Parties or any of their respective Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (x) in respect of which disclosure to the Administrative Agent or any Secured Party (or their respective representatives or contractors) is prohibited by applicable law or (y) is subject to attorney-client privilege or constitutes attorney work product.

      **Section 10.09  Rights in Respect of Investment Property**.  During the existence of an Event of Default, subject to any order of the Bankruptcy Court and the Bankruptcy Code, (i) the Administrative Agent may, upon three (3) Business Days' prior written notice to the relevant Credit Party, transfer or register in the name of the Administrative Agent or any of its nominees, for the benefit of the Secured Parties, any or all of the Collateral consisting of investment property, the proceeds thereof (in cash or otherwise), and all liens, security, rights, remedies, and claims of any Credit Party with respect thereto (collectively, the "Pledged Collateral") held by the Administrative Agent hereunder, and the Administrative Agent or its nominee may thereafter, after written notice to the applicable Credit Party, exercise all voting and corporate rights at any meeting of any corporation, partnership, or other business entity issuing any of the Pledged Collateral and any and all rights of conversion, exchange, subscription, or any other rights, privileges, or options pertaining to any of the Pledged Collateral as if it were the absolute owner thereof, including the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization, or other readjustment of any corporation, partnership, or other business entity issuing any of such Pledged Collateral or upon the exercise by any such issuer or the Administrative Agent of any right, privilege, or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar, or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to exercise any of the aforesaid rights, privileges, or options, and the Administrative Agent shall not be responsible for any failure to do so or delay in so doing, (ii) to the extent permitted under any requirements of law, after the Administrative Agent's giving of the notice specified in clause (i) of this Section 10.09, all rights of any Credit Party to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and to receive the dividends, interest, and other distributions which it would otherwise be authorized to receive and retain thereunder shall be suspended until such Event of Default shall no longer exist, and all such rights shall, until such Event of Default shall no longer exist, thereupon become vested in the Administrative Agent which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends, interest, and other distributions, (iii) all dividends, interest, and other distributions which are received by any Credit Party contrary to the provisions of this Section 10.09 shall be received in trust for the benefit of the Administrative Agent, shall be forthwith deposited into an account specified by the Administrative Agent as Collateral in the same form as so received (with any necessary endorsement), and (iv) each Credit Party shall execute and deliver (or cause to be executed and delivered) to the Administrative Agent all such proxies and other instruments

as the Administrative Agent or a Lender may request for the purpose of enabling the Administrative Agent to exercise the voting and other rights which it is entitled to exercise pursuant to this Section 10.09 and to receive the dividends, interest, and other distributions which it is entitled to receive and retain pursuant to this Section 10.09.

Section 10.10  **No Filings Required**.  Notwithstanding anything to the contrary contained herein, (a) the Liens and security interests referred to herein shall be deemed valid and perfected by entry of the DIP Orders and (b) the Administrative Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Orders. If the Administrative Agent (as directed by the Majority Lenders in their sole discretion) from time to time elects to prepare, file, register or publish any such financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Administrative Agent's Lien on the Collateral, all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order or the Final Order, as applicable, is entered and shall not negate or impair the validity or effectiveness of this Section 10.10 or of the perfection of any other Liens on the Collateral in favor of the Administrative Agent.

# ARTICLE XI.

# MISCELLANEOUS

Section 11.01  **Notices**.

(a)     Subject to paragraph (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or email, as follows:

(i)     if to the Borrower, to Gastar Exploration Inc., 1331 Lamar, Suite 650, Houston, Texas 77010, Attention: Michael A. Gerlich, Senior Vice President and Chief Financial Officer / Trent Determann, Vice President-Finance, Facsimile No. (713) 739-0458, email: mgerlich@gastar.com / tdetermann@gastar.com, with a copy to Kirkland and Ellis LLP, Attention:  Ross Kwasteniet, Facsimile No, (312) 862-2200, email: rkwasteniet@kirkland.com and John Luze, Facsimile No, (312) 862-2200, email: john.luze@kirkland.com;

(ii)     if to the Administrative Agent, to Wilmington Trust, National Association, 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, Attention: Jeffrey Rose, Facsimile No. (612) 217-5651, email:  JRose@wilmingtontrust.com , with a copy to Arnold & Porter Kaye Scholer LLP 250 West 55th Street, New York, NY 10019, Attention:  Alan Glantz, Facsimile No, (212) 836-6763, email: Alan.Glantz@arnoldporter.com; and

(iii)    if to any other Lender, to its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number or email address for notices and other communications hereunder by written notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if received during the recipient's normal business hours.

