## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GASTAR EXPLORATION INC., *et al.*,[1] | § | Case No. 18-36057 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Re:  Docket Nos. 33, 59** |

## NOTICE OF FILING OF FURTHER REVISED PROPOSED ORDER REGARDING THE DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on October 31, 2018, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed the *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 33] (the "<u>DIP Motion</u>") with the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>").

**PLEASE TAKE FURTHER NOTICE** that on November 1, 2018, the Debtors filed a revised proposed *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 59] (the "<u>Proposed Order</u>").

**PLEASE TAKE FURTHER NOTICE** that on November 1, 2018, a hearing was held on the DIP Motion.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Gastar Exploration Inc. (1640), and Northwest Property Ventures LLC (8685).  The location of the Debtors' service address is: 1331 Lamar Street, Suite 650, Houston, Texas 77010.

    **PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a further revised proposed *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Revised Proposed Order").

    **PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is a redline of the Revised Proposed Order reflecting changes from the Proposed Order.

    **PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases are available free of charge by visiting http://www.bmcgroup.com/gastar.  You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.


                        [*Remainder of page intentionally left blank.*]

Dated:  November 2, 2018

*/s/ Matthew D. Cavenaugh*
Patricia B. Tomasco (TX Bar No. 01797600)
Elizabeth C. Freeman (TX Bar No. 24009222)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          ptomasco@jw.com
                 efreeman@jw.com
                 mcavenaugh@jw.com

-and-

Anna G. Rotman, P.C. (TX Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:     (713) 836-3601
Email:          anna.rotman@kirkland.com

-and-

Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
John R. Luze (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          ross.kwasteniet@kirkland.com
                 john.luze@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on November 2, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## Exhibit A

**Redline**

KE 57787726

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| GASTAR EXPLORATION INC., *et al.*,[1] | § | Case No. 18-36057 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, 364, AND
507 OF THE BANKRUPTCY CODE (I) AUTHORIZING DEBTORS TO
OBTAIN SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION FINANCING,
(II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (III) GRANTING
ADEQUATE PROTECTION TO THE PRIMED PARTIES, (IV) SCHEDULING A
FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion ("Motion") filed by Gastar Exploration Inc. ("Gastar") and its

subsidiary Northwest Property Ventures LLC ("NPV"), as debtors and debtors in possession

(collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Chapter

11 Cases") requesting entry of an interim order (this "Interim Order") and a final order ("Final

Order" and, together with the Interim Order, the "DIP Orders") under sections 105, 361, 362,

363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C.

§§101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004, and 9014 of the

Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1

and 4001-1(b), 4002-1(i), and 9013-1 of the Local Bankruptcy Rules for the Southern District of

Texas (as amended, the "Bankruptcy Local Rules"), *inter alia* (a) authorizing the Debtors to enter

into a secured superpriority debtor-in-possession financing facility in the aggregate amount of no

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include:  Gastar Exploration Inc. (1640), and Northwest Property Ventures LLC (8685).  The location of
the Debtors' service address is:  1331 Lamar Street, Suite 650, Houston, Texas 77010.

less than $383,851,332.61 (the "DIP Facility") pursuant to and in accordance with the superpriority secured debtor-in-possession credit agreement in the form attached hereto as Exhibit 2 (as amended from time to time, the "DIP Credit Agreement") with Gastar, as borrower (the "DIP Borrower"), NPV, as guarantor, Wilmington Trust, National Association, as administrative and collateral agent (the "DIP Agent"), and the lenders party thereto (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), the other DIP Loan Documents (as defined below), the Budget (as defined below), and the DIP Orders, (b) authorizing the Debtors to use Cash Collateral (as defined below) as of the Petition Date pursuant to and in accordance with the Budget and the DIP Orders, (c) granting to the DIP Agent, for the benefit of the DIP Secured Parties, security interests in and liens on the DIP Collateral (as defined below) and a superpriority administrative expense claim, to the extent and as provided in the DIP Orders and the DIP Loan Documents, to secure the DIP Obligations (as defined below); (d) granting certain adequate protection to the Primed Parties and the Hedge Counterparties (as each is defined below); (e) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and (f) granting related relief; and the Bankruptcy Court having found that the relief requested in the Motion is in the best interests of each of the Debtors, their estates, their creditors and other parties in interest; and the Bankruptcy Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Bankruptcy Court (the "Interim Hearing"); and the Bankruptcy Court having determined that the legal and factual bases set forth in the Motion, the *Declaration of Michael A. Gerlich, Chief Financial Officer of Gastar Exploration Inc., in Support of Chapter 11 Petitions and First Day Motions*, dated as of October 31, 2018, and the *Declaration of Kevin M. Cofsky, Partner of Perella Weinberg Partners LP, in Support of Chapter 11 Petitions and First Day Motions*, dated as of October 31, 2018, and

articulated at the Interim Hearing adequately establish just cause for the relief granted herein; and upon all of the proceedings had before the Bankruptcy Court; and after due deliberation and sufficient cause appearing therefor, it is

HEREBY FOUND AND CONCLUDED THAT:[2]

A.   Commencement of Chapter 11 Cases.   On October 31, 2018 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "Court" or the "Bankruptcy Court").   The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   No official committee of unsecured creditors (a "Committee") has been appointed in the Chapter 11 Cases.

B.   Jurisdiction and Venue.   The Bankruptcy Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.   Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   The Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.   Venue of the Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Bankruptcy Local Rules 4001-1(b), 4002-1(i), and 9013-1.

---

[2]   The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

C. <u>Adequate Notice</u>.  On October 31, 2018, the Debtors filed the Motion with the Bankruptcy Court pursuant to Bankruptcy Rules 2002, 4001 and 9014, and provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery, or overnight delivery to the following parties and/or their respective counsel as indicated below:  (a) the Office of the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>"); (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to Wilmington Trust, National Association; (d) counsel to the Debtors' proposed postpetition lenders and the lenders under the Debtors' pre-petition financing facilities; (e) counsel to the Hedge Counterparties; (f) the United States Securities and Exchange Commission; (g) the Internal Revenue Service; and (h) all parties entitled to notice pursuant to Bankruptcy Local Rule 9013-1 (collectively, the "<u>Notice Parties</u>").

D. <u>DIP Facility</u>.  The DIP Facility is a secured superpriority financing facility, which shall be comprised of a term loan in the aggregate principal amount equal to $383,851,332.61 *plus* any accrued and unpaid interest on the Term Loans, (as defined below), consisting of:

(i)      up to $100,000,000 of new money loans (the "<u>New Money Loans</u>"), of which (a) $15,000,000 (the "<u>Interim DIP Amount</u>") shall be made available to the Debtors in one or more draws upon entry of this Interim Order, subject to satisfaction of the conditions precedent contained in the DIP Loan Documents, the Interim Order, and the Budget (the "<u>Interim DIP Tranche</u>") and (b) $100,000,000, minus the sum of (x) any amounts of New Money Loans previously drawn by the Debtors under the Interim DIP Tranche and (y) the aggregate amount of New Money Loans, as of any applicable time determination, drawn by the Debtors under the Reserve DIP Tranche (defined below) shall be made available to the Debtors in one or more draws

upon entry of the Final Order, subject to satisfaction of the conditions contained in the DIP Loan Documents, the Final Order, and the Budget (the "Final DIP Tranche"); and

(ii)     upon entry of the Final Order, term loans in an amount equal to $283,851,332.61 *plus* any accrued and unpaid interest on the Term Loans, the proceeds of which shall be used to refinance outstanding principal amount and accrued and unpaid interest under the Term Facility as of the Petition Date (the "Refinanced Loans" and, together with the New Money Loans, the "DIP Loans").

(iii)     In addition, upon entry of the Final Order, and subject to the terms and conditions of the DIP Loan Documents, the Final Order and the Debtors having demonstrated to the reasonable satisfaction of the DIP Lenders, acting in good faith, the bona fide need of the Debtors for such additional liquidity to preserve lease operating rights in response to actions taken or proposed to be taken by third parties (the "Operating Rights Preservation Activities"), a portion of the New Money Loans in an amount equal to $100 million, *minus* any amounts of New Money Loans previously drawn by the Debtors prior to such date under either the Interim DIP Tranche or the Final DIP Tranche (the "Reserve DIP Tranche") shall be available to the Debtors to fund such Operating Rights Preservation Activities.  Notwithstanding the foregoing or anything to the contrary in this Interim Order, other than as necessary to fund the Carve Out Reserve Account, (a) draws under the Reserve DIP Tranche shall be limited to no more than one draw per week and (b) no draw under the Reserve DIP Tranche shall in any event exceed the amount actually needed by the DIP Borrower at the applicable time of determination (taking into account the DIP Borrower's cash on hand at such time) to fund Operating Rights Preservation Activities over the immediately succeeding Borrowing Cap Period (as defined in the DIP Loan Documents) in the amounts expressly approved by the DIP Lenders for such Borrowing Cap Period, net of (and

without duplicating) any amounts previously drawn under the DIP Facility in respect of amounts so approved by the DIP Lenders for such Borrowing Cap Period.  All DIP Loans and the other obligations under the DIP Loan Documents, including, without limitation, principal, interest, expenses, the DIP Fees (as defined below), and the other obligations due from time to time by the Debtors pursuant to the DIP Loan Documents shall be referred to as the "DIP Obligations."

E.    Good Cause for Immediate Entry of the Interim Order.  Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  The Debtors have an immediate and critical need to obtain up to $15,000,000 of the DIP Loans and access to the Cash Collateral (as defined below) to satisfy their liquidity requirements to preserve and operate their businesses and maintain business relationships with, and the confidence of, their vendors, suppliers, and customers. Absent authorization to immediately use a portion of the DIP Facility and Cash Collateral, the Debtors' estates and their creditors would suffer immediate and irreparable harm.  "Cash Collateral" shall have the meaning assigned to the term "cash collateral" under section 363(a) of the Bankruptcy Code and covers all "cash collateral" that constitutes Prepetition Collateral (as defined below).

