**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GASTAR EXPLORATION INC., *et al.*,[1] | § | Case No. 18-36057 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors-in-possession (the "Debtors") hereby file this plan supplement (the "Plan Supplement"), in support of the Debtors' Joint Prepackaged Plan (as Modified) of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (as may be modified, amended, or supplemented from time to time, the "Plan")[2] filed in these chapter 11 cases on December 12, 2018.

**PLEASE TAKE FURTHER NOTICE THAT** this Plan Supplement includes the current drafts of the following documents (which continue to be negotiated between interested parties, and the Debtors, and which will be filed in substantially final form prior to the Confirmation Hearing), as may be modified, amended, or supplemented from time to time in accordance with the Plan:

- **Exhibit A** – New Organizational Documents

- **Exhibit B** – First Lien Exit Credit Agreement

- **Exhibit C** – Parent Credit Agreement

- **Exhibit D** – Hedge Party Secured Notes

- **Exhibit E** – Hedge Party Intercreditor Agreement

- **Exhibit F** – Schedule of Retained Causes of Action

- **Exhibit G** – Assumed Executory Contracts and Unexpired Leases List

- **Exhibit H** – Rejected Executory Contracts and Unexpired Leases List

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Gastar Exploration Inc. (1640), and Northwest Property Ventures LLC (8685).  The location of the Debtors' service address is: 1331 Lamar Street, Suite 650, Houston, Texas 77010.

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

- **Exhibit I** – New Board of Reorganized Debtors

**PLEASE TAKE FURTHER NOTICE THAT** the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Court pursuant to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE THAT** certain documents, or portions thereof, contained in the Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto.  The Debtors reserve the right to alter, amend, modify, or supplement any document in this Plan Supplement in accordance with the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; provided, that, if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Confirmation Hearing, the Debtors will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors will seek confirmation of the Plan at the Confirmation Hearing scheduled for **Thursday, December 20, 2018, at 1:30 p.m.** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **Monday, December 17, 2018, at 4:00 p.m.** prevailing Central Time (the "Objection Deadline").  Any objection to the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state the name and address of the objecting party and the amount and nature of the claim or interest beneficially owned by such entity; (d) state with particularity the legal and factual basis for such objections, and, if practicable, a proposed modification to the Plan that would resolve such objections; and (e) be filed with this Court by the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** copies of all documents filed in these chapter 11 cases are available free of charge by visiting the website of BMC Group, Inc. at https://www.bmcgroup.com/gastar.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.txs.uscourts.gov/bankruptcy in accordance with the procedures and fees set forth therein.

Dated:  December 13, 2018

*/s/ Matthew D. Cavenaugh*
Patricia B. Tomasco (TX Bar No. 01797600)
Elizabeth C. Freeman (TX Bar No. 24009222)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:           ptomasco@jw.com
                     efreeman@jw.com
                     mcavenaugh@jw.com

-and-

Anna G. Rotman, P.C. (TX Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:      (713) 836-3601
Email:           anna.rotman@kirkland.com

-and-

Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
John R. Luze (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           ross.kwasteniet@kirkland.com
                     john.luze@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GASTAR EXPLORATION INC., *et al.*,[1] | § | Case No. 18-36057 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**PLAN SUPPLEMENT FOR THE JOINT**
**CHAPTER 11 PLAN OF REORGANIZATION**
**OF GASTAR EXPLORATION INC. AND NORTHWEST PROPERTY VENTURES LLC**

**TABLE OF CONTENTS**

| Exhibit | Description |
|---|---|
| A | New Organizational Documents |
| B | First Lien Exit Credit Agreement |
| C | Parent Credit Agreement |
| D | Hedge Party Secured Notes |
| E | Hedge Party Intercreditor Agreement |
| F | Schedule of Retained Causes of Action |
| G | Assumed Executory Contracts and Unexpired Leases List |
| H | Rejected Executory Contracts and Unexpired Leases List |
| I | New Board of Reorganized Debtors |

Certain documents, or portions thereof, contained in this Plan Supplement remain subject to continuing negotiations among the Debtors, the Consenting Parties and interested parties with respect thereto. The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date in accordance with the Plan, the Confirmation Order or any other order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Gastar Exploration Inc. (1640) ("Gastar"), and Northwest Property Ventures LLC (8685).  The location of the Debtors' service address is: 1331 Lamar Street, Suite 650, Houston, Texas 77010.

subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.[2]

---

[2]   Capitalized terms used but not otherwise defined in this Plan Supplement shall have the meanings ascribed to such terms in the *The Debtors' Joint Prepackaged Plan (as Modified) of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 109], as it may be amended, modified, or supplemented from time to time (the "Plan").

## EXHIBIT A

**New Organizational Documents**

PRELIMINARY DRAFT—12/13/18
SUBJECT TO COMPLETION

# LIMITED LIABILITY COMPANY AGREEMENT

OF

# [TOPCO] HOLDINGS, LLC

## DATED AS OF JANUARY [●], 2019

# LIMITED LIABILITY COMPANY
## AGREEMENT
## OF
## [●] HOLDINGS, LLC

## TABLE OF CONTENTS

**Page**

ARTICLE 1.  FORMATION AND CONTINUATION OF THE COMPANY ........................... 2

    Section 1.1    Formation and Continuation of the Company ........................... 2
    Section 1.2    Name ........................... 2
    Section 1.3    Business of the Company ........................... 2
    Section 1.4    Location of Principal Place of Business ........................... 2
    Section 1.5    Registered Agent ........................... 2
    Section 1.6    Term ........................... 3

ARTICLE 2.  DEFINITIONS ........................... 3

    Section 2.1    Definitions ........................... 3
    Section 2.2    Rules of Interpretation ........................... 9

ARTICLE 3.  UNITS; CAPITAL CONTRIBUTIONS ........................... 9

    Section 3.1    Capitalization; Issuance of Units ........................... 9
    Section 3.2    Management Incentive Plan ........................... 10
    Section 3.3    Additional Capital Contributions ........................... 10
    Section 3.4    Interest on Capital Contributions ........................... 11
    Section 3.5    Withdrawal and Return of Capital Contributions ........................... 11
    Section 3.6    Form of Capital Contribution ........................... 11
    Section 3.7    Unit Certificates ........................... 11

ARTICLE 4.  DISTRIBUTIONS ........................... 12

    Section 4.1    Distributions ........................... 12
    Section 4.2    Limitations on Distributions ........................... 13
    Section 4.3    Reserves. ........................... 13

ARTICLE 5.  BOOKS OF ACCOUNT, RECORDS AND REPORTS, FISCAL YEAR ......... 13

    Section 5.1    Books and Records ........................... 13
    Section 5.2    Financial Reports ........................... 13
    Section 5.3    Fiscal Year ........................... 14
    Section 5.4    Tax Returns ........................... 14
    Section 5.5    Taxable as a Corporation ........................... 14

ARTICLE 6.  POWERS, RIGHTS AND DUTIES OF THE MEMBERS ........................... 14

    Section 6.1    Limitations ........................... 14
    Section 6.2    Liability ........................... 14

i

#4813-6740-7744

**Page**

Section 6.3    Competition and Corporate Opportunities ................................................. 15

ARTICLE 7.  POWERS, RIGHTS AND DUTIES OF THE BOARD OF DIRECTORS .......... 16

Section 7.1    Authority ........................................................................................ 16
Section 7.2    Powers and Duties of the Board of Directors .......................................... 16
Section 7.3    Board of Directors ............................................................................ 16
Section 7.4    Officers, Agents and Employees .......................................................... 19
Section 7.5    Company Funds ................................................................................ 19
Section 7.6    Other Activities and Competition ........................................................ 20
Section 7.7    Exculpation ..................................................................................... 20
Section 7.8    Indemnification of the Board of Directors, Officers, Members and
                Agents .......................................................................................... 20
Section 7.9    Expenses ........................................................................................ 21
Section 7.10   Affiliate Transactions ....................................................................... 21
Section 7.11   Directors' Insurance ......................................................................... 21
Section 7.12   Additional Units; Additional Members .................................................. 21

ARTICLE 8.  TRANSFERS OF INTEREST BY MEMBERS .................................................. 22

Section 8.1    General. ......................................................................................... 22
Section 8.2    Transfer of Interest of Members ......................................................... 23
Section 8.3    Further Requirements. ...................................................................... 23
Section 8.4    Consequences of Transfers Generally .................................................. 24
Section 8.5    Units; Percentage Interest. ............................................................... 25
Section 8.6    Additional Filings. ........................................................................... 25
Section 8.7    Indirect Transfers. ........................................................................... 25
Section 8.8    Right of First Offer .......................................................................... 25
Section 8.9    Drag Along Sale .............................................................................. 26

ARTICLE 9.  RESIGNATION OF MEMBERS; TERMINATION OF COMPANY;
            LIQUIDATION AND DISTRIBUTION OF ASSETS ................................... 29

Section 9.1    Resignation of Members. ................................................................... 29
Section 9.2    Dissolution of Company. ................................................................... 30
Section 9.3    Distribution in Liquidation. ............................................................... 31
Section 9.4    Final Reports. ................................................................................. 31
Section 9.5    Rights of Members ........................................................................... 32
Section 9.6    Termination. ................................................................................... 32

ARTICLE 10.  NOTICES AND VOTING ........................................................................... 32

Section 10.1   Notices .......................................................................................... 32
Section 10.2   Voting ........................................................................................... 33

ARTICLE 11.  AMENDMENT OF AGREEMENT ................................................................ 33

Section 11.1   Amendments ................................................................................... 33
Section 11.2   Amendment of Certificate.................................................................. 34

**Page**

ARTICLE 12.  MISCELLANEOUS ....................................................................... 34

Section 12.1   Confidentiality ................................................................. 34
Section 12.2   No Third-Party Beneficiaries ...................................... 35
Section 12.3   Entire Agreement ........................................................ 35
Section 12.4   Severability ................................................................. 35
Section 12.5   Effect ........................................................................... 36
Section 12.6   Captions ....................................................................... 36
Section 12.7   Counterparts ................................................................ 36
Section 12.8   Remedies ...................................................................... 36
Section 12.9   Waiver of Partition....................................................... 36
Section 12.10  Governing Law. ........................................................... 36
Section 12.11  Consent to Jurisdiction and Venue. ............................. 37
Section 12.12  Waiver of Trial by Jury................................................ 37
Section 12.13  Exercise of Rights and Remedies. .............................. 37
Section 12.14  No Recourse ................................................................ 38
Section 12.15  Corporate Reorganization Transactions....................... 38
Section 12.16  Triggering Event; Eligible Holder Certifications ................... 39
Section 12.17  Redemption ................................................................ 39

**<u>SCHEDULE</u>**

Schedule A – Equity Interests

**<u>EXHIBIT</u>**

Exhibit A – Form of Joinder Agreement

#4813-6740-7744

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## [●] HOLDINGS, LLC

This **LIMITED LIABILITY COMPANY AGREEMENT** (the "<u>Agreement</u>") of [●] Holdings, LLC, a Delaware limited liability company (the "<u>Company</u>"), dated as of January [●], 2019, is entered into by and among the Initial Members (as defined below) listed on <u>Schedule A</u> as in effect on the date of this Agreement and the Persons who become Members of the Company in accordance with the provisions of this Agreement.  Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth in <u>Section 2.1</u>.

## RECITALS

**WHEREAS**, the Certificate of Formation of the Company was filed with the Office of the Secretary of State of Delaware on [●], 201[●];

**WHEREAS**, various affiliates of Ares Management Corporation ("<u>Ares</u>") held certain claims against Gastar Exploration, Inc. (which entity is currently known as [Gastar Exploration, L.L.C.], "<u>Gastar</u>") and certain of its Affiliates (collectively, "<u>Debtors</u>");

**WHEREAS**, on October 31, 2018, the Debtors filed a prepackaged plan of reorganization (the "<u>Plan</u>") under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>") in the jointly administered chapter 11 bankruptcy cases under the caption In re Gastar Exploration Inc., et al., No. 18-36057 (MI);

**WHEREAS**, the Plan was confirmed by the Bankruptcy Court on December [●], 2018;

[**WHEREAS**, (i) [●], a Delaware limited liability company ("<u>Holdco</u>") was issued or otherwise received all of the equity interests in Gastar, (ii)  [●], a Delaware limited liability company ("<u>Midco</u>") was issued or otherwise received all of the equity interests in Holdco, (iii) the Company elected to be taxed as a corporation and was issued or otherwise received [●] of the equity interests in Midco, (iv) certain investors were issued or otherwise received [●] of the equity interests in Midco and (v) following the foregoing, Gastar was converted into a limited liability company by the filing of a certificate of conversion and a certificate of formation with the Office of the Secretary of State of the State of Delaware pursuant to Section 266 of the Delaware General Corporation Law and Section 18-214 of the Act (as defined below);][1]

**WHEREAS**, in connection with the consummation of the transactions contemplated by the Plan on the date of this Agreement (the "<u>Effective Date</u>") the parties to this Agreement desire to adopt this Agreement in its entirety to: (i) establish the manner in which the

---

[1] TBD.  Subject to further revision.

business and affairs of the Company shall be managed; (ii) set forth certain terms of the Members' relationship with respect to ownership interests in the Company on the terms and conditions set forth in this Agreement; (iii) establish the respective economic and other rights of Members of the Company; and (iv) provide regulations and procedures for the governance of the Company.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the promises and covenants contained in this Agreement, the parties agree as follows:

## ARTICLE 1.   FORMATION AND CONTINUATION OF THE COMPANY

Section 1.1    <u>Formation and Continuation of the Company</u>.  The Company was formed as a limited liability company under the Act by the filing of the Certificate with the Office of the Secretary of State of Delaware on [●], 201[●].  The parties agree to continue the existence of the Company as a limited liability company under the Act.  The Company shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all requirements for operation of the Company as a limited liability company under this Agreement and the Act and under all other laws of the State of Delaware and such other jurisdictions in which the Company determines that it may conduct business.

Section 1.2    <u>Name</u>.  The name of the Company is "[●] Holdings, LLC", as such name may be modified from time to time by the Board of Directors in its discretion.

Section 1.3    <u>Business of the Company</u>.  Subject to the limitations on the activities of the Company otherwise specified in this Agreement, the purpose and business of the Company shall be to conduct and carry on any business or activity that may be conducted by a limited liability company organized pursuant to the Act, including, without limitation, entering into, making and performing all contracts and other undertakings, and engaging in all activities and transactions as the Board of Directors may deem necessary or advisable to the carrying out of the business of the Company.

Section 1.4    <u>Location of Principal Place of Business</u>.  The location of the principal place of business of the Company shall be 1331 Lamar Street, Suite 650, Houston, Texas 77010, or such other location as may be determined by the Board of Directors.  In addition, the Company may maintain such other offices as the Board of Directors may deem advisable at any other place or places within or without the State of Delaware.

Section 1.5    <u>Registered Agent</u>.  The registered agent for the Company shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 or such other registered agent as the Board of Directors may designate from time to time.

Section 1.6     Term.  The term of the Company commenced on the date of filing of the Certificate, and shall be perpetual unless the Company is earlier dissolved and terminated in accordance with the provisions of this Agreement.

## ARTICLE 2.   DEFINITIONS

Section 2.1     Definitions.  The following terms used in this Agreement shall have the following meanings.

"Act" means the Delaware Limited Liability Company Act, Chapter 434 of Title 6 of the Delaware Code, 6 Del. Code §§18-101 *et seq.*, as in effect on the date of this Agreement and as it may be amended hereafter from time to time.

"Additional Call Amount" has the meaning set forth in Section 3.3(b).

"Additional Class" has the meaning set forth in Section 3.1(a).

"Additional Member" has the meaning set forth in Section 7.12(a).

"Adverse Claim" has the meaning set forth in Section 8-102 of the applicable Uniform Commercial Code.

"Affiliate" of a Member means any other Person who is a Family Member of such Member or controlling, controlled by or under common control with such Member.  For the purpose of this definition, the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Member, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, either through the ownership of a majority of such Person's Voting Stock, by contract or otherwise.  Notwithstanding the foregoing, (i) neither the Company nor any of the Subsidiaries shall be deemed to be an Affiliate of any Member, nor shall any other Person be deemed to be an Affiliate of a Member solely by reason of such Member's control of the Company or any of the Subsidiaries, and (ii) none of the Ares Entities nor any Affiliate of Ares shall be deemed to be an Affiliate of the Company for any purpose under this Agreement.

"Agreement" has the meaning set forth in the preamble.

"Applicable Time" means any time at which the Company holds any interest in oil and gas leases on federal lands as a result of which applicable law and/or regulations require that each Member be a Person qualified to hold an interest in such oil and gas leases.

"Ares" has the meaning set forth in the recitals.

"Ares Entities" means the Initial Members listed on Schedule A as in effect on the date of this Agreement and their Permitted Transferees that become a party to this Agreement. For purposes hereof, actions proposed to be taken by the Ares Entities shall, in each case, be

3

taken with the consent of the Ares Entity or Ares Entities, as the case may be, holding a majority of the Units then held by all Ares Entities as of any applicable time of determination.

"Assignees" has the meaning set forth in Section 8.2(d).

"Available Cash" at the time of any distribution means the excess of (a) all cash then held by the Company to the extent not otherwise required to pay Company expenses over (b) the amount of reserves established by the Company in accordance with Section 4.3, in each case as determined by the Board of Directors.

"Award Agreement" means any bona fide award agreement executed by a participant in the Management Incentive Plan governing the terms of the Units issued to such participant under the Management Incentive Plan.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Board of Directors" means the board of directors of the Company established pursuant to Section 7.3.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in New York City, New York.

"Capital Contribution" means a contribution to the capital of the Company.

"Capital Stock" means (i) with respect to any Person that is a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of the capital stock of such Person; and (ii) with respect to any other Person, any and all partnership, limited liability company, membership or other Equity Interests in such Person, including the Units.

"Certificate" means the Certificate of Formation of the Company, as amended, modified or supplemented from time to time.

"Chairman of the Board" has the meaning set forth in Section 7.3(c).

"Company" has the meaning set forth in the preamble.

"Confidential Information" has the meaning set forth in Section 12.1(a).

"Debtors" has the meaning set forth in the recitals.

"Drag Along Agents" has the meaning set forth in Section 8.9(b)(vi).

"Drag Along Notice" has the meaning set forth in Section 8.9(a).

"Drag Along Sale" has the meaning set forth in Section 8.9.

"Drag Along Sale Percentage" means, at the election of the Ares Entities in their sole discretion, either (i) the percentage determined by dividing the number of Units that is proposed to be Transferred, directly or indirectly, by the Ares Entities to a Prospective Buyer in a

4

Sale by the total number of Units then owned by the Ares Entities or (ii) a percentage representing the aggregate ownership interest in Midco proposed to be Transferred, both indirectly through the Transfer of Units and directly through the Transfer of Equity Interests in Midco, to a Prospective Buyer in a Sale.

"Drag Along Sellers" has the meaning set forth in Section 8.9(a).

"Drag Along Shares" has the meaning set forth in Section 8.9(a).

"Effective Date" has the meaning set forth in the recitals.

"Eligible Holder" at any Applicable Time means a Person qualified to hold an interest in oil and gas leases on federal lands under applicable law and/or regulations.  As of the date of this Agreement, Eligible Holder means: (a) a citizen of the United States; (b) a corporation organized under the laws of the United States or of any state thereof; (c) a public body, including a municipality; or (d) an association of United States citizens, such as a partnership or limited liability company, organized under the laws of the United States or of any state thereof, but only if such association does not have any direct or indirect foreign ownership, other than foreign ownership of stock in a parent corporation organized under the laws of the United States or of any state thereof.  For the avoidance of doubt, onshore mineral leases or any direct or indirect interest in such leases may be acquired and held by aliens only through stock ownership, holding or control in a corporation organized under the laws of the United States or of any state thereof. For purposes of this definition, each of the Initial Members is an "Eligible Holder."

"Eligible Holder Certification" means a properly completed certificate in such form as may be specified by the Board of Directors pursuant to which a Member certifies that he, she or it is an Eligible Holder.  To the extent that "he, she or it" is a nominee holding for the account of another Person, then, to the best of his, her or its knowledge, such other Person is an Eligible Holder.

"Eligible Holder Default" has the meaning set forth in Section 12.16(b).

"Eligible Holder Units" has the meaning set forth in Section 12.16(b).

"Equity Interests" of any Person means Capital Stock of such Person or warrants, options or other rights to acquire Capital Stock of such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Family Members" with respect to any individual means, such Person's spouse, children, parents and lineal descendants of such Person's parents (in each case, natural or adopted).

"Family Trust" with respect to any individual means a trust, limited partnership or limited liability company benefiting solely such individual or the Family Members of such individual.

"Fiscal Year" has the meaning set forth in Section 5.3.

"Gastar" has the meaning set forth in the recitals.

"Holdco" has the meaning set forth in the recitals.

"Indemnified Party" has the meaning set forth in Section 7.8(a).

"Initial Members" means each Person that is a Member as of the date of this Agreement.

"Interest" when used in reference to an interest in the Company means the entire ownership interest of a Member in the Company at any particular time, including its interest in the capital, profits, losses and distributions of the Company.  All Interests in the Company shall be represented by Units.

"Liquidator" has the meaning set forth in Section 9.2(b).

"Majority Members" with respect to any individual means the Member or Members holding more than 50% of the Units of the Company outstanding at such time.

"Management Incentive Plan" has the meaning set forth in Section 3.2.

"Member" means each of the Initial Members, as well as each Substituted Member and each Additional Member.

"Member Affiliate" has the meaning set forth in Section 12.14.

"Midco" has the meaning set forth in the recitals.

"Offer Notice" has the meaning set forth in Section 8.8(a).

"Offer Period" has the meaning set forth in Section 8.8(b).

"Other Investments" has the meaning set forth in Section 6.3(a)(i)(A).

"Participating Seller" has the meaning set forth in Section 8.9(a).

"Percentage Interest" with respect to each Member as of any time of determination means a fraction, expressed as a percentage, the numerator of which is the number of Units held by such Member at such time, and the denominator of which is the aggregate number of Units held by all Members at such time.

"Permitted Transfer" means, with respect to any Member other than the Ares Entities, (a) any Transfer pursuant to a Drag Along Sale; (b) any redemptions and other

6

repurchases of Units, as may be made in the discretion of the Board of Directors from time to time, from an employee in connection with the termination of his or her employment with the Company or any of its Subsidiaries; and (c) any Transfer of Units by an individual to a Family Trust with respect to such individual.  "Permitted Transfer" means, with respect to the Ares Entities, any Transfer of Units to any Person so long as such Transfer is executed in accordance with applicable law, including, without limitation, the Act and the Securities Act.

"Permitted Transferee" means any transferee pursuant to a Permitted Transfer.

"Person" means any individual, partnership, limited liability company, association, corporation, trust or other entity.

"Plan" has the meaning set forth in the recitals.

"Prospective Buyer" means any Person proposing to purchase (i) Units from an Ares Entity, (ii) Equity Interests in Midco and/or (iii) assets of the Company, Midco or any of their Subsidiaries, in each case, other than pursuant to a Permitted Transfer.

"Redeemable Units" means any Subject Units and/or Eligible Holder Units for which a redemption notice has been given, and has not been withdrawn, pursuant to Section 12.17.

"Representatives" has the meaning set forth in Section 12.1(a).

"Required Disclosure" has the meaning set forth in Section 12.1(a).

"ROFO Units" has the meaning set forth in Section 8.8.

"Sale" shall mean:

(a)     a merger or consolidation in which (i) the Company or Midco is a constituent party or (ii) a Subsidiary of the Company or Midco is a constituent party and the Company or Midco, as applicable, issues Equity Interests pursuant to such merger or consolidation;

(b)     the sale, lease, transfer, exclusive license or other disposition (whether by merger, consolidation or otherwise), in a single transaction or series of related transactions, by the Company, Midco or any Subsidiary of either of them of (A) all or substantially all of the assets of the Company, Midco and their Subsidiaries taken as a whole, or (B) one or more Subsidiaries of the Company or Midco if all or substantially all of the assets of the Company, Midco and their Subsidiaries taken as a whole are held by such Subsidiary or Subsidiaries, in each case, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned Subsidiary of the Company or Midco; or

(c)     the acquisition, in a single transaction or a series of related transactions, by any person or group (within the meaning of Section 13(d) or 14(d) of the Exchange Act), other than the Members of the Company or Midco as of the Effective Date, of (A) beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of at least

50% of the Voting Stock (x) of the Company or Midco (including by means of the Company's or Midco's issuance of its Equity Interests) or (y) of one or more Subsidiaries of the Company or Midco if all or substantially all of the assets of the Company, Midco and their Subsidiaries taken as a whole are held by such Subsidiary or Subsidiaries (including by means of the issuance of Equity Interests of any such Subsidiary or Subsidiaries, as applicable) or (B) the contractual right to designate or elect the manager of Midco or 50% or more of the Board of Directors.

"Sale Period" has the meaning set forth in Section 8.8(d).

"Sale Price" has the meaning set forth in Section 8.8(a).

"Securities Act" means the Securities Act of 1933, as amended.

"Specified Event" has the meaning set forth in Section 8.3(c).

"Sponsor Related Parties" has the meaning set forth in Section 6.3.

"Subject Units" has the meaning set forth in Section 12.16(a).

"Subsidiary" or "Subsidiaries" means all Persons in which the Company owns, directly or indirectly, a majority of the Voting Stock or is a general partner or otherwise has the power to control, by agreement or otherwise, the management and general business affairs of such other Person.

"Substituted Member" means any Person admitted to the Company as a substituted Member pursuant to the provisions of Article 8.

"Threshold Value" means, with respect to a Unit, the "Threshold Value," if any, assigned to such Unit in the applicable Award Agreement.

"Transfer", "Transferee" and "Transferor" have the respective meanings set forth in Section 8.1.

"Transferring Member" has the meaning set forth in Section 8.8.

"Triggering Event" has the meaning set forth in Section 12.16(a).

"UCC" means Article 8 of the Uniform Commercial Code as in effect in the State of Delaware.

"Units" means units representing limited liability company interests in the Company, as set forth on Schedule A and in the books and records of the Company.

"Upstream Equity Interests" has the meaning set forth in Section 8.7.

"Value" of any asset of the Company or a Member, as the case may be, as of any date, means the fair market value of such asset as of such date, as determined by the Board of Directors.  Any determination of the Value or of the fair market value of an asset of the

8

Company or a Member made by the Board of Directors shall be binding on the Members for all purposes of this Agreement.

"Void Transfer" has the meaning set forth in Section 8.1.

"Voting Stock" of any Person means any Capital Stock or other Equity Interests of any class or classes of such Person whose holders are entitled under ordinary circumstances (irrespective of whether at the time stock or other Equity Interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency) to vote for the election of a majority of the directors, managers, trustees or other governing body of such Person.

"Withdrawing Member" has the meaning set forth in Section 8.2(d).

Section 2.2     Rules of Interpretation.  Unless the context otherwise clearly requires: (a) a term has the meaning assigned to it; (b) "or" is not exclusive; (c) wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, feminine or neuter shall include the masculine, feminine and neuter; (d) provisions apply to successive events and transactions; (e) all references in this Agreement to "including" shall be deemed to be followed by the phrase "without limitation," whether or not so expressly provided in this Agreement; (f) all references in this Agreement to designated "Articles," "Sections," "paragraphs," "clauses" and other subdivisions are to the designated Articles, Sections, paragraphs, clauses and other subdivisions of this Agreement, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, paragraph, clause or other subdivision; and (g) any definition of or reference to any agreement, instrument, document, statute or regulation in this Agreement shall be construed as referring to such agreement, instrument, document, statute or regulation as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Agreement).

## ARTICLE 3.   UNITS; CAPITAL CONTRIBUTIONS

Section 3.1     Capitalization; Issuance of Units.

(a)     Each Member's relative rights, privileges, preferences, restrictions and obligations with respect to the Company are represented by such Member's Units.  As of the Effective Date, there shall be one class of Units of the Company, with such class referred to in this Agreement as the "Units."  Units may be issued in whole or fractional form.  Any issuances of Units following the Effective Date may be issued by the Company in one or more separate classes or series (each, an "Additional Class") at a price per Unit and with such other relative rights, privileges, preferences, restrictions and obligations, in each case, as determined by the Board of Directors.  All Units issued under this Agreement shall constitute "securities" governed by Article 8 of the UCC.  A Member may own one or more classes or series of Units.  The ownership of one class or series of Units shall not affect the rights, privileges, preferences or obligations of a Member with respect to the other class or series of Units owned by such

Member.  Any reference in this Agreement to a holder of a class of Units shall be deemed to refer to such holder only to the extent of such holder's ownership of such class or series of Units.

(b)     The present ownership of the issued and outstanding Equity Interests in the Company is set forth on Schedule A.  The Company or its designee shall from time to time update Schedule A and the books and records of the Company to reflect each Transfer, issuance or redemption of any Units of the Company or any other transaction or occurrence that affects the ownership of any Equity Interests in the Company.  Any reference in this Agreement to Schedule A shall be deemed a reference to Schedule A as amended in accordance with this Section 3.1 and in effect from time to time. As presently in effect, and as updated from time to time, Schedule A shall constitute the record of the ownership of the issued and outstanding Equity Interests in the Company.  Notwithstanding the foregoing, the failure to reflect a change or adjustment to Schedule A shall not prevent any otherwise valid change or adjustment from being effective.

Section 3.2     Management Incentive Plan.  The Board of Directors may approve from time to time one or more management incentive plans of the Company or any Subsidiary (each, a "Management Incentive Plan") pursuant to which the Company, upon the approval of the Board of Directors, would be permitted to issue Units and/or additional classes of units in the Company (or Equity Interests in a Subsidiary of the Company, as the case may be) at such time and in such amounts as may be approved for issuance by the Board of Directors and correspondingly provided for pursuant to the terms of such Management Incentive Plans. Notwithstanding the foregoing, the aggregate amount of all Units issuable pursuant to such Management Incentive Plans shall in no event exceed Equity Interests representing greater than 10% equity ownership in the business of the Company and its Subsidiaries (calculated on a fully diluted basis assuming the exercise, conversion or exchange, as applicable, in full of any applicable Equity Interests which are unexercised as of any time of determination). Notwithstanding anything to the contrary in this Agreement or otherwise, the provisions of this Agreement shall be subject to the terms of each Management Incentive Plan then in effect with respect to all Equity Interests issued pursuant to any such Management Incentive Plan.  In the event any of the provisions of this Agreement conflict with the provisions of such Management Incentive Plan, the provisions of such Management Incentive Plan shall control with respect to the subject matter of such Management Incentive Plan.  To the extent necessary or appropriate, upon the execution of any Management Incentive Plan relating to the Company and/or the consummation of any issuance of Equity Interests in the Company pursuant to any Management Incentive Plan, Schedule A, the books and records of the Company and this Agreement shall thereafter be amended accordingly by the Board of Directors to reflect the effect of any such issuance.

Section 3.3     Additional Capital Contributions.

(a)     Except as otherwise required by law, no Member shall be required to make any additional Capital Contributions to the Company without the prior consent of such Member and the Board of Directors.  Except as otherwise required by law, no Member shall be permitted to make any additional Capital Contributions to the Company without the prior consent of the Board of Directors.

10

(b)     After the Effective Date and in its sole discretion, the Board of Directors may determine that one or more additional Capital Contributions are necessary or advisable for the conduct of the Company's business.  Any such additional Capital Contribution called after the Effective Date shall be referred to as an "Additional Call Amount."  In the event the Board of Directors makes such a determination, each Member shall have the option (but not the obligation) to participate in each such additional Capital Contribution in accordance with its Percentage Interest. To the extent less than all of the Members elect to participate in any additional Capital Contribution, those Members that elect to make such additional Capital Contribution shall have the option (but not the obligation) to increase their additional Capital Contributions *pro rata* in accordance with their respective Percentage Interests such that the total of the applicable additional Capital Contribution equals the Additional Call Amount. Unless otherwise determined by the Board of Directors, the funding of any such Additional Call Amount shall be made no later than 10 Business Days following a Member's receipt of a capital call notice in respect of such Additional Call Amount.  Notwithstanding the foregoing, in no event shall such amounts be required to be funded to the Company sooner than 5 Business Days following receipt of such capital call notice.

(c)     Upon the funding of any Capital Contribution by a Member pursuant to Section 3.3(b) above, such Member shall be issued a number of additional Units (or, if the Board of Directors determines to issue Equity Interests in the Company of an Additional Class, a number of Equity Interests of such Additional Class) equal to the amount of the Capital Contribution made by such Member in respect of such Capital Contribution divided by a price per Unit or Equity Interest of an Additional Class, as the case may be, determined by the Board of Directors.  Schedule A, the books and records of the Company and, if appropriate, this Agreement shall be thereafter amended accordingly by the Board of Directors to reflect the Capital Contribution and the issuance of Units or Equity Interests of an Additional Class, as the case may be, effected in connection therewith.

Section 3.4     Interest on Capital Contributions.  No Member shall be entitled to interest on or with respect to any Capital Contribution.

Section 3.5     Withdrawal and Return of Capital Contributions.  Except as provided in this Agreement, no Member shall be entitled to withdraw any part of such Member's Capital Contribution or to receive distributions from the Company.

Section 3.6     Form of Capital Contribution.  Unless otherwise agreed to by the Board of Directors, all Capital Contributions shall be made in cash.

Section 3.7     Unit Certificates.

(a)     The Units shall initially be uncertificated (as contemplated in Section 18-702(c) of the Act) and recorded in the books and records of the Company and on Schedule A to this Agreement.  In its sole discretion, the Board of Directors shall be permitted to cause all or a portion of the Units of the Company issued on or after the Effective Date to be represented by certificates issued by the Company.  The face of any such certificate shall designate the class of Units represented thereby.  Any such certificates (and the Units represented thereby) shall constitute "securities" governed by Article 8 of the UCC.

11

(b)      In the event any Unit certificates are issued, the Company may in its discretion imprint any or all certificates representing Units now or hereafter owned by any Member with the following legends:

> **THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT.**

> **THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO GOVERNANCE AGREEMENTS, TRANSFER RESTRICTIONS AND OTHER TERMS CONTAINED IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF [____], 2019, AS SUCH LIMITED LIABILITY COMPANY AGREEMENT MAY BE AMENDED OR MODIFIED FROM TIME TO TIME.  A COPY OF SUCH AGREEMENT IS ON FILE AT THE COMPANY'S PRINCIPAL EXECUTIVE OFFICES.**

Such imprinting is without prejudice, however, to the rights of Members to sell or otherwise dispose of such Units in accordance with the terms of this Agreement and pursuant to an exemption from the registration requirements available under the Securities Act. After such time as any of the legends described by this Section 3.7(b) are no longer required on any certificate or certificates representing the Units, upon the request of any Member, the Company shall cause such certificate or certificates to be exchanged for a certificate or certificates that do not bear such legends.

(c)      In addition to the legends required by paragraph (b) above, Units issued pursuant to any Management Incentive Plan shall include legends required by the terms of such Management Incentive Plan.

## ARTICLE 4.  DISTRIBUTIONS

Section 4.1      Distributions.  Subject to the provisions of Sections 4.2, and 4.3, the Company shall distribute Available Cash at such times and in such amounts as may be determined by the Board of Directors in its sole discretion.  Any distribution made to the Members pursuant to this Section 4.1 shall be made to the Members in accordance with their Percentage Interests.

It is understood and agreed that a Management Incentive Plan may provide that certain Units or other Equity Interests in the Company authorized following the date of this Agreement and issued pursuant to such Management Incentive Plan shall also share in distributions made pursuant to this Section 4.1 in the manner specified in such Management Incentive Plan and any related amendments, supplements or modifications to, or amendments and restatements of, this Agreement.  Notwithstanding anything herein contained to the contrary, no distribution shall be made under this Section 4.1 or Section 9.3 to any Member in respect of

#4813-6740-7744

any Unit with respect to which a Threshold Value has been assigned unless and until the sum of the aggregate amount of distributions made by the Company pursuant to this Section 4.1 and Section 9.3 in respect of all other Units (measured from the date of the issuance of the applicable Unit to which a Threshold Value has been assigned) is equal to or greater than the Threshold Value assigned to such Unit. Notwithstanding the foregoing, in the case of each distribution, for purpose of determining whether aggregate distributions are equal to or greater than the applicable Threshold Value, distributions in respect of other Units shall be considered to be made prior to the distribution in respect of such Unit. Amounts not distributed with respect to a Unit by operation of the foregoing sentence shall be distributed to the Members in accordance with this Section 4.1, but without including any such Unit in such distribution.

Section 4.2    Limitations on Distributions.

(a)    Anything to the contrary in this Agreement notwithstanding:

(i)    no distribution pursuant to this Agreement shall be made if such distribution would result in a violation of the Act; and

(ii)    no distribution pursuant to this Agreement shall be made if such distribution would result in a violation of applicable law.

(b)    In the event that a distribution is not made as a result of the application of paragraph (a) of this Section 4.2, the Company shall make such distribution as soon as such distribution would not be prohibited pursuant to this Section 4.2.

Section 4.3    Reserves.  The Company may establish reserves in such amounts and for such time periods as the Board of Directors determines in its discretion to be necessary for estimated accrued Company expenses and any contingent or unforeseen Company liabilities. If the Board of Directors determines that all or any portion of such reserves are no longer necessary, any such amount of such reserves may, in the discretion of the Board of Directors, be distributed to the Members in accordance with this Article 4.

## ARTICLE 5.  BOOKS OF ACCOUNT, RECORDS AND REPORTS, FISCAL YEAR

Section 5.1    Books and Records.  Records and books of account shall be kept by the Company in a manner determined by the Board of Directors in its sole discretion. The records and books of accounts shall reflect such transactions and other matters relating to the Company's business as are usually entered into records and books of account maintained by Persons engaged in businesses of a like character.

Section 5.2    Financial Reports.  The Company shall deliver or otherwise make available to each Member:

(a)    as soon as available and in any event within 60 days after the end of each of the first three quarters of each fiscal year of the Company, consolidated balance sheets of the Company and its Subsidiaries as of the end of such period, and consolidated statements of

13

income and cash flows of the Company and its Subsidiaries for the period then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted in such balance sheets and statements, and subject to the absence of footnotes and to year-end adjustments; and

(b)     as soon as available and in any event within 90 days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such year, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the year then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted in such balance sheets and statements, together with an auditor's report thereon of a firm satisfactory to the Board of Directors.

Section 5.3     Fiscal Year.  Unless otherwise determined by the Board of Directors, the fiscal year of the Company (the "Fiscal Year") shall be the calendar year. Notwithstanding anything to the contrary in this Agreement, the last Fiscal Year of the Company shall end on the date on which the Company is terminated.

Section 5.4     Tax Returns.  The Board of Directors will cause to be prepared and filed all necessary federal, state and local income tax returns for the Company and the Board of Directors will select a nationally recognized accounting firm to prepare the Company's federal, state and local income tax returns.

Section 5.5     Taxable as a Corporation.  The Company has elected to be treated as an association taxable as a corporation for U.S. federal income tax purposes.  To the extent permitted by law, the Company shall similarly elect to be treated as an association taxable as a corporation for state and local income tax purposes. The Company shall not make any election or take any action inconsistent with such treatment and this Section 5.5 without the approval of the Majority Members.  If the Majority Members determine to take action to cause the Company to be treated as other than an association taxable as a corporation, this Agreement shall be amended in a manner determined by agreement of the Majority Members to include provisions that the Majority Members determine relevant in connection with such change in status.

## ARTICLE 6.  POWERS, RIGHTS AND DUTIES OF THE MEMBERS

Section 6.1     Limitations.  Other than as set forth in this Agreement, but excluding Members that are also members of the Board of Directors, the Members shall not: (i) participate in the management or control of the Company's business;  (ii) transact any business for the Company;  or (iii) have the power to act for or bind the Company.  All such powers shall vest solely and exclusively in the Board of Directors.  Persons dealing with the Company shall not be entitled to rely on the power and authority of the Members to act for or bind the Company.

Section 6.2     Liability.  Subject to the provisions of the Act, no Member shall be liable for the repayment, satisfaction or discharge of any Company liabilities.  No Member shall be personally liable for the return of any portion of the Capital Contributions (or any return thereon) of any other Member.

14

Section 6.3        Competition and Corporate Opportunities.

(a)        Each Member acknowledges, agrees and affirms that the Ares Entities and their respective Affiliates (collectively, the "Sponsor Related Parties"):

(i)        (A) have participated (directly or indirectly) and will continue to participate (directly or indirectly) in financing, venture capital, private equity and other direct investments in corporations, joint ventures, limited liability companies and other entities (the "Other Investments"), including Other Investments engaged in various aspects of business that may, are or will be competitive with the Company or its Subsidiaries' business or that could be suitable for the Company or its Subsidiaries, including businesses and undertakings in direct competition with the Company or its Subsidiaries, (B) have interests in, participate with, aid and maintain seats on the board of directors or similar governing bodies of, Other Investments and (C) may develop or become aware of business opportunities for Other Investments; and

(ii)        may or will, as a result of or arising from the matters referenced in clause (i) above, the nature of the Sponsor Related Parties' businesses and other factors, have conflicts of interest or potential conflicts of interest with the Company, the Company's Subsidiaries and/or other Members.

(b)        The Members other than the Ares Entities (individually and on behalf of the Company) expressly: (i) waive any such conflicts of interest or potential conflicts of interest as described in Section 6.3(a); (ii) agree that no Sponsor Related Party or its respective representatives shall have any liability to any Member or any Affiliate of any Member, or the Company or any of its Subsidiaries with respect to such conflicts of interest or potential conflicts of interest; and (iii) agree that the Sponsor Related Parties shall not have any duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Company or any of its Subsidiaries.  The Members other than the Ares Entities (individually and on behalf of the Company) also expressly agree: (A) that in the event any Sponsor Related Party acquires knowledge of a potential transaction or matter that may be a corporate opportunity for itself and the Company or any of its Subsidiaries neither the Company nor any of its Subsidiaries shall have any expectancy in such corporate opportunity; (B) to waive and relinquish any and all claims relating to or arising out of such potential corporate opportunities; (C) that the applicable Sponsor Related Party shall not have any duty to communicate or offer such corporate opportunity to the Company or any of its Subsidiaries and may pursue or acquire such corporate opportunity for itself or themselves, as the case may be, or direct such corporate opportunity to another Person; and (D) that neither the Company nor any of its Subsidiaries shall be entitled to (x) the right to consent to, (y) the right to participate in or (z) any right to any profits from, in each case, any such other business opportunity or Other Investment. The Members (for themselves and on behalf of the Company) also acknowledge that the Sponsor Related Parties and their representatives have duties not to disclose confidential information of or related to the Other Investments.

(c)        In the event that a director or an officer of the Company who is also a partner, principal, director, officer, member, manager and/or employee of any Sponsor Related Party acquires knowledge of a potential transaction or matter that may be a corporate opportunity

#4813-6740-7744

for the Company or any of its Subsidiaries as well as a Sponsor Related Party, neither the Company nor any of its Subsidiaries shall have any expectancy in such corporate opportunity. In addition, such Sponsor Related Party shall not have any duty to communicate or offer such corporate opportunity to the Company or any of its Subsidiaries and may pursue or acquire such corporate opportunity for itself or direct such corporate opportunity to another Person.

(d)     In addition to and notwithstanding the foregoing provisions of this <u>Section 6.3</u>, a corporate opportunity shall not be deemed to belong to the Company if it is a business opportunity that the Company is not financially able, contractually permitted or legally able to undertake, or that is, based on its nature, not in the line of the Company's business or is of no practical advantage to it or is a business opportunity in which the Company has no interest or reasonable expectancy.

## ARTICLE 7.  POWERS, RIGHTS AND DUTIES OF THE BOARD OF DIRECTORS

Section 7.1     <u>Authority</u>.  Except as specifically contemplated by this Agreement, the Board of Directors shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company.  Any action authorized by the Board of Directors shall constitute the act of and serve to bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Board of Directors as set forth in this Agreement.

Section 7.2     <u>Powers and Duties of the Board of Directors</u>.  Except as otherwise specifically provided in this Agreement, the Board of Directors shall have all rights and powers of a "manager" under the Act.  The Board of Directors shall have such authority, rights and powers in the management of the Company's business to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

Section 7.3     <u>Board of Directors</u>.  A board of directors shall be established to manage the business and affairs of the Company in accordance with the following terms:

(a)     <u>Appointment; Certain Vacancies</u>.

(i)     The authorized number of directors on the Board of Directors is established at [●][2] directors, which number shall not be increased or decreased without the written consent of the Board of Directors, acting by majority vote.

(ii)     The Board of Directors shall be comprised of the following initial members:  [●].[3]

(iii)     Unless the Majority Members shall otherwise determine, the composition of any committees of the Board of Directors and the composition of the board of directors, committees or other governing bodies of each of the Company's Subsidiaries shall be designated in the manner set forth with respect to the Company in <u>Section 7.3(a)</u>

---

[2] TBD.
[3] TBD.

16

and Section 7.3(b).  In addition, unless the Majority Members shall otherwise determine, the manager of any direct or indirect Subsidiary of the Company that is a manager-managed limited liability company shall be the Company, acting in such capacity at the direction of the Board of Directors.

(iv)    If any person designated as a director pursuant to Section 7.3(a)(ii) for any reason ceases to serve as a member of the Board of Directors, the resulting vacancy on the Board of Directors shall be filled by Majority Members acting by vote or written consent.

(v)    a director shall only be removed from the Board of Directors upon the vote of a majority of the directors then in office or by Majority Members acting by vote or written consent.

(b)    Term of Directors.  Subject to Section 7.3(a)(v), each director shall hold office from the time of his or her appointment until his or her resignation or removal without the need to be voted into office on an annual basis or otherwise.  Notwithstanding the foregoing, any director may resign at any time upon written notice to the Company.  Any such resignation shall take effect at the time specified in the applicable instrument of resignation or, if the time be not specified, upon receipt of such notice.  Unless otherwise specified in the notice, the acceptance of such instrument of resignation shall not be necessary to make such resignation effective.

(c)    Chairman of the Board.  The Board of Directors may from time to time, in its discretion, by majority vote elect a Chairman of the Board (the "Chairman of the Board").  If elected, the Chairman of the Board shall: (i) preside at all meetings of the Board of Directors; (ii) have such other powers and duties as may be delegated to him or her by the Board of Directors; and (iii) except as otherwise provided in the immediately succeeding sentence, shall serve in such capacity for such time as the Board of Directors shall determine.  The initial Chairman of the Board shall be appointed by a majority of the directors and shall serve for one (1) year from the date of his or her appointment.  Unless otherwise approved by the Majority Members, the Chairman of the Board shall serve in a non-executive capacity and shall not have any authority as an officer of the Company by virtue of his or her role as Chairman of the Board.

(d)    Meetings.  Meetings of the Board of Directors, regular or special, may be held at any place within or without the State of Delaware.  Members of the Board of Directors, or of any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.  The Board of Directors may fix times and places for regular meetings of the Board of Directors and no additional, special notice of such meetings need be given.  A special meeting of the Board of Directors shall be held whenever called by a majority of the directors then in office, at such time and place as shall be specified in the notice or waiver of such meeting.  Notice of each special meeting shall be given by the directors calling the meeting to each other director personally, by facsimile transmission, by electronic mail communication or by telephone not later than the day before the meeting.

(e)     Quorum and Voting.  A whole number of directors equal to at least a majority of the entire Board of Directors, either present or represented by proxy, shall constitute a quorum for the transaction of business.  In the event there is less than a quorum at any meeting of the Board of Directors, a majority of the directors present may adjourn the meeting from time to time.  Notice of adjournment and the time and place of the rescheduled meeting shall be given to all of the directors not then in attendance.  Except as otherwise provided by this Agreement, the vote of a majority of the directors present at a meeting at which a quorum is present or at an adjourned meeting shall be the act of the Board of Directors.

(f)     Proxies.  Each director entitled to vote at a meeting of the Board of Directors may authorize another person or persons to act for him or her by proxy.  Each proxy shall be signed by the director giving such proxy.

(g)     Written Consent of Directors in Lieu of a Meeting.  Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if a majority of the members of the Board of Directors consent in writing.

(h)     Standard of Care.  Notwithstanding anything to the contrary set forth in this Agreement or under applicable law, no director shall be liable to the Company, any creditor of the Company, any Member, any assignee or any other holder of Equity Interests in the Company for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any Subsidiary, on the one hand, and any Member or any Affiliate of such member, on the other), except for such actions as constitute fraud or bad faith.  To the extent any director has any liabilities or duties at law or in equity (including, without limitation, fiduciary duties or other standards of care) more expansive than those set forth in this Section 7.3(h), such liabilities and duties are hereby modified to the fullest extent permitted by applicable law (including, without limitation, Section 18-1101(c) of the Act) to those set forth in the first sentence of this Section 7.3(h).  In furtherance of the foregoing, it is understood and agreed that no director, in his or her capacity as a director, shall have any fiduciary duties of any kind or description to the Company, any Member, any assignee or any other holder of Equity Interests in the Company, each such director instead being deemed an agent of the Member appointing such director and not a fiduciary of any other party.  In addition, with the exception of officers whose duty is set forth in Section 7.4,  no Member, any other holder of Equity Interests in the Company or any Affiliate of any of the foregoing entities or persons shall have any duty of any kind or description to the Company, any other Member or any other holder of Equity Interests in the Company or any Affiliate of any of the foregoing entities or persons for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any Subsidiary, on the one hand, and any Member or any Affiliate of such member, on the other), except for such actions as constitute fraud or bad faith.  Notwithstanding the foregoing, nothing in this Section 7.3(h) shall be construed to eliminate the covenant of good faith and fair dealing.  Notwithstanding the foregoing or anything to the contrary contained in this Agreement, nothing contained in this Agreement shall relieve any Person of any liability for breach of fiduciary duty, if any, owed to the Company or its Affiliates incurred in such Person's role as an officer or employee of the Company or its Affiliates.

18

(i)      Expenses; Compensation.  The Company shall pay all reasonable out-of-pocket expenses incurred by each director in connection with attending regular and special meetings of the Board of Directors and any committee of the Board of Directors.  In addition to the foregoing, upon the approval of the Board of Directors, the Company shall furnish each director who is not an officer or employee of the Company with such compensation or other remuneration for his or her service to the Board of Directors as the Board of Directors shall reasonably fix.

Section 7.4      Officers, Agents and Employees.

(a)      Appointment and Term of Office.  The Board of Directors may appoint, and may delegate power to appoint, such officers, agents and employees as it may deem necessary or proper, who shall hold their offices or positions for such terms, have such authority and perform such duties as may from time to time be determined by or pursuant to authorization of the Board of Directors, in each case in furtherance of the business carried on by the Company.  Except as may be prescribed otherwise by the Board of Directors in a particular case, all such officers shall hold their offices at the pleasure of the Board of Directors for an unlimited term (unless otherwise provided in any applicable employment agreement) and need not be reappointed annually or at any other periodic interval.  Any action taken by an officer of the Company pursuant to authorization of the Board of Directors shall constitute the act of and serve to bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the authority of such officers set forth in the authorization of the Board of Directors, but only to the extent expressly provided in such authorization.  Any action purported to be taken by any officer, agent or employee of the Company or any of its Subsidiaries in the absence of a grant of authority from the Board of Directors, or otherwise in contravention of the terms of this Section 7.4(a), shall be void and without effect.

(b)      Resignation and Removal.  Any officer may resign at any time upon written notice to the Company.  Any officer, agent or employee of the Company may be removed by the Board of Directors with or without cause at any time.  The Board of Directors may delegate such power of removal as to officers, agents and employees not appointed by the Board of Directors.

(c)      Compensation.  The compensation of the officers of the Company shall be fixed by the Board of Directors, but this power may be delegated to any officer in respect of other officers under his or her control.  The compensation for senior executive officers of the Company shall, in each case, be commensurate with the financial performance of the Company, the role of the officer, the scope of the officer's responsibilities and the performance and success of the officer, as determined in the reasonable judgment of the Board of Directors.

(d)      Standard of Care.  Officers shall be held to the same standard of care and shall have the same fiduciary duties to the Company as if they were officers of a Delaware corporation, including the duties of care and loyalty.

Section 7.5      Company Funds.  Company funds shall be held in the name of the Company and shall not be commingled with those of any other Person.  Company funds shall be used only for the business of the Company.

Section 7.6     Other Activities and Competition.  None of the directors shall be required to manage the Company as his or her sole and exclusive function.  Each such director may engage in or possess any interests in business ventures and may engage in other activities of every kind and description independently or with others in addition to those relating to the Company.  Each Member authorizes, consents to and approves of such present and future activities by each such director.  Notwithstanding the foregoing, none of the Company, any Member or any officer of the Company shall have any right by virtue of this Agreement or the relationship created hereby in or to other ventures or activities of the directors, the Ares Entities, Ares or any Affiliate of the Ares Entities or Ares (which, for the avoidance of doubt, excludes the Company), or to the income or proceeds derived therefrom.

Section 7.7     Exculpation.  No director, officer, agent or employee of the Company or any Member shall be personally liable for the return of any portion of the Capital Contributions (or any return thereon) of any Member.  The return of such Capital Contributions (or any return thereon) shall be made solely from the Company's assets.  No Member shall have the right to demand or receive property other than cash for its Interest in the Company.  No director of the Company or any Member shall be liable, responsible or accountable in damages or otherwise to the Company or any Member for any loss incurred as a result of any act or failure to act by such Person on behalf of the Company unless such loss is finally determined by a court of competent jurisdiction to have resulted solely from such Person's fraud or bad faith.

Section 7.8     Indemnification of the Board of Directors, Officers, Members and Agents.

(a)     The Company shall defend and indemnify any Member, director or member or trustee or shareholder of any Member or director from any threatened, pending or completed action, suit or proceeding by reason of the fact that such Person is or was an officer, employee or other agent of the Company or a Member or director (each, an "Indemnified Party"), to the fullest extent permitted by applicable law in effect on the date of this Agreement and to such greater extent as applicable law may hereafter from time to time permit.  The indemnity shall protect the Indemnified Party from and against any loss, expense, damage or injury suffered or sustained by them arising out of their activities on behalf of the Company if the acts upon which such threatened, pending or completed action are based were not a result of fraud or bad faith by such Indemnified Party.  Upon the approval of the Board of Directors, the Company may indemnify any other Person who was or is a party or is threatened to be made a party to any action suit or proceeding to the same extent and subject to the same conditions as any other Indemnified Party as set forth in this Section 7.8.  The Company shall indemnify and hold harmless any Indemnified Party or Person executing any guaranty of indebtedness of the Company from any and all claims, demands, losses, liabilities, damages and expenses (including reasonable attorneys' fees) suffered or incurred by any such guarantor by reason of the failure of the Company to perform its obligations under any guaranteed indebtedness or suffered or incurred by such guarantor in defending or prosecuting any suit, action or other proceeding brought in connection with the guaranty or such indebtedness or in enforcing this indemnification or any subrogation rights or other rights or remedies, at law or in equity, which the guarantor may have by reason of performing its obligations under any such guaranty of indebtedness.  Any indemnification pursuant to this Section 7.8 shall only be from the assets of the Company.

#4813-6740-7744

(b)      Expenses (including attorneys' fees) incurred by an Indemnified Party in a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a legally enforceable written undertaking by or on behalf of such Indemnified Party in form and substance acceptable to the Board of Directors to repay such amount if such Indemnified Party is determined pursuant to this Section 7.8 or adjudicated to be ineligible for indemnification, which undertaking will be an unlimited general obligation of the Indemnified Party but need not be secured unless so determined by the Board of Directors.

(c)      No amendment, modification or deletion of this Section 7.8 will apply to or have any effect on the right of any Indemnified Party to indemnification for or with respect to any acts or omissions of such Indemnified Party occurring prior to such amendment, modification or deletion.

Section 7.9      Expenses.  The Company shall pay for reasonable and documented out-of-pocket expenses incurred in connection with the operation of the Company's business, provided that such expenses are not incurred in violation of an instruction issued, or policy approved, by the Board of Directors.

Section 7.10      Affiliate Transactions.  For the avoidance of doubt and in furtherance of the authority vested in the Board of Directors pursuant to Section 7.1 and Section 7.2, unless approved in writing by the Board of Directors of the Company, the Company will not, and will cause its Subsidiaries not to, extend any indebtedness or other similar arrangement to any officer (or any Family Member or relative of any officer), director (or any Family Member or relative of any director) or employee (or any Family Member or relative of any employee). For the avoidance of doubt and in furtherance of the authority vested in the Board of Directors pursuant to Section 7.1 and Section 7.2, unless approved in writing by the Board of Directors of the Company, the Company will not, and will cause its Subsidiaries not to, enter into any contract or amend or modify any existing contract, and will not engage in any transaction of any kind or description with any officer (or any Family Member or relative of any officer), director (or any Family Member or relative of any director) or employee (or any Family Member or relative of any employee).  It is expressly agreed that: (i) any action purported to be taken by any officer, director or employee of the Company or any of its Subsidiaries in contravention of the terms of this Section 7.10 shall be void and without effect; and (ii) any action purported taken in compliance with this Section 7.10 shall be deemed to satisfy the covenant of good faith and fair dealing.

Section 7.11      Directors' Insurance.  The Company shall maintain directors' and officers' liability insurance covering the full Board of Directors in an amount to be determined by the Board of Directors in its discretion.

Section 7.12      Additional Units; Additional Members.

(a)      At the discretion of the Board of Directors, the Company may issue additional Units at any time and from time to time to any Person for any amount of consideration as determined by the Board of Directors and, subject to paragraphs (b), (c) and (d) of this Section

7.12, admit such Person as an Additional Member (an "Additional Member") with all of the rights and obligations of a Member under this Agreement.

(b)     Notwithstanding the provisions of Section 7.12(a), no Person may be admitted as an Additional Member if such admission would violate or cause the Company to violate any applicable Federal, state or foreign law, rule or regulation including, without limitation, the Securities Act, or any other applicable Federal, state or foreign securities laws, rules or regulations, cause the Company to be an investment company required to be registered under the Investment Company Act of 1940, as amended, or cause some or all of the Company's assets to be "plan assets."

(c)     Each Additional Member shall execute such documentation as may be required by the Board of Directors to evidence such Additional Member's agreement to be bound by the terms and provisions of this Agreement, including a joinder to this Agreement in substantially the form attached as Exhibit A.

(d)     Each Person desiring to become an Additional Member shall be admitted to the Company upon the approval of the Board of Directors and the delivery of a counterpart signature page to this Agreement that has been duly executed and delivered to the Company and any other documentation required by the Board of Directors.  The Company shall reflect each admission authorized under this Section 7.12 by preparing an amendment to this Agreement, dated as of the date of such admission, to reflect such admission.

## ARTICLE 8.  TRANSFERS OF INTEREST BY MEMBERS

Section 8.1     General.  No Member may sell, transfer, assign, pledge, hypothecate or in any manner dispose of (whether with or without consideration and whether voluntary or involuntary or by operation of law) or create or suffer the creation of a security interest in or any encumbrance on all or a portion of its Interest in the Company, whether now owned or hereafter acquired, or enter into any swap, contract, participation or other arrangement that transfers to another Person, in whole or in part, any of the economic consequences of ownership with respect to any such Interest (the commission of any such act being referred to as a "Transfer," any Person who effects a Transfer being referred to as a "Transferor" and any Person to whom a Transfer is effected being referred to as a "Transferee") except in accordance with the terms and conditions set forth in this Article 9.  No Transfer of an Interest in the Company shall be effective until such time as all requirements of this Article 9 have been satisfied with respect to the Transfer and, if consents, approvals or waivers are required by the Board of Directors, all of same shall have been confirmed in writing by the Board of Directors.  Any Transfer or purported Transfer of an Interest in the Company not made in accordance with this Agreement (a "Void Transfer") shall be null and void and of no force or effect whatsoever.  Any amounts otherwise distributable under Article 4 or Article 10 in respect of an Interest in the Company that has been the subject of a Void Transfer may be withheld by the Company, in the discretion of the Board of Directors, until the Void Transfer has been rescinded, whereupon the amount withheld (after reduction by any damages suffered by the Company attributable to such Void Transfer) shall be distributed without interest.

#4813-6740-7744

Section 8.2     Transfer of Interest of Members.

(a)     A Member may not Transfer all or any portion of its Interest in the Company to any Person other than, subject to compliance with Section 8.3, a Transfer of all or any portion of its Units pursuant to a Permitted Transfer.

(b)     The Transferee of a Member's Interest in the Company pursuant to Section 8.2(a) shall be admitted to the Company as a Substituted Member only upon satisfying each applicable obligation under this Article 9, including, without limitation, executing a joinder to this Agreement in substantially the form attached as Exhibit A.  Unless a Transferee of a Member's Interest in the Company is admitted as a Substituted Member under this Section 8.2(b), it shall have none of the powers of a Member and shall have only such rights of an assignee under the Act as are consistent with this Agreement.

(c)     Upon the Transfer of all of the Units of a Member and effective upon the admission of its Transferee as a Member, the Transferor shall be deemed to have withdrawn from the Company as a Member.

(d)     Upon the death, dissolution, withdrawal in contravention of Section 9.1 or the bankruptcy of a Member (the "Withdrawing Member"), the Company shall have the right to treat such Member's successor(s)-in-interest as assignee(s) of such Member's Interest in the Company, with none of the powers of a Member and with only such rights of an assignee under the Act as are consistent with this Agreement. Notwithstanding the foregoing, if the resulting Transfer to such successor(s)-in-interest constitutes a Permitted Transfer and such Transfer otherwise complies with the provisions of Section 8.3, any such successor-in-interest shall be admitted to the Company as a Substituted Member in accordance with Section 8.2(b).  For purposes of this Section 8.2(d), if a Withdrawing Member's Interest in the Company is held by more than one Person who received such Interest other than pursuant to a Permitted Transfer (for purposes of this Section 8.2(d), the "Assignees"), the Assignees shall appoint one Person with full authority to accept notices and distributions with respect to such Interest in the Company on behalf of the Assignees and to bind them with respect to all matters in connection with the Company or this Agreement.

(e)     The Company shall reflect each Transfer and admission as a Substituted Member authorized under this Article 9 (including any terms and conditions imposed thereon by the Board of Directors) on Schedule A and in the books and records of the Company.

Section 8.3     Further Requirements.  In addition to the other requirements of Section 8.2, and unless waived in whole or in part by the Board of Directors, no Transfer of all or any portion of an Interest in the Company may be made unless the following conditions are met:

(a)     The Transferor shall have paid all reasonable costs and expenses, including attorneys' fees and disbursements and the cost of the preparation, filing and publishing of any amendment to this Agreement or the Certificate, incurred by the Company in connection with the Transfer;

(b)     The Transferor shall have delivered to the Company a fully executed copy of all documents relating to the Transfer, executed by both the Transferor and the Transferee,

and the agreement of the Transferee in writing and otherwise in form and substance acceptable to the Board of Directors to:

(i)      be bound by the terms of this Agreement by executing a joinder substantially in the form attached hereto as Exhibit A; and

(ii)     assume all obligations of the Transferor under this Agreement relating to the Interest in the Company that is the subject of such Transfer;

(c)      The Board of Directors shall have been reasonably satisfied, including, at its option, having received an opinion of counsel to the Company reasonably acceptable to the Company, that (each of the following, if it were to be caused by a Transfer, a "Specified Event"):

(i)      the Transfer will not violate the Securities Act, or any other applicable Federal, state or non-United States securities laws, rules or regulations;

(ii)     the Transfer will not cause some or all of the assets of the Company to be "plan assets";

(iii)    the Transfer will not result in the (A) requirement that the Company register its Units under the Exchange Act, (B) Company being treated as a publicly held company or (C) Company otherwise being required to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise whatsoever;

(iv)    the Transfer will not cause the Company to be an investment company required to be registered under the Investment Company Act of 1940, as amended; and

(v)     during any Applicable Time, the Transfer will not result in the admission of any Member that is not an Eligible Holder;

(d)     The proposed Transferee of the Interests shall not be a competitor of the Company or any of its Subsidiaries, as determined by the Board of Director in its sole discretion.

Any waivers from the Board of Directors under this Section 8.3 shall be given or denied in the discretion of the Board of Directors.  The Company shall reflect each Transfer and admission authorized under this Article 9 (including the terms and conditions imposed thereon by the Board of Directors) on Schedule A and using documentation the form and content of which have been approved by the Board of Directors, which approval may be granted or withheld in the discretion of the Board of Directors.

Section 8.4      Consequences of Transfers Generally.

(a)      In the event of any Transfer or Transfers permitted under this Article 9, the Transferor and the Interest in the Company that is the subject of such Transfer shall remain subject to this Agreement, and the Transferee shall hold such Interest in the Company subject to all unperformed obligations of the Transferor under this Agreement.  Any successor or

24

Transferee shall be subject to and bound by this Agreement as if originally a party to this Agreement.

(b)     Each Member agrees that such Member will, upon request of the Board of Directors, execute such certificates or other documents and perform such acts as the Board of Directors deems appropriate after a Transfer of such Member's Interest in the Company to preserve the limited liability of the Members under the laws of the jurisdictions in which the Company is organized or doing business.

(c)     The Transfer of a Member's Interest in the Company and the admission of a Substituted Member shall not be cause for dissolution of the Company.

Section 8.5     Units; Percentage Interest.  Any Transferee of a Member under this Article 9 shall, subject to the last sentence of Section 8.1, succeed to the Units and Percentage Interest so Transferred to such Transferee.

Section 8.6     Additional Filings.  Upon the admission of a Substituted Member under Section 8.2, the Company shall cause to be executed, filed and recorded with the appropriate governmental agencies such documents (including amendments to this Agreement) as are required to accomplish such substitution.

Section 8.7     Indirect Transfers.  Each Member that is not a natural person (other than the Ares Entities or any of their  respective Affiliates) agrees that: (i) Equity Interests in it and other Equity Interests in any entity controlling such entity, if any (the "Upstream Equity Interests"), will note the restrictions on transfer contained in this Article 9; and (ii) none of such Upstream Equity Interests may be transferred to any Person other than in accordance with the terms and provisions of this Article 9 as if such Equity Interests were Units.  As a condition to the admission of any Person that is not a natural person (other than Affiliates of Ares) as a Member, each such Person shall have caused legally effective definitive documentation memorializing the limitations set forth in the immediately preceding sentence with respect to the transfer of Upstream Equity Interests to be entered into by each holder of such Upstream Equity Interests.  Among other things, such documentation shall provide that any attempt to transfer the Upstream Equity Interests in contravention of the terms of such definitive documentation or any applicable limitations on transfer contemplated by this Agreement shall be void and without effect.

Section 8.8     Right of First Offer.  Prior to any Transfer pursuant to Section 8.2 by a Member other than any Ares Entity (the "Transferring Member") of any of its Units (the "ROFO Units"), such Transferring Member must first comply with the provisions of this Section 8.8:

(a)     The Transferring Member shall first deliver to the Company a written notice (the "Offer Notice") that sets forth:  (i) the number of ROFO Units, (ii) the price per ROFO Unit that the Transferring Member proposes to be paid for the ROFO Units (the "Sale Price"), (iii) the manner of payment and (iv) the material terms of such proposed sale.  The Offer Notice shall constitute an irrevocable offer by the Transferring Member to sell to the Company the ROFO Units for cash at the Sale Price on the terms set forth in the Offer Notice.

#4813-6740-7744

(b)     The Company shall have until the 15th Business Day following the delivery of the Offer Notice (the "Offer Period") to notify the Transferring Member that it accepts such offer as to all or any portion of the ROFO Units on the terms set forth in the Offer Notice. Such notice shall specify the amount of the ROFO Units the Company wishes to purchase.

(c)     If the Company accepts such offer with respect to all or any portion of the ROFO Units, a closing of the purchase of such ROFO Units shall take place at the principal office of the Company on the 30th Business Day after the date on which the Offer Notice was delivered unless otherwise agreed by the parties. The Sale Price shall be payable in accordance with the payment terms of the Offer Notice.

(d)     Subject to the other provisions of this Article 8, if the Company does not elect to purchase the entire ROFO Units for the Sale Price prior to expiration of the Offer Period, the Transferring Member shall have the right to sell the unpurchased portion of the ROFO Units for a period of 90 days (the "Sale Period"). Such sale shall be at a price per ROFO Unit no less than the Sale Price and on other terms no more favorable to the transferees than offered in the Offer Notice. If the Transferring Member does not Transfer the ROFO Units before the end of the Sale Period, such Transferring Member may not sell any ROFO Units without repeating the procedures set forth in this Section 8.8.

Section 8.9     Drag Along Sale.  If requested by the Ares Entities, each Member shall Transfer the Drag Along Sale Percentage of its Units in the manner and on the terms set forth in this Section 8.9 (a "Drag Along Sale") and/or take such other action in support of any Drag Along Sale as is provided for in this Section 8.9.

(a)     Exercise.  If the Ares Entities elect to exercise their rights under this Section 8.9, the Ares Entities shall deliver a written notice (the "Drag Along Notice") to each other Member.  The Drag Along Notice shall set forth the principal terms of the proposed Sale insofar as it relates to such Units including: (i) the number and type of Units to be acquired from the Ares Entities; (ii) the Drag Along Sale Percentage applicable to such other Member; (iii) the consideration to be received in the proposed Sale; (iv) the name and address of the Prospective Buyer; and (v) the draft Transfer agreement with the Prospective Buyer.  If the Ares Entities consummate the proposed Sale to which reference is made in the Drag Along Notice, each other Member (each a "Participating Seller," and, collectively with the Ares Entities, the "Drag Along Sellers") shall be bound and obligated to Transfer the applicable Drag Along Sale Percentage of its Units (the "Drag Along Shares") in the proposed Sale on the same terms and conditions, with respect to each Drag Along Share sold, as the Ares Entities shall Transfer their respective Units in the Sale.  If the proposed Sale has not been consummated by the end of the 180th day following the date of the delivery of the Drag Along Notice, then the Drag Along Notice shall be null and void, each Participating Seller shall be released from its obligation under the Drag Along Notice and it shall be necessary for a separate Drag Along Notice to be furnished and the terms and provisions of this Section 8.9 separately complied with, in order to consummate such proposed Sale pursuant to this Section 8.9.

(b)     Miscellaneous.  The following provisions shall be applied to any proposed Transfer to which this Section 8.9 applies:

(i)        Certain Legal Requirements.

(A)        In the event the consideration to be paid in exchange for Units in a Drag Along Sale includes any securities, and the receipt of such securities by a Participating Seller would require under applicable law (x) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities or (y) the provision to any Participating Seller of any information regarding the Company, such securities or the issuer of such securities, such Participating Seller shall not have the right to Transfer Units in such proposed transaction.  In such event, the Ares Entities shall cause to be paid to such Participating Seller in lieu of such securities, against surrender of the Units (in accordance with Section 8.9(b)(v) of this Agreement) which would have otherwise been Transferred by such Participating Seller to the Prospective Buyer in the proposed transaction, an amount in cash equal to the fair market value (as determined in the good-faith judgment of the Board of Directors) of such Units as of the date such securities would have been issued in exchange for such Units.

(B)        If the Company or the Ares Entities enter into any negotiation or Sale for which Rule 506 of the Securities Act (or any similar rule then in effect) may be available with respect to such negotiation or transaction, at the request of the Company or the Ares Entities, each Member shall appoint a purchaser representative (as such term is defined in Rule 501 of the Securities Act) reasonably acceptable to the Ares Entities at such Member's sole cost and expense.

(ii)        Further Assurances.

(A)        Whether in his, her or its capacity as a Participating Seller, Member, officer or director of the Company, or otherwise, each Participating Seller and the Company shall take or cause to be taken all such actions as may be necessary or desirable in order expeditiously to consummate a Drag Along Sale and any related transaction, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments; furnishing information and copies of documents; filing applications, reports, returns, filings and other documents or instruments with governmental authorities; and otherwise cooperating with the Ares Entities and the Prospective Buyer.  Without limiting the generality of the foregoing, in connection with a Drag Along Sale, each Participating Seller and the Company shall execute and deliver such agreements as may be specified by the Ares Entities, including: (x) (I) agreements to make individual representations and warranties (including the absence of any Adverse Claim with respect to such Participating Seller's Units, the power, authority and legal right to Transfer Units in the Drag Along Sale, the enforceability of relevant agreements and the absence of conflicts with applicable law or other agreements) and (II) be liable as to such representations and warranties; (y) agreements to be liable (whether by purchase price adjustment, indemnity payments or otherwise) in respect of representations, warranties, covenants and agreements in respect of the Company and its Subsidiaries; and (z) agreements providing for, or

27

containing, holdbacks, escrow arrangements, earn-outs, covenants limiting the right to compete, covenants limiting the right to solicit, and releases, among other matters. Notwithstanding the foregoing, the aggregate amount of liability of any Participating Seller described in clauses (a) and (b) in connection with any such Transfer of Units shall not exceed the lesser of: (1) such Participating Seller's pro rata portion of any such liability, to be determined in accordance with such Participating Seller's portion of the total value of Units included in such Drag Along Sale; or (2) the proceeds received by such Participating Seller in connection with such Drag Along Sale.

(B)     If a Member fails to comply with Section 8.9(b)(ii)(A) (including by failing to deliver any agreement or instrument, from and after the date on which the Drag Along Sale is consummated, the Units in the Company that such Member is obligated to sell under this Section 8.9 shall be deemed to be no longer outstanding. In such event, the non-complying Member shall cease to be a Member of the Company or holder of Units in the Company and shall have no rights with respect thereto except the right to receive payment of the consideration paid in respect of such Units in the Company pursuant to the terms of the Drag Along Sale, without interest, upon compliance with such reasonable terms as the Prospective Buyer in such Drag Along Sale shall establish.

(C)     If the Drag Along Sale is structured as a merger or consolidation and without regard to whether or not such vote is otherwise required as a condition to the execution of such a merger or consolidation under this Agreement, each Member shall vote its Units as requested by the Ares Entities either by written consent or at a meeting as the case may be. Each Member shall also waive all dissenter's rights, appraisal rights and similar rights in connection with such merger or consolidation. If the Drag Along Sale is structured a sale of Units, each Member shall agree to sell, and shall sell, all of its Units and rights to acquire Units on the terms and conditions approved by the Ares Entities. If the Drag Along Sale is structured a sale of assets and without regard to whether or not such vote is otherwise required as a condition to the execution of such a sale of assets under this Agreement, each Member shall vote its Units to approve such sale and any subsequent liquidation of the Company or other distribution of the proceeds therefrom, whether by written consent or at a meeting (as requested by the Ares Entities), in each case, irrespective of the per Unit consideration, if any, such Member is expected to derive from such Drag Along Sale.

(iii)     Sale Process. In their sole discretion, the Ares Entities shall decide whether or not to pursue, consummate, postpone or abandon any proposed Drag Along Sale and the terms and conditions of such Drag Along Sale. Neither the Ares Entities nor any Affiliate of the Ares Entities shall have any liability to any other holder of Units arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Drag Along Sale.

(iv)     Expenses. If a Drag Along Sale is consummated, each Drag Along Seller shall pay its pro rata share (relative to amounts received in respect of Units by each Drag

Along Seller) of the costs incurred by the Ares Entities relating to such Drag Along Sale (including legal fees and expenses), to the extent such costs are not otherwise paid or reimbursed by the Company or the Prospective Buyer.

(v)      Closing.  The closing of a Drag Along Sale shall take place at such time and place as the Ares Entities shall specify by notice to each Participating Seller.  At the closing of such Drag Along Sale, against delivery of the applicable consideration, each Participating Seller shall deliver the certificates evidencing the Units to be Transferred by such Participating Seller, duly endorsed, or with unit (or equivalent) powers duly endorsed, for transfer, free and clear of any liens or encumbrances, with any unit (or equivalent) transfer tax stamps affixed or in lieu of delivery of such certificates, an affidavit (with an appropriate indemnity or guarantee as determined by the Board of Directors in its good-faith discretion) of such Participating Seller certifying that such certificates have been lost, stolen, destroyed or mutilated.

(vi)     Certain Other Matters.  In furtherance of the provisions of this Section 8.9, for so long as this Section 8.9 is in effect, each Member (and its successors, heirs, legal representatives, and permitted assigns and transferees) hereby: (i) irrevocably appoints each of the Ares Entities and their designees as his or its agents and attorneys-in-fact (the "Drag Along Agents") (with full power of substitution) to execute all agreements, instruments and certificates and take all actions necessary or desirable to effectuate any Drag Along Sale as contemplated under this Section 8.9; and (ii) grants to each Drag Along Agent a proxy (which shall be deemed to be coupled with an interest and to be irrevocable) to vote the Units having voting power held by such Person and exercise any consent rights applicable to such Units in favor of any such Drag Along Sale as provided in this Section 8.9.  THE AGREEMENTS CONTAINED IN THIS SECTION 8.9 ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE MEMBERS' OBLIGATIONS UNDER THIS AGREEMENT.  EXCEPT AS PROVIDED IN THIS AGREEMENT, SUCH PROXIES MAY NOT BE REVOKED OR TERMINATED DURING THE TERM OF THIS AGREEMENT AND SHALL SURVIVE THE DEATH, INCOMPETENCY, DISABILITY, BANKRUPTCY OR DISSOLUTION OF EACH MEMBER AND THE SUBSEQUENT HOLDERS OF ITS UNITS OR OTHER EQUITY INTERESTS IN THE COMPANY.  NO MEMBER SHALL GRANT ANY PROXY OR BECOME PARTY TO ANY VOTING TRUST OR OTHER AGREEMENT WHICH IS INCONSISTENT WITH, CONFLICTS WITH OR VIOLATES ANY PROVISION OF THIS AGREEMENT.

## ARTICLE 9.  RESIGNATION OF MEMBERS; TERMINATION OF COMPANY; LIQUIDATION AND DISTRIBUTION OF ASSETS

Section 9.1      Resignation of Members.  Except as otherwise specifically permitted in this Agreement or as approved by the Board of Directors, no Member shall at any time resign, retire or withdraw from the Company.  The Company shall reflect any such permitted withdrawal by preparing an amendment to this Agreement, dated as of the date of such

#4813-6740-7744

withdrawal. Thereafter, the withdrawing Member (or such Member's successors-in-interest) shall have none of the powers of a Member under this Agreement. A withdrawing Member shall only have such rights of an assignee of a limited liability company interest under the Act as are consistent with the other terms and provisions of this Agreement and with no other rights under this Agreement. Any Member purporting to resign, retire or withdraw in contravention of this Section 9.1 shall indemnify, defend and hold harmless the Company, the Board of Directors and all other Members from and against any losses, expenses, judgments, fines, settlements or damages suffered or incurred by the Company or any such other Member arising out of or resulting from such purported resignation, retirement or withdrawal.

Section 9.2    Dissolution of Company.

(a)    The Company shall be dissolved, wound up and terminated as provided in this Agreement upon the first to occur of the following:

(i)    The entry of a decree of dissolution of the Court of Chancery of the State of Delaware pursuant to Section 18-802 of the Act;

(ii)    the determination of the Board of Directors to dissolve the Company; or

(iii)    the occurrence of any other event that would make it unlawful for the business of the Company to be continued.

Except as expressly provided in this Agreement or as otherwise required by the Act, the Members shall have no power to dissolve the Company.

(b)    In the event of the dissolution of the Company for any reason, the Board of Directors or a liquidating agent or committee appointed by the Board of Directors shall act as a liquidating agent (the Board of Directors or such liquidating agent or committee, in such capacity, is referred to in this Agreement as the "Liquidator") and shall commence to wind up the affairs of the Company and to liquidate the Company's assets. The Members shall continue to share all income, losses and distributions during the period of liquidation in accordance with Article 4. The Liquidator shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation, giving due regard to the activity and condition of the relevant market and general financial and economic conditions.

(c)    The Liquidator shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the liquidation and termination of the Company that the Board of Directors would have with respect to the assets and liabilities of the Company during the term of the Company, and the Liquidator is hereby expressly authorized and empowered to execute any and all documents necessary or desirable to effectuate the liquidation and termination of the Company and the transfer of any Company assets.

(d)    Notwithstanding the foregoing, a Liquidator which is not a Member shall not be deemed a Member and shall not have any of the economic interests in the Company of a Member; and such Liquidator shall be compensated for its services to the Company at normal,

customary and competitive rates for its services to the Company, as reasonably determined by the Board of Directors.

Section 9.3    Distribution in Liquidation.  The Company's assets shall be applied in the following order of priority:

(a)    first, to pay the costs and expenses of the winding up, liquidation and termination of the Company;

(b)    second, to creditors of the Company, in the order of priority provided by law, including fees, indemnification payments and reimbursements payable to the Members or their Affiliates, but not including those liabilities (other than liabilities to the Members for any expenses of the Company paid by the Members or their Affiliates, to the extent the Members are entitled to reimbursement under this Agreement) to the Members in their capacity as Members;

(c)    third, to establish reserves reasonably adequate to meet any and all contingent or unforeseen liabilities or obligations of the Company.  Notwithstanding the foregoing, at the expiration of such period of time as the Liquidator may deem in good faith to be advisable, the balance of such reserves remaining after the payment of such contingencies or liabilities shall be distributed as provided below; and

(d)    fourth, the remainder to the Members in accordance with Section 4.1.

If the Liquidator, in its sole discretion, determines that Company assets other than cash are to be distributed, then the Liquidator shall cause the Value of the assets not so liquidated to be determined (with any such determination normally made by the Board of Directors in accordance with the definition of "Value" being made instead by the Liquidator).  Such assets shall be retained or distributed by the Liquidator as follows:

(i)    the Liquidator shall retain assets having a value, net of any liability related thereto, equal to the amount by which the cash net proceeds of liquidated assets are insufficient to satisfy the requirements of paragraphs (a), (b), and (c) of this Section 9.3; and

(ii)    the remaining assets shall be distributed to the Members in the manner specified in paragraph (d) of this Section 9.3.

If the Liquidator, in its sole discretion, deems it not feasible or desirable to distribute to each Member its allocable share of each asset, the Liquidator may allocate and distribute specific assets to one or more Members as the Liquidator shall reasonably determine to be fair and equitable, taking into consideration, *inter alia*, the Value of such assets and the tax consequences of the proposed distribution upon each of the Members (including both distributees and others, if any).  Any distributions in-kind shall be subject to such conditions relating to the disposition and management of such distributions as the Liquidator deems reasonable and equitable.

Section 9.4    Final Reports.  Within a reasonable time following the completion of the liquidation of the Company's assets, the Liquidator shall deliver to each of the Members a

statement which shall set forth the assets and liabilities of the Company as of the date of complete liquidation and each Member's portion of distributions pursuant to Section 9.3.

Section 9.5      Rights of Members.  Each Member shall look solely to the Company's assets for all distributions with respect to the Company and such Member's Capital Contributions (including return of such Capital Contributions), and such Member's share of profits or losses thereon, and shall have no recourse therefor (upon dissolution or otherwise) against any other Member or the Board of Directors.  No Member shall have any right to demand or receive property other than cash upon dissolution and termination of the Company.

Section 9.6      Termination.  The Company shall terminate when all property owned by the Company shall have been disposed of and the assets shall have been distributed as provided in Section 9.3.  The Liquidator shall then execute and cause to be filed a certificate of cancellation of the Company.

## ARTICLE 10.  NOTICES AND VOTING

Section 10.1      Notices.  Except as otherwise expressly provided in this Agreement, all notices, demands or requests required or permitted under this Agreement must be in writing, and shall be made by hand delivery, certified mail, overnight courier service, electronic mail or facsimile to the address, electronic mail address or facsimile number set forth below such Member's name on the signature page to this Agreement.  Notwithstanding the foregoing, any party may designate a different address, electronic mail address or facsimile number by a notice similarly given to the Company.  Any such notice or communication shall be deemed given when delivered by hand, if delivered on a Business Day, the next Business Day after delivery by hand if delivered by hand on a day that is not a Business Day; three Business Days after being deposited in the United States mail, postage prepaid, return receipt requested, if mailed; on the next Business Day after being deposited for next day delivery with Federal Express or a similar overnight courier; when receipt is acknowledged, if sent by electronic mail or facsimile on a Business Day; and the next Business Day following the day on which receipt is acknowledged if sent by electronic mail or facsimile on a day that is not a Business Day.

If to the Company:

[●] Holdings, LLC
1331 Lamar Street
Suite 650
Houston, Texas 77010
Attention:  [●]
Email: [●]
Fax:  [●]

and

[●] Holdings, LLC
c/o Ares Management LLC
2000 Avenue of the Stars
12th Floor
Los Angeles, California 90067
Attention:  Eric Waxman
Email: ewaxman@aresmgmt.com
Fax:  (310) 201-4170

with copies (which shall not constitute notice) to:


Milbank, Tweed, Hadley & McCloy LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Attention: Paul S. Aronzon and Adam R. Moses
Email: paronzon@milbank.com
          amoses@milbank.com
Fax:  (213) 892-4765

Section 10.2    Voting.  Except as otherwise expressly provided in this Agreement or as required by applicable law, all actions and determinations of any kind of, and with respect to, the Company and/or its Subsidiaries shall be made by the Board of Directors.  Subject to the foregoing, in the event that any action or determination is required to be made by the Members, it shall be made by the affirmative vote of Majority Members vote at a meeting or, in lieu of a meeting, by written consent of Majority Members.


## ARTICLE 11.  AMENDMENT OF AGREEMENT

Section 11.1    Amendments.

(a)    Each Member agrees that an appropriate officer of the Company acting at the discretion of the Board of Directors (including under a standing or continuing direction of general application in connection with updates to Schedule A) may execute, swear to, acknowledge, deliver, file and record whatever documents may be required to reflect:

(i)    a change in the name of the Company, the location of the principal place of business of the Company or the registered agent or office of the Company;

(ii)    admission or substitution of Members whose admission or substitution has been made in accordance with this Agreement;

(iii)    a change that the Board of Directors believes is reasonable and necessary or appropriate to qualify or continue the qualification of the Company as a limited liability company under the laws of any state;

(iv)     an amendment or other modification to Schedule A from time to time in accordance with Section 3.1 of this Agreement;

(v)     an amendment pursuant to Section 3.2 or 3.3(c), including, without limitation, to facilitate the implementation of the Management Incentive Plan; and

(vi)     an amendment that is necessary to prevent the Company or its officers from in any manner being subjected to the provisions of the Investment Company Act of 1940, as amended, or "plan asset" regulations adopted under ERISA, whether or not substantially similar to plan asset regulations currently applied by the United States Department of Labor.

(b)     Except as provided in Section 11.1(a), amendments to this Agreement may be made only if embodied in an instrument signed by the Majority Members. Notwithstanding the foregoing, unless otherwise specifically contemplated by this Agreement (including, without limitation, with respect to any Management Incentive Plan), no amendment to this Agreement shall, without the prior consent of each Member materially and adversely affected thereby, disproportionately increase the liability of any Member.

Section 11.2   Amendment of Certificate.  In the event this Agreement shall be amended pursuant to this Article 12, the Board of Directors shall be empowered to and shall amend the Certificate to reflect such change if the Board of Directors deems such amendment of the Certificate to be necessary, appropriate or desirable.

## ARTICLE 12.  MISCELLANEOUS

Section 12.1   Confidentiality.

(a)     Except as may be consented by the Board of Directors, each party to this Agreement agrees that it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to: (i) the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement; or (ii) discussions or negotiations relating to this Agreement or the relationship of the parties contemplated hereby (the foregoing collectively, "Confidential Information"). Notwithstanding the foregoing, Confidential Information may be disclosed to a party's directors, partners, officers, employees, advisors, financing sources or representatives (the foregoing collectively, "Representatives") if: (1) such Representatives of any party are informed by such party of the confidential nature of such Confidential Information and are directed by such party to keep such Confidential Information confidential in accordance with the contents of this Agreement; and (2) each party is liable for any breaches of this Section 12.1 by any of its Representatives.  The confidentiality obligations of this Section 12.1 do not apply to any Confidential Information (i) which is publicly available or becomes publicly available through no act or omission of the party wishing to disclose such Confidential Information; or (ii) to the extent that it is required to be disclosed (a "Required Disclosure") by any applicable law, regulation or legal process or by the rules of any stock exchange, regulatory body or governmental authority.

34

#4813-6740-7744

(b)     In the event that any party to this Agreement or any of its Representatives becomes subject to a Required Disclosure, such party shall provide the Company with prompt written notice of the same.  Upon receipt of such notice, the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement with respect to such Required Disclosure.  In addition, such party or its Representatives, as applicable, subject to such Required Disclosure shall cooperate with the Company in any effort to obtain a protective order or other remedy with respect to such Required Disclosure.  In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the provisions of this Section 12.1 with respect to such Required Disclosure, such party or any of its Representatives, as applicable, shall: (i) furnish only that portion of the Confidential Information that is subject to such Required Disclosure and (ii) exercise all reasonable efforts to obtain reasonably reliable assurance that the Confidential Information so disclosed shall be accorded confidential treatment.

(c)     The provisions of this Section 12.1 shall survive termination of this Agreement.

(d)     None of the Company, any Member or any of their respective Affiliates shall issue, or authorize to be issued, any press release, interview, article or other media release (including any Internet posting, web blog or other electronic publication or transmission) that makes reference to this Agreement or the transactions contemplated in this Agreement or to any other Member, in each case, without the written consent of the Board of Directors.  For the avoidance of doubt, the foregoing shall not apply to Ares.

Section 12.2     No Third-Party Beneficiaries.  Except as set forth in Section 7.8 (*Indemnification of the Board of Directors, Officers, Members and Agents*) in respect of Indemnified Parties and Section 12.14 (*No Recourse*), this Agreement is for the sole benefit of the parties to this Agreement, the directors, Ares, and the Sponsor Related Parties.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 12.3     Entire Agreement.  This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof.  This Agreement supersedes any prior agreement or understandings among them with respect to the subject matter hereof, and it may not be modified or amended in any manner other than as set forth herein.

Section 12.4     Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

#4813-6740-7744

Section 12.5    Effect.  Each party to this Agreement has carefully read this Agreement and has had sufficient time and opportunity to consider its terms and to obtain legal advice, if desired, and fully understands the final and binding effect of this Agreement.  Except as otherwise specifically provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, successors and permitted assigns.

Section 12.6    Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

Section 12.7    Counterparts.  This Agreement may contain more than one counterpart of the signature page.  This Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages.  All of such counterpart signatures pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

Section 12.8    Remedies.  The Company and each Member shall have all remedies available at law, in equity or otherwise in the event of any breach or violation of this Agreement or any default hereunder by the Company or any Member.  The parties to this Agreement acknowledge and agree that in the event of any breach of this Agreement, in addition to any other remedies which may be available, each of the parties to this Agreement shall be entitled to specific performance (without being required to post a bond) of the obligations of the other parties to this Agreement and, in addition, to such other equitable remedies (including preliminary or temporary relief) as may be appropriate in the circumstances.  The Company agrees to pay all fees, costs, and expenses, including fees and expenses of attorneys, accountants and other experts retained by the Ares Entities, Ares or their Affiliates (which, for the avoidance of doubt, excludes the Company) and all fees, costs and expenses of appeals, incurred or expended by the Ares Entities, Ares or their Affiliates (which, for the avoidance of doubt, excludes the Company) in connection with the enforcement of this Agreement or the collection of any sums due hereunder, whether or not suit is commenced.  None of the rights, powers or remedies conferred under this Agreement shall be mutually exclusive.  Each such right, power or remedy shall be cumulative and in addition to any other right, power or remedy whether conferred by this Agreement or now or hereafter available at law, in equity, by statute or otherwise.

Section 12.9    Waiver of Partition.  The Members agree that the Company assets are not and will not be suitable for partition.  Accordingly, each of the Members irrevocably waives any and all rights (if any) that such Member may have to maintain any action for partition of any of such assets.

Section 12.10  Governing Law.    This Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

#4813-6740-7744

Section 12.11  <u>Consent to Jurisdiction and Venue</u>.  Each party to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Chancery Court sitting in Wilmington, Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter of this Agreement. To the fullest extent permitted by law, each party to this Agreement waives and agrees not to assert, and agrees not to allow any of its Affiliates to assert, by way of motion, as a defense or otherwise, in any such action, any claim that: (i) it is not subject personally to the jurisdiction of the Delaware Chancery Court; (ii) its property is exempt or immune from attachment or execution; (iii) any such proceeding brought in the Delaware Chancery Court is improper; or (iv) that this Agreement or the subject matter of this Agreement may not be enforced in or by such court. Each party to this Agreement further agrees: (A) not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter of this Agreement other than before the Delaware Chancery Court; and (B) not to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than the Delaware Chancery Court whether on the grounds of inconvenient forum or otherwise.  Each party to this Agreement consents to service of process in any such proceeding in any manner permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to <u>Section 10.1</u> of this Agreement is reasonably calculated to give actual notice.

Section 12.12  <u>Waiver of Trial by Jury</u>. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY TO THIS AGREEMENT WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER OF THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES TO THIS AGREEMENT THAT THIS <u>SECTION 12.12</u> CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT.  ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 12.12</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 12.13  <u>Exercise of Rights and Remedies</u>. No delay of or omission in the exercise of any right, power or remedy accruing to any party to this Agreement as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy.  Nor shall any such delay or omission be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later.  Nor shall any

#4813-6740-7744

such delay, omission nor waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

   Section 12.14 <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Member may be a partnership or limited liability company, each Member, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Members shall have any obligation under this Agreement.  Each Member further acknowledges and agrees that it has no rights of recovery under this Agreement against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against: (i) any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Member (or any of their successor or permitted assignees); (ii) against any former, current, or future general or limited partner, manager, stockholder or member of any Member (or any of their successors or permitted assignees) or any Affiliate of any of the foregoing;  or (iii) against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Members (each, but excluding for the avoidance of doubt, the Members, a "<u>Member Affiliate</u>"). The prohibitions set forth in this <u>Section 12.14</u> shall apply without regard to whether any claim, action, recourse or right: (i) is sought by attempting to pierce the corporate veil; (ii) sounds in tort, contract or otherwise; (iii) is brought by or on behalf of such party against the Member Affiliates; or (iv) is brought by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise.  Each Member also expressly agrees and acknowledges that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Member Affiliate, as such, for any obligations of the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Except to the extent otherwise expressly set forth in, and subject in all cases to the terms and conditions of and limitations in this Agreement, this Agreement may only be enforced against, and any claim or cause of action of any kind based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the Persons that are expressly named as parties to this Agreement and then only with respect to the specific obligations set forth in this Agreement with respect to such party. Each Member Affiliate is expressly intended as a third party beneficiary of this <u>Section 12.14</u>.

   Section 12.15 <u>Corporate Reorganization Transactions</u>.  Notwithstanding anything to the contrary in this Agreement, at the direction of the Board of Directors made in its sole discretion, the Company and each Member shall take all action necessary, to reorganize and/or restructure the Company and its Affiliates to (i) enable, or otherwise facilitate, a strategic transaction, (ii) increase tax-efficiency or preserve the Company's favorable tax attributes and/or (iii) otherwise provide for a tax-efficient structure for the benefit of Ares and its Affiliates and

38

investors. For the avoidance of doubt, no consent of any Member shall be required as a condition to the Board of Directors issuing the direction contemplated by the preceding sentence.

Section 12.16  Triggering Event; Eligible Holder Certifications.

(a)     If (i) any Transfer of any Equity Interests in the Company results in the occurrence of a Specified Event, or (ii) the Board of Directors at any time determines in good faith that it is reasonably necessary or advisable and in the best interests of the Company to redeem the Units or other Equity Interests of a Member who was formerly an employee of the Company or any affiliate thereof (each of the foregoing clauses (i) and (ii), a "Triggering Event"), then the Units or other Equity Interests relating to such Triggering Event held by the applicable Member (the "Subject Units") shall be subject to redemption in accordance with the provisions of Section 12.17.

(b)     During any Applicable Time, the Board of Directors may request, in writing, that any Member furnish to the Board of Directors, within 10 days after receipt of such written request, an executed Eligible Holder Certification or such other reasonably necessary information concerning his, her or its nationality, citizenship or other related status (or, if the Member is a nominee holding for the account of another Person (other than any Person who directly or indirectly owns Equity Interests in a corporation incorporated under the laws of the United States or any State or territory of the United States, so long as that corporation (i) is qualified to hold federal leases under 30 U.S.C. 181 and 43 C.F.R. 3102.2 or its successor stature or rule and (ii) is the direct and indirect owner of such Member), the nationality, citizenship or other related status of such Person) as the Board of Directors in good faith may request in writing. If a Member fails to furnish to the Board of Directors within the aforementioned 10-day period such Eligible Holder Certification or other requested information or, if upon receipt of such Eligible Holder Certification or other requested information the Board of Directors determines in good faith that a Member is not an Eligible Holder (either such event, an "Eligible Holder Default"), then the Units or other Equity Interests of such Member (the "Eligible Holder Units") owned by such Member shall be subject to redemption in accordance with the provisions of Section 12.17.

Section 12.17  Redemption.

(a)     Upon the occurrence of a Triggering Event or an Eligible Holder Default, the Company may redeem the applicable Subject Units and/or Eligible Holder Units of the applicable Member as follows:

(i)     The Board of Directors shall, not later than the 15th day before the date fixed for redemption, give notice of redemption to the applicable Member at his, her or its last address designated in the books and records of the Company. The notice shall be deemed to have been given when so sent. The notice shall specify the Redeemable Units, the date fixed for redemption, the place of payment, that payment of the redemption price will be made upon surrender of the any certificate evidencing the Redeemable Units and that on and after the date fixed for redemption no further allocations or distributions to which the Member would otherwise be entitled in respect of the Redeemable Units will accrue or be made.

(ii)     The aggregate redemption price for Redeemable Units shall be an amount equal to the Value (the date of determination of which shall be the date fixed for redemption) of such Redeemable Units.  The redemption price shall be paid, as determined by the Board of Directors, in cash or, in the case of a redemption of Redeemable Units constituting Eligible Holder Units, by delivery of a promissory note of the Company in the principal amount of the redemption price, bearing interest at the rate of 10% annually and payable in three equal annual installments of principal together with accrued interest, commencing one year after the redemption date.

(iii)     Upon surrender by or on behalf of the Member, at the place specified in the notice of redemption, assignment documentation with respect to the applicable Redeemable Units acceptable to the Board of Directors (including, in the case of certificated Redeemable Units, any certificate evidencing the Redeemable Units, duly endorsed in blank or accompanied by an assignment duly executed in blank), the Member or his, her or its duly authorized representative shall be entitled to receive the payment therefor.

(iv)     After the redemption date, Redeemable Units shall no longer constitute issued and outstanding Equity Interests of the Company.

(b)     The provisions of this Section 12.17 shall also be applicable to Subject Units or Eligible Holder Units held by a Member or assignee as nominee of a Person upon the occurrence of a Triggering Event or an Eligible Holder Default.

#4813-6740-7744

DATED AS OF: _____

LIMITED LIABILITY COMPANY AGREEMENT OF
[●] HOLDINGS, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of [●] Holdings, LLC, dated as of [●], 201[●], to be duly executed as of the date first above written.

[●], a [●] limited liability company, as a Member

By: _____
      Name:
      Title:

#4813-6740-7744

## Schedule A

Issued and Outstanding Equity Interests in the Company

## Exhibit A

## Form of Joinder Agreement

This Joinder Agreement (this "Joinder Agreement") is made as of [_____ ___, 20__] by the undersigned (the "Transferee") in accordance with the Limited Liability Company Agreement of [●] Holdings, LLC, dated as of January [●], 2019 (as the same may be amended from time to time in accordance with its terms, the "LLC Agreement"). Capitalized terms used but not defined in this Joinder Agreement shall have the meanings ascribed to such terms in the LLC Agreement.

By its execution of this Joinder Agreement, the Transferee acknowledges, agrees and confirms that it shall become a party to the LLC Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party to the LLC Agreement and shall be deemed and is hereby admitted as, a Member for all purposes of the LLC Agreement and entitled to all the rights incidental thereto, as of the date first written above.

The Transferee represents and warrants to the Company and each other Member as of the date of the Transferee's admission to the Company as a Member that:

(a)     to the extent it is not a natural person, it is duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation, and if required by law is duly qualified to conduct business and is in good standing in the jurisdiction of its principal place of business (if not formed in such jurisdiction);

(b)     to the extent it is not a natural person, it has full corporate, limited liability company, partnership, trust or other applicable power and authority to execute and deliver the LLC Agreement and to perform its obligations under the LLC Agreement and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries or other Persons necessary for the due authorization, execution, delivery and performance of the LLC Agreement by the Transferee have been duly taken;

(c)     it has duly executed and delivered this Joinder Agreement, and this Joinder Agreement and the LLC Agreement are each enforceable against the Transferee in accordance with their respective terms, subject to bankruptcy, moratorium, insolvency and other laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity);

(d)     its authorization, execution, delivery, and performance of this Joinder Agreement and the LLC Agreement does not breach or conflict with or constitute a default under (A) the Transferee's charter or other governing documents to the extent it is not a natural person or (B) any material obligation under any other material agreement or arrangement to which the Transferee is a party or by which it is bound; and

(e) it:

  (i) has been furnished with such information about the Company and the Interest as the Transferee has requested,

  (ii) has made its own independent inquiry and investigation into, and based thereon has formed an independent judgment concerning, the Company and the Transferee's Interest,

  (iii) has adequate means of providing for its current needs and possible contingencies, is able to bear the economic risks of this investment and has a sufficient net worth to sustain a loss of its entire investment in the Company in the event such loss should occur,

  (iv) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Company,

  (v) is, or is controlled by, an "accredited investor," as that term is defined in Rule 501(a) of Regulation D, promulgated under the Securities Act, and

  (vi) understands and agrees that its Interest shall not be sold, pledged, hypothecated or otherwise Transferred except in accordance with the terms of the LLC Agreement and pursuant to an effective registration statement under the Securities Act or an applicable exemption from registration and/or qualification under the Securities Act and applicable state securities laws. Notwithstanding anything to the contrary in this Joinder Agreement or the LLC Agreement, unless prohibited by applicable securities laws, the foregoing shall not restrict any Initial Member or any of their Affiliates from encumbering or otherwise pledging Units in connection with obtaining any financing with respect to an Initial Member or any of its Affiliates (or any enforcement taken with respect to such encumbrance or pledge).

  IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the LLC Agreement.

    [TRANSFEREE]

    By: _____
     Name:
     Title:

PRELIMINARY DRAFT—12/13/18
SUBJECT TO COMPLETION

# LIMITED LIABILITY COMPANY AGREEMENT

OF

# [MIDCO] HOLDINGS, LLC

## DATED AS OF JANUARY [●], 2019

#4830-1939-2130

Page

**LIMITED LIABILITY COMPANY
AGREEMENT
OF
[●] HOLDINGS, LLC**

**TABLE OF CONTENTS**

Page

ARTICLE 1.  FORMATION AND CONTINUATION OF THE COMPANY .......................... 2

    Section 1.1    Formation and Continuation of the Company ........................................... 2
    Section 1.2    Name ............................................................................................................ 2
    Section 1.3    Business of the Company........................................................................... 2
    Section 1.4    Location of Principal Place of Business .................................................. 2
    Section 1.5    Registered Agent ....................................................................................... 2
    Section 1.6    Term ............................................................................................................ 2

ARTICLE 2.  DEFINITIONS ............................................................................................... 3

    Section 2.1    Definitions.................................................................................................. 3
    Section 2.2    Rules of Interpretation ............................................................................ 10

ARTICLE 3.  UNITS; CAPITAL CONTRIBUTIONS ....................................................... 10

    Section 3.1    Capitalization; Issuance of Units ........................................................... 10
    Section 3.2    Management Incentive Plan .................................................................... 11
    Section 3.3    Initial Capital Contributions .................................................................. 11
    Section 3.4    Additional Capital Contributions........................................................... 12
    Section 3.5    Interest on Capital Contributions .......................................................... 13
    Section 3.6    Withdrawal and Return of Capital Contributions ................................. 13
    Section 3.7    Form of Capital Contribution.................................................................. 13
    Section 3.8    Unit Certificates ....................................................................................... 13

ARTICLE 4.  ALLOCATION OF NET INCOME AND NET LOSS ..................................... 14

    Section 4.1    General ....................................................................................................... 14
    Section 4.2    Other Allocation Provisions.................................................................... 14
    Section 4.3    Allocations for Income Tax Purposes.................................................... 17
    Section 4.4    Withholding ............................................................................................... 17
    Section 4.5    Code § 83 Safe Harbor Election ............................................................. 17
    .    17

ARTICLE 5.  DISTRIBUTIONS ......................................................................................... 18

    Section 5.1    Distributions.............................................................................................. 18
    Section 5.2    Limitations on Distributions ................................................................... 18
    Section 5.3    Reserves ..................................................................................................... 18

ARTICLE 6.  BOOKS OF ACCOUNT, RECORDS AND REPORTS, FISCAL YEAR .......... 19

Section 6.1     Books and Records .................................................... 19
Section 6.2     Financial Reports ...................................................... 19
Section 6.3     Fiscal Year ................................................................ 19
Section 6.4     Tax Returns ............................................................... 19

ARTICLE 7.  POWERS, RIGHTS AND DUTIES OF THE MEMBERS ................................ 20

Section 7.1     Limitations ................................................................ 20
Section 7.2     Liability ..................................................................... 20
Section 7.3     Competition and Corporate Opportunities .............................. 20

ARTICLE 8.  POWERS, RIGHTS AND DUTIES OF THE MANAGER ................................ 21

Section 8.1     Manager .................................................................... 21
Section 8.2     Limitation on Authority of Members ................................... 22
Section 8.3     Reimbursement for Expenses of the Company; Standard of Care .......... 22
Section 8.4     Officers, Agents and Employees .......................................... 23
Section 8.5     Company Funds ............................................................ 24
Section 8.6     Other Activities and Competition ........................................ 24
Section 8.7     Exculpation ................................................................ 24
Section 8.8     Indemnification of the Manager, Officers, Members and Agents .......... 25
Section 8.9     Expenses .................................................................... 25
Section 8.10    Affiliate Transactions .................................................... 26
Section 8.11    Insurance ................................................................... 26
Section 8.12    Additional Units; Additional Members ................................... 26
Section 8.13    Partnership Representative ................................................ 27

ARTICLE 9.  TRANSFERS OF INTEREST BY MEMBERS ................................................ 27

Section 9.1     General. ..................................................................... 27
Section 9.2     Transfer of Interest of Members .......................................... 28
Section 9.3     Further Requirements ..................................................... 28
Section 9.4     Consequences of Transfers Generally .................................... 29
Section 9.5     Units; Percentage Interest. ................................................ 30
Section 9.6     Additional Filings. ........................................................ 30
Section 9.7     Indirect Transfers. ........................................................ 30
Section 9.8     Right of First Offer ....................................................... 30
Section 9.9     Drag Along Sale ........................................................... 31

ARTICLE 10.  RESIGNATION OF MEMBERS; TERMINATION OF COMPANY;
             LIQUIDATION AND DISTRIBUTION OF ASSETS ................................... 34

Section 10.1    Resignation of Members. .................................................. 34
Section 10.2    Dissolution of Company. .................................................. 35
Section 10.3    Distribution in Liquidation. .............................................. 36
Section 10.4    Final Reports. .............................................................. 36
Section 10.5    Rights of Members ......................................................... 37
Section 10.6    Termination. ............................................................... 37

ARTICLE 11.  NOTICES AND VOTING ................................................................. 37

    Section 11.1  Notices ........................................................................... 37
    Section 11.2  Voting ............................................................................ 38

ARTICLE 12.  AMENDMENT OF AGREEMENT .................................................. 38

    Section 12.1  Amendments ................................................................. 38
    Section 12.2  Amendment of Certificate ............................................. 39

ARTICLE 13.  MISCELLANEOUS ........................................................................ 39

    Section 13.1  Confidentiality .............................................................. 39
    Section 13.2  No Third-Party Beneficiaries ....................................... 40
    Section 13.3  Entire Agreement .......................................................... 40
    Section 13.4  Severability ................................................................... 40
    Section 13.5  Effect ............................................................................. 41
    Section 13.6  Captions ........................................................................ 41
    Section 13.7  Counterparts ................................................................. 41
    Section 13.8  Remedies ....................................................................... 41
    Section 13.9  Waiver of Partition ....................................................... 41
    Section 13.10  Governing Law. ............................................................ 42
    Section 13.11  Consent to Jurisdiction and Venue. .............................. 42
    Section 13.12  Waiver of Trial by Jury. ............................................... 42
    Section 13.13  Exercise of Rights and Remedies. ............................... 43
    Section 13.14  No Recourse ................................................................. 43
    Section 13.15  Corporate Reorganization Transactions ....................... 44
    Section 13.16  Triggering Event; Eligible Holder Certifications ....................... 44
    Section 13.17  Redemption ................................................................. 44

**SCHEDULE**

Schedule A – Equity Interests
Schedule B – Initial Capital Contributions

**EXHIBIT**

Exhibit A – Form of Joinder Agreement

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## [●] HOLDINGS, LLC

This **LIMITED LIABILITY COMPANY AGREEMENT** (the "Agreement") of [●] Holdings, LLC, a Delaware limited liability company (the "Company"), dated as of January [●], 2019, is entered into by and among the Manager (as defined below), the holders of Units, being [Name of Topco] ("Topco"), the Initial Members (as defined below) listed on Schedule A as in effect on the date of this Agreement and the Persons who become Members of the Company in accordance with the provisions of this Agreement. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth in Section 2.1.

## RECITALS

**WHEREAS**, the Certificate of Formation of the Company was filed with the Office of the Secretary of State of Delaware on [●], 201[●];

**WHEREAS**, various affiliates of Ares Management Corporation ("Ares") held certain claims against Gastar Exploration, Inc. (which entity is currently known as [Gastar Exploration, L.L.C.], "Gastar") and certain of its Affiliates (collectively, "Debtors");

**WHEREAS**, on October 31, 2018, the Debtors filed a prepackaged plan of reorganization (the "Plan") under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") in the jointly administered chapter 11 bankruptcy cases under the caption In re Gastar Exploration Inc., et al., No. 18-36057 (MI);

**WHEREAS**, the Plan was confirmed by the Bankruptcy Court on December [●], 2018;

[**WHEREAS**, (i) [●], a Delaware limited liability company ("Holdco") was issued or otherwise received all of the equity interests in Gastar, (ii) the Company was issued or otherwise received all of the equity interests in Holdco and (iii) following the foregoing, Gastar was converted into a limited liability company by the filing of a certificate of conversion and a certificate of formation with the Office of the Secretary of State of the State of Delaware pursuant to Section 266 of the Delaware General Corporation Law and Section 18-214 of the Act (as defined below);][1] and

**WHEREAS**, in connection with the consummation of the transactions contemplated by the Plan on the date of this Agreement (the "Effective Date") the parties to this Agreement desire to adopt this Agreement in its entirety to: (i) establish the manner in which the business and affairs of the Company shall be managed; (ii) set forth certain terms of the Members' relationship with respect to ownership interests in the Company on the terms and

---

[1] TBD.  Subject to further revision.

conditions set forth in this Agreement; (iii) establish the respective economic and other rights of Members of the Company; and (iv) provide regulations and procedures for the governance of the Company.

## AGREEMENT

        **NOW**, **THEREFORE**, in consideration of the promises and covenants contained in this Agreement, the parties agree as follows:

### ARTICLE 1.   FORMATION AND CONTINUATION OF THE COMPANY

        Section 1.1    Formation and Continuation of the Company.  The Company was formed as a limited liability company under the Act by the filing of the Certificate with the Office of the Secretary of State of Delaware on [●], 201[●].  The parties agree to continue the existence of the Company as a limited liability company under the Act.  The Company shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all requirements for operation of the Company as a limited liability company under this Agreement and the Act and under all other laws of the State of Delaware and such other jurisdictions in which the Company determines that it may conduct business.

        Section 1.2    Name.  The name of the Company is "[●] Holdings, LLC", as such name may be modified from time to time by the Manager in its discretion.

        Section 1.3    Business of the Company.  Subject to the limitations on the activities of the Company otherwise specified in this Agreement, the purpose and business of the Company shall be to conduct and carry on any business or activity that may be conducted by a limited liability company organized pursuant to the Act, including, without limitation, entering into, making and performing all contracts and other undertakings, and engaging in all activities and transactions as the Manager may deem necessary or advisable to the carrying out of the business of the Company.

        Section 1.4    Location of Principal Place of Business.  The location of the principal place of business of the Company shall be 1331 Lamar Street, Suite 650, Houston, Texas 77010, or such other location as may be determined by the Manager.   In addition, the Company may maintain such other offices as the Manager may deem advisable at any other place or places within or without the State of Delaware.

        Section 1.5    Registered Agent.  The registered agent for the Company shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 or such other registered agent as the Manager may designate from time to time.

        Section 1.6    Term.  The term of the Company commenced on the date of filing of the Certificate, and shall be perpetual unless the Company is earlier dissolved and terminated in accordance with the provisions of this Agreement.

2

## ARTICLE 2.   DEFINITIONS

Section 2.1     Definitions.  The following terms used in this Agreement shall have the following meanings:

"Act" means the Delaware Limited Liability Company Act, Chapter 434 of Title 6 of the Delaware Code, 6 Del. Code §§ 18-101 *et seq.*, as in effect on the date of this Agreement and as it may be amended hereafter from time to time.

"Additional Call Amount" has the meaning set forth in Section 3.4(b).

"Additional Class" has the meaning set forth in Section 3.1(a).

"Additional Member" has the meaning set forth in Section 8.12(a).

"Adjusted Capital Account" has the meaning set forth in Section 4.2(b).

"Adverse Claim" has the meaning set forth in Section 8-102 of the applicable Uniform Commercial Code.

"Affiliate" of a Member means any other Person who is a Family Member of such Member or controlling, controlled by or under common control with such Member.  For the purpose of this definition, the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Member, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, either through the ownership of a majority of such Person's Voting Stock, by contract or otherwise.  Notwithstanding the foregoing, (i) neither the Company nor any of the Subsidiaries shall be deemed to be an Affiliate of any Member other than Topco, nor shall any other Person be deemed to be an Affiliate of a Member solely by reason of such Member's control of the Company or any of the Subsidiaries, and (ii) none of the Ares Entities nor any Affiliate of Ares shall be deemed to be an Affiliate of the Company for any purpose under this Agreement.

"Agreement" has the meaning set forth in the preamble.

"Applicable Time" means any time at which the Company holds any interest in oil and gas leases on federal lands as a result of which applicable law and/or regulations require that each Member be a Person qualified to hold an interest in such oil and gas leases.

"Ares" has the meaning set forth in the recitals.

"Ares Entities" means, collectively, (i) the Initial Members listed on Schedule A as in effect on the date of this Agreement and (ii) any Permitted Transferee of an Initial Member that becomes a party to this Agreement.  For purposes hereof, actions proposed to be taken by the Ares Entities shall, in each case, be taken with the consent of the Ares Entity or Ares Entities, as the case may be, holding a majority of the Units then held by all Ares Entities as of any applicable time of determination.

3

"<u>Assignees</u>" has the meaning set forth in <u>Section 9.2(d)</u>.

"<u>Available Cash</u>" at the time of any distribution means the excess of (a) all cash then held by the Company to the extent not otherwise required to pay Company expenses over (b) the amount of reserves established by the Company in accordance with <u>Section 5.3</u>, in each case as determined by the Manager.

"<u>Award Agreement</u>" means any bona fide award agreement executed by a participant in the Management Incentive Plan governing the terms of the Units issued to such participant under the Management Incentive Plan.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Book Value</u>" means, with respect to any Company asset as of any date, such Company asset's adjusted basis for Federal income tax purposes as of such date, except as follows:  (i) the initial Book Value of a Company asset contributed by a Member to the Company shall be the Value of such Company asset on the date of such contribution; and (ii) if the Book Value of a Company asset has been determined under <u>clause (i)</u> above, such Book Value shall thereafter be adjusted by the depreciation, cost recovery and amortization attributable to such Company asset assuming that the adjusted basis of such Company asset was equal to its Book Value determined under the methodology described in Regulation § 1.704-1(b)(2)(iv)(g)(3).

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in New York City, New York.

"<u>Capital Account</u>" means with respect to each Member the account established and maintained for such Member on the books of the Company in compliance with Regulation §§ 1.704-1(b)(2)(iv) and 1.704-2, as amended.  Subject to the preceding sentence, each Member's Capital Account balance shall initially equal the amount of cash and the Contribution Value of any other property contributed by such Member.  Throughout the term of the Company, each Capital Account will be (i) increased by the amount of (A) income and gains allocated to such Capital Account pursuant to <u>Article 4</u> and (B) the amount of any cash and the Contribution Value of any other property subsequently contributed to such Capital Account, and (ii) decreased by the amount of (A) losses and deductions allocated to such Capital Account pursuant to <u>Article 4</u> and (B) the amount of cash and the Distribution Value of any other property distributed or transferred from such Capital Account pursuant to <u>Article 3</u>, <u>5</u> or <u>10</u>.

"<u>Capital Contribution</u>" means a contribution to the capital of the Company.

"<u>Capital Stock</u>" means (i) with respect to any Person that is a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of the capital stock of such Person; and (ii) with respect to any other Person, any and all partnership, limited liability company, membership or other Equity Interests in such Person, including the Units.

"<u>Certificate</u>" means the Certificate of Formation of the Company, as amended, modified or supplemented from time to time.

4

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time (or any succeeding law).

"Company" has the meaning set forth in the preamble.

"Confidential Information" has the meaning set forth in Section 13.1(a).

"Contribution Value" means the Value of a Company asset contributed by a Member to the Company (net of liabilities secured by such contributed asset that the Company is treated as assuming or taking subject to).

"Debtors" has the meaning set forth in the recitals.

"Distribution Value" means the Value of a Company asset distributed to a Member by the Company (net of liabilities secured by such distributed asset that such Member is treated as assuming or taking subject to).

"Drag Along Agents" has the meaning set forth in Section 9.9(b)(vi).

"Drag Along Notice" has the meaning set forth in Section 9.9(a).

"Drag Along Sale" has the meaning set forth in Section 9.9.

"Drag Along Sale Percentage" means, at the election of the Ares Entities in their sole discretion, either (i) the percentage determined by dividing the number of Units that is proposed to be Transferred, directly or indirectly, by the Ares Entities to a Prospective Buyer in a Sale by the total number of Units then owned by the Ares Entities or (ii) a percentage representing the aggregate ownership interest in the Company proposed to be Transferred, both directly through the Transfer of Units and indirectly through the Transfer of Equity Interests in Topco, to a Prospective Buyer in a Sale.

"Drag Along Sellers" has the meaning set forth in Section 9.9(a).

"Drag Along Shares" has the meaning set forth in Section 9.9(a).

"Effective Date" has the meaning set forth in the recitals.

"Eligible Holder" at any Applicable Time means a Person qualified to hold an interest in oil and gas leases on federal lands under applicable law and/or regulations.  As of the date of this Agreement, Eligible Holder means: (a) a citizen of the United States; (b) a corporation organized under the laws of the United States or of any state thereof; (c) a public body, including a municipality; or (d) an association of United States citizens, such as a partnership or limited liability company, organized under the laws of the United States or of any state thereof, but only if such association does not have any direct or indirect foreign ownership, other than foreign ownership of stock in a parent corporation organized under the laws of the United States or of any state thereof.  For the avoidance of doubt, onshore mineral leases or any direct or indirect interest in such leases may be acquired and held by aliens only through stock ownership, holding or control in a corporation organized under the laws of the United States or

5

of any state thereof.  For purposes of this definition, each of the Initial Members is an "Eligible Holder."

"Eligible Holder Certification" means a properly completed certificate in such form as may be specified by the Manager pursuant to which a Member certifies that he, she or it is an Eligible Holder.  To the extent that "he, she or it" is a nominee holding for the account of another Person, then, to the best of his, her or its knowledge, such other Person is an Eligible Holder.

"Eligible Holder Default" has the meaning set forth in Section 13.16(b).

"Eligible Holder Units" has the meaning set forth in Section 13.16(b).

"Equity Interests" of any Person means Capital Stock of such Person or warrants, options or other rights to acquire Capital Stock of such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Family Members" with respect to any individual means such Person's spouse, children, parents and lineal descendants of such Person's parents (in each case, natural or adopted).

"Family Trust" with respect to any individual means a trust, limited partnership or limited liability company benefiting solely such individual or the Family Members of such individual.

"Fiscal Year" has the meaning set forth in Section 6.3.

"Gastar" has the meaning set forth in the recitals.

"Holdco" has the meaning set forth in the recitals.

"Indemnified Party" has the meaning set forth in Section 8.8(a).

"Initial Members" means Topco and each other Person that is a Member as of the date of this Agreement.

"Interest" when used in reference to an interest in the Company means the entire ownership interest of a Member in the Company at any particular time, including its interest in the capital, profits, losses and distributions of the Company.  All Interests in the Company shall be represented by Units.

"IRS Notice" has the meaning set forth in Section 4.5(a).

"Liquidator" has the meaning set forth in Section 10.2(b).

"<u>Majority Members</u>" with respect to any individual means the Member or Members holding more than 50% of the Units of the Company outstanding at such time.

"<u>Management Incentive Plan</u>" has the meaning set forth in <u>Section 3.2</u>.

"<u>Manager</u>" means, (i) as of the date of this Agreement, Topco, and, (ii) as of any subsequent time of determination, Topco or any other Person designated as the Manager as provided in <u>Section 8.1</u>, as the case may be.

"<u>Member</u>" means each of the Initial Members, as well as each Substituted Member and each Additional Member.

"<u>Member Affiliate</u>" has the meaning set forth in <u>Section 13.14</u>.

"<u>Net Income</u>" and "<u>Net Loss</u>", respectively, for any period means the income or loss of the Company for such period as determined in accordance with the method of accounting followed by the Company for Federal income tax purposes, including, for all purposes, any income exempt from tax and any expenditures of the Company which are described in Code section 705(a)(2)(B); <u>provided</u>, <u>however</u>, that in determining Net Income and Net Loss and every item entering into such computation, solely for the purpose of adjusting the Capital Accounts of the Members (and not for tax purposes), (i) any income, gain, loss or deduction attributable to the taxable disposition of any Company asset shall be computed as if the adjusted basis of such Company asset on the date of such disposition equaled its Book Value as of such date, (ii) if any Company asset is distributed in kind to a Member, the difference between its Value and its Book Value immediately prior to the time of such distribution shall be treated as gain or loss, and (iii) any depreciation, cost recovery and amortization as to any Company asset shall be computed by assuming that the adjusted basis of such Company asset equaled its Book Value determined under the methodology described in Regulation § 1.704-1(b)(2)(iv)(g)(3); <u>provided</u>, <u>further</u>, that any item (computed with the adjustments in the preceding proviso) allocated under <u>Section 4.2</u> shall be excluded from the computation of Net Income and Net Loss.

"<u>Offer Notice</u>" has the meaning set forth in <u>Section 9.8(a)</u>.

"<u>Offer Period</u>" has the meaning set forth in <u>Section 9.8(b)</u>.

"<u>Other Investments</u>" has the meaning set forth in <u>Section 7.3(a)(i)(A)</u>.

"<u>Participating Seller</u>" has the meaning set forth in <u>Section 9.9(a)</u>.

"<u>Percentage Interest</u>" with respect to each Member as of any time of determination means a fraction, expressed as a percentage, the numerator of which is the number of Units held by such Member at such time, and the denominator of which is the aggregate number of Units held by all Members at such time.

"<u>Permitted Transfer</u>" means, with respect to any Member other than the Ares Entities, (a) any Transfer pursuant to a Drag Along Sale; (b) any redemptions and other repurchases of Units, as may be made in the discretion of the Manager from time to time, from an employee in connection with the termination of his or her employment with the Company or

any of its Subsidiaries; and (c) any Transfer of Units by an individual to a Family Trust with respect to such individual. "Permitted Transfer" means, with respect to the Ares Entities, any Transfer of Units to any Person so long as such Transfer is executed in accordance with applicable law, including, without limitation, the Act and the Securities Act.

"Permitted Transferee" means any transferee pursuant to a Permitted Transfer.

"Person" means any individual, partnership, limited liability company, association, corporation, trust or other entity.

"Plan" has the meaning set forth in the recitals.

"Prospective Buyer" means any Person proposing to purchase (i) Units from an Ares Entity, (ii) Equity Interests in Topco and/or (iii) assets of the Company or any Subsidiary of the Company, in each case, other than pursuant to a Permitted Transfer.

"Redeemable Units" means any Subject Units and/or Eligible Holder Units for which a redemption notice has been given, and has not been withdrawn, pursuant to Section 13.17.

"Regulation" means a Treasury Regulation promulgated under the Code.

"Representatives" has the meaning set forth in Section 13.1(a).

"Required Disclosure" has the meaning set forth in Section 13.1(a).

"ROFO Units" has the meaning set forth in Section 9.8.

"Sale" shall mean:

(a)     a merger or consolidation in which (i) the Company or Topco is a constituent party or (ii) a Subsidiary of the Company or Topco is a constituent party and the Company or Topco, as applicable, issues Equity Interests pursuant to such merger or consolidation;

(b)     the sale, lease, transfer, exclusive license or other disposition (whether by merger, consolidation or otherwise), in a single transaction or series of related transactions, by the Company or any Subsidiary of the Company of (A) all or substantially all of the assets of the Company and its Subsidiaries taken as a whole, or (B) one or more Subsidiaries of the Company if all or substantially all of the assets of the Company and its Subsidiaries taken as a whole are held by such Subsidiary or Subsidiaries, in each case, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned Subsidiary of the Company; or

(c)     the acquisition, in a single transaction or a series of related transactions, by any person or group (within the meaning of Section 13(d) or 14(d) of the Exchange Act), other than the Members of the Company or Topco as of the Effective Date, of (A) beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of at least 50% of the Voting Stock (x) of the Company or Topco (including by means of the Company's or

8

Topco's issuance of its Equity Interests) or (y) of one or more Subsidiaries of the Company or Topco if all or substantially all of the assets of the Company, Topco and their respective Subsidiaries taken as a whole are held by such Subsidiary or Subsidiaries (including by means of the issuance of Equity Interests of any such Subsidiary or Subsidiaries, as applicable) or (B) the contractual right to designate or elect the Manager or 50% or more of the members of the board of directors of Topco.

"Sale Period" has the meaning set forth in Section 9.8(d).

"Sale Price" has the meaning set forth in Section 9.8(a).

"Securities Act" means the Securities Act of 1933, as amended.

"Specified Event" has the meaning set forth in Section 9.3(c).

"Sponsor Related Parties" has the meaning set forth in Section 7.3.

"Subject Units" has the meaning set forth in Section 13.16(a).

"Subsidiary" or "Subsidiaries" means all Persons in which the Company owns, directly or indirectly, a majority of the Voting Stock or is a general partner or otherwise has the power to control, by agreement or otherwise, the management and general business affairs of such other Person.

"Substituted Member" means any Person admitted to the Company as a substituted Member pursuant to the provisions of Article 9.

"Taxable Members" has the meaning set forth in Section 4.2(g).

"Threshold Value" means, with respect to a Unit, the "Threshold Value," if any, assigned to such Unit in the applicable Award Agreement.

"Transferring Member" has the meaning set forth in Section 9.8.

"Topco" means [●], a Delaware limited liability company.

"Transfer", "Transferee" and "Transferor" have the respective meanings set forth in Section 9.1.

"Triggering Event" has the meaning set forth in Section 13.16(a).

"UCC" means Article 8 of the Uniform Commercial Code as in effect in the State of Delaware.

"Units" means units representing limited liability company interests in the Company, as set forth on Schedule A and in the books and records of the Company.

"Upstream Equity Interests" has the meaning set forth in Section 9.7.

"Value" of any asset of the Company or a Member, as the case may be, as of any date, means the fair market value of such asset as of such date, as determined by the Manager. Any determination of the Value or of the fair market value of an asset of the Company or a Member made by the Manager shall be binding on the Members for all purposes of this Agreement.

"Void Transfer" has the meaning set forth in Section 9.1.

"Voting Stock" of any Person means any Capital Stock or other Equity Interests of any class or classes of such Person whose holders are entitled under ordinary circumstances (irrespective of whether at the time stock or other Equity Interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency) to vote for the election of a majority of the directors, managers, trustees or other governing body of such Person.

"Withdrawing Member" has the meaning set forth in Section 9.2(d).

Section 2.2    Rules of Interpretation.  Unless the context otherwise clearly requires: (a) a term has the meaning assigned to it; (b) "or" is not exclusive; (c) wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, feminine or neuter shall include the masculine, feminine and neuter; (d) provisions apply to successive events and transactions; (e) all references in this Agreement to "including" shall be deemed to be followed by the phrase "without limitation," whether or not so expressly provided in this Agreement; (f) all references in this Agreement to designated "Articles," "Sections," "paragraphs," "clauses" and other subdivisions are to the designated Articles, Sections, paragraphs, clauses and other subdivisions of this Agreement, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, paragraph, clause or other subdivision; and (g) any definition of or reference to any agreement, instrument, document, statute or regulation in this Agreement shall be construed as referring to such agreement, instrument, document, statute or regulation as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Agreement).

## ARTICLE 3.   UNITS; CAPITAL CONTRIBUTIONS

Section 3.1    Capitalization; Issuance of Units.

(a)    Each Member's relative rights, privileges, preferences, restrictions and obligations with respect to the Company are represented by such Member's Units.  As of the Effective Date, there shall be one class of Units of the Company, with such class referred to in this Agreement as the "Units."  Units may be issued in whole or fractional form.  Any issuances of Units following the Effective Date may be issued by the Company in one or more separate classes or series (each, an "Additional Class") at a price per Unit and with such other relative rights, privileges, preferences, restrictions and obligations, in each case, as determined by the Manager.  All Units issued under this Agreement shall constitute "securities" governed by Article 8 of the UCC.  A Member may own one or more classes or series of Units.  The

ownership of one class or series of Units shall not affect the rights, privileges, preferences or obligations of a Member with respect to the other class or series of Units owned by such Member.  Any reference in this Agreement to a holder of a class of Units shall be deemed to refer to such holder only to the extent of such holder's ownership of such class or series of Units.

(b)  The present ownership of the issued and outstanding Equity Interests in the Company is set forth on Schedule A.  The Company or its designee shall from time to time update Schedule A and the books and records of the Company to reflect each Transfer, issuance or redemption of any Units of the Company or any other transaction or occurrence that affects the ownership of any Equity Interests in the Company.  Any reference in this Agreement to Schedule A shall be deemed a reference to Schedule A as amended in accordance with this Section 3.1 and in effect from time to time.  As presently in effect, and as updated from time to time, Schedule A shall constitute the record of the ownership of the issued and outstanding Equity Interests in the Company.  Notwithstanding the foregoing, the failure to reflect a change or adjustment to Schedule A shall not prevent any otherwise valid change or adjustment from being effective.

Section 3.2  Management Incentive Plan.  The Manager may approve from time to time one or more management incentive plans of the Company or any Subsidiary (each, a "Management Incentive Plan") pursuant to which the Company, upon the approval of the Manager, would be permitted to issue Units and/or additional classes of units in the Company (or Equity Interests in a Subsidiary of the Company, as the case may be) at such time and in such amounts as may be approved for issuance by the Manager and correspondingly provided for pursuant to the terms of such Management Incentive Plans.  Notwithstanding the foregoing, the aggregate amount of all Units issuable pursuant to such Management Incentive Plans shall in no event exceed Equity Interests representing greater than 10% equity ownership in the business of the Company and its Subsidiaries (calculated on a fully diluted basis assuming the exercise, conversion or exchange, as applicable, in full of any applicable Equity Interests which are unexercised as of any time of determination).  Notwithstanding anything to the contrary in this Agreement or otherwise, the provisions of this Agreement shall be subject to the terms of each Management Incentive Plan then in effect with respect to all Equity Interests issued pursuant to any such Management Incentive Plan.  In the event any of the provisions of this Agreement conflict with the provisions of such Management Incentive Plan, the provisions of such Management Incentive Plan shall control with respect to the subject matter of such Management Incentive Plan.  To the extent necessary or appropriate, upon the execution of any Management Incentive Plan relating to the Company and/or the consummation of any issuance of Equity Interests in the Company pursuant to any Management Incentive Plan, Schedule A, the books and records of the Company and this Agreement shall thereafter be amended accordingly by the Manager to reflect the effect of any such issuance.

Section 3.3  Initial Capital Contributions.  On the Effective Date, each Member shall make, or shall be deemed to have made, a Capital Contribution to the Company in the

11

amount set forth opposite such Member's name on <u>Schedule B</u> hereto, which are to be made in consideration for the issue of Units.

Section 3.4    <u>Additional Capital Contributions</u>.

(a)    Except as otherwise required by law, no Member shall be required to make any additional Capital Contributions to the Company without the prior consent of such Member and the Manager.  Except as otherwise required by law, no Member shall be permitted to make any additional Capital Contributions to the Company without the prior consent of the Manager.

(b)    After the Effective Date and in its sole discretion, the Manager may determine that one or more additional Capital Contributions are necessary or advisable for the conduct of the Company's business.  Any such additional Capital Contribution called after the Effective Date shall be referred to as an "<u>Additional Call Amount</u>."  In the event the Manager makes such a determination, each Member shall have the option (but not the obligation) to participate in each such additional Capital Contribution in accordance with its Percentage Interest.  To the extent less than all of the Members elect to participate in any additional Capital Contribution, those Members that elect to make such additional Capital Contribution shall have the option (but not the obligation) to increase their additional Capital Contributions *pro rata* in accordance with their respective Percentage Interests such that the total of the applicable additional Capital Contribution equals the Additional Call Amount.  Unless otherwise determined by the Manager, the funding of any such Additional Call Amount shall be made no later than 10 Business Days following a Member's receipt of a capital call notice in respect of such Additional Call Amount.  Notwithstanding the foregoing, in no event shall such amounts be required to be funded to the Company sooner than 5 Business Days following receipt of such capital call notice.

(c)    Upon the funding of any Capital Contribution by a Member pursuant to <u>Section 3.4(b)</u> above, such Member shall be issued a number of additional Units (or, if the Manager determines to issue Equity Interests in the Company of an Additional Class, a number of Equity Interests of such Additional Class) equal to the amount of the Capital Contribution made by such Member in respect of such Capital Contribution <u>divided</u> <u>by</u> a price per Unit or Equity Interest of an Additional Class, as the case may be, determined by the Manager.  <u>Schedule A</u>, the books and records of the Company and, if appropriate, this Agreement shall be thereafter amended accordingly by the Manager to reflect the Capital Contribution and the issuance of Units or Equity Interests of an Additional Class, as the case may be, effected in connection therewith.

Section 3.5      Interest on Capital Contributions.  No Member shall be entitled to interest on or with respect to any Capital Contribution.

Section 3.6      Withdrawal and Return of Capital Contributions.  Except as provided in this Agreement, no Member shall be entitled to withdraw any part of such Member's Capital Contribution or to receive distributions from the Company.

Section 3.7      Form of Capital Contribution.  Unless otherwise agreed to by the Manager, all Capital Contributions shall be made in cash.

Section 3.8      Unit Certificates.

(a)      The Units shall initially be uncertificated (as contemplated in Section 18-702(c) of the Act) and recorded in the books and records of the Company and on Schedule A to this Agreement.  In its sole discretion, the Manager shall be permitted to cause all or a portion of the Units of the Company issued on or after the Effective Date to be represented by certificates issued by the Company.  The face of any such certificate shall designate the class of Units represented thereby.  Any such certificates (and the Units represented thereby) shall constitute "securities" governed by Article 8 of the UCC.

(b)      In the event any Unit certificates are issued, the Company may in its discretion imprint any or all certificates representing Units now or hereafter owned by any Member with the following legends:

**THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT.**

**THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO GOVERNANCE AGREEMENTS, TRANSFER RESTRICTIONS AND OTHER TERMS CONTAINED IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF [____], 2019, AS SUCH LIMITED LIABILITY COMPANY AGREEMENT MAY BE AMENDED OR MODIFIED FROM TIME TO TIME.  A COPY OF SUCH AGREEMENT IS ON FILE AT THE COMPANY'S PRINCIPAL EXECUTIVE OFFICES.**

Such imprinting is without prejudice, however, to the rights of Members to sell or otherwise dispose of such Units in accordance with the terms of this Agreement and pursuant to an exemption from the registration requirement available under the Securities Act.  After such time as any of the legends described by this Section 3.8(b) are no longer required on any certificate or certificates representing the Units, upon the request of any Member, the Company shall cause such certificate or certificates to be exchanged for a certificate or certificates that do not bear such legends.

(c)     In addition to the legends required by paragraph (b) above, Units issued pursuant to any Management Incentive Plan shall include legends required by the terms of such Management Incentive Plan.

## ARTICLE 4.  ALLOCATION OF NET INCOME AND NET LOSS

Section 4.1     General.  The Members agree to treat the Company as a partnership and the Members as partners for Federal income tax purposes and shall file all tax returns accordingly.  Subject to Section 4.2, Net Income or Net Loss and each item of income, gain, loss and deduction entering into such computation, for each Fiscal Year (or any other period that the Manager deems appropriate) shall be allocated among the Members (and credited and debited to their Capital Accounts) so as, to the extent possible, to cause each Member's Capital Account balance, as increased by the amount of such Member's share of partnership minimum gain (as defined in Regulation § 1.704-2(g)(1) and (3)) and the amount of such Member's share of partner nonrecourse debt minimum gain (as defined in Regulation § 1.704-2(i)(5)), to equal the amount that would be distributed to such Member if the Company sold all of its assets for their Book Value in cash, paid all of its liabilities, and distributed its cash to its Members pursuant to Section 5.1 in complete liquidation.

Section 4.2     Other Allocation Provisions.

(a)     If during a Fiscal Year there is a net decrease in "partnership minimum gain" (within the meaning of Regulation § 1.704-2(d)) with respect to the Company, then there shall be allocated to each Member items of income and gain of the Company for such Fiscal Year (and, if necessary, for succeeding Fiscal Years) equal to such Member's share of the net decrease in partnership minimum gain (within the meaning of Regulation § 1.704-2(g)(2)), subject to the exceptions set forth in Regulation § 1.704-2(f)(2) and (3), and to any exceptions provided by the Commissioner of the Internal Revenue Service pursuant to Regulation § 1.704-2(f)(5). Notwithstanding the foregoing, if the Company has any discretion as to an exception provided pursuant to Regulation § 1.704-2(f)(5), the Manager may exercise reasonable discretion on behalf of the Company.  The foregoing is intended to be a "minimum gain chargeback" provision as described in Regulation § 1.704-2(f) and shall be interpreted and applied in all respects in accordance with such Regulation.

If during a Fiscal Year there is a net decrease in partner nonrecourse debt minimum gain (as determined in accordance with Regulation § 1.704-2(i)(3)) with respect to the Company, then, in addition to the amounts, if any, allocated pursuant to the preceding paragraph, any Member with a share of such partner nonrecourse debt minimum gain (determined in accordance with Regulation § 1.704-2(i)(5)) as of the beginning of the Fiscal Year shall, subject to the exceptions set forth in Regulation § 1.704-2(i)(4), be allocated items of income and gain of such Fiscal Year for the Fiscal Year (and, if necessary, for succeeding Fiscal Years) equal to such Member's share of the net decrease in the partner nonrecourse minimum gain.  The foregoing is intended to be the "chargeback of partner nonrecourse debt minimum gain" required by Regulation § 1.704-2(i)(4) and shall be interpreted and applied in all respects in accordance with such Regulation.

14

#4830-1939-2130

(b)     If during any Fiscal Year a Member unexpectedly receives an adjustment, allocation or distribution described in Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which causes or increases a deficit balance in such Member's Adjusted Capital Account, there shall be allocated to such Member items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain of the Company for such Fiscal Year) in an amount and manner sufficient to eliminate such deficit as quickly as possible.  The foregoing is intended to be a "qualified income offset" provision as described in Regulation § 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in all respects in accordance with such Regulation.

A Member's "Adjusted Capital Account", at any time, shall equal the Member's Capital Account at such time (x) increased by the sum of (A) the amount of the Member's share of partnership minimum gain (as defined in Regulation § 1.704-2(g)(1) and (3)), (B) the amount of the Member's share of partner nonrecourse debt minimum gain (as defined in Regulation § 1.704-2(i)(5)) and (C) any amount of the deficit balance in its Capital Account that the Member is treated as obligated to restore pursuant to Regulation § 1.704-1(b)(2)(ii)(c) and (y) decreased by reasonably expected adjustments, allocations and distributions described in Regulation §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6).  This definition shall be interpreted consistently with Regulation § 1.704-1(b)(2)(ii)(d).

(c)     Notwithstanding anything to the contrary in this Article 4,

(i)     losses, deductions, or expenditures subject to Code section 705(a)(2)(B) that are attributable to a particular partner nonrecourse liability shall be allocated to the Member that bears the economic risk of loss for the liability in accordance with the rules of Regulation § 1.704-2(i); and

(ii)     losses, deductions, or expenditures subject to Code section 705(a)(2)(B) that are attributable to partnership nonrecourse liabilities shall be allocated to the Members in proportion to their Percentage Interests.

(d)     (i)  Notwithstanding any provision of Section 4.1, no allocation of Net Loss shall be made to a Member if it would cause the Member to have a negative balance in its Adjusted Capital Account.  Allocations of Net Loss that would be made to a Member but for this Section 4.2(d)(i) shall instead be made to other Members pursuant to Section 4.1 to the extent not inconsistent with this Section 4.2(d)(i).  To the extent allocations of Net Loss cannot be made to any Member because of this Section 4.2(d)(i), such allocations shall be made to the Members in accordance with Section 4.1 notwithstanding this Section 4.2(d)(i).

(ii)     If any Member has a deficit in its Adjusted Capital Account, such Member shall be specially allocated items of Company income and gain in the amount of such deficit as rapidly as possible. Notwithstanding the foregoing, an allocation pursuant to this Section 4.2(d)(ii) shall be made if and only to the extent that such Member would have a deficit in its Adjusted Capital Account after all other allocations provided for in this Agreement have been tentatively made as if this Section 4.2(d)(ii) were not in this Agreement.

#4830-1939-2130

(e)     To the extent that any item of income, gain, loss or deduction has been specially allocated pursuant to paragraph (b) or (d) of this Section 4.2 and such allocation is inconsistent with the way in which the same amount otherwise would have been allocated under Section 4.1, subsequent allocations under Section 4.1 shall be made, to the extent possible and without duplication, in a manner consistent with paragraph (a), (b), (c) or (d) of this Section 4.2, which negate as rapidly as possible the effect of all such inconsistent allocations under said paragraph (b) or (d).

(f)     Except to the extent otherwise required by the Code and Regulations, if any Interest in the Company or part of such Interest is transferred in any Fiscal Year, the items of income, gain, loss, deduction and credit allocable to such Interest for such Fiscal Year shall be apportioned between the transferor and the transferee in proportion to the number of days in such Fiscal Year the Interest is held by each of them. Notwithstanding the foregoing, if the transferor and transferee agree between themselves and so notify the Manager within thirty days after the transfer, then at their option and expense, (i) all items or (ii) extraordinary items, including capital gains and losses, may be allocated to the Person who held the Interest on the date such items were realized or incurred by the Company.

(g)     If the Company is required to pay any amount of taxes (including withholding taxes) with respect to any of its income, such amount shall be allocated to the Members in the same manner as the income subject to such taxes is allocated.  Notwithstanding the foregoing, to the extent that such amount is payable with respect to income allocable to some (but not all) of the Members (the "Taxable Members"), the Manager shall (i) allocate such amount to the Taxable Members, and (ii) cause a distribution to be made to all Members other than the Taxable Members in a manner which takes into account the fact that their respective allocable shares of income are not subject to the same taxes.

(h)     Any allocations made pursuant to this Article 4 shall be made in the following order:

(i)     Section 4.2(a);

(ii)     Section 4.2(b);

(iii)     Section 4.2(c);

(iv)     Section 4.2(e);

(v)     Section 4.2(g); and

(vi)     Section 4.1, as modified by Section 4.2(d).

These provisions shall be applied as if all distributions and allocations were made at the end of the Fiscal Year.  Where any provision depends on the balance of a Capital Account of any Member, such Capital Account shall be determined after the operation of all preceding provisions for the year.  These allocations shall be made consistently with the requirements of Regulation § 1.704-2(j).

16

Section 4.3     Allocations for Income Tax Purposes.  The income, gains, losses, deduction and credits of the Company for any Fiscal Year shall be allocated to the Members in the same manner Net Income and Net Loss were allocated to the Members for such Fiscal Year pursuant to Sections 4.1 and 4.2.

Section 4.4     Withholding.  The Company shall comply with withholding requirements under Federal, state and local law and shall remit amounts withheld to and file required forms with the applicable jurisdictions.  To the extent the Company is required to withhold and pay over any amounts to any authority with respect to distributions or allocations to any Member, the amount withheld shall be deemed to be, at the option of the Manager, either a distribution to or a demand loan by the Company to such Member in the amount of the withholding.  In the event of any claimed over-withholding, Members shall be limited to an action against the applicable jurisdiction.  If the amount was deemed to be a demand loan, the Company may, at its option, (a) at any time require the Member to repay such loan in cash or (b) at any time reduce any subsequent distributions by the amount of such loan.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, its withholding obligations.

Section 4.5     Code § 83 Safe Harbor Election.

(a)     By executing this Agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "IRS Notice"), including any similar safe harbor in any finalized Revenue Procedure, Revenue Ruling or Treasury Regulation, apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such final pronouncement in connection with services provided to the Company. For purposes of making such Safe Harbor election, the Manager is hereby designated as the "partner who has responsibility for Federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the Manager constitutes execution of a "Safe Harbor Election" in accordance the IRS Notice or any similar provision of any final pronouncement.  The Company and each Member hereby agree to comply with all requirements of any such Safe Harbor, including any requirement that a Member prepare and file all Federal income tax returns reporting the income tax effects of each Interest issued by the Company in connection with services in a manner consistent with the requirements of the IRS Notice or other final pronouncement.  In addition, the Company shall make all allocations required by effective Regulations similar to the proposed regulations, including "forfeiture allocations."  A Member's obligations to comply with the requirements of this Section 4.5 shall survive such Member's ceasing to be a member of the Company and the termination, dissolution, liquidation and winding up of the Company.

(b)     If the Revenue Procedure set forth in the IRS Notice and its related proposed treasury regulations become effective in a form that differs from its current form, each Member authorizes the Manager to amend this Section 4.5 to the extent necessary to achieve substantially the same tax treatment under such different form with respect to any Interest in the Company Transferred to a service provider by the Company in connection with services provided to the Company as that set forth in Section 4 of the IRS Notice, provided that such

17

amendment is not materially adverse to any Member (as compared with the after-tax consequences that would result if the provisions of the IRS Notice applied to all Interests in the Company transferred to a service provider by the Company in connection with services provided to the Company).]

## ARTICLE 5.  DISTRIBUTIONS

Section 5.1    Distributions.  Subject to the provisions of Sections 5.2 and 5.3, the Company shall distribute Available Cash at such times and in such amounts as may be determined by the Manager in its sole discretion.  Any distribution made to the Members pursuant to this Section 5.1 shall be made to the Members in accordance with their Percentage Interests.

It is understood and agreed that a Management Incentive Plan may provide that certain Units or other Equity Interests in the Company authorized following the date of this Agreement and issued pursuant to such Management Incentive Plan shall also share in distributions made pursuant to this Section 5.1 in the manner specified in such Management Incentive Plan and any related amendments, supplements or modifications to, or amendments and restatements of, this Agreement.  Notwithstanding anything herein contained to the contrary, no distribution shall be made under this Section 5.1 or Section 10.3 to any Member in respect of any Unit with respect to which a Threshold Value has been assigned unless and until the sum of the aggregate amount of distributions made by the Company pursuant to this Section 5.1 and Section 10.3 in respect of all other Units (measured from the date of the issuance of the applicable Unit to which a Threshold Value has been assigned) is equal to or greater than the Threshold Value assigned to such Unit. Notwithstanding the foregoing, in the case of each distribution, for purpose of determining whether aggregate distributions are equal to or greater than the applicable Threshold Value, distributions in respect of other Units shall be considered to be made prior to the distribution in respect of such Unit.  Amounts not distributed with respect to a Unit by operation of the foregoing sentence shall be distributed to the Members in accordance with this Section 5.1, but without including any such Unit in such distribution.

Section 5.2    Limitations on Distributions.

(a)    Anything to the contrary in this Agreement notwithstanding:

(i)    no distribution pursuant to this Agreement shall be made if such distribution would result in a violation of the Act; and

(ii)    no distribution pursuant to this Agreement shall be made if such distribution would result in a violation of applicable law.

(b)    In the event that a distribution is not made as a result of the application of paragraph (a) of this Section 5.2, the Company shall make such distribution as soon as such distribution would not be prohibited pursuant to this Section 5.2.

Section 5.3    Reserves.  The Company may establish reserves in such amounts and for such time periods as the Manager determines in its discretion to be necessary for

#4830-1939-2130

estimated accrued Company expenses and any contingent or unforeseen Company liabilities.  If the Manager determines that all or any portion of such reserves are no longer necessary, any such amount of such reserves may, in the discretion of the Manager, be distributed to the Members in accordance with this Article 5.

## ARTICLE 6.  BOOKS OF ACCOUNT, RECORDS AND REPORTS, FISCAL YEAR

Section 6.1    Books and Records.  Records and books of account shall be kept by the Company in a manner determined by the Manager in its sole discretion.  The records and books of accounts shall reflect such transactions and other matters relating to the Company's business as are usually entered into records and books of account maintained by Persons engaged in businesses of a like character.

Section 6.2    Financial Reports.  The Company shall deliver or otherwise make available to each Member:

(a)    as soon as available and in any event within 60 days after the end of each of the first three quarters of each fiscal year of the Company, consolidated balance sheets of the Company and its Subsidiaries as of the end of such period, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the period then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted in such balance sheets and statements, and subject to the absence of footnotes and to year-end adjustments; and

(b)    as soon as available and in any event within 90 days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such year, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the year then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted in such balance sheets and statements, together with an auditor's report thereon of a firm satisfactory to the Manager.

Section 6.3    Fiscal Year.  Unless otherwise determined by the Manager, the fiscal year of the Company (the "Fiscal Year") shall be the calendar year.  Notwithstanding anything to the contrary in this Agreement, the last Fiscal Year of the Company shall end on the date on which the Company is terminated.

Section 6.4    Tax Returns.  The Manager will cause to be prepared and filed all necessary federal, state and local income tax returns for the Company and the Manager will

19

select a nationally recognized accounting firm to prepare the Company's federal, state and local income tax returns.

## ARTICLE 7.  POWERS, RIGHTS AND DUTIES OF THE MEMBERS

Section 7.1     <u>Limitations</u>.  Other than as set forth in this Agreement, the Members shall not: (i) participate in the management or control of the Company's business; (ii) transact any business for the Company; or (iii) have the power to act for or bind the Company.  All such powers shall vest solely and exclusively in the Manager.  Persons dealing with the Company shall not be entitled to rely on the power and authority of the Members to act for or bind the Company.

Section 7.2     <u>Liability</u>.  Subject to the provisions of the Act, no Member shall be liable for the repayment, satisfaction or discharge of any Company liabilities.  No Member shall be personally liable for the return of any portion of the Capital Contributions (or any return thereon) of any other Member.

Section 7.3     <u>Competition and Corporate Opportunities</u>.

(a)     Each Member acknowledges, agrees and affirms that the Ares Entities and their respective Affiliates (collectively, the "<u>Sponsor Related Parties</u>"):

(i)     (A) have participated (directly or indirectly) and will continue to participate (directly or indirectly) in financing, venture capital, private equity and other direct investments in corporations, joint ventures, limited liability companies and other entities (the "<u>Other Investments</u>"), including Other Investments engaged in various aspects of business that may, are or will be competitive with the Company or its Subsidiaries' business or that could be suitable for the Company or its Subsidiaries, including businesses and undertakings in direct competition with the Company or its Subsidiaries, (B) have interests in, participate with, aid and maintain seats on the board of directors or similar governing bodies of, Other Investments and (C) may develop or become aware of business opportunities for Other Investments; and

(ii)     may or will, as a result of or arising from the matters referenced in <u>clause (i)</u> above, the nature of the Sponsor Related Parties' businesses and other factors, have conflicts of interest or potential conflicts of interest with the Company, the Company's Subsidiaries and/or other Members.

(b)     The Members other than the Ares Entities (individually and on behalf of the Company) expressly: (i) waive any such conflicts of interest or potential conflicts of interest as described in <u>Section 7.3(a)</u>; (ii) agree that no Sponsor Related Party or its respective representatives shall have any liability to any Member or any Affiliate of any Member, or the Company or any of its Subsidiaries with respect to such conflicts of interest or potential conflicts of interest; and (iii) agree that the Sponsor Related Parties shall not have any duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Company or any of its Subsidiaries.  The Members other than the Ares Entities (individually and on behalf of the Company) also expressly agree: (A) that in the event any Sponsor Related

Party acquires knowledge of a potential transaction or matter that may be a corporate opportunity for itself and the Company or any of its Subsidiaries neither the Company nor any of its Subsidiaries shall have any expectancy in such corporate opportunity; (B) to waive and relinquish any and all claims relating to or arising out of such potential corporate opportunities; (C) that the applicable Sponsor Related Party shall not have any duty to communicate or offer such corporate opportunity to the Company or any of its Subsidiaries and may pursue or acquire such corporate opportunity for itself or themselves, as the case may be, or direct such corporate opportunity to another Person; and (D) that neither the Company nor any of its Subsidiaries shall be entitled to (x) the right to consent to, (y) the right to participate in or (z) any right to any profits from, in each case, any such other business opportunity or Other Investment.  The Members (for themselves and on behalf of the Company) also acknowledge that the Sponsor Related Parties and their representatives have duties not to disclose confidential information of or related to the Other Investments.

(c)     In the event that the Manager or an officer of the Company who is also a partner, principal, director, officer, member, manager and/or employee of any Sponsor Related Party acquires knowledge of a potential transaction or matter that may be a corporate opportunity for the Company or any of its Subsidiaries as well as a Sponsor Related Party, neither the Company nor any of its Subsidiaries shall have any expectancy in such corporate opportunity.  In addition, such Sponsor Related Party shall not have any duty to communicate or offer such corporate opportunity to the Company or any of its Subsidiaries and may pursue or acquire such corporate opportunity for itself or direct such corporate opportunity to another Person.

(d)     In addition to and notwithstanding the foregoing provisions of this Section 7.3, a corporate opportunity shall not be deemed to belong to the Company if it is a business opportunity that the Company is not financially able, contractually permitted or legally able to undertake, or that is, based on its nature, not in the line of the Company's business or is of no practical advantage to it or is a business opportunity in which the Company has no interest or reasonable expectancy.

### ARTICLE 8.  POWERS, RIGHTS AND DUTIES OF THE MANAGER

Section 8.1     Manager.

(a)     Appointment of Manager.  The Company initially shall be managed by the Manager and all powers of the Company shall be exercised by the Manager.  No Person shall replace [●], LLC as the Manager until such time as [●], LLC delivers a letter of resignation to the Company.  Following the delivery of such a Manager resignation letter, the Manager shall be designated by the board of directors of Topco.  The Manager (i) shall be the "manager" within the meaning of the Act, (ii) shall have general supervision over the business of the Company (including, without limitation, and in each case, without any approval by the Members, the power to determine if and when the Company shall (A) issue new or additional equity or debt securities of the Company, (B) sell any equity or debt securities owned by it, (C) acquire any new equity or debt securities, (D) repurchase any Units from any Member, (E) admit additional Members or accept additional Capital Contributions from existing Members, or (F) acquire and manage any debt of the Company, its direct or indirect subsidiaries or its Affiliates), (iii) shall

21

have charge of the general supervision of the funds and securities of the Company and the books of account of the Company, (iv) shall have the power and authority to sign documents for and otherwise bind the Company, (v) shall vote and execute all rights with respect to voting or debt securities held by the Company, (vi) shall make any distributions to Members in accordance with this Agreement, (vii) shall have the power to authorize, approve and execute, without any approval of the Members, any merger, recapitalization, reorganization, business combination, sale of all or substantially all of the assets of the Company or any similar transaction involving the Company, and (viii) is authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement.  All instruments, contracts, agreements and documents, including but not limited to all documents required to establish a bank account on behalf of the Company or providing for the acquisition, mortgage or disposition of property of the Company, shall be valid and binding on the Company if executed by the Manager.

(b)     Determinations by Manager; Reliance on Experts.  With respect to all determinations, decisions and other actions of the Manager under this Agreement, the Manager shall be able to determine, decide, consent or otherwise act in the Manager's sole and absolute discretion.  In making any such determination, decision and other action, the Manager may take into account such interests and factors as the Manager determines, including the interests of the Manager.  In making any determination or in taking or not taking any action under this Agreement, the Manager may obtain and may rely upon the advice, reports and opinions of experts, including employees of and professional advisors to the Company.

Section 8.2     Limitation on Authority of Members.

(a)     No Member is an agent of the Company solely by virtue of being a Member, and no Member has any authority to act for or bind the Company solely by virtue of being a Member.  No Member shall be required to perform services for the Company solely by virtue of being a Member.  No Member shall perform services for the Company or be entitled to compensation for services performed for the Company unless approved by the Manager.

(b)     This Article 8 supersedes any authority granted to the Members pursuant to the Act.  Any Member who takes any action or binds the Company in violation of this Article 8 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

Section 8.3     Reimbursement for Expenses of the Company; Standard of Care.

(a)     Reimbursement for Expenses of the Company.  The Company shall pay, and shall reimburse the Manager, each of the Manager's Affiliates and any officer of the Company for, all out-of-pocket costs and expenses that, in each case, are approved categorically or specifically by the Manager, including, without limitation, costs and expenses incurred in the formation, financing or operation of the Company including: premiums for insurance protecting the Company; legal, custodial and accounting expenses; auditing expenses; appraisal expenses; expenses incurred in maintaining the places of business of the Company; costs and expenses that are classified as extraordinary expenses under generally accepted accounting principles; taxes or

22

other governmental charges payable by the Company; costs and expenses incurred in connection with any actual or threatened litigation, and any judgments or settlements paid in connection with litigation, involving the Company or an Indemnified Party; costs of reporting to the Members; costs incurred in valuing assets of the Company; costs of winding up and liquidating the Company; interest, fees and other amounts payable to participants and any other agents, lenders, arrangers or other persons under any indebtedness incurred by the Company; and other expenses incurred in connection with the activities of the Company.

(b)     Standard of Care.  Notwithstanding anything to the contrary set forth in this Agreement or under applicable law, the Manager shall not be liable to the Company, any creditor of the Company, any Member, any assignee or any other holder of Equity Interests in the Company for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any Subsidiary, on the one hand, and any Member or any Affiliate of such member, on the other), except for such actions as constitute fraud or bad faith.  To the extent the Manager has any liabilities or duties at law or in equity (including, without limitation, fiduciary duties or other standards of care) more expansive than those set forth in this Section 8.3(b), such liabilities and duties are hereby modified to the fullest extent permitted by applicable law (including, without limitation, Section 18-1101(c) of the Act) to those set forth in the first sentence of this Section 8.3(b).  In furtherance of the foregoing, it is understood and agreed that the Manager shall have no fiduciary duties of any kind or description to the Company, any Member, any assignee or any other holder of Equity Interests in the Company.  In addition, with the exception of officers whose duty is set forth in Section 8.4, no Member, any other holder of Equity Interests in the Company or any Affiliate of any of the foregoing entities or persons shall have any duty of any kind or description to the Company, any other Member or any other holder of Equity Interests in the Company or any Affiliate of any of the foregoing entities or persons for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any Subsidiary, on the one hand, and any Member or any Affiliate of such member, on the other), except for such actions as constitute fraud or bad faith.  Notwithstanding the foregoing, nothing in this Section 8.3(b) shall be construed to eliminate the covenant of good faith and fair dealing. Notwithstanding the foregoing or anything to the contrary contained in this Agreement, nothing contained in this Agreement shall relieve any Person of any liability for breach of fiduciary duty, if any, owed to the Company or its Affiliates incurred in such Person's role as an officer or employee of the Company or its Affiliates.

Section 8.4     Officers, Agents and Employees.

(a)     Appointment and Term of Office.  The Manager may appoint, and may delegate power to appoint, such officers, agents and employees as it may deem necessary or proper, who shall hold their offices or positions for such terms, have such authority and perform such duties as may from time to time be determined by or pursuant to authorization of the Manager, in each case in furtherance of the business carried on by the Company.  Except as may be prescribed otherwise by the Manager in a particular case, all such officers shall hold their offices at the pleasure of the Manager for an unlimited term (unless otherwise provided in any applicable employment agreement) and need not be reappointed annually or at any other periodic interval.  Any action taken by an officer of the Company pursuant to authorization of the Manager shall constitute the act of and serve to bind the Company.  Persons dealing with the

23

Company are entitled to rely conclusively on the authority of such officers set forth in the authorization of the Manager, but only to the extent expressly provided in such authorization. Any action purported to be taken by any officer, agent or employee of the Company or any of its Subsidiaries in the absence of a grant of authority from the Manager, or otherwise in contravention of the terms of this Section 8.4(a), shall be void and without effect.

(b)     Resignation and Removal.  Any officer may resign at any time upon written notice to the Company.  Any officer, agent or employee of the Company may be removed by the Manager with or without cause at any time.  The Manager may delegate such power of removal as to officers, agents and employees not appointed by the Manager.

(c)     Compensation.  The compensation of the officers of the Company shall be fixed by the Manager, but this power may be delegated to any officer in respect of other officers under his or her control.  The compensation for senior executive officers of the Company shall, in each case, be commensurate with the financial performance of the Company, the role of the officer, the scope of the officer's responsibilities and the performance and success of the officer, as determined in the reasonable judgment of the Manager.

(d)     Standard of Care.  Officers shall be held to the same standard of care and shall have the same fiduciary duties to the Company as if they were officers of a Delaware corporation, including the duties of care and loyalty.

Section 8.5     Company Funds.  Company funds shall be held in the name of the Company and shall not be commingled with those of any other Person.  Company funds shall be used only for the business of the Company.

Section 8.6     Other Activities and Competition.  The Manager shall not be required to manage the Company as its sole and exclusive function.  The Manager may engage in or possess any interests in business ventures and may engage in other activities of every kind and description independently or with others in addition to those relating to the Company.  Each Member authorizes, consents to and approves of such present and future activities by the Manager.  Notwithstanding the foregoing, none of the Company, any Member or any officer of the Company shall have any right by virtue of this Agreement or the relationship created hereby in or to other ventures or activities of the Manager, Topco, the Ares Entities, Ares or any Affiliate of Topco, the Ares Entities or Ares (which, for the avoidance of doubt, excludes the Company), or to the income or proceeds derived therefrom.

Section 8.7     Exculpation.  Neither the Manager nor any officer, agent or employee of the Company or any Member shall be personally liable for the return of any portion of the Capital Contributions (or any return thereon) of any Member.  The return of such Capital Contributions (or any return thereon) shall be made solely from the Company's assets.  No Member shall have the right to demand or receive property other than cash for its Interest in the Company.  Neither the Manager nor any Member shall be liable, responsible or accountable in damages or otherwise to the Company, any Member or the Manager for any loss incurred as a result of any act or failure to act by such Person on behalf of the Company unless such loss is

24

finally determined by a court of competent jurisdiction to have resulted solely from such Person's fraud or bad faith.

Section 8.8    Indemnification of the Manager, Officers, Members and Agents.

(a)    The Company shall defend and indemnify the Manager, any Member or member or trustee or shareholder of any Member or the Manager from any threatened, pending or completed action, suit or proceeding by reason of the fact that such Person is or was an officer, employee or other agent of the Company or a Member or the Manager (each, an "Indemnified Party"), to the fullest extent permitted by applicable law in effect on the date of this Agreement and to such greater extent as applicable law may hereafter from time to time permit.  The indemnity shall protect the Indemnified Party from and against any loss, expense, damage or injury suffered or sustained by them arising out of their activities on behalf of the Company if the acts upon which such threatened, pending or completed action are based were not a result of fraud or bad faith by such Indemnified Party.  Upon the approval of the Manager, the Company may indemnify any other Person who was or is a party or is threatened to be made a party to any action suit or proceeding to the same extent and subject to the same conditions as any other Indemnified Party as set forth in this Section 8.8.  The Company shall indemnify and hold harmless any Indemnified Party or Person executing any guaranty of indebtedness of the Company from any and all claims, demands, losses, liabilities, damages and expenses (including reasonable attorneys' fees) suffered or incurred by any such guarantor by reason of the failure of the Company to perform its obligations under any guaranteed indebtedness or suffered or incurred by such guarantor in defending or prosecuting any suit, action or other proceeding brought in connection with the guaranty or such indebtedness or in enforcing this indemnification or any subrogation rights or other rights or remedies, at law or in equity, which the guarantor may have by reason of performing its obligations under any such guaranty of indebtedness.  Any indemnification pursuant to this Section 8.8 shall only be from the assets of the Company.

(b)    Expenses (including attorneys' fees) incurred by an Indemnified Party in a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a legally enforceable written undertaking by or on behalf of such Indemnified Party in form and substance acceptable to the Manager to repay such amount if such Indemnified Party is determined pursuant to this Section 8.8 or adjudicated to be ineligible for indemnification, which undertaking will be an unlimited general obligation of the Indemnified Party but need not be secured unless so determined by the Manager.

(c)    No amendment, modification or deletion of this Section 8.8 will apply to or have any effect on the right of any Indemnified Party to indemnification for or with respect to any acts or omissions of such Indemnified Party occurring prior to such amendment, modification or deletion.

Section 8.9    Expenses.  The Company shall pay for reasonable and documented out-of-pocket expenses incurred in connection with the operation of the Company's business,

provided that such expenses are not incurred in violation of an instruction issued, or policy approved, by the Manager.

Section 8.10     Affiliate Transactions.  For the avoidance of doubt and in furtherance of the authority vested in the Manager pursuant to Section 8.1, unless approved in writing by the Manager, the Company will not, and will cause its Subsidiaries not to, extend any indebtedness or other similar arrangement to any officer (or any Family Member or relative of any officer), or employee (or any Family Member or relative of any employee).  For the avoidance of doubt and in furtherance of the authority vested in the Manager pursuant to Section 8.1, unless approved in writing by the Manager, the Company will not, and will cause its Subsidiaries not to, enter into any contract or amend or modify any existing contract, and will not engage in any transaction of any kind or description with any officer (or any Family Member or relative of any officer), or employee (or any Family Member or relative of any employee).  It is expressly agreed that: (i) any action purported to be taken by any officer or employee of the Company or any of its Subsidiaries in contravention of the terms of this Section 8.10 shall be void and without effect; and (ii) any action purported taken in compliance with this Section 8.10 shall be deemed to satisfy the covenant of good faith and fair dealing.

Section 8.11     Insurance.  To the extent applicable, the Company shall maintain directors' and officers' liability insurance covering the Manager in an amount to be determined by the Manager in its discretion.

Section 8.12     Additional Units; Additional Members.

(a)     At the discretion of the Manager, the Company may issue additional Units at any time and from time to time to any Person for any amount of consideration as determined by the Manager and, subject to paragraphs (b), (c) and (d) of this Section 8.12, admit such Person as an Additional Member (an "Additional Member") with all of the rights and obligations of a Member under this Agreement.

(b)     Notwithstanding the provisions of Section 8.12(a), no Person may be admitted as an Additional Member if such admission would violate or cause the Company to violate any applicable Federal, state or foreign law, rule or regulation including, without limitation, the Securities Act, or any other applicable Federal, state or foreign securities laws, rules or regulations, cause the Company to be an investment company required to be registered under the Investment Company Act of 1940, as amended, or cause some or all of the Company's assets to be "plan assets."

(c)     Each Additional Member shall execute such documentation as may be required by the Manager to evidence such Additional Member's agreement to be bound by the terms and provisions of this Agreement, including a joinder to this Agreement in substantially the form attached as Exhibit A.

(d)     Each Person desiring to become an Additional Member shall be admitted to the Company upon the approval of the Manager and the delivery of a counterpart signature page to this Agreement that has been duly executed and delivered to the Company and any other documentation required by the Manager.  The Company shall reflect each admission authorized

26

under this <u>Section 8.12</u> by preparing an amendment to this Agreement, dated as of the date of such admission, to reflect such admission.

Section 8.13    <u>Partnership Representative</u>

For purposes of Code Section 6223(a) (as in effect following the enactment of the Bipartisan Budget Act of 2015) (and any similar provision of state, local or foreign law), the "Partnership Representative" shall be the Manager.  The Partnership Representative is directed and authorized to take whatever steps may be necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the Regulations.  Expenses incurred by the Partnership Representative, as applicable, acting in its capacity as such shall be borne by the Company.  Such expenses shall include fees of attorneys and other tax professionals, accountants, appraisers and experts, filing fees and reasonable out-of-pocket costs.  The Partnership Representative shall keep the Members fully informed of any inquiry, examination or proceeding, including promptly notifying Members of the beginning and completion of an administrative proceeding involving the Company promptly upon such notice being received by the Partnership Representative.


# ARTICLE 9.  TRANSFERS OF INTEREST BY MEMBERS

Section 9.1    <u>General</u>.  No Member may sell, transfer, assign, pledge, hypothecate or in any manner dispose of (whether with or without consideration and whether voluntary or involuntary or by operation of law) or create or suffer the creation of a security interest in or any encumbrance on all or a portion of its Interest in the Company, whether now owned or hereafter acquired, or enter into any swap, contract, participation or other arrangement that transfers to another Person, in whole or in part, any of the economic consequences of ownership with respect to any such Interest (the commission of any such act being referred to as a "<u>Transfer</u>," any Person who effects a Transfer being referred to as a "<u>Transferor</u>" and any Person to whom a Transfer is effected being referred to as a "<u>Transferee</u>") except in accordance with the terms and conditions set forth in this <u>Article 9</u>.  No Transfer of an Interest in the Company shall be effective until such time as all requirements of this <u>Article 9</u> have been satisfied with respect to the Transfer and, if consents, approvals or waivers are required by the Manager, all of same shall have been confirmed in writing by the Manager.  Any Transfer or purported Transfer of an Interest in the Company not made in accordance with this Agreement (a "<u>Void Transfer</u>") shall be null and void and of no force or effect whatsoever.  Any amounts otherwise distributable under <u>Article 5</u> or <u>Article 10</u> in respect of an Interest in the Company that has been the subject of a Void Transfer may be withheld by the Company, in the discretion of the Manager, until the Void Transfer has been rescinded, whereupon the amount withheld (after

reduction by any damages suffered by the Company attributable to such Void Transfer) shall be distributed without interest.

        Section 9.2      Transfer of Interest of Members.

        (a)      A Member may not Transfer all or any portion of its Interest in the Company to any Person other than, subject to compliance with Section 9.3, a Transfer of all or any portion of its Units pursuant to a Permitted Transfer.

        (b)      The Transferee of a Member's Interest in the Company pursuant to Section 9.2(a) shall be admitted to the Company as a Substituted Member only upon satisfying each applicable obligation under this Article 9, including, without limitation, executing a joinder to this Agreement in substantially the form attached as Exhibit A. Unless a Transferee of a Member's Interest in the Company is admitted as a Substituted Member under this Section 9.2(b), it shall have none of the powers of a Member and shall have only such rights of an assignee under the Act as are consistent with this Agreement.

        (c)      Upon the Transfer of all of the Units of a Member and effective upon the admission of its Transferee as a Member, the Transferor shall be deemed to have withdrawn from the Company as a Member.

        (d)      Upon the death, dissolution, withdrawal in contravention of Section 10.1 or the bankruptcy of a Member (the "Withdrawing Member"), the Company shall have the right to treat such Member's successor(s)-in-interest as assignee(s) of such Member's Interest in the Company, with none of the powers of a Member and with only such rights of an assignee under the Act as are consistent with this Agreement. Notwithstanding the foregoing, if the resulting Transfer to such successor(s)-in-interest constitutes a Permitted Transfer and such Transfer otherwise complies with the provisions of Section 9.3, any such successor-in-interest shall be admitted to the Company as a Substituted Member in accordance with Section 9.2(b). For purposes of this Section 9.2(d), if a Withdrawing Member's Interest in the Company is held by more than one Person who received such Interest other than pursuant to a Permitted Transfer (for purposes of this Section 9.2(d), the "Assignees"), the Assignees shall appoint one Person with full authority to accept notices and distributions with respect to such Interest in the Company on behalf of the Assignees and to bind them with respect to all matters in connection with the Company or this Agreement.

        (e)      The Company shall reflect each Transfer and admission as a Substituted Member authorized under this Article 9 (including any terms and conditions imposed thereon by the Manager) on Schedule A and in the books and records of the Company.

        Section 9.3      Further Requirements. In addition to the other requirements of Section 9.2, and unless waived in whole or in part by the Manager, no Transfer of all or any portion of an Interest in the Company may be made unless the following conditions are met:

        (a)      The Transferor shall have paid all reasonable costs and expenses, including attorneys' fees and disbursements and the cost of the preparation, filing and publishing of any amendment to this Agreement or the Certificate, incurred by the Company in connection with the Transfer;

#4830-1939-2130

(b)     The Transferor shall have delivered to the Company a fully executed copy of all documents relating to the Transfer, executed by both the Transferor and the Transferee, and the agreement of the Transferee in writing and otherwise in form and substance acceptable to the Manager to:

(i)     be bound by the terms of this Agreement by executing a joinder substantially in the form attached hereto as Exhibit A; and

(ii)     assume all obligations of the Transferor under this Agreement relating to the Interest in the Company that is the subject of such Transfer;

(c)     The Manager shall have been reasonably satisfied, including, at its option, having received an opinion of counsel to the Company reasonably acceptable to the Company, that (each of the following, if it were to be caused by a Transfer, a "Specified Event"):

(i)     the Transfer will not violate the Securities Act, or any other applicable Federal, state or non-United States securities laws, rules or regulations;

(ii)     the Transfer will not cause some or all of the assets of the Company to be "plan assets";

(iii)     the Transfer will not result in the (A) requirement that the Company register its Units under the Exchange Act, (B) Company being treated as a publicly held company or (C) Company otherwise being required to make or file public periodic reports pursuant to any applicable federal, state or other securities laws or otherwise whatsoever;

(iv)     the Transfer will not cause the Company to be an investment company required to be registered under the Investment Company Act of 1940, as amended; and

(v)     during any Applicable Time, the Transfer will not result in the admission of any Member that is not an Eligible Holder;

(d)     The proposed Transferee of the Interests shall not be a competitor of the Company or any of its Subsidiaries, as determined by the Manager in its sole discretion.

Any waivers from the Manager under this Section 9.3 shall be given or denied in the discretion of the Manager.  The Company shall reflect each Transfer and admission authorized under this Article 9 (including the terms and conditions imposed thereon by the Manager) on Schedule A and using documentation the form and content of which have been approved by the Manager, which approval may be granted or withheld in the discretion of the Manager.

Section 9.4     Consequences of Transfers Generally.

(a)     In the event of any Transfer or Transfers permitted under this Article 9, the Transferor and the Interest in the Company that is the subject of such Transfer shall remain subject to this Agreement, and the Transferee shall hold such Interest in the Company subject to all unperformed obligations of the Transferor under this Agreement.  Any successor or

Transferee shall be subject to and bound by this Agreement as if originally a party to this Agreement.

(b)     Each Member agrees that such Member will, upon request of the Manager, execute such certificates or other documents and perform such acts as the Manager deems appropriate after a Transfer of such Member's Interest in the Company to preserve the limited liability of the Members under the laws of the jurisdictions in which the Company is organized or doing business.

(c)     The Transfer of a Member's Interest in the Company and the admission of a Substituted Member shall not be cause for dissolution of the Company.

Section 9.5     Units; Percentage Interest.  Any Transferee of a Member under this Article 9 shall, subject to the last sentence of Section 9.1, succeed to the Units and Percentage Interest so Transferred to such Transferee.

Section 9.6     Additional Filings.  Upon the admission of a Substituted Member under Section 9.2, the Company shall cause to be executed, filed and recorded with the appropriate governmental agencies such documents (including amendments to this Agreement) as are required to accomplish such substitution.

Section 9.7     Indirect Transfers.  Each Member that is not a natural person (other than the Ares Entities or any of their respective Affiliates) agrees that: (i) Equity Interests in it and other Equity Interests in any entity controlling such entity, if any (the "Upstream Equity Interests"), will note the restrictions on transfer contained in this Article 9; and (ii) none of such Upstream Equity Interests may be transferred to any Person other than in accordance with the terms and provisions of this Article 9 as if such Equity Interests were Units.  As a condition to the admission of any Person that is not a natural person (other than Affiliates of Ares) as a Member, each such Person shall have caused legally effective definitive documentation memorializing the limitations set forth in the immediately preceding sentence with respect to the transfer of Upstream Equity Interests to be entered into by each holder of such Upstream Equity Interests.  Among other things, such documentation shall provide that any attempt to transfer the Upstream Equity Interests in contravention of the terms of such definitive documentation or any applicable limitations on transfer contemplated by this Agreement shall be void and without effect.

Section 9.8     Right of First Offer.  Prior to any Transfer pursuant to Section 9.2 by a Member other than any Ares Entity (the "Transferring Member") of any of its Units (the "ROFO Units"), such Transferring Member must first comply with the provisions of this Section 9.8:

(a)     The Transferring Member shall first deliver to the Company a written notice (the "Offer Notice") that sets forth:  (i) the number of ROFO Units, (ii) the price per ROFO Unit that the Transferring Member proposes to be paid for the ROFO Units (the "Sale Price"), (iii) the manner of payment and (iv) the material terms of such proposed sale.  The Offer Notice shall constitute an irrevocable offer by the Transferring Member to sell to the Company the ROFO Units for cash at the Sale Price on the terms set forth in the Offer Notice.

30

(b)     The Company shall have until the 15th Business Day following the delivery of the Offer Notice (the "Offer Period") to notify the Transferring Member that it accepts such offer as to all or any portion of the ROFO Units on the terms set forth in the Offer Notice. Such notice shall specify the amount of the ROFO Units the Company wishes to purchase.

(c)     If the Company accepts such offer with respect to all or any portion of the ROFO Units, a closing of the purchase of such ROFO Units shall take place at the principal office of the Company on the 30th Business Day after the date on which the Offer Notice was delivered unless otherwise agreed by the parties.  The Sale Price shall be payable in accordance with the payment terms of the Offer Notice.

(d)     Subject to the other provisions of this Article 9, if the Company does not elect to purchase the entire ROFO Units for the Sale Price prior to expiration of the Offer Period, the Transferring Member shall have the right to sell the unpurchased portion of the ROFO Units for a period of 90 days (the "Sale Period").  Such sale shall be at a price per ROFO Unit no less than the Sale Price and on other terms no more favorable to the transferees than offered in the Offer Notice.  If the Transferring Member does not Transfer the ROFO Units before the end of the Sale Period, such Transferring Member may not sell any ROFO Units without repeating the procedures set forth in this Section 9.8.

Section 9.9     Drag Along Sale.  If requested by the Ares Entities, each Member shall Transfer the Drag Along Sale Percentage of its Units in the manner and on the terms set forth in this Section 9.9 (a "Drag Along Sale") and/or take such other action in support of any Drag Along Sale as is provided for in this Section 9.9.

(a)     Exercise.  If the Ares Entities elect to exercise their rights under this Section 9.9, the Ares Entities shall deliver a written notice (the "Drag Along Notice") to each other Member.  The Drag Along Notice shall set forth the principal terms of the proposed Sale insofar as it relates to such Units including: (i) the number and type of Units to be acquired from the Ares Entities; (ii) the Drag Along Sale Percentage applicable to such other Member; (iii) the consideration to be received in the proposed Sale; (iv) the name and address of the Prospective Buyer; and (v) the draft Transfer agreement with the Prospective Buyer.  If the Ares Entities consummate the proposed Sale to which reference is made in the Drag Along Notice, each other Member (each a "Participating Seller," and, collectively with the Ares Entities, the "Drag Along Sellers") shall be bound and obligated to Transfer the applicable Drag Along Sale Percentage of its Units (the "Drag Along Shares") in the proposed Sale on the same terms and conditions, with respect to each Drag Along Share sold, as the Ares Entities shall Transfer their respective Units in the Sale.  If the proposed Sale has not been consummated by the end of the 180th day following the date of the delivery of the Drag Along Notice, then the Drag Along Notice shall be null and void, each Participating Seller shall be released from its obligation under the Drag Along Notice and it shall be necessary for a separate Drag Along Notice to be furnished and the terms and provisions of this Section 9.9 separately complied with, in order to consummate such proposed Sale pursuant to this Section 9.9.

(b)     Miscellaneous.  The following provisions shall be applied to any proposed Transfer to which this Section 9.9 applies:

#4830-1939-2130

(i)      Certain Legal Requirements.

(A)      In the event the consideration to be paid in exchange for Units in a Drag Along Sale includes any securities, and the receipt of such securities by a Participating Seller would require under applicable law (x) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities or (y) the provision to any Participating Seller of any information regarding the Company, such securities or the issuer of such securities, such Participating Seller shall not have the right to Transfer Units in such proposed transaction.  In such event, the Ares Entities shall cause to be paid to such Participating Seller in lieu of such securities, against surrender of the Units (in accordance with Section 9.9(b)(v) of this Agreement) which would have otherwise been Transferred by such Participating Seller to the Prospective Buyer in the proposed transaction, an amount in cash equal to the fair market value (as determined in the good-faith judgment of the Manager) of such Units as of the date such securities would have been issued in exchange for such Units.

(B)      If the Company or the Ares Entities enter into any negotiation or Sale for which Rule 506 of the Securities Act (or any similar rule then in effect) may be available with respect to such negotiation or transaction, at the request of the Company or the Ares Entities, each Member shall appoint a purchaser representative (as such term is defined in Rule 501 of the Securities Act) reasonably acceptable to the Ares Entities at such Member's sole cost and expense.

(ii)      Further Assurances.

(A)      Whether in his, her or its capacity as a Participating Seller, the Manager, Member or officer of the Company, or otherwise, each Participating Seller and the Company shall take all such actions as may be necessary or desirable in order expeditiously to consummate a Drag Along Sale and any related transaction, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments; furnishing information and copies of documents; filing applications, reports, returns, filings and other documents or instruments with governmental authorities; and otherwise cooperating with the Ares Entities and the Prospective Buyer.  Without limiting the generality of the foregoing, in connection with a Drag Along Sale, each Participating Seller and the Company shall execute and deliver such agreements as may be specified by the Ares Entities, including: (x) (I) agreements to make individual representations and warranties (including the absence of any Adverse Claim with respect to such Participating Seller's Units, the power, authority and legal right to Transfer Units in the Drag Along Sale, the enforceability of relevant agreements and the absence of conflicts with applicable law or other agreements) and (II) be liable as to such representations and warranties; (y) agreements to be liable (whether by purchase price adjustment, indemnity payments or otherwise) in respect of representations, warranties, covenants and agreements in respect of the Company and its Subsidiaries; and (z) agreements providing for, or

32

containing, holdbacks, escrow arrangements, earn-outs, covenants limiting the right to compete, covenants limiting the right to solicit, and releases, among other matters.  Notwithstanding the foregoing, the aggregate amount of liability of any Participating Seller described in clauses (a) and (b) in connection with any such Transfer of Units shall not exceed the lesser of: (1) such Participating Seller's pro rata portion of any such liability, to be determined in accordance with such Participating Seller's portion of the total value of Units included in such Drag Along Sale; or (2) the proceeds received by such Participating Seller in connection with such Drag Along Sale.

(B)     If a Member fails to comply with Section 9.9(b)(ii)(A) (including by failing to deliver any agreement or instrument, from and after the date on which the Drag Along Sale is consummated, the Units in the Company that such Member is obligated to sell under this Section 9.9 shall be deemed to be no longer outstanding.  In such event, the non-complying Member shall cease to be a Member of the Company or holder of Units in the Company and shall have no rights with respect thereto except the right to receive payment of the consideration paid in respect of such Units in the Company pursuant to the terms of the Drag Along Sale, without interest, upon compliance with such reasonable terms as the Prospective Buyer in such Drag Along Sale shall establish.

(C)     If the Drag Along Sale is structured as a merger or consolidation and without regard to whether or not such vote is otherwise required as a condition to the execution of such a merger or consolidation under this Agreement, each Member shall vote its Units as requested by the Ares Entities either by written consent or at a meeting as the case may be.  Each Member shall also waive all dissenter's rights, appraisal rights and similar rights in connection with such merger or consolidation.  If the Drag Along Sale is structured a sale of Units, each Member shall agree to sell, and shall sell, all of its Units and rights to acquire Units on the terms and conditions approved by the Ares Entities.  If the Drag Along Sale is structured a sale of assets and without regard to whether or not such vote is otherwise required as a condition to the execution of such a sale of assets under this Agreement, each Member shall vote its Units to approve such sale and any subsequent liquidation of the Company or other distribution of the proceeds therefrom, whether by written consent or at a meeting (as requested by the Ares Entities), in each case, irrespective of the per Unit consideration, if any, such Member is expected to derive from such Drag Along Sale.

(iii)     Sale Process.  In their sole discretion, the Ares Entities shall decide whether or not to pursue, consummate, postpone or abandon any proposed Drag Along Sale and the terms and conditions of such Drag Along Sale.  Neither the Ares Entities nor any Affiliate of the Ares Entities shall have any liability to any other holder of Units arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Drag Along Sale.

(iv)     Expenses.  If a Drag Along Sale is consummated, each Drag Along Seller shall pay its pro rata share (relative to amounts received in respect of Units by each Drag

33

Along Seller) of the costs incurred by the Ares Entities relating to such Drag Along Sale (including legal fees and expenses), to the extent such costs are not otherwise paid or reimbursed by the Company or the Prospective Buyer.

(v)      Closing.  The closing of a Drag Along Sale shall take place at such time and place as the Ares Entities shall specify by notice to each Participating Seller.  At the closing of such Drag Along Sale, against delivery of the applicable consideration, each Participating Seller shall deliver the certificates evidencing the Units to be Transferred by such Participating Seller, duly endorsed, or with unit (or equivalent) powers duly endorsed, for transfer, free and clear of any liens or encumbrances, with any unit (or equivalent) transfer tax stamps affixed or in lieu of delivery of such certificates, an affidavit (with an appropriate indemnity or guarantee as determined by the Manager in its good-faith discretion) of such Participating Seller certifying that such certificates have been lost, stolen, destroyed or mutilated.

(vi)      Certain Other Matters.  In furtherance of the provisions of this Section 9.9, for so long as this Section 9.9 is in effect, each Member (and its successors, heirs, legal representatives, and permitted assigns and transferees) hereby: (i) irrevocably appoints each of the Ares Entities and their designees as his or its agents and attorneys-in-fact (the "Drag Along Agents") (with full power of substitution) to execute all agreements, instruments and certificates and take all actions necessary or desirable to effectuate any Drag Along Sale as contemplated under this Section 9.9; and (ii) grants to each Drag Along Agent a proxy (which shall be deemed to be coupled with an interest and to be irrevocable) to vote the Units having voting power held by such Person and exercise any consent rights applicable to such Units in favor of any such Drag Along Sale as provided in this Section 9.9.  THE AGREEMENTS CONTAINED IN THIS SECTION 9.9 ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE MEMBERS' OBLIGATIONS UNDER THIS AGREEMENT.  EXCEPT AS PROVIDED IN THIS AGREEMENT, SUCH PROXIES MAY NOT BE REVOKED OR TERMINATED DURING THE TERM OF THIS AGREEMENT AND SHALL SURVIVE THE DEATH, INCOMPETENCY, DISABILITY, BANKRUPTCY OR DISSOLUTION OF EACH MEMBER AND THE SUBSEQUENT HOLDERS OF ITS UNITS OR OTHER EQUITY INTERESTS IN THE COMPANY.  NO MEMBER SHALL GRANT ANY PROXY OR BECOME PARTY TO ANY VOTING TRUST OR OTHER AGREEMENT WHICH IS INCONSISTENT WITH, CONFLICTS WITH OR VIOLATES ANY PROVISION OF THIS AGREEMENT.

## ARTICLE 10.  RESIGNATION OF MEMBERS; TERMINATION OF COMPANY; LIQUIDATION AND DISTRIBUTION OF ASSETS

Section 10.1      Resignation of Members.  Except as otherwise specifically permitted in this Agreement or as approved by the Manager, no Member shall at any time resign, retire or withdraw from the Company.  The Company shall reflect any such permitted withdrawal by preparing an amendment to this Agreement, dated as of the date of such

34

withdrawal.  Thereafter, the withdrawing Member (or such Member's successors-in-interest) shall have none of the powers of a Member under this Agreement.  A withdrawing Member shall only have such rights of an assignee of a limited liability company interest under the Act as are consistent with the other terms and provisions of this Agreement and with no other rights under this Agreement.  Any Member purporting to resign, retire or withdraw in contravention of this Section 10.1 shall indemnify, defend and hold harmless the Company, the Manager and all other Members from and against any losses, expenses, judgments, fines, settlements or damages suffered or incurred by the Company or any such other Member arising out of or resulting from such purported resignation, retirement or withdrawal.

Section 10.2    Dissolution of Company.

(a)      The Company shall be dissolved, wound up and terminated as provided in this Agreement upon the first to occur of the following:

(i)      The entry of a decree of dissolution of the Court of Chancery of the State of Delaware pursuant to Section 18-802 of the Act;

(ii)      the determination of the Manager to dissolve the Company; or

(iii)      the occurrence of any other event that would make it unlawful for the business of the Company to be continued.

Except as expressly provided in this Agreement or as otherwise required by the Act, the Members shall have no power to dissolve the Company.

(b)      In the event of the dissolution of the Company for any reason, the Manager or a liquidating agent or committee appointed by the Manager shall act as a liquidating agent (the Manager or such liquidating agent or committee, in such capacity, is referred to in this Agreement as the "Liquidator") and shall commence to wind up the affairs of the Company and to liquidate the Company's assets.  The Members shall continue to share all income, losses and distributions during the period of liquidation in accordance with Article 5.  The Liquidator shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation, giving due regard to the activity and condition of the relevant market and general financial and economic conditions.

(c)      The Liquidator shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the liquidation and termination of the Company that the Manager would have with respect to the assets and liabilities of the Company during the term of the Company, and the Liquidator is hereby expressly authorized and empowered to execute any and all documents necessary or desirable to effectuate the liquidation and termination of the Company and the transfer of any Company assets.

(d)      Notwithstanding the foregoing, a Liquidator which is not a Member shall not be deemed a Member and shall not have any of the economic interests in the Company of a Member; and such Liquidator shall be compensated for its services to the Company at normal, customary and competitive rates for its services to the Company, as reasonably determined by the Manager.

Section 10.3   <u>Distribution in Liquidation</u>.  The Company's assets shall be applied in the following order of priority:

(a)     first, to pay the costs and expenses of the winding up, liquidation and termination of the Company;

(b)     second, to creditors of the Company, in the order of priority provided by law, including fees, indemnification payments and reimbursements payable to the Members or their Affiliates, but not including those liabilities (other than liabilities to the Members for any expenses of the Company paid by the Members or their Affiliates, to the extent the Members are entitled to reimbursement under this Agreement) to the Members in their capacity as Members;

(c)     third, to establish reserves reasonably adequate to meet any and all contingent or unforeseen liabilities or obligations of the Company.  Notwithstanding the foregoing, at the expiration of such period of time as the Liquidator may deem in good faith to be advisable, the balance of such reserves remaining after the payment of such contingencies or liabilities shall be distributed as provided below; and

(d)     fourth, the remainder to the Members in accordance with <u>Section 5.1</u>.

If the Liquidator, in its sole discretion, determines that Company assets other than cash are to be distributed, then the Liquidator shall cause the Value of the assets not so liquidated to be determined (with any such determination normally made by the Manager in accordance with the definition of "Value" being made instead by the Liquidator).  Such assets shall be retained or distributed by the Liquidator as follows:

(i)     the Liquidator shall retain assets having a value, net of any liability related thereto, equal to the amount by which the cash net proceeds of liquidated assets are insufficient to satisfy the requirements of <u>paragraphs (a)</u>, <u>(b)</u>, and <u>(c)</u> of this <u>Section 10.3</u>; and

(ii)    the remaining assets shall be distributed to the Members in the manner specified in <u>paragraph (d)</u> of this <u>Section 10.3</u>.

If the Liquidator, in its sole discretion, deems it not feasible or desirable to distribute to each Member its allocable share of each asset, the Liquidator may allocate and distribute specific assets to one or more Members as the Liquidator shall reasonably determine to be fair and equitable, taking into consideration, *inter alia*, the Value of such assets and the tax consequences of the proposed distribution upon each of the Members (including both distributees and others, if any).  Any distributions in-kind shall be subject to such conditions relating to the disposition and management of such distributions as the Liquidator deems reasonable and equitable.

Section 10.4   <u>Final Reports</u>.  Within a reasonable time following the completion of the liquidation of the Company's assets, the Liquidator shall deliver to each of the Members a

statement which shall set forth the assets and liabilities of the Company as of the date of complete liquidation and each Member's portion of distributions pursuant to Section 10.3.

Section 10.5    Rights of Members.  Each Member shall look solely to the Company's assets for all distributions with respect to the Company and such Member's Capital Contributions (including return of such Capital Contributions), and such Member's share of profits or losses thereon, and shall have no recourse therefor (upon dissolution or otherwise) against any other Member or the Manager.  No Member shall have any right to demand or receive property other than cash upon dissolution and termination of the Company.

Section 10.6    Termination.  The Company shall terminate when all property owned by the Company shall have been disposed of and the assets shall have been distributed as provided in Section 10.3.  The Liquidator shall then execute and cause to be filed a certificate of cancellation of the Company.

## ARTICLE 11.  NOTICES AND VOTING

Section 11.1    Notices.  Except as otherwise expressly provided in this Agreement, all notices, demands or requests required or permitted under this Agreement must be in writing, and shall be made by hand delivery, certified mail, overnight courier service, electronic mail or facsimile to the address, electronic mail address or facsimile number set forth below such Member's name on the signature page to this Agreement.  Notwithstanding the foregoing, any party may designate a different address, electronic mail address or facsimile number by a notice similarly given to the Company.  Any such notice or communication shall be deemed given when delivered by hand, if delivered on a Business Day, the next Business Day after delivery by hand if delivered by hand on a day that is not a Business Day; three Business Days after being deposited in the United States mail, postage prepaid, return receipt requested, if mailed; on the next Business Day after being deposited for next day delivery with Federal Express or a similar overnight courier; when receipt is acknowledged, if sent by electronic mail or facsimile on a Business Day; and the next Business Day following the day on which receipt is acknowledged if sent by electronic mail or facsimile on a day that is not a Business Day.

If to the Company:

[●] Holdings, LLC
1331 Lamar Street
Suite 650
Houston, Texas 77010
Attention:  [●]
Email: [●]
Fax:  [●]

#4830-1939-2130

and

[●] Holdings, LLC
c/o Ares Management LLC
2000 Avenue of the Stars
12th Floor
Los Angeles, California 90067
Attention:  Eric Waxman
Email: ewaxman@aresmgmt.com
Fax:  (310) 201-4170


with copies (which shall not constitute notice) to:


Milbank, Tweed, Hadley & McCloy LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Attention: Paul S. Aronzon and Adam R. Moses
Email: paronzon@milbank.com
        amoses@milbank.com
Fax:  (213) 892-4765

Section 11.2   Voting.  Except as otherwise expressly provided in this Agreement or as required by applicable law, all actions and determinations of any kind of, and with respect to, the Company and/or its Subsidiaries shall be made by the Manager.  Subject to the foregoing, in the event that any action or determination is required to be made by the Members, it shall be made by the affirmative vote of Majority Members vote at a meeting or, in lieu of a meeting, by written consent of Majority Members.


## ARTICLE 12.  AMENDMENT OF AGREEMENT

Section 12.1   Amendments.

(a)      Each Member agrees that an appropriate officer of the Company acting at the discretion of the Manager (including under a standing or continuing direction of general application in connection with updates to Schedule A) may execute, swear to, acknowledge, deliver, file and record whatever documents may be required to reflect:

(i)      a change in the name of the Company, the location of the principal place of business of the Company or the registered agent or office of the Company;

(ii)      admission or substitution of Members whose admission or substitution has been made in accordance with this Agreement;

38

(iii)    a change that the Manager believes is reasonable and necessary or appropriate to qualify or continue the qualification of the Company as a limited liability company under the laws of any state;

(iv)    an amendment or other modification to Schedule A from time to time in accordance with Section 3.1 of this Agreement;

(v)    an amendment pursuant to Section 3.2 or 3.4(c), including, without limitation, to facilitate the implementation of the Management Incentive Plan; and

(vi)    an amendment that is necessary to prevent the Company or its officers from in any manner being subjected to the provisions of the Investment Company Act of 1940, as amended, or "plan asset" regulations adopted under ERISA, whether or not substantially similar to plan asset regulations currently applied by the United States Department of Labor.

(b)    Except as provided in Section 12.1(a), amendments to this Agreement may be made only if embodied in an instrument signed by the Majority Members.  Notwithstanding the foregoing, unless otherwise specifically contemplated by this Agreement (including, without limitation, with respect to any Management Incentive Plan), no amendment to this Agreement shall, without the prior consent of each Member materially and adversely affected thereby, disproportionately increase the liability of any Member, disproportionately decrease any Member's interest in Net Income or items of income or gain and distributions, disproportionately increase any Member's interest in Net Loss or items of deduction or loss.

Section 12.2    Amendment of Certificate.  In the event this Agreement shall be amended pursuant to this Article 12, the Manager shall be empowered to and shall amend the Certificate to reflect such change if the Manager deems such amendment of the Certificate to be necessary, appropriate or desirable.

## ARTICLE 13.  MISCELLANEOUS

Section 13.1    Confidentiality.

(a)    Except as may be consented by the Manager,  each party to this Agreement agrees that it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to: (i) the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement; or (ii) discussions or negotiations relating to this Agreement or the relationship of the parties contemplated hereby (the foregoing collectively, "Confidential Information"). Notwithstanding the foregoing, Confidential Information may be disclosed to a party's directors, partners, officers, employees, advisors, financing sources or representatives (the foregoing collectively, "Representatives") if: (1) such Representatives of any party are informed by such party of the confidential nature of such Confidential Information and are directed by such party to keep such Confidential Information confidential in accordance with the contents of this Agreement; and (2) each party is liable for any breaches of this Section 13.1 by any of its Representatives.  The confidentiality obligations of this Section 13.1 do not apply to

39

any Confidential Information (i) which is publicly available or becomes publicly available through no act or omission of the party wishing to disclose such Confidential Information; or (ii) to the extent that it is required to be disclosed (a "Required Disclosure") by any applicable law, regulation or legal process or by the rules of any stock exchange, regulatory body or governmental authority.

(b)     In the event that any party to this Agreement or any of its Representatives becomes subject to a Required Disclosure, such party shall provide the Company with prompt written notice of the same.  Upon receipt of such notice, the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement with respect to such Required Disclosure.  In addition, such party or its Representatives, as applicable, subject to such Required Disclosure shall cooperate with the Company in any effort to obtain a protective order or other remedy with respect to such Required Disclosure.  In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the provisions of this Section 13.1 with respect to such Required Disclosure, such party or any of its Representatives, as applicable, shall: (i) furnish only that portion of the Confidential Information that is subject to such Required Disclosure and (ii) exercise all reasonable efforts to obtain reasonably reliable assurance that the Confidential Information so disclosed shall be accorded confidential treatment.

(c)     The provisions of this Section 13.1 shall survive termination of this Agreement.

(d)     None of the Company, any Member or any of their respective Affiliates shall issue, or authorize to be issued, any press release, interview, article or other media release (including any Internet posting, web blog or other electronic publication or transmission) that makes reference to this Agreement or the transactions contemplated in this Agreement or to any other Member, in each case, without the written consent of the Manager.  For the avoidance of doubt, the foregoing shall not apply to Ares.

Section 13.2     No Third-Party Beneficiaries.  Except as set forth in Section 8.8 (*Indemnification of the Manager, Officers, Members and Agents*) in respect of Indemnified Parties and Section 13.14 (*No Recourse*), this Agreement is for the sole benefit of the parties to this Agreement, the Manager, Ares, and the Sponsor Related Parties.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 13.3     Entire Agreement.  This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof.  This Agreement supersedes any prior agreement or understandings among them with respect to the subject matter hereof, and it may not be modified or amended in any manner other than as set forth herein.

Section 13.4     Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party.  Upon such

determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

Section 13.5     Effect.  Each party to this Agreement has carefully read this Agreement and has had sufficient time and opportunity to consider its terms and to obtain legal advice, if desired, and fully understands the final and binding effect of this Agreement.  Except as otherwise specifically provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, successors and permitted assigns.

Section 13.6     Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

Section 13.7     Counterparts.  This Agreement may contain more than one counterpart of the signature page.  This Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages.  All of such counterpart signatures pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

Section 13.8     Remedies.  The Company and each Member shall have all remedies available at law, in equity or otherwise in the event of any breach or violation of this Agreement or any default hereunder by the Company or any Member.  The parties to this Agreement acknowledge and agree that in the event of any breach of this Agreement, in addition to any other remedies which may be available, each of the parties to this Agreement shall be entitled to specific performance (without being required to post a bond) of the obligations of the other parties to this Agreement and, in addition, to such other equitable remedies (including preliminary or temporary relief) as may be appropriate in the circumstances.  The Company agrees to pay all fees, costs, and expenses, including fees and expenses of attorneys, accountants and other experts retained by Topco, the Ares Entities, Ares or their Affiliates (which, for the avoidance of doubt, excludes the Company) and all fees, costs and expenses of appeals, incurred or expended by Topco, the Ares Entities, Ares or their Affiliates (which, for the avoidance of doubt, excludes the Company) in connection with the enforcement of this Agreement or the collection of any sums due hereunder, whether or not suit is commenced.  None of the rights, powers or remedies conferred under this Agreement shall be mutually exclusive.  Each such right, power or remedy shall be cumulative and in addition to any other right, power or remedy whether conferred by this Agreement or now or hereafter available at law, in equity, by statute or otherwise.

Section 13.9     Waiver of Partition.  The Members agree that the Company assets are not and will not be suitable for partition.  Accordingly, each of the Members irrevocably

#4830-1939-2130

waives any and all rights (if any) that such Member may have to maintain any action for partition of any of such assets.

Section 13.10  <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

Section 13.11  <u>Consent to Jurisdiction and Venue</u>.  Each party to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Chancery Court sitting in Wilmington, Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter of this Agreement.  To the fullest extent permitted by law, each party to this Agreement waives and agrees not to assert, and agrees not to allow any of its Affiliates to assert, by way of motion, as a defense or otherwise, in any such action, any claim that: (i) it is not subject personally to the jurisdiction of the Delaware Chancery Court; (ii) its property is exempt or immune from attachment or execution; (iii) any such proceeding brought in the Delaware Chancery Court is improper; or (iv) that this Agreement or the subject matter of this Agreement may not be enforced in or by such court. Each party to this Agreement further agrees: (A) not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter of this Agreement other than before the Delaware Chancery Court; and (B) not to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than the Delaware Chancery Court whether on the grounds of inconvenient forum or otherwise.  Each party to this Agreement consents to service of process in any such proceeding in any manner permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to <u>Section 11.1</u> of this Agreement is reasonably calculated to give actual notice.

Section 13.12  <u>Waiver of Trial by Jury</u>. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY TO THIS AGREEMENT WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER OF THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES TO THIS AGREEMENT THAT THIS <u>SECTION 13.12</u> CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT.  ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS

42

<u>SECTION 13.12</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 13.13  <u>Exercise of Rights and Remedies</u>. No delay of or omission in the exercise of any right, power or remedy accruing to any party to this Agreement as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy.  Nor shall any such delay or omission be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later.  Nor shall any such delay, omission nor waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

Section 13.14  <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Member may be a partnership or limited liability company, each Member, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Members shall have any obligation under this Agreement.  Each Member further acknowledges and agrees that it has no rights of recovery under this Agreement against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against: (i) any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Member (or any of their successor or permitted assignees); (ii) against any former, current, or future general or limited partner, manager, stockholder or member of any Member (or any of their successors or permitted assignees) or any Affiliate of any of the foregoing; or (iii) against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Members (each, but excluding for the avoidance of doubt, the Members, a "<u>Member Affiliate</u>"). The prohibitions set forth in this <u>Section 13.14</u> shall apply without regard to whether any claim, action, recourse or right: (i) is sought by attempting to pierce the corporate veil; (ii) sounds in tort, contract or otherwise; (iii) is brought by or on behalf of such party against the Member Affiliates; or (iv) is brought by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise.  Each Member also expressly agrees and acknowledges that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Member Affiliate, as such, for any obligations of the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.  Except to the extent otherwise expressly set forth in, and subject in all cases to the terms and conditions of and limitations in this Agreement, this Agreement may only be enforced against, and any claim or cause of action of any kind based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the Persons that are expressly named as parties to this Agreement and then only with respect to the specific obligations set forth in this Agreement

43

with respect to such party.  Each Member Affiliate is expressly intended as a third party beneficiary of this Section 13.14.

Section 13.15  Corporate Reorganization Transactions.  Notwithstanding anything to the contrary in this Agreement, at the direction of the Manager made in its sole discretion, the Company and each Member shall take all action necessary, to reorganize and/or restructure the Company and its Affiliates to (i) enable, or otherwise facilitate, a strategic transaction, (ii) increase tax-efficiency or preserve the Company's favorable tax attributes and/or (iii) otherwise provide for a tax-efficient structure for the benefit of Ares and its Affiliates and investors. For the avoidance of doubt,  no consent of any Member shall be required as a condition to the Manager issuing the direction contemplated by the preceding sentence.

Section 13.16  Triggering Event; Eligible Holder Certifications.

(a)     If (i) any Transfer of any Equity Interests in the Company results in the occurrence of a Specified Event, or (ii) the Manager at any time determines in good faith that it is reasonably necessary or advisable and in the best interests of the Company to redeem the Units or other Equity Interests of a Member who was formerly an employee of the Company or any affiliate thereof (each of the foregoing clauses (i) and (ii), a "Triggering Event"), then the Units or other Equity Interests relating to such Triggering Event held by the applicable Member (the "Subject Units") shall be subject to redemption in accordance with the provisions of Section 13.17.

(b)     During any Applicable Time, the Manager may request, in writing, that any Member furnish to the Manager, within 10 days after receipt of such written request, an executed Eligible Holder Certification or such other reasonably necessary information concerning his, her or its nationality, citizenship or other related status (or, if the Member is a nominee holding for the account of another Person (other than any Person who directly or indirectly owns Equity Interests in a corporation incorporated under the laws of the United States or any State or territory of the United States, so long as that corporation (i) is qualified to hold federal leases under 30 U.S.C. 181 and 43 C.F.R. 3102.2 or its successor stature or rule and (ii) is the direct and indirect owner of such Member), the nationality, citizenship or other related status of such Person) as the Manager in good faith may request in writing.  If a Member fails to furnish to the Manager within the aforementioned 10-day period such Eligible Holder Certification or other requested information or, if upon receipt of such Eligible Holder Certification or other requested information the Manager determines in good faith that a Member is not an Eligible Holder (either such event, an "Eligible Holder Default"), then the Units or other Equity Interests of such Member (the "Eligible Holder Units") owned by such Member shall be subject to redemption in accordance with the provisions of Section 13.17.

Section 13.17  Redemption.

(a)     Upon the occurrence of a Triggering Event or an Eligible Holder Default, the Company may redeem the applicable Subject Units and/or Eligible Holder Units of the applicable Member as follows:

#4830-1939-2130

(i)     The Manager shall, not later than the 15th day before the date fixed for redemption, give notice of redemption to the applicable Member at his, her or its last address designated in the books and records of the Company.  The notice shall be deemed to have been given when so sent.  The notice shall specify the Redeemable Units, the date fixed for redemption, the place of payment, that payment of the redemption price will be made upon surrender of the any certificate evidencing the Redeemable Units and that on and after the date fixed for redemption no further allocations or distributions to which the Member would otherwise be entitled in respect of the Redeemable Units will accrue or be made.

(ii)     The aggregate redemption price for Redeemable Units shall be an amount equal to the Value (the date of determination of which shall be the date fixed for redemption) of such Redeemable Units.  The redemption price shall be paid, as determined by the Manager, in cash or, in the case of a redemption of Redeemable Units constituting Eligible Holder Units, by delivery of a promissory note of the Company in the principal amount of the redemption price, bearing interest at the rate of 10% annually and payable in three equal annual installments of principal together with accrued interest, commencing one year after the redemption date.

(iii)     Upon surrender by or on behalf of the Member, at the place specified in the notice of redemption, assignment documentation with respect to the applicable Redeemable Units acceptable to the Manager (including, in the case of certificated Redeemable Units, any certificate evidencing the Redeemable Units, duly endorsed in blank or accompanied by an assignment duly executed in blank), the Member or his, her or its duly authorized representative shall be entitled to receive the payment therefor.

(iv)     After the redemption date, Redeemable Units shall no longer constitute issued and outstanding Equity Interests of the Company.

(b)     The provisions of this Section 13.17 shall also be applicable to Subject Units or Eligible Holder Units held by a Member or assignee as nominee of a Person upon the occurrence of a Triggering Event or an Eligible Holder Default.

DATED AS OF:  _____

LIMITED LIABILITY COMPANY AGREEMENT OF
[●] HOLDINGS, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of [●] Holdings, LLC, dated as of [●], 201[●], to be duly executed as of the date first above written.

[●], a [●] limited liability company, as a Member

By: _____
    Name:
    Title:

## Schedule A

Issued and Outstanding Equity Interests in the Company

## Schedule B

Initial Capital Contributions

[To come]

## Exhibit A

## Form of Joinder Agreement

This Joinder Agreement (this "Joinder Agreement") is made as of [_____ ___, 20__] by the undersigned (the "Transferee") in accordance with the Limited Liability Company Agreement of [●] Holdings, LLC, dated as of January [●], 2019 (as the same may be amended from time to time in accordance with its terms, the "LLC Agreement"). Capitalized terms used but not defined in this Joinder Agreement shall have the meanings ascribed to such terms in the LLC Agreement.

By its execution of this Joinder Agreement, the Transferee acknowledges, agrees and confirms that it shall become a party to the LLC Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party to the LLC Agreement and shall be deemed and is hereby admitted as, a Member for all purposes of the LLC Agreement and entitled to all the rights incidental thereto, as of the date first written above.

The Transferee represents and warrants to the Company and each other Member as of the date of the Transferee's admission to the Company as a Member that:

(a)     to the extent it is not a natural person, it is duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation, and if required by law is duly qualified to conduct business and is in good standing in the jurisdiction of its principal place of business (if not formed in such jurisdiction);

(b)     to the extent it is not a natural person, it has full corporate, limited liability company, partnership, trust or other applicable power and authority to execute and deliver the LLC Agreement and to perform its obligations under the LLC Agreement and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries or other Persons necessary for the due authorization, execution, delivery and performance of the LLC Agreement by the Transferee have been duly taken;

(c)     it has duly executed and delivered this Joinder Agreement, and this Joinder Agreement and the LLC Agreement are each enforceable against the Transferee in accordance with their respective terms, subject to bankruptcy, moratorium, insolvency and other laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity);

(d)     its authorization, execution, delivery, and performance of this Joinder Agreement and the LLC Agreement does not breach or conflict with or constitute a default under (A) the Transferee's charter or other governing documents to the extent it is not a natural person or (B) any material obligation under any other material agreement or arrangement to which the Transferee is a party or by which it is bound; and

(e)    it:

(i)    has been furnished with such information about the Company and the Interest as the Transferee has requested,

(ii)    has made its own independent inquiry and investigation into, and based thereon has formed an independent judgment concerning, the Company and the Transferee's Interest,

(iii)    has adequate means of providing for its current needs and possible contingencies, is able to bear the economic risks of this investment and has a sufficient net worth to sustain a loss of its entire investment in the Company in the event such loss should occur,

(iv)    has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Company,

(v)    is, or is controlled by, an "accredited investor," as that term is defined in Rule 501(a) of Regulation D, promulgated under the Securities Act, and

(vi)    understands and agrees that its Interest shall not be sold, pledged, hypothecated or otherwise Transferred except in accordance with the terms of the LLC Agreement and pursuant to an effective registration statement under the Securities Act or an applicable exemption from registration and/or qualification under the Securities Act and applicable state securities laws.  Notwithstanding anything to the contrary in this Joinder Agreement or the LLC Agreement, unless prohibited by applicable securities laws, the foregoing shall not restrict any Initial Member or any of their Affiliates from encumbering or otherwise pledging Units in connection with obtaining any financing with respect to an Initial Member or any of its Affiliates (or any enforcement taken with respect to such encumbrance or pledge).

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the LLC Agreement.

[TRANSFEREE]

By: _____
        Name:
        Title:

PRELIMINARY DRAFT—12/13/18
SUBJECT TO COMPLETION

# OPERATING AGREEMENT

## OF

## [GASTAR HOLDCO] LLC

This OPERATING AGREEMENT (this "Agreement") of [Gastar Holdco,] LLC (the "Company") is made and entered into as of January [●], 2019, by [Gastar Midco,] LLC, a Delaware limited liability company (the "Sole Member") and [Gastar Topco,] LLC, a Delaware limited liability company (the "Manager").

## RECITALS

WHEREAS,  the Company was formed as a Delaware limited liability company by the filing of the Certificate of Formation of the Company (the "Certificate") with the Secretary of State of Delaware on [●], 201[●];

WHEREAS, on October 31, 2018, Gastar Exploration Inc., a Delaware corporation ("Gastar Inc."), and its subsidiary commenced chapter 11 proceedings and filed a prepackaged plan of reorganization (as amended, supplemented or otherwise modified, the "Plan") under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, on December [●], 2018, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order");

WHEREAS, on the effective date of the Plan, all equity interests in Gastar Inc. were cancelled and extinguished;

WHEREAS, pursuant to the Plan and the Confirmation Order, (i) the Company was issued or otherwise received all of the equity interests in Gastar Inc. and (ii) the Company was authorized to take certain actions in order to effectuate the restructuring transactions set forth in the Plan, including, but not limited to, issuing or otherwise providing all membership interests in the Company to the Sole Member; and

WHEREAS, in connection with the consummation of the transactions contemplated by the Plan, the Sole Member and the Manager desire to enter into a written limited liability company agreement, in accordance with the provisions of the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. (the "Act").

NOW THEREFORE, the Sole Member and the Manager declare the following to be the Agreement of the Company, effective as of the date of this Agreement:

## AGREEMENT

NOW, THEREFORE, in consideration of the promises and covenants contained herein, the parties hereto agree as follows:

1.     <u>Name</u>.  The name of the Company is "[Gastar Holdco] LLC."

2.     <u>Business of the Company</u>. The purpose of the Company is to engage in any activity and to exercise any powers permitted to limited liability companies under the laws of the State of Delaware.

3.     <u>Location of Principal Place of Business</u>.  The principal office of the Company in the United States shall be at such place as the Manager designates from time to time. The principal office does not need to be in the State of Delaware. The Company shall maintain records at its principal office or such other place as the Manager may designate.  The Company may have such other offices as the Manager may designate.

4.     <u>Term of Company</u>.  The term of this Agreement commenced on the filing of the Certificate and is perpetual unless sooner terminated as provided in this Agreement or by law.

5.     <u>Authority</u>.  Subject to the limitations provided in this Agreement, the Manager shall have complete authority and discretion to: (i) manage the operations and affairs of the Company, (ii) make any decisions regarding the business of the Company and (iii) execute any and all agreements, documents and instruments on behalf of the Company and in its name. Any action taken by the Manager on behalf of the Company shall constitute the act of and serve to bind the Company.  In dealing with the Manager acting on behalf of the Company, no person or entity shall be required to inquire into the authority of the Manager to bind the Company. Persons and entities dealing with the Company are entitled to rely conclusively on the power and authority of the Manager as set forth in this Agreement.  No person or entity shall replace the then-serving Manager until the earlier to occur of (i) such then-serving Manager delivering a letter of resignation to the Company and (ii) the Sole Member removing such then-serving Manager by written notice to such effect delivered to the Company and such then-Serving Manager (each of the events specified in the foregoing clause (i) and clause (ii), a "<u>Removal Event</u>").  Following the occurrence of any Removal Event, a successor Manager shall be designated by the Sole Member. Except as otherwise specifically provided herein, the Manager shall have all rights and powers of a "manager" under the Act, and shall have all authority, rights and powers in the management of the Company business to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

6.     <u>Membership; Cash and Property Contributed to the Company</u>.  The Sole Member shall make an initial contribution of cash or property to the Company at such time and in such amounts as the Sole Member shall determine. The Sole Member owns 100% of the membership interests in the Company. The Company will not issue any certificates to evidence ownership of the membership interests.

7.     <u>Additional Contributions</u>.  The Sole Member may make additional contributions of cash or property to the Company at such times and in such amounts as the Sole Member shall determine.

#4824-0831-3986

8.      Share of Profits and Other Compensation to be Received by the Sole Member.  The Sole Member shall be entitled to all of the profits, losses and distributions of the Company.

9.      Internal Affairs of the Company.

(a)      As of the date of this Agreement, it is intended that the Company be disregarded as an entity separate from the Manager for federal and all relevant state and local income tax purposes.

(b)      The books and records of the Company shall be maintained in accordance with U.S. generally accepted accounting principles.

(c)      The Manager hereby approves and ratifies the execution and filing of the Certificate with the Secretary of State of the State of Delaware.

10.      Officers.

(a)  Appointment and Term of Office.  The Manager may appoint, and may delegate power to appoint, such officers, agents and employees as it may deem necessary or proper, who shall hold their offices or positions for such terms, have such authority and perform such duties as may from time to time be determined by or pursuant to authorization of the Manager.  Except as may be prescribed otherwise by the Manager in a particular case, all such officers shall hold their offices at the pleasure of the Manager for an unlimited term (unless otherwise provided in any applicable employment agreement) and need not be reappointed annually or at any other periodic interval.  Any action taken by an officer of the Company pursuant to authorization of the Manager shall constitute the act of and serve to bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the authority of such officers set forth in the authorization of the Manager, but only to the extent expressly provided in such authorization.  Any action purported to be taken by any officer, agent or employee of the Company or any of its subsidiaries in the absence of a grant of authority from the Manager, or otherwise in contravention of the terms of this Section 10(a), shall be void and without effect.

(b)  Resignation and Removal.  Any officer may resign at any time upon written notice to the Company.  Any officer, agent or employee of the Company may be removed by the Manager with or without cause at any time.  The Manager may delegate such power of removal as to officers, agents and employees not appointed by the Manager.

(c)      Compensation.  The compensation of the officers of the Company shall be fixed by the Manager, but this power may be delegated to any officer in respect of other officers under his or her control.  The compensation for senior executive officers of the Company shall, in each case, be commensurate with the financial performance of the Company, the role of the

3

officer, the scope of the officer's responsibilities and the performance and success of the officer, as determined in the reasonable judgment of the Manager.

(d)     Standard of Care of Officers.  Officers shall be held to the same standard of care and shall have the same fiduciary duties to the Company as if they were officers of a Delaware corporation, including the duties of care and loyalty.

11.     Amendments.  Amendments to this Agreement may be made only if embodied in an instrument signed by the Sole Member and the Manager.

12.     Amendment of Certificate.  In the event this Agreement shall be amended pursuant to Section 11, the Manager shall amend the Certificate to reflect such change if the Manager deems such amendment of the Certificate to be necessary or appropriate.

13.     Dissolution.

(a)     The Company shall dissolve, and its affairs shall be wound up upon the first to occur of: (i) a time determined by the Manager, or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)     Upon the dissolution of the Company, the Company's assets shall be liquidated under the direction of the Manager and the business of the Company shall be wound up.  Within a reasonable time after the effective date of dissolution of the Company, the Company's assets shall be distributed in the following manner and order:

(i)     first, the claims of all creditors of the Company shall be paid and discharged other than liabilities for which reasonable provision for payment has been made.  Such claims of creditors shall include claims by the Sole Member except to the extent not permitted by law; and

(ii)     thereafter, to the Sole Member.

14.     Certain Other Matters.  Notwithstanding anything to the contrary set forth in this Agreement or under applicable law, the Manager shall not be liable to the Company, any creditor of the Company, the Sole Member, any assignee or any other holder of the membership interests in the Company for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any subsidiary of the Company, on the one hand, and the Manager or any affiliate of the Manager, on the other), except for such actions as constitute fraud or bad faith.  To the extent the Manager has any liabilities or duties at law or in equity (including, without limitation, fiduciary duties or other standards of care) more expansive than those set forth in this Section 14, such liabilities and duties are hereby modified to the fullest extent permitted by applicable law (including, without limitation, Section 18-1101(c) of the Act) to those set forth in the first sentence of this Section 14.  In furtherance of the foregoing, it is understood and agreed that the Manager shall have no fiduciary duties of any kind or description to the Company, the Sole Member, any assignee or any other holder of membership interests in the Company.  In addition, with the exception of officers whose duty is set forth in Section 10(d), none of the Sole Member, any other holder of

4

membership interests in the Company or any affiliate of any of the foregoing entities or persons shall have any duty of any kind or description to the Company, the Sole Member or any other holder of membership interests in the Company or any affiliate of any of the foregoing entities or persons for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any subsidiary of the Company, on the one hand, and the Sole Member or any affiliate of the Sole Member, on the other), except for such actions as constitute fraud or bad faith.  Notwithstanding the foregoing or anything to the contrary contained in this Agreement, (i) nothing in this Section 14 shall be construed to eliminate the covenant of good faith and fair dealing and (ii) nothing contained in this Agreement shall relieve any Person of any liability for breach of fiduciary duty, if any, owed to the Company or its Affiliates incurred in such Person's role as an officer or employee of the Company or its Affiliates.

15.    Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of Laws provision or rule that would cause the application of the domestic substantive Laws of any other jurisdiction.

16.    Consent To Jurisdiction And Venue.  The Sole Member, the Manager and each person or entity subject to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Chancery Court sitting in Wilmington, Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter of this Agreement. To the fullest extent permitted by law, the Sole Member, the Manager and each person or entity subject to this Agreement waives and agrees not to assert, and agrees not to allow any of its affiliates to assert, by way of motion, as a defense or otherwise, in any such action, any claim that: (i) it is not subject personally to the jurisdiction of the Delaware Chancery Court; (ii) its property is exempt or immune from attachment or execution; (iii) any such proceeding brought in the Delaware Chancery Court is improper; or (iv) that this Agreement or the subject matter of this Agreement or thereof may not be enforced in or by such court.  The Sole Member, the Manager and each person or entity subject to this Agreement further agrees: (i) not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof or thereof other than before the Delaware Chancery Court; and (ii) not to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than the Delaware Chancery Court whether on the grounds of inconvenient forum or otherwise.  The Sole Member, the Manager and each person or entity subject to this Agreement consents to service of process in any such proceeding in any manner permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified in the books and records of the Company is reasonably calculated to give actual notice.

17.    Expenses.  The Company shall be responsible for and shall pay all fees and expenses incurred in connection with the formation of the Company, including, without limitation, all legal and accounting fees and expenses incurred in connection with the

preparation, execution and delivery of this Agreement and all related agreements and instruments, and negotiations with third parties.  The Company shall pay all filing fees, minimum franchise or other similar taxes and other governmental charges incident to its formation and qualification to do business.

18.    <u>Limited Liability</u>.  Except as otherwise provided by the Act and whether arising in contract, tort or otherwise, the debts, obligations and liabilities of the Company shall be solely the debts, obligations and liabilities of the Company.  Neither the Sole Member nor the Manager shall be obligated for any such debt, obligation or liability of the Company by reason of being a member of the Company.

19.    <u>Indemnification of the Sole Member, the Manager, Officers and Agents</u>.

(a)    The Company shall defend and indemnify the Sole Member, the Manager or member or trustee or shareholder of the Sole Member or the Manager from any threatened, pending or completed action, suit or proceeding by reason of the fact that such person or entity is or was an officer, employee or other agent of the Company, the Sole Member or the Manager (each, an "<u>Indemnified Party</u>"), to the fullest extent permitted by applicable law in effect on the date of this Agreement and to such greater extent as applicable law may hereafter from time to time permit.  The indemnity shall protect the Indemnified Party from and against any loss, expense, damage or injury suffered or sustained by them arising out of their activities on behalf of the Company if the acts upon which such threatened, pending or completed action are based were not a result of fraud or bad faith by such Indemnified Party.  Upon the approval of the Manager, the Company may indemnify any other person or entity who was or is a party or is threatened to be made a party to any action suit or proceeding to the same extent and subject to the same conditions as any other Indemnified Party as set forth in this <u>Section 19</u>.  The Company shall indemnify and hold harmless any Indemnified Party or person or entity executing any guaranty of indebtedness of the Company from any and all claims, demands, losses, liabilities, damages and expenses (including reasonable attorneys' fees) suffered or incurred by any such guarantor by reason of the failure of the Company to perform its obligations under any guaranteed indebtedness or suffered or incurred by such guarantor in defending or prosecuting any suit, action or other proceeding brought in connection with the guaranty or such indebtedness or in enforcing this indemnification or any subrogation rights or other rights or remedies, at law or in equity, which the guarantor may have by reason of performing its obligations under any such guaranty of indebtedness.  Any indemnification pursuant to this <u>Section 19</u> shall only be from the assets of the Company.

(b)    Expenses (including attorneys' fees) incurred by an Indemnified Party in a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a legally enforceable written undertaking by or on behalf of such Indemnified Party in form and substance acceptable to the Sole Member to repay such amount if such Indemnified Party is determined pursuant to this <u>Section 19</u> or adjudicated to be ineligible for indemnification, which undertaking will be an unlimited general obligation of the Indemnitee but need not be secured unless so determined by the Sole Member.

#4824-0831-3986

(c)     No amendment, modification or deletion of this <u>Section 19</u> will apply to or have any effect on the right of any Indemnified Party to indemnification for or with respect to any acts or omissions of such Indemnified Party occurring prior to such amendment, modification or deletion.

20.     <u>Insurance</u>.   To the extent applicable, the Company shall maintain directors' and officers' liability insurance covering the Manager in an amount to be determined by the Manager in its discretion.

21.     <u>No Third-Party Beneficiaries</u>.  Except as set forth in <u>Section 19</u> (*Indemnification of the Sole Member, the Manager, Officers and Agents*) in respect of Indemnified Parties, this Agreement is for the sole benefit of the parties to this Agreement. Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

22.      <u>Complete Agreement</u>.  This Agreement and the Certificate constitute the complete and exclusive statement of agreement by the Sole Member with respect to their respective subject matters and supersede all prior written and oral agreements or statements.

23.     <u>Counterparts</u>.  This Agreement may contain more than one counterpart of the signature page and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages.  All of such counterpart signatures pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

[*Signature page follows*]

#4824-0831-3986

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date set forth above.

**SOLE MEMBER:**

**[GASTAR MIDCO,] LLC**

_____
Name:
Title:

**MANAGER:**

**[GASTAR TOPCO,] LLC**

_____
Name:
Title:

[Signature Page to Gastar Holdco LLC Agreement]

PRELIMINARY DRAFT—12/13/18
SUBJECT TO COMPLETION

# OPERATING AGREEMENT

## OF

## [GASTAR HOLDCO] LLC

This OPERATING AGREEMENT (this "Agreement") of [Gastar Holdco,] LLC (the "Company") is made and entered into as of January [●], 2019, by [Gastar Midco,] LLC, a Delaware limited liability company (the "Sole Member") and [Gastar Topco,] LLC, a Delaware limited liability company (the "Manager").

## RECITALS

WHEREAS,  the Company was formed as a Delaware limited liability company by the filing of the Certificate of Formation of the Company (the "Certificate") with the Secretary of State of Delaware on [●], 201[●];

WHEREAS, on October 31, 2018, Gastar Exploration Inc., a Delaware corporation ("Gastar Inc."), and its subsidiary commenced chapter 11 proceedings and filed a prepackaged plan of reorganization (as amended, supplemented or otherwise modified, the "Plan") under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, on December [●], 2018, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order");

WHEREAS, on the effective date of the Plan, all equity interests in Gastar Inc. were cancelled and extinguished;

WHEREAS, pursuant to the Plan and the Confirmation Order, (i) the Company was issued or otherwise received all of the equity interests in Gastar Inc. and (ii) the Company was authorized to take certain actions in order to effectuate the restructuring transactions set forth in the Plan, including, but not limited to, issuing or otherwise providing all membership interests in the Company to the Sole Member; and

WHEREAS, in connection with the consummation of the transactions contemplated by the Plan, the Sole Member and the Manager desire to enter into a written limited liability company agreement, in accordance with the provisions of the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. (the "Act").

NOW THEREFORE, the Sole Member and the Manager declare the following to be the Agreement of the Company, effective as of the date of this Agreement:

## AGREEMENT

NOW, THEREFORE, in consideration of the promises and covenants contained herein, the parties hereto agree as follows:

1.      <u>Name</u>.  The name of the Company is "[Gastar Holdco] LLC."

2.      <u>Business of the Company</u>. The purpose of the Company is to engage in any activity and to exercise any powers permitted to limited liability companies under the laws of the State of Delaware.

3.      <u>Location of Principal Place of Business</u>.  The principal office of the Company in the United States shall be at such place as the Manager designates from time to time. The principal office does not need to be in the State of Delaware. The Company shall maintain records at its principal office or such other place as the Manager may designate.  The Company may have such other offices as the Manager may designate.

4.      <u>Term of Company</u>.  The term of this Agreement commenced on the filing of the Certificate and is perpetual unless sooner terminated as provided in this Agreement or by law.

5.      <u>Authority</u>.  Subject to the limitations provided in this Agreement, the Manager shall have complete authority and discretion to: (i) manage the operations and affairs of the Company, (ii) make any decisions regarding the business of the Company and (iii) execute any and all agreements, documents and instruments on behalf of the Company and in its name. Any action taken by the Manager on behalf of the Company shall constitute the act of and serve to bind the Company.  In dealing with the Manager acting on behalf of the Company, no person or entity shall be required to inquire into the authority of the Manager to bind the Company. Persons and entities dealing with the Company are entitled to rely conclusively on the power and authority of the Manager as set forth in this Agreement.  No person or entity shall replace the then-serving Manager until the earlier to occur of (i) such then-serving Manager delivering a letter of resignation to the Company and (ii) the Sole Member removing such then-serving Manager by written notice to such effect delivered to the Company and such then-Serving Manager (each of the events specified in the foregoing clause (i) and clause (ii), a "<u>Removal Event</u>").  Following the occurrence of any Removal Event, a successor Manager shall be designated by the Sole Member. Except as otherwise specifically provided herein, the Manager shall have all rights and powers of a "manager" under the Act, and shall have all authority, rights and powers in the management of the Company business to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

6.      <u>Membership; Cash and Property Contributed to the Company</u>.  The Sole Member shall make an initial contribution of cash or property to the Company at such time and in such amounts as the Sole Member shall determine. The Sole Member owns 100% of the membership interests in the Company. The Company will not issue any certificates to evidence ownership of the membership interests.

7.      <u>Additional Contributions</u>.  The Sole Member may make additional contributions of cash or property to the Company at such times and in such amounts as the Sole Member shall determine.

8.      <u>Share of Profits and Other Compensation to be Received by the Sole Member</u>.  The Sole Member shall be entitled to all of the profits, losses and distributions of the Company.

9.      <u>Internal Affairs of the Company</u>.

(a)     As of the date of this Agreement, it is intended that the Company be disregarded as an entity separate from the Manager for federal and all relevant state and local income tax purposes.

(b)     The books and records of the Company shall be maintained in accordance with U.S. generally accepted accounting principles.

(c)     The Manager hereby approves and ratifies the execution and filing of the Certificate with the Secretary of State of the State of Delaware.

10.     <u>Officers</u>.

(a)  <u>Appointment and Term of Office</u>.  The Manager may appoint, and may delegate power to appoint, such officers, agents and employees as it may deem necessary or proper, who shall hold their offices or positions for such terms, have such authority and perform such duties as may from time to time be determined by or pursuant to authorization of the Manager.  Except as may be prescribed otherwise by the Manager in a particular case, all such officers shall hold their offices at the pleasure of the Manager for an unlimited term (unless otherwise provided in any applicable employment agreement) and need not be reappointed annually or at any other periodic interval.  Any action taken by an officer of the Company pursuant to authorization of the Manager shall constitute the act of and serve to bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the authority of such officers set forth in the authorization of the Manager, but only to the extent expressly provided in such authorization.  Any action purported to be taken by any officer, agent or employee of the Company or any of its subsidiaries in the absence of a grant of authority from the Manager, or otherwise in contravention of the terms of this <u>Section 10(a)</u>, shall be void and without effect.

(b)  <u>Resignation and Removal</u>.  Any officer may resign at any time upon written notice to the Company.  Any officer, agent or employee of the Company may be removed by the Manager with or without cause at any time.  The Manager may delegate such power of removal as to officers, agents and employees not appointed by the Manager.

(c)     <u>Compensation</u>.  The compensation of the officers of the Company shall be fixed by the Manager, but this power may be delegated to any officer in respect of other officers under his or her control.  The compensation for senior executive officers of the Company shall, in each case, be commensurate with the financial performance of the Company, the role of the

3

officer, the scope of the officer's responsibilities and the performance and success of the officer, as determined in the reasonable judgment of the Manager.

(d)  Standard of Care of Officers.  Officers shall be held to the same standard of care and shall have the same fiduciary duties to the Company as if they were officers of a Delaware corporation, including the duties of care and loyalty.

11.  Amendments.  Amendments to this Agreement may be made only if embodied in an instrument signed by the Sole Member and the Manager.

12.  Amendment of Certificate.  In the event this Agreement shall be amended pursuant to Section 11, the Manager shall amend the Certificate to reflect such change if the Manager deems such amendment of the Certificate to be necessary or appropriate.

13.  Dissolution.

(a)  The Company shall dissolve, and its affairs shall be wound up upon the first to occur of: (i) a time determined by the Manager, or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)  Upon the dissolution of the Company, the Company's assets shall be liquidated under the direction of the Manager and the business of the Company shall be wound up.  Within a reasonable time after the effective date of dissolution of the Company, the Company's assets shall be distributed in the following manner and order:

(i)  first, the claims of all creditors of the Company shall be paid and discharged other than liabilities for which reasonable provision for payment has been made. Such claims of creditors shall include claims by the Sole Member except to the extent not permitted by law; and

(ii)  thereafter, to the Sole Member.

14.  Certain Other Matters.  Notwithstanding anything to the contrary set forth in this Agreement or under applicable law, the Manager shall not be liable to the Company, any creditor of the Company, the Sole Member, any assignee or any other holder of the membership interests in the Company for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any subsidiary of the Company, on the one hand, and the Manager or any affiliate of the Manager, on the other), except for such actions as constitute fraud or bad faith.  To the extent the Manager has any liabilities or duties at law or in equity (including, without limitation, fiduciary duties or other standards of care) more expansive than those set forth in this Section 14, such liabilities and duties are hereby modified to the fullest extent permitted by applicable law (including, without limitation, Section 18-1101(c) of the Act) to those set forth in the first sentence of this Section 14.  In furtherance of the foregoing, it is understood and agreed that the Manager shall have no fiduciary duties of any kind or description to the Company, the Sole Member, any assignee or any other holder of membership interests in the Company.  In addition, with the exception of officers whose duty is set forth in Section 10(d), none of the Sole Member, any other holder of

4

membership interests in the Company or any affiliate of any of the foregoing entities or persons shall have any duty of any kind or description to the Company, the Sole Member or any other holder of membership interests in the Company or any affiliate of any of the foregoing entities or persons for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any subsidiary of the Company, on the one hand, and the Sole Member or any affiliate of the Sole Member, on the other), except for such actions as constitute fraud or bad faith.  Notwithstanding the foregoing or anything to the contrary contained in this Agreement, (i) nothing in this Section 14 shall be construed to eliminate the covenant of good faith and fair dealing and (ii) nothing contained in this Agreement shall relieve any Person of any liability for breach of fiduciary duty, if any, owed to the Company or its Affiliates incurred in such Person's role as an officer or employee of the Company or its Affiliates.

15.    Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of Laws provision or rule that would cause the application of the domestic substantive Laws of any other jurisdiction.

16.    Consent To Jurisdiction And Venue.  The Sole Member, the Manager and each person or entity subject to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Chancery Court sitting in Wilmington, Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter of this Agreement. To the fullest extent permitted by law, the Sole Member, the Manager and each person or entity subject to this Agreement waives and agrees not to assert, and agrees not to allow any of its affiliates to assert, by way of motion, as a defense or otherwise, in any such action, any claim that: (i) it is not subject personally to the jurisdiction of the Delaware Chancery Court; (ii) its property is exempt or immune from attachment or execution; (iii) any such proceeding brought in the Delaware Chancery Court is improper; or (iv) that this Agreement or the subject matter of this Agreement or thereof may not be enforced in or by such court.  The Sole Member, the Manager and each person or entity subject to this Agreement further agrees: (i) not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof or thereof other than before the Delaware Chancery Court; and (ii) not to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than the Delaware Chancery Court whether on the grounds of inconvenient forum or otherwise.  The Sole Member, the Manager and each person or entity subject to this Agreement consents to service of process in any such proceeding in any manner permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified in the books and records of the Company is reasonably calculated to give actual notice.

17.    Expenses.  The Company shall be responsible for and shall pay all fees and expenses incurred in connection with the formation of the Company, including, without limitation, all legal and accounting fees and expenses incurred in connection with the

#4824-0831-3986

preparation, execution and delivery of this Agreement and all related agreements and instruments, and negotiations with third parties.  The Company shall pay all filing fees, minimum franchise or other similar taxes and other governmental charges incident to its formation and qualification to do business.

18.     <u>Limited Liability</u>.  Except as otherwise provided by the Act and whether arising in contract, tort or otherwise, the debts, obligations and liabilities of the Company shall be solely the debts, obligations and liabilities of the Company.  Neither the Sole Member nor the Manager shall be obligated for any such debt, obligation or liability of the Company by reason of being a member of the Company.

19.     <u>Indemnification of the Sole Member, the Manager, Officers and Agents</u>.

(a)     The Company shall defend and indemnify the Sole Member, the Manager or member or trustee or shareholder of the Sole Member or the Manager from any threatened, pending or completed action, suit or proceeding by reason of the fact that such person or entity is or was an officer, employee or other agent of the Company, the Sole Member or the Manager (each, an "<u>Indemnified Party</u>"), to the fullest extent permitted by applicable law in effect on the date of this Agreement and to such greater extent as applicable law may hereafter from time to time permit.  The indemnity shall protect the Indemnified Party from and against any loss, expense, damage or injury suffered or sustained by them arising out of their activities on behalf of the Company if the acts upon which such threatened, pending or completed action are based were not a result of fraud or bad faith by such Indemnified Party.  Upon the approval of the Manager, the Company may indemnify any other person or entity who was or is a party or is threatened to be made a party to any action suit or proceeding to the same extent and subject to the same conditions as any other Indemnified Party as set forth in this <u>Section 19</u>.  The Company shall indemnify and hold harmless any Indemnified Party or person or entity executing any guaranty of indebtedness of the Company from any and all claims, demands, losses, liabilities, damages and expenses (including reasonable attorneys' fees) suffered or incurred by any such guarantor by reason of the failure of the Company to perform its obligations under any guaranteed indebtedness or suffered or incurred by such guarantor in defending or prosecuting any suit, action or other proceeding brought in connection with the guaranty or such indebtedness or in enforcing this indemnification or any subrogation rights or other rights or remedies, at law or in equity, which the guarantor may have by reason of performing its obligations under any such guaranty of indebtedness.  Any indemnification pursuant to this <u>Section 19</u> shall only be from the assets of the Company.

(b)     Expenses (including attorneys' fees) incurred by an Indemnified Party in a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a legally enforceable written undertaking by or on behalf of such Indemnified Party in form and substance acceptable to the Sole Member to repay such amount if such Indemnified Party is determined pursuant to this <u>Section 19</u> or adjudicated to be ineligible for indemnification, which undertaking will be an unlimited general obligation of the Indemnitee but need not be secured unless so determined by the Sole Member.

#4824-0831-3986

(c)     No amendment, modification or deletion of this <u>Section 19</u> will apply to or have any effect on the right of any Indemnified Party to indemnification for or with respect to any acts or omissions of such Indemnified Party occurring prior to such amendment, modification or deletion.

20.     <u>Insurance</u>.   To the extent applicable, the Company shall maintain directors' and officers' liability insurance covering the Manager in an amount to be determined by the Manager in its discretion.

21.     <u>No Third-Party Beneficiaries</u>.  Except as set forth in <u>Section 19</u> (*Indemnification of the Sole Member, the Manager, Officers and Agents*) in respect of Indemnified Parties, this Agreement is for the sole benefit of the parties to this Agreement. Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

22.     <u>Complete Agreement</u>.  This Agreement and the Certificate constitute the complete and exclusive statement of agreement by the Sole Member with respect to their respective subject matters and supersede all prior written and oral agreements or statements.

23.     <u>Counterparts</u>.  This Agreement may contain more than one counterpart of the signature page and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages.  All of such counterpart signatures pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

[*Signature page follows*]

#4824-0831-3986

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date set forth above.

**SOLE MEMBER:**

**[GASTAR MIDCO,] LLC**

_____
Name:
Title:

**MANAGER:**

**[GASTAR TOPCO,] LLC**

_____
Name:
Title:

[Signature Page to Gastar Holdco LLC Agreement]

PRELIMINARY DRAFT—12/13/18
SUBJECT TO COMPLETION

# OPERATING AGREEMENT

## OF

## [GASTAR EXPLORATION] LLC

This OPERATING AGREEMENT (this "Agreement") of [Gastar Exploration] LLC (the "Company") is made and entered into as of January [●], 2019, by [Gastar Holdco,] LLC, a Delaware limited liability company (the "Sole Member") and  [Gastar Topco,] LLC, a Delaware limited liability company (the "Manager").

## RECITALS

WHEREAS,  Gastar Exploration Inc., a Delaware corporation ("Gastar Inc.") was incorporated as a corporation under the Delaware General Corporation Law 8 Del. C. § 1-101, et seq. pursuant to the Certificate of Incorporation of Gastar Inc. filed on May 24, 2011 (the "Formation Date") with the Secretary of State of the State of Delaware;

WHEREAS, on October 31, 2018, Gastar Inc. and its subsidiary (together, the "Debtors") commenced chapter 11 proceedings and filed a prepackaged plan of reorganization (as amended, supplemented or otherwise modified, the "Plan") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, on December [●], 2018, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order");

WHEREAS, on the effective date of the Plan, all equity interests in Gastar Inc. were cancelled and extinguished;

WHEREAS, pursuant to the Plan and the Confirmation Order, the Company was authorized to take certain actions in order to effectuate the restructuring transactions set forth in the Plan, including, but not limited to, issuing or otherwise providing all membership interests in the Company to the Sole Member;

WHEREAS, Gastar Inc. was converted into a Delaware limited liability company through the filing of a Certificate of Conversion and a Certificate of Formation (together, the "Certificate") with the office of the Secretary of State of the State of Delaware on the date of this Agreement;

WHEREAS, pursuant to Section 18-214(d) of the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. (the "Act"), the existence of the Company shall be deemed to have commenced on the Formation Date; and

WHEREAS, in connection with the consummation of the transactions contemplated by the Plan, the Sole Member and the Manager desire to enter into a written limited liability company agreement, in accordance with the provisions of the Act.

NOW THEREFORE, the Sole Member and the Manager declare the following to be the Agreement of the Company, effective as of the date of this Agreement:

<u>**AGREEMENT**</u>

NOW, THEREFORE, in consideration of the promises and covenants contained herein, the parties hereto agree as follows:

1.    <u>Name</u>.  The name of the Company is "[Gastar Exploration] LLC."

2.    <u>Business of the Company</u>. The purpose of the Company is to engage in any activity and to exercise any powers permitted to limited liability companies under the laws of the State of Delaware.

3.    <u>Location of Principal Place of Business</u>.  The principal office of the Company in the United States shall be at such place as the Manager designates from time to time. The principal office does not need to be in the State of Delaware. The Company shall maintain records at its principal office or such other place as the Manager may designate.  The Company may have such other offices as the Manager may designate.

4.    <u>Term of Company</u>.  The term of this Agreement commenced on the filing of the Certificate and is perpetual unless sooner terminated as provided in this Agreement or by law.

5.    <u>Authority</u>.  Subject to the limitations provided in this Agreement, the Manager shall have complete authority and discretion to: (i) manage the operations and affairs of the Company, (ii) make any decisions regarding the business of the Company and (iii) execute any and all agreements, documents and instruments on behalf of the Company and in its name. Any action taken by the Manager on behalf of the Company shall constitute the act of and serve to bind the Company.  In dealing with the Manager acting on behalf of the Company, no person or entity shall be required to inquire into the authority of the Manager to bind the Company. Persons and entities dealing with the Company are entitled to rely conclusively on the power and authority of the Manager as set forth in this Agreement.  No person or entity shall replace the then-serving Manager until the earlier to occur of (i) such then-serving Manager delivering a letter of resignation to the Company and (ii) the Sole Member removing such then-serving Manager by written notice to such effect delivered to the Company and such then-Serving Manager (each of the events specified in the foregoing clause (i) and clause (ii), a "<u>Removal Event</u>").  Following the occurrence of any Removal Event, a successor Manager shall be designated by the Sole Member. Except as otherwise specifically provided herein, the Manager shall have all rights and powers of a "manager" under the Act, and shall have all authority, rights and powers in the management of the Company business to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

6.    <u>Membership; Cash and Property Contributed to the Company</u>.  The Sole Member shall make an initial contribution of cash or property to the Company at such time and in such amounts as the Sole Member shall determine. The Sole Member owns 100% of the

membership interests in the Company. The Company will not issue any certificates to evidence ownership of the membership interests.

7. <u>Additional Contributions</u>.  The Sole Member may make additional contributions of cash or property to the Company at such times and in such amounts as the Sole Member shall determine.

8. <u>Share of Profits and Other Compensation to be Received by the Sole Member</u>.  The Sole Member shall be entitled to all of the profits, losses and distributions of the Company.

9. <u>Internal Affairs of the Company</u>.

(a) As of the date of this Agreement, it is intended that the Company be disregarded as an entity separate from the Manager for federal and all relevant state and local income tax purposes.

(b) The books and records of the Company shall be maintained in accordance with U.S. generally accepted accounting principles.

(c) The Manager hereby approves and ratifies the execution and filing of the Certificate with the Secretary of State of the State of Delaware.

10. <u>Officers</u>.

(a) <u>Appointment and Term of Office</u>.  The Manager may appoint, and may delegate power to appoint, such officers, agents and employees as it may deem necessary or proper, who shall hold their offices or positions for such terms, have such authority and perform such duties as may from time to time be determined by or pursuant to authorization of the Manager.  Except as may be prescribed otherwise by the Manager in a particular case, all such officers shall hold their offices at the pleasure of the Manager for an unlimited term (unless otherwise provided in any applicable employment agreement) and need not be reappointed annually or at any other periodic interval.  Any action taken by an officer of the Company pursuant to authorization of the Manager shall constitute the act of and serve to bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the authority of such officers set forth in the authorization of the Manager, but only to the extent expressly provided in such authorization.  Any action purported to be taken by any officer, agent or employee of the Company or any of its subsidiaries in the absence of a grant of authority from the Manager, or otherwise in contravention of the terms of this <u>Section 10(a)</u>, shall be void and without effect.

(b) <u>Resignation and Removal</u>.  Any officer may resign at any time upon written notice to the Company.  Any officer, agent or employee of the Company may be removed by the Manager with or without cause at any time.  The Manager

3

may delegate such power of removal as to officers, agents and employees not appointed by the Manager.

(c) <u>Compensation</u>.  The compensation of the officers of the Company shall be fixed by the Manager, but this power may be delegated to any officer in respect of other officers under his or her control.  The compensation for senior executive officers of the Company shall, in each case, be commensurate with the financial performance of the Company, the role of the officer, the scope of the officer's responsibilities and the performance and success of the officer, as determined in the reasonable judgment of the Manager.

(d) <u>Standard of Care of Officers</u>.  Officers shall be held to the same standard of care and shall have the same fiduciary duties to the Company as if they were officers of a Delaware corporation, including the duties of care and loyalty.

11. <u>Amendments</u>.  Amendments to this Agreement may be made only if embodied in an instrument signed by the Sole Member and the Manager.

12. <u>Amendment of Certificate</u>.  In the event this Agreement shall be amended pursuant to <u>Section 11</u>, the Manager shall amend the Certificate to reflect such change if the Manager deems such amendment of the Certificate to be necessary or appropriate.

13. <u>Dissolution</u>.

(a) The Company shall dissolve, and its affairs shall be wound up upon the first to occur of: (i) a time determined by the Manager, or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b) Upon the dissolution of the Company, the Company's assets shall be liquidated under the direction of the Manager and the business of the Company shall be wound up.  Within a reasonable time after the effective date of dissolution of the Company, the Company's assets shall be distributed in the following manner and order:

(i) <u>first</u>, the claims of all creditors of the Company shall be paid and discharged other than liabilities for which reasonable provision for payment has been made. Such claims of creditors shall include claims by the Sole Member except to the extent not permitted by law; and

(ii) <u>thereafter</u>, to the Sole Member.

14. <u>Certain Other Matters</u>.  Notwithstanding anything to the contrary set forth in this Agreement or under applicable law, the Manager shall not be liable to the Company, any creditor of the Company, the Sole Member, any assignee or any other holder of the membership interests in the Company for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any subsidiary of the Company, on the one hand, and the Manager or any affiliate of the Manager, on the other), except for such actions as constitute fraud or bad faith.  To the extent the Manager has any liabilities or duties at law or in equity (including, without limitation, fiduciary duties or other

4

standards of care) more expansive than those set forth in this <u>Section 14</u>, such liabilities and duties are hereby modified to the fullest extent permitted by applicable law (including, without limitation, Section 18-1101(c) of the Act) to those set forth in the first sentence of this <u>Section 14</u>.  In furtherance of the foregoing, it is understood and agreed that the Manager shall have no fiduciary duties of any kind or description to the Company, the Sole Member, any assignee or any other holder of membership interests in the Company.  In addition, with the exception of officers whose duty is set forth in <u>Section 10(d)</u>, none of the Sole Member, any other holder of membership interests in the Company or any affiliate of any of the foregoing entities or persons shall have any duty of any kind or description to the Company, the Sole Member or any other holder of membership interests in the Company or any affiliate of any of the foregoing entities or persons for any action taken or omitted on behalf of the Company (including any agreement or transaction entered into between the Company or any subsidiary of the Company, on the one hand, and the Sole Member or any affiliate of the Sole Member, on the other), except for such actions as constitute fraud or bad faith.  Notwithstanding the foregoing or anything to the contrary contained in this Agreement, (i) nothing in this <u>Section 14</u> shall be construed to eliminate the covenant of good faith and fair dealing and (ii) nothing contained in this Agreement shall relieve any Person of any liability for breach of fiduciary duty, if any, owed to the Company or its Affiliates incurred in such Person's role as an officer or employee of the Company or its Affiliates.

15.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of Laws provision or rule that would cause the application of the domestic substantive Laws of any other jurisdiction.

16.    <u>Consent To Jurisdiction And Venue</u>.  The Sole Member, the Manager and each person or entity subject to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Chancery Court sitting in Wilmington, Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter of this Agreement. To the fullest extent permitted by law, the Sole Member, the Manager and each person or entity subject to this Agreement waives and agrees not to assert, and agrees not to allow any of its affiliates to assert, by way of motion, as a defense or otherwise, in any such action, any claim that: (i) it is not subject personally to the jurisdiction of the Delaware Chancery Court; (ii) its property is exempt or immune from attachment or execution; (iii) any such proceeding brought in the Delaware Chancery Court is improper; or (iv) that this Agreement or the subject matter of this Agreement or thereof may not be enforced in or by such court.  The Sole Member, the Manager and each person or entity subject to this Agreement further agrees: (i) not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof or thereof other than before the Delaware Chancery Court; and (ii) not to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than the Delaware Chancery Court whether on the grounds of inconvenient forum or otherwise.  The Sole Member, the Manager and each person or entity subject to this Agreement consents to service of process in any such proceeding in any manner

#4824-0662-8993

permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified in the books and records of the Company is reasonably calculated to give actual notice.

17.     Expenses.  The Company shall be responsible for and shall pay all fees and expenses incurred in connection with the formation of the Company, including, without limitation, all legal and accounting fees and expenses incurred in connection with the preparation, execution and delivery of this Agreement and all related agreements and instruments, and negotiations with third parties.  The Company shall pay all filing fees, minimum franchise or other similar taxes and other governmental charges incident to its formation and qualification to do business.

18.     Limited Liability.  Except as otherwise provided by the Act and whether arising in contract, tort or otherwise, the debts, obligations and liabilities of the Company shall be solely the debts, obligations and liabilities of the Company.  Neither the Sole Member nor the Manager shall be obligated for any such debt, obligation or liability of the Company by reason of being a member of the Company.

19.     Indemnification of the Sole Member, the Manager, Officers and Agents.

(a)     The Company shall defend and indemnify the Sole Member, the Manager or member or trustee or shareholder of the Sole Member or the Manager from any threatened, pending or completed action, suit or proceeding by reason of the fact that such person or entity is or was an officer, employee or other agent of the Company, the Sole Member or the Manager (each, an "Indemnified Party"), to the fullest extent permitted by applicable law in effect on the date of this Agreement and to such greater extent as applicable law may hereafter from time to time permit.  The indemnity shall protect the Indemnified Party from and against any loss, expense, damage or injury suffered or sustained by them arising out of their activities on behalf of the Company if the acts upon which such threatened, pending or completed action are based were not a result of fraud or bad faith by such Indemnified Party.  Upon the approval of the Manager, the Company may indemnify any other person or entity who was or is a party or is threatened to be made a party to any action suit or proceeding to the same extent and subject to the same conditions as any other Indemnified Party as set forth in this Section 19.  The Company shall indemnify and hold harmless any Indemnified Party or person or entity executing any guaranty of indebtedness of the Company from any and all claims, demands, losses, liabilities, damages and expenses (including reasonable attorneys' fees) suffered or incurred by any such guarantor by reason of the failure of the Company to perform its obligations under any guaranteed indebtedness or suffered or incurred by such guarantor in defending or prosecuting any suit, action or other proceeding brought in connection with the guaranty or such indebtedness or in enforcing this indemnification or any subrogation rights or other rights or remedies, at law or in equity, which the guarantor may have by reason of performing its obligations under any such guaranty of indebtedness.  Any indemnification pursuant to this Section 19 shall only be from the assets of the Company.

(b)     Expenses (including attorneys' fees) incurred by an Indemnified Party in a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final

6

disposition of such action, suit or proceeding upon receipt of a legally enforceable written undertaking by or on behalf of such Indemnified Party in form and substance acceptable to the Sole Member to repay such amount if such Indemnified Party is determined pursuant to this Section 19 or adjudicated to be ineligible for indemnification, which undertaking will be an unlimited general obligation of the Indemnitee but need not be secured unless so determined by the Sole Member.

(c)     No amendment, modification or deletion of this Section 19 will apply to or have any effect on the right of any Indemnified Party to indemnification for or with respect to any acts or omissions of such Indemnified Party occurring prior to such amendment, modification or deletion.

20.     Insurance.   To the extent applicable, the Company shall maintain directors' and officers' liability insurance covering the Manager in an amount to be determined by the Manager in its discretion.

21.     No Third-Party Beneficiaries.  Except as set forth in Section 19 (*Indemnification of the Sole Member, the Manager, Officers and Agents*) in respect of Indemnified Parties, this Agreement is for the sole benefit of the parties to this Agreement. Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

22.     Complete Agreement.  This Agreement and the Certificate constitute the complete and exclusive statement of agreement by the Sole Member with respect to their respective subject matters and supersede all prior written and oral agreements or statements.

23.     Counterparts.  This Agreement may contain more than one counterpart of the signature page and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages.  All of such counterpart signatures pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

[*Signature page follows*]

#4824-0662-8993

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date set forth above.

**SOLE MEMBER:**


**[GASTAR HOLDCO,] LLC**


_____
Name:
Title:


**MANAGER:**


**[GASTAR TOPCO,] LLC**


_____
Name:
Title:

## EXHIBIT B

**First Lien Exit Credit Agreement**

MTHM DRAFT 12/13/18

AMENDED AND RESTATED CREDIT AGREEMENT

dated as of

January [_], 2019

among

[GASTAR EXPLORATION LLC],
as Borrower,

[GASTAR HOLDCO, LLC],
as Holdings,

The Guarantors from time to time Party Hereto,

the Lenders Party Hereto,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent

TABLE OF CONTENTS

Page

Article I. Definitions ................................................................................................ 2
    Section 1.01    Defined Terms ................................................................... 2
    Section 1.02    Terms Generally ............................................................... 30
    Section 1.03    Classification of Loans and Borrowings ............................ 31

Article II. The Credits ........................................................................................... 31
    Section 2.01    Accounting Terms; GAAP ................................................ 31
    Section 2.02    Loans and Commitments .................................................. 31
    Section 2.03    Request for Borrowings; Funding of Borrowings ................ 32
    Section 2.04    Termination of New Money Commitment .......................... 34
    Section 2.05    Repayment of Loans; Evidence of Debt ............................ 34
    Section 2.06    Optional Prepayment of Loans ......................................... 35
    Section 2.07    Mandatory Prepayment of Loans ...................................... 35
    Section 2.08    [Reserved] ....................................................................... 36
    Section 2.09    [Reserved] ....................................................................... 36
    Section 2.10    Interest on Loans ............................................................. 36
    Section 2.11    Alternate Rate of Interest ................................................. 37
    Section 2.12    Fees ................................................................................. 39
    Section 2.13    Conversion and Continuation of Borrowings ..................... 39
    Section 2.14    Increased Costs ................................................................ 40
    Section 2.15    Change in Legality ........................................................... 41
    Section 2.16    Breakage ......................................................................... 42
    Section 2.17    Taxes .............................................................................. 42
    Section 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ............ 46

Article III. Representations and Warranties ........................................................... 48
    Section 3.01    Organization; Powers ....................................................... 48
    Section 3.02    Authorization; Enforceability ........................................... 48
    Section 3.03    Governmental Approvals; No Conflicts .............................. 48
    Section 3.04    Financial Condition; No Material Adverse Change.............. 48
    Section 3.05    Properties ........................................................................ 49
    Section 3.06    Litigation and Environmental Matters ............................... 50
    Section 3.07    Compliance with Laws and Agreements ............................ 51
    Section 3.08    Investment Company Status .............................................. 51
    Section 3.09    Taxes .............................................................................. 51
    Section 3.10    ERISA ............................................................................ 51
    Section 3.11    Disclosure ....................................................................... 52
    Section 3.12    Labor Matters .................................................................. 52
    Section 3.13    Capitalization .................................................................. 52
    Section 3.14    Margin Stock................................................................... 52
    Section 3.15    Bank Accounts ................................................................ 52
    Section 3.16    Insurance ......................................................................... 52
    Section 3.17    Material Contracts............................................................ 52

#4823-0519-7946

Section 3.18    Gas Imbalances ................................................................. 53
Section 3.19    Reserve Reports .................................................................. 53
Section 3.20    Sale of Production ............................................................... 53
Section 3.21    Anti-Corruption Laws and Sanctions................................... 54
Section 3.22    No Foreign Operations ....................................................... 54
Section 3.23    Solvency ............................................................................. 54
Section 3.24    Holdings as Holding Company ........................................... 54

Article IV. Conditions to Effectiveness and Borrowings ..................................... 54

Section 4.01    Conditions to Effectiveness ............................................... 54
Section 4.02    Conditions to All Loans ..................................................... 57

Article V. Affirmative Covenants ....................................................................... 58

Section 5.01    Financial Statements; Other Information ............................. 58
Section 5.02    Notices of Material Events.................................................. 60
Section 5.03    Existence; Conduct of Business .......................................... 61
Section 5.04    Payment of Obligations ...................................................... 61
Section 5.05    Maintenance of Properties; Insurance ................................. 61
Section 5.06    Books and Records; Inspection Rights ................................ 62
Section 5.07    Compliance with Laws ....................................................... 62
Section 5.08    Environmental Matters........................................................ 62
Section 5.09    Use of Proceeds.................................................................. 62
Section 5.10    Collateral Matters............................................................... 63
Section 5.11    Title Data ........................................................................... 64
Section 5.12    Swap Agreements ............................................................... 64
Section 5.13    Operation of Oil and Gas Property ..................................... 64
Section 5.14    Subsidiaries ........................................................................ 65
Section 5.15    Pledged Capital Stock ........................................................ 65
Section 5.16    Accounts ............................................................................. 66
Section 5.17    Further Assurances.............................................................. 66
Section 5.18    Post-Closing Matters.......................................................... 66

Article VI. Negative Covenants .......................................................................... 67

Section 6.01    [Reserved] .......................................................................... 67
Section 6.02    Indebtedness....................................................................... 67
Section 6.03    Liens................................................................................... 68
Section 6.04    Fundamental Changes.......................................................... 70
Section 6.05    Disposition of Assets .......................................................... 70
Section 6.06    Nature of Business .............................................................. 71
Section 6.07    Investments ........................................................................ 72
Section 6.08    Swap Agreements ............................................................... 73
Section 6.09    Restricted Payments............................................................ 73
Section 6.10    Transactions with Affiliates................................................. 74
Section 6.11    Restrictive Agreements ....................................................... 75
Section 6.12    Disqualified Stock............................................................... 75
Section 6.13    Certain Amendments to Organizational Documents;
                Amendments of Documents.................................................. 75

ii

Section 6.14    Sale and Leaseback Transactions and other Off-Balance Sheet Liabilities ....................................................................................... 75
Section 6.15    DrillCo Restrictions ........................................................................ 76
Section 6.16    Lease Restrictions ........................................................................... 76

Article VII. Guarantee of Obligations ...................................................................... 76

Section 7.01    Guarantee of Payment .................................................................... 76
Section 7.02    Guarantee Absolute ........................................................................ 77
Section 7.03    Guarantee Irrevocable .................................................................... 77
Section 7.04    Reinstatement ................................................................................. 77
Section 7.05    Subrogation ..................................................................................... 77
Section 7.06    Subordination ................................................................................. 77
Section 7.07    Payments Generally ........................................................................ 78
Section 7.08    Setoff .............................................................................................. 78
Section 7.09    Formalities ...................................................................................... 78
Section 7.10    Limitations on Guarantee .............................................................. 78
Section 7.11    Keepwell ........................................................................................ 79
Section 7.12    Stay of Acceleration ....................................................................... 79
Section 7.13    Survival .......................................................................................... 79

Article VIII. Events of Default ................................................................................. 79

Article IX. The Administrative Agent ....................................................................... 83

Section 9.01    Appointment and Authority ........................................................... 83
Section 9.02    Rights as a Lender .......................................................................... 84
Section 9.03    Exculpatory Provisions ................................................................... 84
Section 9.04    Reliance by Administrative Agent .................................................. 85
Section 9.05    Delegation of Duties ...................................................................... 86
Section 9.06    Collateral and Guaranty Matters .................................................... 86
Section 9.07    Resignation and Removal of Administrative Agent ........................ 87
Section 9.08    Non-Reliance on Administrative Agent and Other Lenders ............ 88
Section 9.09    Administrative Agent May File Proofs of Claim ............................ 88

Article X. Miscellaneous .......................................................................................... 90

Section 10.01    Notices .......................................................................................... 90
Section 10.02    Waivers; Amendments ................................................................. 92
Section 10.03    Expenses; Indemnity; Damage Waiver ........................................ 94
Section 10.04    Successors and Assigns ................................................................ 96
Section 10.05    Survival ........................................................................................ 100
Section 10.06    Counterparts; Integration; Effectiveness; Electronic Execution ......... 100
Section 10.07    Severability .................................................................................. 101
Section 10.08    Right of Setoff ............................................................................. 101
Section 10.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS .............................................................. 101
Section 10.10    WAIVER OF JURY TRIAL ...................................................... 102
Section 10.11    Headings ...................................................................................... 102
Section 10.12    Confidentiality ............................................................................ 102

#4823-0519-7946

Section 10.13    Material Non-Public Information .......................................................... 103
Section 10.14    Authorization to Distribute Certain Materials to Public-Siders........... 103
Section 10.15    Interest Rate Limitation ..................................................................... 104
Section 10.16    USA PATRIOT Act............................................................................ 104
Section 10.17    Release of Guarantees and Liens ...................................................... 104
Section 10.18    [Swap Intercreditor Agreement.......................................................... 105
Section 10.19    Amendment and Restatement ............................................................ 105
Section 10.20    Limited Third Party Beneficiaries ..................................................... 106

#4823-0519-7946

EXHIBITS:

Exhibit A – Form of Assignment and Assumption
Exhibit B – Form of Borrowing Request
Exhibit C – Form of Counterpart Agreement
Exhibit D – Form of Swap Intercreditor Agreement
Exhibit E – Form of Mortgage
Exhibit F – Form of Security Agreement
Exhibit G – Form of Note
Exhibits H-1 through H-4 – Form of Tax Certificates
Exhibit I – Form of Interest Election Request
Exhibit J – Form of Notice of PIK Election
Exhibit K – Form of Solvency Certificate

SCHEDULES:

Schedule 1.01(a) – Mortgaged Properties
Schedule 1.01(b) – Subject Leases
Schedule 2.01 – Commitments
Schedule 3.04 – Material Liabilities
Schedule 3.06 – Disclosed Matters
Schedule 3.13 – Capitalization
Schedule 3.15 – Bank Accounts
Schedule 3.17 – Material Contracts
Schedule 3.18 – Gas Imbalances
Schedule 3.19 – Changes to Reserves
Schedule 3.20 – Marketing Agreements
Schedule 6.02 – Existing Indebtedness
Schedule 6.03 – Existing Liens
Schedule 6.07(c) – Investment Commitments
Schedule 6.07(g) – Existing Investments

#4823-0519-7946

# AMENDED AND RESTATED CREDIT AGREEMENT

This AMENDED AND RESTATED CREDIT AGREEMENT, dated as of January [_], 2019, is among [GASTAR EXPLORATION LLC, a Delaware limited liability company], as Borrower, [GASTAR HOLDCO, LLC, a Delaware limited liability company], as Holdings and a Guarantor, and CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors, the LENDERS party hereto, and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent.

## RECITALS

WHEREAS, on October 31, 2018, the Borrower and the Guarantors (other than Holdings) (collectively, the "Debtors" and each, a "Debtor") commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and the Borrower and the Guarantors continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on December [_], 2018, the Bankruptcy Court entered the Confirmation Order (as defined below);

WHEREAS, the Debtors are party to that certain Superpriority Debtor-In-Possession Credit Agreement, dated as of October 31, 2018, among the Borrower, the guarantors party thereto, the lenders party thereto (the "Existing Lenders") and Wilmington Trust, National Association, as administrative agent (in such capacity, the "Existing Agent") (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "DIP Credit Agreement");

WHEREAS, pursuant to the DIP Credit Agreement, the Refinanced Loans (as defined in the DIP Credit Agreement) refinanced certain Prepetition Term Loan Obligations (as defined in the DIP Credit Agreement) and the Liens on the collateral granted pursuant to the DIP Credit Agreement were deemed a continuation of the Liens on the collateral granted pursuant to the Prepetition Security Documents;

WHEREAS, in connection with the confirmation and implementation of the Plan of Reorganization (as defined below), the Debtors have requested that the Lenders amend and restate the DIP Credit Agreement to make available to the Borrower a term loan facility of $100,000,000 to enable the reorganized Debtors to (a) refinance all outstanding New Money DIP Loans that were made pursuant to the DIP Credit Agreement and (b) finance the working capital needs and general corporate purposes of the Borrower and its Subsidiaries;

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to Administrative Agent, for the benefit of the Secured Parties, a lien on substantially all of their respective assets; and

WHEREAS, the Existing Lenders and the Existing Agent are willing to amend and restate the DIP Credit Agreement on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, such parties hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

**Section 1.01   Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"ABR Loan" or "ABR Borrowing" means a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Security Interest" means, with respect to any Property, a Lien which (a) exists in favor of the Administrative Agent for the benefit of the Secured Parties, (b) is superior to all Liens or rights of any other Person in the Property encumbered thereby (other than Permitted Encumbrances), (c) secures the Obligations, and (d) is perfected and enforceable. Any requirement that the Credit Parties provide an Acceptable Security Interest with respect to any DrillCo PDP Reserves shall be satisfied if the applicable Credit Party grants a Wellbore Lien with respect to such DrillCo PDP Reserves and the Oil and Gas Properties owned by any Credit Party attributable thereto, so long as the Wellbore Lien meets the foregoing criteria.

"Acquisition" means, the acquisition by the Borrower or any Subsidiary, whether by purchase, merger (and, in the case of a merger with any such Person, with such Person being the surviving corporation) or otherwise, of all or substantially all of the Capital Stock of, or all or substantially all of the business, property or fixed assets of or business line or unit or a division of, any other Person engaged solely in the business of producing oil or Natural Gas or the acquisition by the Borrower or any Subsidiary of Property consisting of Oil and Gas Property.

"Act" has the meaning assigned to such term in Section 10.16.

"Additional Assets" means (a) Oil and Gas Properties prospective for the SCOOP and/or the STACK play, (b) the Capital Stock of a Person that becomes a Subsidiary as a result of the acquisition of such Capital Stock by the Borrower or another Subsidiary, (c) Capital Stock constituting a minority interest in any Person that at such time is a Subsidiary of Holdings, and (d) other long-term assets that are used or useful in the oil and gas business and related to Additional Assets; provided, however, that, in respect of (b) and (c) above, (i) the assets of the Subsidiary whose Capital Stock has been acquired consist primarily of Oil and Gas Properties prospective for the SCOOP and/or the STACK play and (ii) the Borrower and/or the applicable Subsidiary has complied with Section 5.15 in connection with such acquisition.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) (x) an interest rate per annum (rounded upward, if necessary, to the next 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBO Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (y) 1 minus the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period and (b) 2.00% per annum.

Page 2

"<u>Administrative Agent</u>" means Wilmington Trust, National Association, in its capacity as Administrative Agent under any of the Loan Documents, and any successor agent appointed pursuant to Article IX.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Advance Payment</u>" has the meaning assigned to such term in the definition of Advance Payment Contract.

"<u>Advance Payment Contract</u>" means any contract whereby any Credit Party either (a) receives or becomes entitled to receive (either directly or indirectly) any payment (an "<u>Advance Payment</u>") to be applied toward payment of the purchase price of Hydrocarbons produced or to be produced from Oil and Gas Property owned by any Credit Party and which Advance Payment is, or is to be, paid in advance of actual delivery of such production to or for the account of the purchaser regardless of such production, or (b) grants an option or right of refusal to the purchaser to take delivery of such production in lieu of payment, and, in either of the foregoing instances, the Advance Payment is, or is to be, applied as payment in full for such production when sold and delivered or is, or is to be, applied as payment for a portion only of the purchase price thereof or of a percentage or share of such production; <u>provided</u> that inclusion of the standard "take or pay" provision in any gas sales or purchase contract or any other similar contract in the ordinary course of business shall not, in and of itself, constitute such contract as an Advance Payment Contract for the purposes hereof.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Affiliate Transaction</u>" has the meaning assigned to such term in <u>Section 6.10(a)</u>.

"<u>Aggregate Commitment</u>" means, collectively, the aggregate New Money Commitments and the aggregate Refinanced Commitments.

"<u>Agreement</u>" means this Amended and Restated Credit Agreement, dated as of January [_], 2019, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Alternate Base Rate</u>" means, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1.00% or (c) the Adjusted LIBO Rate for a one-month Interest Period beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1.00%.  If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Base Rate or the

Page 3

Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"<u>Anti-Corruption Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption, including without limitation the United States Foreign Corrupt Practices Act of 1977, as amended.

"<u>Applicable Margin</u>" means, for any day (a) with respect to any Eurodollar Loan, 6.00% per annum, unless the Borrower has delivered a Notice of PIK Election in accordance with Section 2.10(c) for any Interest Payment Date in respect of such Eurodollar Loan, in which case the Applicable Margin for such Eurodollar Loan during the Interest Period ending on such Interest Payment Date shall be 8.00% per annum and (b) with respect to any ABR Loan, 5.00% per annum, unless the Borrower has delivered a Notice of PIK Election in accordance with Section 2.10(c) for any Interest Payment Date in respect of such ABR Loan, in which case the Applicable Margin for such ABR Loan during the period from the then most recent Interest Payment Date for such Loan (or, in the case of ABR Loan originally made as an ABR Loan that (x) was not at any time a Eurodollar Loan and (y) in respect of which an Interest Payment Date had not occurred on or prior to such date, from the date such ABR Loan was initially funded) and ending on such Interest Payment Date (such period, the "<u>Applicable Interest Payment Period</u>") shall be 7.00% per annum during such Applicable Interest Payment Period.

"<u>Applicable Percentage</u>" means, with respect to any Lender at any time, a percentage equal to a fraction, the numerator of which is the sum of such Lender's Credit Exposure and unused Commitments at such time and the denominator of which is the aggregate Credit Exposure and aggregate unused Commitments at such time.

"<u>Approved Fund</u>" has the meaning assigned to such term in <u>Section 10.04(b)</u>.

"<u>Approved Petroleum Engineer</u>" means Wright & Company, Inc. or any reputable firm of independent petroleum engineers selected by the Borrower and reasonably acceptable to the Majority Lenders.

"<u>Ares</u>" means (a) Ares Management LLC, its Affiliate investment managers and funds or accounts managed by any of them (but excluding any portfolio companies that are owned in whole or in part by any of the foregoing) and (b) any partner, member, manager, principal, director or officer of any of the foregoing.

"<u>Asset Sale</u>" means any Disposition by any Credit Party of any Property other than  (a) Dispositions permitted by clauses (a), (b), (c), (d), (e), (f) or (h) of <u>Section 6.05</u> and (b) any single Disposition or series of related Dispositions that involves Properties having a Fair Market Value not exceeding $2,000,000 and when aggregated together with all other Dispositions under this clause (b) the total does not exceed $10,000,000.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required under 10.04), and accepted by the Administrative Agent, in the form of <u>Exhibit A</u> or any other form approved by the Administrative Agent.

#4823-0519-7946

"Availability Period" means the period from and including the Effective Date to the earliest of (a) the Maturity Date, (b) the date of termination of the New Money Commitments pursuant to Section 2.04 and (c) the date of termination of the New Money Commitment of each Lender to make New Money Loans pursuant to Article VIII.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," now and hereafter in effect, or any applicable successor statute.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Majority Lenders, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Base Rate" means, for any day, the prime lending rate published in *The Wall Street Journal* for such day; *provided* that if *The Wall Street Journal* ceases to publish for any reason such rate of interest, "Base Rate" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates); each change in the Base Rate shall be effective on the date such change is effective.  The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means [Gastar Exploration LLC, a Delaware limited liability company], and its successors and permitted assigns.

"Borrower Materials" has the meaning assigned to such term in Section 10.01(d).

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a written request by the Borrower for a New Money Loan in accordance with Section 2.03, which shall be substantially in the form of Exhibit B.

"Breakage Event" has the meaning assigned to such term in Section 2.16.

Page 5

"Business Day" means any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or lease obligations on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a "nationally recognized statistical rating organization" (within the meaning of proposed Rule 3b-10 promulgated by the SEC under the Exchange Act), if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision or taxing authority (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Credit Parties.

"Change in Law" means the occurrence after the date of this Agreement or, with respect to the Administrative Agent or any Lender, such later date on which the Administrative Agent or

such Lender becomes a party to this Agreement of (a) the adoption of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the interpretation or application thereof by any Governmental Authority or (c) compliance by any Lender (or, for purposes of Section 2.14(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law" regardless of the date enacted, adopted or issued.

["Change of Control" means

(a)     any "person" or "group" (as such terms are used in sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than Ares or any Related Party thereof, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that such person or group shall be deemed to have "beneficial ownership" of all shares that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 35% of the total voting power of the outstanding Capital Stock normally entitled to vote in the election of directors ("Voting Stock") of Holdings (or its successor by merger, consolidation or purchase of all or substantially all of its assets);

(b)     the failure at any time of Holdings to be the beneficial owner of 100% of the Voting Stock of the Borrower;

(c)     a disposition by Holdings or any Subsidiary pursuant to which Holdings or any Subsidiary sells, leases, licenses, transfers, assigns or otherwise Disposes, in one or a series of related transactions, all or substantially all of the properties or assets of Holdings and its Subsidiaries as determined by reference to Holdings's and its Subsidiaries' financial statements on the last day of the most recently ended fiscal quarter, determined on a consolidated basis in accordance with GAAP; or

(d)     the Borrower's stockholders approve any plan relating to the liquidation or dissolution of the Borrower.

Notwithstanding anything to the contrary herein, the Restructuring Transactions shall not constitute a Change of Control.][1]

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Charges" has the meaning assigned to such term in Section 10.15.

---

[1] NTD: Subject to further review of the final structure.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all assets, whether now owned or hereafter acquired by the Borrower or any other Credit Party, in which a Lien is granted or purported to be granted to any Secured Party as security for any Obligation.

"Commitment" means a New Money Commitment or a Refinanced Commitment.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan of Reorganization pursuant to Section 1129 of the Bankruptcy Code, together with all schedules and exhibits thereto.

"Consummation of the Plan of Reorganization" means the occurrence of the Effective Date (as defined in the Plan of Reorganization) and the substantial consummation of the Plan of Reorganization within the meaning of Section 1101(2) of the Bankruptcy Code in accordance with its terms in all material respects.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Subsidiaries" means, for any Person, any Subsidiary or other entity the accounts of which would be consolidated with those of such Person in its consolidated financial statements in accordance with GAAP.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means a deposit account, securities or commodity account control agreement, as applicable, to be executed and delivered among any Credit Party, the Administrative Agent and each bank at which such Credit Party maintains, any deposit, securities or commodity account, in each case, in form and substance acceptable to the Majority Lenders and the Administrative Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Counterpart Agreement" means a Counterpart Agreement substantially in the form of Exhibit C delivered by a Guarantor pursuant to Section 5.14.

"Credit Date" means the date of a Borrowing.

"Credit Exposure" means, with respect to any Lender at any time, the outstanding principal amount of such Lender's Loans at such time.

"Credit Parties" means, collectively, the Borrower and each Guarantor, and each individually, a "Credit Party".

"Debtor" has the meaning assigned to such term in the recitals hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means, with respect to the Loans or other Obligations which accrue interest at the Default Rate hereunder, a rate per annum equal to the sum of three percent (3%) plus the interest rate otherwise applicable thereto.

"DIP Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"Discharge of Obligations" means (a) the payment in full in cash of all Obligations (other than contingent indemnity obligations for which no claim for payment has been made (which indemnity obligations continue to survive as expressly provided in this Agreement or in any other Loan Document)), (b) termination or expiration of the Aggregate Commitments and (c) termination of this Agreement other than indemnity and reimbursement obligations which expressly survive the termination hereof.

"Disclosed Matters" means the actions, suits and proceedings and any environmental matters disclosed in Schedule 3.06.

"Disposition" or "Dispose" means the sale, transfer, license, lease, exchange or other disposition (including any Sale and Leaseback Transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Capital Stock (which would not constitute Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable for any consideration other than other Capital Stock (which would not constitute Disqualified Stock) at the sole option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after the Maturity Date.

"Dollars" or "$" refers to lawful money of the United States of America.

"DrillCo Agreement" means that certain Development Agreement dated as of October 14, 2016 by and between the Borrower and DrillCo Investor, as amended as permitted under this Agreement.

"DrillCo Contract Area" means the following locations in Kingfisher County, Oklahoma: Township 18 North – Range 6 West, Township 18 North – Range 7 West and Township 18 North – Range 8 West.

#4823-0519-7946

"DrillCo Investor" means STACK Exploration LLC, a Delaware limited liability company.

"DrillCo Joint Well" means a "Joint Well Program Interest," as that term is defined in the DrillCo Agreement, that is located in the DrillCo Contract Area.

"DrillCo Operating Agreement" means a "DrillCo Operating Agreement" as that term is defined in the DrillCo Agreement.

"DrillCo PDP Reserves" means the Proved Developed Producing Reserves of any Credit Party attributable to any well located in the DrillCo Contract Area.

"DrillCo Required Disposition" means an assignment to the DrillCo Investor of an interest in a DrillCo Joint Well in accordance with the DrillCo Agreement pursuant to a DrillCo Wellbore Assignment.

"DrillCo Wellbore Assignment" means a "Wellbore Assignment" as that term is defined in the DrillCo Agreement.

"Effective Date" means the date the conditions set forth in Section 4.01 are satisfied (or waived by the Majority Lenders) which date is January [_], 2019.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means any Person that qualifies as an assignee pursuant to Section 10.04(b)(i); provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrower or any of the Borrower's Subsidiaries.

"Eligible Contract Participant" means an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder.

"Environmental Laws" means all laws (including common law), rules, regulations, codes, ordinances, orders, determinations, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority relating in any way to protection of the environment, preservation or reclamation of natural resources, pollution, the management, release or threatened release of any Hazardous Material or to health and safety matters (to the extent relating to exposure to Hazardous Materials).

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) any violation of or liability under any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal (or arrangement for the disposal) of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Credit Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure of any Plan to satisfy the minimum funding standard applicable to that Plan for a plan year under Section 412 of the Code or Section 302 of ERISA; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Credit Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Credit Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Credit Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by any Credit Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Credit Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar Loan" or "Eurodollar Borrowing" means a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VIII.

"Excluded Account" means (a) any deposit accounts that are designated to hold cash as collateral in support of performance bond obligations or other similar obligations or (b) any deposit accounts that are designated solely as accounts for, and are used solely for, employee benefits, taxes, payroll funding or petty cash in an amount not to exceed $500,000 individually or in the aggregate.

"Excluded Hedges" means, collectively, Swap Agreements that (a) are basis differential only swaps for volumes of natural gas included under other Swap Agreements permitted by Section 6.08(a) or (b) are a hedge of volumes of Hydrocarbons by means of a price "floor" for which there exists no deferred obligation to pay the related premium or other purchase price or the only deferred obligation is to either pay the premium or other purchase price on each settlement date so long as such settlement date occurs at least monthly, or pay the financing for such premium or other purchase price.

"Excluded Swap Obligation" means with respect to any Guarantor, any obligation under any Swap Agreement if, and to the extent that, all or a portion of the guaranty by such Guarantor of, or the grant by such Guarantor of a security interest or lien to secure, or the provision by such

Page 11

Guarantor of other support of, such obligation is or becomes illegal under the Commodity Exchange Act by virtue of such party's failure for any reason to constitute an Eligible Contract Participant at the time such guaranty, grant of security interest or lien or provision of support of, such Swap Obligation becomes effective. If an obligation arises under a master agreement governing more than one Swap Agreement, such exclusion shall apply only to the portion of such obligation that is attributable to Swap Agreements for which such guaranty, grant of security interest or lien to secure or provision of other support is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(f) and (g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Agent" has the meaning assigned to such term in the recitals hereto.

"Existing Lenders" has the meaning assigned to such term in the recitals hereto.

"Fair Market Value" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith in accordance with generally accepted finance practices.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received

by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means that certain Fee Letter by and between the Borrower and the Administrative Agent dated as of the Effective Date, as may be amended, restated, supplemented or otherwise modified from time to time.

"Financial Officer" means the chief financial officer of any Credit Party.  Any document delivered hereunder that is signed by a Financial Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party and such Financial Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"Foreign Lender" means a Lender that is not a U.S. Person.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 2.01.

"Gas Imbalance" means (a) a sale or utilization by the Borrower or any of its Subsidiaries of volumes of Natural Gas in excess of its gross working interest, (b) receipt of volumes of natural gas into a gathering system and redelivery by the Borrower or any of its Subsidiaries of a larger or smaller volume of Natural Gas under the terms of the applicable transportation agreement, or (c) delivery to a gathering system of a volume of Natural Gas produced by the Borrower or any of its Subsidiaries that is larger or smaller than the volume of Natural Gas such gathering system redelivers for the account of the Borrower or any of its Subsidiaries, as applicable.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity properly exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (in this definition, the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

#4823-0519-7946

"Guaranteed Liabilities" has the meaning assigned to such term in Section 7.01.

"Guarantor" means Holdings, the Borrower (with respect to the Obligations of the other Credit Parties) and each Subsidiary that is a party hereto or hereafter executes and delivers to the Administrative Agent and the Lenders a Counterpart Agreement pursuant to Section 5.14 or otherwise.

"Hazardous Materials" means all contaminants, pollutants or, hazardous or toxic materials, substances, wastes or other chemicals, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, explosive materials, radioactive materials and all other materials, substances or wastes of any nature regulated pursuant to, or for which liability or standards of conduct may be imposed under, any Environmental Law due to their hazardous or dangerous properties or characteristics.

"Hedge Modification" means the amendment, modification, cancellation, monetization, sale, transfer, assignment, early termination or other disposition of any Swap Agreement.

"Holdings" means [Gastar Holdco, LLC, a Delaware limited liability company], and its successors and permitted assigns.[2]

"Hydrocarbon Interests" means all presently existing or after-acquired rights, titles and interests in and to oil and gas leases, oil, gas and mineral leases, other Hydrocarbon leases, mineral interests, mineral servitudes, overriding royalty interests, royalty interests, net profits interests, production payment interests and other similar interests. Unless otherwise qualified, all references to a Hydrocarbon Interest or Hydrocarbon Interests in this Agreement shall refer to a Hydrocarbon Interest or Hydrocarbon Interests of the Borrower or the Guarantors.

"Hydrocarbons" means, collectively, oil, gas, casinghead gas, drip gasoline, Natural Gas, condensate, distillate and all other liquid or gaseous hydrocarbons and related minerals and all products therefrom, in each case whether in a natural or a processed state.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding those incurred in the ordinary course of business which are not greater than 60 days past the due date or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person, but limited to the lesser of (i) the amount of such Indebtedness and (ii) the fair market value of the property securing such Indebtedness, (f) all Guarantees by such Person of Indebtedness of others to the extent of the

---

[2]     NTD: To be defined as the specific entity that ends up being the direct parent of Gastar borrower in the exit structure.

lesser of the amount of such Indebtedness and the maximum stated amount of such Guarantee, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (j) attributable Indebtedness in respect of Sale and Leaseback Transactions and (k) all obligations of such Person relating to any Production Payment.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document and (b) to the extent not otherwise described in (a) hereof, Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 10.03.

"Ineligible Institution" has the meaning assigned to it in Section 10.04(b).

"Information" has the meaning assigned to such term in Section 10.12.

"Initial Swap ISDA Counterparty" means, with respect to any Initial Swap Party ISDA, any Swap Counterparty (as defined in the Swap Intercreditor Agreement) to an Initial Swap Party ISDA (a) that is a party to the Swap Intercreditor Agreement on the Effective Date or (b) (i) that is acceptable to the Majority Lenders as evidenced by their written consent and (ii) becomes a party to the Swap Intercreditor Agreement.

"Initial Swap Party ISDAs" has the meaning assigned to such term in the Swap Intercreditor Agreement.

"Interest Election Request" means a request by the Borrower in accordance with the terms of Section 2.13 and substantially in the form of Exhibit I or such other form as shall be approved by the Administrative Agent.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last Business Day of each calendar quarter and any date upon which a payment or prepayment thereof is made and (b) with respect to any Eurodollar Borrowing, the last day of the Interest Period applicable to such Borrowing, and any date upon which a payment or prepayment thereof is made.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day that is (x) one week thereafter, (y) one month thereafter or (y) three months thereafter, in any case at the Borrower's election pursuant to Section 2.03 or 2.13, as applicable; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar

month at the end of such Interest Period) shall, subject to clause (c), end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Borrowing shall extend beyond the applicable Maturity Date.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of the Borrowing initially shall be the date on which the Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of the Borrowing.

"Investment" means all direct or indirect investments by such Person in other Persons (including, without limitation, Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Capital Stock or other securities (excluding any interest in an oil or Natural Gas leasehold to the extent constituting a security under applicable law), together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRS" means the United States Internal Revenue Service.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period therefor, the rate per annum determined by the Administrative Agent by reference to the ICE Benchmark Administration London Interbank Offered Rate for deposits in Dollars with a term equivalent to such Interest Period (as set forth on the applicable Bloomberg screen page or by or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period; *provided* that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the LIBO Rate shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which the Administrative Agent is offered deposits in Dollars by major banks in the London interbank market in London, England at approximately 11:00 a.m., London, England time, two (2) Business Days prior to the first day of such Interest Period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, any promissory notes executed in connection herewith, the Security Documents, the Fee Letter and any other agreements executed by any Credit Party in connection with this Agreement and designated as a Loan Document therein.

"<u>Loans</u>" means, collectively, the New Money Loans and the Refinanced Loans.

"<u>Majority Lenders</u>" means, at any time, Lenders having more than 50% of the sum of the total outstanding Loans and unused Aggregate Commitments.

"<u>Market Disruption Loans</u>" means Loans the rate of interest applicable to which is based upon the Market Disruption Rate, and the Applicable Margin with respect thereto shall be the same as the Applicable Margin applicable to Eurodollar Loans; <u>provided</u> that, other than with respect to the rate of interest and Applicable Margin applicable thereto, Market Disruption Loans shall for all purposes hereunder and under the other Loan Documents be treated as ABR Loans (and Borrowings bearing interest at the Market Disruption Rate shall for all purposes hereunder and under the other Loan Documents be treated as ABR Borrowings).

"<u>Market Disruption Rate</u>" means, for any day, a fluctuating rate *per annum* (rounded upwards, if necessary, to the nearest 1/100th of 1.00%) equal to, the Alternate Base Rate for such day (without giving effect to clause (c) of the definition of Alternate Base Rate).  Any change in the Market Disruption Rate shall be effective as of the opening of business on the effective day of any change in the relevant component of the Market Disruption Rate. Notwithstanding the foregoing, if the "*Market Disruption Rate*" as determined in accordance with the immediately preceding sentences is less than the percentage specified in clause (b) of the definition of "*Adjusted LIBO Rate,*" then for all purposes of this Agreement and the other Loan Documents, the "*Market Disruption Rate*" shall be deemed equal to such percentage for such Interest Period.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, operations, financial condition or results of operations of Holdings and its Subsidiaries taken as a whole, (b) the ability of any Credit Party to perform any of its obligations under this Agreement or the other Loan Documents or (c) the validity or enforceability of any Loan Document against any Credit Party which is a party thereto or the rights of or benefits available to the Lenders under this Agreement or the other Loan Documents.

"<u>Material Indebtedness</u>" means Indebtedness (other than the Loans) and obligations in respect of one or more Swap Agreements of the Borrower or any one or more of the Subsidiaries in an aggregate principal amount exceeding $15,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any Swap Agreement at any time shall be the Swap Termination Value.

"<u>Maturity Date</u>" means the earlier of (a) January [_], 202[_] and (b) the date of termination of the Commitments and the acceleration of any outstanding extensions of credit, in each case, under this Agreement.

"<u>Maximum Liability</u>" has the meaning assigned to such term in <u>Section 7.10</u>.

"<u>Maximum Rate</u>" has the meaning assigned to such term in <u>Section 10.15</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Mortgaged Properties</u>" means the Oil and Gas Properties listed on <u>Schedule 1.01(a)</u>, together with any additional Oil and Gas Properties of the Borrower or any Subsidiary over

which a Mortgage may hereafter be granted to Administrative Agent for the benefit of the Secured Parties pursuant to Section 5.10.

"Mortgages" means all mortgages, deeds of trust, amendments to mortgages, security agreements, assignments of production, pledge agreements, collateral mortgages, collateral chattel mortgages, collateral assignments, financing statements and other documents, instruments and agreements evidencing, creating, perfecting or otherwise establishing the Liens on the Mortgaged Properties as required by Section 5.10, which shall be substantially in the form of Exhibit E (with such changes thereto as may be reasonably requested by the Majority Lenders).

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Credit Party or any ERISA Affiliate contributed or has any obligations (current or contingent).

"Natural Gas" means all natural gas, distillate or sulphur, natural gas liquids and all products recovered in the processing of natural gas (other than condensate) including, without limitation, natural gasoline, coalbed methane gas, casinghead gas, iso-butane, normal butane, propane and ethane (including such methane allowable in commercial ethane).

"Net Cash Proceeds" means, with respect to any Disposition or series of related Dispositions of any assets (including any Oil and Gas Property and Capital Stock of any Subsidiary) by the Borrower or any Subsidiary, the excess, if any, of (a) the sum of cash and Cash Equivalents received in connection with such Disposition or Dispositions, but only as and when so received, over (b) the sum of (i) the principal amount of any Indebtedness that is secured by such asset or assets and that is required to be repaid in connection with such Disposition or Dispositions (other than the Loans) and (ii) the reasonable and documented out-of-pocket expenses (including Taxes) incurred by the Borrower or such Subsidiary in connection with such Disposition or Dispositions.

"New Money Commitment" means as to each Lender, its obligation to make New Money Loans to Borrower hereunder, expressed as an amount representing the maximum principal amount of New Money Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption or reduced from time to time pursuant to the last sentence of Section 2.02(c). The amount of each Lender's New Money Commitment is set forth on Schedule 2.01 under the caption "New Money Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Commitment, as the case may be. The aggregate amount of the New Money Commitments as of the Effective Date is equal to $[_].

"New Money Loans" has the meaning assigned to such term in Section 2.02(b).

"New Money DIP Loans" means New Money Loans as defined in the DIP Credit Agreement.

"Non-Core Assets" means the Oil and Gas Properties of the Borrower or any Subsidiary within (i) the WEHLU field in Oklahoma and (ii) the undeveloped acreage to the East of WEHLU located in 15N 4W and 14N 4W in Oklahoma County, Oklahoma.

"Non-DrillCo Assets" means any Property located in the DrillCo Contract Area and owned or acquired by the Borrower or any Subsidiary thereof but not necessary or desirable for the Borrower to produce, operate, maintain, and plug and abandon the DrillCo Joint Wells described in the Development Plans (as defined in the DrillCo Agreement).

"Notice of PIK Election" means a certificate substantially in the form of Exhibit J delivered by a Responsible Officer of the Borrower to the Administrative Agent.

"NYMEX" means the New York Mercantile Exchange.

"Obligations" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, whether or not allowed) or otherwise) of each Credit Party from time to time owed to the Administrative Agent or any Lender under any Loan Document, including any make-whole amounts, any repayment or prepayment premiums and any accrued and unpaid interest, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"Off-Balance Sheet Liability" of a Person means (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability under any Sale and Leaseback Transaction which is not a Capital Lease Obligation, (iii) any liability under any so-called "synthetic lease" transaction entered into by such Person, or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person, but excluding from the foregoing clauses, operating leases and usual and customary oil, gas and mineral leases.

"Oil and Gas Properties" means Hydrocarbon Interests; the properties now or hereafter pooled or unitized with Hydrocarbon Interests; all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority having jurisdiction) which may affect all or any portion of the Hydrocarbon Interests; all operating agreements, contracts and other agreements which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; all Hydrocarbons in and under which may be produced and saved or attributable to the Hydrocarbon Interests, the lands covered thereby and all oil in tanks and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; all tenements, hereditaments, appurtenances and properties in anywise appertaining, belonging, affixed or incidental to the Hydrocarbon Interests, properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires,

towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.  Unless otherwise qualified, all references to an Oil and Gas Property or to Oil and Gas Properties in this Agreement shall refer to an Oil and Gas Property or Oil and Gas Properties of Borrower or its Subsidiaries.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation, organization or formation, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership or formation, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its certificate of formation or articles of organization, as amended, and its limited liability company agreement or operating agreement, as amended.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant" has the meaning assigned to such term in Section 10.04(c).

"Participant Register" has the meaning assigned to such term in Section 10.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

(a)      Liens imposed by law for Taxes, assessments or other governmental charges or levies which are not yet delinquent or which (i) are being contested in good faith by appropriate proceedings diligently conducted, (ii) the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (iii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, and contractual Liens granted to operators and non-operators under oil and gas operating agreements, in each case, arising in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Property and securing obligations that are not overdue by more than 60 days or which (i) are being contested

in good faith by appropriate proceedings, (ii) the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (iii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect;

(c)     contractual Liens which arise in the ordinary course of business under oil and gas leases, division orders, contracts for the sale, transportation or exchange of oil and Natural Gas, unitization and pooling declarations and agreements, area of mutual interest agreements, marketing agreements, processing agreements, development agreements, gas balancing agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements and seismic or other geophysical permits or agreements, which Liens are limited to the Oil and Gas Property and related property that is the subject of such agreement, arising out of or pertaining to the operation or the production or sale of Hydrocarbons produced from the Oil and Gas Property, provided that any such Lien referred to in this clause does not materially impair the use of the property covered by such Lien for the purposes for which such property is held by the Borrower or any Subsidiary or materially impair the value of such property subject thereto;

(d)     pledges and deposits in connection with workers' compensation, unemployment insurance and other social security laws or regulations;

(e)     Liens on cash and securities and deposits to secure the performance of bids, trade contracts, leases, statutory obligations (excluding Liens arising under ERISA), surety and appeal bonds, performance bonds and other obligations of a like nature, in each case, which are in the ordinary course of business and which are in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(f)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies, or under general depositary agreements, and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower or any of its Subsidiaries to provide collateral to the depository institution;

(g)     judgment liens in respect of judgments that do not constitute an Event of Default under clause (g) of Article VIII;

(h)     easements, zoning restrictions, rights-of-way, servitudes, permits, surface leases, and similar encumbrances on real property in each case imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and that, in the aggregate, do not materially detract from the value of the affected property or materially impair the use of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

Page 21

(i)      royalties, overriding royalties, reversionary interests and similar burdens granted by the Borrower or any Subsidiary with respect to the Oil and Gas Property owned by the Borrower or such Subsidiary, as the case may be, if the net cumulative effect of such burdens does not operate to deprive the Borrower or any Subsidiary of any material right in respect of its assets or properties (except for rights customarily granted with respect to such interests) and the net cumulative effect is deducted in the calculation of PV10;

(j)      Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower or any Subsidiary in the ordinary course of business covering the property under the lease;

(k)      unperfected Liens reserved in leases (other than oil and gas leases) or arising by operation of law for rent or compliance with the lease in the case of leasehold estates;

(l)      defects in or irregularities of title (other than defects or irregularities of title to Oil and Gas Property), if such defects or irregularities do not deprive the Borrower or any Subsidiary of any material right in respect of its assets or properties; and

(m)      Liens or activity and use limitations imposed under Environmental Law;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Prior Liens" means Liens described in Section 6.03(a) and in clauses (c), (f), (g), (h) and (i) of Section 6.03 that, by operation of law, have priority over the Liens securing the Obligations.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petroleum Industry Standards" means Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"PIK Interest" has the meaning assigned to such term in Section 2.10(c).

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Credit Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform" has the meaning assigned to such term in Section 10.01(d).

"Plan of Reorganization" means that certain Prepackaged Plan (as modified) of Reorganization pursuant to Chapter 11 of the Bankruptcy Code, dated as of November 5, 2018 and filed by the Debtors with the Bankruptcy Court on November 5, 2018, as supplemented by the Plan Supplement.

"<u>Plan Supplement</u>" has the meaning assigned to such term in the Plan of Reorganization.

"<u>Prepetition Credit Agreement</u>" means that certain Third Amended and Restated Credit Agreement, dated as of March 3, 2017, by and among the Borrower, the guarantors party thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent, as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof.

"<u>Prepetition Security Documents</u>" means the "Security Documents" as defined in the Prepetition Credit Agreement.

"<u>Production Payment</u>" means the grant or transfer by the Borrower or any of its Subsidiaries to any Person of a royalty, overriding royalty, net profits interest, production payment, partnership or other interest in Oil and Gas Property, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties, in which the holder of such interests is entitled to receive a specified volume or value of production and in which the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the oil and gas business.

"<u>Projected Oil and Gas Production</u>" means (a) the projected production of oil or natural gas (measured by volume unit or BTU equivalent, not sales price) from Oil and Gas Properties owned by the Borrower and the Guarantors which have attributable to them Proved Developed Producing Reserves, as such production is projected in the most recent Reserve Report delivered pursuant to this Agreement, after deducting projected production from any Oil and Gas Properties or Hydrocarbon Interests sold or under contract for sale that had been included in such report and after adding projected production from any Oil and Gas Properties or Hydrocarbon Interests that had not been reflected in such report but that are reflected in a separate or supplemental report meeting the requirements of Section 5.01(f) and otherwise are satisfactory to the Majority Lenders plus (b) the projected production of oil or natural gas (measured by volume unit or BTU equivalent, not sales price) from Oil and Gas Properties owned by the Borrower and the Guarantors which are projected to have Proved Developed Producing Reserves attributed to them within the following 12 month period based on the planned capital expenditures set forth in the projections.

"<u>Property</u>" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.  Unless otherwise qualified, all references to Property in this Agreement shall refer to a Property or Properties of Holdings or its Subsidiaries.

"<u>Proved Developed Producing Reserves</u>" means oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves."

"Proved Reserves" means oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following:  (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves".

"Public Lender" has the meaning assigned to such term in Section 10.01(d).

"Public-Sider" means a Lender or any representative of such Lender that does not want to receive material non-public information within the meaning of the federal and state securities laws.

"PV10" means, in respect of the Proved Reserves of any Credit Parties' Oil and Gas Property set forth in the most recently delivered Reserve Report, the aggregate net present value (discounted at 10% per annum) of such Oil and Gas Properties calculated before income taxes, but after reduction for royalties, lease operating expenses, severance and ad valorem taxes, capital expenditures and abandonment costs and with no escalation of capital expenditures or abandonment costs (a) calculated in accordance with SEC guidelines but using Strip Price for crude oil and natural gas liquids (WTI Cushing) and natural gas (Henry Hub), (b) calculated by (i) in the case of a Reserve Report prepared as of December 31 of any year, an Approved Petroleum Engineer and (ii) in the case of each other Reserve Report or as otherwise required under this Agreement, at the Borrower's option, a petroleum engineer employed by the Borrower or an Approved Petroleum Engineer, in each case, in such person's reasonable judgment after having reviewed the information from the most recently delivered Reserve Report, (c) as set forth in the Reserve Report most recently delivered under Section 5.01(f), (d) as adjusted to give effect to Swap Agreements permitted by this Agreement as in effect on the date of such determination and (e) as adjusted to give *pro forma* effect to all Dispositions or Acquisitions completed since the date of the Reserve Report.

"Qualified Counterparty" means, with respect to any Swap Agreement, any counterparty to a Swap Agreement (a) that is a party to the Swap Intercreditor Agreement on the Effective Date or (b) (i) that is acceptable to the Majority Lenders as evidenced by their written consent and (ii) becomes a party to the Swap Intercreditor Agreement.

"Qualified ECP Guarantor" means, in respect of any obligations under Swap Agreements that constitute Secured Obligations hereunder, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant guarantee provided by such Guarantor or grant of the relevant security interest becomes effective with respect to such obligations or such other person as constitutes an Eligible Contract Participant and can cause another person to qualify as Eligible Contract Participant at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Preferred Shares" means shares of any series of the Borrower's preferred stock (other than Disqualified Stock), the proceeds of which are used to redeem or repurchase all or any number of the then outstanding Series A Preferred Shares or Series B Preferred Shares (or any previously issued shares of Qualified Preferred Shares); provided such preferred stock (a) is not materially more restricted on Gastar and its Subsidiaries than the Series A Preferred Stock and the Series B Preferred Stock, as in effect on the date hereof, (b) does not have a weighted

Page 24

average yield in excess of the weighted average yield (with the comparative determinations to be made by the Majority Lenders in a manner consistent with generally accepted finance practices) of the Indebtedness being refinanced or repaid with the proceeds of the Qualified Preferred Shares and (c) for which cash distributions do not exceed $15,000,000 per annum.

"Recipient" means (a) the Administrative Agent, (b) the Majority Lenders and (b) any other Lender, as applicable.

"Refinanced Commitment" means as to each Lender, its obligation to make a Refinanced Loan to Borrower hereunder, expressed as an amount representing the maximum principal amount of Refinanced Loans to be made by such Lender under this Agreement.  The amount of each Lender's Refinanced Commitment is set forth on Schedule 2.01 under the caption "Refinanced Loans".  The aggregate amount of the Refinanced Commitments as of the Effective Date is equal to $[_], which amount (a) shall refinance New Money DIP Loans and (b) shall be deemed funded by the Lenders on the Effective Date.

"Refinanced Loans" are the Loans made pursuant to Section 2.02(a).

"Register" has the meaning assigned to such term in Section 10.04(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, managers, members, partners, employees, agents and advisors of such Person and such Person's Affiliates.

"Removal Effective Date" has the meaning assigned to such term in Section 9.07(b).

"Requirements of Law" means, as to any Person, any order, law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserve Report" means an unsuperseded engineering analysis of the Credit Parties' Oil and Gas Property, in form and substance reasonably acceptable to the Majority Lenders, which shall include (i) pricing assumptions based upon the Strip Price and (ii) projections of revenues attributable to all undrilled locations on the Credit Parties' Oil and Gas Property based on a development plan for a period no greater than 10 years from the date of such Reserve Report reasonably acceptable to the Majority Lenders; provided that, for the avoidance of doubt, such projections need not be based on historical capital expenditures in such locations nor take into account potential financings of projected capital expenditures.

"Reserve Report Certificate" means, with respect to any Reserve Report, a certificate from a Responsible Officer certifying that in all material respects:  (a) such Reserve Report is based on information reasonably available to the Borrower; (b) the Borrower or its Subsidiaries owns good and defensible title to the Oil and Gas Property evaluated in such Reserve Report (except any such Oil and Gas Property that has been disposed of since the date of such Reserve Report as permitted by this Agreement) and such properties are free and clear of all Liens except for Liens permitted by Section 6.03; (c) except as set forth on an exhibit to the Reserve Report Certificate, on a net basis there are no gas imbalances, take-or-pay or other prepayments with

Page 25

respect to its Oil and Gas Property evaluated in such Reserve Report which would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from Oil and Gas Property at some future time without then or thereafter receiving full payment therefor other than those which do not result in any Credit Party or any Subsidiary having net aggregate liability in excess of $1,000,000; (d) except as set forth on an exhibit to the Reserve Report Certificate, none of the Borrower's or its Subsidiaries' Oil and Gas Property have been disposed of since the last delivery of the corresponding Reserve Report, which exhibit shall describe in reasonable detail such Dispositions; (e) the Borrower is in compliance with Section 5.10(a); and (f) except as set forth on an exhibit to the Reserve Report Certificate, all such properties are owned by the Borrower or a Guarantor.

"Resignation Effective Date" has the meaning assigned to such term in Section 9.07(a).

"Responsible Officer" means the chief executive officer or chief financial officer of a Credit Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"Restricted Payment" means:

(a)      any dividend or other distribution or other payment (whether in cash, securities or other property) with respect to any Capital Stock in Holdings or any Subsidiary, to any Person (in each case, solely in such Person's capacity as holder of such Capital Stock or, in the case of any payment, to the direct or indirect holders of Holdings's or any of its Subsidiaries' Capital Stock), including any dividend or distribution payable or payment made in connection with any merger, amalgamation or consolidation;

(b)      any purchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of Holdings (including in connection with any merger, amalgamation or consolidation); and

(c)      any principal payment on, or redemption, purchase, repurchase, defeasance or other acquisition or retirement for value, in each case, prior to any scheduled repayment, sinking fund payment or scheduled maturity, of any Indebtedness secured by Liens junior in priority to the Liens securing the Obligations hereunder or unsecured Indebtedness, of the Borrower or any Subsidiary (excluding any intercompany Indebtedness between or among Borrower and any Guarantor), except a payment of interest or principal at the stated maturity date thereof.

[Notwithstanding anything to the contrary, an AHYDO Catch-Up Payment shall not constitute a Restricted Payment.][3]

"Restructuring Transactions" has the meaning assigned to such term in the Plan of Reorganization.

"S&P" means Standard & Poor's.

---

[3]      NTD: Subject to discussion re term of the loans and structure upon exit.

#4823-0519-7946

"Sale and Leaseback Transaction" means any sale or other transfer of any property by any Person with the intent to lease such property as lessee.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions (at the time of this Agreement, Cuba, Crimea, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or (b) (i) an agency of the government of a Sanctioned Country, (ii) an organization controlled by a Sanctioned Country, (iii) any Person domiciled, organized or resident in a Sanctioned Country or (iv) any Person controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including but not limited to those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the United Kingdom, the European Union and other relevant sanctions authority with jurisdiction over the Credit Parties, each as amended, supplemented or substituted from time to time.

"SCOOP and STACK play" means those geographic areas of the state of Oklahoma prospective for Hydrocarbons and generally known in the industry as the South Central Oklahoma Oil Province or "SCOOP" and Sooner Trend Anadarko Basin Canadian and Kingfisher Counties or "STACK".

"SEC" means the Securities and Exchange Commission of the United States of America.

"Secured Obligations" means (a) the Obligations, (b) all obligations in respect of Swap Agreements entered into with a counterparty that is a Qualified Counterparty at the time such Swap Agreement is entered into and (c) all obligations in respect of Initial Swap Party ISDAs entered into with an Initial Swap ISDA Counterparty thereto. The term "Secured Obligations" excludes any Excluded Swap Obligations with respect to any applicable Guarantor.

"Secured Party" means each of the Administrative Agent, each Lender, any Qualified Counterparty (to the extent, and for so long as, the obligations in respect of Swap Agreements with such Qualified Counterparty constitute "Secured Obligations" hereunder), any Initial Swap ISDA Counterparty (to the extent, and for so long as, the obligations in respect of Initial Swap Party ISDAs with such Initial Swap ISDA Counterparty constitute "Secured Obligations" hereunder) and the "Collateral Agent", as defined in the Swap Intercreditor Agreement.

"Security Agreement" means that certain Pledge and Security Agreement executed and delivered by each Credit Party on the Effective Date in favor of the Administrative Agent, for the benefit of the Secured Parties, which shall be substantially in the form of Exhibit F (with such changes thereto as may be reasonably requested by the Majority Lenders).

"Security Documents" means collectively the Prepetition Security Documents, the Security Agreement, all Control Agreements, the Swap Intercreditor Agreement and all Mortgages, deeds of trust, security agreements, pledge agreements, guaranty agreements

#4823-0519-7946

(including Article VII of this Agreement but otherwise excluding this Agreement), collateral assignments and all other collateral documents, now or hereafter executed and delivered by any Credit Party or any other Person as security for the payment or performance of the Secured Obligations, all such documents to be in form and substance satisfactory to the Administrative Agent and the Majority Lenders in their sole discretion.

"Solvent" means, with respect to any Person as of the date of any determination, that on such date (a) the fair value of the Property of such Person (both at fair valuation and at present fair saleable value) is greater than the total liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations, and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (e) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's Property would constitute unreasonably small capital after giving due consideration to current and anticipated future capital requirements and current and anticipated future business conduct and the prevailing practice in the industry in which such Person is engaged.  In computing the amount of contingent liabilities at any time, such liabilities shall be computed at the amount which, in light of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Statutory Reserves" means, for any day during any Interest Period for any Eurodollar Borrowing, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained, during such Interest Period under regulations issued from time to time (including "*Regulation D,*" issued by the Board of Governors of the Federal Reserve Bank of the United States (the "Reserve Regulations") by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion Dollars against Eurocurrency funding liabilities (currently referred to as "*Eurocurrency liabilities*" (as such term is used in Regulation D)).  Eurodollar Borrowings shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under the Reserve Regulations.

"Strip Price" means, as of any date of determination, the forward month prices as of such date, for the most comparable hydrocarbon commodity applicable to such future production month for a five-year period (or such shorter period if forward month prices are not quoted for a reasonably comparable hydrocarbon commodity for the full five-year period), with such prices escalated at 2% each year thereafter based on the last quoted forward month price of such period, as such prices are (i) quoted on the NYMEX as of the determination date and (ii) adjusted by appropriate management adjustments for additions to reserves and depletion or sale of reserves since the date of such Reserve Report, adjusted for any basis differential as of the date of determination.

"<u>Subject Lease</u>" means the Oil and Gas Property set forth on Schedule 1.01(b) or at any time thereafter held or acquired by any Credit Party, in each case, that is subject to a right of a third party existing on the date hereof under an area of mutual interest agreement, joint venture agreement, participation agreement or other similar agreement customary in the oil and gas industry to acquire an interest in such lease from such Credit Party; provided, in each case, that such right has not been exercised and the time for exercise has not expired.

"<u>Subsidiary</u>" means, with respect to any Person (the "<u>parent</u>") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Capital Stock representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent. Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of Holdings.

"<u>Swap Agreement</u>" means any agreement or arrangement, or any combination thereof, (a) consisting of interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies or (b) relating to oil and gas or other hydrocarbon prices or basis costs or differentials or other similar financial factors.

"<u>Swap Intercreditor Agreement</u>" means that certain Intercreditor Agreement, dated as of the Effective Date, among the Administrative Agent, Wilmington Trust, National Association, as collateral agent, the Qualified Counterparties from time to time party thereto, the Borrower and the Guarantors, as amended, supplemented or otherwise modified from time to time, which shall be substantially in the form of <u>Exhibit D</u>.

"<u>Swap Notes</u>" means (a) that certain Promissory Note, dated as of January [_], 2019, issued by the Borrower in favor of NextEra Energy Marketing, LLC and (b) that certain Promissory Note, dated as of January [_], 2019, issued by the Borrower in favor of Cargill, Incorporated.

"<u>Swap Note Documents</u>" means the Loan Documents as defined in the Swap Notes.

"<u>Swap Termination Value</u>" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Texas Finance Code" has the meaning assigned to such term in Section 10.15.

"Transactions" means (a) the execution, delivery and performance by the Credit Parties of this Agreement and the other Loan Documents, (b) the Borrowing of Loans, and (c) the use of the proceeds thereof.

"Type" when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "*Rate*" means the Adjusted LIBO Rate and the Alternate Base Rate.

"U.S. Government Securities" means direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency or instrumentality thereof to the extent such obligations are entitled to the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(f)(ii)(B)(3).

"Wellbore Lien" means, with respect to any DrillCo PDP Reserves of a Credit Party attributable to a particular well, a Lien (including a real property mortgage on and a locally, and, if applicable, centrally, filed financing statement covering fixtures and as-extracted collateral) on (i) the interest of the relevant Credit Party in and to such well, the associated wellbore and the associated fixtures and as-extracted collateral, and (ii) the interest of such Credit Party in and to the relevant leases or other Oil and Gas Properties attributable to such DrillCo PDP Reserves, but only insofar as such Leases or other Oil and Gas Properties are necessary to produce, operate, maintain, and plug and abandon such well.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Credit Party and the Administrative Agent.

**Section 1.02**   **Terms Generally**.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any

Page 30

agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.03   **Classification of Loans and Borrowings**.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "*Eurodollar Loan*") or as either New Money Loans or Refinanced Loans.

## ARTICLE II.

## THE CREDITS

Section 2.01   **Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent in writing that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Majority Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein.

Section 2.02   **Loans and Commitments**.

(a)       Subject to the terms and conditions set forth herein (including Sections 4.01 and 4.02), and relying upon the representations and warranties set forth herein, each Lender with a Refinanced Commitment shall be deemed, on the Effective Date, to have made a loan to the Borrower (each such loan, a "Refinanced Loan") in an aggregate amount equal to such Lender's Refinanced Commitment.  The Administrative Agent, the Lenders and the Credit Parties each acknowledges and agrees that the Refinanced Loans shall be deemed funded on the Effective Date without any actual funding and the Refinanced Commitment of each Lender shall terminate

Page 31

immediately and automatically after the deemed making of the Refinanced Loan.  The Borrower acknowledges and agrees that the full proceeds of the Refinanced Loans have been disbursed by the Lenders to the Borrower.  The Refinanced Loans shall initially be made as Eurodollar Loans with an Interest Period of three months.  Once repaid, the Refinanced Loans may not be reborrowed, and any Refinanced Commitment, once terminated, may not be reinstated.

(b)     Subject to the terms and conditions set forth herein (including Sections 4.01 and 4.02), and relying upon the representations and warranties set forth herein, each Lender with a New Money Commitment agrees, severally and not jointly, to make loans to the Borrower (each such loan, a "New Money Loan") in Dollars on any Business Day on or following the Effective Date and during the Availability Period in an aggregate amount not to exceed its New Money Commitment at such time; provided that the aggregate amount of each such Borrowing shall not be less than $500,000 (or, if less, the aggregate amount of the remaining New Money Commitments), and, in any event, in an aggregate amount for each such Borrowing not to exceed the aggregate New Money Commitments at such time.  The amount of each Lender's New Money Loan as part of any such Borrowing shall equal its *pro rata* share of such Borrowing.

(c)     Proceeds of the New Money Loans shall be used and distributed by the Borrower solely as permitted herein.  Once borrowed or repaid, the New Money Loans may not be reborrowed, and any New Money Commitment, once terminated or reduced, may not be reinstated.  The aggregate amount of the New Money Commitments shall be reduced by the amount of each Borrowing of New Money Loans made hereunder immediately upon the funding thereof, and the amount of each Lender's applicable New Money Commitment shall be automatically and permanently reduced by the amount of the related New Money Loan funded by such Lender pursuant to Section 2.02(b) immediately upon the funding thereof.

**Section 2.03     Request for Borrowings; Funding of Borrowings**.

(a)     In order to request a Borrowing (other than a Borrowing of Refinanced Loans), the Borrower shall deliver in writing to the Administrative Agent and the Lenders (or shall provide telephonic notice promptly confirmed in writing by a duly completed Borrowing Request) not later than 12:00 p.m. New York City time, three (3) Business Days prior to the proposed Borrowing.  Such Borrowing Request shall be irrevocable and shall be delivered by telecopy or email to the Administrative Agent and shall be signed by the Borrower.  Each such written Borrowing Request shall specify the following information:

(i)     whether the Borrowing then being requested is to be a Eurodollar Borrowing or an ABR Borrowing;

(ii)     the aggregate amount of such Borrowing;

(iii)     the wiring information of the account of the Borrower to which funds are to be disbursed;

(iv)     the date of such Borrowing, which shall be a Business Day; and

(v)     if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto.

#4823-0519-7946

Notwithstanding any other provision of this Agreement, the Borrower shall not request, and the Lenders shall not be required to fund, a Borrowing of New Money Loans more frequently than once per calendar week.

Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from a Responsible Officer of the Borrower.

(b)      If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of three months' duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's *pro rata* share of the requested Borrowing.

(c)      Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or elect to convert or continue, any Borrowing if the Interest Period requested or elected with respect thereto would end after the maturity date of such Borrowing.

(d)      The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(e)      Each submission by the Borrower to the Administrative Agent of a Borrowing Request shall be deemed to constitute a representation and warranty by the Borrower that the conditions set forth in Article IV have been satisfied or waived as of the date of the Borrowing.

(f)      Each Lender shall make its *pro rata* share of each Borrowing of New Money Loans by wire transfer of immediately available funds by 12:00 p.m., New York City time, to an account of the Administrative Agent designated for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly disbursing the amounts so received, in like funds, to a deposit account of the Borrower designated by the Borrower in the applicable Borrowing Request.

(g)      Unless the Administrative Agent shall have received written notice from a Lender prior to the proposed time its New Money Loan is required to be made by such Lender in accordance with paragraph (f) of this Section that such Lender will not make available to the Administrative Agent such Lender's New Money Loan, the Administrative Agent may assume that such Lender has made its New Money Loan available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its New Money Loan available to the Administrative Agent, then such Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the

Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to the New Money Loans.  If such Lender pays such amount to the Administrative Agent, then the principal portion of such payment shall constitute such Lender's New Money Loan.

(h)     Notwithstanding any other provision of this Agreement, there shall be no more than fifteen (15) Interest Periods outstanding at any time.

### Section 2.04    Termination of New Money Commitment.

(a)     The Borrower may at any time terminate, or from time to time reduce, the New Money Commitments; provided that each reduction of the New Money Commitments shall be in an amount that is an integral multiple of $500,000 and not less than 1,000,000.

(b)     The Borrower shall notify the Administrative Agent in writing of any election to terminate or reduce the New Money Commitments under paragraph (a) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any such notice, the Administrative Agent shall advise the applicable Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section shall be irrevocable.  Any termination or reduction of the New Money Commitments shall be permanent.  Each reduction of the New Money Commitments shall be made ratably among the Lenders in accordance with their respective New Money Commitments.

### Section 2.05    Repayment of Loans; Evidence of Debt.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of the Loans of such Lender, and all interest due thereon, and otherwise satisfy all other Obligations, in each case, on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from the Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's Applicable Percentage thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain

Page 34

#4823-0519-7946

such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement; and provided further that to the extent there is any conflict between the accounts maintained pursuant to paragraph (b) or (c) of this Section and the Register maintained pursuant to Section 10.04(b), the Register shall control.

(e)     Any Lender may request that the Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender or its registered assigns in the form attached hereto as Exhibit G.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by a promissory note in such form.

### Section 2.06     Optional Prepayment of Loans.

(a)     The Borrower shall have the right at any time and from time to time to prepay the Loans, in whole or in part, in an aggregate minimum amount equal to (i) if being paid in whole, the Obligations and (ii) if being paid in part, $1,000,000 and integral multiples of $500,000 in excess of that amount.  With respect to each prepayment of Loans required by this Section 2.06, such prepayments shall be applied on a *pro rata* basis to the then outstanding Loans irrespective of whether such outstanding Loans are ABR Loans or Eurodollar Loans.

(b)     The Borrower shall notify the Administrative Agent and the Lenders in writing of any prepayment hereunder not later than 12:00 p.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans to be prepaid.  All prepayments under this Section 2.06 shall be subject to Section 2.16 but otherwise without premium or penalty.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment shall be applied ratably to the Loans.

(c)     Each prepayment pursuant to this Section 2.06 shall be accompanied by a cash amount equal to the accrued but unpaid interest through the date of such prepayment.

### Section 2.07     Mandatory Prepayment of Loans.

(a)     If any Credit Party shall consummate any Asset Sale, incur any Indebtedness (other than Indebtedness permitted under Section 6.02) or realize proceeds from any Casualty Event above $500,000 individually or in the aggregate, then, in each case, not later than two (2) Business Days after receipt of the Net Cash Proceeds therefrom, the Borrower shall (i) apply 100% of such Net Cash Proceeds to the repayment of Loans and the payment of accrued and unpaid interest thereon and/or (ii) in the case of any Asset Sale elect (by written notice to the Administrative Agent) to reinvest all or any portion of such Net Cash Proceeds in Additional Assets; provided that, in the case of Asset Sales of Properties other than Non-Core Assets, the aggregate Net Cash Proceeds from all such Asset Sales which may be reinvested does not exceed $25,000,000 in the aggregate; provided further that if all or any portion of such Net Cash Proceeds are not so used to reinvest in Additional Assets within 360 days (or such earlier date, if any, as the applicable Credit Party determines not to reinvest such Net Cash Proceeds as set forth

above), such remaining portion shall be applied on the last date of such period (or such earlier date, as the case may be) to the prepayment of Loans. The provisions of this Section 2.07(a) do not constitute a consent to any Disposition or the incurrence of any Indebtedness by any Credit Party.

(b)     Each payment of Net Cash Proceeds pursuant to this Section 2.07 shall be applied on a *pro rata* basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are ABR Loans or Eurodollar Loans and shall be accompanied by all accrued but unpaid interest thereon.

(c)     The Borrower shall notify the Administrative Agent and the Lenders in writing of any prepayment hereunder not later than 12:00 p.m., New York City time, three (3) Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans to be prepaid. All prepayments under this Section 2.07 shall be subject to Section 2.16 but otherwise without premium or penalty. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.

**Section 2.08    [Reserved]**.

**Section 2.09    [Reserved]**.

**Section 2.10    Interest on Loans**.

(a)     The Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days (or, in the case of ABR Loans that bear interest by reference to the Base Rate, 365 or 366 days, as applicable) and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)     Interest on each Loan shall be payable in cash in arrears on each Interest Payment Date applicable to such Loan and on the Maturity Date, and, in the event of any repayment or prepayment of any Loan, interest on the amount so repaid or prepaid shall be payable in cash on the date of such repayment or prepayment; provided, that the Borrower may elect, by providing a Notice of PIK Election to the Administrative Agent in accordance with the immediately following sentence, to have all (but not less than all) of the interest payable on any Interest Payment Date paid in kind by having such interest capitalized and added to the outstanding principal balance of the Loans on such Interest Payment Date in lieu of cash payment (such interest that is capitalized and added to the principal amount of a Loan being referred to herein as "PIK Interest"). In order to elect to have the interest payable on any Interest Payment Date paid as PIK Interest in lieu of cash, the Borrower shall provide a Notice of PIK Election to the Administrative Agent (i) in the case of a Eurodollar Loan, not later than12:00 p.m., New York

City time, one (1) Business Day prior to the first day of the Interest Period ending on such Interest Payment Date and (ii) in the case of an ABR Loan, not later than 12:00 p.m., New York City time, one (1) Business Day prior to the Interest Payment Date in respect of such Loan immediately preceding the Interest Payment Date to which such PIK Election relates (or, if such PIK Election in respect of such Loan is for the first Interest Payment Date occurring after the Effective Date, not later than 12:00 p.m., New York City time, one (1) Business Day prior to the Effective Date).  Upon being capitalized and added to the then aggregate outstanding principal balance of the Loans, PIK Interest shall be treated as principal of the Loans for all purposes of this Agreement and the other Loan Documents.  Notwithstanding anything to the contrary contained herein, interest accruing pursuant to Section 2.10(d) shall be payable in cash from time to time on demand.

(d)     Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans and, to the extent permitted by applicable law, other Obligations outstanding shall thereafter bear interest, after as well as before judgment, at the Default Rate.

(e)     [Notwithstanding anything to the contrary set forth in this Agreement, if at the end of any "accrual period" (as defined in Section 1272(a)(5) of the Code) ending after the fifth (5th) anniversary of the Effective Date, the aggregate amount of accrued but unpaid original issue discount (as defined in Section 1273(a)(1) of the Code) and interest (including any accrued interest added to principal) on any Loan would, but for this paragraph, exceed an amount equal to the product of (x) the "issue price" (as defined in Sections 1273(b) and 1274(a) of the Code and the regulations promulgated thereunder) multiplied by (y) the "yield to maturity" (as defined in Treasury Regulation Section 1.1272-1(b)(1)(i)) (such amount, the "Maximum Accrual"), then interest for such accrual period shall not be deferred and all accrued but unpaid interest and original issue discount on such Loan as of the end of such accrual period in excess of an amount equal to the Maximum Accrual shall be paid in cash (the "AHYDO Catch-Up Payment"), and such AHYDO Catch-Up Payment shall be treated for purposes of Section 163(i) of the Code as interest paid on such Loan. No partial repayment of the Loans pursuant to any other provision of this Agreement or the other Loan Documents prior to such payment date shall alter the obligation to make AHYDO Catch-Up Payments provided for in this paragraph. For the avoidance of doubt and notwithstanding anything to the contrary herein, this paragraph shall be construed so as to require payments at such times and in such amounts to cause the Loans to not be treated as having "significant original issue discount" within the meaning of Section 163(i)(2) of the Code.][4]

(f)     If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the rate applicable during such extension period.

**Section 2.11   Alternate Rate of Interest**.

---

[4]     NTD: Subject to discussion re term of the loans and structure upon exit.

#4823-0519-7946

(a)     If prior to the commencement of any Interest Period for a Eurodollar Borrowing: (x) the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or (y) the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) or is advised in writing by the Majority Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period; then the Administrative Agent shall give written notice thereof to Borrower and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Eurodollar Borrowing requested to be made on the first day of such Interest Period shall be made as a Market Disruption Loan, (ii) any Borrowings that were to have been converted on the first day of such Interest Period to a Eurodollar Borrowing shall be continued as a Market Disruption Loan and (iii) any outstanding Eurodollar Borrowing shall be converted, on the last day of the then-current Interest Period, to a Market Disruption Loan.

(b)     If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(x) above have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(x) have not arisen but the administrator of the ICE Benchmark Administration London Interbank Offered Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the ICE Benchmark Administration London Interbank Offered Rate shall no longer be used for determining interest rates for loans, then the Borrower and the Administrative Agent (acting at the direction of the Majority Lenders) shall endeavor to establish an alternate rate of interest to the LIBO Rate that (x) gives due consideration to the then-prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time and (y) is a rate for which the Administrative Agent has indicated in writing to the Lenders (which includes email) that it is able to calculate and administer and the Borrower and the Administrative Agent, with the consent of Majority Lenders, may enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin) (and the Lenders hereby (A) authorize and direct the Administrative Agent to execute and deliver any such amendment in respect of which the Majority Lenders have indicated in writing to the Administrative Agent (which may be via email) that such amendment (and the alternate interest rate specified therein) is satisfactory to the Majority Lenders and (B) acknowledge and agree that the Administrative Agent shall be entitled to all of the exculpations and indemnifications provided for in this Agreement in favor of the Administrative Agent in executing and delivering any such amendment).  Notwithstanding anything to the contrary in Section 10.02, such amendment shall become effective without any further action or consent of any other party to this Agreement.  Until an alternate rate of interest is determined in accordance with this clause (b) (but, in the case of the circumstances described in clause (ii) of the first sentence of this Section 2.11(b), only to the extent the ICE Benchmark Administration London Interbank Offered Rate for such Interest Period is not available or published at such time on a current basis), (x) any requested Eurodollar Loans shall be made as ABR Loans, (y) any ABR Loans that were to have been converted to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then current

Page 38

Interest Period applicable thereto, into ABR Loans, in each case determined without giving effect to clause (c) of the Alternate Base Rate.

**Section 2.12   Fees**.  The Borrower shall pay to the Administrative Agent, for its own account, the fees and expenses set forth in the Fee Letter in the amounts and at the times set forth therein.  Such fees shall be fully earned when due and shall not be refundable for any reason whatsoever.

**Section 2.13   Conversion and Continuation of Borrowings**.  The Borrower shall have the right at any time upon delivery of an Interest Election Request to the Administrative Agent (a) not later than 12:00 p.m., New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 12:00 p.m., New York City time, three (3) Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 12:00 p.m., New York City time, three (3) Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

(i)      each conversion or continuation shall be made *pro rata* among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)     no less than all the outstanding principal amount of any Borrowing shall be converted or continued;

(iii)    accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv)    if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v)     any portion of the Borrowing maturing or required to be repaid in less than one week may not be converted into or continued as a Eurodollar Borrowing;

(vi)    any portion of a Eurodollar Borrowing that cannot be continued as a Eurodollar Borrowing by reason of the immediately preceding clause (v) shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing; and

(vii)   after the occurrence and during the continuance of a Default or Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each such Interest Election Request shall be irrevocable and shall specify (a) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (b) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (c) if such notice requests a conversion, the date of such conversion (which shall be a

Business Day) and (d) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto.  If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of three months' duration.  The Administrative Agent shall promptly advise the Lenders of any notice given pursuant to this Section 2.13.  If the Borrower shall not have given notice in accordance with this Section 2.13 to continue any Borrowing into a subsequent Interest Period, such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted into an ABR Borrowing.

**Section 2.14**   **Increased Costs**.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate);

(ii)      subject any Recipient to any Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (iii) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender

and the result of any of the foregoing shall be to increase the cost to such Recipient of making, converting to, continuing or maintaining any Loan or maintaining its obligations to make any such Loan or to reduce the amount of any sum received or receivable by such Recipient hereunder (whether of principal, interest or any other amount), then the Borrower will pay to such Recipient such additional amount or amounts as will compensate such Recipient for such additional costs incurred or reduction suffered.

(b)      If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender such Lender's holding company for any such reduction suffered.

(c)      A certificate of a Recipient setting forth the amount or amounts necessary to compensate such Recipient or its holding company, as the case may be, as specified in

Page 40

paragraph (a) or (b) of this Section shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive absent manifest error.  The Borrower shall pay such Recipient the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof.

(d)     Failure or delay on the part of any Recipient to demand compensation pursuant to this Section shall not constitute a waiver of such Recipient's right to demand such compensation; provided that the Borrower shall not be required to compensate a Recipient pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Recipient notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Recipient's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

**Section 2.15   Change in Legality**.

(a)     Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)     such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)     such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under paragraph (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)     For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, (i) if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan and (ii) in all other cases, on the date of receipt by the Borrower.

Section 2.16   **Breakage**.  The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving, or being deemed to receive, any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.13) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "Breakage Event") or (b) any default in the making of any payment or prepayment required to be made hereunder.  In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period.  A certificate of any Lender (with a copy to the Administrative Agent) setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

Section 2.17   **Taxes**.

(a)       Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Credit Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings of Indemnified Taxes applicable to additional sums payable under this Section 2.17) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)       Payment of Other Taxes by the Borrower.  The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)       Evidence of Payments.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 2.17, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)    Indemnification by the Borrower.  The Credit Parties shall jointly and severally indemnify each Recipient, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) Business Days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Page 43

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form); or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form), a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or Exhibit H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as

Page 44

applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    each Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)    Status of Administrative Agent.  On or before the date on which Wilmington Trust, National Association (and any successor or replacement Administrative Agent) becomes the Administrative Agent hereunder, it shall deliver to the Borrower two executed copies of either (i) IRS Form W-9, or (ii) IRS Form W-8ECI (with respect to any payments to be received on its own behalf) and IRS Form W-8IMY (for all other payments), establishing that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States, including Taxes imposed under FATCA.

(h)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such

Page 45

refund (but only to the extent of indemnity payments made under this <u>Section 2.17</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     <u>Survival</u>.  Each party's obligations under this <u>Section 2.17</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**Section 2.18   <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.**

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under <u>Section 2.14</u>, <u>Section 2.16</u> or <u>Section 2.17</u>, or otherwise) prior to 2:00 p.m. New York City Time on the date when due, in Dollars and (other than in the case of PIK Interest) in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at such account as may be specified by the Administrative Agent, except that payments pursuant to <u>Section 2.14</u>, <u>Section 2.16</u>, <u>Section 2.17</u> or <u>Section 10.03</u> shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied (i) first, towards payment of fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of fees then due to such parties, (ii) second, towards payment of interest and premiums then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and premiums then due to such parties and (iii) third, towards payment of principal then due hereunder, ratably

Page 46

among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.17(e) or Section 10.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to it under such Sections until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES

Each Credit Party represents and warrants to the Administrative Agent and the Lenders that on the Effective Date and each Credit Date:

**Section 3.01   Organization; Powers**.  Each Credit Party (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and, (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

**Section 3.02   Authorization; Enforceability**.  The Transactions are within each Credit Party's corporate, limited liability company or partnership powers and have been duly authorized by all necessary corporate, limited liability company or partnership and, if required, actions by equity holders.  This Agreement has been duly executed and delivered by each Credit Party and constitutes a legal, valid and binding obligation of each Credit Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03   Governmental Approvals; No Conflicts**.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect or have been made or to be made in connection with the filing of any Security Documents, financing statements, or other registrations or filings to secure the Obligations, (b) will not violate any Requirement of Law applicable to any Credit Party or any Subsidiary, (c) will not violate or result in a default under any indenture, agreement or other instrument evidencing Material Indebtedness, or give rise to a right thereunder to require any payment to be made by any Credit Party or any Subsidiary, and (d) will not result in the creation or imposition of any Lien on any asset of any Credit Party or any Subsidiary not otherwise permitted under Section 6.03.

**Section 3.04   Financial Condition; No Material Adverse Change**.

(a)     The Borrower has heretofore furnished to the Administrative Agent and the Lenders (i) the audited consolidated balance sheet and related statements of income, stockholders equity and cash flows of the Borrower and its Consolidated Subsidiaries as of and for the fiscal year ended December 31, 2017, reported on by BDO USA, LLP, independent public accountants and (ii) the unaudited consolidated balance sheet and related statements of income, stockholders equity and cash flows of the Borrower and its Consolidated Subsidiaries as of and for the fiscal quarter ended September 30, 2018.  Such financial statements, together with any notes and management discussions related to such financials appearing in the Borrower's Form 10-K filed with the SEC on March 15, 2018 and the Borrower's Form 10-Q filed with the SEC on November 14, 2018 present fairly, in all material respects, the financial position and results of

operations and cash flows of the Borrower and its Consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP and, except as set forth on Schedule 3.04, show all Material Indebtedness and other liabilities, direct or contingent, of the Borrower and its Consolidated Subsidiaries as of the date thereof, including material commitments and Indebtedness.

(b)     Since October 26, 2018 (excluding the pendency of the Chapter 11 Cases), no event or circumstance, either individually or in the aggregate, which has had or could reasonably be expected to have a Material Adverse Effect has occurred.

**Section 3.05    Properties**.

(a)     Except as otherwise provided in Section 3.05(c) with respect to Oil and Gas Property, Holdings and each Subsidiary has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for (i) minor defects in title that do not, in the aggregate, interfere with its ability to conduct its business as currently conducted and (ii) Liens permitted under Section 6.03.

(b)     Holdings and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by Holdings and such Subsidiaries, as the case may be, does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c)     Each Credit Party has good and defensible title to all Proved Reserves included in the Oil and Gas Property described in the most recent Reserve Report provided to the Administrative Agent and the Lenders (other than such Proved Reserves that have been subsequently disposed of and disclosed on Schedule 3.19), free and clear of all Liens except Liens permitted under Section 6.03.  All such proved Oil and Gas Property are valid, subsisting, and in full force and effect in all material respects, and all rentals, royalties, and other amounts due and payable in respect thereof have been duly paid except for such rentals, royalties and other amounts that are amounts being contested in good faith by appropriate proceedings and for which the Borrower or the applicable Subsidiary has set aside on its books adequate reserves, or except to the extent such rentals, royalties and other amounts due, if left unpaid, would not result in the loss or forfeiture of Oil and Gas Property having an aggregate fair market value in excess of $5,000,000.  Without regard to any consent or non-consent provisions of any joint operating agreement covering any Credit Party's proved Oil and Gas Property, such Credit Party's share of (a) the costs for the proved Oil and Gas Property described in the Reserve Report (other than for such proved Oil and Gas Property that have been subsequently disposed of and disclosed on Schedule 3.19) is not materially greater than the decimal fraction set forth in the Reserve Report, before and after payout, as the case may be, and described therein by the respective designations "working interests," "WI," "gross working interest," "GWI," or similar terms (except in such cases where there is a corresponding increase in the net revenue interest), and (b) production from, allocated to, or attributed to such proved Oil and Gas Property is not materially less than the decimal fraction set forth in the Reserve Report, before and after payout, as the case may be, and described therein by the designations "net revenue interest," "NRI," or similar terms.  The wells drilled in respect of proved producing Oil and Gas Property described in the Reserve

Report (other than wells drilled in respect of such proved producing Oil and Gas Property that have been subsequently disposed of and disclosed on <u>Schedule 3.19</u>) (1) are capable of, and are presently, either producing Hydrocarbons in commercially profitable quantities or in the process of being worked over or enhanced, and the Credit Party that owns such proved producing Oil and Gas Property is currently receiving payments for its share of production, with no funds in respect of any thereof being presently held in suspense, other than any such funds being held in suspense pending delivery of appropriate division orders, (2) have been drilled, bottomed, completed, and operated in compliance with all applicable laws, and (3) are not subject to any penalty in production by reason of such well having produced in excess of its allowable production; except where any failure to comply with clauses (2) or (3) would not have a Material Adverse Effect.

(d)     No Credit Party has knowledge that a default exists under any of the terms or provisions, express or implied, of any of the leases and term mineral interests in the Oil and Gas Properties evaluated in the most recently delivered Reserve Report (other than any thereof disposed of in a Disposition permitted by this Agreement) or under any agreement to which the same are subject that would materially and adversely affect the rights of the Credit Parties with respect to the Oil and Gas Properties to which such lease, interest, or agreement relates.

(e)     Except as otherwise permitted hereunder, there are no obligations under any Oil and Gas Property or contract or agreement which require the drilling of additional wells or operations to earn or to continue to hold any of the Oil and Gas Properties in force and effect, except leases in the primary term and those under customary continuous operations provisions that may be found in one or more of the Borrower's or any Subsidiaries oil and gas and/or oil, gas and mineral leases.

(f)     To the extent required hereunder, all material necessary regulatory filings have been properly made in connection with the drilling, completion and operation of the wells on or attributable to the Oil and Gas Properties and all other operations related thereto.

(g)     To the extent required hereunder, all production and sales of Hydrocarbons produced or sold from the Oil and Gas Properties have been made in accordance with any applicable allowables (plus permitted tolerances) imposed by any Governmental Authorities except for where the failure to so comply could not reasonably be expected to result in a Material Adverse Effect.

(h)     No Credit Party has collected any proceeds from the sale of Hydrocarbons produced from the Oil and Gas Properties which are subject to any refund obligation except for where the failure to so comply could not reasonably be expected to result in a Material Adverse Effect.

(i)     The Mortgaged Properties, together with the Subject Leases listed on <u>Schedule 1.01(b)</u> constitute all of the Hydrocarbon Interests owned by the Credit Parties as of the Effective Date.

**Section 3.06   <u>Litigation and Environmental Matters</u>**.

(a)     There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Credit Party, threatened

Page 50

against or affecting Holdings or any Subsidiary (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect after taking into account insurance proceeds or other recoveries from third parties actually received (other than the Disclosed Matters) or (ii) that involve this Agreement or the Transactions.

(b)     Except for the Disclosed Matters and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect after taking into account insurance proceeds or other recoveries from third parties actually received, neither Holdings nor any Subsidiary, to the Borrower's knowledge, (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any reasonable basis for any claim against Holdings or any Subsidiary with respect to any Environmental Liability.

Section 3.07   **Compliance with Laws and Agreements**.  (a) Holdings and each Subsidiary is in compliance with all Requirements of Law applicable to it or its property, (b) Holdings and each Subsidiary is in compliance with its respective Organizational Documents and (c) Holdings and each Subsidiary is in compliance with all indentures, agreements and other instruments binding upon it or its property, except, in the case of clauses (a) or (c), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

Section 3.08   **Investment Company Status**.  Neither Holdings nor any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

Section 3.09   **Taxes**.  Holdings and each Subsidiary has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which Holdings or such Subsidiary, as applicable, has set aside on its books adequate reserves maintained in accordance with GAAP, (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect, or (c) to the extent otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

Section 3.10   **ERISA**.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of U.S. GAAP Codification Topic 715-30) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount that could reasonably be expected to result in Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of U.S. GAAP Codification Topic 715-30) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value

Page 51

of the assets of all such underfunded Plans by an amount that could reasonably be expected to result in Material Adverse Effect.

Section 3.11   **Disclosure**.  The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of Holdings or any Subsidiary to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date made or deemed made; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based on assumptions believed to be reasonable at the time and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

Section 3.12   **Labor Matters**.  There are no strikes, lockouts or slowdowns against Holdings or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened that could reasonably be expected to have a Material Adverse Effect.  The hours worked by and payments made to employees of Holdings and of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other Law dealing with such matters to the extent that such violation could reasonably be expected to have a Material Adverse Effect.

Section 3.13   **Capitalization**.  Schedule 3.13 lists as of the Effective Date, (a) for the Borrower and each Subsidiary, its full legal name and its jurisdiction of organization and (b) for each Subsidiary, the number of shares of capital stock or other Capital Stock outstanding and the owner(s) of such shares or Capital Stock.

Section 3.14   **Margin Stock**.  Neither Holdings nor any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), and no part of the proceeds of the Loans will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

Section 3.15   **Bank Accounts**.  Schedule 3.15 lists all accounts maintained by or for the benefit of any Credit Party with any bank or financial institution.

Section 3.16   **Insurance**.  Customary insurance certificates have been furnished by the Borrower to the Administrative Agent and the Lenders as of the Effective Date demonstrating Holdings's and the Subsidiaries' compliance with Section 5.05(b).

Section 3.17   **Material Contracts** .  Schedule 3.17 contains a complete and accurate list of each contract, agreement or commitment, whether oral or written, to which any Credit Party is a party or by which it is bound, and which are currently effective, that are:  (i) non-competition agreements or other agreements or obligations that purport to limit in any material respect the

Page 52

manner in which, or the localities in which, all or any material portion of any Credit Party's business is conducted; (ii) contracts with one year or greater remaining duration, or that cannot be canceled on 90 days' notice or less; (iii) agreements for the borrowing of money; (iv) employment agreements, consulting agreements or other contract for services involving a payment of more than $500,000 annually; (v) leases with respect to any property, real or personal (other than leases constituting Mortgaged Properties); (vi) Production Payments or Advance Payment Contracts; (vii) agreements for a purchase or sale of assets, securities or a business, or otherwise obligating any Credit Party to pay any consideration of more than $500,000; (viii) agreements with any agent, dealer or distributor, including all such agreements relating to the gathering and/or marketing of Hydrocarbons; (ix) stand-by letters of credit, guarantee or performance bond; (x) agreements not made in the ordinary course of business; and (xi) material contracts to which any Credit Party is a party that would terminate or become terminable, require any Credit Party to take any action, cause any Credit Party to lose any material benefits or give to others any rights of amendment, acceleration, suspension, revocation or cancellation, under any such contract as a result of the transactions contemplated in this Agreement (each of the foregoing, a "Material Contract").

Section 3.18   **Gas Imbalances**.  Except as set forth on Schedule 3.18, on a net basis there are no Gas Imbalances, take or pay or other prepayments with respect to any Oil and Gas Properties which would require any Credit Party to deliver Hydrocarbons produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor other than that which do not result in any Credit Party or any Subsidiary having net aggregate liability in excess of $5,000,000.

Section 3.19   **Reserve Reports**. To the Borrower's knowledge, (i) the assumptions stated or used in the preparation of each Reserve Report are reasonable (it being understood by Administrative Agent and the Lenders that assumptions as to future results are subject to uncertainty and that no assurance can be given that any particular projections will be realized to the extent beyond any Credit Party's control), (ii) all information furnished by any Credit Party to the Approved Petroleum Engineer for use in the preparation of each Reserve Report was accurate in all material respects at the time furnished or was subsequently corrected, (iii) except as set forth on Schedule 3.19, there has been no decrease in the amount of the estimated Proved Reserves shown in any Reserve Report since the date thereof, except for changes which have occurred as a result of production in the ordinary course of business, and (iv) at the time furnished, no Reserve Report omitted any statement or information necessary to cause the same not to be misleading to Administrative Agent and the Lenders in any material respect.

Section 3.20   **Sale of Production**.  No Oil and Gas Property is subject to any Advance Payment Contract or any contract whereby payments are made to any Credit Party other than by checks, drafts, wire transfer advices or other similar writings, instruments or communications for the immediate payment of money.  Except for production sales contracts, processing agreements, transportation agreements and other agreements relating to the marketing of production that are listed on Schedule 3.20 in connection with the Oil and Gas Properties to which such contract or agreement relates:  (i) no Oil and Gas Property is subject to any contractual or other arrangement for the sale, processing or transportation of production (or otherwise related to the marketing of production) which cannot be canceled on one year's (or fewer) notice, other than as consented to by the Majority Lenders, and (ii) all contractual or other arrangements for the sale, processing or

Page 53

transportation of production (or otherwise related to the marketing of production) are bona fide arm's length transactions made on the best terms available with third parties not affiliated with any Credit Party.  Each Credit Party is presently receiving a price for all production from (or attributable to) each Oil and Gas Property covered by a production sales contract or marketing contract listed on <u>Schedule 3.20</u> that is computed in accordance with the terms of such contract, and no Credit Party is having deliveries of production from such Oil and Gas Property curtailed substantially below such Property's delivery capacity.

       **Section 3.21**   **Anti-Corruption Laws and Sanctions**.  The Borrower has implemented and maintains in effect policies and procedures designed to promote and achieve compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers, to the knowledge of the Borrower its directors, employees and agents, insofar as the same are acting on behalf of the Borrower or its Subsidiaries, (i) are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and (ii) have not, in the past five years, engaged in any dealings with a Sanctioned Person in violation of applicable Sanctions.  None of the Borrower or any Subsidiary, or to the knowledge of the Borrower, any director, officer, employee or agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

       **Section 3.22**   **No Foreign Operations**.  Holdings and its Subsidiaries do not operate their business outside the geographical boundaries of the United States.

       **Section 3.23**   **Solvency**.  Before (other than in the case of the Refinanced Loans), and after giving effect to, the making of Loans and the application of the proceeds hereof, the Credit Parties, taken as a whole, are Solvent.

       **Section 3.24**   **Holdings as Holding Company**.  Holdings is a holding company and does not engage in any business activities or own any assets or incur any liabilities other than (a) its ownership of the Capital Stock of the Borrower and liabilities incidental thereto and (b) in connection with the consummation of the Transactions.

**ARTICLE IV.**

**<u>CONDITIONS TO EFFECTIVENESS AND BORROWINGS</u>**

       **Section 4.01**   **Conditions to Effectiveness**.  The effectiveness of this Agreement shall be subject to the satisfaction (or waiver by the Majority Lenders) of the following conditions:

       (a)    *Loan Documents*. The Administrative Agent and the Lenders shall have received executed counterparts of this Agreement and the other Loan Documents executed by each party hereto and thereto, each of which shall be in form and substance satisfactory to the Majority Lenders in their sole discretion.

       (b)    *Organizational Documents.*  The Administrative Agent and the Lenders shall have received (i) customary certificates of resolutions or other action, incumbency certificates of Responsible Officers of each Credit Party evidencing the identity, authority and capacity of each

#4823-0519-7946

Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Credit Party is a party and (ii) certificates (including Organizational Documents and good standing certificates) relating to the organization, existence and good standing of each Credit Party in its jurisdiction of organization, in each case, as certified by the Secretary or an Assistant Secretary of such Credit Party.

(c)     *Security Interests*.  (i) The Security Documents shall have been duly executed by each Credit Party that is to be a party thereto and shall be in full force and effect on the Effective Date, (ii) the Administrative Agent on behalf of the Secured Parties shall have a perfected first priority (subject to Permitted Prior Liens) security interest in the Collateral of the type and priority described in each Security Document, including, as applicable, not less than 90% of the PV10 of the Proved Reserves attributable to the Oil and Gas Properties of the Credit Parties, (iii) the Administrative Agent and the Lenders shall have received a perfection certificate with respect to the Credit Parties dated the Effective Date and duly executed by a Responsible Officer of each of the Credit Parties, (iv) the Administrative Agent and the Lenders shall have received reasonably satisfactory results of customary lien searches and (v) the Administrative Agent and the Lenders shall have received title information satisfactory to the Lenders as required by the Lenders on at least 90% of the PV10 of the Oil and Gas Properties of the Credit Parties.

(d)     *Fees and Expenses*.  The Administrative Agent and the Lenders shall have received all fees and expenses due and payable to the Secured Parties on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all reasonable and documented expenses (including reasonable and documented fees, charges and disbursements of counsel and other advisors) required to be reimbursed or paid by any Credit Party hereunder or under any other Loan Document.  The Administrative Agent shall have received a fully executed copy of the Fee Letter.

(e)     *Required Documentation*.  At least five (5) Business Days prior to the Effective Date, the Administrative Agent and the Lenders shall have received all documentation and other information with respect to the Credit Parties, requested in writing by the Administrative Agent or a Lender and required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act including, for the avoidance of doubt, a certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230.

(f)     *Indebtedness*.  The Lenders shall be satisfied in their sole discretion that, on the Effective Date, immediately after giving effect to the consummation of the Plan of Reorganization, the issuance of the Loans to occur on the Effective Date and any other transactions to occur on the Effective Date, the Credit Parties and their subsidiaries shall have outstanding no Indebtedness for borrowed money other than Indebtedness outstanding under the Loan Documents and any additional Indebtedness (including but not limited to capital leases and obligations owed to the Credit Parties' hedge counterparties) on terms and conditions (including as to structure and amount) satisfactory to the Lenders in their sole discretion.

(g)     *Insurance*.  The Administrative Agent and the Lenders shall have received (i) a certificate, dated the Effective Date and signed by a Responsible Officer of the Borrower, confirming that the Credit Parties have (A) complied with the conditions set forth in

#4823-0519-7946

paragraphs (k), (l) and (o) of this <u>Section 4.01</u> and paragraphs (a) and (b) of <u>Section 4.02</u> and (B) complied with the requirements of <u>Section 5.10</u> and <u>Section 5.11</u> and (ii) customary insurance certificates issued by the insurance agent or broker of the Borrower demonstrating compliance with <u>Section 5.05(b)</u>, with customary endorsements to follow within 30 days of the Effective Date (or as the Administrative Agent and the Majority Lenders may otherwise agree in their reasonable discretion).

(h)    *Solvency*.  The Administrative Agent and the Lenders shall have received a certificate from a Responsible Officer of Holdings and the Borrower, substantially in the form of Exhibit K.

(i)    *Opinion*.  The Administrative Agent and the Majority Lenders shall have received, and the Borrower shall have requested, a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of each of Kirkland & Ellis, LLP, counsel for the Credit Parties, and Elias, Books, Brown & Nelson, P.C., special Oklahoma counsel for the Credit Parties, in each covering such matters relating to the Credit Parties, this Agreement or the Transactions as the Lenders shall reasonably request.

(j)    *Financials*.  The Administrative Agent and the Lenders shall have received all of the financial statements described in <u>Section 3.04(a)</u>.

(k)    *Approvals*.  Each Credit Party shall have obtained all approvals required from any Governmental Authority and all consents of other Persons, in each case that are necessary or, in the discretion of the Majority Lenders, advisable in connection with the Transactions and each of the foregoing shall be in full force and effect and in form and substance satisfactory to the Majority Lenders.

(l)    *Litigation*.  There shall not exist any material action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority , except as otherwise disclosed pursuant to the Credit Parties' public disclosures or to the Lenders in writing prior to the Effective Date.

(m)    *Reserve Reports*.  The Administrative Agent and the Lenders shall have received and reviewed to the satisfaction of the Lenders the reserve reports (i) dated as of [_], 2018 and prepared by Wright & Company, Inc. or other engineering firm acceptable to the Lenders and (ii) dated as of [_], 2018 and prepared internally by the Borrower, together with certification by the Borrower as to accuracy, title and, except as otherwise disclosed, absence of Gas Imbalances or take-or-pay or other prepayments.

(n)    *DIP Credit Agreement*.  No default or event of default shall have occurred and be continuing under the DIP Credit Agreement.

(o)    *No Material Adverse Effect*.  Since October 26, 2018 (excluding the pendency of the Chapter 11 Cases), there shall have been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(p)    *Bankruptcy Related Conditions*.

(i)      The Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance satisfactory to the Majority Lenders and the Administrative Agent in their sole discretion.  The Confirmation Order must be in full force and effect, and shall not have been vacated, reversed, modified, amended or stayed in any manner without the written consent of the Majority Lenders and the Administrative Agent and shall be final and non-appealable;

(ii)     The Plan of Reorganization shall not have been modified, altered, amended or otherwise changed or supplemented in any manner without the written consent of the Majority Lenders and the Administrative Agent;

(iii)    All conditions precedent to the effectiveness of the Plan of Reorganization (other than the occurrence of the Effective Date hereunder) shall have been satisfied or waived (with the prior written consent of the Majority Lenders); and

(iv)     The Consummation of the Plan of Reorganization shall occur substantially simultaneously with the occurrence of the Effective Date.

The Majority Lenders shall notify the Administrative Agent of the Effective Date and such notice shall be conclusive and binding.  Without limiting the generality of the provisions of Article IX, for purposes of determining compliance with the conditions specified in this Article IV, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Effective Date specifying its objection thereto

**Section 4.02    Conditions to All Loans**. The obligation of each Lender to make any Loans shall be subject to the satisfaction (or waiver by the Majority Lenders) of the following conditions:

(a)      *Representations and Warranties*.  The representations and warranties of each Credit Party contained in this Agreement and in each other Loan Document shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such date of Borrowing, as applicable, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date).

(b)      *No Default*. At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(c)      *Borrowing Request*.  The Administrative Agent shall have received a Borrowing Request in accordance with <u>Section 2.03</u>.

Page 57

# ARTICLE V.

## AFFIRMATIVE COVENANTS

Until the Discharge of Obligations, the Credit Parties covenant and agree with the Administrative Agent and the Lenders that:

**Section 5.01   Financial Statements; Other Information**.  The Borrower will furnish to the Administrative Agent for distribution to each Lender:

(a)        within 120 days after the end of each fiscal year of Holdings, the audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows of Holdings and its Consolidated Subsidiaries as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by BDO USA, LLP or other independent public accountants reasonably acceptable to the Majority Lenders (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit other than a "going concern" qualification solely as to the Maturity Date occurring within the 12-month period following the date of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of Holdings and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)        within 90 days after the end of each fiscal quarter of Holdings, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows of Holdings and its Consolidated Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of Holdings and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)        within three Business Days following the delivery of any financial statements under clause (a) or (b) above, a certificate in a form reasonably acceptable to Majority Lenders signed by a Financial Officer of the Borrower certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

(d)        within 90 days after the conclusion of each fiscal year, the Borrower's annual operating and capital expenditure budgets, and financial forecasts, including cash flow projections covering proposed fundings, repayments, additional advances, investments and other cash receipts and disbursements, each for the following fiscal year in a format reasonably consistent with projections, budgets and forecasts theretofore provided to the Administrative Agent and the Lenders, and promptly following the preparation thereof, material updates to any of the foregoing from time to time prepared by management of the Borrower;

#4823-0519-7946

(e)  promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by the Borrower to its shareholders generally, as the case may be;

(f)  within 45 days following June 30th of each year and within 90 days following December 31st of each year, the Borrower shall furnish or make available to the Administrative Agent and each Lender (i) a Reserve Report in form and substance satisfactory to the Majority Lenders in their reasonable discretion and prepared as of the immediately preceding June 30th or December 31st, as applicable, which Reserve Report, in the case of each December 31 report shall be prepared or audited by an Approved Petroleum Engineer and in the case of each other Reserve Report shall be prepared by one or more petroleum engineers employed by the Borrower or, at the Borrower's election, by an Approved Petroleum Engineer; said Reserve Report to utilize economic and pricing parameters consistent with those set forth in the definition of Reserve Report, together with a Reserve Report Certificate;

(g)  together with each Reserve Report required to be delivered under Section 5.01(f), a report, in reasonable detail, setting forth (i) the Swap Agreements then in effect, the notional volumes of and prices for, on a monthly basis and in the aggregate, the Hydrocarbons for each such Swap Agreement and the term of each such Swap Agreement, (ii) the notional volumes of Hydrocarbons for each such Swap Agreement and (iii) a list of the customers comprising 80% of the Hydrocarbons (by value) being purchased from the Borrower or any Subsidiary in the six month period prior to the "as of" date of the most recently delivered Reserve Report or Reserve Report, as applicable;

(h)  together with each Reserve Report delivered under Section 5.01(f) for the period ending June 30th and December 31st of each year, (i) any updated production history of the Proved Reserves of the Credit Parties as of such date, (ii) the lease operating expenses attributable to the Oil and Gas Properties of the Credit Parties for the prior 12-month period ending on the effective date of the applicable Reserve Report, and (iii) any other information as to the operations of Holdings and its Subsidiaries as reasonably requested by Administrative Agent; and

(i)  from time to time such information or projections with respect to the business or Properties, or the condition or operations, financial or otherwise, of, or compliance with the terms of this Agreement by, the Credit Parties and their respective Subsidiaries as the Administrative Agent or the Majority Lenders may reasonably request, including, for the avoidance of doubt, any unsuperseded analysis of (i) the Borrower's and its Subsidiaries' Proved Reserves and (ii) the valuation of the Oil and Gas Properties, in each case, in any Credit Party's possession or control, such information to be provided in each case, as promptly as practicable, and in any event, within fifteen (15) Business Days following each such request;

Documents required to be delivered pursuant to Section 5.01 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (1) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's website

on the Internet at www.gastar.com, or (2) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:  (i) upon request, the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent (by electronic mail) and, upon request, each Lender (by electronic mail) of the posting of any such documents and, upon request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

    **Section 5.02   Notices of Material Events**.  The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

    (a)    as soon as possible, but in any event within five (5) days of obtaining knowledge thereof, (i) the occurrence of any Default, (ii) the occurrence of any "default" or "event of default" under any Material Indebtedness or (iii) occurrence of any default under the DrillCo Operating Agreement;

    (b)    as soon as possible, but in any event within twenty (20) days after obtaining knowledge of the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Credit Party or any Affiliate thereof that, if adversely determined, could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect;

    (c)    as soon as possible, but in any event within  twenty (20) days after the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

    (d)    as soon as possible, but in any event within twenty (20) days after obtaining knowledge of any release by any Credit Party of any Hazardous Material into the environment, which could reasonably be expected to have a Material Adverse Effect;

    (e)    as soon as possible, but in any event within twenty (20) days after any notice alleging any violation of any Environmental Law by any Credit Party or any other Environmental Liability, which could reasonably be expected to have a Material Adverse Effect;

    (f)    as soon as possible, but in any event within twenty (20) days after the occurrence of any breach or default under, or repudiation or termination of, any Material Contract, which could reasonably be expected to have a Material Adverse Effect;

    (g)    as soon as possible, but in any event within five (5) days after becoming aware of any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

#4823-0519-7946

(h)      within three (3) days after the date on which any Credit Party provides written notice to the DrillCo Investor that an Initial Reversion Date (as defined in the DrillCo Agreement) or Final Reversion Date (as defined in the DrillCo Agreement) has occurred, the Borrower shall provide a copy of such notice to the Administrative Agent and the Lenders. Within three (3) Business Days of any Credit Party receiving a DrillCo Wellbore Assignment from the DrillCo Investor covering an Initial Reversionary Share (as defined in the DrillCo Agreement) or a Final Reversionary Share (as defined in the DrillCo Agreement), the Borrower shall notify the Administrative Agent of the same.

To the extent applicable, each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**Section 5.03   Existence; Conduct of Business**.  Each Credit Party will, and will cause each Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.04 or any Disposition permitted under Section 6.05 nor shall any Credit Party or any Subsidiary be required to preserve any right or franchise unrelated to the Oil and Gas Property if such Credit Party or such Subsidiary determines that the preservation thereof is no longer desirable in the conduct of its business and that the loss thereof is not adverse in any material respect to the Administrative Agent or any Lender.

**Section 5.04   Payment of Obligations**.  Each Credit Party will, and will cause each Subsidiary to, pay its obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and such Credit Party or such Subsidiary, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP, or (b) the failure to make such payment could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.05   Maintenance of Properties; Insurance**.  Each Credit Party will, and will cause each Subsidiary and use commercially reasonable efforts to cause each operator of Oil and Gas Property to:

(a)      keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and

(b)      maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  Upon request of the Administrative Agent, the Borrower will furnish or cause to be furnished to the Administrative Agent from time to time a summary of the respective insurance coverage of Holdings and its Subsidiaries in form and substance reasonably satisfactory to the Majority Lenders, and, if requested, will furnish the Administrative Agent copies of the applicable policies.  Upon demand

Page 61

by the Administrative Agent, the Borrower will cause any insurance policies covering any such property to be endorsed (a) to provide that such policies may not be cancelled, reduced or affected in any manner for any reason without 30 days' prior notice to the Administrative Agent, (b) to include the Administrative Agent as loss payee with respect to all property/casualty policies and additional insured with respect to all liability policies and (c) to provide for such other matters as the Lenders may reasonably require.

Section 5.06   **Books and Records; Inspection Rights**.  Each Credit Party will, and will cause each Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Each Credit Party will, and will cause each Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its senior management, independent accountants and other advisors, all at such reasonable times and as often as reasonably requested.

Section 5.07   **Compliance with Laws** .  Each Credit Party will, and will cause each Subsidiary to, comply with all Requirements of Law (including Environmental Laws) applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.08   **Environmental Matters**.  If an Event of Default is continuing or if the Administrative Agent at any time has a reasonable basis to believe that there exists a violation of any Environmental Law by any Credit Party or any Subsidiary or that there exists any other Environmental Liabilities that would in either case reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect, then the applicable Credit Party and each relevant Subsidiary shall, promptly upon the receipt of a request from the Administrative Agent, cause the performance of, or allow the Administrative Agent (or its designee) access to the real property for the purpose of conducting, an environmental assessment, including subsurface sampling of soil and groundwater, and cause the preparation of a report.  Such assessments and reports, to the extent not conducted by the Administrative Agent (or its designee), shall be conducted and prepared by a reputable environmental consulting firm acceptable to the Majority Lenders and shall be in form and substance acceptable to the Majority Lenders.  The Borrower shall be responsible for (and reimburse the Administrative Agent for) all costs associated with any such assessments and reports.

Section 5.09   **Use of Proceeds**.  The proceeds of the New Money Loans will be used only to finance the working capital needs of the Borrower, including capital expenditures, and for general corporate purposes of the Borrower and the Guarantors, in the ordinary course of business, including the exploration, acquisition and development of Oil and Gas Property.  No part of the proceeds of the New Money Loans will be used, whether directly or indirectly, to purchase or carry any margin stock (as defined in Regulation U issued by the Board).  The Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of the New Money Loans (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or

Page 62

with any Sanctioned Person, or in any Sanctioned Country, in each case, in violation of applicable Sanctions or (C) in any manner that would result in the violation of any Sanctions by any party hereto.  The Borrower will not fund all or part of any repayment of the Obligations out of proceeds derived from transactions which would be prohibited by Sanctions or would otherwise cause any party hereto to be in breach of Sanctions.

   **Section 5.10   Collateral Matters**.

   (a)      The Borrower will, and will cause each Guarantor to, at all times maintain an Acceptable Security Interest in Mortgaged Properties constituting at least 90% of the PV10 of the Credit Parties' Proved Reserves attributable to the Oil and Gas Property evaluated in the most recent Reserve Report provided to the Administrative Agent pursuant to Section 5.01(f).

   (b)      With respect to any Oil and Gas Property acquired (including any interest of a Credit Party in Oil and Gas Properties acquired as the result of the formation of any pool or unit or acquired with the proceeds of any Disposition) after the Effective Date by any Credit Party as to which the Administrative Agent, for the benefit of the Secured Parties, does not have an Acceptable Security Interest (other than any real property not constituting an Oil and Gas Property), such Credit Party shall:

   (i)      with respect to Oil and Gas Properties with any associated Proved Reserves, promptly, (1) and in any event within 30 days, execute and deliver to the Administrative Agent such Security Documents or amendments to Security Documents and take all actions, including without limitation, the filing of any financing statements or Mortgages, as the Majority Lenders deem reasonably necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, an Acceptable Security Interest in such Property, and (2) deliver to the Administrative Agent such legal opinions relating to the matters described in clause (1) immediately preceding as the Administrative Agent or Majority Lenders may reasonably request, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Majority Lenders; provided, that, unless a Property is acquired for a purchase price or other consideration in excess of $250,000, the Borrower will not be required to take the actions specified in this Section 5.10(b)(i) prior to the end of the fiscal quarter in which the acquisition occurs, or if earlier, the date at which the cumulative amount of purchase price or other consideration for all Property acquired in such quarter equals or exceeds $250,000, at which time all Property theretofore acquired and not previously made subject to a Lien in favor of the Administrative Agent will be made so subject; and

   (ii)      with respect to Oil and Gas Properties without any associated Proved Reserves, execute and deliver to the Administrative Agent such Security Documents or amendments to Security Documents and take all actions, including the filing of any financing statements or Mortgages, as the Majority Lenders deem necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, an Acceptable Security Interest in such Property promptly, and in any event within 30 days following the earlier of (1) the end of the calendar month in which the recorded lease with respect to such Oil and Gas Property is received by the Borrower and (2) the date such Oil and Gas Property is acquired if the purchase price of such Oil and Gas Property, together with all other such property acquired for which no Mortgage has been filed, equals or exceeds $5,000,000 in the aggregate; provided, that the Borrower shall not be

Page 63

required to take the actions specified in this Section 5.10(b)(ii) with respect to any Subject Lease until the earlier of (a) the 90th day after such Subject Lease is acquired by a Credit Party, and (b) the 30th day after the earlier to occur of (A) the date that the third party having a right to acquire an interest in such Subject Lease has acquired and paid for such interest, (B) the date that such third party has declined the offer to acquire such interest and (C) the date that such third party's right to acquire such interest has expired.

(c)      So long as no Event of Default has occurred, the Credit Parties may continue to receive from the purchasers of production all proceeds of the sale of production, subject, however, to the Liens created under the Security Documents, which Liens are hereby affirmed and ratified.  Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent and Lenders may exercise all rights and remedies granted under the Loan Documents subject to the terms thereof, including the right to obtain possession of all proceeds of production from such Mortgaged Properties then held by such Credit Parties or to receive directly from the purchasers of production all other proceeds of production.  In no case shall any failure, whether intentioned or inadvertent, by the Administrative Agent or Lenders to collect directly any such proceeds of production from the Mortgaged Properties constitute in any way a waiver, remission or release of any of their rights under the Security Documents, nor shall any release of any proceeds of production from any Oil and Gas Properties by the Administrative Agent or Lenders to any Credit Parties constitute a waiver, remission, or release of any other proceeds of production from any Oil and Gas Properties or of any rights of the Administrative Agent or Lenders to collect other proceeds of production from the Oil and Gas Properties thereafter.

Section 5.11    **Title Data**.  Each Credit Party will, and will cause each Subsidiary to, by the Effective Date (or a later date acceptable to the Majority Lenders in their sole discretion) and from time to time thereafter at the request of the Majority Lenders, deliver to the Administrative Agent title information in form and substance reasonably acceptable to the Majority Lenders with respect to that portion of the Oil and Gas Property set forth in the most recent Reserve Report provided to the Administrative Agent and the Lenders as the Majority Lenders shall deem reasonably necessary or appropriate to verify the title of the Credit Parties to not less than 90% of the PV10 of the Oil and Gas Property set forth in such Reserve Report that are required to be subject to a Mortgage pursuant to Section 5.10.

Section 5.12    **Swap Agreements**.  Upon the request of the Majority Lenders, the Borrower shall, within 30 days of such request, provide to the Administrative Agent and the Majority Lenders copies of all agreements, documents and instruments evidencing the Swap Agreements not previously delivered to the Administrative Agent, certified as true and correct by a Responsible Officer of the Borrower, and such other information regarding such Swap Agreements as the Majority Lenders may reasonably request.

Section 5.13    **Operation of Oil and Gas Property**.

(a)      Each Credit Party will, and will cause each Subsidiary to, maintain, develop and operate its Oil and Gas Property in a good and workmanlike manner, and observe and comply with all of the terms and provisions, express or implied, of all oil and gas leases relating to such Oil and Gas Property so long as such Oil and Gas Property are capable of producing

Page 64

Hydrocarbons and accompanying elements in paying quantities, except where such failure to comply could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Each Credit Party will, and will cause each Subsidiary to, comply in all respects with all contracts and agreements applicable to or relating to its Oil and Gas Property or the production and sale of Hydrocarbons and accompanying elements therefrom, except to the extent a failure to so comply could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 5.14     Subsidiaries**.  At the time hereafter that any Subsidiary of Holdings is created or acquired, each Credit Party will (a) promptly take all action necessary to comply with Section 5.15, (b) promptly take all such action and execute and deliver, or cause to be executed and delivered, to the Administrative Agent all such opinions, documents, instruments, agreements, and certificates that the Administrative Agent or the Majority Lenders may reasonably request, and (c) promptly cause such Subsidiary to (i) become a party to this Agreement and Guarantee the Obligations by executing and delivering to the Administrative Agent a Counterpart Agreement in the form of Exhibit C, (ii) to the extent required to comply with Section 5.10, execute and deliver Mortgages and other Security Documents creating first priority Liens in favor of the Administrative Agent, subject in priority only to Permitted Prior Liens, in such Subsidiary's Oil and Gas Property and substantially all of such Subsidiary's personal property, and (iii) to the extent required to comply with Section 5.11, all title opinions and other information.  Upon delivery of any such Counterpart Agreement to the Administrative Agent, notice of which is hereby waived by each Credit Party, such Subsidiary shall be a Guarantor and shall be as fully a party hereto as if such Subsidiary were an original signatory hereto.  Each Credit Party expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Credit Party hereunder.  This Agreement shall be fully effective as to any Credit Party that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Credit Party hereunder.  With respect to each such Subsidiary, the Borrower shall promptly send to the Administrative Agent written notice setting forth with respect to such Person the date on which such Person became a Subsidiary of Holdings, and supplement the data required to be set forth in the Schedules to this Agreement as a result of the acquisition or creation of such Subsidiary; provided that such supplemental data must be reasonably acceptable to the Majority Lenders.

**Section 5.15     Pledged Capital Stock**.  On the Effective Date and at the time hereafter that any Subsidiary of the Borrower is created or acquired, the Borrower and the Subsidiaries (as applicable) shall execute and deliver to the Administrative Agent for the benefit of the Secured Parties, the Security Agreement (or an amendment or supplement to, or amendment and restatement of, the Security Agreement), in form and substance reasonably acceptable to the Administrative Agent and the Majority Lenders, from the Borrower and/or the Subsidiaries (as applicable) covering all Capital Stock owned by the Borrower or the Subsidiaries in such Subsidiary, together with all certificates (or other evidence acceptable to the Majority Lenders) evidencing the issued and outstanding Capital Stock of each such Subsidiary of every class owned by such Credit Party (as applicable) which, if certificated, shall be duly endorsed or accompanied by stock powers executed in blank to the Administrative Agent, as the Administrative Agent or the Majority Lenders shall deem necessary or appropriate to grant,

Page 65

evidence and perfect a first priority security interest in the issued and outstanding Capital Stock owned by Borrower or any Subsidiary in each Subsidiary.

Section 5.16  <u>Accounts</u>.  Subject to <u>Section 5.18</u>, no Credit Party shall establish or maintain a deposit account, securities account or commodities account, without executing and delivering to Majority Lenders and the Administrative Agent a Control Agreement covering the applicable deposit account, securities account or commodities account, other than with respect to Excluded Accounts; provided, however, that in the case of any a deposit account, securities account or commodities account acquired pursuant to an acquisition permitted under <u>Section 6.07</u> (and which was not formed in contemplation of such acquisition), so long as such acquiring Credit Party provides the Majority Lenders and the Administrative Agent with written notice of the existence of such deposit account, securities account or commodities account within five Business Days following the date of such acquisition (or such later date as the Majority Lenders may agree in their sole discretion), such Credit Party will have 30 days (or such later date as the Majority Lenders may agree in their sole discretion) to subject such deposit account, securities account or commodities account to a Control Agreement.  Once a control agreement has been so executed and delivered, none of the Credit Parties will deposit or maintain Collateral (including the proceeds thereof) in a deposit account, securities account or commodities account that is not subject to a control agreement.

Section 5.17  <u>Further Assurances</u>.

(a)     From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as Administrative Agent or the Majority Lenders may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other Property hereafter acquired by any Credit Party, which may be deemed to be part of the Collateral) pursuant hereto or thereto.

(b)     Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from any Credit Party or any of their respective Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

Section 5.18  <u>Post-Closing Matters</u>.

(a)     Prior to the date 30 days after the Effective Date (or such later date as the Administrative Agent and the Majority Lenders may otherwise agree in their reasonable discretion), the Administrative Agent and the Majority Lenders shall have received customary insurance endorsements.

(b)     Prior to the date 30 days after the Effective Date (or such later date as the Administrative Agent and the Majority Lenders may otherwise agree in their reasonable discretion), the Administrative Agent and the Majority Lenders shall have received Control Agreements in respect of the deposit accounts, securities accounts and commodities accounts (other than Excluded Accounts) of the Credit Parties.

## ARTICLE VI.

## NEGATIVE COVENANTS[5]

Until the Discharge of Obligations, the Credit Parties covenant and agree with the Administrative Agent and the Lenders that:

**Section 6.01   [Reserved]**.

**Section 6.02   Indebtedness**.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness of any Credit Party under the Loan Documents;

(b)     Indebtedness of any Credit Party under the Swap Notes so long as such Indebtedness is subject to the Swap Intercreditor Agreement;

(c)     letters of credit not exceeding $7,500,000 in aggregate face amount at any time outstanding;

(d)     Indebtedness in respect of Swap Agreements permitted pursuant to Section 6.08;

(e)     Indebtedness existing on the Effective Date and set forth in Schedule 6.02 and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (except by an amount equal to the reasonable premium paid and fees and expenses reasonably incurred therewith);

(f)     Unsecured intercompany Indebtedness between the Borrower and any Subsidiary or between Subsidiaries to the extent expressly permitted by Section 6.07(b); provided that any such Indebtedness owed by either the Borrower or a Guarantor shall be subordinated to the Indebtedness on terms set forth in Article VII or on such terms as are reasonably acceptable to the Majority Lenders; provided, further, that upon the request of the Administrative Agent or the Majority Lenders at any time, such Indebtedness shall be evidenced by promissory notes having terms reasonably satisfactory to the Majority Lenders, and the sole originally executed counterparts of which shall be pledged and delivered to the Administrative Agent, for the benefit of the Secured Parties, as security for the Obligations;

---

[5] NTD: Permitted liens, permitted, indebtedness, etc., subject to further review and discussion regarding a potential RBL/TL facility.

(g)      (i) Indebtedness of the Borrower and the Subsidiaries incurred to finance the acquisition, construction or improvement of any fixed or capital assets (including office equipment, data processing equipment and motor vehicles), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any assets or secured by a Lien on any assets prior to the acquisition thereof or (ii) any Indebtedness of any Subsidiary issued and outstanding on or prior to the date on which such Subsidiary was acquired by the Borrower or any Subsidiary, and not incurred in contemplation thereof, in a transaction permitted hereunder, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof; provided that (A) with respect to the Indebtedness incurred pursuant to clause (i) of this Section 6.02(h), such Indebtedness is incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement and (B) the aggregate principal amount of Indebtedness permitted by this Section 6.02(h) at any time outstanding shall not exceed $5,000,000;

(h)      Indebtedness (other than Indebtedness for borrowed money) incurred or deposits made by the Borrower or any Subsidiary (i) under worker's compensation laws, unemployment insurance laws or similar legislation, (ii) in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which the Borrower or any Subsidiary is a party, (iii) to secure public or statutory obligations of the Borrower or any Subsidiary, and (iv) of cash or U.S. Government Securities made to secure the performance of statutory obligations, surety, stay, customs and appeal bonds to which the Borrower or any Subsidiary is party in connection with the operation of the Oil and Gas Property, in each case in the ordinary course of business and consistent with past practice;

(i)      Guarantees in respect of Indebtedness otherwise permitted pursuant to this Section 6.02;

(j)      Indebtedness in connection with the endorsement of negotiable instruments and other obligations in respect of cash management services, netting services, overdraft protection and similar arrangements, in each case in the ordinary course of business and consistent with past practice;

(k)      Indebtedness in respect of insurance premium financing for insurance being acquired or maintained by the Borrower or any Subsidiary under customary terms and conditions;

(l)      Indebtedness consisting of sureties or bonds provided to any Governmental Authority or other Person and assuring payment of contingent liabilities of the Borrower in connection with the operation of the Oil and Gas Properties, including with respect to plugging, facility removal and abandonment of its Oil and Gas Properties; and

(m)      other unsecured Indebtedness not in respect of borrowed money in an aggregate amount outstanding at any time not to exceed $1,000,000.

**Section 6.03   Liens**.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, create, incur, assume or permit to exist any Lien on any Property now owned or hereafter acquired by it, except:

Page 68

(a)      Liens created pursuant to any Loan Document;

(b)      Liens securing obligations pursuant to the Swap Notes so long as such Liens are subject to the Swap Intercreditor Agreement;

(c)      Permitted Encumbrances;

(d)      any Lien on any Property of the Borrower or any Subsidiary existing on the Effective Date and set forth in Schedule 6.03; provided that (i) such Lien shall not apply to any other Property of the Borrower or any other Subsidiary (other than proceeds and accessions and additions to such property) and (ii) such Lien shall secure only those obligations which it secures on the Effective Date and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof

(e)      any Lien securing obligations under Swap Agreements permitted pursuant to Section 6.08;

(f)      any Lien existing on any Property prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any Property of any Person that becomes a Subsidiary after the Effective Date prior to the time such Person becomes a Subsidiary; provided that (i) such Lien secures Indebtedness permitted by Section 6.02(g), (ii) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (iii) such Lien shall not apply to any other Property of the Borrower or any other Subsidiary and (iv) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(g)      Liens on fixed or capital assets (including office equipment, data processing equipment and motor vehicles) acquired, constructed or improved by the Borrower or any Subsidiary; provided that (i) such Liens secure Indebtedness permitted by clause (g) of Section 6.02, (ii) such Liens and the Indebtedness secured thereby are incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such Liens shall not apply to any other property or assets of the Borrower or any other Subsidiaries (other than proceeds and accessions and additions to such property);

(h)      Liens securing insurance premium financing under customary terms and conditions, provided that no such Lien may extend to or cover any property other than the insurance being acquired with such financing, the proceeds thereof and any unearned or refunded insurance premiums related thereto;

(i)      Liens arising under the DrillCo Operating Agreements provided (1) such DrillCo Operating Agreements do not cover Property located outside of the DrillCo Contract Area, and (2) such DrillCo Operating Agreements are entered into pursuant to the DrillCo Agreement; and

(j)      Liens securing reimbursement obligations under letters of credit incurred in accordance with Section 6.02(c).

**Section 6.04   Fundamental Changes**.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing:

(a)      any Subsidiary may merge into a Credit Party in a transaction in which such Credit Party is the surviving entity so long as such transaction does not have an adverse effect on the perfection or priority of the Liens granted under the Security Documents;

(b)      any Subsidiary that is not a Credit Party may merge into any other Subsidiary that is not a Credit Party in a transaction in which the surviving entity is a Subsidiary;

(c)      any Subsidiary may Dispose of its assets to a Credit Party; and

(d)      Dispositions permitted by Section 6.05 may be made.

**Section 6.05   Disposition of Assets**.  The Borrower will not, and will not permit any Subsidiary to, Dispose of any property except:

(a)      the sale of Hydrocarbons in the ordinary course of business;

(b)      the Disposition of equipment and other property in the ordinary course of business, that is obsolete or no longer necessary in the business of the Borrower or any of its Subsidiaries or that is being replaced by equipment of comparable value and utility;

(c)      Liens permitted by Section 6.03, Investments permitted by Section 6.07 and Restricted Payments permitted by Section 6.09;

(d)      Dispositions of cash and Cash Equivalents in the ordinary course of business;

(e)      any Credit Party may Dispose of its property to another Credit Party;

(f)      sales or discounts of overdue accounts receivable in the ordinary course of business, in connection with the compromise or collection thereof, and not in connection with any financing transaction;

(g)      other Dispositions of Oil and Gas Property (other than Hedge Modifications or Production Payments), provided that:

(i)      the consideration received shall be at least equal to the Fair Market Value of the Oil and Gas Property subject to such Disposition (and with respect to Dispositions involving consideration in excess of $2,000,000 individually and $10,000,000 in the aggregate for all Dispositions pursuant to this Section 6.05, the Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer certifying that such Disposition was for Fair Market Value);

Page 70

#4823-0519-7946

(ii)      100% of the consideration received by the Borrower or any Subsidiary in respect of such Disposition is cash or Cash Equivalents; and

(iii)      the Net Cash Proceeds of such Disposition are used to prepay the Loans to the extent required pursuant to Section 2.07(a).

(h)      substantially contemporaneous (and in any event occurring within 30 days of each other) Dispositions of Oil and Gas Properties as to which no Proved Reserves are attributable in exchange for other Oil and Gas Properties provided that (i) the Fair Market Value of the Oil and Gas Properties exchanged by the Borrower or its Subsidiary (together with any cash) is reasonably equivalent to the Fair Market Value of the Oil and Gas Properties (together with any cash) to be received by the Borrower or its Subsidiary, and (ii) any cash received must be applied in accordance with Section 2.07;

(i)      Dispositions of seismic, geologic or other data and license rights in the ordinary course of business;

(j)      Hedge Modifications; provided that the consideration received for such Hedge Modification is at least equal to Fair Market Value;

(k)      a DrillCo Required Disposition so long as the Administrative Agent (or any designee thereof) has received within 30 days of the date on which such DrillCo Required Disposition is effected, a duly executed Mortgage granting an Acceptable Security Interest in the applicable Credit Party's interest in the DrillCo Joint Well that is the subject of such DrillCo Required Disposition;

(l)      Dispositions pursuant to a decision not to participate in an Oklahoma Corporation Commission Force Pooling Order or any relinquishment of any interests in any oil and gas leases pursuant to a non-consent provision of a standard form of joint operating agreement;

(m)      Any farm-out, drillco or similar arrangement with respect to any Non-Core Assets;

(n)      Dispositions of interests in any Subject Lease pursuant to the exercise by a third party of its rights to acquire an interest therein, to the extent and pursuant to the terms of such right to acquire an interest therein, to the extent and pursuant to the terms of such right as in effect on the date hereof, which Disposition is effected on or before the 90th day after such Subject Lease is acquired by a Credit Party (or, in the case of Subject Leases held on the Effective Date, the 90th day after the Effective Date); and

(o)      Other dispositions and sales of Properties (including any midstream assets or gathering systems) not otherwise permitted pursuant to this Section 6.05 having a fair market value not to exceed $5,000,000 in the aggregate for all dispositions and sales of Properties pursuant to this Section 6.05(o) for the term of this Agreement.

**Section 6.06   Nature of Business**.  Holdings will not engage in any business activities or own any assets or incur any liabilities other than (a) its ownership of the Capital Stock of the Borrower and liabilities incidental thereto, (b) transactions expressly permitted under this

Page 71

Agreement and the other Loan Documents and (c) in connection with the consummation of the Transactions.  The Borrower will not, nor will Holdings or the Borrower permit any of their Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the Effective Date and businesses reasonably related thereto.

Section 6.07   <u>Investments</u>.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, make any Investment, except:

(a)      Investments in Cash Equivalents;

(b)      Investments made by any Credit Party in or to any other Credit Party;

(c)      Investments made by the Borrower or any Subsidiary pursuant to the commitments set forth on Schedule 6.07(c); <u>provided,</u> that the Borrower's or any Subsidiary's commitments set forth on Schedule 6.07(c) shall not be increased or otherwise altered in any manner adverse to the interests of the Borrower or any of its Subsidiaries, on the one hand, and the Lenders, on the other hand, unless otherwise consented to by the Majority Lenders;

(d)      Guarantees constituting Indebtedness permitted by <u>Section 6.02</u> (other than guarantees in respect of Capital Lease Obligations) and performance guarantees, in each case, incurred in the ordinary course of business;

(e)      Investments by the Borrower and its Subsidiaries that are customary in the oil and gas business and in the ordinary course of the Borrower's or such Subsidiary's business, and in the form of, or pursuant to, oil, gas and mineral leases, operating agreements, unitization agreements, joint bidding agreements, services contracts and other similar agreements that a reasonable and prudent oil and gas industry owner or operator would find reasonably acceptable;

(f)      Investments consisting of Swap Agreements to the extent permitted under <u>Section 6.08</u>;

(g)      Investments existing as of the Effective Date and set forth on <u>Schedule 6.07(g)</u>;

(h)      Investments consisting of loans and advances to employees for moving, entertainment, travel and other similar expenses in the ordinary course of business and in any event not to exceed $250,000 in the aggregate at any time outstanding;

(i)      demand deposits with financial institutions, prepaid expenses and extensions of trade credit in the ordinary course of business (and any Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss);

(j)      trade and customer accounts receivable which are for goods furnished or services rendered in the ordinary course of business and are payable in accordance with customary trade terms;

#4823-0519-7946

(k)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; provided that, the aggregate amount of such investment shall not exceed $1,000,000 (other than by appreciation);

(l)      Investments consisting of any deferred portion of the sales price received by the Borrower or any Subsidiary in connection with any sale of assets permitted hereunder;

(m)      any Investment by the Borrower or any Subsidiary of the Borrower in a Person, if as a result of such Investment (i) such Person becomes a Subsidiary of the Borrower or (ii) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its Properties or assets to, or is liquidated into, the Borrower or a Subsidiary of the Borrower; and

(n)      other investments not to exceed $1,000,000 in the aggregate.

**Section 6.08   Swap Agreements**.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, enter into any Swap Agreement, except Swap Agreements with Qualified Counterparties entered into in the ordinary course of business and not for speculative purposes to:

(a)      hedge or mitigate price risks with respect to Hydrocarbons to which the Borrower or any Subsidiary has actual exposure (whether or not treated as a hedge for accounting purposes under GAAP); provided that at the time the Borrower or any Subsidiary enters into any such Swap Agreement, such Swap Agreement (x) does not have a term greater than 60 months from the date such Swap Agreement is entered into, and (y) when aggregated with all other Swap Agreements then in effect would not cause the aggregate notional volume per month for each of Hydrocarbons, calculated separately, under all Swap Agreements then in effect (other than Excluded Hedges) to exceed, as of the date such Swap Agreement is executed, (A) for any month during the forthcoming five-year period, 100% of the Projected Oil and Gas Production as set forth in clause (a) of such defined term and (B) for any month during the forthcoming 36-month period, 75% of the Projected Oil and Gas Production as set forth in clause (b) of such defined term; and

(b)      effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

**Section 6.09   Restricted Payments**.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment; provided that, so long as at the time of and immediately after giving effect to such Restricted Payment no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof, Holdings or any Subsidiary may make the following Restricted Payments:

(a)      the declaration and payment of dividends or distributions by Holdings solely in Capital Stock (other than Disqualified Stock) of Holdings;

#4823-0519-7946

(b)      the declaration and payment of dividends or distributions by any Subsidiary to the Borrower or any Guarantor.[6]

[For the avoidance of doubt, nothing in this Agreement shall prevent any AHYDO Catch-Up Payment (including any AHYDO Catch-Up Payment with respect to any subordinated debt obligation permitted under this Agreement).][7]

### Section 6.10   Transactions with Affiliates.

(a)      Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any Property from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with (or for the benefit of), any Affiliate of Holdings (each, an "Affiliate Transaction"), unless:

(i)      the Affiliate Transaction is on terms that are no less favorable to Holdings or the relevant Subsidiary than those that would have been obtained in a comparable transaction by Holdings or such Subsidiary with an unrelated Person or, if in the good faith judgment of Holdings's Board of Directors, no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to Holdings or the relevant Subsidiary from a financial point of view; and

(ii)      the Borrower delivers to the Administrative Agent (A) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10,000,000, a resolution of the Board of Directors of Holdings set forth in an officers' certificate certifying that such Affiliate Transaction or series of related Affiliate Transactions complies with this covenant and that such Affiliate Transaction or series of related Affiliate Transactions has been approved by a majority of the disinterested members of the Board of Directors of Holdings; and (B) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $20,000,000, an opinion as to the fairness to Holdings or such Subsidiary of such Affiliate Transaction or series of related Affiliate Transactions from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing.

(b)      Section 6.10(a) will not apply to:

(i)      transactions between or among Credit Parties;

(ii)      payment of reasonable and customary fees and reimbursements of expenses (pursuant to indemnity arrangements or otherwise) of officers, directors, employees or consultants of Holdings or any of its Subsidiaries;

(iii)      Restricted Payments permitted by Section 6.09; and

---

[6] NTD: Subject to final corporate structure.
[7] NTD: Subject to discussion re term of the loans and structure upon exit.

#4823-0519-7946

(iv)    any issuance of Capital Stock (other than Disqualified Stock) of the Borrower to Affiliates of Holdings and the granting of registration and other customary rights in connection therewith.

Section 6.11    **Restrictive Agreements**.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of Holdings or any Subsidiary to create, incur or permit to exist any Lien upon any of its Property to secure the Obligations, or (b) the ability of the Borrower or any Subsidiary to pay dividends or other distributions with respect to any of its Capital Stock or to make or repay loans or advances to Holdings or any Subsidiary or to guarantee Indebtedness of Holdings or any Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement and (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the Property securing such Indebtedness, (B) customary provisions in leases and other contracts restricting the assignment thereof, (C) restrictions with respect to Oil and Gas Property that are not included in the most recent Reserve Report delivered to the Administrative Agent and (D) provisions of the DrillCo Agreement pursuant to which the Credit Parties agree not to grant Liens that can be perfected with recordings in the applicable county records securing the Obligations on any Properties in the DrillCo Contract Area (other than Wellbore Liens permitted hereunder and Liens on Non-DrillCo Assets).

Section 6.12    **Disqualified Stock**.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to, issue any Disqualified Stock.

Section 6.13    **Certain Amendments to Organizational Documents; Amendments of Documents**.  Neither Holdings nor the Borrower will, nor will they permit any of their Subsidiaries to:

(a)    enter into or permit any modification or amendment of, or waive any material right or obligation of any Person under its Organizational Documents if the effect thereof would be materially adverse to the Administrative Agent or any Lender or violate Section 6.11;

(b)    without the prior written consent of the Majority Lenders, except for amendments to the Swap Note Documents that are not prohibited by the Swap Intercreditor Agreement, amend or modify the terms of any Material Indebtedness if the effect thereof would be materially adverse to the Administrative Agent or any Lender; or

(c)    without the prior written consent of the Majority Lenders, amend, modify or assign, or waive any material right or obligation of any Person under, any of their respective Material Contracts in a manner materially adverse to the Administrative Agent or any Lender.

Section 6.14    **Sale and Leaseback Transactions and other Off-Balance Sheet Liabilities**.  Neither Holdings nor the Borrower will, nor will they permit any Subsidiary to, enter into or suffer to exist any Sale and Leaseback Transaction or any other transaction pursuant to which it incurs or has incurred Off-Balance Sheet Liabilities.

Page 75

**Section 6.15   DrillCo Restrictions**.  Without the prior written consent of the Majority Lenders, no Credit Party shall amend or otherwise modify the DrillCo Agreement in a manner materially adverse to the Lenders, including, without limitation, any amendment or modification which would (a) increases the number of Joint Wells (as defined in the DrillCo Agreement) above sixty (60); (b) materially changes the area subject to the Joint Development Agreement; or (c) materially change any economic terms or provision of the Joint Development Agreement, including with respect to the costs to be borne by the Borrower.

**Section 6.16   Lease Restrictions**.  The Borrower and its Subsidiaries shall not, without the consent of the Majority Lenders, allow more than 10.0% of the net acreage consisting of Oil and Gas Properties of the Borrower and its Subsidiaries, measured as of the Effective Date, to lapse, expire or otherwise terminate in any manner without such Oil and Gas Properties being replaced by Oil and Gas Properties of similar quantity and value in Township 20 North – Range 8 West, Township 20 North – Range 7 West, Township 19 North – Range 9 West, Township 19 North – Range 8 West, Township 19 North – Range 7 West, Township 18 North – Range 8 West, Township 18 North – Range 7 West, and Township 18 North – Range 6 West; provided that, (a) for purposes of calculating such net acreage, all Non-Core Assets shall be excluded from the Oil and Gas Properties of the Borrower and its Subsidiaries and (b) such percentage shall be adjusted following the Effective Date to take into account any disposition or acquisition of Oil and Gas Properties as reasonably determined between the Borrower and the Majority Lenders (it being understood and agreed that such adjustment referred to in this proviso shall not in and of itself result in a Default or an Event of Default).

**ARTICLE VII.**

**GUARANTEE OF OBLIGATIONS**[8]

**Section 7.01   Guarantee of Payment**.  Each Guarantor unconditionally and irrevocably guarantees to the Administrative Agent for the benefit of the Secured Parties, the punctual payment of all Obligations now or which may in the future be owing by any Credit Party, including any Obligations incurred or accrued during the pendency of any proceeding under bankruptcy, insolvency or similar laws of any jurisdiction, whether or not allowed or allowable in such proceeding (including all such amounts that would become due but for the operation of the automatic stay under section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a), and the operation of sections 502(b) and 506(b) of the Bankruptcy Code, 11 U.S.C. §502(b) and §506(b)) (collectively, the "Guaranteed Liabilities").  This Guarantee is a guaranty of payment and not of collection only.  The Administrative Agent shall not be required to exhaust any right or remedy or take any action against the Borrower or any other Person or any collateral.  Each Guarantor agrees that, as between the Guarantor and the Administrative Agent, the Guaranteed Liabilities may be declared to be due and payable for the purposes of this Guarantee notwithstanding any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards the Borrower or any other Guarantor and that in the event of a declaration or attempted declaration, the Guaranteed Liabilities shall immediately become due and payable by each Guarantor for the purposes of this Guarantee.

---

[8]     NTD: Subject to further K&E hedge team review.

Section 7.02   **Guarantee Absolute**.  Each Guarantor guarantees that the Guaranteed Liabilities shall be paid strictly in accordance with the terms of this Agreement.  The liability of each Guarantor hereunder is absolute and unconditional irrespective of:  (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Loan Documents or the Guaranteed Liabilities, or any other amendment or waiver of or any consent to departure from any of the terms of any Loan Document or Guaranteed Liability, including any increase or decrease in the rate of interest thereon; (b) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or any exchange, release or non-perfection of any collateral, for all or any of the Loan Documents or Guaranteed Liabilities; (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Loan Document or Guaranteed Liability; (d) without being limited by the foregoing, any lack of validity or enforceability of any Loan Document or Guaranteed Liability; and (e) any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Loan Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrower or a Guarantor (other than the defense of payment or performance).

Section 7.03   **Guarantee Irrevocable**.  This Guarantee is a continuing guaranty of the payment of all Guaranteed Liabilities now or hereafter existing under this Agreement, and shall remain in full force and effect until the Discharge of Obligations.

Section 7.04   **Reinstatement**.  This Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Liabilities is rescinded or must otherwise be returned by the Administrative Agent or any Lender as a result of the insolvency, bankruptcy or reorganization of the Borrower, or any other Credit Party, or otherwise, all as though the payment had not been made.

Section 7.05   **Subrogation**.  Until the Discharge of Obligations, no Guarantor shall exercise any rights which it may acquire by way of subrogation, by any payment made under this Guarantee or otherwise.  If any amount is paid to the Guarantor on account of subrogation rights under this Guarantee at any time when all the Guaranteed Liabilities have not been paid in full, the amount shall be held in trust for the benefit of the Secured Parties and shall be promptly paid to the Administrative Agent to be credited and applied to the Guaranteed Liabilities, whether matured or unmatured or absolute or contingent, in accordance with the terms of this Agreement and the Swap Agreements.  If any Guarantor makes payment to any Secured Party of all or any part of the Guaranteed Liabilities and all the Guaranteed Liabilities are paid in full and this Agreement is terminated, the Administrative Agent and the Secured Parties shall, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Liabilities resulting from the payment.

Section 7.06   **Subordination**.  Without limiting the rights of the Administrative Agent and the other Secured Parties under any other agreement, any liabilities owed by the Borrower to any Guarantor in connection with any extension of credit or financial accommodation by any Guarantor to or for the account of the Borrower, including but not limited to interest accruing at

Page 77

the agreed contract rate after the commencement of a bankruptcy or similar proceeding, are hereby subordinated to the Guaranteed Liabilities, and such liabilities of the Borrower to such Guarantor, if the Administrative Agent so requests after the occurrence and during the continuation of a Default or event of default or termination event (howsoever defined) under any Swap Agreement constituting a Secured Obligation hereunder, shall be collected, enforced and received by any Guarantor as trustee for the Administrative Agent and shall be paid over to the Administrative Agent on account of the Guaranteed Liabilities but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guarantee.

Section 7.07   **Payments Generally**.  All payments by the Guarantors shall be made in the manner, at the place and in the currency (the "Payment Currency") required by the Loan Documents and in accordance with the Swap Intercreditor Agreement; provided, however, that if the Payment Currency is other than Dollars any Guarantor may, at its option (or, if for any reason whatsoever any Guarantor is unable to effect payments in the foregoing manner, such Guarantor shall be obligated to) pay to the Collateral Agent at its principal office the equivalent amount in Dollars computed at the selling rate of the Collateral Agent or a selling rate chosen by the Collateral Agent, most recently in effect on or prior to the date the Guaranteed Liability becomes due, for cable transfers of the Payment Currency to the place where the Guaranteed Liability is payable. In any case in which any Guarantor makes or is obligated to make payment in Dollars, the Guarantor shall hold the Collateral Agent and the Secured Parties harmless from any loss incurred by the Collateral Agent and any Secured Party arising from any change in the value of Dollars in relation to the Payment Currency between the date the Guaranteed Liability becomes due and the date the Collateral Agent or such Secured Party is actually able, following the conversion of the Dollars paid by such Guarantor into the Payment Currency and remittance of such Payment Currency to the place where such Guaranteed Liability is payable, to apply such Payment Currency to such Guaranteed Liability.

Section 7.08   **Setoff**.  Each Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim the Administrative Agent or any other Secured Party may otherwise have, the Administrative Agent or such Secured Party shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final) held by it for the account of any Guarantor at any office of the Administrative Agent or such Secured Party, in Dollars or in any other currency, against any amount payable by such Guarantor under this Guarantee which is not paid when due (regardless of whether such balances are then due to such Guarantor), in which case it shall promptly notify such Guarantor thereof; provided that the failure of the Administrative Agent or such Secured Party to give such notice shall not affect the validity thereof.

Section 7.09   **Formalities**.  Each Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guarantee or incurrence of any Guaranteed Liability and any other formality with respect to any of the Guaranteed Liabilities or this Guarantee.

Section 7.10   **Limitations on Guarantee**.  The provisions of the Guarantee under this Article VII are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guarantee would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the

amount of such Guarantor's liability under this Guarantee, then, notwithstanding any other provision of this Guarantee to the contrary, the amount of such liability shall, without any further action by the Guarantors, the Administrative Agent or any other Secured Party, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability").  This Section 7.10 with respect to the Maximum Liability of the Guarantors is intended solely to preserve the rights of the Administrative Agent and the other Secured Parties hereunder to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other Person shall have any right or claim under this Section 7.10 with respect to the Maximum Liability, except to the extent necessary so that none of the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law.

Section 7.11   **Keepwell**.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under this Article VII in respect of all obligations in respect of Swap Agreements that constitute Secured Obligations hereunder (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 7.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 7.11 or otherwise under this Article VII voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Article VII shall remain in full force and effect until a discharge of the Guaranteed Liabilities. Each Qualified ECP Guarantor intends that this Section 7.11 constitute, and this Section 7.11 shall be deemed to constitute, a "keepwell, support or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 7.12   **Stay of Acceleration**.  If acceleration of the time for payment of any of the Guaranteed Liabilities is stayed upon the insolvency, bankruptcy or reorganization of the Credit Parties, all such amounts otherwise subject to acceleration under the terms of this Agreement or any other Loan Document shall nonetheless be payable by each of the Guarantors hereunder forthwith on demand by the Administrative Agent made at the written request of the Majority Lenders.

Section 7.13   **Survival**.  The agreements and other provisions in this Article VII shall survive, and remain in full force and effect regardless of, the resignation or removal of the Administrative Agent, the replacement of any Lender, the expiration or termination of this Agreement and the Aggregate Commitments or the Discharge of Obligations.

## ARTICLE VIII.

## EVENTS OF DEFAULT

If any of the following events ("Events of Default") shall occur:

(a)    *Non-Payment*. (i) Any Credit Party shall fail to pay any principal of, or premium on, any Loan when and as the same shall become due and payable, whether at the due date

Page 79

thereof or at a date fixed for prepayment thereof or otherwise or (ii) any Credit Party shall fail to pay any interest on any Loan, any fee or any other amount, other than an amount referred to in clause (i), payable under this Agreement or the Fee Letter, when and as the same shall become due and payable, and such failure under this clause (ii) shall continue unremedied for a period of five (5) Business Days;

(b)     *Representations and Warranties*.  Any representation or warranty made or deemed made by or on behalf of Holdings or any Subsidiary in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder or in any Loan Document furnished pursuant to or in connection with this Agreement or any amendment or modification thereof or waiver hereunder, shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing;

(c)     *Covenants*.  Holdings or any Subsidiary shall fail to observe or perform (i) any term, covenant, condition or agreement contained in Section 5.01(a), Section 5.01(b), Section 5.01(c), Section 5.01(d), Section 5.02, Section 5.03 (with respect to Holdings's or any Subsidiary's existence), Section 5.09, Section 5.18 or in Article VI or (ii) any other term, covenant, condition or agreement contained in this Agreement (other than those specified in the foregoing clause (i) of this section or clause (a) or (b) of this Article) or any Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier of (x) knowledge thereof by the Borrower or any other applicable Credit Party or (y) receipt of written notice thereof from the Administrative Agent to the Borrower or any other Credit Party (which notice will be given at the request of any Lender);

(d)     *DrillCo Agreement*.  The Borrower or any Subsidiary shall fail to make any payment required under the DrillCo Agreement within 30 days of the date such payment is due under the DrillCo Agreement, unless such payment is being disputed in good faith and the Borrower has established adequate reserves therefor;

(e)     *Cross-Default*.  Holdings or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable and such failure shall continue beyond the applicable grace period, if any, or any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (e) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the Property securing such Indebtedness and (ii) Indebtedness that becomes due as a result of a change in law, tax regulation or accounting treatment so long as such Indebtedness is paid when due;

(f)     *Involuntary Proceedings*.  An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Holdings or any Subsidiary or its debts, or of a substantial part of its assets, under any Federal,

Page 80

state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(g)    *Voluntary Proceedings*.  Holdings or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (f) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) take any action for the purpose of effecting any of the foregoing or (vii) become unable, admit in writing its inability or fail generally to pay its debts as they become due.

(h)    *Judgments*.  One or more judgments for the payment of money in an aggregate amount in excess of $2,500,000 shall be rendered against Holdings or any Subsidiary or any combination thereof and either the same shall remain undischarged or unsatisfied for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of Holdings or any Subsidiary to enforce any such judgment;

(i)    *ERISA*.  An ERISA Event shall have occurred that, in the opinion of the Majority Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(j)    *Guarantee*.  The delivery by any Guarantor to the Administrative Agent of written notice that a Guarantee under Article VII has been revoked;

(k)    *Invalidity of Loan Documents*.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be valid and enforceable as against any Credit Party; or any Credit Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Credit Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document;

(l)    *DrillCo*.  Any Lien granted to a Credit Party by the DrillCo Investor under or related to the DrillCo Operating Agreement fails to be senior to all other Liens granted by the DrillCo Investor in the Property encumbered thereby (other than (i) the Liens granted under the memorandum of DrillCo Operating Agreement to the other Persons party thereto and (ii) Liens of the type described in clause (a) of "Permitted Encumbrances" definition), and such failure shall remain unremedied for 30 days after the earlier to occur of a Credit Party becoming aware

Page 81

of the occurrence of such failure and notice from the Administrative Agent to the Borrower of such failure;

(m)     *Collateral*.  Any Security Document after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (subject in priority only to Permitted Prior Liens) on the Collateral purported to be covered thereby;

(n)     *Swap Notes*.  A default under the Swap Note Documents shall have occurred; or

(o)     *Change of Control*.  There occurs any Change of Control.

then, and in every such event (other than an event with respect to Holdings or any Subsidiary described in clause (e) or (f) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the written request of the Majority Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate the Aggregate Commitment, and thereupon the Aggregate Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrower accrued or payable hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (e) or (f) of this Article, the Aggregate Commitment shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees, premiums and other obligations of the Borrower accrued or payable hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.  Without limiting the foregoing, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender may, subject to the Swap Intercreditor Agreement, protect and enforce its rights under this Agreement and the other Loan Documents by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained in this Agreement or any other Loan Document, and the Administrative Agent and each Lender may, subject to the Swap Intercreditor Agreement, enforce payment of any Obligations due and payable hereunder or enforce any other legal or equitable right and remedies which it may have under this Agreement, any other Loan Document, or under applicable law or in equity.

Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, the Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Administrative Agent from or on behalf of Borrower or any Guarantor of all or any part of the Obligations, and, as between Borrower on the one hand and Administrative Agent and Lenders on the other, Administrative Agent shall, subject to the Swap Intercreditor Agreement, have the continuing and exclusive right to apply and to reapply any and all payments received against the

Obligations in such manner as Administrative Agent may deem advisable notwithstanding any previous application by Administrative Agent.

Following the occurrence and during the continuance of an Event of Default, Administrative Agent shall, subject to the Swap Intercreditor Agreement, apply any and all payments received by Administrative Agent in respect of the Obligations, and any and all proceeds of Collateral received by Administrative Agent, in the following order:  first, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to Administrative Agent with respect to this Agreement, the other Loan Documents or the Collateral, second, to all fees, costs, indemnities and expenses incurred by or owing to any Lender with respect to this Agreement, the other Loan Documents or the Collateral, third, to accrued and unpaid interest on the Obligations, fourth, to the principal amount of the Obligations outstanding, and fifth, to any other indebtedness or obligations of Borrower owing to Administrative Agent or any Lender under the Loan Documents.  Any balance remaining after giving effect to the applications set forth above shall be delivered to the Borrower or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct.  In carrying out any of the applications set forth herein, amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category.

## ARTICLE IX.

## THE ADMINISTRATIVE AGENT

### Section 9.01   Appointment and Authority.

(a)     Each of the Lenders hereby irrevocably appoints Wilmington Trust, National Association, to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

(b)     The Administrative Agent shall also act as the "Collateral Agent" or "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  All protections, exculpations, indemnifications, expense reimbursements, rights, powers and privileges provided to the Administrative Agent under this Agreement and the other Loan Documents shall also apply to the Administrative Agent acting in its capacity as "Collateral Agent" (or "collateral agent" as applicable) under the Loan Documents.  In this connection, the Administrative Agent acting in its capacity as "Collateral Agent" (or "collateral agent" as applicable) and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent (in it capacity as "Collateral Agent" or "collateral agent") pursuant to this Article IX for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Loan Documents, or for exercising any rights and remedies thereunder, shall be entitled to the benefits of all provisions of this Article IX and Article X (including, without limitation, Section 10.03 as though such co-agents, sub-agents and

attorneys-in-fact were the "collateral agent" or "Collateral Agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02   **Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity, if applicable, as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with any Credit Party or other Affiliate thereof as if it were not the Administrative Agent hereunder.

Section 9.03   **Exculpatory Provisions**.  The duties of Administrative Agent shall be mechanical and administrative in nature.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein or in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing:

(a)      the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing,

(b)      the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise as directed in writing by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02); *provided* that Administrative Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law, and

(c)      except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Credit Party or any of their Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02) or in the absence of its own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, or any other Loan Document or any other agreement, instrument or document, or the

#4823-0519-7946

creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.  The Administrative Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term us used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.  Each party to this Agreement acknowledges and agrees that the Administrative Agent and the Majority Lenders or the Majority Lenders may use an outside service provider for the tracking of all UCC financing statements or similar statements under the laws of any other jurisdiction required to be filed pursuant to the Loan Documents and notification to the Administrative Agent, the Majority Lenders or the Majority Lenders, as the case may be, of, among other things, the upcoming lapse or expiration thereof.

**Section 9.04    Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.

The Administrative Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents the Administrative Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, the Administrative Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from Majority Lenders or all or such other portion of Lenders as shall be prescribed by this Agreement.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of Administrative Agent acting or refraining from acting under this Agreement or any

of the other Loan Documents in accordance with the instructions of the Majority Lenders (or all or such other portion of Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of the Majority Lenders (or such other applicable portion of Lenders), the Administrative Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable law or exposes the Administrative Agent to any liability for which it has not received indemnification reasonably satisfactory to it.

        **Section 9.05   <u>Delegation of Duties</u>**.  The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs, including those indemnification and expense reimbursement provisions in <u>Section 10.03</u>, shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  Administrative Agent shall not incur any liability for any action or inaction taken by a sub-agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

        **Section 9.06   <u>Collateral and Guaranty Matters</u>**.  Subject to the Swap Intercreditor Agreement, each Lender hereby authorizes the Administrative Agent to release (or instruct the Collateral Agent to release) any Collateral that it is permitted to be sold or released pursuant to the terms of the Loan Documents (it being understood and agreed that the Administrative Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the Loan Documents).  Each Lender hereby authorizes the Administrative Agent to execute and deliver (or instruct the Collateral Agent to execute and deliver) to the Borrower, at the Borrower's sole cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any Disposition of Collateral to the extent such Disposition is permitted by the terms of this Agreement or is otherwise authorized by the terms of the Loan Documents.  Upon request by the Administrative Agent at any time, the Lenders will confirm the Administrative Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Article IX.

        The Administrative Agent shall have no obligation whatsoever to any Lender or any other person to investigate, confirm or assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or has been encumbered, or that any particular items of Collateral meet the eligibility criteria applicable in respect of the Loans hereunder, or that the liens and security interests granted to the Administrative Agent pursuant hereto or any of the Loan Documents or otherwise have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Administrative Agent in this Agreement or in any of the other Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, subject to the other terms and

#4823-0519-7946

conditions contained herein, the Administrative Agent shall have no duty or liability whatsoever to any Lender.

The Administrative Agent and each Lender hereby appoint each other as agent for the purpose of perfecting the Administrative Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control.  Should any Lender (other than the Administrative Agent) obtain possession or control of any such assets, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor, shall deliver such assets to the Administrative Agent or in accordance with the Administrative Agent's instructions or transfer control to the Administrative Agent in accordance with the Administrative Agent's instructions.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loans unless instructed to do so by the Administrative Agent (or consented to by Administrative Agent), it being understood and agreed that such rights and remedies may be exercised only by Administrative Agent.

### Section 9.07   Resignation and Removal of Administrative Agent.

(a)      The Administrative Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Majority Lenders shall have the right, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed), to appoint a successor; provided that no consent of the Borrower shall be required if any Event of Default has occurred and is continuing.  If no successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier date as shall be agreed by the Majority Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in Chicago, Illinois or New York, New York, or an Affiliate of any such bank that is a financial institution.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor which shall include execution by such successor Administrative Agent of a Joinder Supplement (as defined in the Swap Intercreditor Agreement), such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent.  If no successor administrative agent has accepted appointment as Administrative Agent by the date which is thirty (30) days following a retiring Administrative Agents notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective.  For the avoidance of doubt, any resignation of the Administrative Agent shall also constitute a resignation of the Administrative Agent in its capacity as "Collateral Agent" or "collateral agent" under the Loan Documents.

(b)      The Majority Lenders may remove the Administrative Agent upon twenty (20) days prior written notice to the Administrative Agent and the Borrower and, in consultation with the Borrower, appoint a successor.  If no successor administrative agent shall have been appointed by the Majority Lenders and shall have accepted such appointment within twenty (20) days (or such earlier date as shall be agreed by the Majority Lenders (the "Removal Effective Date")) which acceptance shall include execution by such successor Administrative Agent of a Joinder Supplement (as defined in the Swap Intercreditor Agreement), then such

removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date. For the avoidance of doubt, any removal of the Administrative Agent shall also constitute a removal of the Administrative Agent in its capacity as "Collateral Agent" or "collateral agent" under the Loan Documents, subject to the terms of the Swap Intercreditor Agreement.

(c)     With the effect of the Resignation Effective Date or the Removal Effective Date, the Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly and the Majority Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Majority Lenders appoint a successor as provided for above. After the Administrative Agent's resignation or removal hereunder, the provisions of this Article IX and Section 10.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

**Section 9.08   Non-Reliance on Administrative Agent and Other Lenders**. Each Lender acknowledges and agrees that the extensions of credit made hereunder are commercial loans and not investments in a business enterprise or securities. Each Lender further represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder. Each Lender shall, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder and in deciding whether or to the extent to which it will continue as a lender or assign or otherwise transfer its rights, interests and obligations hereunder.

**Section 9.09   Administrative Agent May File Proofs of Claim**. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any Subsidiary, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their

respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 10.03</u> of this Agreement allowed in such judicial proceeding); and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and their agents and counsel, and any other amounts due the Administrative Agent under <u>Section 10.03</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrower, Administrative Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by Administrative Agent, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), Administrative Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code,) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and Administrative Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from Majority Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Administrative Agent at such sale or other disposition.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Majority Lenders, to credit bid all or any portion of the Secured Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 thereof, or any similar laws in any other jurisdictions to which a Credit Party is subject, (b) at any other sale or

#4823-0519-7946

foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Capital Stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Capital Stock thereof shall be governed, directly or indirectly, by the vote of the Majority Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Majority Lenders contained in Section 10.02), (iii) the Administrative Agent shall be authorized to assign the relevant Secured Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Capital Stock and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Secured Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Lenders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Secured Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

## ARTICLE X.

## MISCELLANEOUS

**Section 10.01  Notices**.

(a)      Subject to paragraph (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or email, as follows:

(i)      if to the Borrower or any Guarantor, to Gastar Exploration Inc., 1331 Lamar, Suite 650, Houston, Texas 77010, Attention: Michael A. Gerlich, Senior Vice President and Chief Financial Officer / Trent Determann, Vice President-Finance, Facsimile No. (713) 739-0458, email: mgerlich@gastar.com / tdetermann@gastar.com;

(ii)      if to the Administrative Agent, to Wilmington Trust, National Association, 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, Attention: Jeffrey Rose,

Page 90

Facsimile No. (612) 217-5651, email: JRose@wilmingtontrust.com, with a copy to Arnold & Porter Kaye Scholer LLP 250 West 55th Street, New York, NY 10019, Attention: Alan Glantz, Facsimile No, (212) 836-6763, email: Alan.Glantz@arnoldporter.com; and

(iii)    if to any other Lender, to its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number or email address for notices and other communications hereunder by written notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if received during the recipient's normal business hours.

(d)    Borrower hereby acknowledges that (i) the Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on SyndTrak, Intralinks, DebtDomain or another similar electronic system (the "Platform"), (ii) the Administrative Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications, and (iii) certain of the Lenders may be "public-side" Lenders (i.e., Lenders, or representatives thereof, that do not wish to receive material nonpublic information with respect to Borrower or its securities) (each, a "Public Lender").  Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC", Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor". Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless Borrower notifies the Administrative Agent in writing promptly (after being given a reasonable opportunity to review such Borrower Materials) that any such document contains

Page 91

material non-public information:  (1) the Loan Documents and (2) notification of changes in the terms of the Loan Documents.

(e)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY CREDIT PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY CREDIT PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL AND NON-APPEALABLE RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**Section 10.02  Waivers; Amendments**.

(a)      No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of the Loans shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)      None of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified, and no consent to any departure by the Borrower or any other Credit Party therefrom shall be effective, except pursuant to an agreement or agreements in writing entered into by the Credit Parties and the Majority Lenders, and acknowledged by the Administrative Agent or Collateral Agent (as applicable), or by the Credit

Parties and the Administrative Agent or Collateral Agent (as applicable) in each case with the consent of the Majority Lenders; provided that no such agreement shall:

> (i)      increase the Commitment of any Lender without the written consent of such Lender;

> (ii)      reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees or premium payable hereunder, without the written consent of each Lender affected thereby;

> (iii)      postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any of the Aggregate Commitment, without the written consent of each Lender affected thereby (it being understood that any waiver of a mandatory prepayment of the Loans shall not constitute a postponement or waiver of a scheduled payment or date of expiration);

> (iv)      change Section 2.13(b) or Section 2.13(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender;

> (v)      except in connection with any Dispositions permitted in Section 6.05, release any Guarantor from its obligations under Article VII or release any of the Collateral without the written consent of each Lender;

> (vi)      change any of the provisions of this Section or the definition of "Majority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender; or

> (vii)      change (x) the definition of "Qualified Counterparty", "Secured Obligations", "Secured Party" or "Swap Intercreditor Agreement" in any manner adverse to the Qualified Counterparties, (y) Section 6.08, or (z) Section 9.07 in any manner that would eliminate or waive the requirements for a successor administrative agent hereunder to execute and deliver a Joinder Supplement (as defined in the Swap Intercreditor Agreement), in either case, without the written consent of each Qualified Counterparty;

provided further that (i) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent and (ii) the Fee Letter may only be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

> (c)      Notwithstanding anything to the contrary contained in this Section 10.02, the Administrative Agent may, with the consent of the Borrower only, amend, modify or supplement this Agreement or any of the other Loan Documents to correct any clerical errors or cure any ambiguity, omission, mistake, defect or inconsistency.

**Section 10.03  Expenses; Indemnity; Damage Waiver**.

(a)      The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Majority Lenders and each of their respective Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and the Majority Lenders, in connection with the preparation and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Majority Lenders or any other Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent, the Majority Lenders or any other Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)      THE CREDIT PARTIES SHALL, JOINTLY AND SEVERALLY, INDEMNIFY THE ADMINISTRATIVE AGENT AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY, OR ANY OTHER ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY SUBSIDIARY, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER OR NOT SUCH CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING IS BROUGHT BY A CREDIT PARTY, ANY EQUITY HOLDERS OF A CREDIT PARTY, ANY AFFILIATES OF A CREDIT PARTY, ANY CREDITORS OF A CREDIT PARTY OR ANY OTHER THIRD PERSON AND WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR, SOLELY IN THE CASE OF A LENDER, FROM A CLAIM BROUGHT BY A CREDIT PARTY AGAINST SUCH LENDER FOR MATERIAL BREACH IN BAD FAITH OF SUCH LENDER'S

#4823-0519-7946

OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS. FOR THE AVOIDANCE OF DOUBT, WITH RESPECT TO THE FOREGOING PROVISO "ANY INDEMNITEE" MEANS ONLY THE INDEMNITEE OR INDEMNITEES, AS THE CASE MAY BE, THAT ARE DETERMINED BY SUCH COURT IN SUCH JUDGMENT TO HAVE BEEN GROSSLY NEGLIGENT OR TO HAVE ENGAGED IN WILLFUL MISCONDUCT OR, SOLELY IN THE CASE OF A LENDER, MATERIALLY BREACHED THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN BAD FAITH AND NOT ANY OTHER INDEMNITEE.  THIS <u>SECTION 10.03(b)</u> SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS OR DAMAGES ARISING FROM ANY NON-TAX CLAIM.

(c)     To the extent that any Credit Party fails to pay any amount required to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party thereof under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent thereof) or such Related Party of the Administrative Agent, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or if such unreimbursed amount or indemnity payment is sought after the date on which the Loans have been paid in full, and the Commitments have terminated or expired, in accordance with such Lender's Applicable Percentage immediately prior to the date on which the Loans are paid in full and the Commitments have terminated or expired)) of such unpaid amount.  If any indemnity furnished to Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Majority Lenders, until such additional indemnity is furnished.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any source against any amount due to the Administrative Agent under this paragraph (c).

(d)     To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party hereto on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, the Loans or the use of the proceeds thereof; <u>provided</u> that, nothing in this clause (d) shall relieve any Credit Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)     The Lenders acknowledge and agree that all indemnification obligations of the "Administrative Agent" to the "Collateral Agent" or any sub-agent thereof or any Related Party of the "Collateral Agent" or any sub-agent thereof under Section 19(b) of the Swap Intercreditor Agreement shall (i) notwithstanding anything to the contrary provided in the Swap Intercreditor Agreement, be obligations of the Lenders (and not the Administrative Agent) to the "Collateral Agent" and such other Persons (payable by the Lenders in accordance with their respective Applicable Percentages (determined as of the time that the indemnity payment is sought (or if such indemnity payment is sought after the date on which the Loans have been paid in full, in accordance with each Lender's Applicable Percentage immediately prior to the date on which the

Page 95

Loans are paid in full)) and (ii) the Administrative Agent and the "Collateral Agent" under the Swap Intercreditor Agreement may directly enforce such indemnification obligations against the Lenders (and each Lender hereby authorizes the Administrative Agent and the "Collateral Agent" to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent or the "Collateral Agent" to the Lender from any source against any amount due to the "Collateral Agent" under this paragraph (e).

(f)     All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

(g)     The agreements in this <u>Section 10.03</u> shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, the termination of this Agreement and the repayment, satisfaction or discharge of the Secured Obligations.

**Section 10.04  <u>Successors and Assigns</u>**.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the Administrative Agent (and any attempted assignment or transfer by such Credit Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Except as set forth in Section 10.20, nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)

(i)     Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of (A) the Administrative Agent and (B) if no Event of Default has occurred and is continuing, the Borrower.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consent; provided

#4823-0519-7946

that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of such Lender's Commitment and such Lender's Loans under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (unless such fee is waived or reduced by the Administrative Agent in its sole discretion); and

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and any tax forms required under Section 2.17.

For the purposes of this Section 10.04(b), the term "Approved Fund" and "Ineligible Institution" have the following meanings:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Ineligible Institution" means a (a) natural person, (b) company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof or (c)  the Borrower.

(iii)      Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.14, Section 2.15, Section 2.16, Section 2.17 and Section 10.03).      Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section except that any attempted assignment or transfer by any Lender that does not comply with clause (C) of Section 10.04(b)(ii) shall be null and void.

(iv)      The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and

Page 97

Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment and the Applicable Percentage of, and principal amount of (and stated interest on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Credit Parties, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Credit Parties and any Lender, at any reasonable time and from time to time upon reasonable prior notice. For the avoidance of doubt, the language in this Section 10.04(b)(iv) is intended to cause the Loans, and any participation therein, to be in "registered form" as defined in Sections 163(f), 87(h)(2) and 881(c)(2) of the Code, Section 5f.103-(c) of the United States Treasury Regulations and Section 1.163-5(b)(1) of the proposed United States Treasury Regulations, and such language shall be interpreted and applied consistently therewith.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any applicable tax forms (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section, and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.18(d) or Section 10.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)

(i)     Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant"), other than an Ineligible Institution, in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.02(b) that affects such

#4823-0519-7946

Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.14, Section 2.15, Section 2.16 and Section 2.17 (subject to the requirements and limitations therein, including the requirements under Section 2.17(f) (it being understood, however, that the documentation required under Section 2.17(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.14, Section 2.15, Section 2.16 or Section 2.17, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts of (and stated interest on) each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"), and no participation shall be effective unless it has been recorded in the Participant Register pursuant to this Section; provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b)(1) of the proposed United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)      The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Ineligible Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is an Ineligible Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Ineligible Institution.

**Section 10.05  Survival**.  All covenants, agreements, representations and warranties made by the Credit Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee, premium or any other amount payable under this Agreement is outstanding and so long as the Aggregate Commitment has not expired or terminated.  The provisions of Section 2.14, Section 2.15, Section 2.16, Section 2.17, Section 10.03, Article VII and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Aggregate Commitment or the termination of this Agreement or any provision hereof.

**Section 10.06  Counterparts; Integration; Effectiveness; Electronic Execution**.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR**, **CONTEMPORANEOUS**, **OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES**.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce

Page 100

Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 10.07  Severability**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 10.08  Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of any Credit Party now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section and Section 7.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

**Section 10.09  GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS**.

(a)      THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(b)      EACH CREDIT PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN, AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

#4823-0519-7946

(c)      EACH CREDIT PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)      EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 10.01</u>. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 10.10  <u>WAIVER OF JURY TRIAL</u>**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 10.11  <u>Headings</u>**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 10.12  <u>Confidentiality</u>**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Requirements of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Credit Parties and their obligations, (g) with the consent of

the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than a Credit Party.  For the purposes of this Section, "Information" means all information received from any Credit Party relating to any Credit Party or its business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Credit Party; provided that, in the case of information received from any Credit Party after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 10.13  **Material Non-Public Information**.

(a)      EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 10.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(b)      ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE CREDIT PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.14  **Authorization to Distribute Certain Materials to Public-Siders**.

(a)      If the Borrower does not file this Agreement with the SEC, then the Borrower hereby authorizes the Administrative Agent to distribute the execution version of this Agreement and the Loan Documents to all Lenders, including their Public-Siders.  The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Parties' respective securities while in possession of the Loan Documents.

(b)      The Borrower represents and warrants that none of the information in the Loan Documents constitutes or contains material non-public information within the meaning of the

federal and state securities laws.  To the extent that any of the executed Loan Documents constitutes at any time material non-public information within the meaning of the federal and state securities laws after the date hereof, the Borrower agrees that it will promptly make such information publicly available by press release or public filing with the SEC.

Section 10.15  **Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.  In the event that, notwithstanding Section 10.09, applicable law is the law of the State of Texas and such applicable law provides for an interest ceiling under Chapter 303 of the Texas Finance Code (the "Texas Finance Code") as amended, for each day, the ceiling shall be the "weekly ceiling" as defined in the Texas Finance Code and shall be used in this Note and the other Loan Documents for calculating the Maximum Rate and for all other purposes.  Chapter 346 of the Texas Finance Code (which regulates certain revolving credit accounts (formerly Tex. Rev. Civ. Stat.  Ann.  Art.  5069, Ch.  15)) shall not apply to this Agreement or to any Loan, nor shall this Agreement or any Loan be governed by or be subject to the provisions of such Chapter 346 in any manner whatsoever.

Section 10.16  **USA PATRIOT Act**.  Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and the Administrative Agent hereby notifies each Credit Party that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender or the Administrative Agent to identify each Credit Party in accordance with the Act.

Section 10.17  **Release of Guarantees and Liens**.

(a)     Upon Discharge of Obligations, the Collateral shall, subject to the Swap Intercreditor Agreement, be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of each Credit Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person; and

(b)     If any of the Collateral shall be sold, transferred or otherwise disposed of by Holdings or any Subsidiary in a transaction permitted by this Agreement, then the Administrative Agent, at the request and sole expense of Holdings or any Subsidiary, shall, subject to the Swap Intercreditor Agreement, execute and deliver to Holdings or any Subsidiary all releases or other

Page 104

documents reasonably necessary or desirable for the release of the Liens created by the Security Documents on such <u>Collateral; provided</u> that the Borrower shall have delivered to the Administrative Agent, at least five (5) Business Days prior to the date of the proposed release, a written request for release identifying the terms of the Disposition in reasonable detail, including the price thereof and any anticipated expenses in connection therewith, together with a certification by the Borrower stating that such transaction is in compliance with this Agreement and the other Loan Documents (and the Lenders hereby authorize and direct the Administrative Agent to conclusively rely on such certifications in performing its obligations under this <u>Section 10.17</u>).  At the request and sole expense of the Borrower, a Guarantor shall, subject to the Swap Intercreditor Agreement, be released from its obligations hereunder and under the other Security Documents upon Discharge of Obligations.

      **Section 10.18  [<u>Swap Intercreditor Agreement</u>**.  REFERENCE IS MADE TO THE SWAP INTERCREDITOR AGREEMENT.  EACH LENDER HEREUNDER (A) CONSENTS TO THE TERMS OF THE SWAP INTERCREDITOR AGREEMENT, (B) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE SWAP INTERCREDITOR AGREEMENT AND (C) AUTHORIZES AND DIRECTS THE ADMINISTRATIVE AGENT (IN ITS CAPACITIES AS "ADMINISTRATIVE AGENT" AND "COLLATERAL AGENT" UNDER THE SWAP INTERCREDITOR AGREEMENT) TO ENTER INTO THE SWAP INTERCREDITOR AGREEMENT ON BEHALF OF SUCH LENDER.  THE PROVISIONS OF THIS <u>SECTION 10.18</u> ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE SWAP INTERCREDITOR AGREEMENT.  REFERENCE MUST BE MADE TO THE SWAP INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.  EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE SWAP INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE SWAP INTERCREDITOR AGREEMENT.  IN THE EVENT OF A CONFLICT BETWEEN THE PROVISIONS OF ANY OF THE LOAN DOCUMENTS AND THE PROVISIONS OF THE SWAP INTERCREDITOR AGREEMENT, THE PROVISIONS OF THE SWAP INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.][9]

      **Section 10.19  <u>Amendment and Restatement</u>**.  On the Effective Date, the DIP Credit Agreement shall be amended, restated and superseded in its entirety.  The parties hereto acknowledge and agree that (i) this Agreement and other Loan Documents, whether executed and delivered in connection herewith or otherwise, do not constitute a novation, payment or reborrowing, or termination of the "Obligations" (as defined in the DIP Credit Agreement) relating to the New Money DIP Loans as in effect prior to the Effective Date and (ii) such "Obligations" (as defined in the DIP Credit Agreement) are in all respects continuing (as amended and restated hereby) with only the terms thereof being modified as provided in this Agreement.  Each Credit Party hereby reaffirms its duties and obligations under each Loan Document to which it is a party (such reaffirmation is solely for the convenience of the parties hereto and is not required by the terms of the DIP Credit Agreement).  Each reference to this

---

[9] NTD:  Subject to review of Swap Intercreditor Agreement

Agreement in any Loan Document shall be deemed to be a reference to this Agreement as amended and restated hereby.

      **Section 10.20 <u>Limited Third Party Beneficiaries</u>**.  The parties hereto acknowledge and agree that each Secured Party not party to this Agreement (including, for the avoidance of doubt, the Collateral Agent and each Qualified Counterparty and each Initial Swap ISDA Counterparty satisfying the definition of "Secured Party" hereunder) shall be an express third party beneficiary under Article VII and Section 10.20 of this Agreement and, as such, Article VII and Section 10.20 of this Agreement will inure to the benefit of each such Secured Party and be enforceable by each such Secured Party and its respective successors and assigns.

[Signature Pages Follow]

#4823-0519-7946

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWER**:

**[GASTAR EXPLORATION LLC]**

By: _____
Name:
Title:

**GUARANTORS**:

**[GASTAR HOLDCO, LLC]**

By: _____
Name:
Title:

**NORTHWEST PROPERTY VENTURES LLC**

By: _____
Name:
Title:

Signature Page to
Amended and Restated Credit Agreement

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
as Administrative Agent


By: _____
Name:
Title:

#4823-0519-7946

**AF V Energy I Holdings, L.P**.,
as a Lender


By: _____
Name:
Title:      Authorized Signatory

**SCHEDULE 2.01**

COMMITMENTS

New Money Loans

| Lender | New Money Interim Commitment | Percent of Aggregate New Money Interim Commitment |
|---|---|---|
| AF V Energy I Holdings, L.P. | $[_] | 100% |
| **TOTAL:** | **$[_]** | **100%** |

Refinanced Loans

| Lender | Refinanced Commitment | Refinanced Commitment |
|---|---|---|
| AF V Energy I Holdings, L.P. | $[_] | 100% |
| **TOTAL:** | **$[_]** | **100%** |

#4823-0519-7946

# EXHIBIT C

## Parent Credit Agreement

MTHM DRAFT 12/13/18

CREDIT AGREEMENT

dated as of

January [_], 2019

between

[_],
as Borrower,

and

AF V ENERGY I HOLDINGS, L.P.,
as Lender

# TABLE OF CONTENTS

Page

Article I. Definitions ................................................................................................. 1
    Section 1.01   Defined Terms ........................................................................ 1
    Section 1.02   Terms Generally ................................................................... 18
    Section 1.03   Classification of Loans and Borrowings ............................. 19

Article II. The Credits ............................................................................................ 19
    Section 2.01   Accounting Terms; GAAP................................................... 19
    Section 2.02   Loans and Commitments ..................................................... 19
    Section 2.03   Funding of Borrowings ....................................................... 19
    Section 2.04   [Reserved] ........................................................................... 20
    Section 2.05   Repayment of Loans; Evidence of Debt .............................. 20
    Section 2.06   Optional Prepayment of Loans ........................................... 20
    Section 2.07   Mandatory Prepayment of Loans......................................... 21
    Section 2.08   [Reserved] ........................................................................... 21
    Section 2.09   [Reserved] ........................................................................... 21
    Section 2.10   Interest on Loans................................................................. 21
    Section 2.11   Alternate Rate of Interest ................................................... 23
    Section 2.12   [Reserved] ........................................................................... 23
    Section 2.13   Conversion and Continuation of Borrowings ..................... 24
    Section 2.14   Increased Costs .................................................................... 25
    Section 2.15   Change in Legality.............................................................. 26
    Section 2.16   Breakage ............................................................................. 26
    Section 2.17   Taxes ................................................................................... 27
    Section 2.18   Payments Generally; Pro Rata Treatment; Sharing of Set-offs ............ 30

Article III. Representations and Warranties............................................................. 31
    Section 3.01   Organization; Powers .......................................................... 31
    Section 3.02   Authorization; Enforceability ............................................. 31
    Section 3.03   Governmental Approvals; No Conflicts .............................. 32
    Section 3.04   No Material Adverse Change................................................ 32
    Section 3.05   Properties ............................................................................ 32
    Section 3.06   Litigation and Environmental Matters ................................ 32
    Section 3.07   Compliance with Laws and Agreements .............................. 33
    Section 3.08   Investment Company Status ................................................ 33
    Section 3.09   Taxes ................................................................................... 33
    Section 3.10   ERISA ................................................................................. 33
    Section 3.11   Disclosure ........................................................................... 33
    Section 3.12   Labor Matters ...................................................................... 34
    Section 3.13   Capitalization ...................................................................... 34
    Section 3.14   Margin Stock....................................................................... 34
    Section 3.15   [Reserved] ........................................................................... 34
    Section 3.16   [Reserved] ........................................................................... 34
    Section 3.17   [Reserved] ........................................................................... 34

i

Section 3.18     [Reserved] ................................................................................... 34
Section 3.19     [Reserved] ................................................................................... 34
Section 3.20     [Reserved] ................................................................................... 34
Section 3.21     Anti-Corruption Laws and Sanctions ............................................ 34
Section 3.22     No Foreign Operations .................................................................. 34
Section 3.23     [Reserved] ................................................................................... 34
Section 3.24     Borrower as Holding Company ..................................................... 34

Article IV. Conditions to Effectiveness and Borrowings ........................................... 35

Section 4.01     Conditions to Effectiveness .......................................................... 35
Section 4.02     Conditions to All Loans ................................................................ 36

Article V. Affirmative Covenants ................................................................................ 36

Section 5.01     Financial Statements; Other Information ...................................... 37
Section 5.02     Notices of Material Events ............................................................ 38
Section 5.03     Existence; Conduct of Business .................................................... 39
Section 5.04     Payment of Obligations ................................................................. 39
Section 5.05     Maintenance of Properties; Insurance ........................................... 39
Section 5.06     Books and Records; Inspection Rights .......................................... 39
Section 5.07     Compliance with Laws .................................................................. 39
Section 5.08     Environmental Matters .................................................................. 39
Section 5.09     Use of Proceeds ............................................................................. 40
Section 5.10     [Reserved] ................................................................................... 40
Section 5.11     [Reserved] ................................................................................... 40
Section 5.12     Swap Agreements .......................................................................... 40
Section 5.13     [Reserved] ................................................................................... 40
Section 5.14     [Reserved] ................................................................................... 40
Section 5.15     [Reserved] ................................................................................... 40
Section 5.16     [Reserved] ................................................................................... 40
Section 5.17     Further Assurances ........................................................................ 40

Article VI. Negative Covenants .................................................................................. 40

Section 6.01     [Reserved] ................................................................................... 41
Section 6.02     Indebtedness .................................................................................. 41
Section 6.03     Liens .............................................................................................. 41
Section 6.04     Fundamental Changes .................................................................... 42
Section 6.05     Disposition of Assets .................................................................... 42
Section 6.06     Nature of Business ........................................................................ 43
Section 6.07     Investments .................................................................................... 43
Section 6.08     Swap Agreements .......................................................................... 44
Section 6.09     Restricted Payments ...................................................................... 44
Section 6.10     Transactions with Affiliates .......................................................... 44
Section 6.11     Restrictive Agreements ................................................................. 45
Section 6.12     Disqualified Stock ......................................................................... 45
Section 6.13     Certain Amendments to Organizational Documents ..................... 45
Section 6.14     Sale and Leaseback Transactions .................................................. 45

Article VII. [Reserved] ........................................................................................................ 45

Article VIII. Events of Default .......................................................................................... 45

Article IX. [Reserved].......................................................................................................... 48

Article X. Miscellaneous ..................................................................................................... 48

     Section 10.01    Notices ............................................................................ 48
     Section 10.02    Waivers; Amendments.................................................... 49
     Section 10.03    Expenses; Indemnity; Damage Waiver................................. 49
     Section 10.04    Successors and Assigns.................................................. 51
     Section 10.05    Survival ........................................................................... 54
     Section 10.06    Counterparts; Integration; Effectiveness; Electronic Execution............ 54
     Section 10.07    Severability .................................................................... 55
     Section 10.08    Right of Setoff................................................................ 55
     Section 10.09    GOVERNING LAW; JURISDICTION; CONSENT TO
                        SERVICE OF PROCESS ..................................................... 55
     Section 10.10    WAIVER OF JURY TRIAL................................................ 56
     Section 10.11    Headings ......................................................................... 56
     Section 10.12    Confidentiality ................................................................ 56
     Section 10.13    Material Non-Public Information ............................................ 57
     Section 10.14    [Reserved] ...................................................................... 57
     Section 10.15    Interest Rate Limitation .................................................. 57
     Section 10.16    USA PATRIOT Act ......................................................... 58

EXHIBITS:

Exhibit A – Form of Assignment and Assumption
Exhibit B – Form of Note
Exhibits C-1 through C-4 – Form of Tax Certificates
Exhibit D – Form of Interest Election Request
Exhibit E – Form of Notice of PIK Election

SCHEDULES:

Schedule 3.06 – Disclosed Matters
Schedule 3.13 – Capitalization
Schedule 6.02 – Existing Indebtedness
Schedule 6.03 – Existing Liens
Schedule 6.07 – Existing Investments

## CREDIT AGREEMENT

This CREDIT AGREEMENT, dated as of January [_], 2019, is between [_], a Delaware [limited liability company], as Borrower and AF V Energy I Holdings, L.P., as Lender.

## RECITALS

WHEREAS, on October 31, 2018, Gastar Exploration Inc. and its subsidiaries (collectively, the "Debtors" and each, a "Debtor") commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, on December [_], 2018, the Bankruptcy Court entered the Confirmation Order (as defined below);

WHEREAS, the Debtors are party to that certain Superpriority Debtor-In-Possession Credit Agreement, dated as of October 31, 2018, among the Debtors, the other guarantors party thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "DIP Credit Agreement"); and

WHEREAS, in connection with the confirmation and implementation of the Plan of Reorganization (as defined below), the Borrower has requested that Lender make available to the Borrower a term loan facility of $200,000,000 to refinance a portion of the DIP Obligations (as defined below).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, such parties hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

**Section 1.01   Defined Terms**. As used in this Agreement, the following terms have the meanings specified below:

"ABR Loan" or "ABR Borrowing" means a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Alternate Base Rate.

"Act" has the meaning assigned to such term in Section 10.16.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) (x) an interest rate per annum (rounded upward, if necessary, to the next 1/100th of 1%) determined by Lender to be equal to the LIBO Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (y) 1 minus the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period and (b) 2.00% per annum.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Affiliate Transaction</u>" has the meaning assigned to such term in <u>Section 6.10(a)</u>.

"<u>Agreement</u>" means this Credit Agreement, dated as of January [_], 2019, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Alternate Base Rate</u>" means, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1.00% or (c) the Adjusted LIBO Rate for a one-month Interest Period beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1.00%.  If Lender shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of Lender to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"<u>Anti-Corruption Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption, including without limitation the United States Foreign Corrupt Practices Act of 1977, as amended.

"<u>Applicable Margin</u>" means, for any day (a) with respect to any Eurodollar Loan, 6.00% per annum, unless the Borrower has delivered a Notice of PIK Election in accordance with Section 2.10(c) for any Interest Payment Date in respect of such Eurodollar Loan, in which case the Applicable Margin for such Eurodollar Loan during the Interest Period ending on such Interest Payment Date shall be 8.00% per annum and (b) with respect to any ABR Loan, 5.00% per annum, unless the Borrower has delivered a Notice of PIK Election in accordance with Section 2.10(c) for any Interest Payment Date in respect of such ABR Loan, in which case the Applicable Margin for such ABR Loan during the period from the then most recent Interest Payment Date for such Loan (or, in the case of ABR Loan originally made as an ABR Loan that (x) was not at any time a Eurodollar Loan and (y) in respect of which an Interest Payment Date had not occurred on or prior to such date, from the date such ABR Loan was initially funded) and ending on such Interest Payment Date (such period, the "<u>Applicable Interest Payment Period</u>") shall be 7.00% per annum during such Applicable Interest Payment Period.

"<u>Applicable Percentage</u>" means, with respect to any Lender at any time, a percentage equal to a fraction, the numerator of which is the sum of such Lender's Credit Exposure at such time and the denominator of which is the aggregate Credit Exposure at such time.

#4846-6774-8225

"Approved Fund" has the meaning assigned to such term in Section 10.04(b).

"Ares" means (a) Ares Management LLC, its Affiliated investment managers and funds or accounts managed by any of them (but excluding any portfolio companies that are owned in whole or in part by any of the foregoing) and (b) any partner, member, manager, principal, director or officer of any of the foregoing.

"Asset Sale" means any Disposition by Borrower of any Property other than  (a) Dispositions permitted by clauses (a), (b), (c) or (d) of Section 6.05 and (b) any single Disposition or series of related Dispositions that involves Properties having a Fair Market Value not exceeding $1,000,000 and when aggregated together with all other Dispositions under this clause (b) the total does not exceed $5,000,000.

"Assignment and Assumption" means an assignment and assumption entered into by Lender and an Eligible Assignee (with the consent of any Person whose consent is required under 10.04), in the form of Exhibit A or any other form approved by Lender.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," now and hereafter in effect, or any applicable successor statute.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of Lender, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Base Rate" means, for any day, the prime lending rate published in *The Wall Street Journal* for such day; *provided* that if *The Wall Street Journal* ceases to publish for any reason such rate of interest, "Base Rate" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by Lender from time to time for purposes of providing quotations of prime lending interest rates); each change in the Base Rate shall be effective on the date such change is effective.  The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means [_], a Delaware [limited liability company], and its successors and permitted assigns.

Page 3

"Borrower Materials" has the meaning assigned to such term in Section 10.01(d).

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Breakage Event" has the meaning assigned to such term in Section 2.16.

"Business Day" means any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or lease obligations on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, or overnight bank deposits having maturities of six months or less from the date of acquisition issued by Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a "nationally recognized statistical rating organization" (within the meaning of proposed Rule 3b-10 promulgated by the SEC under the Exchange Act), if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision or taxing authority (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower.

"Change in Law" means the occurrence after the date of this Agreement or, with respect Lender, such later date on which a Lender becomes a party to this Agreement of (a) the adoption of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the interpretation or application thereof by any Governmental Authority or (c) compliance by Lender (or, for purposes of Section 2.14(b), by any lending office of Lender or by Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law" regardless of the date enacted, adopted or issued.

"Change of Control" means

(a)     any "person" or "group" (as such terms are used in sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than Ares or any Related Party thereof, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that such person or group shall be deemed to have "beneficial ownership" of all shares that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 35% of the total voting power of the outstanding Capital Stock normally entitled to vote in the election of directors ("Voting Stock") of Borrower (or its successor by merger, consolidation or purchase of all or substantially all of its assets);

(b)     the failure at any time of Holdings to be the beneficial owner of 100% of the Voting Stock of the Borrower; or

(c)     the Borrower's stockholders approve any plan relating to the liquidation or dissolution of the Borrower.

(d)     Notwithstanding anything to the contrary herein, the Restructuring Transactions shall not constitute a Change of Control.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Charges" has the meaning assigned to such term in Section 10.15.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Commitment" means as to Lender, its obligation to make a Loan to Borrower hereunder, expressed as an amount representing the maximum principal amount of Loans to be made by

Page 5

such Lender under this Agreement.  The amount of Lender's Commitment as of the Effective Date is equal to $200,000,000, which amount (a) shall refinance DIP Obligations and (b) shall be deemed funded by Lender on the Effective Date.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan of Reorganization pursuant to Section 1129 of the Bankruptcy Code, together with all schedules and exhibits thereto.

"Consummation of the Plan of Reorganization" means the occurrence of the Effective Date (as defined in the Plan of Reorganization) and the substantial consummation of the Plan of Reorganization within the meaning of Section 1101(2) of the Bankruptcy Code in accordance with its terms in all material respects.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Subsidiaries" means, for any Person, any Subsidiary or other entity the accounts of which would be consolidated with those of such Person in its consolidated financial statements in accordance with GAAP.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Date" means the date of a Borrowing.

"Credit Exposure" means the outstanding principal amount of Lender's Loans at such time.

"Debtor" has the meaning assigned to such term in the recitals hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means, with respect to the Loans or other Obligations which accrue interest at the Default Rate hereunder, a rate per annum equal to the sum of three percent (3%) plus the interest rate otherwise applicable thereto.

"DIP Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"DIP Obligations" means Obligations as defined in the DIP Credit Agreement.

"Discharge of Obligations" means (a) the payment in full in cash of all Obligations (other than contingent indemnity obligations for which no claim for payment has been made (which indemnity obligations continue to survive as expressly provided in this Agreement or in any other Loan Document)), (b) termination or expiration of the Commitments and (c) termination of

this Agreement other than indemnity and reimbursement obligations which expressly survive the termination hereof.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disposition" or "Dispose" means the sale, transfer, license, lease, exchange or other disposition (including any Sale and Leaseback Transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Capital Stock (which would not constitute Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable for any consideration other than other Capital Stock (which would not constitute Disqualified Stock) at the sole option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after the Maturity Date.

"Dollars" or "$" refers to lawful money of the United States of America.

"Effective Date" means the date the conditions set forth in Section 4.01 are satisfied (or waived by Lender) which date is January [_], 2019.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means any Person that qualifies as an assignee pursuant to Section 10.04(b)(i); provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrower or any of the Borrower's Subsidiaries.

"Environmental Laws" means all laws (including common law), rules, regulations, codes, ordinances, orders, determinations, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority relating in any way to the environment, preservation or reclamation of natural resources, pollution, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) any violation of or liability under any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal (or arrangement for the disposal) of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure of any Plan to satisfy the minimum funding standard applicable to that Plan for a plan year under Section 412 of the Code or Section 302 of ERISA; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar Loan" or "Eurodollar Borrowing" means a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VIII.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i)  Lender acquires such interest in the Loan or Commitment or (ii) Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to Lender's assignor immediately before Lender acquired the applicable interest in a Loan or Commitment or to Lender immediately before it changed its lending office, (c) Taxes attributable to Lender's failure to comply with Section 2.17(f) and (g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Fair Market Value" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith in accordance with generally accepted finance practices.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by Lender from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means the chief financial officer of the Borrower.  Any document delivered hereunder that is signed by the Financial Officer of the Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of the Borrower and such Financial Officer shall be conclusively presumed to have acted on behalf of the Borrower.

"Foreign Lender" means a Lender that is not a U.S. Person.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 2.01.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity properly exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (in this definition, the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such

Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all contaminants, pollutants or, hazardous or toxic materials, substances, wastes or other chemicals, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, explosive materials, radioactive materials and all other materials, substances or wastes of any nature regulated pursuant to, or for which liability or standards of conduct may be imposed under, any Environmental Law.

"Hedge Modification" means the amendment, modification, cancellation, monetization, sale, transfer, assignment, early termination or other disposition of any Swap Agreement.

"Holdings" means [_], a Delaware [limited liability company], and its successors and permitted assigns.[1]

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding those incurred in the ordinary course of business which are not greater than 60 days past the due date or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person, but limited to the lesser of (i) the amount of such Indebtedness and (ii) the fair market value of the property securing such Indebtedness, (f) all Guarantees by such Person of Indebtedness of others to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such Guarantee, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (j) attributable Indebtedness in respect of Sale and Leaseback Transactions and (k) all obligations of such Person relating to any Production Payment.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

---

[1]     NTD: To be defined as the specific entity that ends up being the highest, ultimate parent of Gastar borrower in the exit structure.

#4846-6774-8225

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in (a) hereof, Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 10.03.

"Ineligible Institution" has the meaning assigned to it in Section 10.04(b).

"Information" has the meaning assigned to such term in Section 10.12.

"Interest Election Request" means a request by the Borrower in accordance with the terms of Section 2.13 and substantially in the form of Exhibit D or such other form as shall be approved by Lender.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last Business Day of each calendar quarter and any date upon which a payment or prepayment thereof is made and (b) with respect to any Eurodollar Borrowing, the last day of the Interest Period applicable to such Borrowing, and any date upon which a payment or prepayment thereof is made.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day that is (x) one week thereafter, (y) one month thereafter or (y) three months thereafter, in any case at the Borrower's election pursuant to Section 2.03 or 2.13, as applicable; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c), end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Borrowing shall extend beyond the applicable Maturity Date.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of the Borrowing initially shall be the date on which the Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of the Borrowing.

"Investment" means all direct or indirect investments by such Person in other Persons (including, without limitation, Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Capital Stock or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRS" means the United States Internal Revenue Service.

#4846-6774-8225

"<u>Lender</u>" means AF V Energy I Holdings, L.P. and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period therefor, the rate per annum determined by Lender by reference to the ICE Benchmark Administration London Interbank Offered Rate for deposits in Dollars with a term equivalent to such Interest Period (as set forth on the applicable Bloomberg screen page or by or such other commercially available source providing such quotations as may be designated by Lender from time to time) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Loan Documents</u>" means this Agreement, any promissory notes executed in connection herewith and any other agreements executed by the Borrower in connection with this Agreement and designated as a Loan Document therein.

"<u>Loans</u>" means, collectively, any loans made by Lender to the Borrower pursuant to this Agreement.

"<u>Market Disruption Loans</u>" means Loans the rate of interest applicable to which is based upon the Market Disruption Rate, and the Applicable Margin with respect thereto shall be the same as the Applicable Margin applicable to Eurodollar Loans; <u>provided</u> that, other than with respect to the rate of interest and Applicable Margin applicable thereto, Market Disruption Loans shall for all purposes hereunder and under the other Loan Documents be treated as ABR Loans (and Borrowings bearing interest at the Market Disruption Rate shall for all purposes hereunder and under the other Loan Documents be treated as ABR Borrowings).

"<u>Market Disruption Rate</u>" means, for any day, a fluctuating rate *per annum* (rounded upwards, if necessary, to the nearest $1/100^{th}$ of 1.00%) equal to, the Alternate Base Rate for such day (without giving effect to clause (c) of the definition of Alternative Base Rate).  Any change in the Market Disruption Rate shall be effective as of the opening of business on the effective day of any change in the relevant component of the Market Disruption Rate. Notwithstanding the foregoing, if the "*Market Disruption Rate*" as determined in accordance with the immediately preceding sentences is less than the percentage specified in clause (b) of the definition of "*Adjusted LIBO Rate,*" then for all purposes of this Agreement and the other Loan Documents, the "*Market Disruption Rate*" shall be deemed equal to such percentage for such Interest Period.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, operations, financial condition or results of operations of the Borrower, (b) the ability of the Borrower to perform any of its obligations under this Agreement or the other Loan Documents or

(c) the validity or enforceability of any Loan Document against the Borrower or the rights of or benefits available to Lender under this Agreement or the other Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans) of the Borrower in an aggregate principal amount exceeding $10,000,000.

"Maturity Date" means the earlier of (a) January [_], 202[_] and (b) the date of the acceleration of any outstanding extensions of credit under this Agreement.

"Maximum Liability" has the meaning assigned to such term in Section 7.10.

"Maximum Rate" has the meaning assigned to such term in Section 10.15.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which Borrower or any ERISA Affiliate contributed or has any obligations (current or contingent).

"Net Cash Proceeds" means, with respect to any Disposition or series of related Dispositions of any assets by the Borrower, the excess, if any, of (a) the sum of cash and Cash Equivalents received in connection with such Disposition or Dispositions, but only as and when so received, over (b) the sum of (i) the principal amount of any Indebtedness that is secured by such asset or assets and that is required to be repaid in connection with such Disposition or Dispositions (other than the Loans) and (ii) the reasonable and documented out-of-pocket expenses (including Taxes) incurred by the Borrower in connection with such Disposition or Dispositions.

"Notice of PIK Election" means a certificate substantially in the form of Exhibit E delivered by a Responsible Officer of the Borrower to Lender.

"NYMEX" means the New York Mercantile Exchange.

"Obligations" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, whether or not allowed) or otherwise) of the Borrower from time to time owed to Lender under any Loan Document, including any make-whole amounts, any repayment or prepayment premiums and any accrued and unpaid interest, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation, organization or formation, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership or formation, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its certificate of formation or articles of organization, as amended, and its limited liability company agreement or operating agreement, as amended.

"Other Connection Taxes" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant" has the meaning assigned to such term in Section 10.04(c).

"Participant Register" has the meaning assigned to such term in Section 10.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes, assessments or other governmental charges or levies which are not yet delinquent or which (i) are being contested in good faith by appropriate proceedings diligently conducted, (ii) the Borrower, has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (iii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect;

(b)     pledges and deposits in connection with workers' compensation, unemployment insurance and other social security laws or regulations;

(c)     Liens on cash and securities and deposits to secure the performance of bids, trade contracts, leases, statutory obligations (excluding Liens arising under ERISA), surety and appeal bonds, performance bonds and other obligations of a like nature, in each case, which are in the ordinary course of business and which are in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(d)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies, or under general depositary agreements, and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower to provide collateral to the depository institution;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under clause (g) of Article VIII;

Page 14

(f)     easements, zoning restrictions, rights-of-way, servitudes, permits, surface leases, and similar encumbrances on real property in each case imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and that, in the aggregate, do not materially detract from the value of the affected property or materially impair the use of the affected property or interfere with the ordinary conduct of business of the Borrower;

(g)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower in the ordinary course of business covering the property under the lease;

(h)     unperfected Liens reserved in leases or arising by operation of law for rent or compliance with the lease in the case of leasehold estates; and

(i)     defects in or irregularities of title, if such defects or irregularities do not deprive the Borrower of any material right in respect of its assets or properties;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PIK Interest" has the meaning assigned to such term in Section 2.10(c).

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform" has the meaning assigned to such term in Section 10.01(d).

"Plan of Reorganization" means that certain Prepackaged Plan (as modified) of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated as of November 5, 2018 and filed by the Debtors with the Bankruptcy Court on November 5, 2018, as supplemented by the Plan Supplement.

"Plan Supplement" has the meaning assigned to such term in the Plan of Reorganization.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.  Unless otherwise qualified, all references to Property in this Agreement shall refer to a Property or Properties of Borrower.

"Register" has the meaning assigned to such term in Section 10.04(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, managers, members, partners, employees, agents and advisors of such Person and such Person's Affiliates.

Page 15

#4846-6774-8225

"Requirements of Law" means, as to any Person, any order, law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" means the chief executive officer or chief financial officer of Borrower.  Any document delivered hereunder that is signed by a Responsible Officer of Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of Borrower.

"Restricted Payment" means:

(a)      any dividend or other distribution or other payment (whether in cash, securities or other property) with respect to any Capital Stock in Borrower, to any Person (in each case, solely in such Person's capacity as holder of such Capital Stock or, in the case of any payment, to the direct or indirect holders of Borrower's Capital Stock), including any dividend or distribution payable or payment made in connection with any merger, amalgamation or consolidation;

(b)      any purchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of Borrower (including in connection with any merger, amalgamation or consolidation); and

(c)      any principal payment on, or redemption, purchase, repurchase, defeasance or other acquisition or retirement for value, in each case, prior to any scheduled repayment, sinking fund payment or scheduled maturity, of any Indebtedness secured by Liens or unsecured Indebtedness, of the Borrower, except a payment of interest or principal at the stated maturity date thereof.

(d)      [Notwithstanding anything to the contrary, an AHYDO Catch-Up Payment shall not constitute a Restricted Payment.][2]

"Restructuring Transactions" has the meaning assigned to such term in the Plan of Reorganization.

"S&P" means Standard & Poor's.

"Sale and Leaseback Transaction" means any sale or other transfer of any property by any Person with the intent to lease such property as lessee.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions (at the time of this Agreement, Cuba, Crimea, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the

---

[2]      NTD: Subject to discussion re term of the loans and structure upon exit.

#4846-6774-8225

U.S. Department of the Treasury or (b) (i) an agency of the government of a Sanctioned Country, (ii) an organization controlled by a Sanctioned Country, (iii) any Person domiciled, organized or resident in a Sanctioned Country or (iv) any Person controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including but not limited to those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the United Kingdom, the European Union and other relevant sanctions authority with jurisdiction over the Credit Parties, each as amended, supplemented or substituted from time to time.

"SEC" means the Securities and Exchange Commission of the United States of America.

"Statutory Reserves" means, for any day during any Interest Period for any Eurodollar Borrowing, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained, during such Interest Period under regulations issued from time to time (including "*Regulation D,*" issued by the Board of Governors of the Federal Reserve Bank of the United States (the "Reserve Regulations") by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion Dollars against Eurocurrency funding liabilities (currently referred to as "*Eurocurrency liabilities*" (as such term is used in Regulation D)).  Eurodollar Borrowings shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to Lender under the Reserve Regulations.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Capital Stock representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent. Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of Borrower.

"Swap Agreement" means any agreement or arrangement, or any combination thereof, (a) consisting of interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies or (b) relating to oil and gas or other hydrocarbon prices or basis costs or differentials or other similar financial factors.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out

and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Transactions" means (a) the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, (b) the Borrowing of Loans, and (c) the use of the proceeds thereof.

"Type" when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "*Rate*" means the Adjusted LIBO Rate and the Alternate Base Rate.

"U.S. Government Securities" means direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency or instrumentality thereof to the extent such obligations are entitled to the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(f)(ii)(B)(3).

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means Borrower and Lender.

**Section 1.02   Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not

Page 18

to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**Section 1.03   Classification of Loans and Borrowings**.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a *Eurodollar Loan*").

## ARTICLE II.

## THE CREDITS

**Section 2.01   Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if the Borrower notifies Lender in writing that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if Lender notifies the Borrower that Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower at "fair value", as defined therein.

**Section 2.02   Loans and Commitments**.

(a)      Subject to the terms and conditions set forth herein (including Sections 4.01 and 4.02), and relying upon the representations and warranties set forth herein, Lender shall be deemed, on the Effective Date, to have made a loan to the Borrower (each such loan, a "Loan") in an aggregate amount equal to Lender's Commitment.  Lender and Borrower each acknowledges and agrees that the Loans shall be deemed funded on the Effective Date without any actual funding and the Commitment of Lender shall terminate immediately and automatically after the deemed making of the Loan.  The Borrower acknowledges and agrees that the full proceeds of the Loans have been disbursed by Lender to the Borrower.  The Loans shall initially be made as Eurodollar Loans with an Interest Period of three months.  Once repaid, the Loans may not be reborrowed, and any Commitment, once terminated, may not be reinstated.

**Section 2.03   Funding of Borrowings**.

#4846-6774-8225

(a)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to elect to convert or continue any Borrowing if the Interest Period requested or elected with respect thereto would end after the maturity date of such Borrowing.

(b)     Notwithstanding any other provision of this Agreement, there shall be no more than fifteen (15) Interest Periods outstanding at any time.

**Section 2.04   [Reserved]**.

**Section 2.05   Repayment of Loans; Evidence of Debt**.

(a)     The Borrower hereby unconditionally promises to pay to Lender the then unpaid principal amount of the Loans of Lender, and all interest due thereon, and otherwise satisfy all other Obligations, in each case, on the Maturity Date.

(b)     Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to Lender resulting from the Loan made by Lender, including the amounts of principal and interest payable and paid to Lender from time to time hereunder.

(c)     The entries made in the accounts maintained pursuant to paragraph (b) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement; and provided further that to the extent there is any conflict between the accounts maintained pursuant to paragraph (b) of this Section and the Register maintained pursuant to Section 10.04(b), the Register shall control.

(d)     Lender may request that the Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to Lender a promissory note payable to Lender or its registered assigns in the form attached hereto as Exhibit B. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by a promissory note in such form.

**Section 2.06   Optional Prepayment of Loans**.

(a)     The Borrower shall have the right at any time and from time to time to prepay the Loans, in whole or in part, in an aggregate minimum amount equal to (i) if being paid in whole, the Obligations and (ii) if being paid in part, $1,000,000 and integral multiples of $500,000 in excess of that amount.  With respect to each prepayment of Loans required by this Section 2.06, such prepayments shall be applied on a *pro rata* basis to the then outstanding Loans irrespective of whether such outstanding Loans are ABR Loans or Eurodollar Loans.

(b)     The Borrower shall notify Lender in writing of any prepayment hereunder not later than 12:00 p.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans to be prepaid.  All prepayments under this Section 2.06 shall be

Page 20

subject to Section 2.16 but otherwise without premium or penalty.  Each partial prepayment shall be applied ratably to the Loans.

(c)     Each prepayment pursuant to this Section 2.06 shall be accompanied by a cash amount equal to the accrued but unpaid interest through the date of such prepayment.

**Section 2.07     Mandatory Prepayment of Loans**.

(a)     If Borrower shall consummate any Asset Sale, incur any Indebtedness (other than Indebtedness permitted under Section 6.02) or realize proceeds from any Casualty Event above $500,000 individually or in the aggregate, then, in each case, not later than two (2) Business Days after receipt of the Net Cash Proceeds therefrom, the Borrower shall apply 100% of such Net Cash Proceeds to the repayment of Loans and the payment of accrued and unpaid interest thereon.  The provisions of this Section 2.07(a) do not constitute a consent to any Disposition or the incurrence of any Indebtedness by Borrower.

(b)     Each payment of Net Cash Proceeds pursuant to this Section 2.07 shall be applied on a *pro rata* basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are ABR Loans or Eurodollar Loans and shall be accompanied by all accrued but unpaid interest thereon.

(c)     The Borrower shall notify Lender in writing of any prepayment hereunder not later than 12:00 p.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans to be prepaid.  All prepayments under this Section 2.07 shall be subject to Section 2.16 but otherwise without premium or penalty.

**Section 2.08     [Reserved]**.

**Section 2.09     [Reserved]**.

**Section 2.10     Interest on Loans**.

(a)     The Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days (or, in the case of ABR Loans that bear interest by reference to the Base Rate, 365 or 366 days, as applicable) and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)     Interest on each Loan shall be payable in cash in arrears on each Interest Payment Date applicable to such Loan and on the Maturity Date, and, in the event of any repayment or prepayment of any Loan, interest on the amount so repaid or prepaid shall be payable in cash on

the date of such repayment or prepayment; provided, that the Borrower may elect, by providing a Notice of PIK Interest to Lender in accordance with the immediately following sentence, to have all (but not less than all) of the interest payable on any Interest Payment Date paid in kind by having such interest capitalized and added to the outstanding principal balance of the Loans on such Interest Payment Date in lieu of cash payment (such interest that is capitalized and added to the principal amount of a Loan being referred to herein as "PIK Interest").  In order to elect to have the interest payable on any Interest Payment Date paid as PIK Interest in lieu of cash, the Borrower shall provide a Notice of PIK Election to Lender (i) in the case of a Eurodollar Loan, not later than 12:00 p.m., New York City time, one (1) Business Day prior to the first day of the Interest Period ending on such Interest Payment Date and (ii) in the case of an ABR Loan, not later than 12:00 p.m., New York City time, one (1) Business Day prior to the Interest Payment Date in respect of such Loan immediately preceding the Interest Payment Date to which such PIK Election relates (or, if such PIK Election in respect of such Loan is for the first Interest Payment Date occurring after the Effective Date, not later than 12:00 p.m., New York City time, one (1) Business Day prior to the Effective Date).  Upon being capitalized and added to the then aggregate outstanding principal balance of the Loans, PIK Interest shall be treated as principal of the Loans for all purposes of this Agreement and the other Loan Documents.  Notwithstanding anything to the contrary contained herein, interest accruing pursuant to Section 2.10(d) shall be payable in cash from time to time on demand.

(d)     Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans and, to the extent permitted by applicable law, other Obligations outstanding shall thereafter bear interest, after as well as before judgment, at the Default Rate.

(e)     [Notwithstanding anything to the contrary set forth in this Agreement, if at the end of any "accrual period" (as defined in Section 1272(a)(5) of the Code) ending after the fifth (5th) anniversary of the Effective Date, the aggregate amount of accrued but unpaid original issue discount (as defined in Section 1273(a)(1) of the Code) and interest (including any accrued interest added to principal) on any Loan would, but for this paragraph, exceed an amount equal to the product of (x) the "issue price" (as defined in Sections 1273(b) and 1274(a) of the Code and the regulations promulgated thereunder) multiplied by (y) the "yield to maturity" (as defined in Treasury Regulation Section 1.1272-1(b)(1)(i)) (such amount, the "Maximum Accrual"), then interest for such accrual period shall not be deferred and all accrued but unpaid interest and original issue discount on such Loan as of the end of such accrual period in excess of an amount equal to the Maximum Accrual shall be paid in cash (the "AHYDO Catch-Up Payment"), and such AHYDO Catch-Up Payment shall be treated for purposes of Section 163(i) of the Code as interest paid on such Loan. No partial repayment of the Loans pursuant to any other provision of this Agreement or the other Loan Documents prior to such payment date shall alter the obligation to make AHYDO Catch-Up Payments provided for in this paragraph. For the avoidance of doubt and notwithstanding anything to the contrary herein, this paragraph shall be construed so as to require payments at such times and in such amounts to cause the Loans to not be treated as having "significant original issue discount" within the meaning of Section 163(i)(2) of the Code.][3]

---

[3]     NTD: Subject to discussion re term of the loans and structure upon exit.

#4846-6774-8225

(f)     If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the rate applicable during such extension period.

**Section 2.11    Alternate Rate of Interest**.

(a)     If prior to the commencement of any Interest Period for a Eurodollar Borrowing: (x) Lender determines (which determination shall be final and conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or (y) Lender determines (which determination shall be final and conclusive absent manifest error) that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to Lender of making or maintaining their Loans included in such Borrowing for such Interest Period; then Lender shall give written notice thereof to Borrower as promptly as practicable thereafter and, until Lender notifies Borrower that the circumstances giving rise to such notice no longer exist, (i) any Borrowings that were to have been converted on the first day of such Interest Period to a Eurodollar Borrowing shall be continued as a Market Disruption Loan and (ii) any outstanding Eurodollar Borrowing shall be converted, on the last day of the then-current Interest Period, to a Market Disruption Loan.

(b)     If at any time Lender determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(x) above have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(x) have not arisen but the administrator of the ICE Benchmark Administration London Interbank Offered Rate or a Governmental Authority having jurisdiction over Lender has made a public statement identifying a specific date after which the ICE Benchmark Administration London Interbank Offered Rate shall no longer be used for determining interest rates for loans, then the Borrower and Lender shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then-prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time and the Borrower and Lender may enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin).  Notwithstanding anything to the contrary in Section 10.02, such amendment shall become effective without any further action or consent of any other party to this Agreement.  Until an alternate rate of interest is determined in accordance with this clause (b) (but, in the case of the circumstances described in clause (ii) of the first sentence of this Section 2.11(b), only to the extent the ICE Benchmark Administration London Interbank Offered Rate for such Interest Period is not available or published at such time on a current basis), (x) any requested Eurodollar Loans shall be made as ABR Loans, (y) any ABR Loans that were to have been converted to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then current Interest Period applicable thereto, into ABR Loans, in each case determined without giving effect to clause (c) of the Alternative Base Rate.

**Section 2.12    [Reserved]**.

**Section 2.13**   **Conversion and Continuation of Borrowings**.  The Borrower shall have the right at any time upon delivery of an Interest Election Request to Lender (a) not later than 12:00 p.m., New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 12:00 p.m., New York City time, three (3) Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 12:00 p.m., New York City time, three (3) Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

(i)      each conversion or continuation shall be made *pro rata* among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)      no less than all the outstanding principal amount of any Borrowing shall be converted or continued;

(iii)      accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv)      if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v)      any portion of the Borrowing maturing or required to be repaid in less than one week may not be converted into or continued as a Eurodollar Borrowing;

(vi)      any portion of a Eurodollar Borrowing that cannot be continued as a Eurodollar Borrowing by reason of the immediately preceding clause (v) shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing; and

(vii)      after the occurrence and during the continuance of a Default or Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each such Interest Election Request shall be irrevocable and shall specify (a) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (b) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (c) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (d) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto.  If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of three months' duration.  If the Borrower shall not have given notice in accordance with this Section 2.13 to continue any Borrowing into a subsequent Interest Period, such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted into an ABR Borrowing.

#4846-6774-8225

**Section 2.14    Increased Costs**.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of or credit extended by Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate);

(ii)    subject Lender to any Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (iii) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by Lender

and the result of any of the foregoing shall be to increase the cost to Lender of making, converting to, continuing or maintaining any Loan or maintaining its obligations to make any such Loan or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount), then the Borrower will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b)    If Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on Lender's capital or on the capital of Lender's holding company, if any, as a consequence of this Agreement or the Loans made by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to Lender, as the case may be, such additional amount or amounts as will compensate Lender or Lender's holding company for any such reduction suffered.

(c)    A certificate of Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay Lender the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof.

(d)    Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation therefor; provided further that, if the Change in Law

Page 25

giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

**Section 2.15   Change in Legality**.

(a)   Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower:

(i)   Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)   Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event Lender shall exercise its rights under paragraph (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)   For purposes of this Section 2.15, a notice to the Borrower by Lender shall be effective as to each Eurodollar Loan made by Lender, (i) if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan and (ii) in all other cases, on the date of receipt by the Borrower.

**Section 2.16   Breakage**.  The Borrower shall indemnify Lender against any loss or expense that Lender may sustain or incur as a consequence of (a) any event, other than a default by Lender in the performance of its obligations hereunder, which results in (i) Lender receiving, or being deemed to receive, any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.13) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "Breakage Event") or (b) any default in the making of any payment or prepayment required to be

Page 26

made hereunder.  In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period.  A certificate of Lender setting forth any amount or amounts which Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

Section 2.17   **Taxes**.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings of Indemnified Taxes applicable to additional sums payable under this Section 2.17) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     Payment of Other Taxes by the Borrower.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Lender timely reimburse it for the payment of, any Other Taxes.

(c)     Evidence of Payments.  As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this Section 2.17, the Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(d)     Indemnification by the Borrower.  Borrower shall indemnify Lender, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by Lender shall be conclusive absent manifest error.

(e)     [Reserved].

(f)     Status of Lender.

Page 27

(i)        If Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document, it shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, Lender, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of Lender.

(ii)        Without limiting the generality of the foregoing,

(A)        if Lender is a U.S. Person, it shall deliver to the Borrower on or prior to the date on which Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that Lender is exempt from U.S. federal backup withholding Tax;

(B)        if Lender is a Foreign Lender, it shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), whichever of the following is applicable:

(1)        in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)        executed copies of IRS Form W-8ECI;

(3)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit C-1 to the effect that such

Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form); or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form), a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit C-2</u> or <u>Exhibit C-3</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit C-4</u> on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made; and

(D)     Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with their obligations under FATCA and to determine that Lender has complied with Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(g)     [Reserved].

(h)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require an indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival.  Each party's obligations under this Section 2.17 shall survive any assignment of rights by, or the replacement of, Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

## Section 2.18   Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under Section 2.14, Section 2.16 or Section 2.17, or otherwise) prior to 2:00 p.m. New York City Time on the date when due, in Dollars and (other than in the case of PIK Interest) in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to Lender at such account as may be specified by Lender.  Lender shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to Lender to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied (i) first, towards payment of fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of fees then due to such parties, (ii) second, towards payment of interest and premiums then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and premiums then due to such parties and

(iii) third, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that on the Effective Date and each Credit Date:

**Section 3.01   Organization; Powers**.  Borrower (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and, (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

**Section 3.02   Authorization; Enforceability**.  The Transactions are within Borrower's corporate, limited liability company or partnership powers and have been duly authorized by all necessary corporate, limited liability company or partnership and, if required, actions by equity holders.  This Agreement has been duly executed and delivered by Borrower and constitutes a legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

#4846-6774-8225

Section 3.03    **Governmental Approvals; No Conflicts**.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect or have been made, (b) will not violate any Requirement of Law applicable to Borrower, (c) will not violate or result in a default under any indenture, agreement or other instrument evidencing Material Indebtedness, or give rise to a right thereunder to require any payment to be made by Borrower, and (d) will not result in the creation or imposition of any Lien on any asset of Borrower not otherwise permitted under Section 6.03.

Section 3.04    **No Material Adverse Change**.

(a)        [Reserved].

(b)        Since [_], no event or circumstance, either individually or in the aggregate, which has had or could reasonably be expected to have a Material Adverse Effect has occurred.

Section 3.05    **Properties**.

(a)        Borrower has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for (i) minor defects in title that do not, in the aggregate, interfere with its ability to conduct its business as currently conducted and (ii) Liens permitted under Section 6.03.

(b)        Borrower owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by Borrower does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.06    **Litigation and Environmental Matters**.

(a)        There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Borrower, threatened against or affecting Borrower (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect after taking into account insurance proceeds or other recoveries from third parties actually received (other than the Disclosed Matters) or (ii) that involve this Agreement or the Transactions.

(b)        Except for the Disclosed Matters and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect after taking into account insurance proceeds or other recoveries from third parties actually received, Borrower (i)  has not failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii)  has not become subject to any Environmental Liability, (iii)  has not received written notice of any claim with respect to any Environmental Liability or (iv) does not know of any reasonable basis for any claim against Borrower with respect to any Environmental Liability.

#4846-6774-8225

**Section 3.07   Compliance with Laws and Agreements**.  (a) Borrower is in compliance with all Requirements of Law applicable to it or its property, (b) Borrower is in compliance with its Organizational Documents and (c) Borrower is in compliance with all indentures, agreements and other instruments binding upon it or its property, except, in the case of clauses (a) or (c), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

**Section 3.08   Investment Company Status**.  Borrower is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

**Section 3.09   Taxes**.  Borrower has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which Borrower has set aside on its books adequate reserves maintained in accordance with GAAP, (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect, or (c) to the extent otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

**Section 3.10   ERISA**.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of U.S. GAAP Codification Topic 715-30) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount that could reasonably be expected to result in Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of U.S. GAAP Codification Topic 715-30) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that could reasonably be expected to result in Material Adverse Effect.

**Section 3.11   Disclosure**.  The Borrower has disclosed to Lender all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of Borrower to Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date made or deemed made; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based on assumptions believed to be reasonable at the time and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

#4846-6774-8225

**Section 3.12   Labor Matters**.  There are no strikes, lockouts or slowdowns against Borrower pending or, to the knowledge of the Borrower, threatened that could reasonably be expected to have a Material Adverse Effect.  The hours worked by and payments made to employees of Borrower have not been in violation of the Fair Labor Standards Act or any other Law dealing with such matters to the extent that such violation could reasonably be expected to have a Material Adverse Effect.

**Section 3.13   Capitalization**.  Schedule 3.13 lists as of the Effective Date, the Borrower's full legal name and its jurisdiction of organization and a list of all Subsidiaries of Borrower.

**Section 3.14   Margin Stock**.  Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), and no part of the proceeds of the Loans will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

**Section 3.15   [Reserved]**.

**Section 3.16   [Reserved]**.

**Section 3.17   [Reserved]**.

**Section 3.18   [Reserved]**.

**Section 3.19   [Reserved]**.

**Section 3.20   [Reserved]**.

**Section 3.21   Anti-Corruption Laws and Sanctions**.  The Borrower, its Subsidiaries and their respective officers, to the knowledge of the Borrower its directors, employees and agents, insofar as the same are acting on behalf of the Borrower or its Subsidiaries, (i) are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and (ii) have not, in the past five years, engaged in any dealings with a Sanctioned Person in violation of applicable Sanctions.  None of the Borrower or any Subsidiary, or to the knowledge of the Borrower, any director, officer, employee or agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

**Section 3.22   No Foreign Operations**.  Borrower does not operate its business outside the geographical boundaries of the United States.

**Section 3.23   [Reserved]**.

**Section 3.24   Borrower as Holding Company**.  Borrower is a holding company and does not engage in any business activities or own any assets or incur any material liabilities other than (a) its ownership of the Capital Stock of its Subsidiaries and liabilities incidental thereto and (b) in connection with this Agreement.

## ARTICLE IV.

## CONDITIONS TO EFFECTIVENESS AND BORROWINGS

**Section 4.01   Conditions to Effectiveness**.  The effectiveness of this Agreement shall be subject to the satisfaction (or waiver by Lender) of the following conditions:

(a)     *Loan Documents*. Lender shall have received executed counterparts of this Agreement and the other Loan Documents executed by each party hereto and thereto, each of which shall be in form and substance satisfactory to Lender in its sole discretion.

(b)     *Organizational Documents*.  Lender shall have received (i) customary certificates of resolutions or other action, incumbency certificates of Responsible Officers of Borrower evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents and (ii) certificates (including Organization Documents and good standing certificates) relating to the organization, existence and good standing of Borrower in its jurisdiction of organization, in each case, as certified by the Secretary or an Assistant Secretary of Borrower.

(c)     *Fees and Expenses*.  Lender shall have received all fees and expenses due and payable to it on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all reasonable and documented expenses (including reasonable and documented fees, charges and disbursements of counsel and other advisors) required to be reimbursed or paid by Borrower hereunder or under any other Loan Document.

(d)     *Required Documentation*.   At least five (5) Business Days prior to the Effective Date, Lender shall have received all documentation and other information with respect to Borrower, requested in writing by Lender and required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act including, for the avoidance of doubt, a certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230.

(e)     *Indebtedness*.  Lender shall be satisfied in its sole discretion that, on the Effective Date, immediately after giving effect to the consummation of the Plan of Reorganization, the issuance of the Loans to occur on the Effective Date and any other transactions to occur on the Effective Date, Borrower shall have outstanding no Indebtedness for borrowed money other than Indebtedness outstanding under the Loan Documents.

(f)     *Approvals*.  Borrower shall have obtained all approvals required from any Governmental Authority and all consents of other Persons, in each case that are necessary or, in the discretion of Lender, advisable in connection with the Transactions and each of the foregoing shall be in full force and effect and in form and substance satisfactory to Lender.

(g)     *Litigation*.  There shall not exist any material action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority , except as otherwise disclosed to Lender in writing prior to the Effective Date.

#4846-6774-8225

(h)     *DIP Credit Agreement*.  No default or event of default shall have occurred and be continuing under the DIP Credit Agreement.

(i)     *No Material Adverse Effect*.   Since [_], there shall have been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(j)     *Bankruptcy Related Conditions*.

(i)     The Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance satisfactory to Lender in its sole discretion.  The Confirmation Order must be in full force and effect, and shall not have been vacated, reversed, modified, amended or stayed in any manner without the written consent of Lender and shall be final and non-appealable;

(ii)     The Plan of Reorganization shall not have been modified, altered, amended or otherwise changed or supplemented in any manner without the written consent of Lender;

(iii)     All conditions precedent to the effectiveness of the Plan of Reorganization (other than the occurrence of the Effective Date hereunder) shall have been satisfied or waived (with the prior written consent of Lender); and

(iv)     The Consummation of the Plan of Reorganization shall occur substantially simultaneously with the occurrence of the Effective Date.

**Section 4.02   Conditions to All Loans**. The obligation of each Lender to make any Loans shall be subject to the satisfaction (or waiver by Lender) of the following conditions:

(a)     *Representations and Warranties*.  The representations and warranties of Borrower contained in this Agreement and in each other Loan Document shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such date of Borrowing, as applicable, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date).

(b)     *No Default*. At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

## ARTICLE V.

## AFFIRMATIVE COVENANTS

Until the Discharge of Obligations, Borrower covenants and agrees with Lender that:

**Section 5.01   Financial Statements; Other Information**.  The Borrower will furnish to Lender:

(a)      within 90 days after the end of each fiscal year of Borrower, the audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows of Borrower and its Consolidated Subsidiaries as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by BDO USA, LLP or other independent public accountants reasonably acceptable to Lender (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit other than a "going concern" qualification solely as to the Maturity Date occurring within the 12-month period following the date of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)      within 60 days after the end of each fiscal quarter of Borrower, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows of Borrower and its Consolidated Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)      within three Business Days following the delivery of any financial statements under clause (a) or (b) above, a certificate in a form reasonably acceptable to Lender signed by a Financial Officer of the Borrower certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

(d)      within 60 days after the conclusion of each fiscal year, the Borrower's annual operating and capital expenditure budgets, and financial forecasts, including cash flow projections covering proposed fundings, repayments, additional advances, investments and other cash receipts and disbursements, each for the following fiscal year in a format reasonably consistent with projections, budgets and forecasts theretofore provided to Lender, and promptly following the preparation thereof, material updates to any of the foregoing from time to time prepared by management of the Borrower;

(e)      promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Borrower with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by the Borrower to its shareholders generally, as the case may be; and

(f)      from time to time such information or projections with respect to the business or Properties, or the condition or operations, financial or otherwise, of, or compliance with the

#4846-6774-8225

terms of this Agreement by, Borrower as Lender may reasonably request, such information to be provided in each case, as promptly as practicable, and in any event, within fifteen (15) Business Days following each such request;

Documents required to be delivered pursuant to Section 5.01 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (1) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's website on the Internet, or (2) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which Lender has access (whether a commercial, third-party website or whether sponsored by Lender); provided that:  (i) upon request, the Borrower shall deliver paper copies of such documents to Lender until a written request to cease delivering paper copies is given by Lender and (ii) the Borrower shall notify Lender (by electronic mail) of the posting of any such documents and, upon request, provide to Lender by electronic mail electronic versions (i.e., soft copies) of such documents.  Lender shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery.

**Section 5.02   Notices of Material Events**.  The Borrower will furnish to Lender prompt written notice of the following:

(a)    as soon as possible, but in any event within five (5) days of obtaining knowledge thereof, (i) the occurrence of any Default or (ii) the occurrence of any "default" or "event of default" under any Material Indebtedness;

(b)    as soon as possible, but in any event within twenty (20) days after obtaining knowledge of the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower or any Affiliate thereof that, if adversely determined, could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect;

(c)    as soon as possible, but in any event within  twenty (20) days after the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(d)    as soon as possible, but in any event within twenty (20) days after obtaining knowledge of any release by Borrower or any other Person of any Hazardous Material into the environment, which could reasonably be expected to have a Material Adverse Effect;

(e)    as soon as possible, but in any event within twenty (20) days after any notice alleging any violation of any Environmental Law by Borrower or any other Environmental Liability, which could reasonably be expected to have a Material Adverse Effect; and

(f)    as soon as possible, but in any event within five (5) days after becoming aware of any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Page 38

To the extent applicable, each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**Section 5.03    Existence; Conduct of Business**.  Borrower will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.04 or any Disposition permitted under Section 6.05.

**Section 5.04    Payment of Obligations**.  Borrower will pay its obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP, or (b) the failure to make such payment could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.05    Maintenance of Properties; Insurance**.  Borrower will:

(a)    keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and

(b)    maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  Upon request of Lender, the Borrower will furnish or cause to be furnished to Lender from time to time a summary of the respective insurance coverage of Borrower in form and substance reasonably satisfactory to Borrower, and, if requested, will furnish Lender copies of the applicable policies.

**Section 5.06    Books and Records; Inspection Rights**.  Borrower will keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Borrower will permit any representatives designated by Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its senior management, independent accountants and other advisors, all at such reasonable times and as often as reasonably requested.

**Section 5.07    Compliance with Laws** .  Borrower will comply with all Requirements of Law (including Environmental Laws) applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.08    Environmental Matters**.  If an Event of Default is continuing or if Lender at any time has a reasonable basis to believe that there exists a violation of any Environmental Law by Borrower or that there exists any other Environmental Liabilities that would in either case reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect, then Borrower shall, promptly upon the receipt of a request from

Lender, cause the performance of, or allow Lender (or its designee) access to the real property for the purpose of conducting, an environmental assessment, including subsurface sampling of soil and groundwater, and cause the preparation of a report.  Such assessments and reports, to the extent not conducted by Lender (or its designee), shall be conducted and prepared by a reputable environmental consulting firm acceptable to Lender and shall be in form and substance acceptable to Lender.  The Borrower shall be responsible for (and reimburse Lender for) all costs associated with any such assessments and reports.

**Section 5.09    Use of Proceeds**.  The proceeds of the Loans will be used only to refinance DIP Obligations.  The Borrower will not fund all or part of any repayment of the Obligations out of proceeds derived from transactions which would be prohibited by Sanctions or would otherwise cause any party hereto to be in breach of Sanctions.

**Section 5.10    [Reserved]**.

**Section 5.11    [Reserved]**.

**Section 5.12    Swap Agreements**.  Upon the request of Lender, the Borrower shall, within 30 days of such request, provide to Lender copies of all agreements, documents and instruments evidencing the Swap Agreements not previously delivered to Lender, certified as true and correct by a Responsible Officer of the Borrower, and such other information regarding such Swap Agreements as Lender may reasonably request.

**Section 5.13    [Reserved]**.

**Section 5.14    [Reserved]**.

**Section 5.15    [Reserved]**.

**Section 5.16    [Reserved]**.

**Section 5.17    Further Assurances**.

(a)      From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as Lender may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents.

(b)      Upon the exercise by Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that Lender may be required to obtain from Borrower for such governmental consent, approval, recording, qualification or authorization.

## ARTICLE VI.

## NEGATIVE COVENANTS

Page 40

Until the Discharge of Obligations, Borrower covenants and agrees with Lender that:

**Section 6.01   [Reserved]**.

**Section 6.02   Indebtedness**.  Borrower will not create, incur, assume or permit to exist any Indebtedness, except:

(a)      Indebtedness of Borrower under the Loan Documents;

(b)      Indebtedness in respect of Swap Agreements permitted pursuant to Section 6.08;

(c)      Indebtedness existing on the Effective Date and set forth in Schedule 6.02 and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (except by an amount equal to the reasonable premium paid and fees and expenses reasonably incurred therewith);

(d)      Unsecured intercompany Indebtedness between the Borrower and any Subsidiary with the prior written consent of Lender;

(e)      Indebtedness (other than Indebtedness for borrowed money) incurred or deposits made by the Borrower (i) under worker's compensation laws, unemployment insurance laws or similar legislation, (ii) in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which the Borrower is a party and (iii) to secure public or statutory obligations of the Borrower, in each case in the ordinary course of business and consistent with past practice;

(f)      Guarantees in respect of Indebtedness otherwise permitted pursuant to this Section 6.02;

(g)      Indebtedness in connection with the endorsement of negotiable instruments and other obligations in respect of cash management services, netting services, overdraft protection and similar arrangements, in each case in the ordinary course of business and consistent with past practice;

(h)      Indebtedness in respect of insurance premium financing for insurance being acquired or maintained by the Borrower under customary terms and conditions; and

(i)      other unsecured Indebtedness not in respect of borrowed money in an aggregate amount outstanding at any time not to exceed $1,000,000.

**Section 6.03   Liens**.  Borrower will not create, incur, assume or permit to exist any Lien on any Property now owned or hereafter acquired by it, except:

(a)      Permitted Encumbrances;

(b)      any Lien on any Property of the Borrower existing on the Effective Date and set forth in Schedule 6.03; provided that (i) such Lien shall not apply to any other Property of the Borrower (other than proceeds and accessions and additions to such property) and (ii) such Lien

Page 41

shall secure only those obligations which it secures on the Effective Date and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof

(c)     any Lien securing obligations under Swap Agreements permitted pursuant to Section 6.08; and

(d)     Liens securing insurance premium financing under customary terms and conditions, provided that no such Lien may extend to or cover any property other than the insurance being acquired with such financing, the proceeds thereof and any unearned or refunded insurance premiums related thereto.

**Section 6.04   Fundamental Changes**.  Borrower will not merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing:

(a)     any Subsidiary may merge into Borrower in a transaction in which Borrower is the surviving entity; and

(b)     Dispositions permitted by Section 6.05 may be made.

**Section 6.05   Disposition of Assets**.  The Borrower will not Dispose of any property except:

(a)     the Disposition of equipment and other property in the ordinary course of business, that is obsolete or no longer necessary in the business of the Borrower or that is being replaced by equipment of comparable value and utility;

(b)     Liens permitted by Section 6.03, Investments permitted by Section 6.07 and Restricted Payments permitted by Section 6.09;

(c)     Dispositions of cash and Cash Equivalents in the ordinary course of business;

(d)     sales or discounts of overdue accounts receivable in the ordinary course of business, in connection with the compromise or collection thereof, and not in connection with any financing transaction;

(e)     Dispositions of seismic, geologic or other data and license rights in the ordinary course of business;

(f)     Hedge Modifications; provided that the consideration received for such Hedge Modification is at least equal to Fair Market Value; and

(g)     Other dispositions and sales of Properties not otherwise permitted pursuant to this Section 6.05 having a fair market value not to exceed $1,000,000 in the aggregate for all dispositions and sales of Properties pursuant to this Section 6.05(g) for the term of this Agreement.

#4846-6774-8225

**Section 6.06**   <u>Nature of Business</u>.  Borrower will not engage in any business activities or own any assets or incur any liabilities other than (a) its ownership of the Capital Stock of its Subsidiaries and liabilities incidental thereto, (b) transactions expressly permitted under this Agreement and the other Loan Documents and (c) in connection with the consummation of the Transactions.

**Section 6.07**   <u>Investments</u>.  Borrower will not make any Investment, except:

(a)      Investments in Cash Equivalents;

(b)      Investments in or to a Subsidiary with the prior written consent of Lender;

(c)      Guarantees constituting Indebtedness permitted by <u>Section 6.02</u> (other than guarantees in respect of Capital Lease Obligations) and performance guarantees, in each case, incurred in the ordinary course of business;

(d)      Investments consisting of Swap Agreements to the extent permitted under <u>Section 6.08</u>;

(e)      Investments existing as of the Effective Date and set forth on <u>Schedule 6.07</u>;

(f)      Investments consisting of loans and advances to employees for moving, entertainment, travel and other similar expenses in the ordinary course of business and in any event not to exceed $250,000 in the aggregate at any time outstanding;

(g)      demand deposits with financial institutions, prepaid expenses and extensions of trade credit in the ordinary course of business (and any Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss);

(h)      trade and customer accounts receivable which are for goods furnished or services rendered in the ordinary course of business and are payable in accordance with customary trade terms;

(i)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; <u>provided</u> that, the aggregate amount of such investment shall not exceed $1,000,000 (other than by appreciation);

(j)      Investments consisting of any deferred portion of the sales price received by the Borrower in connection with any sale of assets permitted hereunder;

(k)      any Investment by the Borrower in a Person, if as a result of such Investment (i) such Person becomes a Subsidiary of the Borrower or (ii) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its Properties or assets to, or is liquidated into, the Borrower or a Subsidiary of the Borrower; and

(l)      other investments not to exceed $1,000,000 in the aggregate.

Page 43

**Section 6.08**   **Swap Agreements**.  Borrower will not enter into any Swap Agreement, except Swap Agreements with counterparties reasonably acceptable to Lender and entered into in the ordinary course of business and not for speculative purposes to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower.

**Section 6.09**   **Restricted Payments**.  Borrower will not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment; <u>provided</u> that, so long as at the time of and immediately after giving effect to such Restricted Payment no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof, Borrower may make the following Restricted Payments:

(a)   the declaration and payment of dividends or distributions by Borrower solely in Capital Stock (other than Disqualified Stock) of Borrower; and

(b)   the declaration and payment of dividends or distributions with the prior written consent of Lender.

[For the avoidance of doubt, nothing in this Agreement shall prevent any AHYDO Catch-Up Payment (including any AHYDO Catch-Up Payment with respect to any subordinated debt obligation permitted under this Agreement).][4]

**Section 6.10**   **Transactions with Affiliates**.

(a)   Borrower will not make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any Property from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with (or for the benefit of), any Affiliate of Borrower (each, an "<u>Affiliate Transaction</u>"), unless:

(i)   the Affiliate Transaction is on terms that are no less favorable to Borrower than those that would have been obtained in a comparable transaction by Borrower with an unrelated Person or, if in the good faith judgment of Borrower's Board of Directors, no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to Borrower from a financial point of view; and

(ii)   the Borrower delivers to Lender (A) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10,000,000, a resolution of the Board of Directors of Borrower set forth in an officers' certificate certifying that such Affiliate Transaction or series of related Affiliate Transactions complies with this covenant and that such Affiliate Transaction or series of related Affiliate Transactions has been approved by a majority of the disinterested members of the Board of Directors of Borrower; and (B) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $20,000,000, an opinion as to the fairness to Borrower of such

---

[4]   NTD: Subject to discussion re term of the loans and structure upon exit.

#4846-6774-8225

Affiliate Transaction or series of related Affiliate Transactions from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing.

(b)      Section 6.10(a) will not apply to:

(i)      payment of reasonable and customary fees and reimbursements of expenses (pursuant to indemnity arrangements or otherwise) of officers, directors, employees or consultants of Borrower;

(ii)      Restricted Payments permitted by Section 6.09; and

(iii)      any issuance of Capital Stock (other than Disqualified Stock) of Borrower to Affiliates of Borrower and the granting of registration and other customary rights in connection therewith.

**Section 6.11   Restrictive Agreements**.  Borrower will not directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of Borrower to pay dividends or other distributions with respect to any of its Capital Stock or to make or repay loans or advances to Holdings or any Subsidiary or to Guarantee Indebtedness of Holdings or any Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement and (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the Property securing such Indebtedness and (B) customary provisions in leases and other contracts restricting the assignment thereof.

**Section 6.12   Disqualified Stock**.  Borrower will not issue any Disqualified Stock.

**Section 6.13   Certain Amendments to Organizational Documents**.  Borrower will not enter into or permit any modification or amendment of, or waive any material right or obligation of any Person under its Organizational Documents if the effect thereof would be materially adverse to Lender or violate Section 6.11.

**Section 6.14   Sale and Leaseback Transactions**.  Borrower will not enter into or suffer to exist any Sale and Leaseback Transaction.

**ARTICLE VII.**

**[RESERVED]**

**ARTICLE VIII.**

**EVENTS OF DEFAULT**

If any of the following events ("Events of Default") shall occur:

(a)      *Non-Payment*. (i) Borrower shall fail to pay any principal of, or premium on, any Loan when and as the same shall become due and payable, whether at the due date thereof or at a

Page 45

date fixed for prepayment thereof or otherwise or (ii) Borrower shall fail to pay any interest on any Loan, any fee or any other amount, other than an amount referred to in clause (i), payable under this Agreement, when and as the same shall become due and payable, and such failure under this clause (ii) shall continue unremedied for a period of three (3) Business Days;

(b)      *Representations and Warranties*.  Any representation or warranty made or deemed made by or on behalf of Borrower in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder or in any Loan Document furnished pursuant to or in connection with this Agreement or any amendment or modification thereof or waiver hereunder, shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing;

(c)      *Covenants*.  Borrower shall fail to observe or perform (i) any term, covenant, condition or agreement contained in <u>Section 5.01(a)</u>, <u>Section 5.01(b)</u>, <u>Section 5.01(c)</u>, <u>Section 5.01(d)</u>, <u>Section 5.02</u>, <u>Section 5.03</u> (with respect to Borrower's existence), <u>Section 5.09</u> or in Article VI or (ii) any other term, covenant, condition or agreement contained in this Agreement (other than those specified in the foregoing clause (i) of this section or clause (a) or (b) of this Article) or any Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier of (x) knowledge thereof by the Borrower or (y) receipt of written notice thereof from Lender to the Borrower;

(d)      *Cross-Default*.  Borrower shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable and such failure shall continue beyond the applicable grace period, if any, or any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; <u>provided</u> that this clause (e) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the Property securing such Indebtedness and (ii) Indebtedness that becomes due as a result of a change in law, tax regulation or accounting treatment so long as such Indebtedness is paid when due;

(e)      *Involuntary Proceedings*.  An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Borrower or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Borrower or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(f)      *Voluntary Proceedings*.  Borrower shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or

Page 46

foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (f) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Borrower or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) take any action for the purpose of effecting any of the foregoing or (vii) become unable, admit in writing its inability or fail generally to pay its debts as they become due.

(g)     *Judgments*.  One or more judgments for the payment of money in an aggregate amount in excess of $2,500,000 shall be rendered against Borrower or any combination thereof and either the same shall remain undischarged or unsatisfied for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of Borrower to enforce any such judgment;

(h)     *ERISA*.  An ERISA Event shall have occurred that, in the opinion of Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(i)     *Invalidity of Loan Documents*.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be valid and enforceable as against Borrower; or Borrower or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or Borrower denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(j)     *Change of Control*.  There occurs any Change of Control.

then, and in every such event (other than an event with respect to Borrower described in clause (e) or (f) of this Article), and at any time thereafter during the continuance of such event, Lender may, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrower accrued or payable hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (e) or (f) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all fees, premiums and other obligations of the Borrower accrued or payable hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.  Without limiting the foregoing, upon the occurrence and during the continuance of an Event of Default, Lender may protect and enforce its rights under this Agreement and the other Loan Documents by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained in this Agreement or any other Loan Document, and Lender may enforce

payment of any Obligations due and payable hereunder or enforce any other legal or equitable right and remedies which it may have under this Agreement, any other Loan Document, or under applicable law or in equity.

Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, the Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Lender from or on behalf of Borrower of all or any part of the Obligations, and, as between Borrower on the one hand and Lender on the other, Lender shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as Lender may deem advisable notwithstanding any previous application by Lender.

Following the occurrence and during the continuance of an Event of Default, Lender shall apply any and all payments received by Lender in respect of the Obligations in the following order: first, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to Lender with respect to this Agreement or the other Loan Documents, second, to accrued and unpaid interest on the Obligations, third, to the principal amount of the Obligations outstanding, and fourth, to any other indebtedness or obligations of Borrower owing to Lender under the Loan Documents. Any balance remaining after giving effect to the applications set forth above shall be delivered to the Borrower or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out any of the applications set forth herein, amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category.

## ARTICLE IX.

## [RESERVED]

## ARTICLE X.

## MISCELLANEOUS

**Section 10.01  Notices**.

(a)     Subject to paragraph (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or email, as follows:

     (i)     if to the Borrower, to [_], [_], Attention: [_], Facsimile No. [_], email: [_]; and

     (ii)     if to Lender, to [_], [_], Attention: [_], Facsimile No. [_], email: [_].

(b)     Notices and other communications to Lender hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by Lender; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by Lender. Lender or Borrower may, in their discretion, agree to accept notices and other

Page 48

communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)     Any party hereto may change its address or telecopy number or email address for notices and other communications hereunder by written notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if received during the recipient's normal business hours.

**Section 10.02  Waivers; Amendments**.

(a)     No failure or delay by Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of Lender hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of the Loans shall not be construed as a waiver of any Default, regardless of whether Lender may have had notice or knowledge of such Default at the time.

(b)     None of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified, and no consent to any departure by the Borrower therefrom shall be effective, except pursuant to an agreement or agreements in writing entered into by Borrower and Lender.

**Section 10.03  Expenses; Indemnity; Damage Waiver**.

(a)     The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by Lender and each of its Affiliates, including the reasonable fees, charges and disbursements of counsel for Lender, in connection with the preparation and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by Lender, including the reasonable fees, charges and disbursements of any counsel for Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     THE CREDIT PARTIES SHALL, JOINTLY AND SEVERALLY, INDEMNIFY LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES,

Page 49

LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY, OR ANY OTHER ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY SUBSIDIARY, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER OR NOT SUCH CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING IS BROUGHT BY BORROWER, ANY EQUITY HOLDERS OF BORROWER, ANY AFFILIATES OF BORROWER, ANY CREDITORS OF BORROWER OR ANY OTHER THIRD PERSON AND WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR FROM A CLAIM BROUGHT BORROWER AGAINST LENDER FOR MATERIAL BREACH IN BAD FAITH OF LENDER'S OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS.  FOR THE AVOIDANCE OF DOUBT, WITH RESPECT TO THE FOREGOING PROVISO "ANY INDEMNITEE" MEANS ONLY THE INDEMNITEE OR INDEMNITEES, AS THE CASE MAY BE, THAT ARE DETERMINED BY SUCH COURT IN SUCH JUDGMENT TO HAVE BEEN GROSSLY NEGLIGENT OR TO HAVE ENGAGED IN WILLFUL MISCONDUCT OR MATERIALLY BREACHED THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN BAD FAITH AND NOT ANY OTHER INDEMNITEE.  THIS <u>SECTION 10.03(b)</u> SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS OR DAMAGES ARISING FROM ANY NON-TAX CLAIM.

(c)      To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party hereto on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, the Loans or the use of the proceeds thereof; <u>provided</u> that, nothing in this clause (d) shall relieve Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d)      All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

Page 50

(e)      The agreements in this Section 10.03 shall survive the replacement of any Lender, the termination of this Agreement and the repayment, satisfaction or discharge of the Secured Obligations.

**Section 10.04  Successors and Assigns**.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender (and any attempted assignment or transfer by Borrower without such consent shall be null and void) and (ii) Lender may not assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)

(i)      Subject to the conditions set forth in paragraph (b)(ii) below, Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of, if no Event of Default has occurred and is continuing, the Borrower.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is executed) shall not be less than $5,000,000 unless each of the Borrower and Lender otherwise consent; provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing; and

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of such Lender's Commitment and such Lender's Loans under this Agreement.

For the purposes of this Section 10.04(b), the term "Approved Fund" and "Ineligible Institution" have the following meanings:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an

#4846-6774-8225

Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Ineligible Institution" means a (a) natural person, (b) company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof or (c)  the Borrower.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.14, Section 2.15, Section 2.16, Section 2.17 and Section 10.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section except that any attempted assignment or transfer by any Lender that does not comply with clause (C) of Section 10.04(b)(ii) shall be null and void.

(iv)    Lender, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment and the Applicable Percentage of, and principal amount of (and stated interest on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Credit Parties and any Lender, at any reasonable time and from time to time upon reasonable prior notice. For the avoidance of doubt, the language in this Section 10.04(b)(iv) is intended to cause the Loans, and any participation therein, to be in "registered form" as defined in Sections 163(f), 87(h)(2) and 881(c)(2) of the Code, Section 5f.103-(c) of the United States Treasury Regulations and Section 1.163-5(b)(1) of the proposed United States Treasury Regulations, and such language shall be interpreted and applied consistently therewith.

(c)

(i)    Any Lender may, without the consent of the Borrower or Lender, sell participations to one or more banks or other entities (a "Participant"), other than an Ineligible Institution, in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it);

provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.02(b) that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.14, Section 2.15, Section 2.16 and Section 2.17 (subject to the requirements and limitations therein, including the requirements under Section 2.17(f) (it being understood, however, that the documentation required under Section 2.17(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.14, Section 2.15, Section 2.16 or Section 2.17, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts of (and stated interest on) each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"), and no participation shall be effective unless it has been recorded in the Participant Register pursuant to this Section; provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b)(1) of the proposed United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

#4846-6774-8225

**Section 10.05  Survival**.  All covenants, agreements, representations and warranties made by Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee, premium or any other amount payable under this Agreement is outstanding and so long as the Commitment has not expired or terminated.  The provisions of Section 2.14, Section 2.15, Section 2.16, Section 2.17, Section 10.03, Article VII and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitment or the termination of this Agreement or any provision hereof.

**Section 10.06  Counterparts; Integration; Effectiveness; Electronic Execution**.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES**.  This Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

#4846-6774-8225

Section 10.07 __Severability__.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08 __Right of Setoff__.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section and Section 7.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 10.09 __GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS__.

(a)     THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(b)     BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN, AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS

SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 10.01</u>. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 10.10  <u>WAIVER OF JURY TRIAL</u>**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 10.11  <u>Headings</u>**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 10.12  <u>Confidentiality</u>**.  Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Requirements of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to Lender on a nonconfidential basis from a source other than Borrower.  For the purposes of this Section, "<u>Information</u>" means all information received from Borrower relating to Borrower or its business, other than any such information that is available to Lender on a nonconfidential basis prior to disclosure by Borrower; <u>provided</u> that, in the case of information received from

Page 56

Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

> **Section 10.13  <u>Material Non-Public Information</u>**.

> (a)       LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN <u>SECTION 10.12</u> FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

> (b)       ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, LENDER REPRESENTS TO THE BORROWER THAT IT HAS IDENTIFIED TO THE BORROWER A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

> (c)       The Borrower represents and warrants that none of the information in the Loan Documents constitutes or contains material non-public information within the meaning of the federal and state securities laws.  To the extent that any of the executed Loan Documents constitutes at any time a material non-public information within the meaning of the federal and state securities laws after the date hereof, the Borrower agrees that it will promptly make such information publicly available by press release or public filing with the SEC.

> **Section 10.14  [<u>Reserved</u>]**.

> **Section 10.15  <u>Interest Rate Limitation</u>**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be

increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

**Section 10.16 <u>USA PATRIOT Act</u>**.  Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>") hereby notifies Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Act.

[Signature Pages Follow]

#4846-6774-8225

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**<u>BORROWER</u>**:

[_]

By: _____
Name:
Title:

Signature Page to Midco Credit Agreement

**AF V Energy I Holdings, L.P.**,
as a Lender


By: _____
Name:
Title:     Authorized Signatory

Signature Page to Midco Credit Agreement

## **EXHIBIT D**

**Hedge Party Secured Notes**

## **PROMISSORY NOTE**
(Fixed Rate)

$[_____]                                    [_____]

For value received, [Gastar Exploration Inc.], a Delaware corporation, as principal ("Borrower"), promises to pay to the order of [NextEra Energy Marketing, LLC], a Delaware limited liability company ("Lender") at [_____], or at such other address as Lender shall from time to time specify in writing, the principal sum of [_____] ($[_____]), in legal and lawful money of the United States of America, with interest on the outstanding principal from the date advanced until paid at the rate set out below ("Note"). [Interest shall be computed on a per annum basis of a year of 360 days and for the actual number of days elapsed, unless such calculation would result in a rate greater than the highest rate permitted by applicable law, in which case interest shall be computed on a per annum basis of a year of 365 days or 366 days in a leap year, as the case may be.][1]

1.      *Payment Terms.*

(a)      *Generally*. Principal shall be due and payable in monthly payments of $[_____] each, payable on the first business day of each and every calendar month, beginning [●], 2019 and continuing regularly thereafter until December 31, 2019, when the entire amount hereof shall be then due and payable.

(b)      *Initial Principal Amount*. Notwithstanding Section 1(a), the initial principal amount shall be $[●][2], payable on [●].

2.      *Late Charge*. If a payment is made more than five (5) business days after it is due, Borrower will be charged, in addition to interest, a delinquency charge of five percent (5%) of the unpaid portion of the regularly scheduled payment. Borrower agrees with Lender that the charges set forth herein are reasonable compensation to Lender for the handling of such late payments.

3.      *Interest Rate*. Except as provided in Section 2, this Note shall not bear interest from the date of issuance through December 31, 2019.

4.      *Default Rate*. For so long as any event of default exists under this Note or under any of the other Loan Documents (as defined herein), regardless of whether or not there has been an acceleration of the indebtedness evidenced by this Note, and at all times after the maturity of the indebtedness evidenced by this Note (whether by acceleration or otherwise), and in addition to all other rights and remedies of Lender hereunder, interest shall accrue at the rate stated above, but in no event in excess of the highest rate permitted by applicable law, and such accrued

---

[1] NTD: Interest to be confirmed/discussed.

[2] NTD: To equal the the difference between (i) the full amount of the applicable Hedge Claims Payment Amount and (ii) the applicable Catch-Up Payment Amount.

interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any event of default, and such accrued interest is a reasonable estimate of those damages and does not constitute a penalty.

5. _Prepayment_. Borrower shall be entitled to prepay any amounts under this Note, in whole or in part, at any time from time to time without premium or penalty or notice to the holder hereof.

6. _Default_. It is expressly provided that upon default in the punctual payment of any indebtedness evidenced by this Note or any part hereof, as the same shall become due and payable, and the continuation of such monetary default for a period of thirty (30) days thereafter, or upon the occurrence of a non-monetary event of default specified in any of the other Loan Documents (as defined herein), and the continuation of such non-monetary default for a period of thirty (30) days after Lender provides written notice to Borrower of such non-monetary event of default (except Borrower shall have no such grace period in the case of insolvency or for any event of default that is not capable of cure within such time period), the holder of this Note may, at its option, without further notice or demand, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, (ii) refuse to advance any additional amounts under this Note, (iii) foreclose all liens securing payment hereof, (iv) pursue any and all other rights, remedies and recourses available to the holder hereof, including but not limited to any such rights, remedies or recourses under the Loan Documents, at law or in equity, or (v) pursue any combination of the foregoing; and in the event default is made in the prompt payment of this Note when due or declared due, and the same is placed in the hands of an attorney for collection, or suit is brought on same, or the same is collected through probate, bankruptcy or other judicial proceedings, then the Borrower agrees and promises to pay all reasonable costs of collection, including reasonable attorney's fees.

7. _Joint and Several Liability; Waiver_. Each maker, signer, surety and endorser hereof, as well as all heirs, successors and legal representatives of said parties, shall be directly and primarily, jointly and severally, liable for the payment of all indebtedness hereunder. Lender may release or modify the obligations of any of the foregoing persons or entities, or guarantors hereof, in connection with this Note without affecting the obligations of the others. All such persons or entities expressly waive presentment and demand for payment, notice of default, notice of intent to accelerate maturity, notice of acceleration of maturity, protest, notice of protest, notice of dishonor, and all other notices and demands for which waiver is not prohibited by law, and diligence in the collection hereof; and agree to all renewals, extensions, indulgences, partial payments, releases or exchanges of collateral, or taking of additional collateral, with or without notice, before or after maturity. No delay or omission of Lender in exercising any right hereunder shall be a waiver of such right or any other right under this Note.

8. _No Usury Intended; Usury Savings Clause_. In no event shall interest contracted for, charged or received hereunder, plus any other charges in connection herewith which constitute interest, exceed the maximum interest permitted by applicable law. The amounts of such interest or other charges previously paid to the holder of the Note in excess of the amounts permitted by applicable law shall be applied by the holder of the Note to reduce the principal of the indebtedness evidenced by the Note, or, at the option of the holder of the Note, be refunded.

To the extent permitted by applicable law, determination of the legal maximum amount of interest shall at all times be made by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the loan and indebtedness, all interest at any time contracted for, charged or received from the Borrower hereof in connection with the loan and indebtedness evidenced hereby, so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof.

9.     *Security.* This Note is one of the Hedge Party Secured Notes referred to in that certain Amended and Restated Credit Agreement, dated as of January [__], 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among [Gastar Exploration Inc.], [Holdings], the Guarantors from time to time, the Lenders party thereto, and Wilmington Trust, National Association, as administrative agent, and is secured by the Collateral pursuant to the Security Documents (each as defined in the Loan Agreement). This Note, the Loan Agreement and all other documents evidencing, securing, governing, guaranteeing and/or pertaining to this Note, including but not limited to those documents described above, are collectively referred to as the "Loan Documents." The holder of this Note is entitled to the benefits and security provided in the Loan Documents.

10.     *Governing Law, Venue.* THIS NOTE SHALL BE DEEMED A CONTRACT UNDER, AND SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

THIS NOTE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND SUPERSEDE ALL PRIOR UNDERSTANDINGS AND AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATING TO THE TRANSACTIONS PROVIDED FOR HEREIN AND THEREIN. ADDITIONALLY, THIS NOTE AND THE LOAN DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

11.     *Captions.* The captions in this Note are inserted for convenience only and are not to be used to limit the terms herein.

[*Signature on following page*]

IN WITNESS WHEREOF, Borrower has executed and delivered this Note on the date first written above.

**BORROWER:**

**[GASTAR EXPLORATION INC.]**

By: _____

Name:
Title:

## PROMISSORY NOTE
(Fixed Rate)

$[_____]                                    [_____]

For value received, [Gastar Exploration Inc.], a Delaware corporation, as principal ("Borrower"), promises to pay to the order of [Cargill, Incorporated], a Delaware corporation ("Lender") at [_____], or at such other address as Lender shall from time to time specify in writing, the principal sum of [_____] ($[_____]), in legal and lawful money of the United States of America, with interest on the outstanding principal from the date advanced until paid at the rate set out below ("Note"). [Interest shall be computed on a per annum basis of a year of 360 days and for the actual number of days elapsed, unless such calculation would result in a rate greater than the highest rate permitted by applicable law, in which case interest shall be computed on a per annum basis of a year of 365 days or 366 days in a leap year, as the case may be.][1]

1.    *Payment Terms*.

(a)    *Generally*. Principal shall be due and payable in monthly payments of $[_____] each, payable on the first business day of each and every calendar month, beginning [●], 2019 and continuing regularly thereafter until December 31, 2019, when the entire amount hereof shall be then due and payable.

(b)    *Initial Principal Amount*. Notwithstanding Section 1(a), the initial principal amount shall be $[●][2], payable on [●].

2.    *Late Charge*. If a payment is made more than five (5) business days after it is due, Borrower will be charged, in addition to interest, a delinquency charge of five percent (5%) of the unpaid portion of the regularly scheduled payment. Borrower agrees with Lender that the charges set forth herein are reasonable compensation to Lender for the handling of such late payments.

3.    *Interest Rate*. Except as provided in Section 2, this Note shall not bear interest from the date of issuance through December 31, 2019.

4.    *Default Rate*. For so long as any event of default exists under this Note or under any of the other Loan Documents (as defined herein), regardless of whether or not there has been an acceleration of the indebtedness evidenced by this Note, and at all times after the maturity of the indebtedness evidenced by this Note (whether by acceleration or otherwise), and in addition to all other rights and remedies of Lender hereunder, interest shall accrue at the rate stated above, but in no event in excess of the highest rate permitted by applicable law, and such accrued interest shall be immediately due and payable. Borrower acknowledges that it would be

---

[1] NTD: Interest to be confirmed/discussed.

[2] NTD: To equal the the difference between (i) the full amount of the applicable Hedge Claims Payment Amount and (ii) the applicable Catch-Up Payment Amount.

1

extremely difficult or impracticable to determine Lender's actual damages resulting from any event of default, and such accrued interest is a reasonable estimate of those damages and does not constitute a penalty.

5.     *Prepayment.* Borrower shall be entitled to prepay any amounts under this Note, in whole or in part, at any time from time to time without premium or penalty or notice to the holder hereof.

6.     *Default.* It is expressly provided that upon default in the punctual payment of any indebtedness evidenced by this Note or any part hereof, as the same shall become due and payable, and the continuation of such monetary default for a period of thirty (30) days thereafter, or upon the occurrence of a non-monetary event of default specified in any of the other Loan Documents (as defined herein), and the continuation of such non-monetary default for a period of thirty (30) days after Lender provides written notice to Borrower of such non-monetary event of default (except Borrower shall have no such grace period in the case of insolvency or for any event of default that is not capable of cure within such time period), the holder of this Note may, at its option, without further notice or demand, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, (ii) refuse to advance any additional amounts under this Note, (iii) foreclose all liens securing payment hereof, (iv) pursue any and all other rights, remedies and recourses available to the holder hereof, including but not limited to any such rights, remedies or recourses under the Loan Documents, at law or in equity, or (v) pursue any combination of the foregoing; and in the event default is made in the prompt payment of this Note when due or declared due, and the same is placed in the hands of an attorney for collection, or suit is brought on same, or the same is collected through probate, bankruptcy or other judicial proceedings, then the Borrower agrees and promises to pay all reasonable costs of collection, including reasonable attorney's fees.

7.     *Joint and Several Liability; Waiver.* Each maker, signer, surety and endorser hereof, as well as all heirs, successors and legal representatives of said parties, shall be directly and primarily, jointly and severally, liable for the payment of all indebtedness hereunder. Lender may release or modify the obligations of any of the foregoing persons or entities, or guarantors hereof, in connection with this Note without affecting the obligations of the others. All such persons or entities expressly waive presentment and demand for payment, notice of default, notice of intent to accelerate maturity, notice of acceleration of maturity, protest, notice of protest, notice of dishonor, and all other notices and demands for which waiver is not prohibited by law, and diligence in the collection hereof; and agree to all renewals, extensions, indulgences, partial payments, releases or exchanges of collateral, or taking of additional collateral, with or without notice, before or after maturity. No delay or omission of Lender in exercising any right hereunder shall be a waiver of such right or any other right under this Note.

8.     *No Usury Intended; Usury Savings Clause.* In no event shall interest contracted for, charged or received hereunder, plus any other charges in connection herewith which constitute interest, exceed the maximum interest permitted by applicable law. The amounts of such interest or other charges previously paid to the holder of the Note in excess of the amounts permitted by applicable law shall be applied by the holder of the Note to reduce the principal of the indebtedness evidenced by the Note, or, at the option of the holder of the Note, be refunded. To the extent permitted by applicable law, determination of the legal maximum amount of

interest shall at all times be made by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the loan and indebtedness, all interest at any time contracted for, charged or received from the Borrower hereof in connection with the loan and indebtedness evidenced hereby, so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof.

9.　　*Security*. This Note is one of the Hedge Party Secured Notes referred to in that certain Amended and Restated Credit Agreement, dated as of January [__], 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), by and among [Gastar Exploration Inc.], [Holdings], the Guarantors from time to time, the Lenders party thereto, and Wilmington Trust, National Association, as administrative agent, and is secured by the Collateral pursuant to the Security Documents (each as defined in the Loan Agreement). This Note, the Loan Agreement and all other documents evidencing, securing, governing, guaranteeing and/or pertaining to this Note, including but not limited to those documents described above, are collectively referred to as the "<u>Loan Documents</u>." The holder of this Note is entitled to the benefits and security provided in the Loan Documents.

10.　　*Governing Law, Venue*. THIS NOTE SHALL BE DEEMED A CONTRACT UNDER, AND SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

THIS NOTE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND SUPERSEDE ALL PRIOR UNDERSTANDINGS AND AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATING TO THE TRANSACTIONS PROVIDED FOR HEREIN AND THEREIN. ADDITIONALLY, THIS NOTE AND THE LOAN DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

11.　　*Captions*. The captions in this Note are inserted for convenience only and are not to be used to limit the terms herein.

[*Signature on following page*]

IN WITNESS WHEREOF, Borrower has executed and delivered this Note on the date first written above.

**BORROWER:**

[**GASTAR EXPLORATION INC.**]

By: _____

Name:
Title:

## **EXHIBIT E**

**Hedge Party Intercreditor Agreement**

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "**Agreement**") is entered into as of [●], 2019 by and among NextEra Energy Marketing, LLC, a Delaware limited liability company ("**NextEra**"), Cargill, Incorporated, a Delaware corporation ("**Cargill**", and together with NextEra, the "**Initial Swap Parties**"), any other Person that hereafter becomes a party to this Agreement as a "**Swap Counterparty**", as defined below, [GASTAR EXPLORATION INC., a Delaware corporation] ("**Borrower**"), [_], a Delaware [_] ("**Holdings**"), the Guarantors (as defined below), WILMINGTON TRUST, NATIONAL ASSOCIATION ("**Wilmington Trust**"), as administrative agent (in such capacity, together with its successor and assigns in such capacity, the "**Administrative Agent**") for the Lenders (as defined below) from time to time party to the Credit Agreement (as defined below), and Wilmington Trust, as collateral agent on behalf of the Secured Parties (as defined below) (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**").

## RECITALS:

On October 31, 2018, the Borrower and the Guarantors (other than Holdings) (collectively, the "**Debtors**" and each, a "**Debtor**") commenced voluntary cases (the "**Chapter 11 Cases**") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), and the Borrower and the Guarantors continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

On December [_], 2018, the Bankruptcy Court entered the Confirmation Order (as defined below).

(i) Borrower and NextEra have entered into that certain ISDA Master Agreement dated as of March 3, 2017, including the schedules, exhibits and annexes thereto and all confirmations and transactions now or hereafter entered into under such ISDA Master Agreement (in each case, as amended, restated, supplemented, or otherwise modified from time to time, collectively, the "**NextEra ISDA**"), (ii) Borrower and Cargill have entered into that certain ISDA Master Agreement dated as of December 10, 2012, including the schedules, exhibits and annexes thereto and all confirmations and transactions now or hereafter entered into under such ISDA Master Agreement (in each case, as amended, restated, supplemented, or otherwise modified from time to time, collectively, the "**Cargill ISDA**", and together with the NextEra ISDA, the "**Initial Swap Party ISDAs**") and (iii) Borrower, Morgan Stanley Capital Group Inc., a Delaware corporation ("**Morgan Stanley**"), Nextera, Cargill, and Koch Supply & Trading, LP, a Delaware limited partnership ("**Koch**", and together with Morgan Stanley, NextEra and Cargill, the "**Initial Swap Parties**") have entered into that certain Intercreditor Agreement dated as of March 3, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, collectively, the "**Initial Intercreditor Agreement**").

Concurrently herewith, (i) NextEra has received that certain promissory note from the Borrower for the principal sum of $[●] (the "**NextEra Swap Note**") and (ii) Cargill has received that certain promissory note from the Borrower for the principal sum of $[●] (the "**Cargill Swap Note**", and together with the NextEra Promissory Note, the "**Swap Notes**") and (iii) the Swap

Notes are provided in satisfaction of the Swap Counterparties' claims under the prepetition Initial Swap Party ISDAs.

Concurrently herewith, the Borrower and the Lenders have entered into that certain Amended and Restated Credit Agreement dated as of January [_], 2019 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Borrower, the guarantors party thereto, the lenders party thereto (the "**Lenders**"), and the Administrative Agent.

The Loan Parties have granted to the Collateral Agent, for the benefit of the Administrative Agent, the Collateral Agent, the Lenders and the Swap Counterparties (collectively, the "**Secured Parties**"), a Lien (as defined below) on substantially all of their assets, all as more particularly described in the Security Instruments.

The Collateral Agent, the Administrative Agent, the Swap Counterparties and the Loan Parties desire to enter into this Agreement to, among other things, (i) establish the relative priorities of the Lenders and the Swap Counterparties with respect to the Collateral, (ii) agree with respect to which parties can direct the exercise of certain remedies with respect to the Collateral and (iii) have the Secured Parties appoint the Collateral Agent to serve, and have the Collateral Agent agree to serve, as Collateral Agent for the Secured Parties under the Security Instruments (defined below) for the purposes of the holding of and the enforcement of Liens created by and existing under the Security Instruments to secure the Loan Obligations and the Swap Obligations, the apportioning of Proceeds (defined below) between the Administrative Agent (on behalf of itself and the Lenders), on the one hand, and Swap Counterparties, on the other hand, and for the other purposes set forth herein.

## **AGREEMENTS:**

In consideration of the mutual covenants and promises of this Agreement, and for other consideration, the receipt and adequacy of which are hereby acknowledged, Borrower, Swap Counterparties, the Administrative Agent and the Collateral Agent agree as follows:

1.    (a)    Definitions. As used in this Agreement,

**Approved ISDA** means (a) the Initial Swap Party ISDAs and (b) any other ISDA Master Agreement, including any Schedules and Annexes thereto, between Borrower and any other Swap Counterparty that has become a party hereto in accordance with Section 28.

**Bankruptcy Code** means Title 11 of the United States Code.

**Blocking Period** has the meaning assigned to such term in Section 4 below.

**Business Day** means any day other than a Saturday, Sunday or other day in which banking institutions in Houston, Texas or New York, New York are authorized or obligated by law or executive order to close.

**Cargill** has the meaning assigned to such term in the preamble.

2

**Cargill ISDA** has the meaning assigned to such term in the Recitals.

**Collateral** means, all personal, real and mixed property of the Loan Parties and Rights thereto described in and subject to a Lien under the Security Instruments.

**Credit Agreement Secured Parties** has the meaning assigned to such term in the Recitals.

**Credit Agreement Secured Parties** means the Secured Parties, other than the Swap Counterparties.

**Credit Documents** means the Credit Agreement and the other Loan Documents (as defined in the Credit Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Obligations, and any other document or instrument executed or delivered at any time in connection with any Obligations, including any intercreditor or joinder agreement among holders of Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

**Creditors** means, collectively, the Administrative Agent (on behalf of the Credit Agreement Secured Parties) and the Swap Counterparties.

**Debtor Relief Law** means each of the Bankruptcy Code, any similar federal, state, provincial, territorial or foreign laws, rules or regulations for the relief of debtors or any reorganization, insolvency, moratorium or assignment for the benefit of creditors or any other marshalling of the assets and liabilities of any Person and any similar laws, rules or regulations relating to or affecting the enforcement of creditors' rights generally.

**Discharge of Loan Obligations** means the occurrence of all of the following: (i) payment in full in cash of the principal of and interest (including Post-Petition Interest), on all Indebtedness outstanding under the Loan Documents and constituting Loan Obligations (other than those that constitute Unasserted Contingent Obligations); (ii) termination or expiration of all commitments, if any, to extend credit that would constitute Loan Obligations and (ii) payment in full in cash of all other Loan Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been asserted).

**Discharge of Swap Obligations** means the occurrence of all of the following: (i) payment in full in cash of the principal of and interest (including Post-Petition Interest), on all Indebtedness outstanding under the Swap Documents and constituting Swap Obligations (other than those that constitute Unasserted Contingent Obligations); (ii) termination or expiration of all Swap Documents (other than with respect to any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been asserted) and (ii) payment in full in cash of all other Swap Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been asserted).

3

**Early Termination Event** means, with respect to any Swap Document, the occurrence of an event of default or a termination event that results in the termination of all transactions or all affected transactions under such Swap Document.

**Governmental Authority** means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over any Loan Party or any of its properties.

**Hydrocarbons** means collectively, oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate and all other liquid or gaseous hydrocarbons and related minerals and all products therefrom, in each case whether in a natural or a processed state.

**Indemnified Liabilities** means any and all liabilities (including all environmental liabilities), obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, taxes, expenses or disbursements of any kind or nature whatsoever, whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and environmental laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any Indemnitee, in any manner relating to or arising out of the execution, delivery, performance, administration or enforcement of this Agreement or any Security Instrument, any Loan Document or any Swap Document, including any of the foregoing relating to the violation of, noncompliance with or liability under, any law (including environmental laws) applicable to or enforceable against any Loan Party or any of its affiliates or any of the Collateral and all reasonable costs and expenses (including reasonable fees and expenses of legal counsel selected by any Indemnitee) incurred by any Indemnitee in connection with any claim, action, investigation or proceeding in any respect relating to any of the foregoing, whether or not suit is brought.

**Indemnitee** has the meaning assigned to such term in Section 19.

**Insolvency or Liquidation Proceeding** means:

(a)    any voluntary or involuntary case or proceeding commenced by or against any Loan Party or any of its subsidiaries under the Bankruptcy Code or any other Debtor Relief Law;

(b)    any proceeding for the voluntary or involuntary insolvency, reorganization, winding-up, bankruptcy case or proceeding, arrangement, recapitalization or adjustment or marshalling of the assets or liabilities of any Loan Party or any of its subsidiaries, any receivership or assignment for the benefit of creditors relating to any Loan Party or any of its subsidiaries or any similar case or proceeding relative to any Loan Party or any of its subsidiaries or its creditors, as such, in each case whether or not voluntary (other than any merger, amalgamation, arrangement, consolidation, liquidation, windup or dissolution not involving bankruptcy that is expressly permitted pursuant to the terms of the Credit Agreement);

4

(b)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to any Loan Party or any of its subsidiaries, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency (other than any merger, amalgamation, arrangement, consolidation, liquidation, windup or dissolution not involving bankruptcy that is expressly permitted pursuant to the terms of the Credit Agreement);

(c)     any other proceeding of any type or nature in which substantially all claims of creditors of any Loan Party or any of its subsidiaries are determined and any payment or distribution is or may be made on account of such claims;

(d)     any case or proceeding seeking arrangement, adjustment, protection, relief or composition of any debt or other property of any Loan Party;

(e)     any case or proceeding seeking the entry of an order of relief or the appointment of a custodian, receiver, interim receiver, monitor, trustee or other similar proceeding with respect to any Grantor or any property or Loan Obligations of any Loan Party; or

(f)     any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Loan Party.

**Joinder Supplement** means a supplement to this Agreement in the form of Exhibit A hereto, providing for a Person to become a Swap Counterparty under this Agreement.

**Lenders** has the meaning assigned to such term in the Recitals.

**Lien** has the meaning assigned to such term in the Credit Agreement.

**Loan Documents** has the meaning assigned to such term in the Credit Agreement and includes the Security Instruments.

**Loan Obligations** means (a) the "Obligations" as defined in the Credit Agreement, and (b) all other amounts due under the Loan Documents, in each case whether now existing or hereafter incurred, whether direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, now or hereafter existing, due or to become due whether evidenced in writing or not, together with all reasonable costs, expenses, and attorneys' fees incurred in the enforcement or collection thereof, and including, but not limited to, interest thereon after the commencement of any proceedings under any Debtor Relief Laws. **Loan Obligations** shall include all Post-Petition Interest with respect to Credit Documents.

**Majority Lenders** has the meaning assigned to such term in the Credit Agreement.

**NextEra** has the meaning assigned to such term in the preamble.

**NextEra ISDA** has the meaning assigned to such term in the Recitals.

5

**Officers' Certificate** means a certificate with respect to compliance with a condition or covenant provided for in this Agreement, signed on behalf of the Borrower by two officers of the Borrower, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Borrower, including:

      (a)    a statement that the Person making such certificate has read such covenant or condition;

      (b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate are based;

      (c)    a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

      (d)    a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

**Outstanding Amount** means

      (a)    with respect to the Loan Obligations, the Loan Obligations due and payable;

      (b)    (A) with respect to Swap Obligations (other than in respect of the Swap Notes), (i) prior to the Discharge of Credit Facility Obligations, the amount of all Swap Obligations then due and owing to each Swap Counterparty under the Swap Documents governing such Swap Obligations, regardless of whether an Early Termination Event under such Swap Documents has occurred, or (ii) after the Discharge of Credit Facility Obligations, (x) at any time prior to the occurrence of an Early Termination Event under such Swap Documents, at the applicable Swap Counterparty's election, either (A) the amount of all Swap Obligations that would be payable to such Swap Counterparty under such Swap Documents if there occurred at such time an Early Termination Event under such Swap Documents, or (B) the mark-to-market valuation, in either case as determined by such Swap Counterparty, or (y) at any time from and after the occurrence of an Early Termination Event under the Swap Documents governing such Swap Obligations, the amount of all Swap Obligations then due and owing to such Swap Counterparty under such Swap Documents and (B) with respect to Swap Obligations in respect of the Swap Notes, the Swap Obligations in respect thereto due and payable; and

      (c)    with respect to the Total Obligations, the sum of clause (a) and clause (b) above.

**Person** means any individual, general partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, Governmental Authority or other entity or organization.

**Post-Petition Interest** means interest, fees, expenses and other charges that pursuant to the Credit Documents, continue to accrue after the commencement of any Insolvency or

Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

**Principal Agreements** means the Loan Documents and the Swap Documents, collectively.

**Proceeds** includes any and all proceeds from any sale, exchange, destruction, condemnation, foreclosure, liquidation or other disposition of any of the Collateral, including, but not limited to, under any Debtor Relief Law; provided, however, prior to the occurrence of a Triggering Event, such term will not include sales of any Hydrocarbons produced from or attributable to the Collateral in the ordinary course of the Borrower's business or sales of other Collateral permitted under the Loan Documents.

**Ratably or Ratable** means, with respect to any amount to be allocated between the Administrative Agent (on behalf of the Credit Agreement Secured Parties) and the Swap Counterparties at any time, the allocation of a portion of such amount to (a) the Administrative Agent such that the ratio that the amount allocated to the Administrative Agent bears to the total amount to be so allocated equals the ratio of the Loan Obligations to the Total Obligations at such time and (b) Swap Counterparties such that the ratio that the amount allocated to Swap Counterparties bears to the total amount to be so allocated equals the ratio of the Swap Obligations to the Total Obligations at such time (and with such amount allocated to each individual Swap Counterparty under this clause (b) being equal to its Swap Counterparty Ratable Share of such amount).

**Refinance** means, in respect of any Loan Obligations, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Loan Obligations in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

**Related Parties** means, with respect to any Person, such Person's affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's affiliates.

**Right or Rights** means rights, remedies, powers, privileges and benefits.

**Secured Parties** has the meaning assigned to such term in the Recitals.

**Security Instruments** means the "Security Documents" as defined in the Credit Agreement and Article [VII] of the Credit Agreement, and includes, without limitation, those documents listed in Schedule 1 attached hereto and incorporated herein by this reference.

**Swap Counterparties** means the Swap Noteholders, the Initial Swap Parties[1] and each other Person that (x) is acceptable to the Majority Lenders as a "Qualified Counterparty" under the Credit Agreement as evidenced by their written consent and (y) executes and delivers a Joinder Supplement to the Collateral Agent as provided in Section 28.

---

[1] To be confirmed whether any ISDAs will be entered into at closing.

**Swap Counterparty Ratable Share** means, with respect to the portion of the Swap Counterparties' Ratable share of any amount to be allocated to an individual Swap Counterparty at any time, a percentage equal to a fraction, the numerator of which is the amount of Swap Obligations owing to such Swap Counterparty at such time and the denominator of which is the Total Swap Obligations at such time.

**Swap Documents** means each Approved ISDA, including, but not limited to, each relevant confirmation of transaction thereunder and each Swap Note.

**Swap Notes** has the meaning assigned to such term in the Recitals.

**Swap Noteholders** means NextEra and Cargill, together with their permitted successors and assigns.

**Swap Obligations** means, with respect to each Swap Counterparty, all "Note Obligations" as defined in each Swap Note and all other amounts owed or to become owing by Borrower to such Swap Counterparty under any Swap Document, whether direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several or joint and several, together with all costs, expenses and attorneys' fees incurred in the enforcement or collection thereof, and interest thereon after the commencement of any proceedings under any Debtor Relief Laws; provided, that prior to the Discharge of Credit Facility Obligations, Swap Obligations with respect to each Swap Counterparty shall be net of amounts owed by such Swap Counterparty to the Borrower under the applicable Swap Documents to the extent such amounts are permitted to be netted under the applicable Swap Documents or law.

**Total Obligations** means, as of any date of determination, an amount equal to the sum of (a) the aggregate Loan Obligations at such date *plus* (b) the aggregate Swap Obligations at such date.

**Total Swap Obligations** means, as of any date of determination, an amount equal to the aggregate Swap Obligations at such date.

**Triggering Event** shall mean any of the following:

(a)     The Collateral Agent shall have received from any Swap Counterparty written notice that (i) either an event of default or a termination event has occurred and is continuing under one or more of the Swap Documents to which such Swap Counterparty is a party, (ii) an early termination date has been designated as a result thereof, (iii) specifies the sum of all unpaid amounts and settlement payments then due to such Swap Counterparty as the result of the designation of such early termination date and the amount of interest and other amounts then due and payable by Borrower in respect thereof, and (iv) the amount set forth in clause (iii) has not been paid in full or discharged to the satisfaction of such Swap Counterparty; or

(b)     Each Swap Counterparty or Borrower shall have received from the Administrative Agent written notice that (i) an Event of Default (as defined in the Credit Agreement) has occurred and is continuing and (ii) the unpaid principal amount of the

8

Loans and other Loan Obligations under the Credit Agreement have been declared to be then due and payable.

**UCC** means the Uniform Commercial Code as adopted and in effect in the State of New York from time to time, or, when the laws of any other jurisdiction govern the perfection or priority of any Lien, the Uniform Commercial Code of such jurisdiction.

(b)     <u>Rules of Interpretation</u>. (i) Unless otherwise indicated, any reference to any agreement or instrument will be deemed to include a reference to that agreement or instrument as assigned, amended, supplemented, amended and restated, or otherwise modified and in effect from time to time or replaced in accordance with the terms of this Agreement (including in connection with any Refinancing).

(ii)     The use in this Agreement of the word "include" or "including," when following any general statement, term or matter, will not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but will be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The word "will" shall be construed to have the same meaning and effect as the word "shall."

(iii)     References to "Sections," "clauses," "recitals" and the "preamble" will be to Sections, clauses, recitals and the preamble, respectively, of this Agreement unless otherwise specifically provided.

(iv)     This Agreement and the other Security Instruments will be construed without regard to the identity of the party who drafted it and as though the parties participated equally in drafting it. Consequently, each of the parties acknowledges and agrees that any rule of construction that a document is to be construed against the drafting party will not be applicable either to this Agreement or to the other Security Instruments.

2.     <u>Obligations and Liens *Pari Passu*</u>.

(a)     Subject to the other terms and conditions of this Agreement, the Loan Obligations and the Swap Obligations shall be *pari passu* and the Loan Obligations and Swap Obligations shall be secured, Ratably, by the Liens granted to or for the benefit of Collateral Agent under the Security Instruments (after giving effect to any applicable amendments to any of the Security Instruments as provided for below in this Section 2).

(b)     Contemporaneously with the execution of this Agreement, the Loan Parties, the Lenders and the Administrative Agent have executed: (i) the Credit Agreement which (A) permits the Loan Parties to grant a first priority Lien on their assets to secure (i) obligations owing to Qualified Counterparties under Swap Agreements, (ii) Swap Obligations owing to Swap Noteholders under the Swap Notes and (iii) the Loan Obligations, and (B) acknowledges and agrees that any first priority Lien granted to Collateral Agent by any Loan Party to secure the Loan Obligations, shall be held by Collateral Agent for the Ratable benefit of the Swap Counterparties, to secure the Swap Obligations on a *pari passu* basis with the Loan Obligations; and (ii) Security

Instruments causing any Lien granted to or for the benefit of Collateral Agent under such Security Instruments to secure, Ratably, the Loan Obligations and the Swap Obligations.

(c)     Each Swap Counterparty agrees that, without the prior written consent of Administrative Agent, it will not seek or accept credit support for any Swap Obligation other than its Rights under the Security Instruments. Notwithstanding the preceding sentence, to the extent that any Swap Counterparty, with the written consent of the Administrative Agent, hereafter obtains any Lien on assets of any Loan Party to secure all or any portion of the Swap Obligations owing to such Swap Counterparty, the Lien held by the Collateral Agent on such assets to secure the Loan Obligations shall be *pari passu* with any Lien now or hereafter existing in favor of such Swap Counterparty to secure all or any part of the Swap Obligations, notwithstanding (i) the date, manner or order of any grant, attachment or perfection of any such Lien, (ii) any provision of the UCC, other applicable law, the Loan Documents or the Swap Documents or (iii) any manner of enforcement of any Lien or other Rights. Similarly, the parties hereto agree that to the extent any Lender hereafter obtains any Lien on assets of Loan Parties to secure all or any portion of the Loan Obligations, the Lien held by such Lender on such assets shall secure the Loan Obligations and the Swap Obligations and shall be pari passu with any Lien now or hereafter existing in favor of, or for the benefit of, any Swap Counterparty to secure all or any part of the Swap Obligations, notwithstanding (i) the date, manner or order of any grant, attachment or perfection of any such Lien, (ii) any provision of the UCC, other applicable law, the Loan Documents or any Swap Documents or any manner of enforcement of any Lien or other Rights.

(d)     The parties hereto agree that, upon execution of the Credit Agreement, the Security Instruments and this Agreement, (i) any Lien under any Security Instrument securing, Ratably, the Loan Obligations and the Swap Obligations shall be permitted under the Credit Agreement and (ii) Swap Counterparties will become a beneficiary of any Lien granted to Collateral Agent pursuant to any Security Instrument.

(e)     The Administrative Agent (on behalf of the Lenders) consents to Borrower entering into the Approved ISDAs and agrees that each Approved ISDA is a Swap Agreement permitted under the terms of the Credit Agreement, that the Initial Swap Parties are Qualified Counterparties (as defined in the Credit Agreement), and that this Agreement is the Swap Intercreditor Agreement (as defined in the Credit Agreement). Each Swap Counterparty and the Administrative Agent (on behalf of the Lenders) acknowledge and agree that, upon execution of the Credit Agreement, the Security Instruments and this Agreement, such Swap Counterparty will become a secured party under the Security Instruments.

(f)     The amounts payable by the Loan Parties to the Credit Agreement Secured Parties under the Loan Documents and the amounts payable by the Loan Parties to the Swap Counterparties under the Swap Documents shall be separate and independent debts, and each Secured Party shall be entitled to enforce any right arising out of the applicable Principal Agreement to which it is a party, subject to the terms thereof and of this Agreement. Each Secured Party hereby agrees that no Secured Party (whether as the mortgagee or the secured party, as the case may be, under the Security Instruments) other than the Collateral Agent shall have any right individually to realize upon any Liens granted under the Security Instruments, it being understood and agreed that such remedies may be exercised only by Collateral Agent (as the mortgagee or the

secured party, as the case may be, under the Security Instruments) for the Ratable benefit of the Secured Parties.

(g)     Each Creditor agrees: (i) to deliver to the other Creditors, at the same time it makes delivery to Borrower, a copy of any notice of default, notice of intent to accelerate or notice of acceleration with respect to any of the Loan Obligations or the Swap Obligations, as applicable, subject to this Agreement and (ii) to deliver to the other Creditors, at the same time it makes delivery to any Loan Party, a copy of any notice of the commencement of any judicial proceeding by such Creditor and a copy of any other notice with respect to the exercise of remedies with respect to any of the Loan Obligations or the Swap Obligations, as applicable, subject to this Agreement. Any failure by a Creditor to furnish a copy under this Section 2(g) shall not limit or affect the rights and obligations of such Creditor hereunder.

(h)     Each of the Swap Counterparties and the Administrative Agent hereby agrees that it shall endeavor to furnish Borrower with a copy of any notice provided or received, as applicable, by it which notice would, pursuant to clause (a) (in the case of the Swap Counterparties) or clause (b) (in the case of the Administrative Agent) of the definition of Triggering Event in Section 1 above, establish a Triggering Event. Each of Borrower and the Administrative Agent hereby agrees that it shall endeavor to furnish Swap Counterparties with a copy of any notice received or provided, as applicable, by it which notice would, pursuant to clause (b) of the definition of Triggering Event in Section 1 above, establish a Triggering Event.

(i)     The Administrative Agent, the Collateral Agent and the Lenders may enter into any amendment, modification or supplement to the Credit Agreement, or any Loan Document, and termination of any thereof, or any waiver or consent under any thereof, and any such amendment, modification, supplement, termination, waiver or consent shall be deemed accepted by the Swap Counterparties and the Borrower (but without prejudice to the Borrower's consent rights over amendments, modifications or supplements as provided for in the Credit Agreement or any other Loan Document); provided, however, the written consent of the Swap Counterparties (which consent will not be withheld, conditioned or delayed unreasonably) shall be required in connection with any such amendment, modification supplement, termination, waiver, or consent if the effect of such amendment, modification, supplement, termination, waiver, or consent would be to:

(i)     change the definition of "Qualified Counterparty", "Secured Obligations", "Secured Parties", "Security Document" or "Swap Intercreditor Agreement" under the Credit Agreement or change Section 10.02(b)(vii) in any manner adverse to any Swap Counterparty in any material respects or which would reduce or diminish materially the benefits of the security provided for in the Security Instruments;

(ii)     provide for any of the Swap Obligations to cease to be secured by the Security Instruments;

(iii)     cause the Security Instruments to secure obligations other than the Loan Obligations and Swap Obligations;

(iv)     change the priority of or subordinate the Liens created thereby;

11

(v)      materially reduce or materially limit the Rights of the Collateral Agent or any Swap Counterparty provided for therein in any respects; or

(vi)      cause the Swap Obligations owed under any Swap Document to cease (A) to be secured on a first lien, *pari passu* basis with the Loan Obligations with respect to the Collateral or (B) to be guaranteed on a *pari passu* basis with the Loan Obligations (each of the foregoing, a "**Required Consent**"). Any such amendment made without such consent shall be null and void. The Collateral Agent may not release any Collateral under any of the Security Instruments, except as provided in Section 2(j); provided, further, however, that (i) any amendment or supplement that has the effect solely of adding or maintaining Collateral, or preserving, perfecting or establishing the priority of the Collateral Agent's Liens or the rights of the Collateral Agent therein will become effective when executed and delivered by the Borrower and the Collateral Agent and (ii) any amendment or supplement to the provisions of the Security Instruments that effects a release of Collateral will be effective only if the release is effective under Section 2(j).

(j)      The Borrower and Holdings may enter into any Refinancing of the Credit Agreement and the indebtedness thereunder, without the written consent of the Swap Counterparties, all without affecting the lien priorities or other provisions of this Agreement; provided, however, that any such Refinancing that does not satisfy any of the following provisions shall require the prior written consent of the Swap Counterparties (which consent will not be withheld, conditioned or delayed unreasonably):

(i)      such Refinancing shall not contravene any provision of this Agreement and:

(ii)      the indebtedness evidenced by the Swap Notes shall be permitted by such Refinancing;

(iii)      after giving effect to such Refinancing, the Swap Notes continue to be secured by an uncapped, first priority lien on and security interest in the collateral that secures the Credit Agreement and that ranks *pari passu* with the liens granted to the holders of the senior-most creditors (with respect to debt for borrowed money) of the Loan Parties (which, for the avoidance of doubt, may be the creditors under the Credit Agreement) and on a senior basis during any Insolvency or Liquidation Proceeding;

(iv)      the new lenders shall either (A) execute and deliver a Joinder Supplement to the Collateral Agent as provided in Section 28 or (B) enter into a new intercreditor agreement that is either (x) substantially similar to this Agreement or (y) not materially less advantageous to the Swap Counterparties than this Agreement and does not have the effect of disproportionately disadvantaging or otherwise discriminating against any Swap Counterparty, or the Swap Counterparties as a whole, as compared to this Agreement.

(k)      On or after any Refinancing, and the receipt of notice thereof, which notice shall include the identity of any new or replacement Collateral Agent or other agent serving the same or similar function, each existing Collateral Agent shall promptly enter into such documents

and agreements (including amendments or supplements to this Agreement) as the Borrower or such new or replacement Collateral Agent may reasonably request in order to provide to such new or replacement Collateral Agent the rights, remedies and powers and authorities contemplated hereby, in each case consistent in all respects with the terms of this Agreement.

(l)     The Collateral Agent will not release any Lien of the Collateral Agent or consent to the release of any Lien of the Collateral Agent, except:

(i)     Following its receipt of an Officers' Certificate to the effect that the release was permitted by each of the Loan Documents and the Swap Documents (it being agreed by each Swap Counterparty and the Administrative Agent that the Collateral Agent may conclusively rely on any such Officer's Certificate provided by the Borrower to the Collateral Agent as evidence that such release is in fact permitted under the Loan Documents and Swap Documents);

(ii)     upon written consent of the Administrative Agent and each Swap Counterparty, accompanied by an Officers' Certificate to the effect that (A) a Discharge of Loan Obligations has occurred and a Discharge of Swap Obligations has occurred and (B) the release was permitted by each of the Loan Document and Swap Documents; or

(iii)     as ordered pursuant to applicable law under a final and nonappealable order or judgment of a court of competent jurisdiction;

If in the case of any release of Collateral the value of which exceeds ten percent (10%) of the aggregate value of all the Collateral before giving effect to such proposed release (such calculation to be determined in good faith by Borrower), Borrower shall provide notice to each Swap Counterparty of such release at least 5 Business Days prior to such release; provided, however that Borrower's failure to provide such notice will not affect the validity of the release.

(m)     The Collateral Agent will not subordinate any Lien of the Collateral Agent or consent to the subordination of any Lien of the Collateral Agent, except:

(i)     as directed in writing by the Administrate Agent and each Swap Counterparty, accompanied by an Officers' Certificate to the effect that the subordination was permitted by or waived pursuant to each of the Loan Documents and the Swap Documents; or

(ii)     as ordered pursuant to applicable law under a final and nonappealable order or judgment of a court of competent jurisdiction.

(n)     Borrower hereby agrees to provide written notice to Swap Counterparties no less than three days prior to execution of any amendment, modification or supplement to the Credit Agreement or any Security Instrument, any termination of any thereof, or any waiver or consent under any thereof, including with such notice a copy of the proposed amendment, modification, supplement, termination, waiver, or consent, if such amendment, modification, supplement, termination, waiver, or consent constitutes a Required Consent. Borrower hereby agrees to provide written notice to each Swap Counterparty no less than seven days prior to the

13

earliest to occur of (i) the date of (A) signing or (B) closing of any replacement financing or any refinancing of the Credit Agreement, or (ii) the date of any payment in full and retirement of the Credit Agreement, including with such notice a copy of the proposed replacement financing, refinancing or retirement of the Credit Agreement, as applicable.

(o)     Each of the Creditors and Collateral Agent agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including, but not limited to, any proceeding under a Debtor Relief Law), the priority, validity or enforceability of a Lien held by or for the benefit of the Creditors in any Collateral; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any such party to enforce this Agreement as provided herein.

(p)     Borrower hereby agrees that Swap Counterparties may provide to Administrative Agent and Collateral Agent, and each Swap Counterparty hereby agrees (to the extent applicable to such Swap Counterparty) to provide to Administrative Agent and Collateral Agent, within two Business Days following receipt of a written request therefor from Collateral Agent or Administrative Agent, (i) a report of the marked-to-market positions of any or all of the transactions in effect from time to time under the Swap Documents, and (ii) a copy of any trade confirmation pursuant to an applicable Approved ISDA not previously provided to Administrative Agent and Collateral Agent. Any unintentional failure by a party hereto to timely furnish information required by this clause (n) shall not limit or affect the parties' rights and obligations hereunder.

3.     <u>Appointment of Wilmington Trust as Collateral Agent</u>. The Administrative Agent (on behalf of the Credit Agreement Secured Parties) and each Swap Counterparty hereby each appoints Wilmington Trust to (a) act as Collateral Agent, in its name and on its behalf, in and under the Security Instruments, (b) be the beneficiary of the guarantees provided under [Article VII] of the Credit Agreement and hold the Liens on the Collateral, with power of sale, in its name for the benefit and security of Credit Agreement Secured Parties and Swap Counterparties, in each case for enforcement and payment of the Loan Obligations and the Swap Obligations, respectively, and (c) take such action on behalf of the Credit Agreement Secured Parties and Swap Counterparties under the terms and provisions of the Security Instruments and to exercise such rights and remedies under the Security Instruments as are specifically delegated to or required of the Collateral Agent, under the terms and provisions of this Agreement

Subject to the terms hereof, the Collateral Agent agrees to administer and enforce this Agreement and the Security Instruments to which it is a party as Collateral Agent, and to foreclose upon, collect and dispose of the Collateral and to apply the Proceeds therefrom, for the benefit of the Secured Parties, as provided herein, and otherwise to perform its duties and obligations as the Collateral Agent hereunder in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that the Collateral Agent shall have no duties or responsibilities except those expressly set forth herein or in the Security Instruments to which it is a party as Collateral Agent, and no implied covenants or obligations shall be read into any such Security Instruments against the Collateral Agent.

It is understood and agreed that the use of the term "agent" herein or in any other Security Instruments (or any other similar term) with reference to the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of

any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

4.      Collateral Agent's Authority.

        (a)      Upon the occurrence and during the continuance of any Triggering Event, both before and during an Insolvency or Liquidation Proceeding, Collateral Agent shall act, or decline to act, as directed in writing by the Controlling Party, in the exercise and enforcement of the Collateral Agent's interests, rights, powers and remedies in respect of the Collateral or under the Security Instruments or applicable law and, following the initiation of such exercise of remedies, the Collateral Agent will act, or decline to act, with respect to the manner of such exercise of remedies as directed in writing by the Controlling Party. For purposes hereof, the "**Controlling Party**" shall be (i) the Administrative Agent, if the Loan Obligations constitute a majority of the Total Obligations and (ii) if the Swap Obligations constitute a majority of the Total Obligations, the Swap Counterparties holding the majority of the Swap Obligations; provided that for purposes of determining whether the Loan Obligations or the Swap Obligations constitute a majority of the Total Obligations under this Section 4(a), the Loan Obligations, Swap Obligations and Total Obligations shall be calculated in accordance with their respective Outstanding Amounts.

        (b)      [Reserved].

        (c)      Notwithstanding anything to the contrary contained in this Agreement, the Collateral Agent will not commence any exercise of remedies or any foreclosure actions or otherwise take any action or proceeding against any of the Collateral (other than actions as necessary to prove, protect or preserve the Liens securing the Total Obligations) unless and until it receives written notice from the Controlling Party stating that a Triggering Event has occurred and is continuing and directing the Collateral Agent to exercise remedies against the Collateral, and thereafter the Collateral Agent will be required to act only if such notice is not withdrawn in writing by the Controlling Party and only in accordance with the other provisions of this Agreement.

        (d)      If the Collateral Agent at any time receives from the Controlling Party written notice that a Triggering Event has occurred and is continuing, the Collateral Agent will act, or decline to act, as directed by the Controlling Party, in the exercise and enforcement of the Collateral Agent's interests, rights, powers and remedies in respect of the Collateral or under the Security Instruments or applicable law and, following the initiation of such exercise of remedies, the Collateral Agent will act, or decline to act, with respect to the manner of such exercise of remedies as directed by the Controlling Party. Unless it has been directed to the contrary in writing by the Controlling Party, the Collateral Agent in any event may (but will not be obligated to) take or refrain from taking such action with respect to any Triggering Event as it may deem advisable and in the best interest of the holders of Total Obligations.

        (e)      Notwithstanding anything to the contrary contained herein or in any other Security Instruments, the Collateral Agent shall only comply with written instructions or directions from the Controlling Party with respect to the exercise and enforcement of the Collateral Agent's interests, rights, powers and remedies in respect of the Collateral or under the Security Instruments

15

and shall not comply with any such instructions or directions received from any other Person (including any other Secured Party or any other actual or alleged third party beneficiary of this Agreement or the Security Instruments).

(f)       Notwithstanding anything to the contrary contained herein or in any Security Instrument, (i) the Collateral Agent shall for all purposes of this Agreement be entitled to rely (without any independent verification) on a certification from the Administrative Agent in determining the Outstanding Amount of Loan Obligations and (ii) the Collateral Agent shall for all purposes of this Agreement be entitled to rely (without any independent verification) on a certification from each Swap Counterparty in determining the Outstanding Amount of Swap Obligations owing to such Swap Counterparty. Promptly following the occurrence and during the continuation of any Triggering Event (and in any event prior to Collateral Agent being required to take any action pursuant to Section 4(a)) and at any time promptly following its request therefor, (i) the Administrative Agent shall certify in writing to the Collateral Agent the Outstanding Amount of Loan Obligations and (ii) each Swap Counterparty shall certify in writing to the Collateral Agent the Outstanding Amount of Swap Obligations held by it. In the event the Administrative Agent or a Swap Counterparty fails to provide such certification within ten (10) Business Days after request from the Collateral Agent, the Collateral Agent may conclusively assume that, for purposes of determining the Controlling Party only, the Outstanding Amount of the Loan Obligations or Swap Obligations, as applicable, held by the applicable Creditor failing to provide such certification shall be equal to zero ($0).

(g)       For so long as any Triggering Event is continuing, any payments received by the Administrative Agent or the Lenders under the Credit Agreement and any payments received by Swap Counterparties under any Approved ISDA will be held for the Ratable benefit of the Creditors until such time that such Triggering Event is no longer continuing or that Collateral Agent is exercising remedies under the Security Instruments (including, but not limited to, the foreclosure of Liens) and distributing the Proceeds from such remedies Ratably to the Creditors under Section 5(b) of this Agreement ("**Blocking Period**"). All funds received in any deposit account of Borrower subject to an account control agreement during such Blocking Period for the benefit of the Administrative Agent and the Lenders shall be maintained in such deposit account and held for the Ratable benefit of the Creditors until disbursed in accordance with Section 5 of this Agreement.

(h)       If a Triggering Event of the type referred to in clause (b) of the definition of Triggering Event shall have occurred and is continuing, at the request of the Administrative Agent, Borrower shall (subject to Swap Counterparties' netting and setoff rights) be deemed to have requested that Swap Counterparties, and Swap Counterparties may, notwithstanding the existence of the Blocking Period, make payments of any amounts due and owing from such Swap Counterparty to Borrower under the Swap Documents to the Collateral Agent to be distributed in accordance with Section 5(b).

5.       Proceeds.

(a)       The Secured Parties hereby agree among themselves that (i) prior to the occurrence and continuance of a Triggering Event, each Secured Party shall be entitled to receive and retain for its own account, and shall never be required to disgorge to the Collateral Agent or

any other Secured Party or acquire direct or participating interests in the Loan Obligations or the Swap Obligations owing to such Secured Party, scheduled payments or voluntary prepayments, payments of principal, interest, fees, settlement payments and any other payments in respect of the Principal Agreements, all in compliance with the terms thereof, and (ii) after the occurrence and during the continuance of a Triggering Event (and during the Blocking Period), all such amounts (other than any netting or setoff rights, which are acknowledged to be for the sole benefit of the relevant Swap Counterparty, notwithstanding Sections 4 and 5 hereof) shall be treated as if constituting Proceeds and shall be shared by the Creditors Ratably and in accordance with this Section 5.

      (b)      After the occurrence and during the continuance of a Triggering Event, all Proceeds received by any Secured Party shall be applied in accordance with this Section 5. If any Secured Party (including the Collateral Agent) shall obtain or receive any amount or payment in respect of Total Obligations owed to such Secured Party other than in accordance with this Section 5, such Secured Party shall notify each Creditor and the Collateral Agent thereof and shall promptly pay (in the case of the Collateral Agent, to the extent in its possession) such amount (less any reasonable costs and expenses incurred by such Secured Party in obtaining such amount) to the Collateral Agent for the account of the Secured Parties, to be shared in accordance with Section 5(c).

      (c)      After the occurrence and during the continuance of a Triggering Event, all Proceeds received by Collateral Agent shall be applied in the following order (it being agreed that the Collateral Agent shall, within a commercially reasonable time following the receipt thereof, distribute to each of the Administrative Agent and Swap Counterparties its Ratable share of all Proceeds in the following order of priority; <u>provided</u> that such Proceeds shall not be so applied until such time as the amount of the Total Obligations and the applicable breakdown of such Total Obligations owed to the Administrative Agent and each Swap Counterparty has been determined in accordance with the terms hereof and under the terms of the relevant Loan Documents or Swap Documents, as applicable, including and subject to Section 5(d) below):

      **First**, to the payment of all amounts payable under this Agreement, the Fee Letter (as defined in the Credit Agreement) or any of the Security Instruments on account of the Collateral Agent's fees and any reasonable fees, costs and expenses (including, without limitation, reasonable fees and expenses of counsel to the Collateral Agent) or other liabilities of any kind incurred by, or indemnities in favor of, the Collateral Agent or any co-trustee, custodian or agent of the Collateral Agent in connection with this Agreement or any Security Instrument or the Collateral Agent performing its obligations hereunder or thereunder;

      **Second**, Ratably to the Administrative Agent and each Swap Counterparty, respectively, until the Total Obligations then owing are fully satisfied;

      **Third**, to the Administrative Agent in satisfaction of any other indebtedness of the Loan Parties, other than the Loan Obligations or the Swap Obligations, secured by the Security Instruments; and

**Fourth**, to the extent that any Proceeds remain after the full and indefeasible payment of all of the amounts described in the preceding paragraphs, to Borrower or as a court of competent jurisdiction may direct.

In connection with the application of Proceeds pursuant to this Section 5(c), except as otherwise directed in writing by the Controlling Party, the Collateral Agent may sell any non-cash proceeds for cash prior to the application of the proceeds thereof in accordance with the UCC.

(d)    Upon receipt of any of the Proceeds referred to in Section 5(c), the Collateral Agent shall promptly provide notice to the Administrative Agent and each Swap Counterparty of the receipt of such Proceeds. As soon as is reasonably practicable after the receipt of such notice, the Administrative Agent and each Swap Counterparty shall give the Collateral Agent a written certification by an authorized officer or representative thereof of the aggregate amount of the Loan Obligations or Swap Obligations (as applicable) then outstanding owed to the Secured Parties represented by such Creditor under the Loan Documents or Swap Documents (as applicable) to be certified to as presently due and owing (and, promptly upon receipt thereof, the Collateral Agent shall provide a copy of each such certification to each other Creditor). Unless otherwise directed by a court of competent jurisdiction, the Collateral Agent may conclusively rely on such certifications and shall use the information provided for in such certifications as the basis for applying the Proceeds in accordance with Section 5(c). If a Creditor fails to provide such certification within thirty (30) days of the date such Creditor receives notice from the Collateral Agent of receipt of Proceeds referred to in Section 5(c), (x) the Collateral Agent shall send a subsequent notice to such Creditor of its receipt of Proceeds, and (y) such Creditor shall have an additional fifteen (15) days from its receipt of such subsequent notice to provide such certification to the Collateral Agent. If no such certification has been provided by the expiration of such additional fifteen (15) day period, the Collateral Agent shall assume the Loan Obligations or Swap Obligations due and owing to such Creditor are zero ($0) for purposes of the application of Proceeds under Section 5(c). Notwithstanding the foregoing, and for the avoidance of doubt, the Collateral Agent may apply Proceeds in accordance with clause "First" of Section 5(c) at any time following its receipt thereof, regardless whether or not the certifications referred to in this clause (d) have been received by the Collateral Agent.

6.    <u>No Implied Duty</u>. The Collateral Agent will not have any fiduciary duties nor will it have responsibilities or obligations other than those responsibilities and obligations expressly assumed by it in this Agreement and the Security Instruments. The Collateral Agent will not be required to take any action that is contrary to applicable law or any provision of this Agreement or the Security Instruments. Without limiting the generality of the foregoing, (a) the Collateral Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Triggering Event has occurred and is continuing, (b) the Collateral Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Collateral Agent is instructed in writing to exercise by the Controlling Party; *provided* that the Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Collateral Agent to liability or that is contrary to this Agreement or any Security Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under the Bankruptcy Code, and (c) the Collateral Agent shall not have any duty to disclose, nor shall it be liable for the

18

failure to disclose, any information relating to any Loan Party or affiliate thereof that is communicated to or obtained by the Collateral Agent.

7.        Appointment of Agents and Advisors. The Collateral Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it, and will not be responsible for any misconduct or negligence on the part of any of them. The Collateral Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective affiliates. The exculpatory and indemnification provisions of this Agreement and the Security Instruments shall apply to any such sub-agent and to the affiliates of the Collateral Agent and any such sub-agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Agreement and the Security Instruments shall apply to any such sub-agent and to the affiliates of any such sub-agent as if such sub-agent and affiliates were named herein. Collateral Agent shall not incur any liability for any action or inaction taken by a sub-agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Collateral Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

8.        Other Agreements. The Collateral Agent has accepted and is bound by the Security Instruments executed by the Collateral Agent as of the date of this Agreement and, as directed by the Controlling Party, the Collateral Agent shall execute additional Security Instruments delivered to it after the date of this Agreement; provided, however, that such additional Security Instruments do not adversely affect the rights, privileges, benefits and immunities of the Collateral Agent.

9.        Solicitation of Instructions.

        (a)        The Collateral Agent may at any time solicit written confirmatory instructions from the Administrative Agent or any Swap Counterparty or request an order of a court of competent jurisdiction as to any action that it may be requested or required to take, or that it may propose to take, in the performance of any of its obligations under this Agreement or the Security Instruments and may suspend performance of such obligations as it determines to be appropriate until it receives such instructions or order.

        (b)        No written direction given to the Collateral Agent by the Administrative Agent or any Swap Counterparty that in the sole judgment of the Collateral Agent imposes, purports to impose or might reasonably be expected to impose upon the Collateral Agent any obligation or liability not set forth in or arising under this Agreement and the Security Documents will be binding upon the Collateral Agent unless the Collateral Agent elects, at its sole option, to accept such direction.

10.        Documents in Satisfactory Form. The Collateral Agent will be entitled to require that all agreements, certificates, opinions, instruments and other documents at any time submitted to it, including those expressly provided for in this Agreement, be delivered to it in a form and with substantive provisions reasonably satisfactory to it.

11.        Entitled to Rely. The Collateral Agent may seek and rely upon, and will be fully protected in relying upon, any judicial order or judgment, upon any advice, opinion or statement of legal counsel, independent consultants and other experts selected by it in good faith and upon any

19

certification, instruction, notice or other writing delivered to it by the Borrower in compliance with the provisions of this Agreement or delivered to it by the Administrative Agent or any Swap Counterparty, without being required to determine the authenticity thereof or the correctness of any fact stated therein or the propriety or validity of service thereof. The Collateral Agent may act in reliance upon any instrument comporting with the provisions of this Agreement or any signature reasonably believed by it to be genuine and may assume that any Person purporting to give notice or receipt or advice or make any statement or execute any document in connection with the provisions hereof or the Security Instruments has been duly authorized to do so. To the extent an Officers' Certificate or opinion of counsel is required or permitted under this Agreement to be delivered to the Collateral Agent in respect of any matter, the Collateral Agent may rely conclusively on such Officers' Certificate or opinion of counsel as to such matter and such Officers' Certificate or opinion of counsel shall be full warranty and protection to the Collateral Agent for any action taken, suffered or omitted by it under the provisions of this Agreement and the Security Instruments.

12.     Triggering Event. The Collateral Agent will not be required to inquire as to the occurrence or absence of any Triggering Event and will not be affected by or required to act upon any notice or knowledge as to the occurrence of any Triggering Event unless and until it receives from the Administrative Agent or any Swap Counterparty, as applicable, written notice stating that a Triggering Event has occurred and is continuing.

13.     Actions by Collateral Agent. The Collateral Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the Security Instruments or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Collateral Agent shall have received written instructions in respect thereof from the Controlling Party and, upon receipt of such instructions from the Controlling Party, the Collateral Agent shall be entitled to act or (where so instructed) refrain from action, or to exercise such power, discretion or authority, in accordance with such instructions.

14.     Security or Indemnity in favor of the Collateral Agent. The Collateral Agent will not be required to advance or expend any funds or otherwise incur any financial liability in the performance of its duties or the exercise of its powers or rights hereunder unless it has been provided with security or indemnity reasonably satisfactory to it against any and all liability or expense which may be incurred by it by reason of taking or continuing to take such action.

15.     Rights of the Collateral Agent; Certain Acknowledgments.

        (a)     In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in any Security Instrument, the terms and provisions of this Agreement shall supersede and control the terms and provisions of such Security Instrument. In the event there is any bona fide, good faith disagreement between the other parties to this Agreement or any of the Security Instruments resulting in adverse claims being made in connection with Collateral held by the Collateral Agent and the terms of this Agreement or any of the Security Instruments do not unambiguously mandate the action the Collateral Agent is to take or not to take in connection therewith under the circumstances then existing, or the Collateral Agent is in doubt as to what action it is required to take or not to take hereunder or under the Security Instruments,

it will be entitled to refrain from taking any action (and will incur no liability for doing so) until directed otherwise in writing by a request signed by the Controlling Party or by order of a court of competent jurisdiction.

(b)       The Collateral Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Security Instrument, any Loan Document or any Swap Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any of the Security Instruments or Loan Documents or Swap Documents, (iv) the validity, enforceability, effectiveness or genuineness of any Security instrument or Loan Document or Swap Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in any Security Instrument or Loan Document or Swap Document.

(c)       The Administrative Agent (on behalf of the Lenders) and each Swap Counterparty acknowledges that it has, independently and without reliance upon the Collateral Agent and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the Swap Documents or the Loan Documents, as applicable. The Administrative Agent (on behalf of the Lenders) and each Swap Counterparty also acknowledges that it will, independently and without reliance upon the Collateral Agent and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon any Loan Document or Swap Document, any related agreement or any document furnished thereunder. The Collateral Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Credit Agreement Secured Party or any Swap Counterparty with any credit or other information with respect to any Borrower or Affiliate thereof.

(d)       It is acknowledged and agreed by the Administrative Agent (on behalf of the Lenders), each Swap Counterparty and each Loan Party that the Collateral Agent (i) has undertaken no analysis of the Security Instruments or the Collateral and (ii) has made no determination as to (x) the validity, enforceability, effectiveness or priority of any Liens granted or purported to be granted pursuant to the Security Instruments or (y) the accuracy or sufficiency of the documents, filings, recordings and other actions taken, or to be taken, to create, perfect or maintain the existence, perfection or priority of the Liens granted or purported to be granted pursuant to the Security Instruments. The Collateral Agent shall be entitled to assume that all Liens purported to be granted pursuant to the Security Instruments are valid and perfected Liens having the priority intended by the Secured Parties and the Security Instrument.

16.      Limitations on Duty of Collateral Agent in Respect of Collateral.

(a)       Beyond the exercise of reasonable care in the custody of Collateral in its possession, the Collateral Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon. The Collateral Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Collateral Agent will not be liable or responsible for any loss or diminution in the value of

KE 58235869.4

any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith.

(b)     The Collateral Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Collateral Agent as determined by a court of competent jurisdiction in a final and non-appealable judgment, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any Loan Party to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Collateral Agent hereby disclaims any representation or warranty to the present and future holders of the Total Obligations concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

17.     <u>Assumption of Rights, Not Assumption of Duties</u>. Notwithstanding anything to the contrary contained herein:

(a)     each of the parties thereto will remain liable under each of the Security Instruments (other than this Agreement) to the extent set forth therein to perform all of their respective duties and obligations thereunder to the same extent as if this Agreement had not be executed;

(b)     the exercise by the Collateral Agent of any of its rights, remedies or powers hereunder will not release such parties from any of their respective duties or obligations under the Swap Instrument; and

(c)     the Collateral Agent will not be obligated to perform any of the obligations or duties of any of the parties thereunder other than the Collateral Agent.

18.     <u>Collateral Expenses</u>. Borrower agrees to pay, promptly upon demand:

(a)     all reasonable, out-of-pocket costs and expenses incurred by the Collateral Agent and its agents in the preparation, execution, delivery, filing, recordation, administration or enforcement of this Agreement or any Security Instrument or any consent, amendment, waiver or other modification relating hereto or thereto;

(b)     all reasonable out-of-pocket fees, expenses and disbursements of legal counsel and any auditors, accountants, consultants or appraisers or other professional advisors and agents engaged by the Collateral Agent incurred in connection with the negotiation, preparation, closing, administration, performance or enforcement of this Agreement and the Security Instruments or any consent, amendment, waiver or other modification relating hereto or thereto and any other document or matter requested by any Borrower;

(c)     all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and its agents in creating, perfecting, preserving, releasing or enforcing the Collateral

22

Agent's Liens on the Collateral, including filing and recording fees, expenses and taxes, stamp or documentary taxes and search fees;

(d)     all other reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and its agents in connection with the negotiation, preparation and execution of the Security Instruments and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby or the exercise of rights or performance of obligations by the Collateral Agent thereunder; and

(e)     after the occurrence of any Triggering Event, all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and its agents in connection with the preservation, collection, foreclosure or enforcement of the Collateral subject to the Security Instruments or any interest, right, power or remedy of the Collateral Agent or in connection with the collection or enforcement of any of the Total Obligations or the proof, protection, administration or resolution of any claim based upon the Total Obligations in any Insolvency or Liquidation Proceeding, including all reasonable out-of-pocket fees and disbursements of attorneys, accountants, auditors, consultants, appraisers and other professionals engaged by the Collateral Agent or its agents.

The Borrower also agrees to pay the fees set forth in the Fee Letter (as defined in the Credit Agreement) at such times as required under the Fee Letter and (y) such other compensation to the Collateral Agent and its agents as the Borrower and the Collateral Agent may agree in writing from time to time. Each of the parties hereto hereby acknowledges and agrees that the Fee Letter shall constitute a Security Instrument, a Swap Document and a Loan Document, and all fees, costs, expenses and compensation payable thereunder shall constitute Total Obligations secured equally and ratably by the Collateral. All of the agreements in this Section 18 will survive repayment of all Total Obligations and the removal or resignation of the Collateral Agent. The Borrower hereby acknowledges and agrees that the fee and expense reimbursements set forth in this Section 18 are in addition to, and not in replacement of, the fee and expense reimbursements provided by the Borrower under the Credit Agreement

19.   Indemnity.

(a)     The Borrower agrees to defend, indemnify, pay and hold harmless the Collateral Agent and each of its Related Parties (each of the foregoing, an "**Indemnitee**") from and against any and all Indemnified Liabilities, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE**; *provided*, no Indemnitee will be entitled to indemnification hereunder with respect to any Indemnified Liability to the extent such Indemnified Liability is found by a final order of a court of competent jurisdiction which is no longer subject to appeal to have resulted from the gross negligence or willful misconduct of such Indemnitee. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 19(a) may be unenforceable in whole or in part because they are violative of any law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them. The Borrower hereby

23

acknowledges and agrees that the indemnities set forth in this Section 19(a) are in addition to, and not in replacement of, the indemnities provided by the Borrower under the Credit Agreement.

(b)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Collateral Agent (or any sub-agent thereof) or any Related Party thereof under Section 18 or Section 19(a), each of the Administrative Agent (on behalf of the Lenders) and each Swap Counterparty severally agrees to pay to the Collateral Agent (or any such sub-agent thereof) or such Related Party of the Collateral Agent (or any such sub-agent thereof), as the case may be, its Ratable share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought using for purposes of this Section 19(b) the Outstanding Amount of Loan Obligations and Swap Obligations (or if such unreimbursed amount or indemnity payment is sought after the Discharge of Credit Facility Obligations and Discharge of Swap Obligations has occurred, in accordance with its Ratable share (calculated for purposes of this Section 19(b) by using the Outstanding Amount of Loan Obligations and Swap Obligations) immediately prior to the date on which the Discharge of Credit Facility Obligations and Discharge of Swap Obligations has occurred)) of such unpaid amount. By accepting the benefits hereof, each Lender hereby (i) agrees to indemnify the Collateral Agent (or any sub-agent thereof) or any Related Party thereof for any amounts that would be payable by the Administrative Agent under this Section 19(b) in accordance with the provisions of the Credit Agreement (including Section 10.03(e) thereof) and (ii) acknowledges and agrees that the indemnities set forth in this Section 19(b) are in addition to, and not in replacement of, the indemnities provided by the Lenders under the Credit Agreement. Each Lender (by accepting the benefits hereof) and each Swap Counterparty hereby authorizes the Administrative Agent or the Collateral Agent to set off and apply any and all amounts at any time owing to such Lender or Swap Counterparty under this Agreement, any Security Instrument, any Loan Document (if applicable) or otherwise payable by the Administrative Agent or the Collateral Agent to such Lender or Swap Counterparty from any source against any amount due to the Collateral Agent under this paragraph (b).

Upon demand by the Collateral Agent, the Administrative Agent and each Swap Counterparty shall give the Collateral Agent a written certification by an authorized officer or representative thereof of the aggregate amount of the Loan Obligations or Swap Obligations (as applicable) then outstanding owed to the Secured Parties represented by such Creditor under the Loan Documents or Swap Documents (as applicable) to be certified to as presently due and owing (and, promptly upon receipt thereof, the Collateral Agent shall provide a copy of each such certification to each other Creditor). The Collateral Agent may conclusively rely on such certifications and may use the information provided for in such certifications as the basis for determining the amounts owing by each of the individual Creditors to the Collateral Agent under this Section 19(b). For the avoidance of doubt, the failure of any Creditor to provide the Collateral Agent with any certification required hereunder shall not relieve such Creditor of its obligations under this Section 19(b).

(c)     All amounts due under this Section 19 will be payable upon demand.

(d)     No claim shall be made by any party hereto or any Related Party of any party hereto against any other party hereto or any Related Party of any party hereto on any theory of liability for any lost profits or special, indirect, or consequential damages or (to the fullest extent a claim for such damages may lawfully be waived) any punitive damages arising out of, in

24

connection with, or as a result of, this Agreement or any Security Instrument or Loan Document or Swap Document or any agreement or instrument or transaction contemplated hereby or relating in any respect to any Indemnified Liability, and each Loan Party, each Swap Counterparty, the Collateral Agent and the Administrative Agent (on behalf of the Lenders) hereby forever waives, releases and agrees not to sue any other party hereto or any Related Party of any party hereto upon any claim for any such lost profits or special, indirect, consequential or (to the fullest extent lawful) punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(e)     The agreements in this Section 19 will survive repayment of the Total Obligations and the removal or resignation of the Collateral Agent.

20.    <u>Limitation of Liability – Collateral Agent</u>. Neither Collateral Agent nor any of its Related Parties shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Controlling Party (or such other Secured Parties as required herein) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment, and then only for direct damages to the extent provided by law. Collateral Agent shall not be responsible in any manner to any other party for the effectiveness, enforceability, genuineness, validity or the due execution of the Security Instruments or for any representation, warranty, document, certificate, report or statement made in or in connection with the Security Instruments or be under any obligation to any other party to ascertain or inquire as to the performance or observation of any of the terms, covenants or conditions of any of the Loan Documents or the Swap Documents on the part of any Loan Party.

21.    <u>Limitation of Liability – Agent and Swap Counterparties</u>. None of any Swap Counterparty, the Administrative Agent, the Collateral Agent or any Related Party of any of the foregoing shall incur any liability to the other except for liabilities arising from its gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment. None of any Swap Counterparty, the Administrative Agent, the Collateral Agent or any Related Party of any of the foregoing shall incur any liability to Borrower or any other Person except for liabilities arising from its gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment.

22.    <u>Term</u>. Subject to Section 24 below, this Agreement shall terminate upon (i) the Discharge of Credit Facility Obligations and the Discharge of Swap Obligations and (ii) the execution and delivery of a written termination notice signed by the Administrative Agent and each of the Swap Counterparties.

23.    <u>Removal and Resignation of Collateral Agent</u>. The Collateral Agent shall not be removed as Collateral Agent except with the prior written consent of each Swap Counterparty and the Majority Lenders under the Credit Agreement. The Administrative Agent and each Swap Counterparty agree to notify Borrower promptly of any removal of Collateral Agent. The Collateral Agent may resign at any time by giving not less than 30 days' prior written notice of resignation to the Borrower, the Administrative Agent and each Swap Counterparty. Upon any such resignation, the Controlling Party shall have the right to appoint a successor with, so long as no event of default under the Credit Agreement or event of default or termination event under the Swap Documents has occurred and is continuing, the consent of the Borrower (not to be

25

unreasonably withheld, conditioned or delayed). If no successor shall have been so appointed by the Controlling Party and approved by the Borrower (if applicable) and shall have accepted such appointment within 30 days after such retiring Collateral Agent gives notice of its resignation (or such earlier day as shall be agreed in writing by the Controlling Party) (the "<u>Resignation Effective Date</u>"), then such retiring Collateral Agent or any other Creditor may (but shall not be obligated to), on behalf of the Secured Parties with, so long as no event of default under the Credit Agreement or event of default or termination event under any Swap Document has occurred and is continuing, the consent of the Borrower (not to be unreasonably withheld, conditioned or delayed), appoint a successor Collateral Agent which shall be a bank with an office in New York, New York (or a bank having an Affiliate with such an office) having a combined capital and surplus that is not less than $500,000,000 or an Affiliate of any such bank. Whether or not a successor has been appointed, the resigning Collateral Agent's resignation shall become effective on the Resignation Effective Date. With effect from the Resignation Effective Date (1) the retiring Collateral Agent shall be discharged from its duties and obligations hereunder and under the Security Instruments (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring Collateral Agent, all payments, communications, actions and determinations provided to be made or taken by, to or through the Collateral Agent shall instead be made or taken by or to the Controlling Party directly, and except as provided in clause (1), the Controlling Party shall act as Collateral Agent hereunder in accordance with the terms and conditions hereof, until such time, if any, as the Controlling Party, other Creditor or Collateral Agent appoints a successor Collateral Agent as provided for above. Upon or following its resignation, the Collateral Agent agrees to execute and deliver assignments, in form and substance mutually satisfactory to the Collateral Agent and the Creditors, to the successor Collateral Agent of the rights of the mortgagee or the secured party, as the case may be, under the Security Instruments. Such assignments shall be prepared at the expense of Borrower. Borrower hereby consents to such assignments. Upon the acceptance of any appointment as a Collateral Agent hereunder by a successor entity, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of such retiring Collateral Agent (other than any rights to indemnity payments or other amounts owed to the retiring Collateral Agent as of the Resignation Effective Date), and such retiring Collateral Agent shall have no further duties, responsibilities or liabilities under this Agreement or the Security Instruments (if not already discharged therefrom as provided above in this Section), but shall remain entitled to the benefit of the indemnification of the Collateral Agent provided in this Agreement and to reimbursement, in accordance with applicable provisions of this Agreement, of expenses incurred in the discharge of the duties of the Collateral Agent prior to the effective date of such resignation.

24.     <u>Survival of Rights</u>. All of the respective rights and interests of the Administrative Agent, the Collateral Agent and each Swap Counterparty under this Agreement (and the respective obligations and agreements of each Swap Counterparty, the Administrative Agent and the Collateral Agent under this Agreement), shall remain in full force and effect regardless of:

(a)     any lack of validity or enforceability of any of the Loan Documents or the Swap Documents or any other agreement or instrument related thereto; or

26

(b)     any other circumstance which might otherwise constitute a defense available to, or discharge of, any Loan Party with respect to the Loan Obligations or the Swap Obligations (other than the defense that such obligations have been fully satisfied).

25.     <u>Representations and Warranties</u>. Each of the Administrative Agent, each Swap Counterparty, Borrower and Collateral Agent represents and warrants to the other parties hereto that:

(a)     neither the execution and delivery of this Agreement nor its performance of or compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, any other agreement to which it is now subject, including, but not limited to, any of the Loan Documents or the Swap Documents;

(b)     it has all requisite authority to execute, deliver and perform its obligations under this Agreement; and

(c)     this Agreement constitutes its legal, valid, and binding obligation, enforceable against it in accordance with its terms, subject only to applicable bankruptcy, insolvency or similar laws and general principles of equity.

26.     <u>Further Assurances</u>. Each of the Administrative Agent, each Swap Counterparty, Borrower and Collateral Agent covenants that, as long as this Agreement remains in effect, it will execute and deliver any and all other documents or instruments reasonably requested by the other to give effect to the terms and conditions of this Agreement.

27.     <u>Assignment; Agreement Binding on Successors and Assigns</u>. As long as this Agreement remains in effect, no Swap Counterparty will sell, assign or otherwise transfer all or any part of the Swap Obligations, unless the assignee is already a party to this Agreement or executes and delivers to the Collateral Agent a Joinder Supplement. This Agreement shall inure to the benefit of, and shall be binding upon and enforceable against, each Loan Party, the Administrative Agent, each Swap Counterparty and Collateral Agent and their respective successors and permitted assigns. Any sale, assignment or transfer to any Person of any Swap Counterparty's rights or interests in the Swap Obligation made in violation of the provisions of this Section 27 shall be void *ab initio*.

28.     <u>Additional Swap Counterparties</u>. Each of the parties hereto hereby agrees that, notwithstanding anything to the contrary contained herein, in any Security Instrument, in the Credit Agreement, in any other Loan Document or in any Swap Document, no Person providing any swap or hedge agreement to any Loan Party may become a secured party under any Security Instrument after the date hereof until such Person (i) is determined to be acceptable to the Majority Lenders as evidenced by their written consent (a copy of which shall have been provided to the Collateral Agent), (ii) agrees to be bound by the terms of this Agreement as a "Swap Counterparty" by executing and delivering a Joinder Supplement in the form of Exhibit A hereto to the Collateral Agent and the Borrower and (iii) provides the Collateral Agent with all documentation and other information that the Collateral Agent requests in order to comply with the Collateral Agent's obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October

26, 2001)), and the results of any such "know your customer" or similar investigation conducted by the Collateral Agent shall be satisfactory to the Collateral Agent. In each case, upon execution and delivery of such Joinder Supplement by such Person, Collateral Agent and Borrower, such Person shall be deemed a Swap Counterparty hereunder as if an original signatory. Joinder Supplements executed pursuant to this Section 28 do not require the signatures or consents of all Creditors party to this Agreement. Promptly after execution of any such Joinder Supplement, the Borrower will endeavor to send a copy thereof to each other Swap Counterparty, but failure or delay in doing so will not make such Joinder Supplement void or voidable or otherwise affect the rights and duties of the parties hereto.

29.     <u>Notice</u>. Unless otherwise provided, any consent, request, notice, or other communication under or in connection with this Agreement must be in writing to be effective and shall be deemed to have been given (a) if by mail, on the third Business Day after it is enclosed in an envelope and properly addressed, stamped, sealed, certified return receipt requested, and deposited in the appropriate official postal service, or (b) if by courier, electronic transmissions, or facsimile transmission, when actually delivered; provided, however, that any notice provided to Morgan Stanley under this Agreement must also be sent by facsimile transmission to such Person. Until changed by a subsequent notice delivered in accordance with this Section 29, notices for each party are to be directed to:

>       For delivery to NextEra:

>       NextEra Energy Marketing, LLC
>       700 Universe Blvd.
>       Juno Beach, FL 33408
>       Attn: Contracts/Legal Department
>       Facsimile: (561) 625-7504

>       For delivery to Cargill:

>       Cargill, Incorporated
>       9350 Excelsior Boulevard
>       Hopkins, Minnesota 55343-9439
>       Attn: Credit/CRM Administration
>       Facsimile: (952) 984-3763

>       For delivery to a Swap Party (other than the Initial Swap Party):

>       As set forth in the Joinder Supplement pursuant to which it became a party hereto.

>       For delivery to any Loan Party:

>       c/o Gastar Exploration Inc.
>       1331 Lamar, Suite 650
>       Houston, Texas 77010
>       Attention:

KE 58235869.4

Michael A. Gerlich
Senior Vice President and
Chief Financial Officer
Facsimile No. (713) 739-0458
email: mgerlich@gastar.com

Trent Determan, Vice-President Finance
Facsimile No. (713) 739-0458
email: tdeterman@gastar.com

For delivery to Administrative Agent or Collateral Agent:

Wilmington Trust, National Association
Rodney Square, 1100 North Market Street
Wilmington, DE 19890
Attention: Jennifer K. Anderson
Facsimile No. (302) 636-4145
email: JKAnderson@wilmingtontrust.com

with a copy to:

Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
Attention: Alan Glantz
Facsimile No, (212) 836-6763
email: Alan.Glantz@APKS.com

30.     Amendments. This Agreement may only be waived, amended, modified, or terminated by a written agreement signed by the Administrative Agent, the Collateral Agent and each Swap Counterparty.

31.     Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

32.     Governing Law; Jurisdiction; Consent to Service of Process.

        (a)     THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES (BUT GIVING EFFECT TO SECTION 5 1401 OF THE NEW YORK GENERAL OBLIGATION LAW).

29

(b)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to above. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 29. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

33.     <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

34.     <u>Headings</u>. Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

35.     <u>Conflicts</u>. In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any Security Instrument, the provisions of this Agreement shall control.

36.     <u>No Liability for Clean Up of Hazardous Materials</u>. In the event that the Collateral Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which the Collateral Agent determines (in its sole discretion) may cause the Collateral Agent to be

30

considered an "owner or operator" under any environmental laws or otherwise cause the Collateral Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Collateral Agent reserves the right, instead of taking such action, either to resign as Collateral Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Collateral Agent will not be liable to any Person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

37.     Delay and Waiver. No failure to exercise, no course of dealing with respect to the exercise of, and no delay in exercising, any right, power or remedy arising under this Agreement or any of the Security Instruments will impair any such right, power or remedy or operate as a waiver thereof. No single or partial exercise of any such right, power or remedy will preclude any other or future exercise thereof or the exercise of any other right, power or remedy. The remedies herein are cumulative and are not exclusive of any remedies provided by law.

38.     Patriot Act. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust or other legal entity the Collateral Agent will ask for documentation to verify its formation and existence as a legal entity. The Collateral Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

39.     Counterparts. This Agreement may be executed in any number of counterparts (including by facsimile or electronic mail), each of which when so executed and delivered will be deemed an original, but all such counterparts together will constitute but one and the same instrument.

*(Signatures appear on following pages)*

N WITNESS WHEREOF, the parties have executed this Intercreditor Agreement as of the date first hereinabove written.

**NEXTERA ENERGY MARKETING, LLC:**

By: _____
Name:
Title:

SIGNATURE PAGE TO SWAP INTERCREDITOR AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Intercreditor Agreement as of the date first hereinabove written.

**CARGILL, INCORPORATED:**

By: _____

Name:

Title:  Authorized Signer

SIGNATURE PAGE TO SWAP INTERCREDITOR AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Intercreditor Agreement as of the date first hereinabove written.

**ADMINISTRATIVE AGENT:**

WILMINGTON TRUST,
NATIONAL ASSOCIATION, as
Administrative Agent

By: _____
Name:
Title:

**COLLATERAL AGENT:**

WILMINGTON TRUST,
NATIONAL ASSOCIATION, as
Collateral Agent

By: _____
Name:
Title:

SIGNATURE PAGE TO SWAP INTERCREDITOR AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Intercreditor Agreement as of the date first hereinabove written.

**BORROWER:**

**GASTAR EXPLORATION INC.**

By: _____
Name:
Title:

SIGNATURE PAGE TO SWAP INTERCREDITOR AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Intercreditor Agreement as of the date first hereinabove written.

**GUARANTORS:**

**[NORTHWEST PROPERTY VENTURES LLC]**

By: _____
Name:
Title:

SIGNATURE PAGE TO SWAP INTERCREDITOR AGREEMENT

**Exhibit A**

**JOINDER SUPPLEMENT**

This Joinder Supplement (this "<u>Supplement</u>"), dated as of _____, is executed by _____ ("<u>New Swap Counterparty</u>"), Gastar Exploration Inc. ("<u>Borrower</u>"), and Wilmington Trust, National Association, as Collateral Agent (in such capacity, together with its successors and assigns in such capacity, "<u>Collateral Agent</u>").

All capitalized terms used herein but not defined herein shall have the meanings set forth in the Agreement (as defined below).

**W I T N E S S E T H:**

WHEREAS, the Loan Parties, Collateral Agent, Wilmington Trust, National Association, as administrative agent for the Lenders and [          ] have heretofore executed and delivered to Collateral Agent that certain Intercreditor Agreement dated as of [●], 2019 (as from time to time amended, modified, supplemented or restated, the "<u>Agreement</u>"), providing for, among other matters, the relative rights and obligations and apportionment of certain collections among Creditors (as defined therein), and the exercise of certain remedies under the Security Instruments (as defined therein);

WHEREAS, the Agreement provides that one or more additional Persons may become Swap Counterparties thereunder if each such Person is acceptable to the Majority Lenders as a "Qualified Counterparty" under the Credit Agreement and executes and delivers a Joinder Supplement as provided in the Agreement; and

WHEREAS, New Swap Counterparty desires to become a Swap Counterparty under the Agreement.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, New Swap Counterparty, Collateral Agent and Borrower hereby agree as follows:

1.     <u>Recognition</u>. New Swap Counterparty hereby represents and warrants that it is acceptable to the Majority Lenders as a "Qualified Counterparty" under the Credit Agreement as evidenced by their written consent.

2.     <u>Agreement to be Bound</u>. New Swap Counterparty hereby (i) agrees to be bound by all of the terms and provisions of the Agreement as a Swap Counterparty thereunder and (ii) and agrees to perform and observe as a Swap Counterparty each of the covenants, agreements, terms, conditions, obligations, duties, promises and liabilities applicable to a "Swap Counterparty" under the Agreement (including, without limitation, those set forth in Section 19 of the Agreement) as if it were an original signatory thereto. New Swap Counterparty acknowledges and agrees that the terms of the Agreement shall control over the terms of the Principal Agreements to which New Swap Counterparty is a party, to the extent any conflict exists between the Agreement and such Principal Agreements.

3.    <u>Ratification of Agreement; Joinder Supplement Part of Agreement</u>. This Joinder Supplement shall form a part of the Agreement for all purposes. Except as expressly supplemented hereby, the Agreement is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.

4.    <u>Collateral Agent Makes No Representation</u>. Collateral Agent makes no representation as to the validity or sufficiency of the Security Instruments, and New Swap Counterparty acknowledges, consents to, and accepts the disclaimers by, and limitations on the liability of, Collateral Agent that are provided in the Agreement.

5.    <u>Representations and Warranties of New Swap Counterparty</u>. New Swap Counterparty represents and warrants to the other Creditors that:

(a)    neither the execution and delivery of this Supplement or the Agreement nor its performance of or compliance with the terms and provisions hereof or thereof will conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, any other agreement to which it is now subject;

(b)    it has all requisite authority to execute, deliver and perform its obligations under this Supplement and the Agreement; and

(c)    each of this Supplement and the Agreement constitutes its legal, valid, and binding obligation, enforceable against it in accordance with its terms, subject only to applicable bankruptcy, insolvency or similar laws and general principles of equity.

6.    <u>Counterparts</u>. The parties may sign any number of copies of this Joinder Supplement, and different parties may sign on different signature pages. Each signed copy shall be an original, but all of them together shall represent the same supplemental agreement.

7.    <u>Address for Notices</u>. All notices and other communications given to New Swap Counterparty under the Agreement may be given at its address or telecopier number as follows:

[New Swap Counterparty]
[Address]
Attention:
Telecopier No.:

*[remainder of page left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Joinder Supplement to be duly executed as of the date first above written.

NEW SWAP COUNTERPARTY:   [_____]

By:
Name:
Title:

BORROWER:   GASTAR EXPLORATION INC.

By:
Name:
Title:

COLLATERAL AGENT:   WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By:
Name:
Title:

**Schedule 1**

**Listing of Certain Security Instruments**

[Third Amended and Restated Pledge and Security Agreement, dated as of March 3, 2017, by and among Gastar Exploration Inc., certain of its subsidiaries party thereto and Wilmington Trust, National Association, as collateral agent.

Amended and Restated First Lien Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production, dated as of March 3, 2017, executed and delivered by Gastar Exploration Inc., as mortgagor, to Wilmington Trust, National Association, as mortgagee.

Amended and Restated First Lien Wellbore Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production, dated as of March 3, 2017, executed and delivered by Gastar Exploration Inc., as mortgagor, to Wilmington Trust, National Association, as mortgagee.

Master Reaffirmation and Assignment and Assumption of Liens and Security Interests, dated as of March 3, 2017, by and among Gastar Exploration Inc., Wells Fargo Bank National Association, as resigning agent, Wilmington Trust, National Association, as successor administrative agent, and Ares Management, LLC.

Assignment and Assumption of Deposit Account and Sweep Investment Control Agreement, dated as of March 3, 2017, by and among Wells Fargo Bank, National Association, as resigning first lien agent, Wilmington Trust, National Association, as resigning second lien trustee and collateral agent, Wilmington Trust, National Association, as successor first lien agent and successor second lien agent.

Assignment and Assumption of Securities Account Control Agreement, dated as of March 3, 2017, by and among Wells Fargo Bank, National Association, as resigning first lien agent, Wilmington Trust, National Association, as resigning second lien trustee and collateral agent, Wilmington Trust, National Association, as successor first lien agent and successor second lien trustee and collateral agent.][2]

---

[2]     To be updated

S1-1

## EXHIBIT F

### Schedule of Retained Causes of Action

Article S of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action

and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Article S of the Plan, the following Exhibit F(i) through Exhibit F(v) (each of which is attached hereto) include specific types of Causes of Actions expressly preserved by the Debtors or the Reorganized Debtors including:

Exhibit F(i):  Claims Related to Insurance Policies;

Exhibit F(ii):  Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation;

Exhibit F(iii):  Claims Related to Accounts Receivable and Accounts Payable;

Exhibit F(iv):  Claims Related to Contracts and Leases; and

Exhibit F(v):  Claims Related to Liens.

For the avoidance of doubt, subject to the applicable consent rights contained in the Plan, the Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

## <u>EXHIBIT F(i)</u>

### Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified herein, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  There is no schedule to this <u>Exhibit F(i)</u>.

**<u>EXHIBIT F(ii)</u>**

**Claims, Defenses, Cross-Claims, and Counter-Claims
Related to Litigation and Possible Litigation**

      Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, including, without limitation, those litigation, arbitration, or other types of adversarial proceedings or dispute resolution proceedings, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto.

## GASTAR EXPLORATION INC.: ONGOING LITIGATION
Updated 12-13-18

| Case Style/Matter | Case No., County, and filing date |
|---|---|
| Tributary Resources, LLC v. Enervest Operating, Inc., et al. | CV-17-48<br>Kingfisher County<br>4/25/17 (amended 5/23/17) |
| James G. Fulmer, and individual, and Gary Earl Brown, and individual, v. Oklahoma Energy Acquisitions, LP, Gastar Exploration Inc., and Midwest Resources, LLC | CJ-17-50<br>Kingfisher County<br>7/14/17 |
| Tributary Resources, LLC v. Husky Ventures, Inc., et al. | CV-17-92<br>Kingfisher County<br>8/1/17 |
| Chisholm Trail project; Gastar, Texas Raw, Gold Star, and Oljeinvest | Chisholm Trail Project, Garfield and Kingfisher Counties |
| Gastar Exploration Inc., John Henry Haymaker and Karen Anne Cox Haymaker, v. Review Oil & Gas, Inc. | CV-18-23<br>Kingfisher County<br>3/2/18 |
| Gastar Exploration Inc., Gerald F. Felber and Betty Felber, Trustees of the Gerald F. Felber Living Trust Dated November 11, 1998; and Cole Ream  v. Jerry Sanner Family LP, et al. | CJ-18-115-02<br>Garfield County<br>4/19/18 |
| Bromiley Oil, LLC v. Gastar Exploration Inc. | |
| The Braden Companies, Inc. v. Gastar Exploration Inc. | CJ-18-61<br>Kingfisher County<br>7/25/18 |
| Charles LaPorte and Nancy K. Laporte, v. Gastar Exploration Inc. | CV-18-99<br>Kingfisher County<br>8/3/18 |
| Charles E. Bertrand and Debra K. Bertrand v. GST | |

| Case Style/Matter | Case No., County, and filing date |
|---|---|
| Lisa Griggs, and April Marler, on behalf of themselves and other Oklahoma citizens similarly situated vs. New Dominion LLC, TNT Operating Company, Inc., White Operating Company, Rainbo Service Company, Gastar Exploration, Inc., Dryes Corner LLC, Chesapeake Operating LLC, Devon Energy Production Company, LP, Special Energy Production Co LP, Orca Operating Company LLC, White Star Petroleum, LLC, Equal Energy US Inc., Elder Craig Oil and Gas LLC, D&B Operating LLC, M  Energy Inc., Dakota Exploration LLC, Wicklund Petroleum Corporation, Kirkpatrick Oil Company Inc., Toomey Oil Company Inc, Chaparral Energy LLC, East OK Pipeline LLC, Mid-Con Energy Operating LLC, Midstates Petroleum Company and Territory Resources LLC and John Does 1 through 25 | CJ-2017-74<br>Logan County, OK<br>7/21/17 |
| Allied Mineral Management, LLC, an Oklahoma limited liability company vs. Red Bluff Resources Operating, LLC, a foreign limited liability company | CJ17-36<br>Kingfisher County, OK<br>6/12/17 |
| Tributary Resources, LLC vs Red Bluff Resources Operating, LLC; Gastar Exploration, Inc.; Southern Resources, Inc.; Chesapeake | CV-2018-14<br>Kingfisher County, OK<br>1/30/2018 |
| PennMarc Resources II, LP, et al vs. Gastar Exploration USA, Inc., et al | 17-C-214<br>Marshall County, WV<br>10/25/17 |
| Venable Royalty,  Ltd. And Venro Ltd. Vs. Gastar Exploration USA, Inc. et al. | 18-C-227<br>Marshall County, WV<br>10/11/2018 |
| Texas Raw Oil & Gas Inc.; Gold Star Energy LLC; Oljeinvest LLC<br>v.<br>Gastar Exploration Inc.; Gastar Exploration USA Inc.; Gastar Exploration Texas LLC; Gastar Exploration Texas LP; Gastar Exploration Ltd. | CJ-2018-85 Davis<br>10/16/2018 |
| Gastar Exploration Inc. v. Christopher MacArthur | 2015-77605<br>Harris County, TX<br>12/29/2015 |
| Eagle Natrium LLC v. Gastar Exploration USA, Inc. | GD-14-7208<br>Allegheny County, Pennsylvania<br>4/22/2014 |

## **EXHIBIT F(iii)**

### **Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money or any other property or obligations to the Debtors or Reorganized Debtors.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe money or any other property or obligation to them.  There is no schedule to this Exhibit F(iii).

## EXHIBIT F(iv)

### Claims Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtors expressly reserve the Causes of Action based in whole or in part upon any and all contracts and leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever.  The claims and Causes of Actions reserved include, without limitation Causes of Action against vendors, suppliers of goods or services, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) counter-claims and defenses related to contractual obligations; (g) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (h) any accumulated service credits, both those that may apply to future vendor invoices and those from which the Debtors may be entitled to receive a refund.  There is no schedule to this Exhibit F(iv).

## EXHIBIT F(v)

**Claims Related to Liens**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.  There is no schedule to this Exhibit F(v).

## **EXHIBIT G**

**Assumed Executory Contracts and Unexpired Leases List**

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| AEGIS Energy Risk, LLC | Gastar Exploration USA, Inc. | Finance | Amendment to Agreement dated September 24, 2013 | $ 0.00 |
| AEGIS Energy Risk, LLC | Gastar Exploration USA, Inc. | Finance | Hedge Strategy Agreement | $ 0.00 |
| Union Plaza, LLC | Gastar Exploration USA, Inc. | Office Lease | Office Lease-Union Plaza | $ 0.00 |
| Union Plaza, LLC | Gastar Exploration Inc. | Office Lease | First Amendment to Office Lease dated Aug. 1, 2013 | $ 0.00 |
| Ricoh USA, Inc. | Gastar Exploration Texas, LP | Office Lease | Image Management Plus Agreement | $ 0.00 |
| Pitney Bowes, Inc. | Gastar Exploration, LTD | Office Lease | Digital Mailing Lease | $ 0.00 |
| Crescent HC Investors, L.P. | Gastar Exploration, LTD | Office Lease | Office Lease | $ 0.00 |
| Crescent Property Services, Inc. | Gastar Exploration, LTD | Office Lease | Office Lease First Amendment Rider | $ 0.00 |
| Crescent HC Investors, L.P. | Gastar Exploration, LTD | Office Lease | First Amendment to Office Lease | $ 0.00 |
| Crescent HC Investors, L.P. | Gastar Exploration, LTD | Office Lease | Second Amendment to Office Lease | $ 0.00 |
| Crescent HC Investors, L.P. | Gastar Exploration, LTD | Office Lease | Third Amendment to Office Lease | $ 0.00 |
| Crescent HC Investors, L.P. | Gastar Exploration, LTD | Office Lease | Fourth Amendment to Office Lease | $ 0.00 |
| Crescent HC Investors, L.P. | Gastar Exploration, LTD | Office Lease | Fifth Amendment to Office Lease | $ 0.00 |
| Crescent 4HC Investors LLC | Gastar Exploration USA, Inc. | Office Lease | Sixth Amendment to Office Lease | $ 0.00 |
| Crescent 4HC Investors LLC | Gastar Exploration Inc. | Office Lease | Seventh Amendment to Office Lease | $ 0.00 |
| Crescent 4HC Investors LLC | Gastar Exploration Inc. | Office Lease | Eighth Amendment to Office Lease | $ 0.00 |
| Crescent 4HC Investors LLC | Gastar Exploration Inc. | Office Lease | Ninth Amendment to Office Lease | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Barry 1-6H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Bear Claw 1-28H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Biggio 1909 7-1LOH Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Bradbury 28-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Burton 16-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Danny Ray 1-30H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Deep River 30-1MH Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Emmerich 1-16H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Geis 31-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Geis 31-1H Compressor #2 Compressor facility | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Hobbs Ranch 1-19H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Holiday Road 2-1H Compressor #2 Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Jones 1-21H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Joyce 1-10H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Katy 21-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Kodiak 1-29H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Kramer 29-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Kramer 29-1H Compressor #2 Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Ma Stucki 30-1H Compressor #2 Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression McGee 29-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Michael J 1-18H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Sasquatch 1-23H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Sieber 1-31H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Snowman 1-19H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Swart 1-3H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Tomahawk 7-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Townsend 6-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Unruh 1-34H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Vaverka 1-20H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Victoria 25-1H Compressor facility | $ 0.00 |
| Great Plains Gas Compression Holdings, LLC | Gastar Exploration, LTD | Compressor Agreement | Gas Compression Yeti 1-29H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Anna Lee 1-30H Compressor facility | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Barney 1808 35-1MH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Barr 1807 35-1LOH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Best 20-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Bigfoot 1-9H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Biggio 1909 7-1LOH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Bledsoe 1-28H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Boss Hog 1-14H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Breckenridge 1-2H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Broadhead 2007/34-1LOH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Cakes 1907 22-1LOH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Chicken Man 2008 26-1LOH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Cline 1-13H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Coronado 1-3H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Dorothy 1-12H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Dr J 1808/7-1UOH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Eldon 34-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Falcon 1-5H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Gamebird 1-7H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Great Divide 12-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Gritz 1-7H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Gungoll 20-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Hane 14-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Harold & Dorothy 1907 6-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Henley1-11H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Homier 1808 36-1MH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Hubbard 1-23H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Huntsberger 1-3H Compressor facility | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Ingle 29-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Ingle 29-1H Compressor #2 Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Jam 1-4H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Jet 1-12H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Johnny 32-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Liebhart 1-31H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Lilly 28-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Lilly 28-1H Compressor #2 Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Mott 1-19H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Mott 20-2H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Ohm 28-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Ohm 28-1H Compressor #2 Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Pedlik 10-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Pollard Farm 1806/ 7-1LOH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Pudge 1908 28-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Snowden 27-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Stitt 32-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Thrasher 1-1H Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Weber 1806 15-1MH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Winfield 1807 31-1MH Compressor facility | $ 0.00 |
| Heartland Compression Services | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Yogi 1808/8-1UOH Compressor facility | $ 0.00 |
| J-W Power Company | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Bagwell 1808 24-1H Compressor facility | $ 0.00 |
| J-W Power Company | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Bennie Racer 14-1H Compressor facility | $ 0.00 |
| J-W Power Company | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Meritt 12-1H Compressor facility | $ 0.00 |
| J-W Power Company | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Milacek 2007 21-1H Compressor facility | $ 0.00 |
| J-W Power Company | Gastar Exploration Inc. | Compressor Agreement | Gas Compression Mott 19-1H Compressor facility | $ 0.00 |
| Michael Gerlich | Gastar Exploration Inc. | HR | Retention Bonus Agreement | $ 0.00 |
| BDO USA, LLP | Gastar Exploration Inc. | HR | Agreement to Provide Services | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| Henry Hansen | Gastar Exploration Inc. | HR | Separation and Release Agreement | $ 0.00 |
| J. Russell Porter | Gastar Exploration Inc. | HR | Separation and Release Agreement | $ 0.00 |
| Jerry R. Schuyler | Gastar Exploration Inc. | HR | Employment Agreement | $ 0.00 |
| Jerry R. Schuyler | Gastar Exploration Inc. | HR | KEIP Agreement | $ 0.00 |
| Keith Blair | Gastar Exploration Inc. | HR | Separation and Release Agreement | $ 0.00 |
| Michael Gerlich | Gastar Exploration Inc. | HR | Employment Agreement | $ 0.00 |
| Michael Gerlich | Gastar Exploration Inc. | HR | Incentive Payment Agreement | $ 0.00 |
| P2 ES Holdings, Inc. | Gastar Exploration Inc. | HR | Master Agreement | $ 0.00 |
| Stephen Roberts | Gastar Exploration Inc. | HR | Employment Agreement | $ 0.00 |
| Stephen Roberts | Gastar Exploration Inc. | HR | Incentive Payment Agreement | $ 0.00 |
| Stephen Roberts | Gastar Exploration Inc. | HR | KEIP Agreement | $ 0.00 |
| Trent Determann | Gastar Exploration Inc. | HR | Employment Agreement | $ 0.00 |
| Trent Determann | Gastar Exploration Inc. | HR | Incentive Payment Agreement | $ 0.00 |
| Trent Determann | Gastar Exploration Inc. | HR | KEIP Agreement | $ 0.00 |
| Wailua Technology Co. | Gastar Exploration Inc. | HR | Service Contract | $ 0.00 |
| Koch Supply & Trading, LP | Gastar Exploration USA, Inc. | ISDA | Schedule to 1992 Master Agreement | $ 0.00 |
| Morgan Stanley Capital Group Inc. | Gastar Exploration Inc. | ISDA | 2002 Master Agreement | $ 0.00 |
| NextEra Energy Marketing, LLC | Gastar Exploration Inc. | ISDA | Schedule to 1992 Master Agreement | $ 0.00 |
| 4AM Midstream, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| 4J Energy, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Carrera Gas Companies, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Glass Mountain Pipeline, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Great Salt Plains Midstream Holding, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| 3Bear Energy, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Midcon Gathering, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| TexStar Midstream Logistics, LP | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Tauber Oil Company | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Valiant Midstream, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Velocity Midstream Partners, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Hudsonfield Marketing LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Ironwood Midstream Energy Partners, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Legion Energy Services, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Lagoon Water Logistics LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Mainline Energy Partners, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Overflow Energy LLC. | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| S&S Star Operating, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Solaris Midstream Holdings, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| Waterbridge Resources, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Whetstone Midstream LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Multifuels Midstream Group, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Zephyr SWD, LLC | Gastar Exploration Inc. | Confidentiality Agreement | Confidentiality Agreement | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | 2017 Pipeline Divestment | Assignment and Bill of Sale | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | 2017 Pipeline Divestment | Asset Purchase Agreement | $ 0.00 |
| CP Energy, LLC | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Lease Crude Oil Purchase Agreement | $ 0.00 |
| Enterprise Crude Oil LLC | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Confirmation of Amendment | $ 0.00 |
| Gilliland Oil and Gas Inc. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Confirmation of Amendment | $ 0.00 |
| MVPurchasing, LLC | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Lease Crude Oil Purchase Agreement | $ 0.00 |
| Phillips 66 Company | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Lease Crude Oil Purchase Agreement Amendment | $ 0.00 |
| Phillips 66 Company | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Lease Crude Oil Purchase Agreement Amendment | $ 0.00 |
| Phillips 66 Company | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Lease Crude Oil Purchase Agreement | $ 0.00 |
| RoseRock Midstream Crude L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Rose Rock Midstream Crude L.P. Contract #: GAF17TP019979 | $ 0.00 |
| Shell Trading (US) Company | Gastar Exploration Inc. | Crude Oil Purchase Agreement | STUCSO CONTRACT REF: CLP0001922 - Amendment 001 | $ 0.00 |
| Shell Trading (US) Company | Gastar Exploration Inc. | Crude Oil Purchase Agreement | STUCSO CONTRACT REF: CLP0001922 | $ 0.00 |
| Shell Trading (US) Company | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Conoco 2017 General Provisions and Shell Trading (US) Company's 2018 Amendments | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals & Price Amendments | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals & amendments | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - 2017 Bigfoot Payment | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals & amendments | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals & amendments | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| | | | Additional terminals & amendments | |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Revised Pricing | $ 0.00 |
| Suncoco Partners Marketing & Terminals L.P. | Gastar Exploration Inc. | Crude Oil Purchase Agreement | Crude Oil Purchase Agreement Sunoco Partners Reference No. 503988 - Additional terminals & amendments | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract EDM0035PUR | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract EDM1544532 | $ 0.00 |
| Phillips 66 Natural Gas Company | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract EDM1544532 | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1337PUR & OKR 0987-000 | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1369PUR - Amendment: Termination Notice & Add Exhibit D Gas Lift Terms | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1369PUR - Amendment: Termination Notice & Added Commitments | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1369PUR - Amendment | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1369PUR - Amendment | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1369PUR - Amendment | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1369PUR - Amendment: Partial Termination | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1369PUR - Amendment: Partial Termination | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1581PUR | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1764PUR | $ 0.00 |
| DCP Midstream, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Contract OKR1191000 | $ 0.00 |
| Enable Midstream Partners | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | EGP & EOIT System Fuels | $ 0.00 |
| Enable Gathering & Processing, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Purchase Agreement | $ 0.00 |
| EnLink Oklahoma Gas Processing, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Amendment No. 1 to Gas Gathering, Processing and purchase Agreement | $ 0.00 |
| EnLink Oklahoma Gas Processing, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Gathering, Processing and Purchase Agreement | $ 0.00 |
| EnLink Oklahoma Gas Processing, LP | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Memorandum of Gas Gathering, Processing and Purchase Agreement | $ 0.00 |
| ETC Filed Services LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Gathering and Purchase Agreement | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Second Amended and Restrated Gas Purchase Agreement | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | First Amended and Restrated Gas Purchase Agreement | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | First Amendment to Second Amended and Restated Gas Purchaase Agreement | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Second Amendment to the second amended and restated gas purchase agreement | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Purchase Agreement | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Consent to Disclosure | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Memorandum of Agreement | $ 0.00 |
| Kingfisher Midstream, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Memorandum of Agreement | $ 0.00 |
| MarkWest Oklahoma Gas Company LLC | Gastar Exploration Inc. | Gas Gathering Processing & | GGPA24402 | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| | | Purchase Agreements | | |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | First Amendment to Gas Gathering and Processing Agreement | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Second Amendment to Gas Gathering and Processing Agreement | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Third Amendment to Gas Gathering and Processing Agreement | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Fourth Amendment to Gas Gathering and Processing Agreement | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Gathering and Processing Agreement | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0317 Barney 1808 35-1Mh Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0312 Barr 1807 35-1LOH | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0321 Dr J 1808 7-1UOH Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0356 Franchise 1808 20-1MH Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0219 Geis 31-H Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0316 Homier 1808 36-1MH Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0249 Johnny 32-1H Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0220 Kramer 29-1H Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0237 Ma Stucki 30-1H Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0378 Sweetness 1808 21-1MH Well | $ 0.00 |
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0315 Windield 1807 31-MH Well | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| MarkWest Oklahoma Gas Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | 055-0320 Yogi 1808 8-1UOH Well | $ 0.00 |
| Mustang Gas Products LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Purchase Contract | $ 0.00 |
| Mustang Gas Products, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Memorandum of Agreement | $ 0.00 |
| Mustang Gas Products, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Purchase Agreement | $ 0.00 |
| ONEOK Field Services Company, L.L.C. | Gastar Exploration USA, Inc. | Gas Gathering Processing & Purchase Agreements | Termination of Gas Purchase Contract | $ 0.00 |
| ONEOK Field Services Company, L.L.C. | Gastar Exploration USA, Inc. | Gas Gathering Processing & Purchase Agreements | Termination of Gas Purchase Contract | $ 0.00 |
| ONEOK Field Services Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Amendment to the Gas Purchase Agreement | $ 0.00 |
| ONEOK Field Services Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Amendment to the Gas Purchase Agreement | $ 0.00 |
| ONEOK Field Services Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Purchase Agreement | $ 0.00 |
| Southwest Energy | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Base Contract for Sale and Purchase of Natural Gas | $ 0.00 |
| Superior Pipeline Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Purchase Agreement | $ 0.00 |
| SEI Energy, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Purchase Agreement | $ 0.00 |
| Superior Pipeline Company, L.L.C. | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Lift Agreement | $ 0.00 |
| Tall Oak Midcon, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Gas Gathering and Processing Agreement | $ 0.00 |
| Great Salt Plains Midstream Holding, LLC | Gastar Exploration Inc. | Gas Gathering Processing & Purchase Agreements | Change of Ownership Letter | $ 0.00 |
| Chaparral Energy, LLC | Gastar Exploration USA, Inc. | NonOp Agreements | Agency Agreement Dover Unit (Blue Jay) #1MH-22 | $ 0.00 |
| Chaparral Energy, LLC | Gastar Exploration Inc. | NonOp Agreements | Gas Marketing Agreement Sydena 1807 #1UMH-29 | $ 0.00 |
| Chesapeake Operating LLC | Gastar Exploration Inc. | NonOp Agreements | Marketing Arangements for Brown 31-18-7 1H | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| Chesapeake Operating LLC | Gastar Exploration Inc. | NonOp Agreements | Marketing Arangements for Eugene 29-18-6 1H | $ 0.00 |
| Chesapeake Operating LLC | Gastar Exploration Inc. | NonOp Agreements | Marketing Arrangements for States 15-18-6 4HC | $ 0.00 |
| Chesapeake Operating LLC | Gastar Exploration Inc. | NonOp Agreements | Marketing Arrangements for Vincent 15-18-7 1H | $ 0.00 |
| Cimarex Energy Co. | Gastar Exploration Inc. | NonOp Agreements | Natural Gas Purchase Agreement Ella 1-5H | $ 0.00 |
| Cimarex Energy Co. | Gastar Exploration Inc. | NonOp Agreements | Natural Gas Purchase Agreement Heupel 17-13-6 1XH | $ 0.00 |
| Continental Resources Inc. | Gastar Exploration Inc. | NonOp Agreements | Marketing Election Lacretia 1-29-20XH | $ 0.00 |
| Crawley Exploration Corporation | Gastar Exploration Inc. | NonOp Agreements | Gas Marketing Election Form Barry Bollenbach 1-4H | $ 0.00 |
| Crawley Exploration Corporation | Gastar Exploration Inc. | NonOp Agreements | Gas Marketing Election Form Barry Bollenbach 1-9H | $ 0.00 |
| Crawley Exploration Corporation | Gastar Exploration Inc. | NonOp Agreements | Gas Marketing Election Form Glaesline #1-22MH | $ 0.00 |
| Crawley Exploration Corporation | Gastar Exploration Inc. | NonOp Agreements | Gas Marketing Election Form Hajek # 1-6MH | $ 0.00 |
| Crawley Exploration Corporation | Gastar Exploration Inc. | NonOp Agreements | Gas Marketing Election Form Irving 1-31MH | $ 0.00 |
| Devon Energy Production Company LP | Gastar Exploration Inc. | NonOp Agreements | Marketing Arrangements for: Hazel 1, Hazel 2, Hazel 4-26, Janice 1, Kunneman 2-R, Paul Kunneman 1, Sonoyta 2623-3AH | $ 0.00 |
| Devon Energy Production Company LP | Gastar Exploration Inc. | NonOp Agreements | Marketing Arrangement Agreement Sonoyta 23_26 3HX | $ 0.00 |
| Newfield Exploration Mid-Continent Inc. | Gastar Exploration Inc. | NonOp Agreements | Natural Gas Marketing Agreement | $ 0.00 |
| Newfield Exploration Mid-Continent Inc. | Gastar Exploration Inc. | NonOp Agreements | Natural Gas Marketing Agreement | $ 0.00 |
| Newfield Exploration Mid-Continent Inc. | Gastar Exploration Inc. | NonOp Agreements | Natural Gas Marketing Agreement | $ 0.00 |
| Newfield Exploration Mid-Continent Inc. | Gastar Exploration Inc. | NonOp Agreements | Natural Gas Marketing Agreement | $ 0.00 |
| Newfield Exploration Mid-Continent Inc. | Gastar Exploration Inc. | NonOp Agreements | Natural Gas Marketing Agreement | $ 0.00 |
| Payrock Energy LLC | Gastar Exploration Inc. | NonOp Agreements | Waiver of Marketing Fee: Savage 1306 1-1MH | $ 0.00 |
| Kerry Stitt | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Gary Mueggenborg | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Max Vincent | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Gary Mueggenborg | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Gary Mueggenborg | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Charles Grimes | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Barry K. Bollenbach | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| Barry K. Bollenbach | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Barry K. Bollenbach | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| LaDonna Meinders | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| A. Scott Bollenbach | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| A. Scott Bollenbach | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Clint Duffy | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Eldon Snowden and Janice Snowden | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Gary Stinebring Jr. | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| WJW Ranch LLC | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Theodore R. Mack | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Wilfred Dean Janky | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| Marion D. Bledsoe and Patricia J. Bledsoe | Gastar Exploration Inc. | Surface Agreements | Water Right of Way Easement / Water Use Agreement | $ 0.00 |
| MJ Systems Inc. | Gastar Exploration USA, Inc. | License Agreement | Raster Image Well Logs and LogSleuth Software | $ 0.00 |
| D&T GUNGOLL EXPLORATION, LLC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| ELMIRA JANE GUNGOLL, WIDOW OF BRUCE GUNGOLL | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| ADW PRODUCTION LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - CHARLES V. LONG | $ 0.00 |
| ALAL FINLEY | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - ALAN FINLEY | $ 0.00 |
| ARCADIA RESOURCES, LP | Gastar Exploration USA, Inc. | PSA | PURCHASE AND SALE AGREEMENT | $ 0.00 |
| ARCADIA RESOURCES, LP | Gastar Exploration USA, Inc. | PSA | PURCHASE AND SALE AGREEMENT - CHESAPEAKE ET AL TO GST | $ 0.00 |
| B-55 INVESTMENTS LTD | Gastar Exploration Inc. | Participation Agreement | PARTICIPATION AGREEMENT | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| BAREN HEALEY 1988 TRUST | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - BAREN HEALEY 1988 TRUST | $ 0.00 |
| BECK RESOURCES, INC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - BECK RESOURCES, INC | $ 0.00 |
| BROMILEY OIL LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - BROMILEY | $ 0.00 |
| BROMILEY OIL LLC | Gastar Exploration Inc. | Participation Agreement | PARTICIPATION AGREEMENT | $ 0.00 |
| BURGHART | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - BURGHART | $ 0.00 |
| CHESAPEAKE EXPLORATION LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - GST AND CHPK | $ 0.00 |
| DENNIS MCCARTY | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - DENNIS MCCARTY | $ 0.00 |
| DEVON ENERGY PROD CO LP | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - DEVON AND GST | $ 0.00 |
| DORADO E&P PARTNERS, LLC | Gastar Exploration Inc. | | ASSIGNMENT AND ASSUMPTION AGREEMENT - DORADO - GST | $ 0.00 |
| EVERETT MANN JR | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - EVERETT MANN JR | |
| FINNEGAN FAMILY ASSOCIATES, LLC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| GILLILAND OIL AND GAS INC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - GILLILAND OIL AND WEAVER ENERGY - GST | $ 0.00 |
| GKK HUSKY LLC | Gastar Exploration Inc. | Purchase Letter | SECOND AMENDMENT TO PURCHASE LETTER - GKK HUSKY/GST | $ 0.00 |
| GOLD STAR ENERGY | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - GOLD STAR ENERGY 3% | $ 0.00 |
| GOLD STAR ENERGY | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - GOLD STAR ENERGY 5% | $ 0.00 |
| GR & MS LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - GR & MS LLC | $ 0.00 |
| GUNGOLL LEPORE OIL AND GAS PROPERTIES, LLC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| HENRY GUNGOLL PROPERTIES, LLC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| HUSKY OKLAHOMA LLC A TX PTSHP | Gastar Exploration Inc. | Purchase Letter | FIRST AMENDMENT TO PURCHASE LETTER - HUSKY OKLAHOMA/GST | $ 0.00 |
| HUSKY OKLAHOMA LLC A TX PTSHP | Gastar Exploration Inc. | Purchase Letter | SECOND AMENDMENT TO PURCHASE LETTER - HUSKY OKLAHOMA/GST | $ 0.00 |
| HUSKY VENTURES, INC. | Gastar Exploration Inc. | PSA | PSA: HUSKY VENTURES INC & GASTAR EXPL USA INC | $ 0.00 |
| HUSKY VENTURES, INC. | Gastar Exploration Inc. | PSA | PA (GASTAR AND HUSKY VENTURES, INC.) CHISHOLM TRAIL PROSPECT | $ 0.00 |
| HUSKY VENTURES, INC. | Gastar Exploration Inc. | PSA | PA (GASTAR AND HUSKY VENTURES, INC.) PRAIRIE GROVE PROSPECT | $ 0.00 |
| HUSKY VENTURES, INC. | Gastar Exploration Inc. | PSA | PA (GASTAR AND HUSKY VENTURES, INC.) CHEROKEE RIDGE PROSPECT | $ 0.00 |
| INTERSTATE EXPLORATIONS LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - GST AND INTERSTATE EXPLORATION (aka FENTER) | $ 0.00 |
| INTERSTATE EXPLORATIONS LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - INTERSTATE - GST | $ 0.00 |
| INVEST - DEVIN NEWBY | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - INVEST - DEVIN NEWBY | $ 0.00 |
| JAX INVESTMENTS, LLC | Gastar Exploration Inc. | PSA | PSA - CRB, JAX & GST | $ 0.00 |
| JAX INVESTMENTS, LLC | Gastar Exploration Inc. | PSA | PURCHASE AND SALE AGREEMENT - CRB RESOURCES - JAX - GASTAR | $ 0.00 |
| JOHN BRUSSEAU | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - JOHN BRUSSEAU | $ 0.00 |
| KIRK MASSEY POA | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - KIRK MASSEY POA | $ 0.00 |
| KLEINHEINZ | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - KLEINHEINZ | $ 0.00 |
| KLEINHEINZ CAPITAL PARTNERS | Gastar Exploration Inc. | Purchase Letter | SECOND AMENDMENT TO THE REVISED OFFER TO PURCHASE LETTER DTD 2/24/17 - KLEINHEINZ/GST | $ 0.00 |
| LIME ROCK RESOURCES II-C, LP | GASTAR EXPLORATION USA, INC. | PSA | AGREEMENT OF SALE AND PURCHASE - LIME ROCK RESOURCES | $ 0.00 |
| LUCAS BRUSSEAU | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - LUCAS BRUSSEAU | $ 0.00 |
| MASSEY | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - MASSEY | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| MICHAEL MCALLEN | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - MICHAEL MCALLEN | $ 0.00 |
| NEWFIELD EXPLORATION MID-CONTINENT INC | GASTAR EXPLORATION USA, INC. | PSA | PURCHASE AND SALE AGREEMENT - GST AND NEWFIELD | $ 0.00 |
| NEWFIELD EXPLORATION MID-CONTINENT INC | Gastar Exploration Inc. | | RECIPROCAL DATA TRADE AND CONFIDENTIALITY AGREEMENT - NEWFIELD - GST WELL DATA TRADE | $ 0.00 |
| NOBLE AMERICAS CORP | Gastar Exploration Inc. | Participation Agreement | PARTICIPATION AGREEMENT | $ 0.00 |
| OKLAHOMA ENERGY ACQUISITIONS LP | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - OEA - GST | $ 0.00 |
| OKLAHOMA ENERGY ACQUISITIONS LP | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT | $ 0.00 |
| OKLAHOMA ENERGY ACQUISITIONS LP | Gastar Exploration Inc. | Letter Agreement | ACREAGE TRADE LETTER AGREEMENT - OEA - GST | $ 0.00 |
| PAUL GENTRY | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - PAUL GENTRY | $ 0.00 |
| PHIL KENDRICK JR | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - PHIL KENDRICK JR | $ 0.00 |
| PILLAR ENERGY | Gastar Exploration Inc. | PSA | PURCHASE AGREEMENT - GST AND PILLAR | $ 0.00 |
| RED BLUFF RESOURCES OPERATION, LLC | Gastar Exploration Inc. | PSA | PURCHASE AND SALE AGREEMENT - RED BLUFF - GST | $ 0.00 |
| REVOLUTION RESOURCES, LLC | Gastar Exploration Inc. | PSA | PURCHASE AND SALE AGREEMENT - WEHLU - GST AND REVOLUTION | $ 0.00 |
| REVOLUTION RESOURCES, LLC | Gastar Exploration Inc. | PSA | FIRST AMENDMENT TO PSA - REVOLUTION - GST | $ 0.00 |
| REVOLUTION RESOURCES, LLC | Gastar Exploration Inc. | PSA | AGREEMENT OF SALE AND PURCHASE - PSA - REVOLUTION | $ 0.00 |
| REVOLUTION RESOURCES, LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - REVOLUTION RESOURCES, LLC | $ 0.00 |
| ROGER HAYES | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - ROGER HAYES | $ 0.00 |
| RONNIE TREAT | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - RONNIE TREAT | $ 0.00 |
| ROSS GOSNEY | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - ROSS GOSNEY | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| SGH PROPERTIES, LLC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| SILVERSTAR OF NEVADA, INC | Gastar Exploration Inc. | PSA | PURCHASE AND SALE AGREEMENT - HUSKY ET AL | $ 0.00 |
| SILVERSTAR OF NEVADA, INC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - HUSKY VENTURES | $ 0.00 |
| SILVERSTAR OF NEVADA, INC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - RESERVED SECTIONS - HUSKY ET AL | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Development Agreement | DEVELOPMENT AGMNT - GST AND STACK EXPLORATION | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Development Agreement | MEMORANDUM OF DEVELOPMENT AGMNT - GST AND STACK EXPLORATION | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Development Agreement | 1ST AMENDMENT TO DEVELOPMENT AGMNT - GST AND STACK EXPLORATION | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Development Agreement | 2ND AMENDMENT TO DEVELOPMENT AGMNT - GST AND STACK EXPLORATION | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Development Agreement | WAIVER OF SUBSEQUENT DEVELOPMENT PLANS AND OPPORTUNITIES - GST AND STACK EXPLORATION | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | | WAIVER OF ADDITIONAL OPPORTUNITIES - GST AND STACK EXPLORATION | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (GEIS) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (GEIS) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (GEIS) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (LILLY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (LILLY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (LILLY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (LILLY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (KRAMER) - GST AND STACK | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (KRAMER) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (KRAMER) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (KRAMER) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | SECOND AMENDMENT TO JOA (KRAMER) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (ELDON) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTAGE AND FINANCING STATEMENT (ELDON) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (ELDON) - GAST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (ELDON) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (ELDON) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (SNOWDEN) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (SNOWDEN) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (SNOWDEN) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (SNOWDEN) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (SNOWDEN) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (BRADBURY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (BRADBURY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (BRADBURY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (BRADBURY) - GST AND STACK | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (BRADBURY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (PICKLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (PICKLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (PICKLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (PICKLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (PICKLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (STITT) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (STITT) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (STITT) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (STITT) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (STITT) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (OHM) GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (OHM) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (OHM) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (OHM) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (OHM) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO THE JOA (OHM) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (MERITT) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (MERITT) - GST AND STACK | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (MERITT) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (MERITT) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (BAGWELL) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (BAGWELL) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (BAGWELL) - GST TO STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (BAGWELL) - GST TO STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO THE JOA (BAGWELL) - GST TO STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (INGLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (INGLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (INGLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (INGLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (INGLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (INGLE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (KATY 21) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (KATY 21) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (KATY 21) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (KATY 21) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDENT TO JOA (KATY) - GST AND STACK | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (KATY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (MOTT 19) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (MOTT 19) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (MOTT 19) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (MOTT 19) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (MOTT 20) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (MOTT 20) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (MOTT 20) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (MOTT 20) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (VICTORIA 25) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (VICTORIA 25) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (VICTORIA 25) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (BEST) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (BEST) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO THE JOA (BEST) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (BEST) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (BEST) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (MA STUCKI) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (MA | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| | | | STUCKI) - GST AND STACK | |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (MA STUCKI) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (MA STUCKI) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (GREAT DIVIDE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (GREAT DIVIDE) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | JOA (JOHNNY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (JOHNNY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (JOHNNY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (JOHNNY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | JOA | 2ND AMENDMENT TO JOA (JOHNNY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (JOHNNY) - GST AND STACK | $ 0.00 |
| STACK EXPLORATION LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (GREAT DIVIDE) - GST AND STACK | $ 0.00 |
| STACK ROYALTY LLC | Gastar Exploration Inc. | JOA | 1ST AMENDMENT TO JOA (VICTORIA 25) - GST AND STACK | $ 0.00 |
| STACK ROYALTY LLC | Gastar Exploration Inc. | Mortgage Agreement | MORTGAGE AND FINANCING STATEMENT (MA STUCKI) - GST AND STACK | $ 0.00 |
| STRONG OIL & GAS LTD | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| TOMMY AND GEORGIANA GUNGOLL | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| TORCHLIGHT ENERGY | Gastar Exploration Inc. | Participation Agreement | PARTICIPATION AGREEMENT | $ 0.00 |
| TRI TEX CAPITAL LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - TRI TEX CAPITAL LLC | $ 0.00 |
| U S ENERGY | Gastar Exploration Inc. | Participation Agreement | PARTICIPATION AGREEMENT - PRAIRIE GROVE - | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| DEVELOPMENT CORPORATION | | | | |
| ZENITH PETROLEUM CORP | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - CHISHOLM TRAIL PROJECT - ZENITH PETROLEUM CORP | $ 0.00 |
| ATWOOD ACQUISITIONS, LLC | Gastar Exploration Inc. | Closing Agreement | CLOSING AGREEMENT - HUSKY/SILVERSTAR/M AXIMUS/ATWOOD/GST | $ 0.00 |
| ATWOOD ACQUISITIONS, LLC | Gastar Exploration Inc. | PSA | PURCHASE AND SALE AGREEMENT - HUSKY ET AL | $ 0.00 |
| ATWOOD ACQUISITIONS, LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - HUSKY VENTURES | $ 0.00 |
| ATWOOD ACQUISITIONS, LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - RESERVED SECTIONS - HUSKY ET AL | $ 0.00 |
| BECK RESOURCES, INC | PARTICIPATION AGREEMENT - BROMILEY OIL LLC | Participation Agreement | PARTICIPATION AGREEMENT | $ 0.00 |
| CAH OIL & GAS CO, LLC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| CHAPARRAL ENERGY LLC | Gastar Exploration Inc. | | OCC APPLICATION PROTESTS - CHAPARRAL ENERGY/GST | $ 0.00 |
| CHESAPEAKE EXPLORATION, LLC | Gastar Exploration Inc. | Purchase Agreement | ACREAGE TRADE AND PURCHASE AGREEMENT | $ 0.00 |
| CHESAPEAKE EXPLORATION, LLC | Gastar Exploration Inc. | PSA | FIRST AMENDMENT TO ACREAGE TRADE AND PURCHASE AGREEMENT DATED 10/1/2014 | $ 0.00 |
| CHESAPEAKE EXPLORATION, LLC | GASTAR EXPLORATION USA, INC. | PSA | PURCHASE AND SALE AGREEMENT - CHESAPEAKE ET AL TO GST | $ 0.00 |
| CHESAPEAKE EXPLORATION, LLC | GASTAR EXPLORATION USA, INC. | Cooperation Agreement | COOPERATION AGREEMENT | $ 0.00 |
| CHESAPEAKE EXPLORATION, LLC | GASTAR EXPLORATION USA, INC. | Cooperation Agreement | COOPERATION AGREEMENT - CHK - GST | $ 0.00 |
| CRAWLEY PETROLEUM CORPORATION | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - AGREEMENT TO TERM ASSIGNMENT - CRAWLEY | $ 0.00 |
| CRB RESOURCES, INC | Gastar Exploration Inc. | PSA | PURCHASE AND SALE AGREEMENT - CRB RESOURCES - JAX - GASTAR | $ 0.00 |
| D & J OIL COMPANY | | JOA | JOA - D & J OIL COMPANY | $ 0.00 |
| GKK HUSKY LLC | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| GKK HUSKY LLC | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| GKK HUSKY LLC | Gastar Exploration Inc. | Purchase Letter | FIRST AMENDMENT TO PURCHASE LETTER - GKK HUSKY/GST | $ 0.00 |
| GKK HUSKY LLC | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| GUNGOLL-AGGAS EXPLORATION, LLC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| HENRY GUNGOLL ASSOCIATES, LLC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| HENRY GUNGOLL OPERATING INC | Gastar Exploration Inc. | Letter Agreement | FARMOUT LETTER AGREEMENT - GUNGOLL & GASTAR (KINGFISHER & GARFIELD COUNTUES) | $ 0.00 |
| HUSKY OKLAHOMA LLC A TX PTSHP | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| HUSKY OKLAHOMA LLC A TX PTSHP | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| HUSKY OKLAHOMA LLC A TX PTSHP | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| HUSKY VENTURES, INC | Gastar Exploration Inc. | Closing Agreement | CLOSING AGREEMENT - HUSKY/SILVERSTAR/MAXIMUS/ATWOOD/GST | $ 0.00 |
| HUSKY VENTURES, INC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - RESERVED SECTIONS - HUSKY ET AL | $ 0.00 |
| JAMESTOWN RESOURCES, LLC | GASTAR EXPLORATION USA, INC. | PSA | PURCHASE AND SALE AGREEMENT | $ 0.00 |
| JAMESTOWN RESOURCES, LLC | GASTAR EXPLORATION USA, INC. | PSA | PURCHASE AND SALE AGREEMENT - CHESAPEAKE ET AL TO GST | $ 0.00 |
| JOHN B KLEINHEINZ | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| JOHN B KLEINHEINZ | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| JOHN B KLEINHEINZ | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| KIRKPATRICK OIL & GAS LLC ET AL | | JOA | JOA - KIRKPATRICK OIL COMPANY, INC | $ 0.00 |
| KLEINHEINZ CAPITAL PARTNERS | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| KLEINHEINZ CAPITAL PARTNERS | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - | $ 0.00 |

| Name of Claimant | Debtor | Contract Type | Contract Description | Cure Amount |
|---|---|---|---|---|
| | | | KLEINHEINZ GROUP/GST | |
| KLEINHEINZ CAPITAL PARTNERS | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| KLEINHEINZ CAPITAL PARTNERS | Gastar Exploration Inc. | Purchase Letter | FIRST AMENDMENT TO PURCHASE LETTER - KLEINHEINZ/GST | $ 0.00 |
| LARCHMONT RESOURCES, LLC | GASTAR EXPLORATION USA, INC. | PSA | PURCHASE AND SALE AGREEMENT | $ 0.00 |
| LARCHMONT RESOURCES, LLC | GASTAR EXPLORATION USA, INC. | PSA | PURCHASE AND SALE AGREEMENT - CHESAPEAKE ET AL TO GST | $ 0.00 |
| LIME ROCK RESOURCES II-A, LP | GASTAR EXPLORATION USA, INC. | PSA | AGREEMENT OF SALE AND PURCHASE - LIME ROCK RESOURCES | $ 0.00 |
| MAXIMUS EXPLORATION, LLC | Gastar Exploration Inc. | Closing Agreement | CLOSING AGREEMENT - HUSKY/SILVERSTAR/MAXIMUS/ATWOOD/GST | $ 0.00 |
| MAXIMUS EXPLORATION, LLC | Gastar Exploration Inc. | PSA | PURCHASE AND SALE AGREEMENT - HUSKY ET AL | $ 0.00 |
| MAXIMUS EXPLORATION, LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - HUSKY VENTURES | $ 0.00 |
| MAXIMUS EXPLORATION, LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - RESERVED SECTIONS - HUSKY ET AL | $ 0.00 |
| OKLAHOMA ENERGY ACQUISITIONS, LP | Gastar Exploration Inc. | PSA | PSA - GST & OEA 'ALTA MESA', KINGFISHER CO. | $ 0.00 |
| SILVERSTAR OF NEVADA INC | Gastar Exploration Inc. | Closing Agreement | CLOSING AGREEMENT - HUSKY/SILVERSTAR/MAXIMUS/ATWOOD/GST | $ 0.00 |
| STRONG OIL & GAS LTD | Gastar Exploration Inc. | Purchase Letter | FIRST AMENDMENT TO PURCHASE LETTER - STRONG O&G/GST | $ 0.00 |
| STRONG OIL & GAS LTD | Gastar Exploration Inc. | Purchase Letter | SECOND AMENDMENT TO PURCHASE LETTER - STRONG O&G/GST | $ 0.00 |
| STRONG OIL & GAS LTD | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| STRONG OIL & GAS LTD | Gastar Exploration Inc. | Purchase Letter | REVISED OFFER TO PURCHASE - KLEINHEINZ GROUP/GST | $ 0.00 |
| T L S OIL AND GAS COMPANY INC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT RE: FRACKING PROCEDURES - ALMONT ENERGY/GST/TLS O&G | $ 0.00 |
| TORCHLIGHT ENERGY RESOURCES, INC | Gastar Exploration Inc. | PSA | PURCHASE AND SALE AGREEMENT - TORCHLIGHT - HUSKY | $ 0.00 |
| WEAVER ENERGY, LLC | Gastar Exploration Inc. | Letter Agreement | LETTER AGREEMENT - GILLILAND OIL AND WEAVER ENERGY - GST | $ 0.00 |

# **EXHIBIT H**

**Rejected Executory Contracts and Unexpired Leases List**

## <u>EXHIBIT I</u>

### New Board of Reorganized Debtors

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire, and the new directors and officers of the Reorganized Debtors shall be appointed by the Consenting Parties.  In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any person proposed to serve on the new board of directors, as well as those persons that will serve as officers of the Reorganized Debtors.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

Unless otherwise provided in the Plan, and subject to Article V of the Plan, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.