(d)    Borrower hereby acknowledges that (i) the Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on SyndTrak, Intralinks, DebtDomain or another similar electronic system (the "Platform"), (ii) the Administrative Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications, and (iii) certain of the Lenders may be "public-side" Lenders (i.e., Lenders, or representatives thereof, that do not wish to receive material nonpublic information with respect to Borrower or its securities) (each, a "Public Lender").  Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC", Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor". Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless Borrower notifies the Administrative Agent in writing promptly (after being given a reasonable opportunity to review such Borrower Materials) that any such document contains material non-public information:  (1) the Loan Documents and (2) notification of changes in the terms of the Loan Documents.

(e)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES

WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY CREDIT PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY CREDIT PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL AND NON-APPEALABLE RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**Section 11.02  Waivers; Amendments.**

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of the Loans shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     None of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified, and no consent to any departure by the Borrower or any other Credit Party therefrom shall be effective, except pursuant to an agreement or agreements in writing entered into by the Credit Parties and the Majority Lenders, and acknowledged by the Administrative Agent, or by the Credit Parties and the Administrative Agent in each case with the consent of the Majority Lenders; provided that no such agreement shall:

(i)     increase the Commitment of any Lender without the written consent of such Lender;

(ii)     reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees or premium payable hereunder, without the written consent of each Lender affected thereby;

(iii)    postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any of the Aggregate Commitment, without the written consent of each Lender affected thereby (it being understood that any waiver of a mandatory prepayment of the Loans shall not constitute a postponement or waiver of a scheduled payment or date of expiration);

(iv)    change Section 2.13(b) or Section 2.13(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender;

(v)     except in connection with any Dispositions permitted in Section 6.05, release any Guarantor from its obligations under Article VII or release any of the Collateral without the written consent of each Lender; or

(vi)    change any of the provisions of this Section or the definition of "Majority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

provided further that (i) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent and (ii) the Fee Letter may only be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

(c)     Notwithstanding anything to the contrary contained in this Section 11.02, the Administrative Agent may, with the consent of the Borrower only, amend, modify or supplement this Agreement or any of the other Loan Documents to correct any clerical errors or cure any ambiguity, omission, mistake, defect or inconsistency.

**Section 11.03  Expenses; Indemnity; Damage Waiver**.

(a)     The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Majority Lenders and each of their respective Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and the Majority Lenders, in connection with the preparation and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Majority Lenders or any other Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent, the Majority Lenders or any other Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section,

or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     THE CREDIT PARTIES SHALL, JOINTLY AND SEVERALLY, INDEMNIFY THE ADMINISTRATIVE AGENT AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY, OR ANY OTHER ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY SUBSIDIARY, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER OR NOT SUCH CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING IS BROUGHT BY A CREDIT PARTY, ANY EQUITY HOLDERS OF A CREDIT PARTY, ANY AFFILIATES OF A CREDIT PARTY, ANY CREDITORS OF A CREDIT PARTY OR ANY OTHER THIRD PERSON AND WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR, SOLELY IN THE CASE OF A LENDER, FROM A CLAIM BROUGHT BY A CREDIT PARTY AGAINST SUCH LENDER FOR MATERIAL BREACH IN BAD FAITH OF SUCH LENDER'S OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS. FOR THE AVOIDANCE OF DOUBT, WITH RESPECT TO THE FOREGOING PROVISO "ANY INDEMNITEE" MEANS ONLY THE INDEMNITEE OR INDEMNITEES, AS THE CASE MAY BE, THAT ARE DETERMINED BY SUCH COURT IN SUCH JUDGMENT TO HAVE BEEN GROSSLY NEGLIGENT OR TO HAVE ENGAGED IN WILLFUL MISCONDUCT OR, SOLELY IN THE CASE OF A LENDER, MATERIALLY BREACHED THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN BAD FAITH AND NOT ANY OTHER INDEMNITEE.  THIS SECTION 11.03(b) SHALL NOT APPLY WITH RESPECT TO TAXES (WHICH ARE SUBJECT TO SECTION 2.17 HEREOF) OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS OR DAMAGES ARISING FROM ANY NON-TAX CLAIM.

(c)      To the extent that any Credit Party fails to pay any amount required to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party thereof under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent thereof) or such Related Party of the Administrative Agent, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or if such unreimbursed amount or indemnity payment is sought after the date on which the Loans have been paid in full, and the Commitments have terminated or expired, in accordance with such Lender's Applicable Percentage immediately prior to the date on which the Loans are paid in full and the Commitments have terminated or expired)) of such unpaid amount.  If any indemnity furnished to Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Majority Lenders, until such additional indemnity is furnished.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any source against any amount due to the Administrative Agent under this paragraph (c).