F.    Best Financing Available.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  The Debtors are unable to obtain (i) adequate unsecured credit allowable under either sections 364(b) and 503(b)(l) of the Bankruptcy Code or section 364(c)(l) of the Bankruptcy Code, (ii) adequate credit secured by a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, (iii) adequate credit secured by a lien that is junior as to all the encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iv) secured credit under section 364(d)(l) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the

terms of the DIP Facility. The Primed Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Refinanced Loans in the DIP Obligations. Moreover, the refinancing of certain Term Obligations into DIP Loans and the refinancing of Term Obligations in an amount equal to $283,851,332.61 *plus* any accrued and unpaid interest on the Term Loans into Refinanced Loans will enable the Debtors to obtain urgently needed financing that will allow them to fund a prepackaged reorganization process and emerge from these Chapter 11 Cases as a going concern in a prompt and efficient manner.

G.     <u>Terms of DIP Facility are Fair and Reasonable</u>. The DIP Lenders have indicated a willingness to provide the DIP Facility solely on the terms and conditions set forth in this Interim Order (and, subject to entry by the Bankruptcy Court, the Final Order) and the DIP Loan Documents. The terms of the DIP Facility (including, but not limited to, the indemnification provisions set forth in the DIP Credit Agreement) are fair and reasonable and reflect each Debtor's exercise of prudent business judgment consistent with its fiduciary duties, are the best available under the circumstances, and are supported by reasonably equivalent value and consideration.

H.     <u>Arm's Length and Good Faith Negotiation</u>. The Debtors, the DIP Agent, the DIP Lenders, and the Primed Parties have negotiated the terms and conditions of the DIP Facility, the DIP Loan Documents, and this Interim Order in good faith and at arm's length, and any credit extended and loans made to the Debtors pursuant to this Interim Order shall be, and hereby are, deemed to have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and the DIP Agent, the DIP Lenders, and the Primed Parties shall be entitled to the full protection of section 364(e) of the Bankruptcy

Code in the event the Interim Order or any provision thereof is vacated, reversed, or modified, whether on appeal or otherwise.  The Primed Parties have acted in good faith regarding the DIP Facility and the Debtors' use of the Cash Collateral to fund the administration of the Debtors' estates and continued operation of their businesses.  The Hedge Counterparties have acted in good faith regarding the Debtors' use of the Cash Collateral to fund the administration of the Debtors' estates and continued operations of their businesses.

I.     <u>The Prepetition Secured Facilities</u>.  Without prejudice to the rights of any other party and without the subparagraphs of this Paragraph I constituting findings of fact, conclusions of law or orders of the Court, the Debtors acknowledge, admit, represent, stipulate and agree that:

(i)     *Term Loan Facility.*

(A)     Prior to the Petition Date, Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "<u>Term Agent</u>"), and certain parties that are lenders under the Term Credit Agreement (as defined below) (the "<u>Term Lenders</u>" and, together with the Term Agent, the "<u>Term Facility Secured Parties</u>") made loans and advances, and/or provided other financial accommodations, (collectively, the "Term Loans"), to or for the benefit of certain of the Debtors, consisting of a term loan in the aggregate initial principal amount of $250,000,000 (the "<u>Term Facility</u>") pursuant to (x) the Third Amended and Restated Credit Agreement, dated March 3, 2017 (as the same may have been amended, restated, supplemented, or other otherwise modified to date, the "<u>Term Credit Agreement</u>"), by and among Gastar as borrower (the "<u>Borrower</u>"), the guarantor party thereto, the Term Agent and the Term Lenders, and (y) all other agreements, documents and instruments executed and/or delivered to or in favor of the Term Agent and/or the Term Lenders in connection with the Term Facility, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform

Commercial Code financing statements, and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Term Credit Agreement, as all of the same have been supplemented, modified, extended, renewed, restated, and/or replaced at any time prior to the Petition Date, collectively, the "Term Loan Documents"). All "Obligations" (as defined in the Term Loan Documents) arising under the Term Loan Documents including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Term Loan Documents), of any kind or nature, whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Term Loan Documents shall hereinafter be referred to collectively as the "Term Obligations."

(B)     The Term Obligations are guaranteed by NPV (collectively with the Borrower, the "Term Obligors").

(C)     Pursuant to the Term Loan Documents, the Term Obligations are secured by (i) liens (the "Term Liens") on substantially all of the assets of the Borrower; and (ii) a pledge by Gastar of 100% of its equity interest in NPV (collectively, the "Term Facility Collateral").

(ii)     *Second Lien Notes.*

(A)     Prior to the Petition Date, Gastar issued certain secured convertible notes (the "Second Lien Notes") issued in the aggregate initial principal amount of $125,000,000 and an additional amount of Second Lien Notes in the aggregate initial principal

amount $75,000,000, each pursuant to (x) the Indenture dated March 3, 2017 (as the same may have been amended, restated, supplemented, or other otherwise modified to date, the "Second Lien Indenture"), by and between Gastar, as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as trustee and collateral agent (the "Second Lien Trustee" and, collectively with the holders of the Second Lien Notes, the "Second Lien Secured Parties" and, collectively with the Term Facility Secured Parties, the "Primed Parties"), and (y) all other agreements, documents and instruments executed and/or delivered to or in favor of the Second Lien Trustee and/or the holders of the Second Lien Notes the ("Second Lien Noteholders") in connection with the Second Lien Notes, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Second Lien Indenture, as all of the same have been supplemented, modified, extended, renewed, restated, and/or replaced at any time prior to the Petition Date, collectively, the "Second Lien Documents").

      (B)    The obligations of Gastar under the Second Lien Notes (the "Second Lien Obligations") are guaranteed by NPV (together with Gastar, the "Second Lien Obligors").

      (C)    The Second Lien Obligations are secured by second priority liens (the "Second Lien Notes Liens" and, together with the Term Liens, the "Primed Liens") subordinate to the Term Liens and the Hedge Liens (as defined below), on substantially all of the assets of Gastar (as the same collateral securing the repayment of the Term Facility) (collectively, the "Second Lien Collateral" and, together with the Term Facility Collateral, the "Primed Collateral").

10

(iii)     *Secured Hedge Agreements.*

(A)     Prior to the Petition Date, Cargill, Incorporated ("<u>Cargill</u>") and NextEra Energy Marketing, LLC ("<u>Next Era</u>" and together with Cargill, each, a "<u>Hedge Counterparty</u>" and collectively the "<u>Hedge Counterparties</u>"), entered into hedging arrangements with the Debtors pursuant to (x) the ISDA Master Agreement dated as of December 10, 2012, including the schedules, exhibits and annexes thereto and all confirmations now or hereafter entered into under such ISDA Master Agreement (as the same may have been amended, restated, supplemented, or other otherwise modified to date, the "<u>Cargill ISDA</u>") between Gastar and Cargill, (y) the ISDA Master Agreement dated as of March 3, 2017, including the schedules, exhibits and annexes thereto and all confirmations now or hereafter entered into under such ISDA Master Agreement (as the same may have been amended, restated, supplemented, or other otherwise modified to date, the "<u>NextEra ISDA</u>" and, together with the Cargill ISDA, the "<u>Secured Hedge Agreements</u>") between Gastar and NextEra, and (z) all other agreements, documents and instruments executed and/or delivered to or in favor of any Hedge Counterparty in connection with any Secured Hedge Agreement, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Secured Hedge Agreements, as all of the same have been supplemented, modified, extended, renewed, restated, and/or replaced at any time prior to the Petition Date, collectively, the "<u>Hedge Documents</u>" and, collectively with the Term Loan Documents and the Second Lien Documents, the "<u>Prepetition Documents</u>").  All obligations arising under the Hedge Documents including, without limitation, all loans, advances, debts, liabilities, obligations, termination payments, principal, accrued or

11

hereafter accruing interest, settlement payments, fees, costs, charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Hedge Documents), of any kind or nature, whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Hedge Documents shall hereinafter be referred to collectively as the "Hedge Obligations."  For the avoidance of doubt, the Hedge Obligations shall include (in addition to their inclusion as Term Obligations) all fees, costs, expenses and indemnities owing to the Term Agent under the Hedge Documents (including, without limitation, under the Hedge Intercreditor Agreement (as defined below)).

(B)    The Hedge Obligations are guaranteed by NPV (together with Gastar, the "Hedge Obligors").

(C)    Pursuant to the Hedge Documents, the Hedge Obligations are secured by liens (the "Hedge Liens" and, together with the Primed Liens, the "Prepetition Liens"), which are equal in priority to the Term Liens, on the Term Facility Collateral (collectively, the "Hedge Collateral" and, together with the Primed Collateral, the "Prepetition Collateral").

(iv)    *Prepetition Intercreditor Agreements.*

(A)    The Term Agent and the Second Lien ~~Agent~~Trustee are parties to an Intercreditor Agreement, dated as of March 3, 2017, pursuant to which the security interests and certain payment rights of the Second Lien Notes are subordinated to the Term Facility and the Hedge Obligations.

(B)    The Hedge Counterparties, the Debtors and the Term Agent are parties to an Intercreditor Agreement, dated as of March 3, 2017 (the "Hedge Intercreditor

12

Agreement") which governs the relationship of the liens and payment rights of the Hedge Counterparties and the Term Facility Secured Parties.

(v)     *No Other Liens*.  As of the Petition Date, other than the security interests and liens expressly permitted under the Prepetition Documents, there were no security interests or liens on the Prepetition Collateral other than the Prepetition Liens.