(d)      To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party hereto on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, the Loans or the use of the proceeds thereof; provided that, nothing in this clause (d) shall relieve any Credit Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)      All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

(f)      The agreements in this Section 11.03 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, the termination of this Agreement and the repayment, satisfaction or discharge of the Secured Obligations.

### Section 11.04  Successors and Assigns.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the Administrative Agent (and any attempted assignment or transfer by such Credit Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the

Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)

    (i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of (A) the Administrative Agent and (B) if no Event of Default has occurred and is continuing, the Borrower.

    (ii)    Assignments shall be subject to the following additional conditions:

    (A)    except in the case of an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Administrative Agent otherwise consents;

    (B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of such Lender's Commitment and such Lender's Loans under this Agreement;

    (C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (unless such fee is waived or reduced by the Administrative Agent in its sole discretion);

    (D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and any tax forms required under Section 2.17; and

    (E)    in the case of an assignment of a Refinanced Commitment, the assignor and assignee party to the Assignment and Assumption shall have also executed and delivered to the Prepetition Term Loan Agent an Assignment and Assumption (as defined in the Prepetition Term Loan Agreement) in respect of Prepetition Term Loan Obligations in the same amount as the Refinanced Commitment being assigned.

For the purposes of this Section 11.04(b), the term "Approved Fund" and "Ineligible Institution" have the following meanings:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an

Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Ineligible Institution" means a (a) natural person, (b) company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof or (c) or the Borrower.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.14, Section 2.15, Section 2.16, Section 2.17 and Section 11.03).   Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 11.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section except that any attempted assignment or transfer by any Lender that does not comply with clause (C) of Section 11.04(b)(ii) shall be null and void.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment and the Applicable Percentage of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Credit Parties, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Credit Parties and any Lender, at any reasonable time and from time to time upon reasonable prior notice. For the avoidance of doubt, the language in this Section 11.04(b)(iv) is intended to cause the Loans, and any participation therein, to be in "registered form" as defined in Sections 163(f), 87(h)(2) and 881(c)(2) of the Code and Section 5f.103-(c) of the United States Treasury Regulations, and such language shall be interpreted and applied consistently therewith.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any applicable tax forms (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section, and any written consent to such assignment required by paragraph (b) of this Section and any Assignment and Assumption (as defined in the Prepetition Term Loan Agreement) required under paragraph (b)(E) of this Section, the

Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.18(d) or Section 11.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.    No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)

(i)        Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant"), other than an Ineligible Institution, in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 11.02(b) that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.14, Section 2.15, Section 2.16 and Section 2.17 (subject to the requirements and limitations therein, including the requirements under Section 2.17(f) (it being understood, however, that the documentation required under Section 2.17(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.14, Section 2.15, Section 2.16 or Section 2.17, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"), and no participation shall be effective unless it has been recorded in the Participant Register pursuant to this Section; provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's

interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Ineligible Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is an Ineligible Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Ineligible Institution.

**Section 11.05  Survival**.  All covenants, agreements, representations and warranties made by the Credit Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee, premium or any other amount payable under this Agreement is outstanding and so long as the Aggregate Commitment has not expired or terminated.  The provisions of Section 2.14, Section 2.15, Section 2.16, Section 2.17, Section 11.03, Article VII and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Aggregate Commitment or the termination of this Agreement or any provision hereof.

**Section 11.06  Counterparts; Integration; Effectiveness; Electronic Execution**.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements

with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES**.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 11.07  Severability**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 11.08  Right of Setoff**.  If an Event of Default shall have occurred and be continuing, upon three (3) Business Days' prior written notice, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of any Credit Party now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section and Section 7.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

**Section 11.09** **GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS**.

(a)     THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THE LAW OF THE STATE OF NEW YORK IS SUPERSEDED BY THE BANKRUPTCY CODE.

(b)     EACH CREDIT PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, OR, TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION, THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN, AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH BANKRUPTCY COURT, NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     EACH CREDIT PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.01. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 11.10** **WAIVER OF JURY TRIAL**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT

IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 11.11  Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 11.12  Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Requirements of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Credit Parties and their obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than a Credit Party.  For the purposes of this Section, "Information" means all information received from any Credit Party relating to any Credit Party or its business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Credit Party; provided that, in the case of information received from any Credit Party after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**Section 11.13  Material Non-Public Information**.