J.     Debtors' Stipulations.  Without prejudice to the rights of any other party and without the subparagraphs of this Paragraph J constituting findings of fact, conclusions of law or orders of the Court, the Debtors acknowledge, admit, represent, stipulate and agree that:

(i)     *Term Obligations Are Valid and Enforceable*.  The Term Obligations are (A) legal, valid, binding, and enforceable against the Term Obligors, each in accordance with its terms, and (B) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, disallowance, impairment, defenses, or any other claims, causes of action, or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise by any person or entity.  As of the Petition Date, the Debtors were truly and justly indebted and liable in respect of the Term Obligations, in an aggregate amount of not less than $283,851,332.61, inclusive of outstanding principal amounts, but exclusive of accrued but unpaid interest, accrued but uncapitalized interest, and other unpaid fees, charges, costs, and expenses, to the extent payable or otherwise to be calculated under the terms of the Term Loan Documents.

(ii)     *Term Liens Are Valid and Enforceable*.  The Term Liens (A) constitute valid, binding, enforceable, and properly perfected liens on the Term Facility Collateral that secure all the Term Obligations, and (B) are not subject to any attachment,

recoupment, rejection, reductions, recharacterization, set-off or subordination (whether equitable, contractual, or otherwise) by any person or entity; and (C) were not otherwise subject to any liens, security interests, or other encumbrances other than liens expressly permitted under the Term Loan Documents.

(iii)    *No Claims Against Term Facility Secured Parties*.   The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Term Facility Secured Parties with respect to the Term Loan Documents or the Term Obligations, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, or other claims arising under or pursuant to sections 105, 510, 541, or 542 through 553 of the Bankruptcy Code.

(iv)    *Second Lien Obligations Are Valid and Enforceable*.   The Second Lien Obligations are (A) legal, valid, binding, nonavoidable and enforceable against the Second Lien Obligors, each in accordance with its terms; and (B) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, disallowance, impairment, defenses, or any other claims, causes of action, or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise by any person or entity.   As of the Petition Date, the Debtors were truly and justly indebted and liable in respect of the Second Lien Obligations, in an aggregate amount of not less than $162,500,000.00, inclusive of outstanding principal amounts, but exclusive of accrued but unpaid interest, accrued but uncapitalized interest, and other unpaid fees, charges, costs, and expenses, to the extent payable or otherwise to be calculated under the terms of the Second Lien Documents.

(v)     *Second Lien Notes Liens Are Valid and Enforceable*.  The Second Lien Notes Liens (A) constitute valid, binding, enforceable, and properly perfected liens on the Second Lien Collateral that secure all the Second Lien Obligations; (B) are not subject to any attachment, recoupment, rejection, reductions, recharacterization, set-off or subordination (whether equitable, contractual, or otherwise) by any person or entity; and (C) were not otherwise subject to any liens, security interests, or other encumbrances other than liens expressly permitted under the Second Lien Documents.

(vi)     *No Claims Against Second Lien Secured Parties*.  The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Second Lien Secured Parties with respect to the Second Lien Documents or the Second Lien Obligations,, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, or other claims arising under or pursuant to sections 105, 510, 541, or 542 through 553 of the Bankruptcy Code.

(vii)     *Hedge Obligations Are Valid and Enforceable*.   The Hedge Obligations are (A) legal, valid, binding, and enforceable against the Hedge Obligors, each in accordance with its terms, and (B) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, disallowance, impairment, defenses, or any other claims, causes of action, or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise by any person or entity.  As of the Petition Date, the Debtors were truly and justly indebted and liable in respect of the Hedge Obligations, in an amount of approximately $6,301,949.00 with respect to Cargill, and in an amount of approximately $6,095,360.74 with respect to NextEra, in each case inclusive of outstanding principal amounts, accrued but unpaid

interest, accrued but uncapitalized interest, and other unpaid fees, but exclusive of other unpaid fees, charges, costs, and expenses, to the extent payable or otherwise to be calculated under the terms of the Hedge Documents.

(viii) *Hedge Liens Are Valid and Enforceable*.   The Hedge Liens (A) constitute valid, binding, enforceable, and properly perfected liens on the Hedge Collateral that secure all the Hedge Obligations, and (B) are not subject to any attachment, recoupment, rejection, reductions, recharacterization, set-off or subordination (whether equitable, contractual, or otherwise) by any person or entity; and (C) were not otherwise subject to any liens, security interests, or other encumbrances other than liens expressly permitted under the Hedge Documents.

(ix) *No Claims Against Hedge Counterparties*.   The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Hedge Counterparties with respect to the Hedge Documents or the Hedge Obligations, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, or other claims arising under or pursuant to sections 105, 510, 541, or 542 through 553 of the Bankruptcy Code.

(x) *Intercompany Loans*.   The proceeds of the DIP Loans shall not be loaned or advanced to, or invested in (in each case, directly or indirectly), any entity that is not a DIP Guarantor (as defined below); the proceeds of the DIP Facility loaned or advanced to, or invested in, a DIP Guarantor shall be evidenced by an intercompany note, in form and substance reasonably satisfactory to the DIP Lenders, for the full amount of the proceeds so loaned, advanced, or invested; such intercompany note shall be pledged to the DIP Agent, for the benefit of the DIP Secured Parties, to secure the DIP Obligations; and all intercompany liens of the Debtors and the DIP Guarantors, if any, will be contractually subordinated to the liens securing

16

the DIP Facility and to the Adequate Protection Liens (as defined below) on terms satisfactory to the DIP Lenders.

        K.      Adequate Protection.

        (i)      The Term Facility Secured Parties and the Second Lien Secured Parties shall be entitled to adequate protection of their interests in the Primed Collateral (including the Cash Collateral), and the Hedge Counterparties shall be entitled to adequate protection of their interests in the Hedge Collateral (including the Cash Collateral), as set forth in Paragraphs 13, 14, and 15 below, respectively, in an amount equal to the aggregate diminution in value (if any) of the Primed Collateral or the Hedge Collateral, as applicable, resulting from the sale, lease, or use by the Debtors of the Primed Collateral or Hedge Collateral, as applicable, (including the Cash Collateral), and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution, the "Adequate Protection Obligations").

        (ii)      The terms of the Adequate Protection (as defined below) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and are sufficient to allow the Debtors' use of the Prepetition Collateral (including the Cash Collateral) and to permit the DIP Liens and the DIP Superpriority Claims to prime the Primed Liens on the Primed Collateral, but not, for avoidance of doubt, the Hedge Liens on the Hedge Collateral.

        L.      Parties' Consent.

        (i)      Primed Parties' Consent.   The Primed Parties consent to the adequate protection and the priming provided for herein; provided, however, that such consent to the priming, the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order (in form and substance satisfactory to them) relating to the DIP Facility as set forth herein (and as provided by the DIP

Lenders as set forth herein) and such consent shall not be deemed to extend to any other replacement financing or debtor-in-possession financing other than the DIP Loans provided under the terms of the DIP Loan Documents and the DIP Orders; and provided, further, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Loan Documents and DIP Loans as set forth herein are not approved.

(ii)     Hedge Counterparties' Consent.  The Hedge Counterparties consent to the use of Cash Collateral and the adequate protection provided for herein; provided, however, that such consent to the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order (in form and substance reasonably satisfactory to them) relating to the DIP Facility as set forth herein (and as provided by the DIP Lenders as set forth herein) and such consent shall not be deemed to extend to any other replacement financing or debtor-in-possession financing other than the DIP Loans provided under the terms of the DIP Loan Documents and the DIP Orders; and provided, further, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Loan Documents and DIP Loans as set forth herein are not approved.

M.     Independence.  None of the Prepetition Secured Parties or the DIP Lenders control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Documents or DIP Loan Documents.

N.     Order of the Bankruptcy Court.  Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before the Bankruptcy Court at the Interim Hearing, and good and sufficient cause appearing therefor:

18

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.      <u>Motion Granted</u>.   The Motion is granted on an interim basis, as set forth in this Interim Order. Any objections to the Motion that have not previously been resolved or withdrawn are hereby overruled.  This Interim Order shall immediately become effective upon its entry.  To the extent that the terms of any of the DIP Loan Documents differ from the terms of this Interim Order, this Interim Order shall control.

2.      <u>Authority to Enter into DIP Facility</u>.

(a)      The Debtors' entry into the DIP Facility is hereby approved.  The Debtors are also authorized to enter into such additional documents, instruments, and agreements delivered or executed from time to time in connection with the DIP Facility (such agreements, together with the DIP Credit Agreement and the DIP Orders, the "<u>DIP Loan Documents</u>").  The DIP Facility Agreements shall include guarantees from NPV and any other subsidiary that is required to provide a guarantee pursuant to the DIP Loan Documents (collectively, the "<u>DIP Guarantors</u>").

(b)      To the extent not specifically provided in this Interim Order, the Debtors are authorized to incur and perform the obligations arising under, and to otherwise comply with, the DIP Loan Documents and the Interim Order.

(c)      Following the execution of such documents (regardless of whether it was actual execution or deemed execution provided under this Interim Order), each of the DIP Loan Documents shall constitute valid and binding agreements, enforceable against each Debtor that is party thereto, in accordance with the terms of the DIP Loan Documents.

3.      Authority to Borrow and Use of Funds.

(a)      The Debtors are hereby authorized, on an interim basis, to borrow DIP Loans in an amount not to exceed the Interim DIP Amount, pursuant to the terms of this Interim Order and the other DIP Loan Documents.