(a)      EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 11.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY

INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(b)     ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE CREDIT PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

**Section 11.14 <u>Authorization to Distribute Certain Materials to Public-Siders</u>.**

(a)     If the Borrower does not file this Agreement with the SEC, then the Borrower hereby authorizes the Administrative Agent to distribute the execution version of this Agreement and the Loan Documents to all Lenders, including their Public-Siders. The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Parties' respective securities while in possession of the Loan Documents.

(b)     The Borrower represents and warrants that none of the information in the Loan Documents constitutes or contains material non-public information within the meaning of the federal and state securities laws. To the extent that any of the executed Loan Documents constitutes at any time a material non-public information within the meaning of the federal and state securities laws after the date hereof, the Borrower agrees that it will promptly make such information publicly available by press release or public filing with the SEC.

**Section 11.15 <u>Interest Rate Limitation</u>.** Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have

been received by such Lender.  In the event that, notwithstanding Section 11.09, applicable law is the law of the State of Texas and such applicable law provides for an interest ceiling under Chapter 303 of the Texas Finance Code (the "Texas Finance Code") as amended, for each day, the ceiling shall be the "weekly ceiling" as defined in the Texas Finance Code and shall be used in this Note and the other Loan Documents for calculating the Maximum Rate and for all other purposes.  Chapter 346 of the Texas Finance Code (which regulates certain revolving credit accounts (formerly Tex. Rev. Civ. Stat.  Ann.  Art.  5069, Ch.  15)) shall not apply to this Agreement or to any Loan, nor shall this Agreement or any Loan be governed by or be subject to the provisions of such Chapter 346 in any manner whatsoever.

Section 11.16  **USA PATRIOT Act**.  Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and the Administrative Agent hereby notifies each Credit Party that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender or the Administrative Agent to identify each Credit Party in accordance with the Act.

Section 11.17  **Release of Guarantees and Liens**.

(a)      Upon Discharge of Obligations, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of each Credit Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person; and

(b)      If any of the Collateral shall be sold, transferred or otherwise disposed of by the Borrower or any Subsidiary in a transaction permitted by this Agreement, then the Administrative Agent, at the request and sole expense of the Borrower or any Subsidiary, shall execute and deliver to the Borrower or any Subsidiary all releases or other documents reasonably necessary or desirable for the release of the Liens created by the Security Documents on such Collateral; provided that the Borrower shall have delivered to the Administrative Agent, at least five (5) Business Days prior to the date of the proposed release, a written request for release identifying the terms of the Disposition in reasonable detail, including the price thereof and any anticipated expenses in connection therewith, together with a certification by the Borrower stating that such transaction is in compliance with this Agreement and the other Loan Documents (and the Lenders hereby authorize and direct the Administrative Agent to conclusively rely on such certifications in performing its obligations under this Section 11.17).  At the request and sole expense of the Borrower, a Guarantor shall be released from its obligations hereunder and under the other Security Documents upon Discharge of Obligations.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWER**:

**GASTAR EXPLORATION INC.**

By: _____
Name:
Title:

**GUARANTOR**:

**NORTHWEST PROPERTY VENTURES LLC**

By: _____
Name:
Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
as Administrative Agent


By: _____
Name:
Title:

**AF V Energy I Holdings, L.P.**,
as a Lender


By: _____
Name:
Title:      Authorized Signatory

**SCHEDULE 2.01**

<u>COMMITMENTS</u>

<u>New Money Interim Loans</u>

| Lender | New Money Interim Commitment | Percent of Aggregate New Money Interim Commitment |
|---|---|---|
| AF V Energy I Holdings, L.P. | $15,000,000 | 100% |
| **TOTAL:** | | **100%** |

<u>New Money Final Loans</u>

| Lender | New Money Final Commitment | Percent of Aggregate New Money Final Commitment |
|---|---|---|
| AF V Energy I Holdings, L.P. | $100,000,000, *minus* the sum of the amount of New Money Loans previously drawn by the Borrower | 100% |
| **TOTAL:** | | **100%** |

<u>New Money Reserve Loans</u>

| Lender | New Money Reserve Commitment | New Money Reserve Commitment |
|---|---|---|
| AF V Energy I Holdings, L.P. | $100,000,000, *minus* the sum of the amount of New Money Loans previously drawn by the Borrower | 100% |
| **TOTAL:** | | **100%** |

<u>Refinanced Loans</u>

| Lender | Refinanced Commitment | Refinanced Commitment |
|---|---|---|
| AF V Energy I Holdings, L.P. | $286,242,682.88 | 100% |
| **TOTAL:** | | **100%** |