(b)      The Debtors are hereby authorized to use the Interim DIP Tranche and the Cash Collateral pursuant to the DIP Credit Agreement and the Interim Order, and in accordance with the 13-week budget delivered by the Debtors to the DIP Agent pursuant to the DIP Credit Agreement, including any variances to the line items contained in such budget that are permitted under the DIP Credit Agreement (as the same may be amended, supplemented, and/or updated in accordance with the DIP Credit Agreement, the "Budget"), provided that payments of prepetition obligations shall be made only as authorized in other Oorders entered by the Bankruptcy Court.  The initial Budget is annexed hereto as Exhibit 1.  Within five (5) business days of delivery of the Budget to the DIP Agent, the Debtors shall deliver a copy of such Budget to the U.S. Trustee.

4.      Limitation on Use of Funds.

(a)      Notwithstanding anything herein to the contrary, no proceeds of the DIP Loans, the DIP Collateral, the Prepetition Collateral, or any portion of the Carve Out may be used for the payment of (i) the fees and expenses of any person incurred in (A) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any DIP Secured Party, Term Facility Secured Party, Hedge Counterparty or Second Lien Secured Party for the purpose of challenging the amount, validity, extent, perfection, priority, characterization, or enforceability of or asserting any defense, counterclaim or offset to the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Term Obligations, the Term Liens,

the Hedge Obligations, the Hedge Liens, the Term Administrative Expense Claim, the Second

Lien Obligations, the Second Lien Notes Liens, the Second Lien Administrative Expense Claim,

and the Adequate Protection Liens; or (B) asserting any other claims, causes of action, adversary

proceeding, or other litigation or actions (including, without limitation, any Avoidance Actions (as

defined below)) against any DIP Secured Party, Term Facility Secured Party, Hedge Counterparty

or Second Lien Secured Party that would hinder or delay the assertion, enforcement, or realization

on the DIP Collateral or the Cash Collateral in accordance with the DIP Loan Documents, the

Term Loan Documents, the Hedge Documents, the Second Lien Documents, or this Interim Order;

or (ii) any other purposes not expressly permitted under the DIP Loan Documents.

(b)      Notwithstanding the foregoing, subject to entry of the Final Order,

up to $25,000 in the aggregate proceeds of the DIP Loans, the DIP Collateral, the Prepetition

Collateral, and/or the Carve Out may be used to pay fees and expenses of the professionals retained

by any Committee that are incurred in connection with investigating the matters covered by the

stipulations contained in Paragraph J of this Interim Order; provided, however that no portion of

such amount may be used by a Committee or any other party to prosecute or support any claims

or challenges.

(c)      Notwithstanding anything herein to the contrary, so long as the Final

Order is entered by the Bankruptcy Court within 30 days after the Petition Date, no proceeds of

the DIP Loans or the DIP Collateral may be used for the payment of the fees and expenses of any

professional retained (or to be retained) in these Chapter 11 Cases, other than the fees and expenses

of the DIP Agent and DIP Lenders, during the period between entry of this Interim Order and entry

of the Final Order.  Nothing in this paragraph 4(c) shall alter or otherwise impair the Carve Out as

set forth in paragraph 11.

5.      <u>DIP Fees</u>.  Subject to the same procedures set forth in Paragraph 13 below with respect to professionals retained by the Term Facility Secured Parties, the Debtors are hereby authorized and directed to pay all fees, expenses, and other amounts payable under the DIP Loan Documents, including, without limitation, all recording fees, fees and expenses (whether incurred prepetition or postpetition) of the DIP Agent's counsel and the DIP Lenders' counsel (and such other special counsel, financial advisors, and other consultants as are retained by the DIP Agent and the DIP Lenders), and all of the other fees (including, but not limited to, the Make-Whole Amount (as defined and calculated in the DIP Credit Agreement)) and all out-of-pocket costs and expenses of the DIP Secured Parties (all the foregoing, the "<u>DIP Fees</u>"), at such times as they are earned and due under, and otherwise in accordance with the terms of, the DIP Loan Documents.  None of such costs, fees, and expenses shall be subject to Bankruptcy Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court.  All DIP Fees shall constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Loan Documents.  Any DIP Fees outstanding at the time of a draw shall be paid concurrently with any funding of a DIP Loan based on such a draw request.  The indemnification provisions in the DIP Credit Agreement are hereby approved.  For the avoidance of doubt, the upfront fee and yield enhancement fees set forth in section 2.12 of the DIP Credit Agreement shall only be payable as a percentage of the New Money Commitments (as defined in the DIP Credit Agreement) and shall not be payable on any amount of the Refinanced Loans.

6.     <u>Refinanced Loans</u>.  Subject to and effective only upon the entry of the Final Order, the refinancing of outstanding Term Obligations in an amount equal to $283,851,332.61 *plus* any accrued and unpaid interest on the Term Loans shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Primed Parties to fund amounts under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Term Obligations or Second Lien Obligations.  Notwithstanding any other provision of this Interim Order or the DIP Loan Documents, all rights of the Primed Parties shall be fully preserved.

7.     <u>DIP Obligations</u>.  The DIP Obligations are (a) legal, valid, binding, and enforceable against the Debtors, each in accordance with its terms, (b) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual, or otherwise), counterclaims cross-claims, defenses, or any other claims, causes of action, or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise, and (c) shall constitute "allowed claims" within the meaning of section 502 of the Bankruptcy Code.  For the avoidance of doubt, the DIP Obligations shall not include the Refinanced Loans until entry of the Final Order in accordance with paragraph 7.

8.     <u>DIP Make-Whole Amount</u>.  The Make-Whole Amount, as and when incurred in accordance with the DIP Credit Agreement (a) is a legal, valid, binding, and enforceable obligation against the Debtors and (b) is not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other claims, causes of action, or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise.

9.      DIP Superpriority Claims.  Pursuant to sections 364(c)(1), 503, and 507 of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors (the "DIP Superpriority Claims") with priority over any and all administrative expenses of the Debtors (including administrative expenses constituting Adequate Protection), whether heretofore or hereafter incurred, subject and subordinate only to the Hedge Obligations, any indebtedness secured by Permitted Encumbrances (as such term shall be defined under the DIP Loan Documents) and the Carve Out.  Subject to and effective only upon the entry of the Final Order, and to the extent such claims are not otherwise sold pursuant to section 363 or 1129 of the Bankruptcy Code, the DIP Superpriority Claims may be paid out of the proceeds or property recovered, unencumbered or otherwise the subject of successful claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, whether by judgment, settlement, or otherwise (collectively, the "Avoidance Actions" and any proceeds thereof and property received thereby, the "Avoidance Action Proceeds").

10.      DIP Liens.  As security for the repayment of the DIP Obligations, pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, the DIP Agent, on behalf of the DIP Secured Parties, is hereby granted:  (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority security interest and lien on all tangible and intangible unencumbered assets of the Debtors now owned or hereafter acquired (and, subject to and effective only upon the entry of the Final Order, the Avoidance Actions and the Avoidance Action Proceeds); (ii) pursuant to section 364(d) of the Bankruptcy Code, a senior security interest and lien with respect to the Primed Collateral (but, for the avoidance of doubt, subordinate to the Hedge Liens on the Primed Collateral); and (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior security interest and lien on any other tangible or intangible encumbered assets of the Debtors now owned

or hereafter acquired, including, to the extent that such assets are subject to valid, perfected and unavoidable Permitted Encumbrances in favor of third parties that were in existence immediately prior to the Petition Date, or valid and unavoidable Permitted Encumbrances in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (the liens and security interests identified in subsections (i)-(iii) with respect to the DIP Obligations, collectively, the "DIP Liens" and the collateral with respect to which such DIP Liens attach, collectively, the "DIP Collateral").  Other than as set forth above, the DIP Liens shall be subject and subordinate only to the Hedge Liens, and the Carve Out.  For the avoidance of doubt, the DIP Liens shall not extend to (i) Excluded Contracts (as such term is defined in the DIP Loan Documents), (ii) any United States intent-to-use trademark application until such time, if any, as a statement of use or an amendment to allege use is filed with an accepted by the United States Patent and Trademark Office, or (iii) to the extent not covered by clauses (i) or (ii), the Excluded Collateral as defined in the DIP Loan Documents.  Notwithstanding the foregoing, the liens granted pursuant to this order shall not prime the claims secured by statutory mechanic's or construction liens of Schlumberger Technology Corporation.  Such statutory lien claims of Schlumberger Technology Corporation are Permitted Encumbrances.

    (a)  Upon entry of this Interim Order, whether or not the DIP Secured Parties take any action to validate, perfect, or confirm perfection, the DIP Liens shall be deemed valid, perfected, allowed, enforceable, nonavoidable, and not subject to challenge, dispute, avoidance, impairment, or subordination (other than with respect to the Permitted Encumbrances, the Hedge Liens or Carve Out or as set forth in this Interim Order), at the time and as of the date of entry of this Interim Order.

(b)     The DIP Secured Parties are hereby authorized, but not required, to file or record, in any jurisdiction, financing statements, intellectual property filings, mortgages, deeds of trust, notices of lien or similar instruments, or take any other action in order to validate and perfect the DIP Liens.  Upon the request of the DIP Agent, the Debtors, without any further consent of any party, are authorized and directed to take, execute, and deliver such instruments (in each case without representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable the DIP Agent or DIP Lenders to validate, perfect, preserve, and enforce the DIP Liens consistent with the terms of this Interim Order.  A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     The Debtors are authorized and directed to, as soon as reasonably practicable following entry of this Interim Order, add the DIP Secured Parties as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral and shall, subject to the terms of this Interim Order, distribute any proceeds recovered or received in accordance with the terms of this Interim Order and the other DIP Loan Documents.

(d)     So long as any of the DIP Obligations remain outstanding and have not been indefeasibly paid in full in cash:

(i)     the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, except as permitted by this Interim Order, the DIP Loan Documents, as applicable, or as otherwise authorized by the Bankruptcy Court. Subject to the Hedge Obligations, all proceeds of DIP Collateral, shall be applied to the DIP

Obligations and paid to the DIP Lenders in accordance with this Interim Order and the DIP Loan Documents;

(ii)     other than Indebtedness (as defined in the DIP Credit Agreement) expressly permitted under the DIP Loan Documents or Permitted Encumbrances (as defined in the DIP Loan Documents), the consent of the Majority DIP Lenders (such term as used herein having the meaning assigned to the term "Majority Lenders" in the DIP Loan Documents) in their sole discretion is required for any debt (including any guaranty or refinancing) to be incurred or lien to be granted by any Debtor;

(iii)     without the Majority DIP Lenders' consent (which may be withheld in their sole discretion), the Debtors shall not propose, file, consent to, cooperate with, solicit votes with respect to, acquiesce to, or support any chapter 11 plan or debtor in possession financing unless (A) such plan or financing would, on the date of its effectiveness, pay in full in cash all DIP Obligations, all Term Obligations and all Second Lien Obligations or (B) such plan is an Acceptable Plan (as defined in the DIP Loan Documents); and

(iv)     the Debtors shall not directly or indirectly take any action that is inconsistent with, or that would unreasonably delay or impede approval of the DIP Facility or the DIP Loan Documents, which actions include, without limitation, directly or indirectly soliciting, encouraging, initiating, joining, and/or supporting any offer or proposal from, entering into any agreement with, and/or engaging in any discussions or negotiations with, any person concerning any actual or proposed transaction involving any or all of (A) a financial and/or corporate restructuring of any Debtor not supported by the Majority DIP Lenders, (B) another debtor-in-possession financing facility (other than a financing that pays the DIP Obligations, the Term Obligations and the Second Lien Obligations in full in cash), (C) the issuance, sale, or other

disposition of any equity or debt interests, or any material assets, of any Debtor, or (D) a merger, consolidation, business combination, liquidation, recapitalization, refinancing, sale of substantially all assets, or similar transaction involving any Debtor.

      11.    <u>Carve Out</u>.

      (a)    *Carve Out*.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent or the Majority DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $350,000 incurred after the first business day following delivery by the DIP Agent or the Majority DIP Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other

electronic means) by the DIP Agent or the Majority DIP Lenders (or by counsel to either of the foregoing) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

      (b)    *Carve Out Reserves.*

      (i)    On the day on which a Carve Out Trigger Notice is delivered to the Debtors by the DIP Agent (at the direction of the Majority DIP Lenders) or the Majority DIP Lenders (or by counsel to either of the foregoing) as set forth herein (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (A) be deemed a draw request and notice of borrowing by the Debtors for New Money Loans under the Final DIP Tranche (each, as defined in the DIP Loan Documents) (on a pro rata basis based on the then outstanding DIP Loans), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (B) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account of Gastar (the "Carve Out Reserve Account") to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.

      (i)    On the Termination Declaration Date, the Carve Out Trigger Notice shall also (A) be deemed a request by the Debtors for New Money Loans under the Final DIP Tranche (on a pro rata basis based on the then outstanding DIP Loans), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP

Loans) and (B) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in the Carve Out Reserve Account to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent or the Majority DIP Lenders deliver a Carve Out Trigger Notice, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of a Default (as defined in the DIP Loan Documents) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for borrowing of the New Money Loans under the Final DIP Tranche under the DIP Facility, any termination of the DIP Facility following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each DIP Lender (on a pro rata basis based on the then outstanding DIP Loans) shall make available to the DIP Agent for disbursement to the Carve Out Reserve Account designated to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Loan Documents. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay first, the Hedge Obligations, and then the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Loans have been terminated, in which case any such excess shall be

paid to the holders of Term Obligations and Second Lien Obligations in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay first, the Hedge Obligations, and then the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Loans have been terminated, in which case any such excess shall be paid to the holders of Term Obligations and Second Lien Obligations in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 11, then, any excess funds in either of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 11, prior to making any payments to the DIP Agent or the holders of Hedge Obligations, Term Obligations, and Second Lien Obligations, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, the Term Agent, and the Second Lien Trustee shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans (as defined in the DIP Loan Documents) or increase

or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in the Term Facility or Second Lien Notes, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Term Facility Adequate Protection Claims, the Second Lien Adequate Protection Claims, the Hedge Obligations, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, the Term Obligations, or the Second Lien Obligations.  To the extent of any conflict between the terms or provisions of any Prepetition Document (including, without limitation, the Hedge Intercreditor Agreement) and this Interim Order, the terms and provisions of this Interim Order shall govern, and the DIP Agent and Term Agent shall not have any liability to any DIP Lender, Term Lender or Hedge Counterparty for any actions taken (or not taken) by the DIP Agent or the Term Agent, as applicable, in accordance with this Interim Order.

(c)      *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)      *No Direct Obligation To Pay Allowed Professional Fees*.  None of the DIP Agent, DIP Lenders, Term Lenders, the Hedge Counterparties, the holders of Second Lien Notes, the Term Agent, or the Second Lien Trustee shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter

11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, the Term Lenders, the Hedge Counterparties, the holders of Second Lien Notes, the Term Agent, or the Second Lien Trustee in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     *Payment of Carve Out On or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Facility collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

12.     Limitation on Surcharging the Collateral, Waiver of Equities of the Case, and Marshalling.

(a)     Subject to and only effective upon the entry of the Final Order, with the exception of the Carve Out, none of the DIP Collateral, the Hedge Collateral, or the Primed Collateral shall be subject to surcharge by the Debtors or any other party in interest pursuant to sections 105 and 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the secured party whose collateral would be impacted and no such consent shall be implied from any other action, inaction or acquiescence by such parties in this proceeding, including, without limitation, the DIP Secured Parties' funding of the Debtors' ongoing operations.

(b)     Subject to and only effective upon the entry of the Final Order, the "equities of the case" exception set forth in section 552(b) of the Bankruptcy Code shall be deemed

waived by any party in interest with respect to the Term Facility Secured Parties, the Second Lien Secured Parties, the Hedge Counterparties and the Primed Collateral.

(c)     Subject to and only effective upon the entry of the Final Order, in no event shall the DIP Secured Parties or the Primed Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or, the Primed Collateral, or the Hedge Collateral, as applicable.

13.     <u>Adequate Protection of Term Facility Secured Parties</u>.  As adequate protection of their interests in the Term Facility Collateral, the Term Facility Secured Parties are entitled to adequate protection in an amount equal to the aggregate diminution in the value of their interests in the Term Facility Collateral from and after the Petition Date (the "<u>Term Facility Adequate Protection Claims</u>"), for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease, or use by the Debtors (or other decline in value) of the Term Facility Collateral (including for any use of the Term Facility Collateral constituting Cash Collateral), the priming of the Term Liens pursuant to this Interim Order or the DIP Loan Documents, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  In consideration of the Term Facility Adequate Protection Claims, the Term Facility Secured Parties are hereby granted the following (collectively, "<u>Term Facility Adequate Protection</u>"):

(a)     *Adequate Protection Liens.*  As security for the payment of the Adequate Protection Obligations in respect of the Term Facility Adequate Protection Claims, the Term Agent, on behalf of itself and the Term Lenders, is granted (i) a valid and perfected replacement security interest and lien in the Term Facility Collateral and all proceeds thereof, which shall rank junior in priority to the Carve Out, the Hedge Liens and the DIP Liens thereon

34

and (ii) a valid and perfected security interest and lien in all assets of the Debtors that do not constitute Term Facility Collateral but constitute DIP Collateral (including, for the avoidance of doubt, any Avoidance Actions and the proceeds thereof subject to and only effective upon the entry of the Final Order), which shall rank junior in priority to the Carve Out, the Permitted Encumbrances, the Hedge Liens and the DIP Liens (the foregoing clauses (i) and (ii) collectively, the "Term Facility Adequate Protection Liens").  Upon entry of this Interim Order, whether or not the Term Agent takes any action to validate, perfect, or confirm perfection, the Term Facility Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, nonavoidable, and not subject to challenge, dispute, avoidance, impairment, or subordination (other than as set forth in this Interim Order), at the time and as of the date of entry of this Interim Order.  The Term Agent is hereby authorized, but not required, to file or record, in any jurisdiction, financing statements, intellectual property filings, mortgages, deeds of trust, notices of lien or similar instruments, or take any other action in order to validate and perfect the Term Facility Adequate Protection Liens.  Upon the request of the Term Agent or the Term Lenders, the Debtors, without any further consent of any party, are authorized and directed to take, execute, and deliver such instruments to enable the Term Agent to validate, perfect, preserve, and enforce the Term Facility Adequate Protection Liens consistent with the terms of this Interim Order.  A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(b)     *Administrative Expense Claim*.  As security for the payment of the Adequate Protection Obligations, the Term Agent, on behalf of itself and the Term Lenders, is

hereby granted an allowed administrative expense claim against the Debtors (the "Term Administrative Expense Claim") under section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to the Hedge Obligations, the DIP Superpriority Claims, any indebtedness secured by Permitted Encumbrances and the Carve Out, provided, however that the Term Facility Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Term Administrative Expense Claim unless and until the indefeasible payment in full in cash of all DIP Obligations pursuant to the DIP Credit Agreement.

(c)     *Adequate Protection Payments to the Term Facility Secured Parties*. As additional adequate protection, the Term Facility Secured Parties shall be entitled to and the Debtors are directed to pay in cash (x) within three (3) business days following the initial funding of the DIP Facility, all accrued and unpaid reasonable and documented fees and expenses incurred by the Term Facility Secured Parties prior to the Petition Date including the fees and expenses of (i) counsel for the Term Agent, (ii) counsel for the Term Lenders, and (iii) one or more financial advisors and/or consultants for each of the Term Agent and the Term Lenders (the foregoing clauses (i), (ii), and (iii) collectively, the "Term Advisors") and (y) after the entry of this Interim Order, within five business days of presentment of invoices to the Debtors and the U.S. Trustee (and in no event more frequently than monthly) the reasonable and documented costs, fees, expenses, and indemnities incurred by the Term Facility Secured Parties after the Petition Date, including, without limitation, the fees and expenses of the Term Advisors in accordance with, and indemnity obligations payable by the Debtors under, the Term Credit Agreement.  In the event that within ten (10) calendar days from receipt of such invoices the U.S. Trustee raises an objection,

and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Court shall hear and determine such dispute; *provided*, *however*, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Court.

(d)     *Interest Accrual on the Term Facility*.   All interest on the Term Facility, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall not be paid currently, but shall continue to accrue at the non-default rate set forth in the Term Credit Agreement.   To the extent permitted under the Bankruptcy Code, all such interest shall be deemed part of the Term Facility Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

14.     <u>Adequate Protection of Second Lien Secured Parties</u>.   As adequate protection of their interests in the Second Lien Collateral, the Second Lien Secured Parties are entitled to adequate protection in an amount equal to the aggregate diminution in the value of their interests in the Second Lien Collateral from and after the Petition Date (the "<u>Second Lien Adequate Protection Claims</u>" and, together with the Term Adequate Protection Claims, the "<u>Adequate Protection Claims</u>"), for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease, or use by the Debtors (or other decline in value) of the Second Lien Collateral (including for any use of the Second Lien Collateral constituting Cash Collateral), the priming of the Second Lien Notes Liens pursuant to this Interim Order or the DIP Loan Documents, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.   In consideration of the Second Lien Adequate Protection Claim, the Second Lien Secured Parties are hereby granted the

following (collectively, "<u>Second Lien Adequate Protection</u>" and, together with the Term Facility Adequate Protection, the "<u>Adequate Protection</u>"):

        (a)     *Adequate Protection Liens.*  As security for the payment of the Adequate Protection Obligations in respect of the diminution, if any, of the Second Lien Secured Parties' interests in the Second Lien Collateral, including for any use of the Second Lien Collateral constituting Cash Collateral, the Second Lien ~~Agent~~Trustee, on behalf of itself and the Second Lien Noteholders, is granted (i) a valid and perfected replacement security interest and lien in the Second Lien Collateral and all proceeds thereof, which shall rank junior in priority to the Term Liens, the Term Facility Adequate Protection Liens, the Carve Out, the Hedge Liens and the DIP Liens thereon and (ii) a valid and perfected security interest and lien in all assets of the Debtors that do not constitute Second Lien Collateral but constitute DIP Collateral (including, for the avoidance of doubt, any Avoidance Actions and the proceeds thereof subject to and only effective upon the entry of the Final Order), which shall rank junior in priority to the Term Liens, the Term Facility Adequate Protection Liens, the Carve Out, the Permitted Encumbrances, the Hedge Liens and the DIP Liens thereon (the foregoing clauses (i) and (ii) collectively, the "<u>Second Lien Adequate Protection Liens</u>" ~~and, together with the Term Facility Adequate Protection Liens, the "Adequate Protection Liens")~~.").  Upon entry of this Interim Order, whether or not the Second Lien Trustee takes any action to validate, perfect, or confirm perfection, the Second Lien Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, nonavoidable, and not subject to challenge, dispute, avoidance, impairment, or subordination (other than as set forth in this Interim Order), at the time and as of the date of entry of this Interim Order.  The Second Lien Trustee is hereby authorized, but not required, to file or record, in any jurisdiction, financing statements, intellectual property filings, mortgages, deeds of trust, notices of lien or similar

instruments, or take any other action in order to validate and perfect the Second Lien Adequate Protection Liens.  Upon the request of the Second Lien Trustee or the Second Lien Noteholders, the Debtors, without any further consent of any party, are authorized and directed to take, execute, and deliver such instruments to enable the Second Lien Trustee to validate, perfect, preserve, and enforce the Second Lien Adequate Protection Liens consistent with the terms of this Interim Order. A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(b) *Administrative Expense Claim*.  As security for the payment of the Adequate Protection Obligations, the Second Lien Trustee, on behalf of itself and the Second Lien Noteholders, is hereby granted an allowed administrative expense claim against the Debtors (the "Second Lien Administrative Expense Claim") under section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to the Term Administrative Expense Claim, the Hedge Obligations, the DIP Superpriority Claims, any indebtedness secured by Permitted Encumbrances and the Carve Out, provided, however that the Second Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Second Lien Administrative Expense Claim unless and until the indefeasible payment in full in cash of all DIP Obligations pursuant to the DIP Credit Agreement.

(c) *Adequate Protection Payments to the Second Lien Secured Parties*. As additional adequate protection, the Second Lien Secured Parties shall be entitled to and the Debtors are directed to pay in cash (x) within three (3) business days following the initial funding

39

of the DIP Facility, all accrued and unpaid reasonable and documented fees and expenses incurred by the Second Lien Secured Parties prior to the Petition Date including the fees and expenses of (i) counsel for the Second Lien Trustee, (ii) counsel for the Second Lien Noteholders, and (iii) one or more financial advisors and/or consultants for each of the Second Lien Trustee and the Second Lien Noteholders (the foregoing clauses (i), (ii), and (iii) collectively, the "Second Lien Advisors") and (y) after the entry of this Interim Order, within five business days of presentment of invoices to the Debtors and the U.S. Trustee (and in no event more frequently than monthly) the reasonable and documented costs, fees, expenses, and indemnities incurred by the Second Lien Secured Parties after the Petition Date, including, without limitation, the fees and expenses of the Second Lien Advisors in accordance with, and indemnity obligations payable by the Debtors under, the Second Lien Indenture.  In the event that within ten (10) calendar days from receipt of such invoices the U.S. Trustee raises an objection, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Court shall hear and determine such dispute; *provided*, *however*, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Court.

(d)     *Interest Accrual on the Second Lien Notes*.  All interest on the Second Lien Notes, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall not be paid currently, but shall continue to accrue at the non-default rate set forth in the Second Lien Indenture.  To the extent permitted under the Bankruptcy Code, all such interest shall be deemed part of the Second Lien Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

15.     <u>Adequate Protection of Hedge Counterparties</u>.  As adequate protection of their interests in the Hedge Collateral, the Hedge Counterparties are entitled to adequate protection in an amount equal to the aggregate diminution in the value of their interests in the Hedge Collateral from and after the Petition Date (the "<u>Hedge Adequate Protection Claims</u>" and, together with the Term Adequate Protection Claims, and the Second Lien Adequate Protection Claims, the "<u>Adequate Protection Claims</u>"), for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease, or use by the Debtors (or other decline in value) of the Hedge Collateral (including for any use of the Hedge Collateral constituting Cash Collateral) and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.   In consideration of the Hedge Adequate Protection Claim, the Hedge Counterparties are hereby granted the following (collectively, "<u>Hedge Adequate Protection</u>" and, together with the Term Facility Adequate Protection and the Second Lien Adequate Protection, the "<u>Adequate Protection</u>"):

(a)     *Adequate Protection Liens.*  As security for the payment of the Adequate Protection Obligations in respect of the diminution, if any, of the Hedge Counterparties' interests in the Hedge Collateral, including for any use of the Hedge Collateral constituting Cash Collateral, the Hedge Counterparties are granted (i) a valid and perfected replacement security interest and lien in the Hedge Collateral and all proceeds thereof, which shall rank junior in priority to the Carve Out and the Hedge Liens thereon, and (ii) a valid and perfected security interest and lien in all assets of the Debtors that do not constitute Hedge Collateral but constitute DIP Collateral (including, for the avoidance of doubt, any Avoidance Actions and the proceeds thereof subject to and only effective upon the entry of the Final Order), which shall rank junior in priority to the Carve Out, the Permitted Encumbrances, and the Hedge Liens (the foregoing clauses (i) and (ii)

41

collectively, the "Hedge Adequate Protection Liens" and, together with the Term Facility Adequate Protection Liens, and the Second Lien Adequate Protection Liens, the "Adequate Protection Liens").  Upon entry of this Interim Order, whether or not the Hedge Counterparties take any action to validate, perfect, or confirm perfection, the Hedge Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, nonavoidable, and not subject to challenge, dispute, avoidance, impairment, or subordination (other than as set forth in this Interim Order), at the time and as of the date of entry of this Interim Order.  The Hedge Counterparties are hereby authorized, but not required, to file or record, in any jurisdiction, financing statements, intellectual property filings, mortgages, deeds of trust, notices of lien or similar instruments, or take any other action in order to validate and perfect the Hedge Adequate Protection Liens.  Upon the request of the either of the Hedge Counterparties, the Debtors, without any further consent of any party, are authorized and directed to take, execute, and deliver such instruments to enable the respective Hedge Counterparty to validate, perfect, preserve, and enforce the Hedge Lien Adequate Protection Liens consistent with the terms of this Interim Order.  A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(b)     *Administrative Expense Claim*.  As security for the payment of the Adequate Protection Obligations, the Hedge Counterparties, each individually, is hereby granted an allowed administrative expense claim against the Debtors (the "Hedge Administrative Expense Claim") under section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the

Bankruptcy Code, subject and subordinate only to the Hedge Obligations, any indebtedness secured by Permitted Encumbrances, and the Carve Out.

16.    <u>Automatic Stay</u>.  Without requiring further order from the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Majority DIP Lenders or the DIP Agent at the direction of the Majority DIP Lenders to, immediately upon the occurrence and during the continuance of any Event of Default (as defined in the DIP Credit Agreement), (a) send written notice of the occurrence of an Event of Default (such notice, the "<u>Event of Default Notice</u>") and/or (b) without limitation and without prior notice, terminate commitments under the DIP Facility, pursuant to and subject to the terms and conditions set forth in the DIP Loan Documents and in this Interim Order.  Upon the occurrence and during the continuation of an Event of Default, ~~after three (3) business days' prior written notice  (the "Notice Period") to the Debtors from~~ the Majority DIP Lenders or the DIP Agent at the direction of the Majority DIP Lenders<u>, ( may file a</u>~~) the DIP Obligations shall accelerate and (b) the automatic stay of Section 362 of the Bankruptcy Code shall be terminated without order of the Bankruptcy Court, without the need for filing any~~ motion ~~for~~<u>on shortened notice seeking</u> relief from the automatic stay ~~or any other pleading, for the purpose of permitting~~<u>(the "Stay Relief Motion") in order to (a) accelerate the DIP Obligations and (b) permit</u> the DIP Lenders to exercise any or all of their rights and remedies set forth in the DIP Orders or the DIP Loan Documents, including without limitation: (i) directing the DIP Agent to foreclose on the DIP Collateral and (ii) moving the Bankruptcy Court (on shortened notice) to appoint a chief restructuring officer for the Debtors, which motion the Debtors shall not oppose.  <u>The Debtors shall not object to the Stay Relief Motion being heard on shortened notice so long as the Stay</u>

Relief Motion is heard on at least five (5) business days' notice.  After the Majority DIP Lenders or the DIP Agent at the direction of the Majority DIP Lenders have sent the Event of Default Notice, any obligation otherwise imposed on the DIP Lenders to provide any loans or advances under the DIP Facility shall be immediately suspended, unless otherwise ordered by the Court or to fund the Carve Out Reserves as provided herein.  ~~During~~Until such time that the Stay Relief Motion has been adjudicated by the Court (the "Notice Period"), the Debtors may (a) use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of Event of Default) or Cash Collateral to (i) fund operations in accordance with the DIP Credit Agreement and the Budget and (ii) to fund the Carve Out Reserves and (b) seek a determination at the hearing on ~~an expedited basis to consider~~such Stay Relief Motion whether an Event of Default has occurred. ~~If a hearing to consider whether an Event of Default has occurred is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing.~~  Notwithstanding the occurrence of an Event of Default, the Maturity Date, and/or termination of the commitments under the DIP Credit Agreement, all of the rights, remedies, benefits, and protections provided to the DIP Secured Parties under the DIP Loan Documents and this Interim Order shall survive.

17. <u>Modification of Exclusivity Periods; DIP Toggle Notice</u>.

(a)    Upon the occurrence of an Event of Default and an acceleration of the DIP Obligations, the DIP Lenders (or the DIP Agent at the direction of the Majority DIP Lenders) may file a motion to seek to terminate or modify the Debtors' plan exclusivity periods under section 1121 of the Bankruptcy Code and have such motion heard on shortened notice (but in no event on less than five (5) business days' notice).

(b)     Upon the occurrence of an Event of Default, the DIP Lenders (or the DIP Agent at the direction of the Majority DIP Lenders) may also deliver to the Debtors a DIP Toggle Notice.[3]  The delivery of the DIP Toggle Notice shall not be, and shall not be deemed, a waiver of any Event of Default (including, but not limited to, any Event of Default on which the DIP Toggle Notice is based) or any rights or remedies of the DIP Agent or the DIP Lenders in respect of any Event of Default (including the right to terminate the DIP Facility and accelerate the DIP Loans.  All such rights and remedies shall be reserved and preserved and the DIP Agent or the DIP Lenders, as applicable, may exercise such rights and remedies (including the right to terminate the DIP Facility and accelerate the DIP Loans) following the delivery of a DIP Toggle Notice.

18.     <u>Credit Bid</u>.  The following parties shall have the right to credit bid all or a portion the obligations owed to them by the Debtors in accordance with section 365(k) as follows:  (a) the DIP Agent, upon direction of the Majority DIP Lenders in their sole discretion, with respect to the DIP Obligations; (b) the Term Agent, upon the direction of the Term Lenders in their sole discretion, with respect to the Term Obligations; (c) the Second Lien Trustee, upon the direction of the Second Lien Noteholders in their sole discretion, with respect to the Second Lien Obligations; and (d) the Term Agent, upon the direction of the Hedge Parties in their sole discretion, with respect to the Hedge Obligations.

19.     <u>Reservation of Rights</u>.  Nothing in this Interim Order shall be deemed a waiver of any of the Debtors' or the Primed Parties' respective rights, remedies, claims or

---

[3] A "<u>DIP Toggle Notice</u>" is a notice delivered to the Debtors and filed on the docket of the Chapter 11 Cases, in each case by the Majority DIP Lenders or DIP Agent at the direction of the Majority DIP Lenders, stating that the DIP Toggle Event has occurred.  A "<u>DIP Toggle Event</u>" shall have occurred upon (a) the occurrence of an Event of Default and (b) the delivery of a DIP Toggle Notice.

defenses, including, but not limited to, any rights, remedies, claims or defenses under the Term Loan Documents, the Second Lien Documents, or under applicable law (including, but not limited to, any claims under Bankruptcy Code section 506(b)).  Any and all such rights, remedies, claims and defenses of the Primed Parties, as applicable, are expressly reserved and preserved and may be asserted by the Primed Parties at any time during the Chapter 11 Cases.

20.     <u>Modification of the DIP Loan Documents</u>.  The DIP Loan Documents may be modified or amended (including any waiver of any Event of Default) without further order of the Bankruptcy Court so long as such modification or amendment complies with, and is effectuated in accordance with, the DIP Credit Agreement.

21.     <u>Modification of Automatic Stay</u>.   The automatic stay imposed under Bankruptcy Code section 362 is hereby modified and lifted to the extent necessary to effectuate the terms of this Interim Order and the DIP Loan Documents.

22.     <u>Binding Effect</u>.  Subject to Paragraph 28, the provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Primed Parties, the Hedge Counterparties, the Debtors, their estates, all parties in interest, and each of the foregoing parties' respective successors and assigns, including, but not limited to, any statutory committee appointed in the Chapter 11 Cases, any successor in interest in the Chapter 11 Cases or to the Debtors, any examiner, or any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

23.     <u>Survival</u>.   The provisions of this Interim Order and any actions taken pursuant hereto shall survive (x) the entry of any order (a) confirming any plan of reorganization

or liquidation in any of the Chapter 11 Cases (and, to the extent not satisfied in full, in cash, the DIP Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge), (b) converting any of the Chapter 11 Cases to a chapter 7 case, or (c) dismissing any of the Chapter 11 Cases, and (y) the repayment or refinancing of the DIP Obligations.  Unless otherwise provided in the DIP Loan Documents, the DIP Liens, DIP Superpriority Claims, the Primed Liens, the Hedge Liens, the Adequate Protection Liens, and the Adequate Protection Claims shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Interim Order, the DIP Loan Documents, and the Prepetition Documents to the maximum extent permitted by law until all of the DIP Obligations, the Hedge Obligations, and the Term Obligations are indefeasibly paid in full, in cash, and discharged.

      24.    <u>Access to the Debtors</u>.  In accordance with the provisions of access in the DIP Loan Documents, the Debtors shall (a) permit any representatives, agents, and/or employees of the DIP Agent and their respective professionals to have commercially reasonable access to their premises and records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses); and (b) cooperate, consult with, and provide to such representatives, agents, and/or employees all such information, documents, and records as they may reasonably request.

      25.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any party, creditor, equity holder, or other entity other than the DIP Agent, the DIP Lenders, the Primed Parties, and the Debtors, and their respective successors and assigns.

26.     <u>Subsequent Reversal</u>.  If any or all of the provisions of this Interim Order or the DIP Loan Documents are hereafter modified, vacated, amended, or stayed by subsequent order of the Bankruptcy Court or any other court:  (a) such modification, vacatur, amendment, or stay shall not affect the validity of the DIP Obligations or the Adequate Protection Obligations or the validity, enforceability, or priority of the DIP Liens, DIP Superpriority Claims, the Term Facility Adequate Protection and the Second Lien Adequate Protection or other protections authorized or created by this Interim Order or the DIP Loan Documents; and (b) the DIP Obligations and the Adequate Protection Obligations shall continue to be governed in all respects by the original provisions of this Interim Order and the DIP Loan Documents, and the validity of any obligations, security interests, liens, or other protections described in this Paragraph shall be protected by section 364(e) of the Bankruptcy Code.

27.     <u>Effect of Dismissal of the Chapter 11 Cases</u>.  If the Chapter 11 Cases are dismissed, converted, or substantively consolidated, then neither the entry of this Interim Order nor the dismissal, conversion, or substantive consolidation of these Chapter 11 Cases shall affect the rights of the DIP Secured Parties, the Hedge Counterparties, and the Primed Parties (as to the Adequate Protection) under their respective documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Secured Parties, the Hedge Counterparties, and the Primed Parties (as to Adequate Protection) shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated. Notwithstanding the entry of an order dismissing any of the Chapter 11 Cases at any time, (a) the DIP Liens and the DIP Superpriority Claims granted to and conferred pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and

48

satisfied in full and all commitments to lend under the DIP Loan Documents have been terminated; (b) the Adequate Protection granted to and conferred upon the Primed ~~Secured~~ Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until the Adequate Protection Obligations have been satisfied; and (c) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims granted in this Interim Order and the DIP ~~Transaction~~Loan Documents.

28.     <u>Stipulations Binding</u>.   The stipulations and admissions contained in this Interim Order, including, without limitation, in Paragraph J of this Interim Order, shall be binding on the Debtors' estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) and all parties in interest, including, without limitation, any statutory committee appointed in the Chapter 11 Cases, unless a party has timely commenced a contested matter or adversary proceeding (a "<u>Challenge</u>") after obtaining requisite standing and authority (a) challenging the amount, validity, or enforceability of the Term Obligations or the Second Lien Obligations, (b) challenging the perfection or priority of the Primed Liens, (c) challenging the existence of any DIP Collateral, or (d) otherwise asserting any objections, claims, or causes of action (including, without limitation, any actions for preferences, fraudulent conveyances, or other avoidance power claims) against the Primed Parties relating to the Primed Liens, the Term Obligations, the Second Lien Obligations, the Term Loan Documents, or the Second Lien Documents no later than the earlier of (i) forty (40) days after the Petition Date, (ii) thirty (30) days after the appointment of a Committee, or (iii) the date of confirmation of a chapter 11 plan of reorganization in these chapter 11 cases.   If no such Challenge is timely commenced as of such dates then, without further order of the Bankruptcy Court, to the extent not

theretofore indefeasibly repaid, satisfied, or discharged, as applicable, the claims, liens, and security interests of the Primed Parties shall, without further order of the Bankruptcy Court, be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount or otherwise.  Notwithstanding anything to the contrary herein (other than as set forth in Paragraph J), if no Challenge is timely commenced and sustained, the stipulations contained in Paragraph J of this Interim Order shall be binding on the Debtors' estates, any statutory committee appointed in the Chapter 11 Cases, and all parties in interest.  If any such Challenge is timely commenced and/or sustained, the stipulations contained in Paragraph J shall nonetheless remain binding on the Debtors' estates, any statutory committee appointed in the Chapter 11 Cases, and all parties in interest (other than as set forth in Paragraph J), except to the extent that such stipulations were expressly challenged in such Challenge.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory committee appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges. For the avoidance of doubt, as to the Debtors, upon entry of this Interim Order, all Challenges and any rights to assert any Challenges are hereby irrevocably waived and relinquished as of the Petition Date.

29.     Hedge Liens.  Notwithstanding anything to the contrary herein, and except as otherwise provided in the Bankruptcy Code or pursuant to a further order of the Bankruptcy Court, the Hedge Liens shall not be released without consent of each of the Hedge Counterparties to the extent the Hedge Obligations have not theretofore been indefeasibly repaid, satisfied, or discharged, as applicable.

30.     _Controlling Effect of Interim Order_.  To the extent any provision of this Interim Order conflicts with any provision of the Motion, any Prepetition Document, or any DIP Facility Document, the provisions of this Interim Order shall control.

31.     _Retention of Jurisdiction_.  Notwithstanding any provision in the DIP Loan Documents or the Prepetition Documents, the Bankruptcy Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order, the DIP Facility, or the DIP Loan Documents.

32.     _Bankruptcy Rule 6004(h) Waiver_.  The ten (10) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to this Interim Order.

33.     _Final Hearing_.  A final hearing on the Motion shall be heard before the Bankruptcy Court on [__], November 28, 2018 at [__] [a.m./2:00 p.m.]. (**Prevailing Central Time**) at the United States Bankruptcy Court for the Southern District of Texas.  Any party-in-interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file the same with the Bankruptcy Court (with a courtesy copy to chambers) and serve (so as to be received) such objection no later than [__], November 23, 2018 at [__] [a.m./4:00 p.m.]. (**Prevailing Central Time**) on the parties set forth in Paragraph 33 below.

34.     _Notice Under the Interim Order_.  Any notice required to be provided pursuant to this Interim Order, and any party-in-interest objecting to the relief sought in the Final Order, shall submit any such objection, to the following:

(a)     **Gastar Exploration Inc.**, 1331 Lamar, Suite 650, Houston, Texas 77010 (Attn: Michael A. Gerlich, Senior Vice President and Chief Financial, Trent Determann, Vice President-Finance);

51

(b) **Kirkland & Ellis LLP**, 300 North LaSalle, Chicago, Illinois 60654 (Attn: Ross M. Kwasteniet, P.C., John R. Luze, Esq.), counsel to the Debtors;

(c) **Milbank, Tweed, Hadley & McCloy LLP**, 2029 Century Park East, 33rd Floor, Los Angeles, CA 90067 (Attn: Paul Aronzon, Esq., Thomas Kreller, Esq. and Haig Maghakian, Esq.), counsel to the DIP Lenders;

(d) **Arnold & Porter Kaye Scholer LLP**, 250 West 55th Street, New York, NY 10019 (Attn: Alan Glantz, Esq. and Brian J. Lohan, Esq.), counsel to the DIP Agent;

(e) **Haynes and Boone, LLP**, 2323 Victory Ave # 700, Dallas, Texas 75219 (Attn: J. Frasher Murphy), and 1221 McKinney Street, Suite 2100, Houston, Texas 77007 (Attn: Arsalan Muhammad), counsel to NextEra;

(f) **The U.S. Trustee**, 515 Rusk Street, Suite 3516, Houston, Texas 77002 (Attn: Hector Duran, Esq. and Stephen Statham, Esq.).

35. <u>Notice of the Interim Order</u>. The Debtors shall promptly mail or fax copies of this Interim Order and notice of the Final Hearing to the Notice Parties within three (3) business days of the date hereof.

Dated: _____, 2018

_____
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 1**

Budget

**Gastar Exploration Inc.**
DIP Budget (1)(2)

| | Forecast Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending (3) | 11/01 - 11/02 | 11/9/2018 | 11/16/2018 | 11/23/2018 | 11/30/2018 | 12/7/2018 | 12/14/2018 | 12/21/2018 | 12/28/2018 | 1/4/2019 | 1/11/2019 | 1/18/2019 | 1/25/2019 | |
| | *(in thousands)* | | | | | | | | | | | | | | |
| **Total Receipts** | | $ - | $ 450 | $ - | $ 12,916 | $ 2,575 | $ 400 | $ - | $ 10,286 | $ 2,446 | $ - | $ 400 | $ 682 | $ 8,557 | $ 38,712 |
| | | | | | | | | | | | | | | | |
| Royalty and WI payments | | - | - | - | - | (7,587) | - | - | - | (6,266) | - | - | - | (5,959) | (19,812) |
| AP Payments | | (1,850) | (5,710) | (3,026) | (3,026) | (3,026) | (3,063) | (3,063) | (3,063) | (3,063) | (3,051) | (2,674) | (1,966) | (1,966) | (38,546) |
| G&A | | - | (494) | (950) | (464) | (223) | (462) | (108) | (432) | (191) | (347) | (1,606) | (452) | (189) | (5,917) |
| **Total Operating Disbursements** (4) | | $ (1,850) | $ (6,204) | $ (3,976) | $ (3,490) | $ (10,836) | $ (3,525) | $ (3,171) | $ (3,495) | $ (9,521) | $ (3,398) | $ (4,280) | $ (2,417) | $ (8,113) | $ (64,276) |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow from Operations** | | $ (1,850) | $ (5,754) | $ (3,976) | $ 9,426 | $ (8,261) | $ (3,125) | $ (3,171) | $ 6,791 | $ (7,075) | $ (3,398) | $ (3,880) | $ (1,735) | $ 444 | $ (25,563) |
| Restructuring Fees | | - | - | - | - | - | - | (1,500) | - | - | (9,354) | - | - | (250) | (11,104) |
| Hedge Gain / (Loss) | | - | - | - | - | - | - | - | - | - | (1,837) | - | - | (919) | (2,756) |
| **Total Non-Operating** | | $ - | $ - | $ - | $ - | $ - | $ - | $ (1,500) | $ - | $ - | $ (11,191) | $ - | $ - | $ (1,169) | $ (13,860) |
| | | | | | | | | | | | | | | | |
| DIP Interest (@ L + 7.5% ) | | - | - | - | - | (112) | - | - | - | - | (195) | - | - | - | (307) |
| Financing Fees | | (3,500) | - | - | - | - | - | - | - | - | - | - | - | - | (3,500) |
| **Total Debt Service** | | $ (3,500) | $ - | $ - | $ - | $ (112) | $ - | $ - | $ - | $ - | $ (195) | $ - | $ - | $ - | $ (3,807) |
| **Net Cash Flow** | | $ (5,350) | $ (5,754) | $ (3,976) | $ 9,426 | $ (8,373) | $ (3,125) | $ (4,671) | $ 6,791 | $ (7,075) | $ (14,784) | $ (3,880) | $ (1,735) | $ (725) | $ (43,230) |
| | | | | | | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | | | | | | |
| Beginning (Book) Cash Balance | | $ 6,259 | $ 15,935 | $ 10,182 | $ 6,205 | $ 15,632 | $ 7,259 | $ 5,634 | $ 4,963 | $ 11,754 | $ 15,680 | $ 69,396 | $ 65,515 | $ 63,780 | $ 6,259 |
| Net Cash Flow | | (5,350) | (5,754) | (3,976) | 9,426 | (8,373) | (3,125) | (4,671) | 6,791 | (7,075) | (14,784) | (3,880) | (1,735) | (725) | (43,230) |
| DIP Draw / Paydown | | 15,000 | - | - | - | - | 1,500 | 4,000 | - | - | 11,000 | (31,500) | - | - | - |
| Exit Financing | | - | - | - | - | - | - | - | - | - | 100,000 | - | - | - | 100,000 |
| **Ending Cash Balance** | | $ 15,935 | $ 10,182 | $ 6,205 | $ 15,632 | $ 7,259 | $ 5,634 | $ 4,963 | $ 11,754 | $ 15,680 | $ 69,396 | $ 65,515 | $ 63,780 | $ 63,056 | $ 63,029 |

Notes:
1) Cash amounts reflect book basis.
2) Forecast reflects emergence date of 12/31/2018.
3) First week of forecast begins with the estimated cash balance at filing and includes post-petition cash flows.
4) Operating disbursements include payment of pre-petition expenses.